**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| MALEEHA AHMAD, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   No. 4:17-cv-2455-RLW |
| | ) |
| CITY OF ST. LOUIS, MISSOURI, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs seek a preliminary injunction ensuring the City of St. Louis and its officers and agents will cease engaging in unconstitutional conduct against individuals observing, recording, or participating in protest activity.

**I.    Factual Background**

A Missouri state court acquitted St. Louis Metropolitan police officer Jason Stockley of first-degree murder on the morning of Friday, September 15, 2017. (Ex. A, Stockley verdict.) Stockley, who is white, had been charged and prosecuted by the St. Louis Circuit Attorney for killing Anthony Lamar Smith, who was African American, in late 2011. Stockley shot Smith—whom he suspected had engaged in a drug deal—at point-blank range after a brief car chase. Stockley asserted the shooting had been in self-defense; the prosecution argued otherwise.

Some members of the community swiftly condemned the verdict, which they view as a product of institutional racism and unfair bias in favor of the police. Public protests began almost immediately and continue every day. It is no secret that the St. Louis Metropolitan Police Department has repeatedly engaged in heavy-handed conduct vis-à-vis the protests. As soon as the afternoon of the verdict, police officers were—without warning or justification—spraying

1

nonviolent protestors with chemical agents. (*See* Ex. B, Ahmad Declaration; Ex. C, Dreith Declaration; Ex. D, Smith Declaration; Ex. E, Wedding Declaration.) Since then, SLMPD officers have continued to deploy chemical agents, including pepper pellets and tear gas, on multiple occasions without adequate justification and without giving constitutionally required notice. (*See, e.g.*, Ex. F, Sommers Declaration; Ex. G, Green Declaration; Ex. H, Rice Declaration; Ex. I, Counihan Declaration; Ex. J, Lewczuk Declaration; Ex. K, Hoffmann Declaration, Ex. Q, Street Declaration, Ex. R, Davis Declaration, all attached hereto.) In fact, SLMPD officers have repeatedly sprayed and gassed nonviolent protestors who criticize the police or record them engaging in intimidation. (*See, e.g.*, Ex. L, Ziegler Declaration; Ex. M, Rose Declaration; Ex. F, Sommers Declaration; Ex. G, Green Declaration; Ex. H, Rice Declaration, Ex. Q, Street Declaration.) Officers have retaliated against livestreamers and videographers by deleting video, conducting unlawful searches, damaging video equipment, using unnecessary force when conducting arrests, and—again—resorting to chemical agents, often at close range and in the eyes. (Ex. N, Mobley Declaration; Ex. L, Ziegler Declaration; Ex. H, Rice Declaration; Ex. F, Sommers Declaration; Ex. O, Thomas Declaration.)

On Sunday, September 17, SLMPD also employed a tactic known as "kettling," trapping protestors (as well as members of the media, legal observers, curious residents who lived nearby, pedestrians out for a walk, and an undercover police officer) in the intersection of Washington and Tucker Avenues. (Ex. M, Rose Declaration; Ex. P, Franks Declaration; Ex. Q, Street Declaration; Ex. R, Davis Declaration; Ex. H, Rice Declaration; Ex. L, Ziegler Declaration; Ex. S, Newbold Declaration; Ex. T, Nelson Declaration; Ex. U, Baude Declaration; Ex. V, Maclean Declaration.) The officers came ready for a fight: they wore personal protective equipment, gas masks and helmets, and they carried full-body shields and batons. Though there was no threat to

their safety, they fanned out along each of the crosswalks, cutting off all routes of egress, and then rushed and arrested the hundred or so people who got caught inside the kettle. Officers sprayed arrestees who were already compliant, subdued, and kneeling or lying on the ground. Many of the arrestees sustained serious injuries. (*See also* Ex. W, Molina Declaration.)[1] Again, as has been their wont, the officers did not provide to the people adequate warning or opportunity to disperse. The police rejoiced in their victory, chanting "Whose streets? Our streets!" after they had arrested the nonviolent people they had trapped and subdued. (Ex. L, Ziegler Declaration; Ex. J, Lewczuk Declaration.)

