UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MALEEHA AHMAD, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:17 CV 2455 CDP |
| | ) | |
| CITY OF ST. LOUIS, MISSOURI, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER OF PRELIMINARY INJUNCTION

This matter is before the Court on plaintiffs' motion for temporary injunction, which is fully briefed.  The Court held a hearing on the motion on October 18, 19, and 23, 2017.  Eighteen witnesses (including four of the plaintiffs) testified on behalf of the plaintiffs, and three witnesses testified for defendant.  The parties also submitted video, photographic, and documentary evidence.  By agreement both sides also submitted additional affidavits and declarations, which they asked the Court to consider as evidence.  Counsel made extensive closing arguments at the conclusion of the hearing.

After careful consideration of all of the evidence, briefs, and arguments of the parties, the Court will grant plaintiffs' motion in certain respects, as set out more fully below and in the accompanying Preliminary Injunction.

<u>Findings of Fact</u>[1]

On September 15, 2017, the Circuit Court for the Twenty-Second Judicial Circuit of Missouri issued its findings and verdict in *State of Missouri v. Stockley*, Cause No. 1622-CR02213-01.  The decision prompted some members of the public to engage in protest activity around the St. Louis metropolitan area, including within the City of St. Louis.  The protests, which began on the morning of September 15, 2017 and have continued to occur regularly since the verdict, concern not only the verdict itself but broader issues, including racism and the use of force by police officers.  The participants often express views critical of police. This case concerns the response to some of these protests by the St. Louis Metropolitan Police Department[2] during the weekend of September 15-17, 2017.

Protest activity began shortly after the announcement of the verdict on the morning of September 15, 2017.   Protesters assembled in front of the state courthouse downtown near Tucker and Market streets.  They did not have a permit to protest because the City of St. Louis does not require, and will not provide, a permit for protests.  Police voluntarily blocked off that intersection to vehicular traffic to allow protesters to march in the streets. The protest was peaceful.   Later that day, the protesters moved down Tucker toward City Hall and the old police

---

[1] Facts and conclusions determined by a court in granting or denying a preliminary injunction are provisional and nonbinding. *See Henderson v. Bodine Aluminum, Inc.*,  70 F.3d 958, 962 (8th Cir. 1995).

[2] The St. Louis Metropolitan Police Department is a department of the City of St. Louis, which is properly named as the defendant in this case.

station at Tucker and Clark.  Corresponding streets were again blocked by police to allow protesters to march in the streets.  Defendant's witnesses testified that during this time period protesters became violent and began throwing objects at police officers.  Plaintiffs' witnesses testified that the protests remained peaceful, they were not violent, and they did not witness any other protesters become violent.

Eventually protesters blocked one or more city buses containing police officers so the buses could not exit the area.  Some protesters, including plaintiff Maleeha Ahmad, were intentionally blocking a bus to prevent it from leaving as an admitted act of civil disobedience.  Lieutenant Timothy Sachs, commander in charge of the Civil Disobedience Team, was in charge of deploying defendant's tactical units and ordered the police officers to get off the bus and form a line to move the protesters away from the bus so it could leave.  Police officers had shields for their bodies and on their helmets.  Officers from the bicycle unit came to assist, placing their bikes in front of and beside their bodies as they moved forward and ordered the protesters to "Get Back!"  The police moved the crowd north of Clark.  Some officers sprayed hand held mace[3] at and on the protesters, including plaintiff Ahmad.  The evidence is disputed as to whether any warnings were given before the deployment of mace at this time.  Ahmad was not arrested for refusing to move when ordered to do so.  The bus was eventually able to exit the area.  Officers were injured in this encounter, and some arrests were made.

---

[3] This is used as a generic term for pepper spray.

Plaintiff Alison Dreith, who was not blocking the bus, testified that she was maced in the face by a police officer without warning.  Darrell Smith gave similar testimony about being maced by officers around this time period without any warning.  Dreith and Smith testified that they were not behaving violently, were not violating any orders of the police when they were maced, and were not arrested.

A police vehicle parked in front of the police station was vandalized around 5:00 p.m. by a person jumping on it.  The person engaged in the vandalism fled the scene when police approached, and the vehicle was moved.  Keith Rose testified that other than the one person who broke the vehicle's windshield, no one else in the area was participating in violent activity.  Rose heard police Sergeant Brian Rossomanno declare an unlawful assembly because the flow of traffic was being impeded.  Police were continuing to block streets to prevent vehicular traffic from moving through this area at the time.  Rose was immediately maced in the face with no warning by an officer he was filming.  No dispersal order had been given at the time.  Dana Kelly-Franks testified that around this time police began marching aggressively in a line with their shields held in front of their bodies.  She was frightened for herself and children who were in the area.  She testified that a police officer knocked her over with a shield and maced her simultaneously without any warning.  She stated that she was standing on the sidewalk at Clark

and was not behaving violently or engaged in any criminal activity at the time. She was not arrested.  Plaintiff Joshua Wedding testified similarly that he was also maced by an officer marching in this line without any warning.  Wedding testified that he was not behaving violently, was not violating any orders of the police when he was maced, and was not arrested.  Wedding was filming the police at the time he was maced, and that video footage was introduced into evidence as Plaintiffs' Exhibit 5.  It is consistent with his account of events.  Eventually the streets were reopened to vehicular traffic as protest activity died down for the evening in the downtown area and moved to the Central West End.

Rose attends many protests as a legal observer, and testified that in his experience, going back to 2014, St. Louis City police officers declare unlawful assemblies, issue dispersal orders, use force, and deploy chemical agents against those protesting police conduct, but not against other types of protesters.  Rose attended a women's march in January of 2017, an LGBTQ march in February of 2017, and an immigrants' rights march in 2017.  Police blocked traffic, sometime for hours, at each of these events to allow the protesters to march in the streets, and no unlawful assembly or dispersal orders were given at any of these protests.  These protests were peaceful.  Rose testified that he has never engaged in any violent activity at any protest he has attended but has nevertheless been subjected to chemical agents without warning only at protests critical of police.  Sarah

Molina testified that she was subjected to the use of chemical munitions without warning by City police officers in 2015 while protesting police conduct.

Defendant's tactical unit was deployed to the Central West End on the evening of Friday, September 15, 2017, when protesters converged upon the home of the mayor of the City of St. Louis and began throwing objects at the house and at police officers.  This protest was declared an unlawful assembly, police used a loudspeaker to order protesters to disperse, and protesters were warned that chemical munitions could be used if they did not comply.  Plaintiffs do not challenge the police response to the protest at the mayor's house.

Sachs testified that some of these violent protesters left the mayor's house on Lake and continued to roam the Central West End area.  Some officers were injured, including some who received serious injuries, by objects being thrown at them.  Sachs believed he heard gun shots and thought that the protesters were deploying chemical agents.  He observed property damage.  A dumpster fire was reported and attributed to protesters.  The suspects for that fire were later arrested. Tactical units formed lines and moved down the streets of the Central West End, seeking to disperse protesters.  Megan Green testified that she was protesting at the mayor's house, heard the order to disperse, and left the area to return to her car. After seeking shelter in a church, she was allowed to pass through the police line at Lindell but as she was walking to her car away from the protest area police in a

tactical vehicle drove by and sprayed her with chemical agents without warning.

