**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| MALEEHA AHMAD, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 4:17-cv-2455-CDP |
| | ) | |
| CITY OF ST. LOUIS, MISSOURI, | ) | |
| | ) | |
| Defendant. | ) | |

**REPLY TO MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Plaintiffs have requested that a class of future protesters and observers be certified under

Rule 23(b)(2), governing injunctive classes, because the City of St. Louis directs policies and

customs to that class as a whole and the constitutionality of those policies and customs[1] is

amenable to being resolved on a classwide basis. The evidence at the preliminary injunction

hearing[2] further supports Plaintiffs' contention that the St. Louis Metropolitan Police Department

*in fact* applies the challenged policies and customs on a classwide basis and that an injunctive

---

[1]      The policies and customs of the City include: (1) leaving to the unfettered discretion of an individual officer the ability to declare an unlawful assembly in the absence of force or violence; (2) causing officers to issue vague dispersal orders under the city ordinance prohibiting failure to disperse, and then, without providing sufficient notice and an opportunity to disperse, using force in a retaliatory and arbitrary way; (3) deploying chemical agents against protesters in a retaliatory and arbitrary way, based on protestors' expressive activity. (*See* ECF No. 57; ECF No. 11 at 6; ECF No. 9 at para. 53.)

[2]      The evidence that supports the entry of a preliminary injunction is, by nature, preliminary. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). In this way, such evidence is similar to that which supports the certification of a class. *See Blades v. Monsanto Co.*, 400 F.3d 562, 567 (8th Cir. 2005) ("The preliminary inquiry at the class certification stage may require the court to resolve disputes going to the factual setting of the case, and such disputes may overlap the merits of the case. Nonetheless, such disputes may be resolved only insofar as resolution is necessary to determine the nature of the evidence that would be sufficient, if the plaintiff's general allegations were true, to make out a prima facie case for the class."). So the unfinished nature of the evidence so far mustered is no bar to its consideration by the Court for the purpose of class certification. *See In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011) (holding that class certification inquiry is "tentative").

class would therefore be properly certified. (*See* Mem. & Order dated Nov. 15, 2017, ECF No. 57, 36-44.)

The City argues that Plaintiffs' proposed class definition is too broad and too vague—contentions disputed below—but it does not appear to argue that the issues in this case are altogether inappropriate for class treatment. For the reasons provided below, Plaintiffs continue to believe that the proposed class definition is proper. If the Court disagrees, Plaintiffs request that the Court provide the parties an opportunity to amend the class definition and/or brief the issue of subclasses. *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012) (commenting that over- and underinclusivity of class "can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis"); *see also Rawlings v. ADS Alliance Data Sys., Inc.*, 2015 WL 3866885, at *4 (W.D. Mo. June 23, 2015) (relying on *Messner*); *Maez v. Springs Auto. Grp., LLC*, 268 F.R.D. 391, 394–95 (D. Colo. 2010) (commenting that a court "may refine the suggested definition if necessary") (citing *In re Monumental Life Ins. Co.*, 365 F.3d 408, 414 (5th Cir. 2004)).[3]

## I.     Ascertainability

Ascertainability is not a "separate, preliminary requirement" of class certification, *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 996 (8th Cir. 2016), but "a dispute regarding the method for identifying class members calls for an independent discussion of whether a class is ascertainable." *McKeage v. TMBC, LLC*, 847 F.3d 992, 998 (8th Cir. 2017). One way for a class to be ascertainable is for "its members [to] be identified by reference to objective criteria." *Id.*

---

[3]     Plaintiffs incorporate the arguments they made in their memorandum in support of their motion for class certification.

Here, a member of the proposed class may be identified by his or her behavior: namely whether—or not—he or she participates in, records, or observes a protest in a public forum in St. Louis. Conduct, unrelated to any particular viewpoint, is an objective criterion. The proposed class definitions in the civil-rights-era protest cases relied upon by the City depended instead on the subjective beliefs of the would-be protesters. *Vietnam Veterans Against the War v. Benecke*, 63 F.R.D. 675, 679–80 (W.D. Mo. 1974) (rejecting proposed class definition of "all persons of political or social persuasion different than government officials and officers of the Kansas City, Missouri Police Department"); *Koen v. Long*, 302 F. Supp. 1383, 1388–89 (E.D. Mo. 1969) (rejecting proposed class definition of "all persons who are workers for the end of discrimination and segregation . . . and for the exercise and preservation of civil rights generally," commenting that such a definition was "dependent both upon the state of mind of the particular individual involved and upon the state of mind of the particular defendant involved in a situation," but holding that "[t]his does not mean, however, that the action itself cannot be maintained as a class action, but rather that the class description must fail. A proper class was shown to exist under the evidence presented at the trial.").

