IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

MALEEHA AHMAD, et al,        )
                             )
          Plaintiffs,        )
                             )
vs.                          )  No. 4:17-CV-2455 CDP
                             )
CITY OF ST. LOUIS,           )
                             )
          Defendant.         )


Skype Deposition of JAMES GOLDEN, JR.
taken on behalf of the Defendant
February 8, 2019


INDEX
Questions By:                           Page:

MR. DIERKER                               5


Reporter:  Sara Alice Masuga, CSR, CCR
IL CSR No. 084-002993   MO CCR No. 1012


MASUGA REPORTING SERVICE
2033 HIAWATHA AVENUE
ST. LOUIS, MO  63143-1215

Exhibit K

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF MISSOURI
2
3      MALEEHA AHMAD, et al,      )
                                  )
4              Plaintiffs,        )
                                  )
5      vs.                        )  No. 4:17-CV-2455 CDP
                                  )
6      CITY OF ST. LOUIS,         )
                                  )
7              Defendant.         )
8
9   APPEARANCES:
10
    On Behalf of the Plaintiff:
11
12          ACLU
            By Omri E. Praiss, Esq.
13          906 Olive Street
            Suite 1130
14          St. Louis, MO  63101
15
16   On Behalf of the Defendant:
17
            City Counselor's Office
18          By Robert Dierker, Esq.
            Meg Bruyns, Esq.
19          Brandon Laird, Esq.
            Amy Raimondo, Esq.
20          1200 Market Street
            City Hall Room 314
21          St. Louis, MO  63103
22
    Also Present:  Ms. Nicole Strombom
23                 Mr. Naif Albattal
24
25
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

```
 1          IT IS STIPULATED AND AGREED by and between
 2   counsel for Plaintiffs and counsel for Defendant that the
 3   deposition of JAMES GOLDEN, JR. may be taken via Skype
 4   pursuant to the Federal Rules of Civil Procedure, by and
 5   on behalf of the Defendant on February 8, 2019, at the
 6   offices of the ACLU, 906 Olive Street, St. Louis,
 7   Missouri, before me, Sara Alice Masuga, Certified Court
 8   Reporter and Certified Shorthand Reporter; that the
 9   issuance of notice is waived and that this deposition may
10   be taken with the same force and effect as if all Federal
11   Rules had been complied with.
12          IT IS FURTHER STIPULATED AND AGREED that the
13   signature of the deponent is reserved.
14
15
16
17
18
19
20
21
22
23
24
25
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1                         EXHIBIT INDEX
          Exhibit:                                      Page:
2

3    Defendant's Golden Deposition Exhibit A................6
     ("Police Pepper Spray Routs Klan Rally Crowd,"
4     Chicago Tribune Article 9/28/97)

5
     Defendant's Golden Deposition Exhibit B................7
6    (Declaration of Chief James B. Golden, Jr. (Retired)
      dated 1/25/19, C.V., Declaration of James B. Golden,
7     Jr. dated 10/22/17, Expert Report of Chief James B.
      Golden, Jr. (Retired))
8

9    Defendant's Golden Exhibit C..........................29
     (City of St. Louis Special Event Consolidated
10    Application)

11

12   (Exhibits attached.)

13

14

15

16

17

18

19

20

21

22

23

24

25

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

```
 1          JAMES GOLDEN, JR. produced via Skype, sworn, and
 2     examined as a witness on behalf of the Defendant
 3     testified as follows commencing at 9:06 a.m.:
 4
 5                    E X A M I N A T I O N
 6     BY MR. DIERKER:
 7
 8          Q.   Chief, I don't know if you can see me.  I'm
 9     Bob Dierker of the City Counselor's Office.  You don't
10     mind if I call you Chief, do you?
11          A.   No, that's fine, thank you.  Jim, Chief,
12     whatever you choose, it's okay.
13          Q.   All right.  I've got several other attorneys
14     here with me, but they're not going to be doing any of
15     the talking.  I will be doing all the talking.  If you
16     can't hear me for sure, let me know, okay?
17          A.   Yeah, I can hear you.  I just can't see you.
18          Q.   Okay.
19               MS. RAIMONDO:  Do you watch to switch with me
20          so maybe he can see yu?
21               MR. DIERKER:  Well, I think it's better for me
22          to be closer, so...
23                    (Questions by Mr. Dierker)
24          Q.   I'll -- I'll lean in at some point and wave to
25     you, Chief, so...
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

```
1          A.   Okay, that's fine.
2          Q.   So, Chief, what I'd like to do, first of all,
3   there was a reference in your materials to the KKK rally
4   in Saginaw, Michigan and I wanted to show you what I've
5   marked as Deposition Exhibit A, which is an internet copy
6   of a Chicago Tribune report September, 1997 and I'm not
7   sure if -- I'm not sure the best way to get you to see
8   that.
9          A.   Yes, I can see it.
10         Q.   Okay.  And -- And I don't expect you
11  necessarily to be able to identify that.  I just wanted
12  to ask you, the report indicates that Pepper Spray Routes
13  Klan Rally Crowd and I was curious if you are familiar
14  with any incident involving pepper spray at Saginaw with
15  the KKK.
16         A.   No, I'm not.  In fact, the two rallies that
17  were held there were in -- in '96, July and August of
18  1996 in Saginaw.
19         Q.   So, if in September of 1997, would that have
20  been while you were still chief up there?
21         A.   I was chief, yes, in '97.  I don't recall a
22  Klan rally, however, at that time.
23         Q.   Okay.
24              MR. PRAISS:  Just for the record, this is from
25         the Chicago Tribune and I don't see any reference to
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

```
 1          Saginaw, Michigan, or am I missing something?
 2                  MR. DIERKER:  (Pointing.)
 3                  MR. PRAISS:  Thank you.
 4                  MR. DIERKER:  Okay.
 5                  (Questions by Mr. Dierker)
 6          Q.   Okay, Chief, I'd like to get just a couple
 7    other preliminary matters out of the way.  I have marked
 8    for purposes of the deposition as Exhibit B your Dec- --
 9    Declaration and the materials that you provided through
10    the Plaintiffs' lawyers to us.  And does -- does that
11    look familiar to you as --
12          A.   Yes.
13          Q.   -- as best you can see through Skype?
14          A.   Yes.
15          Q.   Okay.  Off the top, do you have anything that
16    specifically you want to amend or alter with regard to
17    the report and materials that you submitted through --
18    through the Plaintiffs' lawyers?
19          A.   No.
20          Q.   Okay.  Are you aware of an entity known as the
21    Commission for the Accreditation of Law Enforcement
22    Agencies, C-A-L-E-A?
23          A.   Yes.
24          Q.   Okay.  Was the Saginaw Police Department
25    accredited by them?
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

```
1            A.   We had begun the process, but it was never
2       completed, at least not on my watch, but we initiated
3       that process when I was chief.
4            Q.   Okay.  So, you're -- you're generally familiar
5       with that organization and its accrediting process?
6            A.   Yes --
7            Q.   Okay.
8            A.   -- CALEA as it's known.
9            Q.   And is that a recognized accreditation process
10      as far as your professional opinion goes?
11           A.   Yes.
12           Q.   And are you aware that the City of St. Louis
13      Police Department is accredited by that entity?
14           A.   I was not aware, no.
15           Q.   Okay.  Have you studied the CALEA standards
16      regarding crowd control response?
17           A.   I have not, not CALEA, no.
18           Q.   Okay.  When was the last time you were in a
19      command position with regard to a crowd control
20      situation?
21           A.   That would have been -- That would have been
22      Saginaw.  And in terms of a significant crowd management
23      situation, I guess it would have been Saginaw.
24           Q.   Did you ever have any --
25           A.   1996.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

```
 1          Q.   While you were with the Philadelphia Police
 2   Department, did you have any occasion to be in crowd
 3   control situations?
 4          A.   Yes, a few times.
 5          Q.   And did you personally ever use -- I'm going
 6   to talk about pepper spray.  Sometimes I'll talk about
 7   mace.  I mean, to me they're interchangeable.  Is that --
 8   Is that okay to use those terms interchangeably?
 9          A.   Yes.
10          Q.   So, did you ever have occasion to deploy mace
11   or -- yourself in any crowd control situation?
12          A.   No.
13          Q.   Did you observe it used by anybody under your
14   command?
15          A.   No.
16          Q.   Okay.  With regard to the International
17   Association of Chiefs of Police, do you regard their
18   statements or their papers, their work to be
19   authoritative within your field or within the field of
20   policing crowd contro- -- and crowd control situations?
21          A.   Yes.
22          Q.   And, so, they -- they would generally be
23   reliable, the standards of the IACP?
24          A.   Yes.
25          Q.   And I believe, correct me if I'm wrong, but I
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1    believe various passages in your report, Exhibit B, track
2    very closely to some of the statements that are made in
3    the IACP paper on Crowd Management and Control, October
4    of 2014; is that a fair statement?
5         A.   I'd have to check that, but, I mean, yes, I
6    know I referenced something from IACP, but I don't know
7    the specific date.  I'd have to look, look at that.
8         Q.   Okay.  In your opinion, Chief, who is better
9    equipped to deal with a crowd control situation, the
10   commanders on the scene or a judge several months later?
11        MR. PRAISS:  Object to the form of the
12        question.
13        Q.   You can go ahead and answer.  Counsel didn't
14   like the way I put the question.  If you understand it,
15   you can answer.
16        A.   Would you repeat it, please?
17        Q.   In your opinion, who is more capable of
18   assessing crowd control situations, the commanders --
19   police commanders on the scene or a judge several months
20   later?
21        MR. PRAISS:  Same objection.
22        A.   If the commanders on the scene, the police
23   commanders, are well-trained and skilled in that area, I
24   would say the police commander.
25        Q.   In your opinion, can anybody anticipate in

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1   advance how a spontaneous public protest will proceed?