At times, riot police have given pedestrians no warning at all before deploying chemicals indiscriminately or taking other actions of force. (Ex. B, Ahmad Declaration; Ex. C, Dreith Declaration; Ex. D, Smith Declaration; Ex. E, Wedding Application.) But at other times, the police have provided vague, haphazard instructions in some apparent facsimile of the City's "unlawful assembly" and "failure to disperse" ordinances. (Ex. X, Southwards Declaration.) Even then, the warnings have been far away from the sites of the officers' eventual enforcement, based on constitutionally insufficient cause, and either followed immediately by the use of force (like knocking while opening a door) or too remote in time to justify their actions. (*Id.*; *see also* Ex. V, Maclean Declaration.)

The Stockley protests are not SLMPD's first rodeo with the First Amendment. The St. Louis Metropolitan Police Department has reacted in much the same way on other occasions when St. Louisans have amassed in public places to demonstrate against what they see as police misconduct; that is, with the arbitrary enforcement of vague ordinances and the deployment of

---

[1] Indeed, evidence at the hearing will show that an undercover police officer was among those gathered up, beaten, and arrested.

chemical agents without adequate cause or warning. (*See, e.g.*, Ex. B, Ahmad Declaration; Ex. K, Hoffmann Declaration; Ex. W, Molina Declaration.)

SLMPD's unconstitutional policies and customs have frightened Plaintiffs and chilled their observation of, recording of, and participating in protesting activity. They have refrained from expressive activity they otherwise would have engaged in. (*See* Ex. B, Ahmad Declaration; Ex. C, Dreith Declaration; Ex. N, Mobley Declaration; Ex. V, Maclean Declaration.)

## II. Argument

### A. Preliminary Injunction Standard

When considering whether to issue a preliminary injunction, this Court must determine: (a) whether the plaintiffs are likely to prevail on the merits, (b) if there exists a threat of irreparable harm to the plaintiffs absent the injunction, (c) the balance between this harm and the injury that the injunction's issuance would inflict upon the defendant, and (d) what is in the public interest. *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc*); accord Abdullah v. Cty. of St. Louis*, 52 F. Supp. 3d 936, 943 (E.D. Mo. 2014).

### A. First Amendment Implications

When the government regulates the exercise of First Amendment rights, the burden is on the proponent of the restriction to establish its constitutionality. *Phelps-Roper v. Koster*, 713 F.3d 942, 949 (8th Cir. 2013). Moreover, where a challenged policy restricts First Amendment activity, consideration of the likelihood of success on the merits is decisive to the question of whether an injunction should issue. "In a First Amendment case, . . . the likelihood of success on the merits is often the determining factor in whether a preliminary injunction should issue." *Phelps–Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled on other grounds by Phelps–Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012). "When a plaintiff has shown

4

a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (en banc) (quoting *Phelps–Roper v. Troutman*, 662 F.3d 485, 488 (8th Cir. 2011) (per curiam) (quotation marks omitted)).

In addition to Plaintiffs' First Amendment claims, their unlawful seizure and due process claims should be considered under this framework because, in the context of this case they touch upon First Amendment rights.

      C.     **Likelihood of Success on the Merits**

Plaintiffs are likely to succeed on the merits[2] because the policies or customs of the City of St. Louis violate the First, Fourth, and Fourteenth Amendments.

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012). A policy or custom is unconstitutionally vague where it "does not provide people with fair notice of when their actions are likely to become unlawful," *Stahl v. City of St. Louis, Mo.*, 687 F.3d 1038, 1041 (8th Cir. 2012), and when it "necessarily entrusts lawmaking to the moment-to-moment judgment of the policeman on his beat." *Kolender v. Lawson*, 461 U.S. 352, 360 (1983) (brackets and quotation marks omitted); *see also City of Chicago v. Morales,* 527 U.S. 41, 56 (1999) (plurality opinion).

---

[2]     Because Plaintiffs challenge a municipal policy or custom, not a statute, they demonstrate likelihood of success if they can show a "fair chance of prevailing." *Planned Parenthood Minnesota, N. Dakota, S. Dakota v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) ("[C]ourts should . . . apply the familiar 'fair chance of prevailing' test where a preliminary injunction is sought to enjoin something other than government action based on presumptively reasoned democratic processes.").