She was not engaged in any criminal activity and was complying with the dispersal

order at that time.  Legal observer Steven Hoffman testified that he was subjected

to chemical agents without warning as he was complying with the dispersal order

because he was filming police activity.  He testified that he was not engaged in any

criminal activity and was complying with all police orders at the time.  Central

West End business owner Chris Sommers was not participating in the protest

activity and testified that he was subjected to chemical agents by police officers

because he was standing on the sidewalk outside his restaurant filming police

activity and expressing his displeasure at the large police presence in the

neighborhood.  Rossomanno testified that he threw the inert smoke bomb which

landed near Sommers.  He stated that he was trying to throw it at protesters further

down the street, but that it fell short and did not reach its intended target.  An

unidentified person standing next to Sommers picked up the smoke bomb and

lobbed it back toward police.  At that point, chemical agents were intentionally

dispersed in Sommers's direction, and police officers rushed toward Sommers.

Sommers and his customers ran inside the restaurant and locked the doors.  The

police banged on the doors but then left.

On Sunday, September 17, 2017, there were peaceful protests in the

downtown St. Louis area during the day and early evening.  Around 8:00 p.m. that

night, there were reports of property being damaged by protesters on Locust and Olive east of Tucker.  Sachs sent his tactical team north on Tucker to investigate. Plaintiff William Patrick Mobley testified that at about the same time he was using his cell phone to record police arresting two people across the street on Pine when a police officer approached him and grabbed his cell phone without warning.  The officer demanded Mobley sit on the ground and produce identification.  He complied.  Mobley then testified that officers accessed his phone without his permission, viewed its contents, and deleted the video.  He also stated that officers threatened to manufacture evidence to arrest him and accused him of property damage.  Eventually, the officers returned Mobley's cell phone and warned him to leave or he would be arrested.

At the Bank of America at Olive and Tucker, the tactical unit encountered a group of protesters who donned goggles and masks as police approached.  They were reaching inside backpacks.  The Incident Commander in charge of the scene, Colonel Leyshock, told Sachs to give a dispersal order.  Rossomanno then made an announcement over a loudspeaker telling people that an unlawful assembly had been declared, directing people to disperse, and warning them that chemical munitions may be used if they did not comply.  Like the other dispersal orders issued by police over the weekend, this order did not specify how far protesters had to go to comply with the directive to leave the area.  Sachs testified that he could

- 8 -

not say "exactly how far would be enough" to comply with this, or any, dispersal order.  Sachs testified that the group was told to leave and given a direction to leave in, but he did not make the announcement and could not hear or recall it, either.  A tactical vehicle eventually deployed chemical munitions at the group. Several protesters were arrested, but most dispersed.  Sachs testified that he was unaware of any property damage occurring in the downtown area after 8:30 p.m. No other witnesses observed any property damage or violence by protesters after this time period, either.

Sachs testified that around 10:00 p.m. the decision was made to make a mass arrest of people remaining in the area of Tucker and Washington, which is three or four blocks away from where the earlier dispersal order was given.  Sachs testified that this decision was made because there were large groups of people blocking traffic and Colonel Leyshock did not want to "allow people back into downtown" because he was worried about property damage.  This decision was made by Leyshock while he and Sachs were at 13th and Olive, not at Washington and Tucker.  Sachs also testified that he believed these were the same people from the bank earlier because some were wearing backpacks, masks, and goggles, which indicated to Sachs that "that they wanted some type of confrontation."  Sachs came up with the idea to block off the four streets surrounding the intersection with tactical units who would block the streets to prevent anyone from exiting and then

march up the street, forcing anyone remaining in the area into the intersection for arrest.[4]   According to defendant's witnesses, numerous dispersal warnings continued to be given from the time this decision was made until a final dispersal order was given around 11:00 p.m., at which point no people remaining in the area were free to leave.  It was Sachs' stated intention to arrest everyone remaining in the area after the final dispersal order was given.  The actual mass arrest did not take place until approximately 11:30 p.m.

The area around the intersection of Tucker and Washington includes residential and commercial uses.  Video footage of the intersection taken by Jonathan Ziegler around this time period and introduced as Plaintiffs' Exhibit 10 shows police continuing to block traffic with police cars and bike officers.  It also shows some vehicular traffic moving through the intersection after the final dispersal order was given.  A group of four to five individuals can be seen sitting on Tucker, and scattered individuals are, at times, walking or standing in the closed streets.  This video does not show a large crowd congregating in the streets.  The video shows some people shouting taunts at police officers.  No violent activity by protesters can be observed on the video.  Some people are wearing or carrying masks and/or goggles, but most are not.  The scene appears calm and most people

---

[4] Bicycle police prevented people from exiting the area by going east on Washington, but they allowed people to walk west of them into the intersection where the unlawful assembly had been declared.  Tactical units assembled at Olive and Tucker, Dr. Martin Luther King Drive and Tucker, and Washington and 13th by way of St. Charles Street.

appear relaxed.   There is a man with a baby in a stroller, and several people can be seen walking their dogs.

The evidence is disputed regarding whether, and to what extent, additional unlawful assembly/dispersal warnings were given after the initial dispersal order was given at Olive and Tucker and before the 11:30 p.m. mass arrest at Washington and Tucker.  Defense witnesses testified that the final warning took place at 11:00 p.m.

Defendant's witnesses also testified that numerous additional warnings had been issued in and around these intersections over loudspeakers by Rossomanno and that Rossomanno and another officer issued warnings by speaking to people directly on the street as well.   Plaintiffs' witnesses offered conflicting accounts about whether warnings were given and, if so, the number, frequency, and specificity of those warnings.  Rose testified that he heard an initial warning to disperse when he arrived at the intersection between 9:30 and 10:00 p.m., tried to leave as directed, but was not permitted to do so by police.  Then those police left and people were just standing around talking, and no further warnings were given.

Sachs admitted that police freely allowed people ingress into the area after the initial dispersal order was given.  Videographer Demetrius Thomas stopped in the area to film and observe what was happening after the initial dispersal order was given.  He testified that he was allowed to enter the area and never heard any

warnings about an unlawful assembly, dispersal, or chemical munitions.  But when he tried to leave later, a police officer stood in front of his car and prevented him from leaving the area.  Dillan Newbold testified that he did not arrive in the area to protest until almost 11:00 p.m. and was allowed to enter the area by police.  He did not hear any dispersal orders or warnings about chemical munitions before being forced into the intersection for a mass arrest.

No audible dispersal warnings can be heard on Plaintiffs' Exhibit 10, which lasts 45 minutes and ends with the 11:30 p.m. mass arrest.  Ziegler testified that he heard Rossomanno issue one dispersal order telling people to move north on Tucker from Olive around 9:45 or 10:00 p.m.  He complied with the request and walked to Washington and Tucker, where he saw police standing around along with people from the neighborhood eating outside.  He described the scene as calm.  He said some people stopped at the intersection where he stopped, while others continued walking.  Ziegler stated that it was very unclear what the police wanted.