The City argues that its police officers will not be able to tell the difference between people participating in or observing protests and "unaffiliated passerby or bystanders" without considering each individual's subjective intent. Although the evidence at the preliminary injunction hearing demonstrated that SLMPD officers sometimes do mistake passersby for protesters, it also showed they are capable of determining when there is a protest. (*See* ECF No. 57, at 12–13, 15; *see also* Tr. Vol. II 147:18–148:3 (testimony of Sgt. Brian Rossomanno that he is the coordinator of the Civil Disobedience Team, that it is "tasked with handling any events of civil unrest, protests, managing protests, that sort of thing," and that he was involved in the

police's response to the post-Stockley verdict protests).) In any event, even unaffiliated bystanders who are subjected to an unconstitutional response to a protest are appropriate members of the class because an individual retaliated against for *perceived* exercise of speech has a First Amendment claim against the governmental entity who retaliated against him. *See Heffernan v. City of Paterson*, 136 S. Ct. 1412, 1418–19 (2016) (holding that police officer demoted for perception he was supporting police chief's electoral opponent, though he was actually just picking up a yard sign for his mother, had cognizable First Amendment claim against chief; commenting that what mattered most was "the police department's reason for taking action," even if that reason was premised on factual error; and explaining that such retaliation could "cause the same kind, and degree, of constitutional harm whether that belief does or does not rest upon a factual mistake"); *see also Peterson v. Farrow*, 2016 WL 3653440, at *7 (E.D. Cal. July 7, 2016) (holding under *Heffernan* that motorcyclist could bring First Amendment retaliation claim if traffic ticket was motivated by associational animus, even if motorcyclist was not part of the association against which officer displayed animus, but dismissing on other grounds).

But even if some class member has no First Amendment right here, his or her inclusion in a purely injunctive class case has no impact because any relief ordered would simply not apply to that class member. *See Sandusky*, 821 F.3d at 997 (reversing denial of class certification on ascertainability grounds in a TCPA case where proposed class was based on sender's fax logs, which likely included some members who had no rights under TCPA, and commenting that those members "just wouldn't be entitled to share in the damages awarded to the class"); *McKeage*, 847 F.3d at 998–99 (describing and reaffirming *Sandusky*).

## II.   <u>Standing</u>

It is undisputed that both the Plaintiffs and the members of the putative class have the right to speak without fear of government reprisal. Loss of speech rights "for even minimal periods of time" constitutes an injury-in-fact. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality); *accord Marcus v. Iowa Pub. Television*, 97 F.3d 1137, 1140–41 (8th Cir. 1996); *see also Elrod*, 427 U.S. at 374 n.29 (noting that "[t]he timeliness of political speech is particularly important"). Because speech rights are "of transcendent value to all society," *Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965), the requirements of standing are "somewhat relaxed" in the First Amendment context. *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013) (cited with approval by *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 794 (8th Cir. 2016)); *Ariz. Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003) ("[W]hen the threatened enforcement effort implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing.") (quoted by *Klahr*, 830 F.3d at 794).

There are two ways a plaintiff can demonstrate the loss of speech rights that "may confer Article III standing to seek prospective relief": (1) by showing that she engaged in objectively reasonable self-censorship—commonly called "chill"—and (2) by showing an intent to engage in constitutionally protected conduct that is proscribed by the government, as long as there is a credible threat that proscription will be enforced. *Klahr*, 830 F.3d at 794 (quoting *Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003) and citing *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)). Plaintiffs and the members of the putative class have shown both types of injury.

Self-censorship is a cognizable First Amendment injury if that self-censorship was "objectively reasonable" in light of what could happen to that would-be speaker if she forges ahead and speaks despite the risks. *281 Care Committee v. Arneson*, 638 F.3d 621, 627 (8th Cir.