2          A.    In many situations, I would say yes.

3          Q.    Do -- In your opinion, do spontaneous or

4   extemporaneous protests present special problems for law

5   enforcement?

6          A.    I would say yeah, depending on the

7   circumstances, you're talking about something that's

8   unexpected or unanticipated as spontaneous, yes.

9          Q.    And in the course of your career, are you

10  familiar with protests that were conducted pursuant to

11  permit processes in the local government?

12         A.    Yes.

13         Q.    And were you familiar with situations where no

14  permit was applied for and -- but a protest proceeded?

15         A.    I can't recall offhand those situations, no.

16         Q.    What was -- The situation in Saginaw that you

17  referred to involving the KKK, were permits involved in

18  that situation?

19         A.    Yes, I believe they were.

20         Q.    Okay.  In your opinion, are there special

21  problems for law enforcement when the police are the

22  target of the protest?

23         A.    I'm not sure what you mean by "special

24  problems."

25         Q.    Well, I'm just asking for your opinion as to

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

```
 1   whether you think there are any.
 2        A.    I think most crowd management situations
 3   involving police and protestors present challenges.
 4        Q.    The counsel for the Plaintiffs sent me a list
 5   of materials that you reviewed, which I think involved --
 6   included the transcripts of the preliminary injunction
 7   hearing in this case and video materials that were
 8   supplied both by the City Police Department and by the
 9   Plaintiffs.  Am I safe in assuming that you have not
10   reviewed any materials that have not been disclosed to us
11   by Plaintiffs' counsel as far as you know?
12        A.    That's correct as far as I know.
13             (At this point, Mr. Albattal arrived at the
14             deposition.)
15        Q.    Okay.  Chief, I've got a copy of the IACP
16   paper on Crowd Management and Control, October of 2014,
17   which I believe is included in or cited in your
18   materials, so I'm not marking that as an exhibit, but I'd
19   just like to read a couple of statements in that paper to
20   see if you agree with those propositions.
21        A.    Okay.
22        Q.    And if you happen to have it with you, that's
23   fine.  I'm reading from Page 2.  Quote, "A civil
24   disturbance is an unlawful assembly and is normally
25   defined in state and local law.  Normally, it is a
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1    gathering that constitutes a breach of the peace or any

2    assembly of persons where there is a threat of collective

3    violence, destruction of property, or other unlawful

4    acts.  Civil disturbances are often, but not always,

5    spontaneous occurrences that require the emergency

6    mobilization of law enforcement officers and related

7    emergency services.  Law enforcement employs crowd

8    control techniques and tactics to address unlawful public

9    assemblies to include a show of force, crowd containment,

10   dispersal equipment and strategies, and preparation for

11   possible multiple arrests."  Would you agree that that

12   capsulizes a civil disturbance situation?

13            A.    I think generally, yes.

14            Q.    And I've got another excerpt I'd like to read

15   to you from Page 7.  Quote, "Law enforcement agencies may

16   employ several options when a crowd does not heed their

17   warnings.  These include but are not limited to any one

18   or any combination of the following:  Display of forceful

19   presence, which can include police lines combined with

20   motorcycles, law enforcement vehicles, and mobile field

21   forces; crowd encirclement; multiple simultaneous

22   arrests; use of aerosol crowd control chemical agents;

23   law enforcement formations and use of batons for forcing

24   crowd movement."  Would you agree that that describes

25   options that are available in dealing with a crowd that

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

```
 1    is not heeding warnings?

 2              MR. PRAISS:  Object to the form --

 3         A.   I believe --

 4              MR. PRAISS:  -- of the -- Give me one second,

 5         Jim.

 6              THE WITNESS:  Yes.

 7              MR. PRAISS:  Object to the form of the

 8         question.  Vague and overbroad.

 9         Q.   You may answer.

10         A.   I believe they are, given the specific

11    circumstances of the event, yes.

12         Q.   And again reading from Page 7, "There are" --

13    Quote, "There are instances in which law enforcement

14    agencies have little or no warning to prepare for

15    demonstrations or civil disturbances.  Sporting events

16    and rock concerts are among those situations that

17    sometimes spawn uncontrolled crowds and illegal

18    gatherings.  Demonstrations or large gatherings of any

19    kind that escalate into civil disturbances are governed

20    by the policies and regulations concerning crowd

21    management, control, and dispersal identified here with

22    respect to civil disturbances.  The first officer to

23    arrive on the scene of a spontaneous demonstration or

24    civil disturbance has a number of responsibilities, to

25    include the following:  Observe the situation from a safe
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1    distance to determine if the gathering is currently or

2    potentially violent.  Notify" communi- -- "the

3    communications center of the nature and seriousness of

4    the disturbance, particularly the availability of

5    improvised or deadly weapons; crowd location and

6    estimated number of participants; current activities

7    (such as blocking traffic); direction of movement; and

8    ingress and egress routes for emergency vehicles.

9    Request the assistance of a supervisor and any necessary

10   backup.  Instruct the individuals to disperse if

11   approaching the crowd does not present unnecessary risk.

12   Attempt to identify crowd leaders and (sic) potential

13   agitators and/or anyone engaged in criminal acts."  Would

14   you say that's a fair summary of what the first responder

15   could or should do in a crowd control situation?

16              MR. PRAISS:  I'm going to again object to the

17          form of the question.  It's overbroad and it's

18          vague, considering how long the section that you

19          just quoted.  Go ahead.

20       Q.   You may answer, Chief, if you understand the

21   question.

22       A.   Yes, but a single officer, if you're talking

23   about an individual officer in a fairly large

24   demonstration, I certainly would hope that officer would

25   summon assistance and support before taking other actions

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1    that you mentioned in that excerpt.

2          Q.   Now, Chief, I understand you -- you reviewed

3    the extensive materials with regard to the events in

4    September 15 through September 17 of 2017 in the City of

5    St. Louis.  Am I safe in assuming that?

6          A.   Yes.

7          Q.   To what extent are you familiar with the

8    geography in the City of St. Louis?

9          A.   Not very.  It's been a while since I visited

10   St. Louis, so I couldn't speak to, you know, specific

11   layout of the City.

12         Q.   With regard to the events on September 15, I

13   will refer to Tucker and Clark, which is the intersection

14   located near the former St. Louis Police Headquarters.

15   Are you aware of that -- the geography of that

16   intersection, roughly?

17         A.   Well, just based on video recordings that I

18   reviewed.

19         Q.   Okay.  And were you aware that the protests

20   regarding the verdict in the Stockley case commenced

21   earlier in the day at the intersection of Tucker and

22   Market Street nearest to the courthouse?

23         A.   That's my understanding, again, from the

24   review of documents and the video recordings.

25         Q.   Okay.  Well, assuming that's the case, would

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1    it have been sound police practice to have a

2    riot-equipped unit staged several blocks away near the

3    old Police Headquarters?

4          A.   I'm not sure I understand that question as --

5    as relates to the previous comment.  Would you -- Would

6    you state it again, please?

7          Q.   That's fine.  I'm -- All the lawyers in this

8    room can attest that I'm grossly out of practice at

9    taking depositions, so.  I would ask you to assume that

10   the -- what I'll call the Stockley protests began at the

11   intersection of Tucker and Market in the City of

12   St. Louis earlier in the day of September 15 and that

13   Tucker and Market is approximately two blocks away from

14   Tucker and Clark.  So, can we -- are you with me so far?

15         A.   Yes.

16         Q.   And in -- in your opinion, given that the

17   protests began to materialize two blocks away from Tucker

18   and Clark, would it have been sound practice to have the

19   riot-equipped units staged at Tucker and Clark?

20         A.   Well, the only way I can answer that is to the

21   extent that there was advanced knowledge or information,

22   the -- the Police Department would have been able to

23   position officers, tactical officers, and other resources

24   where they were most needed.

25         Q.   Well, I understood in your -- your report, you

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1    opined that the Police Department -- that the best

2    practice is to avoid having riot-equipped police visible

3    immediately when a protest starts to materialize.  Am I

4    misstating your view?

5         A.   No, that's correct.

6         Q.   Okay.  Let me -- And forgive me, but I may

7    jump around a little bit like the protest did that

8    weekend.  In your review in preparing and formulating

9    your opinions, did you review materials with regard to

10   any prior incidents of protests related to police conduct

11   in the City of St. Louis?  And by "prior incidents," I

12   mean prior to 2017.

13        A.   I recall there were references to such

14   incidents, but I did not directly review those matters.

15        Q.   Okay, so -- so then to the extent that you

16   made -- formulated any opinions, to the extent you had

17   information about any prior incidents prior to 2017 in

18   the City of St. Louis, you would have been depending

19   mainly on the Plaintiffs' preliminary injunction

20   testimony; is that fair?

21        A.   Yes, that's right.

22             (At this point, Ms. Bruyns left the

23             conference room.)