5

Defendant has policies or customs of: (a) declaring an unlawful assembly (and thus ordering dispersal) in the absence of the use of force or violence; (b) enforcing vague orders of dispersal that do not specify the area from which dispersal is required and after an extended period of time during which individuals reasonably believe the need for dispersal has ceased; and (c) utilizing chemical agents without first issuing clear and unambiguous warnings that such chemical agents will be utilized; without providing individuals sufficient opportunity to heed the warnings and exit the area; without minimizing the impact of such agents on individuals who are complying with lawful law enforcement commands; and without ensuring that there is a means of safe egress from the area that is available to the individuals; and (d) retaliating against or interfering with people recording video of police in public places. Each of these polices or customs places Plaintiffs and others like them at the arbitrary risk of arrest or infliction of injury. These policies or customs also provide the opportunity for discriminatory enforcement and action based on the content and viewpoint of one's expressive activity.

Because the policies and customs of ordering dispersal, enforcing dispersal orders, and utilizing chemical agents are applied to persons engaged in expressive activity at traditional public fora, these customs or policies must have a "greater degree of specificity" than normally required. *Smith v. Goguen*, 415 U.S. 566, 573 (1974) ("Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the [void-for-vagueness] doctrine demands a greater degree of specificity than in other contexts."); *see also Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 872 (1997) (imposing higher standards for vagueness on criminal laws). Here, as applied against Plaintiffs and others, the policies or customs have *ad hoc*, unascertainable parameters. This provides the public insufficient, if any, notice of what is permissible. That is, individuals are required to steer

6

wide and thereby surrender their First Amendment rights or face the possibility of arrest or assault with chemical agents.

Without clear rules, enforcement of vague dispersal orders and the use of chemical agents on protests without warning is arbitrary. The arbitrary nature of the restrictions is especially problematic where First Amendment freedoms are involved. *See Stahl*, 687 F.3d at 1041-42. As the Supreme Court has observed, "[b]ecause First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963). Thus, "[w]hen speech is involved, rigorous adherence to [due process] requirements is necessary to ensure that ambiguity does not chill protected speech." *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012). Even in the few instances where there has been an interest in safety and public order, the government's interest in "curbing criminal activity . . . . cannot justify legislation that would otherwise fail to meet constitutional standards for definiteness and clarity." *Kolender v. Lawson*, 461 U.S. 352, 361 (1983). Because, as applied, the unlawful assembly and dispersal ordinances allow arbitrary enforcement they thereby "impermissibly delegat[ing] basic policy matters to policemen" in violation of the due process clause. *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972).

Interference with and retaliation for photographing and recording police officers also violates the First Amendment. It is clearly established that "the First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest." *Smith v. Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000); *Glik v. Cunniffe*, 655 F.3d 78, 83 (1st Cir. 2011) (holding that an individual's right to record officers' performance of their duties in public was clearly established); *Fordyce v. City of Seattle*, 55 F.3d 436 (9th Cir. 1995) (holding there is a "First Amendment right to film matters of

7

public interest"); *Turner v. Lieutenant Driver*, 848 F.3d 678, 687-88 (5th Cir. 2017) (establishing a First Amendment right to record police activity); *Fields v. Philadelphia*, 862 F.3d 353, 359-60 (3rd Cir. 2017) (same and commenting that all citizens, not just members of the media, have such a right and that "the act of recording, regardless what is recorded, may improve policing"); *Robinson v. Fetterman*, 378 F. Supp. 2d 534, 542 (E.D. Pa. 2005) (recognizing that there was "no doubt that the free speech clause of the Constitution protected" individuals who videotaped law enforcement officers because "[v]ideotaping is a legitimate means of gathering information for public dissemination and can often provide cogent evidence"); *Ramos v. Flowers*, 429 N.J. Super. 13, 56 A.3d 869 (App. Div. 2012) (ruling that an independent filmmaker had a right to film police in the course of making a documentary film); *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583 (7th Cir. 2012); *Demarest v. Athol/Orange Cmty. Television, Inc.,* 188 F. Supp. 2d 82, 94-95 (D. Mass. 2002) (finding it "highly probable" that filming of a public official on street outside his home by contributors to public access cable show was protected by the First Amendment, and noting that, "[a]t base, plaintiffs had a constitutionally protected right to record matters of public interest"); *Channel 10, Inc. v. Gunnarson,* 337 F. Supp. 634, 638 (D. Minn. 1972) (holding that police interference with television newsman's filming of crime scene and seizure of video camera constituted unlawful prior restraint under First Amendment). Simply put, "a citizen's right to film government officials, including law enforcement officers, in the discharge of their duties in a public space is a basic, vital, and well-established liberty safeguarded by the First Amendment." *Glik*, 655 F.3d at 82; *see also Cumming*, 212 F.3d at 1333 (holding that individual citizens have a First Amendment right, subject to reasonable time, manner, and place restrictions, to photograph or videotape police conduct); *Alvarez,* 679 F.3d 583, 595 (7th Cir. 2012) (recognizing that audio recording of police activity is entitled to some

8

degree of First Amendment protection and "the act of making an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights").