 Plaintiff Iris Nelson and her husband Alex Nelson live at 13th and Washington.  They are not protesters.[5]  On the evening of September 17, 2017, the Nelsons saw protest activity outside their apartment.  They went to the roof of their building around 9:00 p.m. to observe the activity in the street.  After about 45

_____

[5] Plaintiffs also offered into evidence the affidavit of Brian Baude [Pls.' Ex. 39], a Lieutenant Colonel in the United States Air Force, who also lives in the area and, like the Nelsons, went out in the neighborhood to observe and was prevented from returning to his home and subsequently arrested and pepper sprayed in the absence of any non-compliance.

minutes, they left the roof and went outside for a walk.  They stayed on the sidewalks and crossed the streets at intersections.  They passed police officers on the streets while they were walking around, but no police officer said anything to them or indicated that they should leave the area because an unlawful assembly had been declared and a dispersal order had been given.  Aside from a larger than normal police presence, they observed the atmosphere to be like any other normal night in their neighborhood.  They saw that some property had been damaged earlier, but did not see anyone damaging property.  At some point, the Nelsons heard police tell a group of protesters to leave the area by going north on Tucker or west on Locust.  Although the Nelsons did not understand this order to be directed at them, they walked north on Tucker anyway toward the direction of their home. After observing the police cars on Tucker, the Nelsons headed home on Washington.  When they were almost home, they were prevented from entering their building by police lined up on Washington.  They tried to find a different way to get inside their building, but when they got back to Tucker and Washington they realized they were closed in all four sides by police.[6]

Upon Sachs's command, the tactical and bicycle units blocked off all streets, preventing egress from the area, and started marching toward the intersection of Tucker and Washington, forcing everyone into the intersection.  Ziegler testified

---

[6] Alex Nelson, a Lieutenant in the United States Air Force with tactical training, realized at some point that they were going to be arrested.  He and his wife found discarded masks lying on the ground and picked them up in an attempt to offer some protection from pepper spray.

that when he realized that everyone was being pushed into the intersection, he and other people, including journalists, looked for a means of egress but that police would not communicate with them or give them any instructions about where to go.  Sachs testified that people began to migrate to the northeast corner of the intersection.  Plaintiffs' witnesses testified that they were pushed into a very small area by police to effectuate arrests.  Plaintiffs' Exhibit 10 appears to show people confined in a very small area on the ground.  People in the area were not offered a means of egress after the police lines had been struck but before they were arrested because, according to Sachs, "They'd had a chance to leave all evening."  In Sachs' opinion, everyone in the Tucker and Washington intersection should have left the downtown area and gone home when the first dispersal order was given at 8:30 p.m. at Tucker and Olive.

The evidence is disputed about the circumstances of the mass arrest.  As the officers closed in, plaintiffs' witnesses testified that the police officers began giving commands to either "Get Down!," "Sit Down!," or "Lay Down on the Ground!"  Police wore shields over their faces and had shields over their bodies.  It is difficult to discern any audible police commands being given on Plaintiffs' Exhibit 10, although some police can be seen pushing people down with their shields.  People appear to be confused and frightened.

All of plaintiffs' witnesses who were arrested in this mass arrest testified that they complied with all police commands or were unable to comply with the demand to "Lay Down on the Ground!" because the number of people confined in the small space made it impossible to do so.  They all also testified that everyone around them appeared to be complying with all police commands as well.  Ziegler testified that most people were already on the ground with their hands in the air before police even issued any commands.  Iris Nelson testified that she was showered with pepper spray, along with the rest of the crowd, despite complying with all police commands.  She also testified that her husband was dragged across the ground, kicked, and had his face shoved into the ground while being maced after his hands were cuffed behind his back.  He was compliant with all police commands.  Alex Nelson testified similarly.  Both were arrested and spent the next day in jail.

Ziegler testified that the entire crowd was misted with pepper spray for no apparent reason.  Plaintiffs' Exhibit 10 shows an unidentified officer walking around with a hand held fogger shooting pepper spray at the arrestees, who all appear to be on the ground and complying with police commands.  This officer issues no verbal commands to any arrestee, and no arrestee on the video appears to be resisting arrest.  The video shows other officers shouting at people on the ground and making threatening gestures at them with mace.  An unidentified man

- 15 -

lying face down on the ground is picked up by his feet by two officers and dragged across the pavement.  It is unclear from the video, but his hands may have been under his body contrary to police commands.  Ziegler testified that he was maced in the face multiple times while he was attempting to comply with police commands.  He also testified that he was maced in the face after his hands were cuffed behind his back and he was compliant with all police commands.

Newbold testified that he was complying with police commands waiting to get arrested when he was dragged out of the group into the street and an officer ripped off his goggles and bandana while a second officer maced him directly in the face.  Newbold testified that he put up no resistance either prior to, during, or after being maced.  He also testified that he was cuffed tightly and when asked for the cuffs to be loosened he was told that he deserved it because he was protesting.  Alex Nelson testified that his cuffs were cinched as tight as possible and he was hit in the head by an officer who asked him, "Do you like that cocksucker?  We'll see you again tomorrow night."  Both Newbold and Nelson suffered injuries as a result of being cuffed too tightly, and both have sought medical treatment for these injuries.

Plaintiffs and plaintiffs' witnesses testified that their treatment by police during the weekend of September 15-17, 2017 has made them fearful of participating in future protest activity to the degree they would like for fear of

being subjected to similar retaliatory conduct by City police officers.  Some

witnesses testified that their experiences dissuaded them completely from

participating in future protests.  Many of plaintiffs' witnesses testified that they

have also been subjected to similar treatment by City police officers when

participating in past protests criticizing police conduct.

Plaintiffs offered into evidence the affidavit of Elyssa Sullivan, who testified

that she was arrested for participating in a protest relating to the *Stockley* verdict on

October 3, 2017.  [Pls.' Ex. 44].  The protest was peaceful.  [*Id.*]  She was unable

to hear a muffled announcement by police and when she asked an officer what was

said, she was told to leave or be arrested.  However when she attempted to leave,

the police officer blocked her avenue of egress and told her to "shut her bitch ass

mouth."  [*Id.*]  She was subsequently arrested.  [*Id.*]

Plaintiffs offered into evidence the affidavit of Heather De Mian, who

testified that she was videotaping protest activity on the evening of September 29,

2017, from her wheelchair and was pepper-sprayed in the face by a City police

officer without warning when she verbally questioned the police officer's

treatment of another protester.  [Pls' Ex. 43].  She testified that no dispersal order

had been given, and that neither she nor any other protester she observed was

engaging in violent activity.  [*Id.*]  The videotape she made of this incident was

introduced into evidence as an exhibit to her affidavit and appears to show her and her camera lens being pepper sprayed after she shouts profanely at police.

None of defendant's three witnesses personally arrested anyone during the mass arrest at the intersection of Washington and Tucker on the evening of September 17, 2017, although all claimed to have observed the arrests.  These witnesses also all testified that they saw force being used only on non-compliant arrestees.  Rossomanno testified that he only saw two non-compliant individuals get maced.  All of defendant's witnesses denied observing anyone get maced or beaten once they had been cuffed.  None of defendant's witnesses testified that they personally observed any of the plaintiffs or plaintiffs' witnesses being arrested on the evening of September 17, 2017.  All defendants agreed that macing a restrained, compliant individual would amount to an inappropriate use of force.

St. Louis City Ordinance 15.52.010 defines an unlawful assembly as follows:

> Any two persons who shall, in this City, assemble together, or, being assembled, shall act in concert to do any unlawful act with force or violence, against the property of this City, or the person or property of another, or against the peace or to the terror of others, and shall make any movement or preparation therefor, and every person present at such meeting or assembly, who shall not endeavor to prevent the commission or perpetration of such unlawful act, shall be guilty of a misdemeanor.

[Pls.' Ex. 46].  Missouri state law defines unlawful assembly in relevant part as follows:

> A person commits the offense of unlawful assembly if he or she knowingly assembles with six or more other persons and agrees with such persons to violate any of the criminal laws of this state or the United States with force or violence.

Mo. Rev. Stat. §574.040(1).  [Pls.' Ex. 49].  Sachs testified that an individual officer can decide, in his or her discretion, to declare an unlawful assembly, and there are no guidelines, rules, or written policies with respect to when an unlawful assembly should be declared.   Sachs further testified that it was the custom or policy of the police department to permit an officer to declare an unlawful assembly if there is any criminal activity taking place, even in the absence of force or violence, depending upon the circumstances.