2012). The evidence so far (undisputed to date) shows the named Plaintiffs have already suffered an injury of chill; they have participated in expressive conduct less or differently than they would have in the absence of the City's methods of enforcing the unlawful assembly and failure-to-disperse ordinances, deploying chemical munitions, and retaliating against people recording SLMPD officers in the course of their official duties. (*See* Tr. Vol. I 10:24–11:6 (Dreith); 23:24–24:15 (Ahmad); 166:13–167:10 (Mobley); 206:13–207:11 (Nelson); ECF No. 11, ¶¶ 4, 7 (Baude).) Given the seriousness of the consequences they have faced—and would continue to face without an injunction—including arbitrary seizure and/or exposure to chemical munitions, their decision to self-censor is objectively reasonable. *See Peterson v. Kopp*, 754 F.3d. 594, 602 (8th Cir. 2014) (holding that fear of being pepper sprayed would form basis of objectively reasonable chill); *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003) (same for receiving parking tickets). Because Plaintiffs have been chilled, they have standing. *See 281 Care Committee*, 638 F.3d at 628 (reversing dismissal of speech claim concerning statute on standing grounds where—even though plaintiffs had not alleged they wished to engage in conduct that actually violated statute at issue—they had alleged they wished to engage in conduct "that could reasonably be interpreted" as falling under the criminal statute); *Phelps-Roper v. City of Manchester*, 697 F.3d 678, 687 (8th Cir. 2012) (holding that would-be protesters had standing to challenge ordinance they had never violated because they alleged they had made 'changes to their operations' because of the ordinance).

A person who intends to go ahead and speak despite unreasonable risk of government reprisal also presents a cognizable injury permitting that person to seek prospective relief. *Klahr*, 830 F.3d at 794 (citing *Ward v. Utah*, 321 F.3d at 1267). That is, a person who can demonstrate that there is "a realistic danger of sustaining a direct injury as a result" of a government action

6

has standing. *Babbitt*, 442 U.S. at 298. Some of the Plaintiffs, who braved protests after their initial encounters with SLMPD, have sustained this type of injury as well (*See* Tr. vol. 1, 11:2-6 (Dreith testifying she protests "far less" and only in the company of her spouse); 24:6-12 (Ahmad testifying that she went to two protests after her interaction with SLMPD but left quickly "because the sixth sense inside me said something was about to go wrong"). The members of the proposed class—who are limited to people who actually participate in or observe protests in St. Louis—also have a redressable injury under this pathway to First Amendment standing. That is, the evidence shows that participating in or observing a protest in St. Louis entails a realistic danger of sustaining a direct injury to First Amendment freedoms as a result of that conduct. (*See* ECF No. 57, 36–44.) The fact that some—perhaps most—protests in St. Louis City proceed unimpeded by SLMPD is thanks to police largesse and not because of any legal restriction on the policies and customs challenged in this suit. (*See* Tr. vol. 2 73:4-23 (police supervisor testifying that when protesters march in the street, "it's illegal right away" and the incident commander can, at his discretion, arrest participants); 212:6–213:20 (police lieutenant testifying that "[i]f we wanted to," they could arrest marchers for blocking street at any time, that "[t]he incident commander normally" would decide when to take enforcement action, and at "[o]f the 200 protests I've worked, 90 percent of them, we've allowed them to march in the streets"). If a would-be participant faces even a ten-percent chance of government reprisal based on unconstitutional enforcement of city ordinances (setting aside the possibility of being pepper sprayed or seized), that would be sufficient to convey standing. *See 281 Care Committee*, 638 F.3d at 628 (commenting that "we disagree with the district court's conclusion that the infrequent enforcement of [a statute] undermines the objective reasonableness of plaintiffs' decision to chill their speech. Total lack of enforcement of a statute can itself undermine the

reasonableness of chill allegedly resulting from that statute, but only in extreme cases approaching desuetude."). Because class members (defined as those who will actually participate in or observe protests) would be facing a realistic possibility of unconstitutional enforcement actions as a result of that expression, they have standing.