24        Q.   Okay.  So, apart from that testimony, you

25   would not have any -- you did not conduct any extensive

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

```
 1    review of any incidents involving Grand Avenue and
 2    Highway 44 in March of 2012; is that right?
 3         A.   That's right.
 4         Q.   And likewise, any incident in October of 2014
 5    at Vandeventer and Manchester Streets or Grand and
 6    Arsenal Streets in the City of St. Louis?
 7         A.   That's right.
 8         Q.   And similarly with regard to August of 2015 at
 9    Page and Walton in the City of St. Louis, you would not
10    have reviewed any materials specific to that?
11         A.   I did not.
12         Q.   Okay.  You indicated that you had testified --
13    you were deposed in a case in Kansas City, in Federal
14    Court in Kansas City; is that correct?
15         A.   Yes.
16         Q.   And are Plaintiffs' counsel in this case the
17    same counsel as in Kansas City?
18         A.   Yes.
19         Q.   And just briefly, what -- what's that lawsuit
20    about, as far as you know?
21         A.   It -- It involved a tender age grade school
22    student being -- being handcuffed by a security officer.
23         Q.   Okay.  And if I understand your resume
24    correctly, your current practice, if I may use that term,
25    focuses on policing and youth; is that -- am I correct in
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1    that?

2         A.   Juvenile justice training for law enforcement

3    and school districts, yes.

4         Q.   Okay.  Are you familiar with an area of

5    Philadelphia called God's Pocket?

6         A.   No, I -- I can't say that I am, no.

7         Q.   When I read your resume, it just brought to

8    the mind a movie that I had seen about Philadelphia and

9    one of my former colleagues was from Philadelphia,

10   Judge Garvey.  You don't happen to know him, do you?

11        A.   It's been a while.  I've been out of Philly

12   for a while, but, I mean, I'm still relatively close to

13   the area, but Judge Garvey, I can't say that I'm familiar

14   with -- with that person.

15        Q.   Okay.  Well, the reason I ask is that was

16   going to lead into a question about do certain areas

17   in -- within a metropolitan area call for different

18   attention or tactics by the police.

19        A.   In a general community policing strategy, yes.

20        Q.   Have you ever been hit by a full water bottle?

21        A.   No.

22        Q.   Have you, yourself, ever been the defendant in

23   a civil rights action based on your policing activities?

24        A.   No.  There have been, you know, administrative

25   actions, but, no, I --

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1      Q.    No --

2      A.    -- don't think.

3      Q.    -- I'm -- I'm referring to --

4      A.    Right.

5      Q.    -- lawsuits, not administrative action.

6      A.    (Nodding.)

7      Q.    Are you aware of any officers under your

8   command who are defendants in civil rights suits?

9           MR. PRAISS:  Object to the form of the

10      question.  Overbroad.

11      Q.    You may answer.

12      A.    I'd really have to search my memory for that,

13   but offhand, I just can't point to anything specific.

14      Q.    Okay.  In your opinion, can individual

15   officers violate police department policy without the

16   presence of a custom?

17           MR. PRAISS:  Object to the form of the

18      question to the extent it calls for legal

19      conclusion.

20      Q.    Well, let -- I'll -- I'll rephrase the

21   question, Chief.  In your opinion, you -- and I'm

22   paraphrasing -- you -- you express the view that the

23   instances of use of mace that you observed in the videos

24   were indicative of a custom of improperly deploying mace.

25   Did I paraphrase that opinion more or less accurately?

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1       A.   Yes, it appeared that way to me.

2       Q.   And what are you -- when you refer to a

3  custom, as a -- as a professional and expert in policing,

4  what -- what do you mean by a custom?

5       A.   Well, in this instance from -- from what I

6  saw, there were other techniques, in my opinion, that

7  could have been employed short of -- of the use of

8  chemical munitions.  It just seemed that that was,

9  instead of a last resort, it was something that was done

10 rather hastily.

11      Q.   Well, let me repeat my question.  As far as

12 your concept of a custom within police operations is

13 concerned, would it be your view that an individual

14 police officer can violate police department policies and

15 regulations without thereby acting pursuant to a custom

16 within the police department?

17      A.   They cannot violate policy pursuant to a

18 custom or practice that essentially flies in the face of

19 that policy, if that's what you're asking.

20      Q.   I think you answered the question better than

21 I asked it, Chief.

22           Based on your review of the materials that

23 have been given to you in this case, what is your

24 understanding of when and where the St. Louis Police

25 deployed teargas?

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

```
 1        A.   When and where in these circumstances or

 2   generally?  I'm sorry, I might have missed --

 3        Q.   Well --

 4        A.   -- the question.

 5        Q.   -- I was referring specifically to the events

 6   of September 15 through September 17 of 2017.

 7        A.   Okay.

 8        Q.   What is your understanding of when on those

 9   dates -- Or maybe I should rephrase it.  What is your

10   understanding as to which incidents involved the

11   deployment of teargas?

12        A.   The most -- The most vivid occasion was on

13   Sunday evening, the 17th, and I believe to some extent on

14   the afternoon of the 15th.

15        Q.   So, it was your observation that teargas was

16   deployed on the evening of September 17 at the Tucker and

17   Washington incident?

18        A.   Yes, I think just prior to the mass arrests.

19             MR. PRAISS:  Just for the record, when you're

20        using the phrase "teargas," is that distinguishable

21        from pepper spray or mace?

22             MR. DIERKER:  Okay, well, thank you, I --

23             MR. PRAISS:  Just so we're all on the same

24        page because it's not clear to me.

25             MR. DIERKER:  Well, I want it to be clear.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

```
 1                    (Questions by Mr. Dierker)
 2          Q.   So, Chief, I -- I started using the term
 3     "teargas."  Can we agree that teargas is a different
 4     munition than pepper spray or mace?
 5          A.   Yes.
 6          Q.   And, so, when I say "teargas," you understand
 7     me to be referring to a substance that is a different
 8     form or different chemical used in crowd control?
 9          A.   Different from pepper spray?
10          Q.   Right.
11          A.   Yes.
12          Q.   So, is it your understanding that teargas was
13     deployed on the evening of September 17?
14          A.   Yeah, I'm sorry, I -- I thought at the outset
15     we talked about using terms interchangeably, but maybe it
16     wasn't teargas, so --
17          Q.   No, I -- I -- I was using pepper spray and
18     mace interchangeably.
19          A.   Right, right, okay.  Yeah --
20          Q.   I --
21          A.   -- and --
22          Q.   I ident- --
23          A.   -- I understand so.
24          Q.   I'm sorry.
25          A.   Yeah, so, specifically you're asking about
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

 1    when I thought the police deployed teargas over the three

 2    days --

 3         Q.   Right.

 4         A.   -- is that right?

 5         Q.   Right.

 6         A.   Okay.  And, frankly, I'd have to go back and

 7    look at the documents or the video recordings.  I don't

 8    recall specifically about the teargas.

 9         Q.   In your review of the materials, did you form

10    an opinion as to whether, from the police standpoint, the

11    conduct of protestors at the mayor's house during the

12    night of September 15 was an unlawful assembly?

13              MR. PRAISS:  Object to the form of the

14         question to the extent it calls for legal

15         conclusion.

16         Q.   You may answer.

17         A.   You're asking if I thought it was an unlawful

18    assembly --

19         Q.   Right, you --

20         A.   -- based on --

21         Q.   -- as -- as a police officer or as a -- as a

22    expert in policing.

23         A.   The mere fact that they were present outside

24    the mayor's residence, in my opinion, would not

25    constitute necessarily an unlawful assembly.  It would

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

```
 1   depend on what's actually happening there.
 2        Q.   Well, and that's my question.  Based on what
 3   you know was actually happening there, did you feel that
 4   it constituted an unlawful assembly?
 5        A.   I'd have to go back and look at exactly what
 6   took place there.  I'm sorry.
 7        Q.   As an expert in policing, how would you define
 8   an unlawful assembly?
 9        A.   I -- I would define it in the context of a
10   demonstration where there is significant violence and
11   destruction of property to the extent that public safety
12   was put at serious risk.
13        Q.   As an expert in policing, to your knowledge,
14   are there statutes and ordinances throughout the country
15   that regulate unlawful assemblies?
16        A.   I'm certain there are in --
17        Q.   Were --
18        A.   -- regards to your --
19        Q.   Were --
20        A.   -- jurisdiction, yes.
21        Q.   Were -- Well, let's refer to Saginaw, Michigan
22   and Michigan in particular.  At the time you were chief,
23   were -- were there ordinances and statutes that pertain
24   to unlawful assemblies?
25        A.   Yes.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1          Q.    And in Philadelphia, to your knowledge, were

2     there similar statutes and regulations?

3          A.    Yes.

4          Q.    Did you ever personally have occasion to

5     employ the soft approach in an anti-police protest

6     context?

7          A.    Specifically anti-police or any crowd control

8     situation?

9          Q.    No, specifically anti-police.

10         A.    No.

11         Q.    In your opinion, do anti-police protests

12    entail greater risks for the police that are assigned to

13    crowd control?

14         A.    No, not necessarily.

15         Q.    From your experience and observation, are

16    injuries to police officers common to all kinds of

17    protests?

18              MR. PRAISS:  Object to the form.  Vague.

19         Q.    You may answer if you understand the question.

20         A.    There -- There is risk certainly to officer

21    safety in many circumstances, including demonstrations

22    and crowd -- crowd management situations.

23         Q.    As an expert in policing, would it be your

24    opinion that a protest that is occupying major

25    thoroughfares in a metropolitan area is a lawful

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1  assembly?

2              MR. PRAISS:  Object to the form of the

3       question.  Vague.

4       A.   Again, it depends on the unique circumstances.

5  It could be lawful.

6       Q.   The term "kettle" has been used in this case.

7  Is that a recognized term of art in the policing

8  profession?

9       A.   Not that I'm familiar with.

10      Q.   Would it surprise you if that term originated

11 with a person who regularly participates in protests, but

12 not a police officer?

13      A.   Not much surprises me anymore, frankly.  Not

14 to evade the question, but...

15      Q.   No, I think that's a valid answer.

16              With regard to crowd control situations, in

17 your opinion as a -- as a policing expert, if an assembly

18 is properly ordered to disperse, is it good practice to

19 take steps to prevent the reassembling of the group?

20      A.   Yes.

21              MR. PRAISS:  Can we take maybe a two minute

22       break?  Somebody needs to get a phone from here and

23       I was trying to find a good spot.  I didn't want to

24       interrupt your flow if this is okay.