Seizing recording devices, deleting videos, damaging camera equipment, deploying chemical agents against people recording, and retaliating against people recording through the use or threat of force or arbitrary arrest all violate these First Amendment principles. The also constitute unlawful seizures, in violation of the Fourth Amendment, and are perpetrated without fair warning, in violation of the Due Process Clause of the Fourteenth Amendment.

For these reasons, Plaintiffs are likely to prevail on the merits.

### D. Remaining *Dataphase* Factors

When a plaintiff has shown a likely violation of constitutional rights, the other preliminary injunction requirements are generally deemed to have been satisfied. *Swanson*, 692 F.3d at 870; *accord Phelps-Roper v. Cty. of St. Charles*, 780 F. Supp. 2d 898, 900-01 (E.D. Mo. 2011). There is no basis for departing from the general rule here.

A restriction of constitutional rights constitutes irreparable harm. It is well settled that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality); *accord Marcus v. Iowa Pub. Television*, 97 F.3d 1137, 1140-41 (8th Cir. 1996). The alleged deprivation of liberty without due process constitutes irreparable harm. *See Lane v. Lombardi*, No. 2:12-CV-4219-NKL, 2012 WL 5873577, at *6 (W.D. Mo. Nov. 15, 2012). Here, protests are ongoing and will be for the foreseeable future, so the need to vindicate the right to observe, record, and participate in protest activity without being subject to arbitrary mistreatment is urgent.

The balance of equities generally favors the constitutionally protected rights. *Nixon*, 545 F.3d at 690; *accord Lane*, 2012 WL 5873577, at *6. Most of the injunctive relief Plaintiffs seek

9

is derived from the consent decree entered on April 19, 2016, in *United States v. City of Ferguson*, No. 4:16-cv-000180-CDP (E.D. Mo.). These provisions have not prevented the City of Ferguson from pursuing legitimate law enforcement objectives. (*See, e.g.*, Moreover, similar restrictions on the use of chemical agents were previously ordered in *Templeton v. Dotson*, No. 4:14-cv-2019 (CEJ) without demonstrable hardship. The restrictions on interference with recording are similar those in consent judgments entered in *Hussein v. County of St. Louis*, No. 4:14-cv-1410 JAR (E.D. Mo.)—except to the extent Defendant has engaged in more egregious behavior of seizing and deleting recordings. And providing specific dispersal directions (and only when a dispersal order is warranted) is not a significant hardship. Indeed, the City of St. Louis has no significant interest in enforcing unconstitutional customs and policies.

"It is always in the public interest to protect constitutional rights." *Id.* at 689; *see also Doe v. S. Iron R-1 Sch. Dist.*, 453 F. Supp. 2d 1093, 1103 (E.D. Mo. 2006), *aff'd*, 498 F.3d 878 (8th Cir. 2007). The public interest is served by protection of the right to gather on public streets and sidewalks without arbitrary interference.

### III.   Conclusions

For these reasons and those that will be presented at the hearing, Plaintiffs request this Court issue preliminary injunction.

Respectfully submitted,

/s/ Anthony E. Rothert
Anthony E. Rothert, #44827
Jessie Steffan, #64861
ACLU of Missouri Foundation
454 Whittier Street
St. Louis, Missouri 63108
Phone: (314) 652-3114
arothert@aclu-mo.org
jsteffan@aclu-mo.org

10

GILLIAN R. WILCOX, #61278MO
ACLU of Missouri Foundation
406 W 34th Street
Suite 420
Kansas City, Missouri 64111
Phone: (816) 470-9938
gwilcox@aclu-mo.org

**Attorneys for Plaintiffs**

<u>Certificate of Service</u>

A copy of the foregoing was delivered by hand to the City Counselor for the City of St. Louis on September 28, 2017.

/s/ Anthony E. Rothert