As relevant to the instant motion, St. Louis City Ordinance 17.16.275 prohibits people from congregating in public places in such a manner as to obstruct, impede, interfere, hinder, or delay vehicular or pedestrian traffic.  [Pls.' Ex. 50].  Any person who impedes traffic and refuses to obey an order to disperse, clear or otherwise move is guilty of failing to obey a dispersing order, a Class A misdemeanor.  [*Id.*].

Mo. Rev. Stat. § 574.060 states in relevant part as follows:

> A person commits the offense of refusal to disperse if, being present at the scene of an unlawful assembly . . . he or she knowingly fails or refuses to obey the lawful command of a law enforcement officer to depart from the scene of such unlawful assembly . . . .

[Pls.' Ex. 51].[7]

Defendant introduced into evidence several Special Orders of the St. Louis City Metropolitan Police Department which are relevant to the instant motion. Section XIII of Special Order 1-01 relates to the deployment of chemical agents for crowd dispersal and was issued in response to a settlement agreement entered in the case styled *Alexis Templeton, et al., v. Sam Dotson, et al.*, Cause Number 4:14CV2019 CEJ, which was brought in this Court.  [33-1; Def.'s Ex. C].  Section XIII describes chemical agent equipment as including, but not limited to, inert smoke grenades, Oleoresin Capsicum (OC) and Chlorobenzalmalononitrile (CS) gas grenades, launched OC, launched CS, pepperballs, and high-capacity, extended range OC spray.  The special order does not, however, define chemical agents. The *Templeton* settlement agreement defines chemical agents as "tear gas, inert smoke, pepper gas, or other chemical agents."  [33-2; Def.'s Ex. E].[8]  The Special

---

[7] Under Missouri's statute, "[a]n unlawful assembly causes a disturbance of the public order so that it is reasonable for rational, firm and courageous persons in the neighborhood of the assembly to believe the assembly will cause injury to persons or damage to property and will interfere with the rights of others by committing disorderly acts."  *State v. Mast*, 713 S.W.2d 601, 603-04 (Mo. Ct. App. 1986).  "A person can join 'an unlawful assembly by not disassociating himself from the group assembled and by knowingly joining or remaining with the group assembled after it has become unlawful.'"  *White v. Jackson*, 865 F.3d 1064, 1075 (8th Cir. 2017) (quoting *Mast*, 713 S.W.2d at 604) (describing an unlawful assembly under state law as including a group of approximately one hundred people who were throwing objects at the police and noting that the orders to disperse were issued after the crowd turned violent).

[8] The *Templeton* settlement provides that defendant will not enforce any rule, policy, or practice that grants law enforcement officials the authority or discretion to use chemical agents for purposes of dispersing groups of individuals who are engaged in non-criminal activity without first: issuing clear and unambiguous warnings that such chemical agents will be utilized, providing sufficient opportunity to heed the warnings and exit the area, reasonably attempting to minimize the impact of such chemical agents on individuals who are complying with lawful law

Order provides that "chemical agents will not be used for the purpose of

frightening of punishing individuals for exercising their constitutional rights."  It

goes on to provide "Restrictions on Deployment" as follows:

> 2. Per a settlement agreement in U.S. District Court, chemical agents will
> not be used to disperse groups engaged in non-criminal activity without
> satisfying all of the following elements:
>
> > a. The Incident Commander ensures that clear and unambiguous
> > warnings are issued stating that chemical agents will be utilized, in
> > conjunction with a statement about why the area is being cleared, (e.g.,
> > "You are impeding the flow of vehicular traffic");
> >
> > b. Individuals are provided sufficient opportunity to heed the above-
> > mentioned warnings and exit the area;
> >
> > c. The impact of chemical agents on individuals who are complying with
> > lawful law enforcement commands is minimized; and
> >
> > d. Ensuring and announcing a means of safe egress from the area that is
> > available to individuals.
>
> 3. The above provisions do not apply to situations that turn violent when
> persons at the scene present an imminent threat of bodily harm to persons, or
> of damage to property, and when law enforcement officials must defend
> themselves or other persons or property against such imminent threats.

[33-1; Def.'s Ex. C].  The Special Order requires that an I/LEADS report be

created to document the use of chemical agents to disperse a crowd.

---

enforcement commands, and ensuring that there is a means of safe egress from the area that is
available to the individuals and announcing this means of egress.  These provisions do not apply
"to situations that turn violent and persons at the scene present an imminent threat of bodily harm
to persons or damage to property, and when law enforcement officials must defend themselves or
other persons or property against such imminent threat."  It also prevents the use of chemical
agents on individuals engaged in non-criminal activity for the purpose of frightening them or
punishing them for exercising their constitutional rights.   [33-2; Def.'s Ex. E].

Section IV of Special Order 1-01 is entitled "Use of Non-Deadly Force – Pepper Mace" and its stated purpose is to provide procedures relating to the use of pepper spray.  [Def.'s Ex. K].  It states that "pepper mace is provided for use when force is necessary to control belligerent, uncooperative persons for whom verbal controls are ineffective."  [*Id.*].  Section IV provides as follows for the use of pepper mace:

> An officer may use pepper mace:
>
> a. to effect a lawful arrest, or to otherwise lawfully control a combative, uncooperative person, when verbal commands and persuasion have been ineffective in inducing cooperation; or
>
> b. to control a dangerous animal.
>
> 2. Pepper mace will not be used against a person who is being controlled by a neck restraint.
>
> 3. Since pepper mace can adversely affect persons in the immediate area of the person against whom it is used, an officer should make every effort to avoid unnecessarily exposing bystanders to pepper mace.

[*Id.*].  Section IV goes on to provide that "since pepper mace is a method of physical control, and may only be used to overcome resistance to an officer's lawful authority, any arrest in which pepper mace is used will be classified as 'Resisting Arrest.'"  [*Id.*]

Sachs testified that officers were not required to give warnings before using hand held mace (either the large fogger or the smaller cans often  carried on officers' belts) for crowd dispersal because it was not required by *Templeton* or

covered under Section XIII of Special Order 1-01.   Sachs testified that the police

do not consider hand held mace to be a "chemical munition" which requires a

warning prior to use.  He admitted, however, that the chemical was the same, no

matter the method of deployment.  Sachs also stated that the macing of individuals

during the "bus incident" was "just to get the dispersal, and we used that for a

dispersal as opposed to just an arrest."  He said that the use of hand held mace in

the bus incident would fall under the exigent circumstances exception.  Sachs

testified that officers needed probable cause to arrest someone before macing them,

but that people who are maced are not always arrested because "they flee" or

"we're not able to take them into custody at the time . . . ."

Defendant also introduced into evidence Special Order 1-06 relating to the

recording of police activity.  Its stated purpose is to provide "officers with

guidance for dealing with situations in which they are being recorded, to include

videotaping, audio-taping, or both, by members of the public or the media" . . . "to

ensure the protection and preservation of every person's Constitutional rights."

[33-1; Def.'s Ex. D].  Special Order 1-06 states in relevant parts as follows:

> Members of the public, including media representatives, have an
> unambiguous First Amendment right to record officers in public places, as
> long as their actions do not interfere with the officer's duties or the safety of
> officers or others.  SLMPD employees will not prevent or prohibit any
> person's ability to observe, photograph, and/or make a video recording (with
> or without simultaneous audio recording) of police activity that occurs in the
> public domain so long as the person's location, actions and/or behavior do
> not created a legitimate, articulable threat to Officer safety, or an unlawful
> hindrance to successful resolution of the police activity.