## III.   Cohesiveness

The requirement that a class be cohesive, *see Ebert v. General Mills, Inc.*, 823 F.3d 472, 480 (8th Cir. 2016), does not mean that a class can challenge only one unconstitutional policy or custom at a time, particularly where those customs and policies involve the same core of operative facts. The evidence at the preliminary injunction hearing shows that SLMPD "has acted . . . on grounds that apply generally to the class," Fed. R. Civ. P. 23(b)(2), by permitting its officers to declare protests to be unlawful assemblies in the absence of force or violence, exercise unfettered discretion to determine when a protest should end, issue vague dispersal orders in an arbitrary and retaliatory way, and deploy chemical agents against citizens engaged in expressive activity in an arbitrary and retaliatory way. *See Multi-Ethnic Immigrant Workers Org. Network v. City of Los Angeles*, 246 F.R.D. 621, 633 (C.D. Cal. 2007) ("The mere fact that the [Los Angeles Police Department declared an unlawful assembly and dispersed the crowd at MacArthur Park is enough to meet the requirement that defendants acted on grounds generally applicable to the class."). Even the testimony from the City's police officer witnesses supported the class allegations that individual officers have discretion to declare unlawful assemblies and to enforce the unlawful-assembly and failure-to-disperse ordinances in the absence of violence, appropriate warnings, and the opportunity to disperse, as well as discretion to deploy pepper spray without complying with the Special Order governing SLMPD's use of chemical agents. (*E.g.*, Tr. vol. 1 303:6-23 (Lieutenant Sachs testifying that every officer is issued pepper spray, that it is not

considered a chemical mutation, and no warning is required before it is deployed).) With the

possible exception of Plaintiff Ahmad, whom one of the officers testified was engaged in

nonviolent criminal activity, the City has not proffered any factual evidence to suggest that

SLMPD applied some policy or custom to any or all of the named Plaintiffs that it would not also

be applying to the proposed class in the absence of the preliminary injunction. *See Ebert*, 823

F.3d at 481 ("It is the disparate *factual circumstances* of class members that prevent the class

from being cohesive and thus unable to be certified under Rule 23(b)(2).") (emphasis added).

That is sufficient to show the proposed class is cohesive; cohesiveness does not require, at this

stage, that the Court determine the precise contours of the injunctive relief to be ordered if the

class is ultimately successful. *See Thorpe v. District of Columbia*, 303 F.R.D. 120, 151–52

(D.D.C. 2014) (holding that where city had allegedly failed to implement a required system, Rule

23(b)(2) class was properly certified even if "particular aspects of the relief that plaintiffs seek

may exceed the relief that the Court would order"); *Olson v. Brown*, 284 F.R.D. 398, 414–415

(N.D. Ind. 2012) (holding that where jail had allegedly engaged in policies or practices of (1)

"failing to appropriately handle inmate grievances," (2) "opening legal mail outside of the

inmates' presence," and (3) "not providing reasonable access to the law library to inmates

proceeding pro se in pending cases," class would be certified); *Stinson v. City of New York*, 282

F.R.D. 360 (S.D.N.Y. 2012) (certifying injunctive and damages class of persons against whom

summonses had been issued without probable cause and which were dismissed for factual

insufficiency, where class sought systemic changes and training injunctions).

## IV.   <u>Commonality</u>

The most basic common question among all of the named Plaintiffs is whether they were

retaliated against by SLMPD officers, pursuant to a policy or custom, for exercising their

constitutional rights to protest or observe protests. *See MacNamara v. City of New York*, 275

F.R.D. 125, 141 (S.D.N.Y. 2011) (holding that "observers of a political protest fall within the

ambit of constitutional protection"). The named Plaintiffs have alleged, and proffered evidence

to support their allegation, that they were and that they and the putative class will be in the

future. The retaliation has taken different forms, but it has resulted in the same injuries in fact:

objectively reasonable chill and the realistic possibility that they will subjected to "the punitive

machinery of government," *Garcia*, 348 F.3d at 729, if they nonetheless keep expressing

themselves in public forums despite the risk of seizure, arrest, and/or chemical spray.

 Relying on *Graham v. Connor*, the City suggests that no policy or custom relating to

arrest or the use of force will ever be appropriate for class treatment because any given seizure is

subject to an individualized calculus of reasonableness. This ignores the fact that the City relied

upon its interpretation of the same two ordinances to justify the seizure of each of the named

Plaintiffs, whether by arrest, detention, or the deployment of chemical munitions. If there were

other factors that would have justified these seizures (other than Plaintiff Ahmad's participation

in nonviolent criminal activity), the City has not explained them. It also ignores the First

Amendment-protected conduct not only common to each of the Plaintiffs and the proposed class

members but the basis for the City's retaliation: participating in or observing protests in a public

forum. *See Carpenter v. Davis,* 424 F.2d 257, 260 (1st Cir. 1970) (approving injunctive class

consisting of all who wish or expect to write for, publish, sell or distribute newspaper in the

future and emphasizing that "[t]he record is ample to show numerous such people in existence,

as well as the probability of others who may become members of the class in the future").