25              MR. DIERKER:  There's no flow to interrupt,

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

```
 1        so, yeah --
 2                MR. PRAISS:  That's okay.
 3                MR. DIERKER:  -- we can --
 4                MR. PRAISS:  I'll tell --
 5                MR. DIERKER:  -- we can take a break.  I've
 6        got to fumble through papers anyway.
 7                MR. PRAISS:  Let's take --
 8                MR. DIERKER:  Chief, is it okay with you if we
 9        break for a couple minutes?
10                THE WITNESS:  Yes.
11                (At this point, there was a break taken from
12                9:51 a.m. to 9:56 a.m.)
13                    (Questions by Mr. Dierker)
14        Q.    Chief, good to go?
15        A.    Yes.
16        Q.    Okay.
17        A.    Yes.
18        Q.    Chief, I'm going to show you what's been
19    marked for identification as Golden Deposition Exhibit C.
20    And I know you're going to be somewhat at a disadvantage,
21    I'm sure you have not seen this before, but can you --
22    can you read it at all?
23        A.    Look like City of St. Louis, an Application or
24    something.
25        Q.    Okay.  Well, I will -- I will represent to you
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

```
 1    that this is a City of St. Louis form that is used for

 2    permits for special events and I will also represent to

 3    you that this is an application for a permit for a safe

 4    free speech zone for citizens to invoke their right to

 5    free speech and I'll further represent to you that this

 6    was an application made by the City Police Department to

 7    the City's other -- another City agency to allow for the

 8    use of a park area for protesting.  So, we can accept

 9    those representations as to what the document is, the

10    document speaks for itself, but the reason I present it

11    to you is merely to ask you a couple questions based on

12    some assumptions.  And I'd ask you to assume that the

13    St. Louis Police Department applied for a permit to allow

14    for an area for protests in anticipation of the Stockley

15    verdict and that the date of commencement of the permit

16    was August 24 of 2017.  So, are you with me so far?

17         A.   Yes.

18         Q.   And I would ask you further to assume that

19    the -- the area designated in the permit is a park area

20    across the street diagonally from the court -- from the

21    court building where the verdict was to be announced.

22    Would the fact that the Police Department -- Assuming

23    those facts, would the effort of the Police Department to

24    anticipate an area for protest change your opinion about

25    the lack of planning by the St. Louis Police Department
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

```
 1   in this instance?
 2              MR. PRAISS:  I'm going to object that I
 3        believe the representations and assumptions that
 4        have been provided to you are incomplete and,
 5        therefore, provide you with a false hypothetical
 6        that's inappropriate.  Subject to that, you can
 7        answer.
 8        Q.   Okay.  So, do you think you can answer my
 9   false hypothetical, Chief?
10        A.   The Application was about a month before, I
11   believe you said August, right?
12        Q.   Yeah, the App- -- the Application contemplated
13   the possibility of protests beginning as early as
14   August 24.  I'd ask you to assume that.
15        A.   Okay.  And the question is --
16        Q.   Well --
17        A.   -- does that --
18        Q.   -- does that change your opinion as to the
19   quality of advance planning by the St. Louis Police
20   Department in regard to the Stockley issue.
21              MR. PRAISS:  Can I have a continuing
22        objection?
23              MR. DIERKER:  It may run to this line of
24        questioning.
25              MR. PRAISS:  Thank you.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

```
 1           A.   No, it would not.
 2                  (Questions by Mr. Dierker)
 3           Q.   Now, I'd further ask you to assume, Chief,
 4      that, in fact, an operations order was in place prior to
 5      September 15 of 2017 in anticipation of protests in the
 6      event of an acquittal on the Stockley case, so I ask you
 7      to assume that that was in place.  Would such a pla- --
 8      the existence of such a plan affect or modify any of the
 9      opinions that you've given so far, just -- just the bare
10      existence of the plan?
11           A.   No.
12           Q.   Okay.  Your opinions would be formed based on
13      the contents of the plan, I assume?
14           A.   Yes.
15           Q.   I believe you discuss in your report what you
16      think some of the basic elements of a good plan for this
17      kind of a situation would be; is that a fair statement?
18           A.   Yes.
19           Q.   And is it fair to say that one element of a --
20      of a good advance plan would be the designation in
21      advance of incident commanders?
22           A.   Yes.
23           Q.   And do you think it would be a good planning
24      practice to have staging areas identified in advance?
25           A.   Yes.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1      Q.   From the materials that you reviewed, do you
2   think the uniform and equipment of the bicycle officers
3   that you observed was of the kind of, shall we say
4   provocative nature that the riot equipment would be?
5      A.   No, they appeared to be standard bicycle
6   patrol uniforms.
7      Q.   In your opinion, how is it -- what is the best
8   policing practice to deal with agitators within a larger
9   group?
10     A.   I think to the extent that the police know who
11  the agitators are, know who the informal leaders, if you
12  will, of the demonstrators might be, establishing
13  rapport, having a liaison with those individuals and even
14  engaging those informal leaders in policing their own
15  is -- is a best practice.
16     Q.   I believe in your opinion, you express the
17  view that unlawful assemblies were hastily declared at
18  one or more points in -- during the various incidents; is
19  that correct?
20     A.   Yes, it appeared that way.
21     Q.   And do you recall at this point with any
22  specificity when and where you felt unlawful assemblies
23  were hastily declared?
24     A.   Not specifically when and where.  Again, it
25  was -- the material was pretty voluminous as well as the

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1   recording, so I'd have to go back and pinpoint it under

2   further review, but at the time that I reviewed those

3   materials, that's the conclusion that I came to.

4        Q.   In any of the materials that you reviewed, did

5   you observe any apparent command officers engaging in

6   conversation with protestors?

7        A.   No.  It depends on how you define "command

8   officers."  In a situation like this, for me it would be

9   senior level ranking police officials.

10       Q.   And are you awa- -- does the name

11  "Brian Rossomanno" mean anything to you?

12       A.   I believe he's a sergeant on the Police

13  Department there if I'm not mistaken.  Yes is the answer,

14  yes.

15       Q.   Okay.  And were you aware that his assignment

16  involved supervision of the -- what the Police Department

17  referred to as the Civil Disobedience Team?

18       A.   Yes.

19       Q.   Would you expect -- Would you consider it to

20  be good policing practice if the person in charge of a

21  civil disobedience unit was relied on by the Department

22  to evaluate assemblies in the declaration of unlawful

23  assemblies?

24       A.   In my opinion, that would have to be someone

25  at the senior level, higher than a sergeant or

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1  lieutenant.

2       Q.   As far as you can recall, the materials that
3  you reviewed specifically with -- with regard to
4  September 15, were those focused primarily on the
5  incident involving the buses and their extraction?

6       A.   As well as other events that -- that
7  afternoon, yes.

8       Q.   What other events do you recall?

9       A.   I recall just a handful of protestors
10 confronting officers on -- on the line, more or less.
11 There were a line of officers and several -- a small
12 group of protestors were being confrontational with them,
13 verbally confrontational.  I believe that was the same
14 afternoon as the bus incident.

15      Q.   Did you observe video of protestors breaking
16 up concrete sewer lids and throwing concrete at officers?

17      A.   No.

18      Q.   Did you have occasion to review any video of
19 protests -- protestors marching through City streets
20 prior -- earlier in the day, say between noon and 5:00
21 p.m. on September 15?

22      A.   I looked at a lot of video footage and it was
23 difficult to pinpoint precisely the day and time as I
24 recall.  I mean, it was just, you know, one after the
25 other after the other, so it -- I can't specifically say

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1    that I -- that I witnessed what you just mentioned.

2         Q.    Referring to Page 6 of your report, Item 19, I

3    would like to quote that for you.  Quote, "Law

4    enforcement agencies should have crowd control policies

5    that focus on protecting citizens, to include protesters

6    and bystanders, and procedures to effectively disperse

7    disorderly crowds in an effort to eliminate the immediate

8    risks of continued escalation and further violence," end

9    quote.

10        A.    Yes.

11        Q.    What -- What procedures, in your opinion,

12   should be in place to effectively disperse disorderly

13   crowds?

14        A.    Well, one is to make sure that there is an

15   area designated into which a crowd could be dispersed

16   and -- and -- and then having resources available so that

17   they don't reconvene.  And I think the idea that there

18   would be no area of dispersal specifically on the night

19   of the 17th is -- is totally foreign to me in my

20   experience.  I just don't understand why protestors would

21   not have been given an area for dispersal.  And that

22   should be part of the operations plan.

23        Q.    What, in your opinion, would constitute

24   dispersal of an unlawful assembly?

25        A.    Basically, you know, having the -- the

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1  protestors leave the immediate area that -- that needs to
2  be evacuated and then dispersed into an area where they
3  could eventually, you know, move, be on their way.  So,
4  you're asking me what constitutes it, it's if -- if an
5  order is issued for them to disperse, they ought to be
6  given an opportunity to do that and an area, again, where
7  they can disperse.
8       Q.   What -- What kind of methods, in your opinion,
9  should be deploy to -- be deployed or used to ensure that
10  the crowd obeys the order to disperse?  How would you
11  physically accomplish that, in your opinion?
12       A.   Well, I mean, there are various methods.  I
13  mean, one would be to just have a -- a cadre of officers
14  or group of officers positioned in such a way as to move
15  the crowd toward the area where you want them to
16  disperse.
17       Q.   So, you would see -- I'm trying to get at
18  what, you know, physically the officers would be expected
19  to do if the crowd is not compliant with verbal orders.
20       A.   Well, again, moving in the direction of the
21  crowd, urging them to -- to move and disperse, so, you
22  know, that's where your tactical interventions come into
23  play and, you know, that's -- that's just one method
24  of -- of dispersing a crowd.  And typically, in my
25  experience, it's one where it's pretty effective.