. . .

## B. GENERAL INFORMATION

1. Persons who are lawfully in public spaces or locations where they have a legal right to be present – such as their home, place of business, or the common areas of public and private facilities and buildings – have a First Amendment right to record things in plain sight or hearing, to include police activity.  Police may not threaten, intimidate, or otherwise discourage or interfere with the recording of police activities.  Officers should assume that they are being recorded at all times when on duty in a public space.

2. As a result, officers must understand that any bystander has an absolute right to photograph and/or video record the enforcement actions of any Police Officer so long as the bystander's actions do not:

   a. Place the safety of the bystander, or of any Police Officer(s), witness(es), victim(s), or suspect(s), in jeopardy;

   b. Hinder the execution or performance of an Officer's official duties;

   c. Interfere with or violate and law, ordinance or code, criminal or traffic;

   d. Obstruct police actions while engaging in a recording.  For example, individuals may not interfere through direct physical intervention, tampering with a witness, or by persistently engaging an officer with questions or interruptions.  The fact that recording and/or overt verbal criticism, insults, or name-calling may be annoying, does not of itself justify an officer taking corrective or enforcement action or ordering that recording be stopped, as this is an infringement on an individual's right to protected speech;

   e. Unreasonably impede the movement of emergency equipment and personnel or the flow of vehicular or pedestrian traffic; or

   f. Attempt to incite an immediate breach of the peace or incite others to commit a violation of the law.

## C. ARREST

1. Persons who violate the foregoing restrictions should be informed that they are engaged in prohibited activity and given information on acceptable alternatives, where appropriate, prior to making an arrest.

2. Arrest of a person who is recording officers in public shall be related to an objective, articulable violation of the law unrelated to the act of recording.  The act of recording does not, in itself, provide grounds for detention or arrest.

3. Arrest of an individual does not provide an exception to the warrant requirement justifying search of the individual's recording equipment or media.  While equipment may be seized incident to an arrest, downloading, viewing, or otherwise accessing files requires a search warrant.  Files and media shall not be erased under any circumstances.

D. <u>CONFISCATION OF RECORDING DEVICES AND MEDIA</u>

1. Recording equipment may not be confiscated unless the recording party is arrested, and the recording is to be held as evidence for the crime in which the recording party was arrested.  Additionally, officers may not order an individual to show recordings that have been made of enforcement actions or other police operations.

[33-1; Def.'s Ex. D].

Plaintiffs allege that they were subjected to excessive uses of force and other unconstitutional conduct in retaliation for the exercise of their first amendment rights during these protests.  Plaintiffs allege that they were pepper-sprayed and subjected to chemical agents with no warning while engaging in non-violent activity in compliance with all police commands.  Plaintiffs who were arrested on the evening of September 17, 2017, also allege that they were subject to excessive uses of force during the arrests.  Plaintiffs allege that they were subjected to retaliatory treatment for filming police conduct and arrested for failing to disperse

without being given appropriate warnings and the required avenues of egress. They also allege that police officers arbitrarily exercised their discretion to declare an "unlawful assembly" when there was no force or violence, contrary to the requirements of city ordinance and Missouri law.  Plaintiffs allege that these actions are all taken pursuant to the custom and policies of defendant.  Plaintiffs seek, on behalf of themselves and a class of similarly situated individuals, to enjoin certain police practices in response to protest activity.

Plaintiffs' claims are brought pursuant to 42 U.S.C. § 1983.  Count I alleges that defendant has a custom and policy of retaliating against plaintiffs and others for engaging in expressive activity in violation of the First Amendment.  In Count II, plaintiffs allege that they were subjected to unlawful seizures and excessive uses of force in violation of the Fourth Amendment in accordance with the custom and policy of defendant and because defendant failed to adequately train and supervise its police officers.  Count III alleges that it is defendant's custom and policy to enforce its ordinances regarding unlawful assemblies and dispersal orders in a manner which violates the Due Process Clause of the Fourteenth Amendment. Plaintiffs contend that the ordinances are unconstitutional on their face and as applied by defendant.  Plaintiffs do not bring individual excessive force claims against named or unnamed police officers in this action, and they do not seek money damages.

Defendant denies any use of excessive force or unconstitutional conduct by police officers responding to the protests.  Defendant maintains that it has appropriate policies in place to respond to protest activities and that those policies were followed throughout the weekend of September 15-17, 2017.  Defendant argues that it was necessary at times to declare an "unlawful assembly" and that any subsequent orders to disperse complied with the police department's policies, including with respect to providing warnings before using chemical agents.  Defendant also denies that police officers engaged in retaliatory activity, but alternatively argues that if any such activity took place it was not in accordance with defendant's policies.

Conclusions of Law

Federal Rule of Civil Procedure 65 gives courts the authority to grant preliminary injunctions.  "A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quoting *Munaf v. Green*, 553 U.S. 674, 689-90 (2008)).  The "issuance of a preliminary injunction depends upon a 'flexible' consideration of (1) the threat of irreparable harm to the moving party; (2) balancing this harm with any injury an injunction would inflict on other interested parties; (3) the probability that the moving party would succeed on the merits; and (4) the effect on the public interest."  *Planned Parenthood of Minn., N.D. v. Rounds*, 530 F.3d 724, 729 n.3

(8th Cir. 2008) (quoting *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)).  "At the base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined."  *Dataphase*, 640 F.2d at 113.

Although defendant asserts that plaintiffs do not have standing to bring their claims, the Court concludes that the chilling of plaintiffs' speech as testified to during the hearing constitutes an injury in fact sufficient to confer First Amendment standing.  *See 281 Care Committee v. Arneson*, 638 F.3d 621, 627 (8th Cir. 2012).

With regard to showing a likelihood of success on the merits, plaintiffs argue that they need only show a "fair chance of prevailing" on their claims.  This is the normal standard for preliminary injunctions, but where plaintiffs seek to enjoin enforcement of a "validly enacted statute," they must meet the "more rigorous" standard of showing that they are "likely to prevail on the merits."  *1-800-411-Pain Referral Serv., LLC v. Otto*, 744 F.3d 1045, 1054 (8th Cir. 2014) (citing *Rounds*, 530 F.3d at 732).  Plaintiffs' amended complaint alleges that the City ordinances "are unconstitutionally vague on their face and as applied to Plaintiffs and do not provide fair notice to a reasonable person as to how to comply with the law."  [9 at ¶ 36].  The evidence and briefing on the preliminary injunction motion, however, focus on the way the ordinances and other customs and policies of the City have

been applied to protests challenging police action.  Based on the evidence and briefing in this case, the Court concludes that plaintiffs can meet either standard and will therefore apply the more rigorous "likely to prevail on the merits" standard to each of plaintiffs' claims.

In *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978), the United States Supreme Court held that municipalities may be liable for injunctive relief under § 1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated" by the municipality.  *Id.* at 690.  To establish liability for a custom, plaintiff must show that there is: (1) a continuing, widespread, and persistent pattern of unconstitutional misconduct, (2) deliberate indifference or tacit authorization of such conduct by policymaking officials after notice of the conduct, and (3) that the custom caused the violation of plaintiff's constitutional rights.  *See Johnson v. Douglas Cnty. Med. Dept.*, 725 F.3d 825, 828 (8th Cir. 2013); *Abdullah v. County of St. Louis, Mo.*, 52 F. Supp. 3d 936, 944 (E.D. Mo. 2014).