 In fact, although the Eighth Circuit ultimately affirmed officers' actions against protestors

in *Bernini v. City of St. Paul*, 665 F.3d 997, 1003 (8th Cir. 2012), it considered the arrests of the

Case: 4:17-cv-02455-CDP   Doc. #:  66   Filed: 12/04/17   Page: 11 of 13 PageID #: 1124

32 plaintiffs as a group.[4] *See also Sullivan v. Murphy,* 478 F.2d 938, 967 (D.C. Cir. 1973)

(commenting that class treatment was appropriate, despite individualized nature of probable

cause, because it was "a situation in which the police did not govern themselves by their ordinary

procedures . . . [a]nd the arrests that were made were the product of a common course of conduct

by the police."). If the Court concludes that the proposed class lacks commonality, Plaintiffs

request an opportunity to propose subclasses. *See Caroline C. ex rel. Carter v. Johnson*, 174

F.R.D. 452, 460-61 (D. Neb. 1996) (certifying class of current and future female patients of

mental institution based on policies and customs that permitted unreasonable exposure to risk of

sexual assault as well as subclass of patients who had been assaulted).

## V.   Enforceability of Potential Injunction

If Plaintiffs ultimately prevail but a class is not certified, the City will be free to continue

policing peaceful protests in an unconstitutional manner because any court order entering a

permanent injunction will be unenforceable by anyone except the named Plaintiffs. *See* Memo.

& Ord. dated Apr. 27, 2016, *Hussein v. St. Louis County*, No. 4:14-CV-1410 JAR (holding that

consent judgment permanently enjoining St. Louis County from interfering with persons

recording police officers was unenforceable by third-party beneficiaries) (copy attached). As

demonstrated by the *Templeton* case, which dealt with some of the issues present here, ingrained

---

[4]      There are other key differences between *Bernini* and this case, including the fact that the proposed class in this case does not seek damages. In addition, St. Paul has a permitting scheme for First Amendment activity, while St. Louis does not, so there is no way for putative class members to lawfully protest on a street or sidewalk in St. Louis city. In addition, *Bernini* concerned one police-protestor interaction, where here, Plaintiffs have alleged that the policies and customs they challenge have spanned years. Further, video footage in *Bernini* showed that protestors had threatened the police and that the police pursued the protestors only afterward; here, evidence presented at the preliminary injunction hearing showed retaliatory enforcement actions against protestors who had not engaged in any violent or threatening conduct. Finally, the *Bernini* court distinguished *Barham v. Ramsey*, 434 F.3d 565 (D.C. Cir. 2006), in which an officer directed "an indiscriminate mass arrest of about 400 persons in a park based on the unlawful acts of a small group of protestors," concluding instead that the St. Paul officers had attempted to discern which people were responsible for the threatening conduct, releasing hundreds of people before effectuating arrests. Here, SLMPD effectuated an indiscriminate mass arrest like in *Barham*.

policies or customs do not change—at least not meaningfully—absent a way to enforce relief that has been obtained. Future protestors facing the violation on their constitutional rights ought to be able to enforce an eventual injunction in this case. That is the purpose and intent of Rule 23(b)(2).

For these reasons, Plaintiffs request their proposed class be certified or, in the alternative, that they be permitted to refine the class definition or propose subclasses.

Respectfully submitted,


/s/ Anthony E. Rothert
Anthony E. Rothert, #44827MO
Jessie Steffan, #64861MO
ACLU of Missouri Foundation
906 Olive Street, Suite 1130
St. Louis, Missouri 63101
Phone: (314) 652-3114
arothert@aclu-mo.org
jsteffan@aclu-mo.org

GILLIAN R. WILCOX, #61278MO
ACLU of Missouri Foundation
406 W 34th Street
Suite 420
Kansas City, Missouri 64111
Phone: (816) 470-9938
gwilcox@aclu-mo.org

**Attorneys for Plaintiffs**

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing was filed electronically and served by operation of

the CM/ECF system on all counsel of record on December 4, 2017.

/s/ Anthony E. Rothert