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

```
 1        Q.   Referring again to your report at Page 6, Item
 2   22, you -- I quote, "The situation near the intersection
 3   of Euclid and McPherson on Friday evening, September 15,
 4   seemed to begin with a fairly innocuous gathering of a
 5   small number of protesters who were behaving in a
 6   peaceful manner," close quote.  Did -- Did any of the --
 7   I think we alluded to this before.  Are you familiar with
 8   the conduct of the protestors at and around the mayor's
 9   office (sic) immediately prior to protestors appearing at
10   Euclid and McPherson?
11        A.   The mayor's office?
12        Q.   The mayor's -- I'm sorry.  The mayor's house.
13        A.   You're asking am I familiar with that
14   particular event?
15        Q.   Right.
16        A.   Yeah, I -- I don't believe I saw any footage
17   or video recordings of protestors at the mayor's house.
18   I -- I -- I read about it in some of the documents.
19        Q.   Okay.  Referring again to your report at Page
20   20 -- Page 7, Item 25, you say, quote, "The testimony of
21   plaintiffs in this matter, along with hours of video
22   recordings of the events on Friday, September 15 and
23   Sunday, September 17, support the claims of inappropriate
24   use of pepper spray and other chemical munitions against
25   many of the protesters who were engaged in nonviolent,
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1    peaceful protests," close quote.  Do you have an estimate

2    of how many protestors were subjected to that conduct?

3            A.   I don't.

4            Q.   Are you aware of an incident at -- In

5    St. Louis, we always refer to it as Highway 40.  I think

6    technically nowadays, it's Interstate 64.  But are you

7    aware of any incident involving a mass arrest at

8    Jefferson Avenue and Interstate 64/Highway 40 in the City

9    of St. Louis in September of 2017?

10           A.   No, I'm not.  I mean, you're saying in

11   September.  I don't -- I don't have a date on that, but

12   I --

13           Q.   Okay.

14           A.   -- can't say that I'm familiar with that

15   anyway.

16           Q.   Okay.  Well -- Well, let me -- let me broaden

17   it.  Are you aware -- Did you review any materials with

18   regard to a mass arrest of protestors who had blocked

19   traffic on Highway 40 in the fall of 2017?

20           A.   No, I don't believe so.

21           Q.   Referring to Page 10 of your report, Item 34,

22   and I think you've alluded to this before in the context

23   of the questions I asked you about custom.  I think -- Is

24   it fair to say, in your opinion, the conduct of some

25   police officers in the fall of 2017 were contrary to

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

```
 1   established policies and procedures of the St. Louis
 2   Police Department?
 3        A.   I'm sorry, would you state the question again,
 4   please?
 5        Q.   Well, let me go back to review -- and put it
 6   in terms of your Item 34.  In view of the policies and
 7   procedures set forth in Metropolitan Police Department
 8   Special Orders 1-01 and 1-06 -- and I'm paraphrasing --
 9   it is clear that the actions of some of the officers were
10   discriminatory, arbitrary, and wholly inconsistent with
11   the spirit and letter of police department policy.  I
12   mean, that -- that -- is that your opinion?
13        A.   Yes.
14        Q.   Okay.  Now, on Page 12, Item 42, you state,
15   quote, "I am aware of no reason that would lead me to
16   believe that the treatment of Luther Hall was isolated,
17   rather than a part of the overall arbitrary and
18   unreasonable response of St. Louis Metropolitan Police
19   Department officers," close quote.  And what -- what
20   leads you to believe that that was not isolated?
21        A.   From everything that I -- I read about that
22   incident, it just seemed that Officer Hall was caught up
23   in the moment with all the other -- was -- was viewed as
24   one of the protestors and, as a result, excessive force
25   was used against him.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1      Q.    Are you aware of any other protestor who has

2  had any course of medical -- Well, let me rephrase the

3  question.

4            Are you familiar with the course of medical

5  treatment that Officer Hall has had to undergo since the

6  incident?

7      A.    I -- I -- I only know of the immediate medical

8  treatment that he received that night and -- and I think

9  there was a subsequent diagnosis by a doctor that is

10  referenced in -- in my report, as well.

11      Q.    Are you aware of any other protestor who

12  suffered any comparable injury at the hands of St. Louis

13  Police during September 15 to the 17th?

14      A.    For which they received medical treatment?

15      Q.    No, for -- Well, regardless of medical

16  treatment, are you aware of any other protestor

17  sustaining similar injuries?

18            MR. PRAISS:  Object to the form of the

19      question.  Overbroad.

20      A.    No.

21      Q.    To what extent, if any, are you aware of

22  injuries suffered by police during the incidents in

23  September of 2017?

24            MR. PRAISS:  Other than Luther Hall's?

25      Q.    Other -- Other than Luther Hall.

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

```
 1              MR. DIERKER:  Good point.
 2         A.   Yeah, I don't know of specific officers other
 3    than Hall who were injured.  I mean, there were
 4    references to things happening, but I don't know of any
 5    other specific injuries to officers.
 6                   (Questions by Mr. Dierker)
 7         Q.   In your opinion, is the -- Let me rephrase
 8    that.
 9              To what extent, in your opinion, are injuries
10    to officers assigned to crowd control indicative of
11    unlawful behavior by the crowd?
12         A.   Well, any -- any officer who is injured as a
13    result of an attack or an assault, I mean, that's
14    obviously criminal behavior.
15         Q.   As an expert in policing, how would you
16    explain the differences between civil disobedience,
17    protest, and violent disorder?
18         A.   Well, I mean, civil disobedience is an act of
19    protest.  It can be -- It can be blocking traffic or
20    otherwise impeding the flow of, you know, normal
21    activity.  A peaceful protest can be the result of, you
22    know, someone or some group gathering to -- to exercise
23    their First Amendment right.  And then a -- I think the
24    third thing is you asked about a violent protest?
25         Q.   Right, how do you distinguish these on a
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

```
1   continuum?
2         A.   Well, as I pointed out, then, you know,
3   violence, of course, is -- is, you know, what the word
4   means, of course.  It's either people attacking each
5   other or attacking the police, attempting to inflict
6   bodily injury or harm against others.  That would be a
7   violent protest.  Or, you know, severe destruction of
8   property, you know, setting buildings on fire, that kind
9   of thing.
10        Q.   And forgive me if I should have picked this up
11  from looking at your resume, but could you describe any
12  frontline operator command training you have in public
13  order or civil disorder situations?
14        A.   I mean, as part of my regular academy training
15  many years ago, I mean, it was woven into the basic
16  police academy training, and then subsequent to that,
17  regular annual in-service training always included some
18  elements of dealing with crowds and demonstrations,
19  especially in Philadelphia where that kind of thing
20  occurred frequently.
21        Q.   And I think we did allude to this already, but
22  just so I'm clear, your direct personal involvement in --
23  in protest activity with or without civil disorder was
24  the Saginaw situation?
25        A.   Where -- Where I was in command, yeah, I was
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

```
 1   the chief of police and the overall commander of -- of
 2   those two protests in Saginaw.  Prior to that, in
 3   Philadelphia, I was a senior official working alongside
 4   others who were responsible for dealing with crowds,
 5   special events.  We had -- We had a KKK rally in
 6   Philadelphia, as a matter of fact, in 1988 where I was
 7   directly involved in that, as well.
 8        Q.   When we're -- You served for a considerable
 9   period as a -- as a line officer in Philadelphia;
10   correct?
11        A.   Yes.
12        Q.   And did -- at the time that -- of your
13   service, did the standard police officer equipment
14   include handheld mace or pepper spray?
15        A.   No, no, that was later on in my career.  In
16   Philadelphia, you were issued a helmet and baton that we
17   call a nightstick and there was not for many years -- not
18   until many years later was there the availability of
19   pepper spray or mace.  And, frankly, I believe that was
20   toward -- pretty much toward the end of my tenure in
21   Philadelphia.
22        Q.   In your opinion, how many hours per year of
23   training are required for both civil disorder deployable
24   officers and commanders regarding public order or civil
25   disorder events?
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1           A.    I think it would depend on the jurisdiction.
2    In -- In larger cities, certainly more hours would be
3    required for that kind of training.  In smaller
4    jurisdictions, perhaps less so.  So, it's difficult to
5    say exactly the number of hours of training that would be
6    required, but in a city like St. Louis or Philadelphia,
7    other major cities, I would say it would have to be
8    constant and ongoing training.
9           Q.    Are you familiar with the term "stress
10   inoculation"?
11          A.    I'm familiar with the two words, but not as
12   a -- not as a phrase or term, no.
13          Q.    Not -- Not as part of police training?
14          A.    No.
15          Q.    In your experience -- Or to what extent in
16   your experience are specialized officers the norm in
17   regard to crown -- crowd control?
18              MR. PRAISS:  Object to the form of the
19         question.  Vague.
20          A.    What -- What I'm familiar with in -- in every
21   jurisdiction where I serve is the need for a what we call
22   special operations or tactical group, usually a smaller
23   section of the department where officers are trained in
24   special weapons and tactics, also known as SWAT.  And
25   in -- in -- in Philadelphia, we called them before the

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1   stakeout unit or highway patrol, but these were specially

2   trained officers who would be available for assignment

3   in -- in special crowd control situations.

4        Q.   Do you think only specialized officers should

5   be deployed to public order or civil disorder events?

6        A.   No, I think it should be multilayered.

7        Q.   Do you think all officers, regardless of

8   training level, are capable of responding appropriately

9   to a high stress, potentially violent situation?

10       A.   I think, yeah, that's just -- it's part of the

11  job, so I think every officer should have some training

12  and some ability to respond in those situations.

13       Q.   As far as you are aware, is there any

14  nationally accepted standard around public order

15  policing?

16       A.   You're asking about a specific national

17  standard?

18       Q.   Right, in your experience, do you believe

19  there exists such a nationally recognized standard?

20       A.   No, and I think that there, as I indicated in

21  my report in some of the references, I think -- I think

22  there are a plethora of resources that help guide police

23  departments in dealing with -- with crowd control

24  situations.

25       Q.   Do you have an opinion as to why there is not

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1    a single nationally recognized standard?

2          A.    No.

3          Q.    Is it your opinion that officers speaking in

4    low, nonthreatening tones would be efficacious in a

5    violent protest situation?

6          A.    When you're saying "violent," I mean, what

7    specifically?  Can you give me an example of a violent

8    protest that you're talking about?

9          Q.    Well, I'll -- I'll use the -- the framework

10   that you described earlier where there's threats or

11   battery of persons, serious property damage conduct.

12         A.    Yeah, in those situations, I think a direct

13   intervention to -- to abate the activity or the behavior

14   certainly is warranted and there ought to be officers who

15   are specially trained for that type of intervention

16   should something like that occur.

17         Q.    Are there, in your opinion, circumstances in

18   which loud, clear, and precise communication by police is

19   appropriate across the spectrum of public order events?

20         A.    Is there -- I'm sorry, repeat that question,

21   please.

22         Q.    In your opinion, are there any circumstances

23   in which loud, clear, and precise communication by police

24   is appropriate across the spectrum of public order

25   events?

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