The First Amendment declares that States "shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble."  U.S. Const. amend. I.  "[T]he First Amendment reflects a 'profound national commitment' to the principle that 'debate on public issues should be uninhibited,

robust, and wide-open.'" *Boos v. Barry*, 485 U.S. 312, 318 (1988) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).   Plaintiffs are engaging in speech in a traditional public forum.  *See United States v. Grace*, 461 U.S. 171, 177 (1983) (streets, sidewalks, and parks are public places historically associated with the free exercise of expressive activities and considered, without more, to be public forums).  "In such places, the government's ability to permissibly restrict expressive conduct is very limited: the government may enforce reasonable time, place, and manner regulations as long as the restrictions are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."  *Id.* (internal quotation marks and citations omitted).

"The very idea of government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for the redress of grievances."  *De Jonge v. Oregon*, 299 U.S. 353, 364 (1937) (internal quotation marks and citation omitted).   "The right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental."  *Id.*

> The greater the importance of safeguarding the community from incitements to the overthrow of our institutions by force and violence, the more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly in order to maintain the opportunity for free political discussion, to the end that government may be responsive to the will of the people and that changes, if desired, may be obtained by

- 30 -

peaceful means.  Therein lies the security of the Republic, the very
foundation of constitutional government.

*Id.* at 365 (internal quotation marks and citation omitted).  "It follows from these
considerations that, consistently with the Federal Constitution, peaceable assembly
for lawful discussion cannot be made a crime."  *Id.*   "The right to associate does
not lose all constitutional protection merely because some members of the group
may have participated in conduct or advocated doctrine that itself is not protected."
*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 908 (1982).

Numerous federal circuit courts of appeals have recognized a general First
Amendment right to record police performing their duties in public, subject to
certain limitations.  *See*, *e.g.*, *Am. Civil Liberties Union of Illinois v. Alvarez*, 679
F.3d 583, 595–96 (7th Cir. 2012); *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011);
*Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000); *see also*,
*Hoyland v. McMenomy*, 185 F. Supp. 3d 1111, 1124 (D. Minn. 2016), *aff'd*, 869
F.3d 644 (8th Cir. 2017).  For purposes of deciding this motion, the Court assumes
that recording police activity is considered a protected first amendment right,
subject to the limitations set out in paragraph 2 of Special Order 1-06.

"[T]he First Amendment prohibits government officials from subjecting an
individual to retaliatory actions . . . for speaking out."  *Hartman v. Moore*, 547
U.S. 250, 256 (2006).  "The First Amendment protects a significant amount of
verbal criticism and challenge directed at police officers."  *Hoyland v. McMenomy*,

869 F.3d 644, 655 (8th Cir. 2017) (internal quotation marks and citation omitted).

"Criticism of public officials lies at the very core of speech protected by the First

Amendment." *Naucke v. City of Park Hills*, 284 F.3d  923, 927 (8th Cir. 2002)

(internal quotation marks and citation omitted).  "The freedom of individuals

verbally to oppose or challenge police action without thereby risking arrest is one

of the principal characteristics by which we distinguish a free nation from a police

state." *City of Houston, Tex. v. Hill*, 482 U.S. 451, 462-63 (1987).

To sustain a First Amendment retaliation claim, plaintiffs must show that

they engaged in protected activity, the police officers acted in a way that would

chill a person of ordinary firmness in continuing the protected activity, and the

officer's actions were motivated at least in part by plaintiffs' engaging in protected

activity. *Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014).[9]   In claims of

retaliatory arrest, plaintiffs must also show that the officer lacked at least arguable

probable cause to arrest plaintiffs.[10]  *Id.*

"A fundamental principle in our legal system is that laws which regulate

persons or entities must give fair notice of conduct that is forbidden or required."

---

[9] Pepper spraying someone in the face would chill a person of ordinary firmness.  *Kopp*, 754
F.3d at 602.

[10] "[A] warrantless arrest, unsupported by probable cause, violates the Fourth Amendment."
*Baribeau v. City of Minneapoli*s, 596 F.3d 465, 478 (8th Cir. 2010).   Where the totality of the
circumstances at the time of an arrest would allow a reasonable officer to believe the suspect had
or was committing a crime, there is probable cause.  *Borgman v. Kedley*, 646 F.3d 518, 523 (8th
Cir. 2011).  "Arguable probable cause exists even where an officer mistakenly arrests a suspect
believing it is based in probable cause if the mistake is objectively reasonable."  *Ulrich v. Pope
County*, 715 F.3d 1054, 1059 (8th Cir. 2013) (internal quotation marks and citation omitted).

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  "A statute or ordinance violates the Due Process Clause if it fails to give fair warning that the allegedly violative conduct was prohibited."  *Stahl v. City of St. Louis, Mo.*, 687 F.3d 1038, 1040 (2012) (internal quotation marks and citation omitted).  "Such a law offends due process because it 'may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits.'"  *Id.* (quoting *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) (plurality opinion)(citing *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)).   "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application."  *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).

The Due Process Clause's proscription against vague regulations is stronger when the regulation in question implicates the First Amendment.  "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech."  *Fox Television Stations, Inc.*, 567 U.S. at 253-54.  That is so because "[s]peech is an activity particularly susceptible to being chilled, and regulations that do not provide citizens with fair notice of what constitutes a violation disproportionately hurt those who espouse unpopular or controversial beliefs."  *Stahl*, 687 F.3d at 1041.  "Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the

forbidden areas were clearly marked." *Grayned*, 408 U.S. at 109 (internal

quotation marks and citations omitted).  An ordinance which accords to police "the

full discretion . . . to determine" whether a violation has occurred "entrusts

lawmaking to the moment-to-moment judgment of the policeman on his beat, . . .

furnishes a convenient tool for harsh and discriminatory enforcement by

prosecuting officials against particular groups deemed to merit their displeasure, . .

. and confers on police a virtually unrestrained power to arrest and charge persons

with a violation." *Kolender*, 461 U.S. at 357-58.

A person is seized for Fourth Amendment purposes when an officer by

means of physical force "terminates or restrains his freedom of movement through

means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254 (2007).

(internal quotation marks and citations omitted).   The right to be free from

excessive force in the context of an arrest is clearly established under the Fourth

Amendment. *Henderson v. Munn*, 439 F.3d 497, 503 (8th Cir. 2006).  "The test is

whether the amount of force used was objectively reasonable under the particular

circumstances." *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir.

2009) (internal quotation marks and citation omitted).  Relevant circumstances

include "the severity of the crime at issue, whether the suspect poses an immediate

threat to the safety of the officers or others, and whether he is actively resisting

arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386,

396 (1989).  "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.*  "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment." *Id.* (internal quotation marks and citation omitted).  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."  *Id.* at 396-97.  "[F]orce is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public."  *Brown*, 574 F.3d at 499.  "The use of any force by officers simply because a suspect is argumentative, contentious, or vituperative is not to be condoned."  *Bauer v. Norris*, 713 F.2d 408, 412 (8th Cir. 1983) (internal quotation marks and citation omitted).  "[T]he use of . . . gratuitous force against a suspect who is handcuffed, not resisting, and fully subdued is objectively unreasonable under the Fourth Amendment.*"  Krout v. Goemmer*, 583 F.3d 557, 566 (8th Cir. 2009).

After due consideration of the foregoing authorities and the evidence presented at this preliminary stage of the proceedings, the Court concludes that

plaintiffs are likely to prevail on the merits of their claims that the policies or customs of defendant discussed below violate the constitutional rights of plaintiffs.