```
 1          A.   Yes.
 2          Q.   What would those situations call for -- In
 3     what situations would it call for loud, clear
 4     communication?
 5          A.   Well, I mean, if -- if police deem it
 6     appropriate to -- to issue a -- a loud, clear order of
 7     whatever type, then certainly, you know, I think it's
 8     appropriate.  I mean, I guess I'm not totally following
 9     the question, but --
10          Q.   No, I -- I think you've --
11          A.   -- sure --
12          Q.   -- answered it.
13          A.   -- there would be specific circumstances where
14     that -- that would be appropriate, yes.
15          Q.   Could you describe how officers can both keep
16     their distance and yet quickly and efficiently identify
17     and remove agitators interspersed among peaceful
18     protestors so as to mitigate escalation?
19          A.   Well, that's where I think the small cadre of
20     tactical officers who are specially trained and -- and --
21     and very disciplined in their response should be deployed
22     while maintaining your normal contingent of officers
23     on -- on a demonstration line.  So, there are going to be
24     situations where agitators will go after the officers on
25     the line, and then if some of the agitators behave
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1  violently or -- or engage in criminal conduct, then you

2  deploy your tactical group to deal with that, the small

3  number of agitators.

4        Q.   And how would such a tactical group be

5  equipped, in your opinion?

6        A.   I mean, it depends.  I mean, certainly there's

7  the standard equipment that all officers carry and, you

8  know, for the tactical group, sure, they -- they would

9  have additional equipment perhaps in order to effectively

10  do their jobs.

11        Q.   Such as military style riot gear?

12        A.   Perhaps, yes.

13        Q.   Is it fair to state that, in your opinion,

14  it's appropriate for police officers that are deployed to

15  a public order event to have equipment ranging from the

16  standard equipment to tactical riot gear?

17        A.   Yes, some of the officers, yes.

18        Q.   And if I understood your views correctly, the

19  officers who are, I'll -- I'll say riot-equipped,

20  helmets, protective body armor, if you will, in your

21  view, the appropriate deployment of those officers would

22  be at some distance from the protest unless and until the

23  violence required further deployment; is that fair?

24        A.   Yeah.  Yes, that's correct.

25        Q.   Are you aware that a number of weapons were

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1   retrieved from the scene at Tucker and Washington on

2   September 17?

3              MR. PRAISS:  Object to the form of the

4        question.  Vague.

5        A.   I saw photographs of items that -- that I

6   believe were -- I guess they were confiscated.  I don't

7   know for sure, but they were part of the package of

8   materials that I reviewed.

9        Q.   Okay.  Well, you say "items."  Did you see

10  firearms?

11       A.   I believe, yes, one or two of those photos

12  included firearms, yes.

13       Q.   In your opinion, is it possible that a police

14  retreat could enable the development of a mob mentality

15  which would cause further risk to protestors and public

16  safety?

17             MR. PRAISS:  Object to the form of the

18       question.

19       A.   It depends on what you mean by "retreat."  You

20  mean totally removing themselves from the scene or what

21  do you mean by "retreat"?

22       Q.   Well, how would you define "retreat"?

23       A.   I think there are any number of levels of

24  retreat.  It's -- You know, that's what I'm trying to get

25  at.

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1          Q.    Well, let's start at whatever you consider the
2    lowest level of retreat.
3          A.    Turning away from an incident where police
4    intervention is required, I guess, would be a retreat and
5    would be -- it would be...
6                (At this point, the picture on the screen
7                froze momentarily and there was no audio.)
8          Q.    I think we're having technical difficulties at
9    this end, Chief.
10         A.    Oh, okay.  What's the matter, you're not
11   seeing me or hearing me?
12               MR. PRAISS:  We lost you for a couple seconds
13         there.
14         Q.    Yeah, we lost --
15         A.    Oh.
16         Q.    -- we lost audio.
17         A.    Oh, okay.
18               MR. PRAISS:  Want to ask the question again?
19         Q.    Well, let me back up and we'll take it step by
20   step.  I think you were about to discuss the situation
21   where officers turn away from violent behavior.  And I
22   take it you think that would not be a good response from
23   a professional standpoint; is that fair?
24         A.    That -- That's right.  A violent event would
25   require direct intervention on the part of police

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

```
 1   officers.
 2        Q.   With regard to your review of the incident on
 3   September 15 involving the -- the buses, did you see any
 4   indication that at any point that officers did, in fact,
 5   retreat?
 6        A.   No, I'm just -- I'm hearkening back to the
 7   video of that and all I see are two buses, I think, and
 8   protestors blocking the egress of those buses.
 9        Q.   Well, let -- let me give you a hypothetical,
10   Chief.  You know, let's assume that we have a crowd of
11   approximately a hundred or so protestors blocking traffic
12   and engaging in, shall we say verbal -- verbal attacks on
13   police officers or directed at the police.  Is there a
14   situation, in your opinion, where -- I'm sorry.  Let me
15   start that whole thing over.  The lawyers are all -- all
16   my colleagues here are going to be chuckling at my
17   difficulty in formulating a hypothetical.
18             But I would ask you to assume that -- that you
19   have officers who are not riot-equipped in the presence
20   of a hundred or so demonstrators who are not exhibiting
21   assaultive behavior, but are, you know, clearly agitated.
22   In your opinion, would it be appropriate police conduct
23   for the police to disengage and remove themselves from
24   sight and sound of the demonstrators?
25        A.    No, not to remove themselves in that
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1   situation, but certainly not to allow that to provoke

2   police into some -- some physical response.

3        Q.    In your opinion, are there circumstances in

4   which the police -- in which police disengagement by

5   removing themselves to a distance from a protest could

6   cause the protest to escalate?

7        A.    That's possible.

8        Q.    And in that situation, would it be your

9   opinion that that would create an increased need for use

10  of tactics by the police that might otherwise have been

11  avoided?

12       A.    Well, in my opinion, I think that's where

13  ongoing evaluation and assessment is -- is critical on

14  the part of police so as to the extent possible avoid the

15  use of force.

16       Q.    Are you aware of situations in the United

17  States where police departments have been sued for

18  failing to respond effectively to a public disorder?

19       A.    In terms of a lawsuit, no, I don't know

20  specifically, no.

21       Q.    Do you have a ballpark number, in your

22  opinion, of the hours of training that would be required

23  to generate officers and commanders with the appropriate

24  skill sets and capabilities to accomplish crowd

25  management?

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1     A.   I would say as a baseline, you know, 40 hours
2  of specific crowd control management training would be
3  required and -- and then, of course, being forced through
4  subsequent in-service training for those officers, but,
5  again, I believe there are different levels of response
6  to a crowd control situation and it would depend on an
7  officer's specific assignment.  For example, if you're a
8  SWAT team member, of course you're going to have much
9  more tactical training, but for line officers, regular
10 line officers, I would say, again, at least 40 hours of
11 training in crowd control management.
12     Q.   Are you familiar with the -- the phrase or
13 term "incident command system"?
14     A.   Yes.
15     Q.   And what does that mean to you?
16     A.   It's -- It's a unified command system where
17 the incident command system is where someone is
18 designated to oversee the police operation at an incident
19 and that ICS, as we call it, or the incident command
20 system individual would be responsible for making
21 decisions with regard to the police response to that
22 incident.
23     Q.   Do you think the use of that structure works
24 well for the management of public order events?
25     A.   I believe it does, yes.

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