Plaintiffs have presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant's custom or policy is to permit any officer to declare an unlawful assembly in the absence of the force or violence requirement of St. Louis City Ordinance 17.16.275 and Mo. Rev. Stat. § 574.060, in violation of plaintiffs' First and Fourth Amendment rights. Although defendant argues that it is usually someone such as the Incident Commander who makes such a determination, Sachs admitted that defendant has issued no guidelines with respect to when, how, or who should declare an unlawful assembly with respect to protest activity. All officers testified that it was within their sole discretion to declare an unlawful assembly whenever they observed a group violating any law, whether peaceably or not, including but not limited to merely congregating on sidewalks or on streets closed by police for protest activity. While unlawful assemblies were declared at times in response to violent activity by protesters (for example, at the mayor's house on the evening of September 15, 2017), plaintiffs presented evidence that they were also declared at other times when it was not "reasonable for rational, firm and courageous persons in the neighborhood of the assembly to believe the assembly will cause injury to persons or damage to property and will interfere with the rights of others by committing disorderly acts,"

*Mast*,[11] 713 S.W.2d at 603-04,  such as on September 17, 2017, and October 3, 2017.

Plaintiffs' evidence of the activities in the Washington and Tucker intersection on September 17, 2017, shows no credible threat of force or violence to officers or property in this mixed commercial and residential area.  No property damage or violence was observed or reported by any officers after 8:30 p.m., and the scene at the intersection was calm.  Some people continued to engage in protest activity by voicing their displeasure with police.  Other people, such as the Nelsons and Baude, were in the area for unrelated reasons.  In the video most people can be seen standing on sidewalks, but even those few people sitting or standing in closed streets are not observed to block the flow of traffic.  Sachs testified that the decision was made because they did not want to "allow people back into downtown"  and defense counsel stated during closing arguments that "the police have the right to tell people, at this point, we're done for the evening; there's no – no more assembling; this assembly is over."

Plaintiffs have presented sufficient evidence for purposes of awarding preliminary injunctive relief that defendant's custom or policy of committing discretionary authority to police officers to declare unlawful assemblies in the absence of any threat of force or violent activity provides no notice to citizens of

---

[11] Although *Mast* articulated this standard when applying Missouri's statute, given that both the statute and the ordinance use the same "force or violence" language, and in the absence of any authority provided by the parties as to how Missouri courts have interpreted the City ordinance, the Court will apply this standard in its analysis.

what conduct is unlawful, and it permits officers to arbitrarily declare "there's no more assembling."  This custom or policy permits officers to exercise their discretion in such a manner as to impermissibly curtail citizens' first amendment rights of assembly and free speech based upon nothing more than a subjective determination by an officer that "we're done for the evening," or when the content of the speech is deemed objectionable, or because an earlier assembly in a different location was declared unlawful.  Plaintiffs have presented sufficient evidence at this stage of the proceedings that this discretion was in fact exercised in such a manner in violation of plaintiffs' constitutional rights.  Defendant's custom or policy with respect to unlawful assemblies accords to police "the full discretion . . . to determine" whether a violation has occurred, "entrusts lawmaking to the moment-to-moment judgment of the policeman on his beat, . . . furnishes a convenient tool for harsh and discriminatory enforcement by prosecuting officials against particular groups deemed to merit their displeasure, . . . and confers on police a virtually unrestrained power to arrest and charge persons with a violation." *Kolender*, 461 U.S. at 357-58.  Such custom or policy cannot meet constitutional standards for definiteness and clarity and runs afoul of the First Amendment's guarantees of free speech, freedom of assembly, and the right to petition the government for redress, as well as the due process protections of the Fourteenth

Amendment.  *See Fox Television*, 132 S. Ct. at 2317; *Kolender*, 461 U.S. at 360; *Stahl*, 687 F.3d at 104; *Abdullah*, 52 F. Supp. 3d at 946.

Similarly, plaintiffs have presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant's custom or policy is to permit officers to issue vague dispersal orders to protesters exercising their first amendment rights in an arbitrary and retaliatory way and then to enforce those dispersal orders without sufficient notice and opportunity to comply before being subjected to uses of force or arrest, in violation of plaintiffs' First and Fourth Amendment rights.  Defendant's witnesses all testified that dispersal orders simply direct people to leave "the area" and do not define "the area."  Sachs testified that he could not testify "exactly how far would be enough" to comply with this, or any, dispersal order.  Sachs could not define "the area" people were ordered to disperse from on September 15, 2017, September 17, 2017, or at any other time.

Plaintiffs presented testimony of witnesses who stated that they were complying with orders to leave the Central West End on the evening of September 15, 2017, but were nevertheless subjected to the use of chemical munitions despite crossing police lines and reasonably believing they were outside the area covered by the dispersal orders.  These witnesses stated that no warnings were given prior to the deployment of chemical agents.  Plaintiffs offered testimony that police

officers similarly deployed chemical agents against protesters critical of police conduct in 2015 with no warning.

Plaintiffs presented sufficient, credible evidence for purposes of awarding preliminary injunctive relief that defendant has a custom or policy, in the absence of exigent circumstances,[12] of issuing dispersal orders to citizens engaged in expressive activity critical of police which are either too remote in time and/or too vaguely worded to provide citizens with sufficient notice and a reasonable opportunity to comply, inaudible and/or not repeated with sufficient frequency and/or by a sufficient number of officers to provide citizens with sufficient notice and a reasonable opportunity to comply, contradictory and inconsistent, not uniformly enforced, and retaliatory.

With respect to the evening of September 17, 2017, plaintiffs presented testimony of numerous witnesses who never heard any dispersal orders before they were arrested for failing to disperse and of witnesses who reasonably thought they had complied with the dispersal order by moving further down the street because the order did not indicate how far they should disperse.  Some of plaintiffs' witnesses reasonably believed that any dispersal order did not apply to them because they were standing near police officers who never told them to disperse

---

[12] As used by the Court herein, the term "exigent circumstances" means those circumstances described by Section XIII of Special Order 1-01, which are situations "that turn violent when persons at the scene present an imminent threat of bodily harm to persons, or of damage to property, and when law enforcement officials must defend themselves or other persons or property against such imminent threats."

and the order either did not specify why it was being given or did not, by its terms, apply to conduct being engaged in by the witnesses.  Other witnesses followed the directions of the dispersal order but were not permitted to leave the area when they attempted to comply.  Additionally, witnesses offered similar testimony regarding vague, inaudible dispersal orders, the lack of opportunity to comply with dispersal orders, and the refusal to offer or permit egress once the order was given regarding a protest on October 3, 2017.  Defendant's custom or policy cannot meet constitutional standards for definiteness and clarity and runs afoul of the First Amendment's guarantees of free speech, freedom of assembly, and the right to petition the government for redress, as well as the due process protections of the Fourteenth Amendment.  *See Fox Television*, 132 S. Ct. at 2317; *Kolender*, 461 U.S. at 360; *Stahl*, 687 F.3d at 104; *Abdullah*, 52 F. Supp. 3d at 946.

Plaintiffs have also presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant has a custom or policy of using chemical agents without warning on citizens engaged in expressive activity that is critical of police or who are recording police in retaliation for the exercise of their first amendment rights, in violation of the First, Fourth, and Fourteenth Amendments.

Sachs and the other officers testified that Section XIII of Special Order 1-01 relating to the deployment of chemical munitions for crowd dispersal does not

apply to the use of hand held mace.  The order, however, does not specifically exempt hand held mace from within its purview, nor does the settlement agreement reached in *Templeton*.  Defendant's witnesses did not testify as to any rationale for this distinction, and the Court fails to discern one based on the preliminary evidence presented at the hearing.  Pepper spray is a "chemical agent," no matter its method of deployment.