```
 1          Q.   In your experience across police departments,
 2    do you think law enforcement officers and commanders
 3    receive enough training in ICS to adequately utilize it?
 4          A.   There is -- There is basic ICS training, but,
 5    again, I think, you know, once an individual is certified
 6    in ICS, then that has to be reinforced through regular
 7    in-service training follow-up.
 8          Q.   And to what extent, if any, are you aware of
 9    any ICS certified officers in the St. Louis Police
10    Department?
11          A.   Not at all.  I'm not aware.
12          Q.   As a best practice, should all disorderly
13    persons always be given the opportunity to disperse even
14    though they might have committed prosecutable offenses?
15              MR. PRAISS:  Object to the form.  Overbroad.
16              (At this point, the picture on the screen
17              froze momentarily and there was no audio.)
18              THE REPORTER:  I think we have a freeze.  We
19         missed your answer.  You -- The screen froze right
20         at the answer.
21              THE WITNESS:  Oh, okay, I think my attorney
22         or -- was objecting there for a moment.
23              MR. DIERKER:  He was.  Do you want to read the
24         question back?
25              (At this point, an off-the-record discussion
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

```
 1              was had.)
 2              (At this point, the reporter read back the
 3              question beginning on Page 55, Line 12.)
 4       A.   I believe there are some circumstances where,
 5    in the overall best interest of public safety, you might
 6    allow a low-level offender.  When you talk about
 7    prosecutable offenses, I mean, there are low-level
 8    offenses that making an arrest of that individual, those
 9    persons could exacerbate or make the situation worse, and
10    in those circumstances, then I would say you're probably
11    better off allowing those people to disperse.  A
12    disorderly conduct, for example, is a low-level offense
13    in my view.
14              MR. PRAISS:  At some point, can we take a,
15         like, five minute break?
16              MR. DIERKER:  You want --
17              MR. PRAISS:  We've been going for a while.
18              MR. DIERKER:  You want to break now?
19              MR. PRAISS:  If you don't mind.
20              MR. DIERKER:  Yeah, that's fine.
21              (At this point, there was a break taken from
22              10:45 a.m. to 10:52 a.m.)
23              (Questions by Mr. Dierker)
24       Q.   Chief, I think your recommendation is or at
25    least your opinion is that it's good policing practice to
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1    keep the -- the officers in riot gear out of sight of the

2    protestors to -- as best you can; is that fair?

3           A.   Yes.

4           Q.   Now, if you've got a situation where the

5    protestors are on the move and it's difficult to predict

6    what their route is, is it always feasible to keep the

7    tactical people out of sight and sound?

8           A.   Well, I mean, in those situations, you know,

9    it has to be fluid.  I mean, repositioning those tactical

10   officers would be appropriate, given the -- the

11   circumstances and the movement of the crowd.

12          Q.   With regard to the September 15 incident

13   involving the buses, from the materials that you

14   reviewed, were you aware that the -- that the buses

15   contained the riot-gear-equipped officers?

16          A.   Yes.

17          Q.   And were you aware that the protestors

18   actually moved toward the buses?

19          A.   Yes.

20          Q.   And are you aware that a lot of the activity

21   in the vicinity of Tucker and Clark at that time was a

22   function of the efforts of the police to remove the buses

23   and the riot-equipped police?

24          A.   Yes.

25          Q.   As a general proposition, when -- in your

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1   opinion, when is it appropriate to deploy the

2   riot-gear-equipped officers?

3        A.   When there is the -- the obvious threat.  If a

4   threat level rises and the potential for violence is --

5   is imminent, then I would say that would -- you know,

6   that's a situation where it's appropriate to deploy

7   tactical officers.

8        Q.   So, would -- would it be appropriate to deploy

9   when members of the crowd begin to throw objects at the

10  non-riot-equipped officers?

11            MR. PRAISS:  Object to the form of the

12       question.  Vague.

13       A.   It could be.

14       Q.   How about a situation where the crowd --

15  members of the crowd are breaking windows and engaging in

16  other property damage?

17            MR. PRAISS:  Same objection.

18       A.   Yes.

19            MR. PRAISS:  Vague.

20            THE WITNESS:  Sorry.

21            MR. DIERKER:  Did you get his objection and

22       the answer?

23            THE REPORTER:  I got both of them, yeah.

24            MR. DIERKER:  Okay.

25       A.   Under those circumstances, yes, it would be

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

```
 1   appropriate.
 2                  (Questions by Mr. Dierker)
 3        Q.   In your opinion, what would be the appropriate
 4   tactic to deal with what we'll call passively resistant
 5   individuals, such as the people who were blocking the
 6   buses on September 15?
 7        A.   Passively resistant?  You mean like --
 8        Q.   Well --
 9        A.   -- in front of the buses or something like
10   that?
11        Q.   Well, let me make it more concrete.  Did you
12   obser- -- In any of the videos, did you obser- -- did you
13   observe protestors locking arms in front of police buses?
14        A.   Yes.
15        Q.   And in your opinion, what measures would be
16   appropriate to eliminate that blockage?
17        A.   I think in that situation, negotiated
18   management, liaising with leaders of the -- of the
19   demonstrators, you know, (inaudible) possible to -- to
20   gain --
21        Q.   Chief?  Chief?
22        A.   -- compliance.
23        Q.   Chief, I'm sorry, but we -- we lo- --
24        A.   Yeah.
25        Q.   -- we lost transmission there, so --
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1          A.   Okay.

2          Q.   -- if you don't mind starting your answer

3    again.

4          A.   Yeah, given that scenario that you described

5    and I think from what I saw in the recordings, it would

6    be important to -- to engage with the demonstrators on a

7    verbal level, in other words, to communicate with them,

8    to negotiate with them and try to the greatest extent

9    possible to gain compliance, explaining to them the --

10   the -- the importance of allowing the buses to leave the

11   area and relocate.  That would be the approach that I

12   would take.

13         Q.   Well, let's assume the individuals refuse to

14   comply based on persuasion.  What would be the next

15   appropriate measure?

16         A.   Well, I mean, if they -- if they are

17   peacefully and passively resisting, then, you know,

18   perhaps arresting and removing those individuals who were

19   blocking the bus.

20         Q.   So, that would require hands-on police

21   activity; correct?

22         A.   If no -- If no other alternative is working,

23   yes.

24         Q.   Would you approve of the use of pepper spray

25   in that situation?

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

```
 1          A.   No.
 2          Q.   Would you approve of the deployment of
 3    officers with batons to physically force the individuals
 4    to move aside?
 5          A.   No, I would say if they're passively
 6    resisting, then you would use some kind of hand restraint
 7    and -- and pick them up and -- and remove them from --
 8    from that area.
 9          Q.   In your experience, are there situations in
10    which members of a crowd are committing violent acts, but
11    it's difficult or impossible for the officers to identify
12    precisely who's committing the acts?
13          A.   Yes, I'm familiar with those situations, yes.
14          Q.   And what, in your opinion, would be the best
15    policing response in that situation?
16          A.   If you witness, I'm sorry, is it --
17          Q.   Well --
18          A.   -- criminal --
19          Q.   -- I'll -- I'll re- --
20          A.   -- behavior?
21          Q.   -- I'll re- --
22          A.   Go ahead.
23          Q.   -- phrase, Chief.
24          A.   Yeah.
25          Q.   I mean, I -- I would ask you to assume that
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1  a -- a group of protestors in the 50 to 100 -- numbering

2  50 to a hundred are engaged in a march or a demonstration

3  and missiles are projecting from within the crowd, but

4  the officers on the scene cannot identify specifically

5  the perpetrators.  What, if any, measures would you

6  approve to be undertaken with -- in that situation?

7       A.  I would -- I would, again depending on the

8  level of activity, certainly attempt to disperse that

9  particular crowd, that group that are responsible for the

10  projectiles, so dispersal would be, I think, an

11  appropriate response.

12       Q.  Would the use of mace or pepper spray in that

13  situation be appropriate?

14       A.  Not necessarily.

15       Q.  When, if at all, would you approve the use of

16  pepper spray or mace to aid in dispersing an unruly

17  demonstration or protest?

18       A.  Well, certainly I believe if the officers are

19  under direct attack, if they're being assaulted by the

20  protestors directly, then, of course, the officer has the

21  right to protect himself or herself and -- and deploy

22  chemical mace in those situations.

23       Q.  In any of the materials that you reviewed,

24  did -- did you see any indication of members of the crowd

25  objecting to efforts by police officers to converse and

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1  defuse the situation?

2          A.   I saw a couple of -- I saw a couple of

3  officers engaging with protestors, talking to them and, I

4  mean, the pro- -- the -- the protestors continued in

5  their -- their activity of verbal -- verbal abuse, if you

6  will, of the officers, but I think if that's what you're

7  asking.

8          Q.   I'll accept that.  What is the best practice,

9  in your opinion, when there are no identifiable leaders

10  of a protest that has become unruly?

11          A.   I'm sorry, what --

12          Q.   Well --

13          A.   -- what do you do --

14          Q.   -- let me --

15          A.   -- are you saying when you can't identify?

16  Or...

17          Q.   Well, let me ask you this:  In your

18  experience, you know, are you aware of situations in

19  which a crowd of protestors has no le- -- identifiable

20  leaders with which the police can communicate?

21          A.   I mean, yes, I mean, sure, that can happen.

22          Q.   And in that situation, in your opinion, is the

23  soft approach likely to be effective?

24          A.   I believe -- I believe the police ought to use

25  whatever de-escalation tactics they're trained in and

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

```
 1   familiar with regardless of whether there are leaders,

 2   identifiable leaders, or not.  You can -- You can

 3   approach individual protestors and engage them verbally

 4   and try to gain compliance that way.  You don't

 5   necessarily have to know who the leaders are.

 6        Q.   I believe at one point, I -- I think it's

 7   Paragraph 13 of your report, you reference an apparent

 8   failure to have clergy and senior commanders of the

 9   Police Department present and available at some of these

10   incidents.  Are you aware that, in fact, some

11   participants in the protest were politicians and officers

12   of City Government?

13        A.   I am familiar with one individual who I

14   believe offered testimony at the hearing who was

15   identified as a member of City Council, I believe.

16        Q.   Based on the materials you reviewed, Chief, is

17   there anything that the City Police did right?

18        A.   That's a pretty broa- -- That's a pretty broad

19   question.

20        Q.   Well, I'll ta- -- I'll --

21        A.   I mean --

22        Q.   -- ta- -- I'll take any crumbs of approval.

23        A.   Well, yeah, I mean, for example, I did see a

24   couple of officers without riot gear, without even a hat

25   on, I think I recall in one recording an officer who
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

 1   didn't even have on a cap was speaking in a soft tone

 2   with a couple of the protestors, so I saw that kind of

 3   interaction occasionally as I reviewed the video

 4   recordings.  I thought that was pretty positive.

 5        Q.   In your experience, is it possible that

 6   protestors in a situation which could be described as

 7   anti-police, that elements of the protestors are desirous

 8   of provoking the deployment of mace or other force

 9   measures?