Plaintiffs have presented sufficient, credible testimony and video evidence from numerous witnesses that they were maced without warning in the absence of exigent circumstances while they were not engaging in violent activity and either were not in defiance of police commands (because none were given) or were complying with those commands.  The evidence showed that police used hand held mace without warnings regularly in situations where Section XIII of Special Order 1-01 and the *Templeton* settlement agreement require warnings.  Neither the Special Order nor *Templeton* are limited to situations in which an unlawful assembly is first declared.  Plaintiffs also introduced sufficient, credible evidence of people being maced while simply recording police activity and/or voicing criticism of officers and for no readily apparent, legitimate law enforcement purpose, contrary to the official written policy regarding recording set out in Special Order 1-06.

To the extent that defendant attempts to distinguish chemical munitions from the use of hand held pepper spray as an appropriate authorized "compliance tool" under Section IV of Special Order 1-01, the evidence does not support the argument. There was no evidence that the spray was used to "effect a lawful arrest" or that these witnesses were "combative" or not complying with lawful orders as set out in Section IV of Special Order 1-01. Sachs admitted that the use of pepper spray requires probable cause to arrest. Plaintiffs have presented sufficient evidence at this stage of the proceedings that almost all of these witnesses[13] were not engaged in criminal activities and so there was no probable cause to arrest them when they were maced, and they were never warned that they were subject to chemical agents or arrest for disobeying police orders. Although Sachs hypothesized that exigent circumstances, flight, or other reasons might prevent officers from arresting certain individuals who were maced, he had no personal knowledge or evidence that any of these situations were actually present when any of these witnesses were maced. Moreover, the evidence shows that hand-held mace is used as a tool to seek compliance with a dispersal order. Defendant has articulated no rational, discernable distinction between hand-held mace and mace deployed from chemical agent equipment when being used for crowd control purposes. Defendant's custom or policy of authorizing the use of hand-held mace against non-violent protesters with no warning or opportunity to

---

[13] The Court excludes plaintiff Ahmad from its evaluation of this claim.

comply and in the absence of probable cause or exigent circumstances impermissibly circumvents the protections afforded by the *Templeton* settlement agreement and vests individual officers with unfettered discretion to exercise that authority in an arbitrary and retaliatory manner in violation of constitutional rights.

Plaintiffs' evidence — both video and testimony – shows that officers have exercised their discretion in an arbitrary and retaliatory fashion to punish protesters for voicing criticism of police or recording police conduct. When all of the evidence is considered, plaintiffs have met their burden of showing that they are likely to succeed on their claim that defendant has a custom or policy of deploying hand held pepper spray against citizens engaged in recording police or in expressive activity critical of police in retaliation for the exercise of their first amendment rights, in violation of the First, Fourth, and Fourteenth Amendments.

Plaintiffs have also presented sufficient evidence at this preliminary stage of the proceedings that the aforementioned customs or policies of defendant caused the violations of plaintiff's constitutional rights.

"When a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Phelps-Roper v. Troutman*, 662 F.3d 485, 488 (8th Cir. 2011).  That is because "it is well-settled law that a loss of First Amendment freedoms, for even minimal periods of time, unquestionably

constitutes irreparable injury" and "it is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 691 (8th Cir. 2008) (internal quotation marks and citations omitted), overruled on other grounds, *Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678 (2012).

The Court concludes that the remaining factors weigh in favor of issuing preliminary injunctive relief.  Plaintiffs have shown sufficient irreparable injury in the form of the loss of First Amendment freedoms if injunctive relief is not granted because protests are ongoing and expected to continue.  Likewise, the public interest favors the protection of core First Amendment freedoms.  *See Iowa Right to Life Comm. v. Williams*, 187 F.3d 963, 970 (8th Cir. 1990).  Both defendant and the public have a legitimate interest in maintaining order and protecting officer and public safety.  However, there is no evidence that these interests would be harmed if limited injunctive relief is awarded to prevent defendant from declaring unlawful assemblies and issuing vague, arbitrary dispersal orders in the absence of force or violent activity by protesters, as defendant has no significant interest in enforcing unconstitutional customs or policies.  Moreover, the injunctive relief with respect to the use of chemical agents and retaliatory conduct closely resembles that previously agreed to by defendant in *Templeton*, and there was no argument or evidence that such an order has prevented the City from pursuing legitimate law enforcement objectives.  Neither the public interests nor the interests of the

defendant favor restricting core constitutional rights of assembly and speech in the arbitrary, vague, and retaliatory manner caused by defendant's customs and policies.

Pursuant to Rule 65(c), Fed. R. Civ. P., the Court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Plaintiff has asked the court set bond in the amount of $100, and defendant did not address the issue of the amount of a bond.  The Court will grant plaintiffs' request to set the bond in the amount of $100.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiffs' motion for preliminary injunction [10] is granted and defendant City of St. Louis and its agents, servants, employees, and representatives will not enforce any rule, policy, or practice that grants law enforcement officials the authority or discretion to:

1) Declare an unlawful assembly under St. Louis Code of Ords. §15.52.010 when the persons against whom it would be enforced are engaged in expressive activity, unless the persons are acting in concert to pose an imminent threat to use force or violence or to violate a criminal law with force or violence;

2) Declare an unlawful assembly under St. Louis Code of Ords. §15.52.010 or enforce St. Louis Code of Ords. §17.16.275(A) and (E) for the purpose of punishing persons for exercising their constitutional rights to engage in expressive activity;

3) Use chemical agents, including, but not limited to, mace/oleoresin capsicum spray or mist/pepper spray/pepper gas, tear gas, skunk, inert smoke, pepper pellets, xylyl bromide, and similar substances (collectively "chemical agents"), whatever the method of deployment, against any person engaged in expressive, non-violent activity in the City of St. Louis, in the absence of probable cause to arrest the person and without first issuing clear and unambiguous warnings that the person is subject to arrest and such chemical agents will be used and providing the person sufficient opportunity to heed the warnings and comply with lawful law enforcement commands or as authorized in paragraph 5 below;

4) Use or threaten to use chemical agents, whatever the method of deployment , against any person engaged in expressive, non-violent activity in the City of St. Louis, for the purpose of punishing the person for exercising constitutional rights; and

5) Issue orders or use chemical agents, whatever the method of deployment, for the purpose of dispersing person(s) engaged in expressive, non-violent activity in the City of St. Louis without first: specifying with reasonable particularity the

area from which dispersal is ordered; issuing audible and unambiguous orders in a manner designed to notify all persons within the area that dispersal is required and providing sufficient warnings of the consequences of failing to disperse, including, where applicable, that chemical agents will be used; providing a sufficient and announced amount of time which is proximately related to the issuance of the dispersal order in which to heed the warnings and exit the area; and announcing and ensuring a means of safe egress from the area that is actually available to all person(s);

**Provided, however,** that paragraphs (3) and (5) above do not apply to situations where persons at the scene present an imminent threat of violence or bodily harm to persons or damage to property, or where law enforcement officials must defend themselves or other persons or property against imminent threat of violence.

**IT IS FURTHER ORDERED** that this preliminary injunction becomes effective upon plaintiffs' posting security in the amount of $100 with the Clerk of Court, and remains in effect until further order of this Court.

A separate Preliminary Injunction in accord with this Memorandum and Order is entered this date, as is a separate order referring this case to mediation.


_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 15th day of November, 2017.