10             MR. PRAISS:  Object to the form of the

11        question.  Calls for speculation.

12        A.   I'm sorry, are you asking if --

13        Q.   Well, let me -- let me re- -- restate it.

14        A.   Yeah.

15        Q.   You know, I'm just asking, in your experience,

16   is it possible that elements of a protest group are

17   desirous of inducing the police to use force?

18             MR. PRAISS:  Same objection.

19        A.   I am -- In my experience, for example, in

20   Saginaw, the anti-Klan protestors were more challenging

21   for the police than the Klan members themselves, so that

22   I'm familiar with.

23        Q.   Well, in that situation, did -- did you

24   perceive that some members of the protest group wanted a

25   violent confrontation with the police?

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

```
1          A.   No, not a violent confrontation with the
2   police.  I think they -- they -- they were provoking,
3   they wanted to provoke some -- some outcome that was
4   favorable to their cause, yes.
5          Q.   Do you think they wanted to provoke deployment
6   of force by the police?
7          A.   Not specifically, no.
8          Q.   Do you think that that is -- that it is
9   impossible that elements of a protest group would want to
10  provoke a violent confrontation with police?
11              MR. PRAISS:  Object to the form of the
12          question.
13          A.   It's not impossible.
14          Q.   In your experience and as a veteran police
15  officer, what would be your reaction to observing a
16  protest group that included numerous people who are
17  wearing masks and goggles?
18          A.   I would think that they were -- they had that
19  equipment to protect themselves.
20          Q.   Would -- Would you as a -- Would -- Would it
21  be your view as a -- from the standpoint of a police
22  officer that that would be indicative of an expectation
23  that there will be disorder?
24              MR. PRAISS:  Object to the form of the
25          question.  Vague.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1          A.   No, my sense is that they had that equipment

2    in the event that mace would be deployed against them.

3    That's how I -- That's what I inferred from what I saw

4    there.

5          Q.   In terms of making an arrest of -- or a mass

6    arrest of a group of protestors, would the presence

7    within the group of persons equipped with goggles and

8    masks suggest that they were, in fact, members of the

9    protest group?

10         A.   Yes.

11         Q.   And -- And I guess I'll restate the question a

12   little bit differently, but in your opinion, would you

13   feel that a reasonable police officer should have any

14   greater concern when confronted with a group of

15   protestors who are masked?

16         A.   No.

17         Q.   You think wearing masks is an ordinary and to

18   be expected part of a lawful protest?

19         A.   Yeah, in my -- in my opinion, the sense I got

20   was that they were expecting that that could happen, yes.

21         Q.   No, I'm not asking about the specifics.  I'm

22   just asking for your general opinion about whether

23   officers who are confronted by masked protestors have

24   reason to regard that group differently than a group that

25   is not wearing masks.

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1          A.    Oh, I see what you're saying.  Well, no,
2     not -- not just merely wearing a mask, no.
3          Q.    So, in your view, that does not give rise to
4     any kind of inference that people are wishing to disguise
5     their identity?
6          A.    Absent other behaviors and activity, no.
7          Q.    So, if there is other behavior such as
8     throwing rocks and bottles, you think the presence of
9     masks could be a factor in the police response?
10         A.    Yes, it could be.
11              MR. DIERKER:  Can we go off the record for a
12        minute?
13              MR. PRAISS:  Sure.
14              (At this point, there was a break taken from
15              11:12 a.m. to 11:14 a.m.)
16                (Questions by Mr. Dierker)
17         Q.    Chief, okay?
18         A.    Yes.
19         Q.    Chief, I think you, in the context of unlawful
20    assemblies, I think you referred to significant violence.
21    Is there any violence that you consider insignificant?
22         A.    Well, and, again, it depends on how you define
23    violence.  Assaultive behavior certainly is -- of any
24    kind is significant, especially in those situations.  You
25    know, throwing a bottle, a water bottle or something like

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1   that, not so significant, but yet it could be deemed a

2   violent act.

3         Q.   What about property damage to -- when, in your

4   opinion, does it become significant?

5         A.   Oh, I mean, brea- -- smashing windows of

6   storefronts and things like that, you know, burning

7   buildings or property, that is significant.

8         Q.   And in formulating your opinions, did you

9   review the Missouri statute and the City ordinance

10  regarding unlawful assembly?

11        A.   Yes.

12        Q.   And did you also review the City ordinances

13  regarding blocking or impeding the flow of traffic?

14        A.   Yes.

15        Q.   Okay.

16             MR. DIERKER:  I don't have anything further.

17             MR. PRAISS:  Okay.  I have no questions.

18             (At this point, an off-the-record discussion

19              was had.)

20                 (Questions by Mr. Dierker)

21        Q.   I'm sorry.  Chief, it's -- you know, I -- I

22  apologize since I'm so rusty at the drill.  Were there

23  any questions that I asked you that you need me to repeat

24  for clarification or do you think we -- you understood

25  everything that I asked?

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

```
1          A.   No, I did.  Thank you for following up some of
2     those where I had questions, but at this point, I can't
3     recall anything that's unclear.
4               MR. DIERKER:  Okay.  And you have the right to
5          read and review the deposition and sign it and you
6          would be able to make corrections to the deposition
7          if you desired or you may waive signature.  And I
8          will pass the buck to counsel to advise you with
9          regard to waiver.
10              MR. PRAISS:  Jim, it's totally up to you.  My
11         recommendation to clients typically is to take the
12         time to review it.  If for some reason, especially
13         with Skype technology, if as you read the transcript
14         you realize that something got transcribed
15         incorrectly, that's you have an errata sheet and
16         opportunity to correct it.  Obviously, it means
17         you've got to relive this thing again, but it won't
18         take you that long.  It's not a very long
19         deposition.
20              THE WITNESS:  Right.  Okay, sure, I'll -- I'll
21         do that.
22              MR. PRAISS:  Okay.  We'll --
23              MR. DIERKER:  Okay.
24              MR. PRAISS:  We'll read.
25              MR. DIERKER:  Thank you very much, Chief.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

```
1              THE WITNESS:  Thank you.  Appreciate it.

2              MR. PRAISS:  Have a great weekend.

3              THE WITNESS:  Okay.  And you, too.  Thank

4      you --

5              MR. PRAISS:  Okay.

6              THE WITNESS:  -- all very much.

7              (Deposition adjourned at 11:17 a.m.)

8                  (SIGNATURE RESERVED)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

```
 1   STATE OF                    )
                                 ) SS
 2   COUNTY OF                   )

 3

 4        I, JAMES GOLDEN, JR., do hereby state that the

 5   foregoing statements are true and correct to the best of

 6   my knowledge and belief.

 7

 8

 9

10

11        _____

12                    JAMES GOLDEN, JR.

13

14

15        Subscribed and sworn to before me this _____ day

16   of _____, 2019.

17

18

19

20        _____

21                    NOTARY PUBLIC

22

23   My Commission Expires:

24

25
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

```
1              DEPOSITION CORRECTION SHEET
           DEPOSITION OF JAMES GOLDEN, JR.
2

3    In Re:  MALEEHA AHMAD, et al vs. CITY OF ST. LOUIS
     No. 4:17-CV-2455 CDP
4

5    Page:   Line:        Should Read:
     Reason:
6
     Page:   Line:        Should Read:
7    Reason:

8    Page:   Line:        Should Read:
     Reason:
9
     Page:   Line:        Should Read:
10   Reason:

11   Page:   Line:        Should Read:
     Reason:
12
     Page:   Line:        Should Read:
13   Reason:

14   Page:   Line:        Should Read:
     Reason:
15
     Page:   Line:        Should Read:
16   Reason:

17   Page:   Line:        Should Read:
     Reason:
18
     Page:   Line:        Should Read:
19   Reason:

20

21   _____
                  SIGNATURE OF DEPONENT
22

23

24

25
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

1              C E R T I F I C A T E

2

3         I, Sara Alice Masuga, Certified Shorthand

4   Reporter and Certified Court Reporter within and for the

5   States of Illinois and Missouri, DO HEREBY CERTIFY that

6   pursuant to agreement between counsel that on February 8,

7   2019, at the offices of the ACLU, 906 Olive Street,

8   St. Louis, Missouri, there appeared before me the

9   aforementioned witness, and having been duly sworn to

10  tell the whole truth, was examined, and the examination

11  was taken down in shorthand by me and afterwards

12  transcribed upon the computer, and said transcription is

13  herewith returned.

14         IN WITNESS WHEREOF, I have hereunto subscribed my

15  name this 10th day of February, 2019.

16

17

18

19

20

21         _____
           Sara Alice Masuga, CSR, CCR
           IL CSR No. 084-002993
22         MO CCR No. 1012

23

24

25

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of JAMES GOLDEN, JR. taken on 02/08/2019

MASUGA REPORTING SERVICE
2033 Hiawatha Avenue
St. Louis, MO  63143-1215
(314)680-2424

February 10, 2019

ACLU
Attn:  Anthony E. Rothert, Esq.
906 Olive Street
Suite 1130
St. Louis, MO  63101
In Re: MALEEHA AHMAD, et al vs. CITY OF ST. LOUIS
No. 4:17-CV-2455 CDP

Dear Mr. Rothert:

Enclosed herewith, please find your copy of the
deposition transcript of JAMES GOLDEN, JR. taken in the
above-styled matter along with the original signature
page of same.

Please have the deponent read your copy of the
transcript, note any corrections to be made, sign the
original signature page, have the deponent's signature
notarized where indicated, and return the signed
signature page and correction sheets to Mr. Dierker for
proper filing of the original transcript with the Court.

Thank you for your attention to this matter.

Sincerely,

MASUGA REPORTING SERVICE


Sara Alice Masuga, CSR, CCR

cc:  Mr. Dierker