SCOTT BOYHER  11/21/2018

1           IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF MISSOURI
2                   EASTERN DIVISION

3    MALEEHA AHMAD, et al.,        )
                                   )
4              Plaintiffs,         )
                                   )
5    vs.                           ) Case No.:
                                   ) 4:17-cv-2455-CDP
6    CITY OF ST. LOUIS,            )
     MISSOURI,                     )
7                                  )
               Defendant.          )

8

9

10

11

12

13              DEPOSITION OF SCOTT BOYHER

14         TAKEN ON BEHALF OF THE PLAINTIFFS

15               NOVEMBER 21, 2018

16

17

18

19

20

21

22

23

24

25
                                        Exhibit P

SCOTT BOYHER  11/21/2018

```
 1                    INDEX OF EXAMINATION

 2

 3   Direct Examination by Ms. Steffan          Page  5

 4   Cross-Examination by Mr. Wheaton           Page 92

 5

 6

 7                    INDEX OF EXHIBITS

 8

 9   Plaintiff's Exhibit 1                      Page 53

10

11

12   (The exhibit was retained by Ms. Steffan.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SCOTT BOYHER  11/21/2018

```
1              IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF MISSOURI
2                     EASTERN DIVISION

3    MALEEHA AHMAD, et al.,         )
                                    )
4              Plaintiffs,          )
                                    )
5    vs.                            ) Case No.:
                                    ) 4:17-cv-2455-CDP
6    CITY OF ST. LOUIS,             )
     MISSOURI,                      )
7                                   )
               Defendant.           )
8

9

10

11            DEPOSITION OF SCOTT BOYHER, produced, sworn,
     and examined on the 21st day of November, 2018,
12   between the hours of 9:15 a.m. and 11:30 a.m. of
     that day, at St. Louis City Hall, 1200 Market
13   Street, St. Louis, Missouri 63103, before AMANDA N.
     FARRAR, a Certified Court Reporter of the State of
14   Missouri.

15

16

17

18

19

20

21

22

23

24

25
```

SCOTT BOYHER  11/21/2018

```
 1                    APPEARANCES

 2           For the Plaintiffs:

 3           MS. JESSIE STEFFAN
             American Civil Liberties Union of
 4           Missouri
             906 Olive Street, Suite 1130
 5           St. Louis, Missouri 63101
             jsteffan@aclu-mo.org
 6           (314)652-3114

 7
             For the Defendant:
 8
             MR. ANDREW D. WHEATON
 9           St. Louis City Counselor's Office
             1200 Market Street, Suite 314
10           Saint Louis, Missouri 63103
             wheatona@stlouis-mo.gov
11           (314)622-3361

12
             The Court Reporter:
13
             MS. AMANDA N. FARRAR, CCR
14           Alaris Litigation Services
             711 North Eleventh Street
15           St. Louis, Missouri 63101
             (314)644-2191

16

17

18

19

20

21

22

23

24

25
```

1              (The deposition commenced at 9:15 a.m.)

2                    SCOTT BOYHER,

3    of lawful age, being produced, sworn, and examined

4    on behalf of the Plaintiffs, deposes and says:

5                    DIRECT EXAMINATION

6    BY MS. STEFFAN

7         Q.   Good morning, Lieutenant Boyher.

8         A.   Good morning.

9         Q.   If you could, please, say and spell your

10   name for the record first.

11        A.   Scott Boyher, B-O-Y-H-E-R.

12        Q.   And the court reporter introduced me,

13   but I'm Jessie Steffan.  I am attorney for the

14   plaintiffs in the case Ahmad vs. City of St. Louis.

15             Have you ever been deposed before?

16        A.   Yes.

17        Q.   So I assume you're familiar generally

18   with the ground rules.  It's important to speak

19   audibly so that the court reporter can take down the

20   record.  If you answer a question, I will presume

21   that you understood the question.  So if you don't

22   understand the question, you should say something

23   and I will attempt to restate.  And you can also

24   take a break at any time as long as there's not a

25   question hanging out there in the air.  If that's

SCOTT BOYHER  11/21/2018

```
1    the case, then I'd ask you answer the question
2    before we go on a break.  Do you understand?
3         A.   Yes.
4         Q.   Have you taken any medications that
5    could affect your ability to be truthful or to
6    remember things for this deposition?
7         A.   No.
8         Q.   And do you have any health conditions
9    that affect your ability to remember or to testify
10   truthfully?
11        A.   No.
12        Q.   Did you do anything to prepare for
13   today's deposition?
14        A.   Yes.
15        Q.   What did you do?
16        A.   I watched some film footage and read the
17   part of the -- part of a report.
18        Q.   I'm sorry.  You said you read part of
19   what?
20        A.   A police report.
21        Q.   What police report was that?
22        A.   I don't -- I don't know the complaint
23   number.
24        Q.   What did it pertain to?
25        A.   The extraction of the buses the CDT team
```

SCOTT BOYHER  11/21/2018

```
 1    were on.

 2         Q.    And what did you watch footage of?

 3         A.    Film footage over weeks of civil unrest

 4    in downtown.

 5         Q.    Do you know where that footage was

 6    taken?

 7         A.    All over the city.

 8         Q.    How many hours of footage would you say

 9    you watched in preparation?

10         A.    It's several.  I don't know.

11         Q.    And they were videos that were taken at

12    different locations downtown?

13         A.    Yes.

14         Q.    All downtown St. Louis, though?

15         A.    All mine were downtown, yes.

16         Q.    Is there anything else that you did to

17    prepare for today's deposition?

18         A.    Not that I'm aware of.

19         Q.    Did you speak to anyone in preparation?

20         A.    Yes.

21         Q.    Other than your attorneys, did you speak

22    to anyone in preparation?

23         A.    No.

24         Q.    Did you review any documents other than

25    the video footage that you mentioned and the police
```

SCOTT BOYHER  11/21/2018

Page 8

```
 1    report that you read part of?
 2         A.    I glanced over the, what is it, the, the
 3    log.  There's a logbook.  I glanced over a copy of
 4    those and the probable cause statement I believe.
 5         Q.    When you say the logbook, that's the
 6    handwritten, like, command staff logbook?  Is that
 7    what we're talking about?
 8         A.    The logbook, I believe it -- yes, it
 9    would have been by the dispatcher or command
10    logbook.
11         Q.    And it's a handwritten document --
12         A.    Yes.
13         Q.    -- if it's what I'm thinking of?
14               And you said you read a probable cause
15    statement as well.  What probable cause statement
16    was that?
17         A.    I'm unsure.
18         Q.    Who did it pertain to?
19         A.    It pertained to the civil unrest
20    downtown.
21         Q.    Which one?
22         A.    I don't know.
23         Q.    What was the probable cause for?
24         A.    I don't know.
25         Q.    You don't know what kind of crime or
```

SCOTT BOYHER  11/21/2018

```
 1    anything?
 2         A.   No.
 3         Q.   When did you read that probable cause
 4    statement?
 5         A.   Yesterday.
 6         Q.   And did you review any communications in
 7    preparation for today's deposition, emails, text
 8    messages, listen to voice mails, anything like that?
 9         A.   No.
10         Q.   I'm not asking for your address, but
11    where do you live approximately?
12         A.   Within the City of St. Louis.
13         Q.   And how old are you?
14         A.   52.
15         Q.   Did you graduate from high school?
16         A.   Yes.
17         Q.   Where did you attend high school?
18         A.   Francis Howell.
19         Q.   I'm from St. Peters myself.
20              And did you graduate from a police
21    academy?
22         A.   Yes.
23         Q.   The St. Louis Police Academy?
24         A.   St. Louis County.
25         Q.   When did you attend St. Louis County
```

SCOTT BOYHER  11/21/2018

```
 1      Police Academy?

 2            A.    In the '80s.

 3            Q.    Fair enough.

 4                  Did you graduate from college?

 5            A.    No.

 6            Q.    Did you attend any college?

 7            A.    Some.

 8            Q.    Where did you attend college?

 9            A.    I took some classes at Meramec and

10      continuing education at the police academy.

11            Q.    And that continuing education, is that

12      St. Louis County Police Academy or --

13            A.    City.

14            Q.    Have you ever served in any branch of

15      the military?

16            A.    No.

17            Q.    And did you ever begin the recruitment

18      process for any branch of the military?

19            A.    No.

20            Q.    Do you have any medical training?

21            A.    No.

22            Q.    You're not a first -- you didn't do

23      first responder training or EMT training?

24            A.    I've had basic first responder training,

25      yes.
```

```
 1          Q.   Do you have any correctional training?

 2     Have you ever worked as a correctional officer or --

 3          A.   No.

 4          Q.   I'm going to try not to speak over you.

 5     If you would try to let me answer -- finish asking

 6     my question before you answer.

 7               Do you have a driver's license?

 8          A.   Yes.

 9          Q.   And do you have any specialized driving

10     training, like, you have a commercial license or

11     anything like that?

12          A.   No.

13          Q.   Do you have any restrictions on your

14     driving license?  For example, I have to wear

15     glasses when I drive.

16          A.   I don't believe so.

17          Q.   Have you ever been convicted of a crime?

18          A.   No.

19          Q.   How about an infraction or an ordinance

20     violation?

21          A.   No.

22          Q.   Have you ever been prosecuted for a

23     crime?

24          A.   No.

25          Q.   And have you ever been arrested?
```

SCOTT BOYHER  11/21/2018

```
 1          A.    No.
 2          Q.    Currently what is your assignment within
 3    St. Louis Metropolitan Police Department?
 4          A.    I'm a lieutenant with the bike patrol.
 5          Q.    How long have you had that rank,
 6    lieutenant?
 7          A.    Which job are you speaking of?
 8          Q.    At what point -- at what time were you
 9    promoted to the rank of lieutenant?
10          A.    Approximately ten years ago -- eight
11    years ago.  I'm sorry.
12          Q.    And my understanding is your current
13    role is as commander of the bike response team; is
14    that right?
15          A.    Correct.
16          Q.    And how long have you been in that role?
17          A.    Roughly two-and-a-half years.
18          Q.    When did you begin your employment with
19    the St. Louis Metropolitan Police Department?
20          A.    In 1992.
21          Q.    And before that you worked elsewhere; is
22    that right?
23          A.    Yes.
24          Q.    Did you work in St. Louis County?
25          A.    No.
```

SCOTT BOYHER  11/21/2018

```
 1              Q.    Where did you work right before you
 2      worked at St. Louis Metropolitan Police Department?
 3              A.    Town and Country Police Department.
 4              Q.    How long were you with Town and Country?
 5              A.    Approximately three years.
 6              Q.    What was your role or your rank at Town
 7      and Country Police Department?
 8              A.    As a police officer.
 9              Q.    Did you ever work in any other law
10      enforcement capacity other than at Town and Country
11      or at St. Louis?
12              A.    No.
13              Q.    When you began your employment at
14      St. Louis Metropolitan Police Department, what rank
15      did you enter as?
16              A.    A probationary officer.
17              Q.    And how long were you a probationary
18      officer?
19              A.    Approximately a year.
20              Q.    After that what rank did you attain?
21              A.    Patrol officer.
22              Q.    How long were you a patrol officer?
23              A.    Approximately nine years.
24              Q.    After you were a patrol officer, you
25      became a lieutenant; is that correct?
```

SCOTT BOYHER  11/21/2018

```
 1          A.    No.

 2          Q.    What rank did you attain after being a

 3   patrol officer?

 4          A.    Sergeant.

 5          Q.    How long were you a sergeant?

 6          A.    Approximately nine years.

 7          Q.    So all in all, how long have you been a

 8   law enforcement officer?  Would it be approximately

 9   thirty --

10          A.    There you go.

11          Q.    Thirty years --

12          A.    Yeah.

13          Q.    -- is that correct?

14                And I imagine that as a patrol officer

15   and as a probationary officer, you served in -- you

16   had different assignments during that time?

17          A.    Yes.

18          Q.    In those positions, were you ever

19   assigned to the bike response team?  Did it exist at

20   the time you were a probationary or patrol officer?

21          A.    It didn't exist.

22          Q.    When you became a sergeant, what was

23   your assignment or your role?

24          A.    At which point?

25          Q.    What did you spend the majority of your
```

SCOTT BOYHER  11/21/2018

```
 1    time doing when you were a sergeant?

 2         A.   Patrol, you know.

 3         Q.   And when you became a lieutenant, you

 4    did something before you became commander of bike

 5    response team; is that right?

 6         A.   Yes.

 7         Q.   What other roles did you have as a

 8    lieutenant?

 9         A.   I was a patrol lieutenant and a special

10    operations lieutenant.

11         Q.   What does being a patrol lieutenant

12    entail?

13         A.   Uniform patrol of our district.

14         Q.   What district were you assigned to?

15         A.   At which point?

16         Q.   Did it change?

17         A.   Yes.

18         Q.   How long were you a patrol lieutenant?

19         A.   At which point?

20         Q.   My understanding is you were a

21    probationary officer for about a year, a patrol

22    officer for about nine years, a sergeant for about

23    nine years and then you became a lieutenant; is that

24    right?

25         A.   Yeah.
```

SCOTT BOYHER  11/21/2018

1        Q.    And you were first a patrol lieutenant

2    when you first attained the rank of lieutenant,

3    right?

4        A.    Yes.

5        Q.    How long were you a patrol lieutenant in

6    total?

7        A.    Several years.

8        Q.    And you were assigned to different

9    districts throughout that time?

10       A.    Yes.

11       Q.    And then you were a special operations

12   lieutenant; is that right?

13       A.    Correct.

14       Q.    At sort of a general level, what does

15   that mean, to be a special operations lieutenant?

16       A.    I was assigned just to special

17   operations unit.

18       Q.    Is that something other than SWAT?

19       A.    Yes.

20       Q.    What is the special operations unit?

21       A.    The special operations unit is a

22   detective unit.

23       Q.    So it's investigatory mostly?

24       A.    Yes.

25       Q.    So currently you're a lieutenant and

SCOTT BOYHER  11/21/2018

```
 1    commander of the bike response team?

 2         A.   Yes, ma'am.

 3         Q.   What are your current job

 4    responsibilities?

 5         A.   My current responsibilities are

 6    patrolling -- supervising the patrolling of

 7    downtown.

 8         Q.   What are the boundaries of downtown?

 9              MR. WHEATON:  Objection; form.

10              Subject to that, you can answer, if you

11    know.

12         A.   The area that I'm responsible for?

13         Q    (By Ms. Steffan) Yes.

14         A.   The area that I'm responsible for is

15    Spruce to -- would be Spruce roughly to Cass, the

16    river to 16th Street, 17th Street.

17         Q.   That is roughly the area that the bike

18    response team is responsible for patrolling; is that

19    right?

20         A.   The bike -- the bike patrol, that's

21    their primary area.

22         Q.   And as the commander of the bike unit,

23    how do your responsibilities differ from just a line

24    officer, police officer who is assigned to that

25    unit?  What do you do differently?
```

SCOTT BOYHER  11/21/2018

```
 1        A.    Supervisor.

 2        Q.    What does that mean?

 3        A.    I supervise the officers.

 4        Q.    On sort of a day-to-day basis, what does

 5   that entail that you actually do?

 6        A.    I would supervise the officers and their

 7   patrol plan.

 8        Q.    If I understand correctly, you're

 9   telling the officers where they should go in that

10   area; is that right?

11        A.    Yes.

12        Q.    Can you describe sort of your typical

13   workday?

14        A.    My typical workday would be:  I come in

15   and I do roll call.  If we have any -- we discuss

16   events that happened the night before, if there's

17   work that needs, needs to be done on them, citizen

18   complaints that have came in on where we need to

19   patrol, administrative duties.  That's, that's a

20   basic day.

21        Q.    So after roll call is over, is that when

22   you sort of begin your administrative duties?

23        A.    No.

24        Q.    What happens after roll call for you?

25        A.    It depends on the day.
```

SCOTT BOYHER  11/21/2018

Page 19

```
 1          Q.    Sometimes are you out patrolling?
 2          A.    Yes.
 3          Q.    And sometimes you're doing something
 4    other than patrolling, right?
 5          A.    Correct.
 6          Q.    And how do your shifts work?  Do you
 7    come in in the morning and you finish in the
 8    evening, or do you have some other kind of work
 9    plan?
10          A.    Are you -- you're saying as bike unit or
11    myself?
12          Q.    Yourself.
13          A.    My hours fluctuate.
14          Q.    By week or by multi-week period?
15          A.    It could be daily.
16          Q.    Do you ever work overnight?
17          A.    What do you mean by -- I don't
18    understand the question.
19          Q.    Do you set your own schedule or does
20    somebody set your schedule for you?
21          A.    I set my schedule.
22          Q.    And is it fair to say you just work when
23    necessary; is that right?
24                MR. WHEATON:  Objection to form.
25                Subject to that, you can answer.
```

SCOTT BOYHER  11/21/2018

```
 1          Q     (By Ms. Steffan) I mean how many hours
 2    do you work in a week?
 3          A.    A minimum of 40, but usually much more
 4    than that.
 5          Q.    That's what I'm trying to say.  You
 6    might work many more hours than 40 if you deem it
 7    necessary; is that right?
 8          A.    Correct.
 9          Q.    Are there set periods that you have to
10    have off?
11          A.    No.
12          Q.    When you attained the rank of
13    lieutenant, did you receive any additional training
14    other than your annual in-service training?
15          A.    Didn't understand the question.
16          Q.    Is there training that comes with a
17    promotion to lieutenant?
18          A.    Yes.
19          Q.    What kind of training is that?
20          A.    I'm not sure.  I don't recall.  It was
21    administrative.  It's a three-day training at the
22    time of getting promoted.
23          Q.    When you first became commander of the
24    bike unit, did you receive any additional training?
25          A.    Yes.
```

SCOTT BOYHER  11/21/2018

```
 1          Q.    What kind of training was that?
 2          A.    Received bike training and bike response
 3    team training.
 4          Q.    What does bike training entail?
 5          A.    How to ride a bike.
 6          Q.    What does bike response team training
 7    entail?
 8          A.    How to operate as a policing unit on a
 9    bicycle.
10          Q.    Other than being promoted, have you
11    received other commendations during your tenure with
12    St. Louis?
13          A.    Yes.
14          Q.    What commendations are those?
15          A.    A Meritorious Service, captain's
16    letters, chief's letters.  That's all I can recall.
17          Q.    Have you ever been disciplined during
18    your tenure at St. Louis?
19          A.    No.
20          Q.    Have you ever received a written
21    reprimand?
22          A.    Not that I recall.
23          Q.    Not a verbal reprimand?
24          A.    Not that I recall.
25          Q.    Have you ever been told that you needed
```

SCOTT BOYHER  11/21/2018

Page 22

```
 1    to be retrained on a department policy?
 2         A.    Not that I recall.
 3         Q.    Do you know if anyone has ever filed a
 4    citizen complaint against you?
 5         A.    Yes.
 6         Q.    Do you recall the specific
 7    circumstances?
 8              MR. WHEATON:  Objection to form.
 9              Subject to that, you can answer, if you
10    know.
11         A.    I'm, I'm sorry.  What was the question
12    again?
13         Q    (By Ms. Steffan) You said you do recall
14    that someone has filed a citizen complaint against
15    you; is that right?
16         A.    Yes.
17         Q.    And do you recall the circumstances of
18    that complaint?  When did it happen, for example?
19         A.    I've had -- well, which one are you
20    speaking of?
21         Q.    How many times has someone filed a
22    citizen complaint against you?
23         A.    I don't know.
24         Q.    More than five?  Less than five?
25         A.    Over which time frame?
```

SCOTT BOYHER  11/21/2018

```
 1          Q.    Your entire tenure at St. Louis?

 2          A.    Over five.

 3          Q.    When's the most recent one that you can

 4   recall?

 5          A.    That was specific -- that I was

 6   specifically named, years ago.

 7          Q.    Can you be more specific?

 8          A.    Years.  No.

 9          Q.    Two or three years ago?  Ten years ago?

10          A.    Longer than two or three years ago.

11          Q.    What was the citizen complaining about?

12          A.    I believe physical abuse.

13          Q.    Was there an investigation into that

14   complaint?

15          A.    Yes.

16          Q.    What was the outcome of the

17   investigation?

18          A.    I don't recall.  I don't know if it was

19   exonerated or unfounded.

20          Q.    But it was one of those two things?

21          A.    Yes.  I was not found guilty of it.

22          Q.    Do you recall any other specific citizen

23   complaints?

24          A.    No.

25          Q.    Have you ever been subject to review
```

SCOTT BOYHER  11/21/2018

1    just because of the number of uses of force you used

2    in a certain period of time?

3         A.   Not that I recall.

4         Q.   Have you ever filed a complaint about

5    another officer's conduct in the course of their

6    duties?

7              MR. WHEATON:  You're asking about a

8    formal complaint?

9         Q.   (By Ms. Steffan)  A written document,

10   yeah.

11             Have you ever written a complaint in

12   which you have alleged that another officer did

13   something improper in the course of carrying out

14   their duties?

15        A.   Yes.

16        Q.   When was that?

17        A.   I don't know.

18        Q.   How long ago?

19             MR. WHEATON:  Objection; foundation.

20        Q.   (By Ms. Steffan)  You can answer.

21        A.   I'm, I'm trying to figure -- I'm trying

22   to remember.  The last one, maybe a year and a half

23   ago roughly.

24        Q.   And what did you allege?

25        A.   The officer didn't do a thorough

SCOTT BOYHER  11/21/2018

 1   investigation.

 2          Q.    **Into a crime that had been committed?**

 3          A.    Correct.

 4                MR. WHEATON:  I want to be certain we're

 5   in agreement that any excerpts of this deposition

 6   transcript that pertain to any discipline or

 7   allegations of misconduct that's reflected in

 8   personnel files be confidential and subject to a

 9   protective order.  I assume there is one in place in

10   this case.

11                MS. STEFFAN:  I don't recall if there is

12   to be honest.  We'll treat it -- if there is,

13   we'll -- and it meets the qualifications for being

14   confidential, then we'll treat as confidential.

15          Q.   **(By Ms. Steffan)  Have you ever filed a**

16   **complaint about another officer's use of force?**

17          A.    Not that I'm aware of.

18          Q.    **Have you ever counseled or reprimanded**

19   **officers under your command in the bike unit for use**

20   **of force?**

21          A.    Can you restate that question?

22          Q.    **Sure.**

23                **Have you ever counseled or reprimanded**

24   **an officer, subject to your command as part of the**

25   **bike unit, for his or her use of force?**

SCOTT BOYHER  11/21/2018

```
 1          A.   No.
 2          Q.   How many lieutenants are there in the
 3   St. Louis Metropolitan Police Department?
 4          A.   At this point, I don't know.
 5          Q.   Do you know approximately, more than
 6   ten, less than ten?
 7          A.   More than ten.  Roughly 60, I imagine.
 8          Q.   More than ten, less than 25; is that
 9   correct?
10          A.   No.  More than 25.
11          Q.   Oh, 60.  Is that what you said?
12          A.   Yeah.
13          Q.   How about captains, approximately?
14          A.   Approximately ten.
15          Q.   How many officers belong to the bike
16   unit?
17          A.   Believe it's either 22 or 24.
18          Q.   Do I understand correctly that that's,
19   like, a permanent assignment?
20          A.   The bike unit, yes.
21          Q.   When was the bike unit created, if you
22   know?
23          A.   I don't know.
24          Q.   Trying to think back of now what you've
25   testified about your employment history.
```

SCOTT BOYHER  11/21/2018

```
 1              Did you -- were you a patrol officer
 2    with the bike unit before you were a lieutenant and
 3    commander of the bike unit, or is that the position
 4    in which you entered the bike unit?
 5         A.    I entered as a lieutenant.
 6         Q.    Do all officers who are assigned to the
 7    bike unit get that bike response team training and
 8    the bike training that you mentioned that you had
 9    received?
10         A.    Yes.
11         Q.    Do you conduct training as commander of
12    the bike unit?
13         A.    Do I conduct it?  No.
14         Q.    That training is through the academy; is
15    that right?
16         A.    No.
17         Q.    Who administers that training?
18         A.    Which training?
19         Q.    The bike response team training and the
20    bike training?
21         A.    The bike -- we have trainers that
22    train -- certified trainers that train for the
23    bikes, and then we have bike response team trainers
24    and outside people that -- outside agencies that
25    come in and train.
```

SCOTT BOYHER  11/21/2018

```
 1          Q.    So there's both internal trainers and
 2   external trainers?
 3          A.    Correct.
 4          Q.    The bike response team sometimes works
 5   with the civil disobedience team; is that correct?
 6          A.    Correct.
 7          Q.    To your knowledge, what is the role of
 8   the civil disobedience team?
 9          A.    To respond to civil unrest.
10          Q.    When you say civil unrest, what do you
11   mean?
12          A.    Large, large crowd management.
13          Q.    So civil unrest is when there's a large
14   crowd?
15          A.    Large crowd management when there's
16   perceived public safety issues.
17          Q.    To the best of your knowledge, how many
18   officers are assigned to the civil disobedience
19   team?
20          A.    I don't know.
21          Q.    Do you know approximately?
22          A.    No.
23          Q.    Do you know if that's a permanent
24   assignment as well like the bike unit is?
25          A.    It is not.
```

SCOTT BOYHER  11/21/2018

1       Q.   So if I understand correctly, officers

2   who are assigned to the civil disobedience team have

3   additional other assignments that they fulfill at

4   other times; is that right?

5       A.   Correct.

6       Q.   Can a person be dual assigned to the

7   bike unit and also to the civil disobedience team?

8       A.   Yes.

9       Q.   Do you have any officers that fulfill

10  both roles right now?

11      A.   They do not fulfill -- they're assigned

12  to both, but they're -- if they're assigned to the

13  bikes, they remain with the bikes.

14      Q.   I guess I don't understand what you're

15  saying.  If they're assigned to the bikes at a

16  particular incident, they remain with the bikes; is

17  that right?

18      A.   No.  If they're assigned -- there's

19  people that -- if they're assigned to the bikes and

20  they were previously assigned to the civil

21  disobedience team, they will stay with the bikes.

22  They will not go with the civil disobedience team.

23      Q.   To your knowledge, what kind of training

24  is given to an officer who is assigned to the civil

25  disobedience team?

SCOTT BOYHER  11/21/2018

1        A.    Formation training, civil disobedience

2   response training.

3        **Q.    And what is civil disobedience response**

4   **training?**

5        A.    How to maneuver in formations in unison

6   with other police.

7        **Q.    Earlier you used the term civil unrest.**

8   **Do you think there is a difference between civil**

9   **unrest and civil disobedience?**

10       A.    Yes.

11       **Q.    What is the difference?**

12       A.    I would -- my perception is civil unrest

13   would be a group that is unhappy or protesting

14   something, which isn't perceived as criminal at all.

15   And then what was the question again?

16       **Q.    To your knowledge, what is the**

17   **difference between civil unrest and civil**

18   **disobedience?**

19       A.    Civil disobedience would be acting out

20   in a criminal matter or violating crimes during your

21   protest.

22       **Q.    My understanding is you sometimes also**

23   **work with the documentation team; is that right?**

24       A.    No, I do not work with the documentation

25   team.

SCOTT BOYHER  11/21/2018

```
 1          Q.   What is the role of the documentation
 2    team to your knowledge?
 3          A.   To document incidents.
 4          Q.   Do you know how big that group is?
 5          A.   No.
 6          Q.   Do you ever give statements to the
 7    documentation team?
 8          A.   Yes.
 9          Q.   When's the last time you did that, if
10    you recall?
11          A.   During, during the civil unrest
12    downtown.
13          Q.   Last September and October, 2017; is
14    that what you're referring to?
15          A.   Yes.
16          Q.   Do you also sometimes work with the SWAT
17    team?
18               MR. WHEATON:  You're asking about
19    currently?
20          Q.   (By Ms. Steffan)  As commander of the
21    bike unit.  Does the bike unit ever work with the
22    SWAT team?
23          A.   No.
24          Q.   Does the bike unit ever work with
25    special operations?
```

SCOTT BOYHER  11/21/2018

```
 1           A.    No.
 2           Q.    I would like to ask you to direct your
 3     attention back to September and October of 2017 and
 4     to the St. Louis Metropolitan Police Department's
 5     response to those protests.  So you understand
 6     generally the time frame and the events that I'm
 7     talking about; is that right?
 8           A.    Yes.
 9           Q.    At that time you were still commander of
10     the bike unit; is that right?
11           A.    Yes.
12           Q.    When did you first hear about the
13     Stockley case?
14           A.    Weeks before the ruling.
15           Q.    And when did you find out that a verdict
16     had been issued?
17           A.    I think -- I think it was -- I don't
18     know.
19           Q.    Did you anticipate that there would be
20     protests in response to the Stockley verdict?
21           A.    Yes.
22           Q.    What did you do to prepare for those
23     protests?
24           A.    I participated in training with the
25     bicycle response team.
```

SCOTT BOYHER  11/21/2018

1      Q.    Who decided that the bicycle response
2  team needed to be trained?
3      A.    I don't know.
4      Q.    Was it you or was it someone else?
5      A.    It's above me.
6      Q.    What did the training include?
7      A.    To teach how to use bicycles for large
8  crowd management.
9      Q.    How long was the training?
10      A.    I don't recall.
11      Q.    More than a day?  Less than a day?
12      A.    More than a day.
13      Q.    More than a week?  Less than a week?
14      A.    Roughly a week.
15      Q.    Was there any other additional training,
16  besides that training, that you participated in as
17  part of the predicted protests?
18      A.    That was it.
19      Q.    Was there anything else that you or your
20  unit did to prepare for those protests?
21      A.    Yes.
22      Q.    What else did you do?
23      A.    We audited our equipment, made sure our
24  equipment was operational.
25      Q.    Does that include things other than your

SCOTT BOYHER  11/21/2018

1    bicycles?

2          A.    Yes.

3          Q.    What else does that include?

4          A.    Protective gear, vehicles, maintenance

5    equipment, uniforms.

6          Q.    When you say protective equipment, what

7    are you referring to?

8          A.    Shin guards, helmets, vests.

9          Q.    Are uniforms assigned to individual

10   officers or are they shared?

11         A.    They're assigned to particular officers.

12         Q.    Are officers' names on their uniforms?

13         A.    Yes.

14         Q.    Where is that displayed?

15         A.    On the upper right chest.

16         Q.    You recall that the verdict in the

17   Stockley case was issued on Friday, September 15th,

18   is that correct, of 2017?

19         A.    Yes.

20         Q.    Did you work that day?

21         A.    Yes.

22         Q.    What time did you start work?

23         A.    Approximately 7 o'clock.

24         Q.    What was the first thing you did when

25   you arrived at work?

SCOTT BOYHER  11/21/2018

```
 1          A.    Drank a cup of coffee.
 2          Q.    That's a good way to start the day.
 3                After that what happened?
 4          A.    We, we got our equipment together.
 5          Q.    When you say "we," you're talking about
 6    the bike unit?
 7          A.    Yes, ma'am.
 8          Q.    What happened after that?
 9          A.    We staged.
10          Q.    What does staging mean?
11          A.    We were prepared to deploy and move all
12    personnel to any particular location that we were
13    directed to go.
14          Q.    Where were you staged?
15          A.    At Ninth, 215 North Ninth.
16          Q.    Indoors?  Outdoors?
17          A.    At the police -- at the bike station.
18          Q.    So is that outdoors?
19          A.    It's both.  I mean, it's the size of
20    this room.
21          Q.    You all squished together?
22          A.    Right.  So you have people inside and
23    outside.
24          Q.    All right.  How long did you remain
25    staged at 215 North Ninth?
```

SCOTT BOYHER  11/21/2018

```
 1          A.    At what time?
 2          Q.    The morning when you had just arrived,
 3     drank your coffee, checked your equipment, got
 4     staged, how long were you staged at that time?
 5          A.    Until I was asked to move everybody to
 6     Tucker and Clark.
 7          Q.    Who were you asked by?
 8          A.    Whoever -- dispatch.  I don't...
 9          Q.    Was dispatch relaying an order from
10     someone else?
11          A.    Somebody above my command.
12          Q.    Approximately what time was that request
13     given?
14          A.    Roughly 8:45.
15          Q.    At that point, to your knowledge, had
16     the verdict been issued?
17          A.    I don't -- I don't know.
18          Q.    What happened after you deployed to
19     Tucker and Clark?
20          A.    We staged.
21          Q.    At that location?
22          A.    (The witness nodded his head.)
23          Q.    And how long were you staged there
24     approximately?
25          A.    I don't -- an hour.
```

SCOTT BOYHER  11/21/2018

```
 1          Q.    Is this the full bike unit at this
 2    point, about 20 to 25 officers or some subset of
 3    that?
 4          A.    I'm sorry.  Can you repeat that, please?
 5          Q.    I think you testified earlier that there
 6    are about 22 to 24 officers assigned to the bike
 7    unit; is that correct?
 8          A.    That's correct.
 9          Q.    So at the time that you deployed to
10    Tucker and Clark on September 15th, 2017, was that
11    20 to 25 officers or was it some smaller or larger
12    number?
13          A.    It was a larger number.
14          Q.    Who was additionally deployed in
15    addition to the bike unit?
16          A.    The bicycle response team, the auxiliary
17    bicycle response time.
18          Q.    That's my mistake.  I didn't understand
19    those are two different units.
20                What is the difference between the
21    bicycle response team and the bike unit?
22          A.    The bike unit is a permanent unit that's
23    responsible for policing the business area of
24    downtown.  The bicycle response team incorporates
25    the bike unit and an auxiliary unit which is
```

SCOTT BOYHER  11/21/2018

Page 38

1   officers from throughout the city that have been

2   bike trained.

3          Q.    I understand.

4                How large is the bicycle response team?

5          A.    Roughly 60 officers.

6          Q.    So if I understand correctly, that's

7   20-ish permanent officers who patrol as part of the

8   bike unit, plus 60 auxiliary officers who are

9   assigned to other duties, but also have been bike

10  trained and act as part of a bicycle response

11  team; is that correct?

12         A.    Total personnel -- total personnel in

13  the bike unit -- allotted personnel is 27 people.

14  The rest are auxiliary.  So you have roughly 32

15  other police personnel that are auxiliary.

16         Q.    So 60-ish total personnel?

17         A.    Correct.

18         Q.    I understand.

19                After you and all of those personnel

20  deployed to Tucker and Clark, you remained about an

21  hour.  Is that what you said?

22         A.    I'm unsure of how long we were staged

23  there.

24         Q.    What was the next thing you did after

25  staging at Tucker and Clark?

SCOTT BOYHER  11/21/2018

Page 39

```
 1          A.    We had to move out of that area.

 2          Q.    Where did you move?

 3          A.    To 14th and Spruce.

 4          Q.    And why did you have to move out of that

 5    area?

 6          A.    Large crowds of protesters had taken the

 7    streets and were heading towards our location.

 8          Q.    So if I understand correctly, you're

 9    moving away from the protesters, not towards the

10    protesters at that point?

11          A.    Correct.

12          Q.    At that point you went to 14th and

13    Spruce; is that correct?

14          A.    Yeah.

15          Q.    How long were you there?

16          A.    I don't know.

17          Q.    Were you staged there or were you doing

18    something else?

19          A.    We staged.

20          Q.    If I understand correctly, 14th is two

21    blocks west of Tucker; is that correct?

22          A.    Yes.

23          Q.    And Spruce is just south of Market; is

24    that correct?

25          A.    Correct.
```

SCOTT BOYHER 11/21/2018

```
 1          Q.    Were there protesters in the area that
 2   you moved to at 14th and Spruce at that point?
 3          A.    At that point, no.
 4          Q.    What happened after you staged there?
 5          A.    At what point?
 6          Q.    What was the next thing that happened
 7   after you staged at 14th and Spruce?
 8          A.    I don't know.
 9          Q.    You agree you moved from that location
10   at some point?
11          A.    Yes.
12          Q.    Was that afternoon by that point?
13          A.    It was sometime after we staged.
14          Q.    Did you encounter protesters that
15   afternoon?
16          A.    Yes.
17          Q.    Where at?
18          A.    At which point?
19          Q.    The next time after you had staged at
20   14th and Spruce?
21          A.    At -- the next time we encountered
22   protesters was at Clark and Tucker.
23          Q.    When you encountered protesters at Clark
24   and Tucker, is that when the buses were there?
25          A.    Yes.
```

SCOTT BOYHER  11/21/2018

```
 1          Q.   When you arrived at that location, the
 2    buses were already there; is that correct?
 3          A.   Yes.
 4          Q.   Is this part of the video you reviewed
 5    before today's deposition?
 6          A.   Yes.
 7          Q.   How many buses were at Clark and Tucker
 8    when you arrived?
 9          A.   Two.
10          Q.   What were the buses there for?
11          A.   To transport civil disobedience officer
12    teams.
13          Q.   What was your role on that scene?  What
14    was the point of the bike unit and the bike response
15    team being there at Clark and Tucker?
16          A.   The protesters had blocked the buses,
17    and there was reports that they were throwing stuff
18    at the buses, and I was given an order to go down
19    and try to extract the buses from the crowd.
20          Q.   So the purpose of the bike unit and the
21    bike response team was to help extract the buses; is
22    that correct?
23          A.   Correct.
24          Q.   Did you see anyone throwing anything?
25          A.   Yes.
```

SCOTT BOYHER  11/21/2018

```
 1          Q.    Have you seen video of anyone throwing
 2   anything?
 3          A.    Yes.
 4          Q.    At Clark and Tucker?
 5          A.    Yes.
 6          Q.    Where did the police want to extract the
 7   buses to?
 8                MR. WHEATON:  Objection; form,
 9   foundation.
10          A.    Out of that area.
11          Q.    (By Ms. Steffan)  Do you know where to?
12          A.    Yes.  The resting for where they wanted
13   to stage them at, no.
14          Q.    But they wanted -- the primary goal was
15   to extract them from that area?
16          A.    Correct.
17          Q.    To go someplace where there were no
18   protesters?
19          A.    Correct.
20          Q.    Were the buses empty or full?
21          A.    I believe they were full.
22          Q.    Of police officers?
23          A.    Yes.
24          Q.    Does a bus driver drive the bus under
25   those circumstances or is it a police officer who
```

SCOTT BOYHER  11/21/2018

1    drives the bus?

2          A.    I'm unsure who was driving the bus.

3          Q.    Me, too.  I can't figure it out.

4                You recall arriving at Clark and Tucker

5    that afternoon?

6          A.    Yes.

7          Q.    What was your sense of what the crowd

8    was like then?

9                MR. WHEATON:  Objection; form.

10          Q.    (By Ms. Steffan)  Based on your

11    experience as a police officer, what was your sense

12    of how the crowd was at that point?

13                MR. WHEATON:  Same objection.

14          A.    There -- it was disobedience, they were

15    trying to block the buses from coming out.  People

16    within the crowd were throwing items.

17          Q.    (By Ms. Steffan)  Was it your perception

18    that the majority of the crowd was engaged in

19    disobedience and throwing items?

20          A.    I'm not sure of that question.  Can you

21    ask me that again?

22          Q.    Was it your perception when you arrived

23    at Clark and Tucker that a majority of the members

24    of the crowd were throwing items and were engaged in

25    disobedience?

SCOTT BOYHER  11/21/2018

```
 1          A.   Yes.

 2               MR. WHEATON:  Are you asking --

 3          Q.   (By Ms. Steffan)  Did you see protesters

 4     blocking the bus?

 5          A.   Yes.

 6          Q.   How many protesters were blocking the

 7     bus?

 8          A.   I don't know.

 9          Q.   Did you see any officers deploy any

10     chemical agents at protesters at that scene?

11          A.   At which point?

12          Q.   At Clark and Tucker.

13          A.   Yes.

14          Q.   How many officers did you see deploy

15     chemical agents?

16          A.   I don't know.

17          Q.   Less than five?  More than five?

18          A.   I don't know.

19          Q.   Did you see more than one officer deploy

20     chemical agents?

21               MR. WHEATON:  Objection; foundation.

22          A.   I know what I did.  I don't --

23          Q.   (By Ms. Steffan)  Let's start with that.

24     What did you do?  Did you deploy any chemical

25     agents --
```

SCOTT BOYHER  11/21/2018

```
 1          A.    Yes.

 2          Q.    How many times did you deploy chemical

 3     agents?

 4          A.    At which point?

 5          Q.    While you were at Clark and Tucker and

 6     had been directed to help extract the buses there.

 7          A.    During the bus extraction, I deployed

 8     pepper spray roughly five or six times.

 9          Q.    Against five or six different

10     individuals?

11          A.    Correct.

12          Q.    Did you use the individual-sized,

13     department-issued pepper spray?

14          A.    No.

15          Q.    Did you use a fogger?

16          A.    No, we didn't.  We don't have foggers.

17          Q.    What did you use to deploy pepper spray?

18          A.    I used a streamer, high-capacity

19     streamer.

20          Q.    I assume you've been trained on how to

21     use the high-capacity streamer?

22          A.    Yes.

23          Q.    When's the last time that you were

24     trained on it?

25          A.    I don't know.
```

SCOTT BOYHER  11/21/2018

1    Q.    More than a year ago, less than a year

2  ago, at this point?

3    A.    I don't know.

4    Q.    What is the intended effect of a

5  high-capacity streamer?  What are you trying to

6  accomplish by using it?

7    A.    To gain compliance.  To gain compliance

8  or stop the criminal activity that's taking place.

9    Q.    Did you arrest the individuals against

10  whom you deployed the streamer?

11    A.    No, I did not.

12    Q.    Did you do an I/LEADS report describing

13  your deployment of the streamer?

14    A.    I did not.

15    Q.    Earlier you testified that you saw maybe

16  at least one other officer deployed chemical

17  agents; is that correct?

18         MR. WHEATON:  Objection; form,

19  foundation, mischaracterizes his testimony.

20    Q.   (By Ms. Steffan)  Is that not what you

21  testified?

22    A.    I said I, I could tell you what I --

23  when I deployed.

24    Q.    Did you see any other officers deploy

25  chemical agents?

SCOTT BOYHER  11/21/2018

```
 1          A.   Yes.

 2          Q.   One officer or more than one other

 3   officer?

 4               MR. WHEATON:  Objection; foundation.

 5          A.   I don't know.

 6          Q.  (By Ms. Steffan)  It might have been one?

 7   It might have been more than one?

 8          A.   Correct.

 9          Q.   Did you review video before today's

10   deposition in which you saw the deployment of

11   chemical agents?

12          A.   Yes.

13          Q.   You saw yourself deploy chemical agents?

14          A.   Yes.

15          Q.   And you saw other officers deploy

16   chemical agents?

17          A.   Yes.

18          Q.   On the video?

19          A.   Yes.

20          Q.   Do you recall how many officers you saw

21   deploy chemical agents on the video?

22          A.   I believe two.

23          Q.   Could you tell if those officers

24   arrested the individuals against whom they had

25   deployed those chemical agents?
```

SCOTT BOYHER  11/21/2018

```
1          A.    No.
2          Q.    Based on what you reviewed on the video,
3    did the officers use streamers or some other form of
4    chemical agent?
5          A.    It would have been streamers.
6          Q.    Is the high-capacity streamer something
7    that is issued to each officer or only certain
8    officers?
9          A.    Certain officers.
10         Q.    What officers are issued high-capacity
11   streamers?
12         A.    Supervisors and people that are holding
13   the position of linebacker, which would be
14   designated personnel that are behind the initial --
15   that are assigned to be behind bike lines if a
16   scrimmage line is put up.
17         Q.    And do you know if anyone had a body
18   camera at the Clark and Tucker --
19         A.    Yes.
20         Q.    -- incident?
21               Did you have a body camera?
22         A.    No.
23         Q.    Who had body cameras?
24         A.    Matt Karnowski, Sergeant.
25         Q.    And is Sergeant Karnowski in your line
```

SCOTT BOYHER  11/21/2018

Page 49

```
 1    of command?  Does that question make sense?  Is he

 2    your subordinate?

 3         A.   Yes.

 4         Q.   And he is assigned permanently to the

 5    bike unit?

 6         A.   He was at that time.

 7         Q.   And he reported to you directly?

 8         A.   Correct.

 9         Q.   At that time how many sergeants did you

10    have?

11         A.   Five, I believe.

12         Q.   Were all of them at Clark and Tucker?

13         A.   I'm unsure.

14         Q.   Sergeant Karnowski was at Clark and

15    Tucker?

16         A.   Yes.

17         Q.   What ultimately happened with the

18    bike -- I'm sorry, with the bus extraction?  Were

19    the buses able to be extracted?

20         A.   Eventually, yes, both buses were

21    extracted.

22         Q.   Do you know where they were extracted

23    to?

24         A.   No.

25         Q.   What did you do after the buses had been
```

SCOTT BOYHER  11/21/2018

```
 1    successfully extracted?

 2         A.   We left the area.

 3         Q.   Where did you go?

 4         A.   I don't recall.

 5         Q.   When you say "the area," do you mean

 6    downtown or just that immediate intersection?

 7         A.   Immediate area.

 8         Q.   But you were still working; is that

 9    correct?

10         A.   Right.

11         Q.   How long did you work that day?

12         A.   I'm unsure.

13         Q.   Did you work into the evening, if you

14    recall?

15         A.   Yes.

16         Q.   Did you encounter protesters at any

17    other point in that day?

18         A.   Yes.

19         Q.   When did you encounter protesters?

20         A.   I don't know.

21         Q.   We're talking about Friday,

22    September 15th?

23         A.   Yes.

24         Q.   After the buses were successfully

25    extracted --
```

SCOTT BOYHER  11/21/2018

```
 1          A.   Yes.

 2          Q.   -- you did encounter protesters; is that

 3    correct?

 4          A.   Yes.

 5          Q.   But you don't know when?

 6          A.   At what point are you speaking of?

 7          Q.   You said afternoon into the evening of

 8    Friday, September 15th, 2017, you did encounter

 9    protesters another time that day.  Where did you

10    encounter them?

11               MR. WHEATON:  Objection to form.  Object

12    to that.

13               You can answer if you understand her

14    question.

15          A.   I don't understand.  At what location

16    are we speaking of?

17          Q.   (By Ms. Steffan)  Any location, any time

18    that afternoon or evening, did you -- you said you

19    did encounter protesters?

20          A.   Yes, we did.

21          Q.   Where and when?

22          A.   At Clark and Tucker, on 1200 Clark.

23          Q.   And that was in the afternoon; is that

24    correct?

25          A.   Yes.
```

SCOTT BOYHER  11/21/2018

Page 52

```
 1          Q.   Still light outside?

 2          A.   Yes.

 3          Q.   Did you encounter protesters at any

 4     other time, that you can recall, that afternoon or

 5     that evening of September 15th?

 6          A.   Yes.

 7          Q.   Do you recall where?

 8          A.   Throughout downtown.

 9               MR. WHEATON:  Could we take a

10     five-minute break?

11               MS. STEFFAN:  Sure.

12               (A short break was taken.)

13          Q    (By Ms. Steffan) I'd like to direct your

14     attention to the evening of Sunday, September 17th,

15     2017.  So this is two days after the verdict was

16     released.  Were you working that day?

17          A.   Yes.

18          Q.   You were downtown; is that correct?

19          A.   Yes.

20          Q.   Do you recall what time you started work

21     on Sunday, the 17th?

22          A.   No.

23          Q.   Do you recall if it was the morning,

24     afternoon or evening?

25          A.   No.
```

SCOTT BOYHER  11/21/2018

Page 53

```
 1              MS. STEFFAN:  At this time I'm going to

 2   show you a portion of a video that we'll refer to as

 3   Plaintiff's Exhibit 1.

 4              (Plaintiffs's Exhibit 1 was marked for

 5   identification.)

 6              MS. STEFFAN:  And just for the record,

 7   this was a video produced by the City as City 01176.

 8              I'm going to try to start it around time

 9   stamp 11:25 p.m.  I'm going to move the laptop this

10   way so we can all see it.

11        Q.   (By Ms. Steffan)  Have you seen this

12   video before, just based on this still frame?

13        A.   Not that -- no.

14        Q.   I'm going to press play now, and we'll

15   watch a few seconds so that we can get our bearings.

16        A.   Okay.

17        Q.   I'm going to stop it.  We're at

18   11:25:45.

19              You haven't seen this video before; is

20   that correct?

21        A.   Not that I -- no.

22        Q.   But you know what it is showing; is that

23   correct?

24        A.   Yes.

25        Q.   What does it show?
```

SCOTT BOYHER  11/21/2018

Page 54

```
1            A.    A bunch of policemen and people under
2      arrest at Washington and Tucker.
3            Q.    Is this on September 17th, 2017?
4            A.    Yes.
5            Q.    Were you working this evening?
6            A.    Yes.
7            Q.    And are you depicted in this video?
8                  I'll direct your attention down to this
9      figure here in the bottom left corner.  Is that you?
10           A.    No.
11           Q.    Do you know who that is?
12           A.    No.
13           Q.    We're going to fast-forward the video.
14     Not fast-forward it, but play it.  I'm going to stop
15     the video for a second.
16                 Do you recall what type of uniform you
17     would have been wearing that evening?
18           A.    Yes.
19           Q.    What type of uniform would you have been
20     wearing?
21           A.    What I'm wearing right now.
22           Q.    So for the record, that's a light blue
23     -- or, no, white shirt?
24           A.    No.  It's going to be a white shirt,
25     white polo shirt, but it will be a long sleeve.
```

SCOTT BOYHER  11/21/2018

```
 1          Q.    So that evening you were wearing a white
 2    polo shirt with long sleeves?
 3          A.    Uh-huh.
 4          Q.    Were you wearing any protective
 5    equipment that evening?
 6          A.    Yes, I'm sure I was.
 7          Q.    What kind of protective equipment were
 8    you wearing?
 9                MR. WHEATON:  If you remember.
10          A.    I don't recall.
11          Q     (By Ms. Steffan) Were you wearing a
12    helmet?
13          A.    Yes.
14          Q.    Were you wearing a gas mask?
15          A.    No.
16          Q.    Were you wearing a vest?
17          A.    Yes.
18          Q.    Would your vest have been one that was
19    marked with "police" on the back, a black vest?
20          A.    I don't recall.
21          Q.    I'm playing the video again.  We're now
22    at approximately time stamp 11:26 p.m.
23                Okay.  I'm going to stop the video for a
24    moment.
25                Can you just describe what direction the
```

SCOTT BOYHER  11/21/2018

Page 56

1    video is oriented?

2         A.   I -- I'm trying to figure that out

3    myself.

4         Q.   I can see -- if you direct your

5    attention up here, this says Washington.  So I know

6    that this is Washington here going diagonal from the

7    top left to the bottom right?

8         A.   Yes.

9         Q.   Do you know if we're facing north or

10   south?

11        A.   That would be -- I don't know why I am

12   having a problem here.  Can you -- I don't -- I

13   don't know.  I don't know which way you're facing.

14   You're at the intersection of Tucker and Washington.

15   I think this is the northwest corner.

16        Q.   That is my understanding as well --

17        A.   Okay.

18        Q.   -- I think.

19             Do you know where you were in relation

20   to this group of people you see here at this

21   intersection?

22             MR. WHEATON:  Objection to form.  It's

23   vague as to the time frame.

24        Q.   (By Ms. Steffan)  At this time,

25   11:26 p.m., do you know where you would have been?

SCOTT BOYHER  11/21/2018

Page 57

```
 1        A.    No.
 2        Q.    Were you part of this line of officers?
 3   And I'm pointing to the circle of officers encasing
 4   the intersection of Washington and Tucker who are
 5   wearing helmets, were you part of that line?
 6        A.    No.
 7        Q.    Would you have been on the outside of
 8   that line or inside that line?
 9        A.    I would have been outside of that line.
10              MS. STEFFAN:   If we can go off the
11   record for one second.
12              (A short break was taken.)
13        Q.    (By Ms. Steffan)  When we went off the
14   record, I think we had just established that you
15   were at this scene and you would have been outside
16   the line of officers and protective equipment; is
17   that correct?
18        A.    Yes.
19        Q.    Let's play the video for a couple more
20   minutes here, and maybe you may be able to identify
21   yourself or maybe not.
22              I'm going to stop the video for a moment
23   here.  We're at 11:27:45.
24              Do you recognize any of those officers
25   as yourself in the video at this point?
```

SCOTT BOYHER  11/21/2018

```
 1           A.    (The witness shook his head.)
 2           Q.    Do you recognize any of the officers at
 3     all?
 4           A.    No.  I can't even.
 5           Q.    You can't tell, for example, who this
 6     figure is in the middle here whose face is exposed?
 7           A.    No.  I don't know who -- I don't know
 8     who that is, but I'm not in there.
 9           Q.    You don't see yourself.
10                 This video, if I understand correctly,
11     is mounted on a building; is that right?
12           A.    I don't know.
13           Q.    This --
14           A.    Oh, this is the real -- is this the
15     police department's?
16           Q.    The police department produced this
17     video.  It is running on a kind of software called
18     Genetec.
19           A.    Uh-huh.
20           Q.    Are you familiar with that software?
21           A.    No.
22           Q.    To the best of your knowledge, is this a
23     Real Time Crime Center video?
24           A.    No.
25           Q.    You don't know?  No, it's not?
```

SCOTT BOYHER  11/21/2018

```
 1          A.    I mean, I -- no, I don't know.
 2          Q.    I am going to ask you, just based on
 3    your knowledge as an officer of St. Louis
 4    Metropolitan Police Department, I'm pointing to the
 5    officers who are facing away from us and who have an
 6    object in their right hands, these objects here,
 7    what are these?
 8          A.    Sticks.
 9          Q.    What kind of sticks?
10          A.    A baton.
11          Q.    Are they department-issued batons?
12          A.    Yes.
13          Q.    What is their use?
14          A.    They use them during -- for civil dis --
15    civil disobedience team uses those.
16          Q.    Those are department issued to members
17    of the civil disobedience team; is that correct?
18          A.    Correct.
19          Q.    I'm playing the video again.  We're
20    starting from 11:27:45.
21                Lieutenant, I'll ask you to direct your
22    attention to these officers who are banging the
23    sticks on the ground.  Do you see that?
24          A.    Uh-huh.
25          Q.    I've stopped the video.
```

SCOTT BOYHER  11/21/2018

 1              Based on your experience as a St. Louis
 2    metropolitan police officer, what is the purpose of
 3    banging the batons on the street?
 4              MR. WHEATON:  Objection; form,
 5    foundation, calls for speculation.
 6         Q.   (By Ms. Steffan)  You can answer.
 7         A.   I'm not part of the civil disobedience
 8    team.
 9         Q.   Is your testimony that you don't know
10    why?
11         A.   I don't know.
12         Q.   Have you ever had any kind of training
13    for civil disobedience events?
14         A.   Yes.
15         Q.   Did you have training with a baton as
16    part of that civil disobedience training?
17         A.   Yes.
18         Q.   Were you ever instructed that you should
19    bang your baton against the ground as part of that
20    training?
21         A.   Not the ground.
22         Q.   Where were you instructed that you
23    should bang your baton as part of that training?
24              MR. WHEATON:  Objection; form,
25    foundation.

SCOTT BOYHER 11/21/2018

```
 1        A.   At that time, it was a shield when you
 2   marched.
 3        Q.   (By Ms. Steffan)  You were to bang your
 4   baton against your shield as you marched; is that
 5   what you're saying?
 6        A.   Yes.
 7        Q.   What was the purpose of doing that?
 8        A.   To gain compliance or -- so you gain
 9   compliance.  It's a showing of -- it was used as if
10   you're marching into a group or if you're going to
11   move a group, it was used as a method of
12   controlling.
13        Q.   How does that effectuate control?
14             MR. WHEATON:  Objection; form,
15   foundation, calls for speculation.
16        A.   I don't know.
17        Q.   (By Ms. Steffan)  Are those officers that
18   you see depicted in that video marching into a
19   group?
20        A.   No.
21        Q.   I'm going to start the video again.
22   We're at 11:27:58.  Lieutenant, I ask you to just
23   watch for a minute or so here.  If you do see
24   yourself, will you identify yourself, please.
25             I'm going to stop the video for one
```

SCOTT BOYHER  11/21/2018

Page 62

1   second.  I see that there is a figure now at

2   11:28:30, on the right-hand side of the screen,

3   wearing protective equipment and also a long-sleeved

4   white shirt.  Is that you?

5        A.   No.

6        Q.   Is that someone else who is a

7   lieutenant?

8        A.   It's a lieutenant or a captain.  That's

9   a uniform white shirt.

10        Q.   Started the video again.

11             I'm going to stop the video again.  Now

12   we're at time stamp 11:30 p.m.

13             Have you seen yourself at all in the

14   video?

15        A.   No.

16        Q.   Have you seen any officers you recognize

17   in the video?

18        A.   No.

19        Q.   You were at this intersection at this

20   time; is that correct?

21        A.   Yes.

22        Q.   Where were you in relation to the video?

23   Do you know?

24        A.   Yes.

25        Q.   Where were you?

SCOTT BOYHER  11/21/2018

```
 1          A.   A block down.

 2          Q.   You're a block north; is that correct?

 3          A.   Correct.

 4          Q.   Why are you a block north?

 5          A.   That was my position that I was given to

 6     control when they were effecting the mass arrest.

 7          Q.   You're with the bike response team; is

 8     that correct?

 9          A.   Correct.

10          Q.   And all members of the bike response

11     team who are working at this time are at that

12     position with you; is that correct?

13          A.   No.

14          Q.   Where are the members of the bike

15     response team deployed at this point?

16          A.   I believe there is two squads.  That's

17     west.  They're down here blocking.

18          Q.   I think you're pointing to the north and

19     east?

20          A.   No.  To the east.  They're to the -- if

21     this is the northwest corner.

22          Q.   Yes.  I think that's correct.

23          A.   Okay.  They're down here behind

24     everybody.

25          Q.   From your vantage point at that position
```

SCOTT BOYHER  11/21/2018

Page 64

```
 1    where you were, not where your other members of the
 2    bike response team were, could you see the arrests
 3    that were being effectuated?
 4         A.   I could see -- I could see people being
 5    marched out of the group in handcuffs, but I
 6    didn't -- I couldn't articulate exactly what was
 7    going on.
 8         Q.   Sure.
 9              Approximately how many officers do you
10    see in this video?
11         A.   I don't know.  60, 70.
12         Q.   To your knowledge, do you know how many
13    officers, among all the different kinds of units,
14    were deployed that evening at or near this
15    intersection?
16         A.   Do I know how many, no.
17         Q.   Do you know approximately?
18         A.   No.
19         Q.   Do you know how many people were
20    arrested at that intersection?
21         A.   No.
22         Q.   Have you ever read the incident report
23    describing the arrest at that intersection?
24         A.   No.
25         Q.   How long did you remain at that
```

SCOTT BOYHER  11/21/2018

1    position, a block or so north of the Washington and

2    Tucker intersection, that evening?

3         A.    I don't know.

4         Q.    Do you know what time you ended work?

5         A.    No.

6         Q.    Did you work into the next morning?  Do

7    you know?

8         A.    We worked -- we worked well after the

9    mass arrest was completed.

10        Q.    What did you do after that point?

11             MR. WHEATON:  Objection to form.

12        A.    Primary responsibility was to patrol

13   downtown for -- there was multiple groups that were

14   still roaming downtown.  So we kept a police

15   presence downtown.

16        Q.    (By Ms. Steffan)  When you say multiple

17   groups, do you mean groups of civilians and

18   protesters?

19        A.    Yes.

20        Q.    Protesters and non-protesters, or just

21   protesters?

22             MR. WHEATON:  Objection; foundation.

23   Subject to that.

24        A.    I don't know who all was in the street

25   that night.

SCOTT BOYHER  11/21/2018

Page 66

1        Q.   (By Ms. Steffan)  Fair enough.

2             If I can ask you to back up in time

3    slightly.  Do you know when you arrived at that

4    point, about a block north of this intersection?

5        A.   Before the --

6        Q.   Before this arrest was effectuated?

7        A.   Correct.

8        Q.   Do you know when you arrived there?

9        A.   As the civil disobedience teams were

10   coordinating with each other for the mass arrest, I

11   took over the location of Lucas and Tucker, which

12   was an extended period.  I don't know.

13       Q.   Something longer than an hour?

14       A.   No.  Less than an hour.

15       Q.   At the place where you were on that

16   line, I'm -- my understanding is you and other

17   members of the bike response team were in a line; is

18   that correct?

19       A.   Correct.

20       Q.   And you were blocking both the sidewalk

21   and the street at that point; is that correct?

22       A.   No.

23       Q.   The sidewalk was open?

24       A.   Yes.

25       Q.   At what point did the sidewalk close, or

SCOTT BOYHER  11/21/2018

```
 1    was it never closed?

 2          A.    We never closed it.

 3          Q.    Did you encounter any pedestrians at

 4    that line?

 5          A.    Yes.

 6          Q.    Many pedestrians?  A few?  One?

 7          A.    At that location I saw several, several

 8    groups, singles, several.

 9          Q.    Did you speak with any pedestrians while

10    you were at that line?

11          A.    No.

12          Q.    Did any pedestrians go past you on the

13    sidewalk?

14          A.    Yes.

15          Q.    How many pedestrians went past you on

16    the sidewalk approximately?

17          A.    I don't know.  Numerous.

18          Q.    You and the other members of the bike

19    response team were at that point blocking the

20    street; is that correct?

21          A.    Blocking Lucas.  We were blocking

22    pedestrian and vehicular traffic eastbound on Lucas.

23          Q.    So you were -- you had created a line

24    that went north-south, is that correct, or you

25    created a line that went west-east?
```

SCOTT BOYHER  11/21/2018

```
 1            A.    North-south.
 2            Q.    North-south.
 3                  And you were on the east side of the
 4     intersection with Washington; is that correct?
 5            A.    Yes.
 6            Q.    Were there cars trying to go past you
 7     one way or the other?
 8            A.    Not that I recall.
 9            Q.    Were there cars trying to go north or
10     south on Washington?
11            A.    Not that I recall.
12            Q.    Did you have your bicycles at that
13     point?
14            A.    Yes.
15            Q.    And were you using your bicycles, if I
16     can sort of demonstrate, sort of perpendicular in
17     front of you like this?
18            A.    Yes.
19            Q.    Were you also working during a
20     demonstration or a protest on September 28th or 29th
21     of 2017 on Broadway?  Do you recall?
22            A.    I don't know.
23            Q.    How about an action on October 3rd near
24     or on a highway?  Were you working?
25            A.    I'm unable to tell by the dates.
```

SCOTT BOYHER  11/21/2018

Page 69

```
1          Q.    Have you ever been -- in the last year

2   and a half, let's say, have you ever been deployed

3   at an action where protesters attempted to block the

4   highway?

5          A.    Yes.

6          Q.    Do you recall if that was before or

7   after the Stockley verdict?

8          A.    After.

9          Q.    What happened there?

10         A.    A large number of people walked onto the

11  highway, and the bikes -- the bike unit became

12  involved when they exited the highway on a mass

13  arrest.

14         Q.    Did you arrest people as part of that

15  action?

16         A.    Yes.

17         Q.    How many individuals did you arrest?

18         A.    I, I did not personally arrest people.

19         Q.    I see.

20               Members of the bike unit arrested

21  people?

22         A.    I think we, we -- the bike unit

23  assisted, but they were not the primary arresting

24  unit.

25         Q.    I see.
```

SCOTT BOYHER  11/21/2018

```
 1              What was the role of the bike unit at

 2    that action?

 3         A.    To assist the civil disobedience teams.

 4         Q.    In effectuating the arrests or something

 5    else?

 6         A.    Correct.

 7         Q.    Have you patrolled other public

 8    demonstrations or protests during your tenure as an

 9    officer of St. Louis Metropolitan Police Department?

10         A.    Yes.

11         Q.    How many approximately?

12         A.    What was your question again?

13         Q.    Have you patrolled other protests or

14    demonstrations during your tenure at SLMPD?

15         A.    Is that including the Stockley or --

16    dozens.

17         Q.    Dozens including the Stockley protest;

18    is that what you're saying?

19         A.    Dozens, yes.

20         Q.    How many -- approximately how many

21    protests have you patrolled that were unrelated to

22    the Stockley verdict?

23         A.    Dozens.

24         Q.    What is your understanding of when you

25    can use pepper spray against an individual?
```

SCOTT BOYHER  11/21/2018

```
 1              MR. WHEATON:  Objection; form and
 2   foundation.
 3         A.   Against an individual?  If they're -- if
 4   I'm addressing an individual that is committing a
 5   crime, interfering, I can address them with pepper
 6   spray.
 7         Q.   (By Ms. Steffan)  You said committing a
 8   crime, interfering.  Are those one or the other or
 9   do they have to be doing both things in order for it
10   to be appropriate to use pepper spray?
11         A.   They would have to -- either one would
12   be a crime.
13         Q.   Are there other -- based on your
14   experience as a police officer, are there other
15   limitations on when you can use pepper spray, or any
16   time a person is interfering or committing another
17   crime, is it okay to use pepper spray?
18              MR. WHEATON:  Objection; form and
19   foundation, calls for speculation.
20         A.   I'm unsure exactly what you're asking.
21         Q.   (By Ms. Steffan)  It's a complicated
22   question.  I can understand that.
23              Are you -- you just testified that you
24   may use -- you may use pepper spray if a person is
25   committing a crime, one crime of which might be
```

SCOTT BOYHER  11/21/2018

1    interfering with an officer; is that correct?

2         A.    Correct.

3         Q.    But you're not saying every time a

4    person is committing a crime it is appropriate to

5    use pepper spray; is that correct?

6         A.    That would be correct.

7         Q.    What other limitations are there on the

8    use of pepper spray?  What has to be true for it to

9    be appropriate to use pepper spray?

10             MR. WHEATON:  Same objection, calls for

11   speculation, absence of specific facts and

12   circumstances for deployment.

13        A.    I do not understand the question.

14        Q.    (By Ms. Steffan)  Let's make it

15   non-hypothetical.

16        A.    Yes.

17        Q.    Let's go back to the bus extraction.

18        A.    Yes.

19        Q.    You used pepper spray through a

20   streamer?

21        A.    Yes.

22        Q.    On several occasions?

23        A.    Yes.

24        Q.    Why did you do that?

25        A.    The people that I addressed with pepper

SCOTT BOYHER 11/21/2018

```
 1   spray were interfering with officers or assaulting
 2   officers or grabbing the assault -- the officers'
 3   equipment bikes, impeding the -- impeding the
 4   officers on making the bus extraction.  Therefore,
 5   they were addressed -- I addressed them with pepper
 6   spray at that time to stop their actions.
 7         Q.   When you say you addressed them with
 8   pepper spray, you mean you shot the streamer; is
 9   that correct?
10         A.   I sprayed them, yes.
11         Q.   When I started that question, and I was
12   asking about what circumstances make it appropriate
13   to use pepper spray, we were discussing when it was
14   appropriate to use pepper spray against an
15   individual; is that correct?
16         A.   Yes.
17         Q.   Are there different circumstances in
18   which it is appropriate to use pepper spray against
19   a crowd?
20         A.   Yes.
21         Q.   When is it okay to use pepper spray
22   against a crowd?
23         A.   When a crowd becomes violent, there is
24   a -- we have a special order on it during these
25   times.  If it's considered a violent crowd and
```

SCOTT BOYHER  11/21/2018

Page 74

1    you're trying to disperse the crowd, there's
2    specific -- there's specific things that you have to
3    do, which we have three -- make up 3-by-5 cards when
4    we're doing this to make sure we have it and what we
5    have to say via loud speaker to make sure everybody
6    knows.
7         **Q.   You said it would be appropriate to use**
8    **pepper spray in such a situation if the crowd were**
9    **violent; is that correct?**
10        A.   At which point?
11        **Q.   Those limitations that you're**
12   **describing, the instructions that you have to give**
13   **members of a crowd, those occur when a crowd is**
14   **violent; is that correct?**
15             MR. WHEATON:  Objection; foundation,
16   calls for speculation.
17        A.   If it has been deemed that it is a
18   unlawful assembly and you're trying to do a crowd
19   dispersal, you have to announce -- give them an
20   avenue of moving.
21        **Q.   (By Ms. Steffan)  What makes a crowd an**
22   **unlawful assembly?**
23             MR. WHEATON:  Objection; foundation,
24   calls for speculation.
25        **Q.   (By Ms. Steffan)  You can answer.**

SCOTT BOYHER  11/21/2018

```
 1          A.    There's specific things within our --
 2   within our special orders.  If there's -- if they're
 3   engaging in illegal activity and it's deemed --
 4   there, there's a checklist, you have to read over
 5   the checklist, check everything.  If everything's
 6   met, then it's an unruly -- it's an unlawful
 7   assembly.
 8          Q.    What are the things on the checklist?
 9          A.    I don't know exactly.
10          Q.    Can you name any of them?
11          A.    Yes.  It's violation of law, violence.
12   That would be it.
13          Q.    There might be other things, you just
14   don't recall what they are?
15          A.    Correct.
16          Q.    When you have to make a determination
17   about whether a crowd is violent, what types of
18   things count as violence?
19          MR. WHEATON:  Objection; foundation.
20   There's no foundation that he is responsible for
21   making that determination.
22          Q.    (By Ms. Steffan)  If you know, you can
23   answer.
24          A.    What is determined -- one more time.
25          MR. WHEATON:  You can ask her to read
```

SCOTT BOYHER  11/21/2018

1    the question back if you'd like.

2          A.    What makes it a crowd?  If they're

3    throwing rocks and they're acting in unison together

4    and we're trying to disperse a crowd, that would be

5    it.

6          **Q.   (By Ms. Steffan)  Let's take a**

7    **hypothetical situation.  Say you have a crowd of ten**

8    **people and one person throws a rock.  Is it okay to**

9    **use pepper spray against the crowd under those**

10   **circumstances?**

11             MR. WHEATON:  Objection; foundation,

12   calls for speculation.  It's an improper

13   hypothetical.

14         A.   I, I would -- I would need more

15   specifics on exactly what's going on.

16         **Q.   (By Ms. Steffan)  What kinds of**

17   **information would you need?**

18         A.    Exactly what the crowd is doing, are

19   they acting in unison.

20         **Q.    How do you determine if the crowd is**

21   **acting in unison?**

22             MR. WHEATON:  Objection; foundation,

23   calls for speculation again, absent specific

24   context.

25         A.    Specifically -- I, I would need

SCOTT BOYHER  11/21/2018

Page 77

```
 1   specifics on which -- is there an incident we're
 2   speaking of or just a hypothetical?
 3          Q.   (By Ms. Steffan)   I'm speaking
 4   hypothetically, and I'm not asking you to make a
 5   determination.   What I'm asking you is:   What kinds
 6   of information would you be looking for in order to
 7   make a determination about whether a crowd is acting
 8   violently or not?
 9          A.    Personally?
10          Q.    Yeah, personally.
11          A.    Yes.   If you have a group that's
12   throwing rocks and other people are acting in
13   unison, even though they're not throwing rocks, but
14   they're foiling, foiling the offenders that are --
15   that are throwing the rocks, foiling them -- the
16   police from responding to them or acting as shields
17   where they stand up in front of you and then guys
18   are throwing rocks over, it's not usually the people
19   in front, but that would -- my determination would
20   be that they're acting in unison together.
21          Q.    Is it your understanding that if you
22   deploy a chemical agent while you're on duty, that
23   you need to write a report about it?
24          A.    A chemical agent?
25          Q.    What does chemical agent mean to you?
```

SCOTT BOYHER  11/21/2018

```
 1          A.    A chemical agent can be an irritant or a

 2   chemical.  So are, are we speaking of the irritant?

 3          Q.    Is pepper spray a chemical agent?

 4          A.    I would consider it an, an irritant,

 5   yes.  So for the sake of this conversation, we can

 6   say it's a chemical agent.

 7          Q.    Is tear gas a chemical agent to you?

 8          A.    Yes.

 9          Q.    And is OC spray, oleoresin capsicum

10   spray, pepper spray, no matter how it is deployed,

11   is that a chemical agent to you, whether it's a

12   streamer or a fogger or --

13          A.    Sure.  Yes.

14          Q.    Yes?

15          A.    Yes.

16          Q.    Is it your understanding that you are

17   required to write a report if you deploy a chemical

18   agent while you are on duty?

19          A.    Yes.

20          Q.    Are you familiar with a St. Louis City

21   ordinance about traffic obstruction or interference?

22          A.    Yes.

23          Q.    Are you aware that that ordinance makes

24   it a crime to obstruct or impede traffic?

25          A.    Yes.
```

SCOTT BOYHER  11/21/2018

1          Q.   What is your understanding of when a

2    person is violating that ordinance?  What do they

3    have to be doing in order to be violating the

4    impeding or obstructing traffic ordinance?

5               MR. WHEATON:  Objection; foundation,

6    calls for speculation.

7          A.   Are you wanting a hypothetical?

8          Q.   (By Ms. Steffan)  I want to know what

9    elements you think have to be present for a person

10   to be violating that ordinance.

11              MR. WHEATON:  Same objection.

12         A.   That they're impeding the flow of

13   traffic.  If their actions are causing traffic to

14   not be able to use that thoroughfare, they're

15   impeding the flow of traffic.

16         Q.   (By Ms. Steffan)  Can a person be

17   impeding or obstructing traffic if the road is

18   closed?

19         A.   If their actions are causing the road to

20   be closed, they would be impeding the flow of

21   traffic.

22         Q.   Can a person be impeding or obstructing

23   traffic if they're on a sidewalk?

24         A.   Yes.

25         Q.   If a person is standing still on a

SCOTT BOYHER  11/21/2018

Page 80

```
 1      sidewalk, are they impeding or obstructing traffic?
 2              MR. WHEATON:  Objection; form, calls for
 3      speculation.
 4          A.   I'm unsure what the question is.
 5          Q.   (By Ms. Steffan)  If a person is standing
 6      still on a sidewalk, are they obstructing traffic?
 7              MR. WHEATON:  Objection; form,
 8      foundation, improper hypothetical.
 9          A.   That in itself, no.
10          Q.   (By Ms. Steffan)  What else has to be
11      present for them to be obstructing traffic?
12          A.   If they're blocking -- if they're
13      blocking the sidewalk.  So one person, no, but if
14      you have multiple people acting in unison, they're,
15      they're impeding the flow of the sidewalk.
16          Q.   How do you tell if people are acting in
17      unison?
18              MR. WHEATON:  Objection; form.
19          A.   When you're giving orders for them to
20      move and they don't move and they're blocking -- and
21      they're blocking the sidewalk.
22          Q.   (By Ms. Steffan)  What is your
23      understanding of when you can order people to move
24      on a sidewalk?
25          A.   I'm not sure --
```

SCOTT BOYHER  11/21/2018

```
 1                MR. WHEATON:  Can you read that question
 2    back for me.  I'm sorry.
 3                (The pending question was read back by
 4    the court reporter.)
 5                MR. WHEATON:  Make an objection to form,
 6    foundation and it calls for speculation.
 7         A.   Okay.  I can -- it's my understanding we
 8    can move people when it's a public safety issue
 9    or -- a public safety issue.  So when we move
10    somebody from a sidewalk, you're either impeding the
11    flow or they're impeding the flow -- if they're
12    impeding the flow and it's causing a public safety
13    issue.
14         Q.   (By Ms. Steffan)  What is a public safety
15    issue?
16         A.   It would depend on the circumstance.
17         Q.   Can you give me an example of a public
18    safety issue?
19         A.   If a civil disobedience team is trying
20    to move on a sidewalk and everybody's -- and people
21    are blocking the sidewalk and they're giving lawful
22    orders to move, they're interfering and -- impeding
23    the flow of the sidewalk and interfering with an
24    officer.
25         Q.   If I understand correctly, you're saying
```

SCOTT BOYHER  11/21/2018

Page 82

```
 1    if an officer is trying to get by and the officer
 2    can't get by, that would be impeding the flow of
 3    traffic; is that correct?
 4            A.   That would be, too, yes.
 5            Q.   Is that the situation you just described
 6    or do I have it wrong?
 7            A.   I used a hypothetical of a civil dis --
 8    civil disobedience team or a policing element trying
 9    to move down a sidewalk that is being blocked by
10    people and they were giving orders to move, they
11    would be in violation -- they would be impeding the
12    flow of traffic on the sidewalk as well as
13    interfering with an officer.
14            Q.   You mentioned earlier that if you are --
15    let me back up a second.
16                 You testified earlier that if a crowd is
17    deemed to be an unlawful assembly and asked to
18    disperse, there are certain things you have to do
19    before you can actually disperse the crowd; is that
20    correct?
21            A.   Correct.
22            Q.   Those are warnings that would be given
23    over a loud speaker; is that correct?
24            A.   Correct.
25            Q.   And you mentioned the 3-by-5 cards I
```

SCOTT BOYHER  11/21/2018

Page 83

```
 1    think.  Those have the text of the warning on
 2    them; is that correct?
 3          A.    Correct.
 4          Q.    Do you know the elements that that
 5    warning has to include?
 6          A.    Yes.
 7          Q.    What are those elements?
 8          A.    You identify yourself, that it's been --
 9    identify yourself, tell the crowd what the violation
10    is and the avenue of exit, where to go.
11          Q.    Do you know how long a dispersal order
12    remains in effect, how long people have to stay out
13    of the area?
14          A.    Until the activity ceases.
15          Q.    What does that mean?
16          A.    If you have a riotous crowd and you tell
17    them to leave the area and they don't leave, or they
18    move one, one block over or 10 feet over and
19    continue their, their activity, that would not be
20    dispersing.
21          Q.    So 10 feet over, not dispersing; is that
22    correct?
23          A.    They have to leave the area.
24          Q.    How big is the area?
25                MR. WHEATON:  Objection; form,
```

SCOTT BOYHER  11/21/2018

 1   foundation, calls for speculation.

 2        A.   It would depend -- it would depend on

 3   the situation.

 4        Q.   (By Ms. Steffan)  Is a block away -- have

 5   you left the area if you are a block away?

 6             MR. WHEATON:  Same objection.

 7        A.   It depends on the situation.

 8        Q.   (By Ms. Steffan)  So that might be

 9   leaving the area, but it might not be, depending on

10   the circumstances?

11             MR. WHEATON:  Same objection.

12        A.   Correct.

13        Q.   (By Ms. Steffan)  Is that information

14   included in the warning that you described, how far

15   away the person has to go?

16        A.   No.  It gives -- we were giving avenues

17   of exit --

18        Q.   Does it tell --

19        A.   -- to leave the area.

20        Q.   Does the warning contain information

21   about how long the person has to remain out of the

22   area?

23        A.   No.

24        Q.   Do you agree that people in St. Louis

25   have a First Amendment right to protest?

SCOTT BOYHER  11/21/2018

```
 1                    MR. WHEATON:  Objection.  Go ahead.  Go

 2     ahead.

 3          A.    Absolutely.

 4          Q.    (By Ms. Steffan)  Does that include the

 5     right to protest the actions of police officers

 6     themselves?

 7          A.    Yes.

 8          Q.    Does that include the right to protest

 9     on sidewalks?

10          A.    Yes.

11          Q.    And on streets as well?

12                    MR. WHEATON:  Just going to object to

13     foundation and that it calls for speculation again,

14     absent specific context.

15          A.    I'm unsure of the question.

16          Q.    (By Ms. Steffan)  Do people have a right,

17     protected by the First Amendment, to protest in

18     streets in the City of St. Louis?

19                    MR. WHEATON:  Same objection.

20          A.    That would -- that would depend.

21          Q.    (By Ms. Steffan)  Sometimes do they have

22     that right?

23          A.    Yes.

24          Q.    Who decides what streets and what

25     sidewalks people can protest on?
```

SCOTT BOYHER  11/21/2018

```
 1                  MR. WHEATON:  Objection; calls for
 2      speculation.
 3          A.   I don't know.
 4          Q.   (By Ms. Steffan)  Did you patrol the
 5      women's march in January of 2017 in downtown
 6      St. Louis?
 7          A.   Yes.
 8          Q.   Were people blocking the street during
 9      that protest?
10          A.   Yes.
11          Q.   Did you deploy chemical agents against
12      anyone during that protest?
13          A.   No.
14          Q.   Even though they were blocking the
15      street?
16          A.   Correct.
17          Q.   Did you arrest anyone at that protest?
18          A.   Yes.
19          Q.   How many people did you arrest?
20                  MR. WHEATON:  Are you asking if he
21      personally arrested anyone?
22                  MS. STEFFAN:  Yeah.
23          Q.   (By Ms. Steffan)  How many people did you
24      personally arrest?
25          A.   I arrested one.
```

SCOTT BOYHER  11/21/2018

1          Q.    **What was that person doing that caused**
2    **them to be arrested?**
3          A.    When the street was opened up, refused
4    to get out of the street.
5          Q.    **Who had opened up the street?**
6               MR. WHEATON:  Are you asking who
7    physically removed barricades, or are you asking who
8    made the decision?
9          Q.  **(By Ms. Steffan)  Who made the decision**
10   **to open up the street?**
11              MR. WHEATON:  If you know.
12         A.    I don't know.
13         Q.  **(By Ms. Steffan)  Do you know if it was**
14   **the police department that made that decision or**
15   **someone else?**
16         A.    I don't know.
17         Q.    **You weren't involved in that decision?**
18         A.    No.
19         Q.    **Were you involved in the decisions to**
20   **open or close streets during the protests related to**
21   **the Stockley verdict?**
22         A.    Can I have that question one more time?
23         Q.    **Sure.**
24              **Were you personally involved in any**
25   **decisions to open or close streets during the**

SCOTT BOYHER  11/21/2018

```
 1      Stockley verdict protests?

 2                  MR. WHEATON:  Objection; form.

 3      A.   Yes.

 4      Q.   (By Ms. Steffan)  Do you recall a

 5  specific instance in which you opened or closed a

 6  street, related to the Stockley verdict?

 7      A.   We closed -- the groups of protesters

 8  were marching from exit -- entrance ramps and exit

 9  ramps, trying to get onto the highway, and we were

10  staying ahead of them and putting up lines to keep

11  them from going up on the highway.

12      Q.   Do you remember opening or closing any

13  other street where you personally were involved in

14  the decision during the protests after the Stockley

15  verdict?

16      A.   Yes.

17      Q.   When was that?

18      A.   At Ninth and Olive.

19      Q.   On September 17th -- on the Sunday?

20      A.   That Sunday.

21      Q.   Do you recall any other times where you

22  made a decision to open or close the street related

23  to the protests after the Stockley verdict?

24      A.   Yes, numerous.

25      Q.   Numerous times?
```

SCOTT BOYHER  11/21/2018

Page 89

```
 1        A.    Yeah.
 2        Q.    Have you personally sent any emails in
 3   which you describe the police response to the
 4   Stockley verdict protests?
 5             MR. WHEATON:  Objection; form.
 6        A.    Can I have that one more time?
 7        Q.    (By Ms. Steffan)  Sure.
 8             Have you sent any emails in which you
 9   discuss or describe the police response to the
10   Stockley verdict protests?
11             MR. WHEATON:  Same objection.
12        A.    Not that I'm aware of.
13        Q.    (By Ms. Steffan)  Have you received any
14   emails in which the police response to the Stockley
15   verdict protests has been discussed?
16        A.    Not that I'm aware of.
17        Q.    Considering the police response to the
18   Stockley verdict protest as a whole, would you do
19   anything differently than you did then today if the
20   same events occurred?
21             MR. WHEATON:  Objection; form,
22   foundation, calls for speculation.
23        A.    I don't know.
24        Q.    (By Ms. Steffan)  Are you aware that the
25   court issued a preliminary injunction in this case?
```

SCOTT BOYHER  11/21/2018

```
 1          A.   Yes, ma'am.

 2          Q.   How did you find out about that?

 3          A.   At a meeting.

 4          Q.   A meeting of who?

 5          A.   A meeting in headquarters.

 6          Q.   So command staff; is that accurate --

 7          A.   Yes.

 8          Q.   -- to say?

 9          A.   Command staff.

10          Q.   To the best of your understanding, what

11   does the preliminary injunction tell you about what

12   you should do differently in your day-to-day

13   actions?

14          MR. WHEATON:  Objection; form and

15   foundation, calls for speculation.  A preliminary

16   injunction order speaks for itself.

17          A.   I don't know.

18          Q.   (By Ms. Steffan)  Do you do anything

19   differently when you're patrolling today as opposed

20   to before the preliminary injunction was issued, as

21   a result of the preliminary injunction?

22          MR. WHEATON:  Objection to form.  It's

23   vague.

24          A.   Not to my knowledge.

25          MS. STEFFAN:  Can we go off the record a
```

SCOTT BOYHER  11/21/2018

```
 1   second?

 2                 (A discussion was held off the record.)

 3         Q.   (By Ms. Steffan)   Lieutenant, do you know

 4   if there is a minimum number of people to be an

 5   unlawful assembly?

 6                 MR. WHEATON:   Objection; form,

 7   foundation, calls for speculation.

 8         A.   No.

 9         Q.   (By Ms. Steffan)   Directing your

10   attention to the afternoon of September 15th, 2017.

11   You testified earlier that you deployed your

12   streamer against approximately five to six

13   individuals on that afternoon; is that correct?

14         A.   Yes.

15         Q.   Did you provide decontamination to any

16   of those individuals?

17         A.   No.

18         Q.   And I would like to direct your

19   attention to the whole of your deployment during the

20   Stockley verdict protests.   During that experience

21   as a whole, did you personally see any officer

22   deploy a chemical agent in a situation you believed

23   was unreasonable?

24                 MR. WHEATON:   Objection to form,

25   foundation.   Subject to that.
```

SCOTT BOYHER  11/21/2018

```
 1          A.    No.

 2                MS. STEFFAN:  No more questions.

 3                MR. WHEATON:  Give me one second.

 4                     CROSS-EXAMINATION

 5      BY MR. WHEATON

 6          Q.    Lieutenant, you were asked a number of

 7      questions with regards to the difference between

 8      civil unrest or civil disobedience.  Do you recall

 9      ever, one way or the other, ever having been trained

10      with regards to the definition of either of those

11      terms?

12          A.    No.

13          Q.    So you were answering just strictly

14      based on your personal understanding of what those

15      terms mean as you sit here today; is that right?

16          A.    Yes.

17                MR. WHEATON:  Thanks.  That's all I

18      have.

19                MS. STEFFAN:  Nothing.

20                THE COURT REPORTER:  Signature?

21                MR. WHEATON:  So, Lieutenant, you have

22      the right, if you'd like, to review this transcript

23      for typographical errors, or you can trust that the

24      court reporter took everything down correctly.  I

25      typically recommend that people waive their right to
```

SCOTT BOYHER  11/21/2018

1    review and sign.  That choice is up to you.  If you

2    do choose to trust she take it down correctly, you

3    just tell her you waive, and if not and you'd like

4    to read the transcript, you say you'll read.

5              THE WITNESS:  Do I stay here for five

6    more hours?

7              MR. WHEATON:  No.

8              MS. STEFFAN:  You don't read it right

9    this second.

10             MR. WHEATON:  No.

11             MS. STEFFAN:  You will have a chance to

12   do that.

13             MR. WHEATON:  She would send it to you.

14             THE WITNESS:  I'm kidding.  I'll waive.

15             (The deposition concluded at 11:31 a.m.)

16

17

18

19

20

21

22

23

24

25

SCOTT BOYHER  11/21/2018

```
 1              CERTIFICATE OF REPORTER

 2

 3         I, Amanda N. Farrar, a Certified Court

 4    Reporter for the State of Missouri, do hereby

 5    certify that the witness whose testimony appears in

 6    the foregoing deposition was duly sworn by me; the

 7    testimony of said witness was taken by me to the

 8    best of my ability and thereafter reduced to

 9    typewriting under my direction; that I am neither

10    counsel for, related to, nor employed by any of the

11    parties to the action in which this deposition was

12    taken, and further that I am not a relative or

13    employee of any attorney or counsel employed by the

14    parties thereto, nor financially or otherwise

15    interested in the outcome of the action.

16

17

18                           _____

19                           Certified Court Reporter

20

21

22

23

24

25
```

SCOTT BOYHER  11/21/2018

## A

a.m 3:12,12 5:1
93:15
ability 6:5,9
94:8
able 49:19
57:20 79:14
absence 72:11
absent 76:23
85:14
Absolutely 85:3
abuse 23:12
academy 9:21
9:23 10:1,10,12
27:14
accomplish
46:6
accurate 90:6
act 38:10
acting 30:19
76:3,19,21
77:7,12,16,20
80:14,16
action 68:23
69:3,15 70:2
94:11,15
actions 73:6
79:13,19 85:5
90:13
activity 46:8
75:3 83:14,19
addition 37:15
additional
20:13,24 29:3
33:15
additionally
37:14
address 9:10
71:5
addressed
72:25 73:5,5
73:7
addressing 71:4
administers
27:17
administrative

18:19,22 20:21
affect 6:5,9
afternoon 40:12
40:15 43:5
51:7,18,23
52:4,24 91:10
91:13
age 5:3
agencies 27:24
agent 48:4
77:22,24,25
78:1,3,6,7,11,18
91:22
agents 44:10,15
44:20,25 45:3
46:17,25 47:11
47:13,16,21,25
86:11
ago 12:10,11
23:6,9,9,10
24:18,23 46:1
46:2
agree 40:9
84:24
agreement
25:5
ahead 85:1,2
88:10
Ahmad 1:3 3:3
5:14
air 5:25
al 1:3 3:3
Alaris 4:14
allegations
25:7
allege 24:24
alleged 24:12
allotted 38:13
Amanda 3:13
4:13 94:3
Amendment
84:25 85:17
American 4:3
ANDREW 4:8
announce 74:19
annual 20:14
answer 5:20 6:1

11:5,6 17:10
19:25 22:9
24:20 51:13
60:6 74:25
75:23
answering
92:13
anticipate 32:19
APPEARANC...
4:1
appears 94:5
appropriate
71:10 72:4,9
73:12,14,18
74:7
approximately
9:11 12:10 13:5
13:19,23 14:6
14:8 26:5,13
26:14 28:21
34:23 36:12
36:24 55:22
64:9,17 67:16
70:11,20 91:12
area 17:12,14,17
17:21 18:10
37:23 39:1,5
40:1 42:10,15
50:2,5,7 83:13
83:17,23,24
84:5,9,19,22
arrest 46:9
54:2 63:6
64:23 65:9
66:6,10 69:13
69:14,17,18
86:17,19,24
arrested 11:25
47:24 64:20
69:20 86:21
86:25 87:2
arresting 69:23
arrests 64:2
70:4
arrived 34:25
36:2 41:1,8
43:22 66:3,8

arriving 43:4
articulate 64:6
asked 36:5,7
82:17 92:6
asking 9:10 11:5
24:7 31:18
44:2 71:20
73:12 77:4,5
86:20 87:6,7
assault 73:2
assaulting 73:1
assembly 74:18
74:22 75:7
82:17 91:5
assigned 14:19
15:14 16:8,16
17:24 27:6
28:18 29:2,6
29:11,12,15,18
29:19,20,24
34:9,11 37:6
38:9 48:15
49:4
assignment
12:2 14:23
26:19 28:24
assignments
14:16 29:3
assist 70:3
assisted 69:23
assume 5:17
25:9 45:20
attain 13:20
14:2
attained 16:2
20:12
attempt 5:23
attempted 69:3
attend 9:17,25
10:6,8
attention 32:3
52:14 54:8
56:5 59:22
91:10,19
attorney 5:13
94:13
attorneys 7:21

audibly 5:19
audited 33:23
auxiliary 37:16
37:25 38:8,14
38:15
avenue 74:20
83:10
avenues 84:16
aware 7:18
25:17 78:23
89:12,16,24

## B

B-O-Y-H-E-R
5:11
back 26:24
32:3 55:19
66:2 72:17
76:1 81:2,3
82:15
bang 60:19,23
61:3
banging 59:22
60:3
barricades 87:7
based 43:10
48:2 53:12
59:2 60:1
71:13 92:14
basic 10:24
18:20
basis 18:4
baton 59:10
60:15,19,23
61:4
batons 59:11
60:3
bearings 53:15
began 13:13
behalf 1:14 5:4
believe 8:4,8
11:16 23:12
26:17 42:21
47:22 49:11
63:16
believed 91:22
belong 26:15

best 28:17
  58:22 90:10
  94:8
bicycle 21:9
  32:25 33:1
  37:16,17,21,24
  38:4,10
bicycles 33:7
  34:1 68:12,15
big 31:4 83:24
bike 12:4,13
  14:19 15:4 17:1
  17:17,20,20
  17:22 19:10
  20:24 21:2,2
  21:4,5,6 25:19
  25:25 26:15
  26:20,21 27:2
  27:3,4,7,7,8,12
  27:19,20,21
  27:23 28:4,24
  29:7 31:21,21
  31:24 32:10
  35:6,17 37:1,6
  37:15,21,22
  37:25 38:2,8
  38:9,13 41:14
  41:14,20,21
  48:15 49:5,18
  63:7,10,14
  64:2 66:17
  67:18 69:11,20
  69:22 70:1
bikes 27:23
  29:13,13,15,16
  29:19,21 69:11
  73:3
black 55:19
block 43:15 63:1
  63:2,4 65:1
  66:4 69:3
  83:18 84:4,5
blocked 41:16
  82:9
blocking 44:4,6
  63:17 66:20
  67:19,21,21

80:12,13,20,21
  81:21 86:8,14
blocks 39:21
blue 54:22
body 48:17,21
  48:23
bottom 54:9
  56:7
boundaries 17:8
Boyher 1:13 3:11
  5:2,7,11
branch 10:14,18
break 5:24 6:2
  52:10,12 57:12
Broadway
  68:21
building 58:11
bunch 54:1
bus 42:24,24
  43:1,2 44:4,7
  45:7 49:18
  72:17 73:4
buses 6:25
  40:24 41:2,7
  41:10,16,18,19
  41:21 42:7,20
  43:15 45:6
  49:19,20,25
  50:24
business 37:23

——— C ———
call 18:15,21,24
called 58:17
calls 60:5 61:15
  71:19 72:10
  74:16,24 76:12
  76:23 79:6
  80:2 81:6 84:1
  85:13 86:1
  89:22 90:15
  91:7
camera 48:18
  48:21
cameras 48:23
capacity 13:10
capsicum 78:9

captain 62:8
captain's 21:15
captains 26:13
cards 74:3
  82:25
carrying 24:13
cars 68:6,9
case 1:5 3:5
  5:14 6:1 25:10
  32:13 34:17
  89:25
Cass 17:15
cause 8:4,14,15
  8:23 9:3
caused 87:1
causing 79:13
  79:19 81:12
CCR 4:13
CDT 6:25
ceases 83:14
Center 58:23
certain 24:2
  25:4 48:7,9
  82:18
CERTIFICATE
  94:1
certified 3:13
  27:22 94:3,19
certify 94:5
chance 93:11
change 15:16
check 75:5
checked 36:3
checklist 75:4,5
  75:8
chemical 44:10
  44:15,20,24
  45:2 46:16,25
  47:11,13,16,21
  47:25 48:4
  77:22,24,25
  78:1,2,3,6,7,11
  78:17 86:11
  91:22
chest 34:15
chief's 21:16
choice 93:1

choose 93:2
circle 57:3
circumstance
  81:16
circumstances
  22:7,17 42:25
  72:12 73:12,17
  76:10 84:10
citizen 18:17
  22:4,14,22
  23:11,22
city 1:6 3:6,12
  4:9 5:14 7:7
  9:12 10:13 38:1
  53:7,7 78:20
  85:18
civil 4:3 7:3 8:19
  28:5,8,9,10,13
  28:18 29:2,7
  29:20,22,24
  30:1,3,7,8,9,12
  30:17,17,19
  31:11 41:11
  59:14,15,17
  60:7,13,16
  66:9 70:3
  81:19 82:7,8
  92:8,8
civilians 65:17
Clark 36:6,19
  37:10 38:20
  38:25 40:22
  40:23 41:7,15
  42:4 43:4,23
  44:12 45:5
  48:18 49:12,14
  51:22,22
classes 10:9
close 66:25
  87:20,25
  88:22
closed 67:1,2
  79:18,20 88:5
  88:7
closing 88:12
coffee 35:1 36:3
college 10:4,6,8

come 18:14 19:7
  27:25
comes 20:16
coming 43:15
command 8:6,9
  25:19,24 36:11
  49:1 90:6,9
commander
  12:13 15:4 17:1
  17:22 20:23
  27:3,11 31:20
  32:9
commenced 5:1
commendatio...
  21:11,14
commercial
  11:10
committed 25:2
committing 71:4
  71:7,16,25
  72:4
communicati...
  9:6
complaining
  23:11
complaint 6:22
  22:4,14,18,22
  23:14 24:4,8
  24:11 25:16
complaints
  18:18 23:23
completed
  65:9
compliance
  46:7,7 61:8,9
complicated
  71:21
concluded
  93:15
conditions 6:8
conduct 24:5
  27:11,13
confidential
  25:8,14,14
consider 78:4
considered
  73:25

SCOTT BOYHER  11/21/2018

Considering 89:17
contain 84:20
context 76:24 85:14
continue 83:19
continuing 10:10,11
control 61:13 63:6
controlling 61:12
conversation 78:5
convicted 11:17
coordinating 66:10
copy 8:3
corner 54:9 56:15 63:21
correct 12:15 13:25 14:13 16:13 19:5 20:8 25:3 26:9 28:3,5,6 29:5 34:18 37:7,8 38:11,17 39:11,13,21,24 39:25 41:2,22 41:23 42:16,19 45:11 46:17 47:8 49:8 50:9 51:3,24 52:18 53:20 53:23 57:17 59:17,18 62:20 63:2,3 63:8,9,12,22 66:7,18,19,21 67:20,24 68:4 70:6 72:1,2,5 72:6 73:9,15 74:9,14 75:15 82:3,20,21,23 82:24 83:2,3 83:22 84:12 86:16 91:13

correctional 11:1 11:2
correctly 18:8 26:18 29:1 38:6 39:8,20 58:10 81:25 92:24 93:2
counsel 94:10 94:13
counseled 25:18,23
Counselor's 4:9
count 75:18
Country 13:3,4 13:7,10
County 9:24,25 10:12 12:24
couple 57:19
course 24:5,13
court 1:1 3:1,13 4:12 5:12,19 81:4 89:25 92:20,24 94:3,19
created 26:21 67:23,25
crime 8:25 11:17 11:23 25:2 58:23 71:5,8 71:12,17,25,25 72:4 78:24
crimes 30:20
criminal 30:14 30:20 46:8
Cross-Examin... 2:4 92:4
crowd 28:12,14 28:15 33:8 41:19 43:7,12 43:16,18,24 73:19,22,23 73:25 74:1,8 74:13,13,18,21 75:17 76:2,4,7 76:9,18,20 77:7 82:16,19 83:9,16

crowds 39:6
cup 35:1
current 12:12 17:3,5
currently 12:2 16:25 31:19

———————
D
———————
D 4:8
daily 19:15
dates 68:25
day 3:11,12 18:20,25 33:11 33:11,12 34:20 35:2 50:11,17 51:9 52:16
day-to-day 18:4 90:12
days 52:15
decided 33:1
decides 85:24
decision 87:8,9 87:14,17 88:14 88:22
decisions 87:19 87:25
decontaminat... 91:15
deem 20:6
deemed 74:17 75:3 82:17
Defendant 1:7 3:7 4:7
definition 92:10
demonstrate 68:16
demonstration 68:20
demonstratio... 70:8,14
department 12:3,19 13:2,3 13:7,14 22:1 26:3 58:16 59:4,16 70:9 87:14
department's

32:4 58:15
department-i... 45:13 59:11
depend 81:16 84:2,2 85:20
depending 84:9
depends 18:25 84:7
depicted 54:7 61:18
deploy 35:11 44:9,14,19,24 45:2,17 46:24 47:13,15,21 77:22 78:17 86:11 91:22
deployed 36:18 37:9,14 38:20 45:7 46:10,16 46:23 47:25 63:15 64:14 69:2 78:10 91:11
deployment 46:13 47:10 72:12 91:19
deposed 5:15
deposes 5:4
deposition 1:13 3:11 5:1 6:6,13 7:17 9:7 25:5 41:5 47:10 93:15 94:6,11
describe 18:12 55:25 89:3,9
described 82:5 84:14
describing 46:12 64:23 74:12
designated 48:14
detective 16:22
determination 75:16,21 77:5 77:7,19

determine 76:20
determined 75:24
diagonal 56:6
differ 17:23
difference 30:8 30:11,17 37:20 92:7
different 7:12 14:16 16:8 37:19 45:9 64:13 73:17
differently 17:25 89:19 90:12,19
direct 2:3 5:5 32:2 52:13 54:8 56:4 59:21 91:18
directed 35:13 45:6
Directing 91:9
direction 55:25 94:9
directly 49:7
dis 59:14 82:7
discipline 25:6
disciplined 21:17
discuss 18:15 89:9
discussed 89:15
discussing 73:13
discussion 91:2
disobedience 28:5,8,18 29:2,7,21,22 29:25 30:1,3 30:9,18,19 41:11 43:14,19 43:25 59:15 59:17 60:7,13 60:16 66:9 70:3 81:19

SCOTT BOYHER  11/21/2018

82:8 92:8
dispatch 36:8,9
dispatcher 8:9
dispersal 74:19
    83:11
disperse 74:1
    76:4 82:18,19
dispersing
    83:20,21
displayed 34:14
district 1:1,1 3:1,1
    15:13,14
districts 16:9
DIVISION 1:2
    3:2
document 8:11
    24:9 31:3
documentation
    30:23,24 31:1
    31:7
documents
    7:24
doing 15:1 19:3
    39:17 61:7 71:9
    74:4 76:18
    79:3 87:1
downtown 7:4
    7:12,14,15
    8:20 17:7,8
    31:12 37:24
    50:6 52:8,18
    65:13,14,15
    86:5
dozens 70:16,17
    70:19,23
drank 35:1 36:3
drive 11:15
    42:24
driver 42:24
driver's 11:7
drives 43:1
driving 11:9,14
    43:2
dual 29:6
duly 94:6
duties 18:19,22
    24:6,14 38:9

duty 77:22
    78:18

——— E ———
earlier 30:7
    37:5 46:15
    82:14,16 91:11
east 63:19,20
    68:3
eastbound
    67:22
EASTERN 1:1,2
    3:1,2
education 10:10
    10:11
effect 46:4
    83:12
effecting 63:6
effectuate 61:13
effectuated
    64:3 66:6
effectuating
    70:4
eight 12:10
either 26:17
    71:11 81:10
    92:10
element 82:8
elements 79:9
    83:4,7
Eleventh 4:14
emails 9:7 89:2
    89:8,14
employed
    94:10,13
employee 94:13
employment
    12:18 13:13
    26:25
empty 42:20
EMT 10:23
encasing 57:3
encounter
    40:14 50:16,19
    51:2,8,10,19
    52:3 67:3
encountered

40:21,23
ended 65:4
enforcement
    13:10 14:8
engaged 43:18
    43:24
engaging 75:3
entail 15:12 18:5
    21:4,7
enter 13:15
entered 27:4,5
entire 23:1
entrance 88:8
equipment
    33:23,24 34:5
    34:6 35:4
    36:3 55:5,7
    57:16 62:3
    73:3
errors 92:23
established
    57:14
et 1:3 3:3
evening 19:8
    50:13 51:7,18
    52:5,14,24
    54:5,17 55:1,5
    64:14 65:2
events 18:16
    32:6 60:13
    89:20
Eventually
    49:20
everybody 36:5
    63:24 74:5
everybody's
    81:20
everything's
    75:5
exactly 64:6
    71:20 75:9
    76:15,18
Examination 2:1
    2:3 5:5
examined 3:11
    5:3
example 11:14

22:18 58:5
    81:17
excerpts 25:5
exhibit 2:9,12
    53:3,4
EXHIBITS 2:7
exist 14:19,21
exit 83:10 84:17
    88:8,8
exited 69:12
exonerated
    23:19
experience
    43:11 60:1
    71:14 91:20
exposed 58:6
extended 66:12
external 28:2
extract 41:19,21
    42:6,15 45:6
extracted 49:19
    49:21,22 50:1
    50:25
extraction 6:25
    45:7 49:18
    72:17 73:4

——— F ———
face 58:6
facing 56:9,13
    59:5
facts 72:11
fair 10:3 19:22
    66:1
familiar 5:17
    58:20 78:20
far 84:14
Farrar 3:13 4:13
    94:3
fast-forward
    54:13,14
feet 83:18,21
figure 24:21
    43:3 54:9
    56:2 58:6
    62:1
filed 22:3,14,21

24:4 25:15
files 25:8
film 6:16 7:3
financially
    94:14
find 32:15 90:2
finish 11:5 19:7
first 5:10 10:22
    10:23,24 16:1
    16:2 20:23
    32:12 34:24
    84:25 85:17
five 22:24,24
    23:2 44:17,17
    45:8,9 49:11
    91:12 93:5
five-minute
    52:10
flow 79:12,15,20
    80:15 81:11,11
    81:12,23 82:2
    82:12
fluctuate 19:13
fogger 45:15
    78:12
foggers 45:16
foiling 77:14,14
    77:15
footage 6:16
    7:2,3,5,8,25
force 24:1 25:16
    25:20,25
foregoing 94:6
form 17:9 19:24
    22:8 42:8
    43:9 46:18
    48:3 51:11
    56:22 60:4
    60:24 61:14
    65:11 71:1,18
    80:2,7,18 81:5
    83:25 88:2
    89:5,21 90:14
    90:22 91:6,24
formal 24:8
Formation 30:1
formations 30:5

SCOTT BOYHER  11/21/2018

| | | | | |
|---|---|---|---|---|
| found 23:21 | glasses 11:15 | happened 18:16 | imagine 14:14 | 57:8 |
| foundation | go 6:2 14:10 | 35:3,8 36:18 | 26:7 | instance 88:5 |
| 24:19 42:9 | 18:9 29:22 | 40:4,6 49:17 | immediate 50:6 | instructed |
| 44:21 46:19 | 35:13 41:18 | 69:9 | 50:7 | 60:18,22 |
| 47:4 60:5,25 | 42:17 50:3 | happens 18:24 | impede 78:24 | instructions |
| 61:15 65:22 | 57:10 67:12 | head 36:22 | impeding 73:3 | 74:12 |
| 71:2,19 74:15 | 68:6,9 72:17 | 58:1 | 73:3 79:4,12 | intended 46:4 |
| 74:23 75:19 | 83:10 84:15 | heading 39:7 | 79:15,17,20 | interested |
| 75:20 76:11 | 85:1,1 90:25 | headquarters | 79:22 80:1,15 | 94:15 |
| 76:22 79:5 | goal 42:14 | 90:5 | 81:10,11,12,22 | interference |
| 80:8 81:6 84:1 | going 11:4 53:1 | health 6:8 | 82:2,11 | 78:21 |
| 85:13 89:22 | 53:8,9,14,17 | hear 32:12 | important 5:18 | interfering 71:5 |
| 90:15 91:7,25 | 54:13,14,24 | held 91:2 | improper 24:13 | 71:8,16 72:1 |
| frame 22:25 | 55:23 56:6 | helmet 55:12 | 76:12 80:8 | 73:1 81:22,23 |
| 32:6 53:12 | 57:22 59:2 | helmets 34:8 | in-service 20:14 | 82:13 |
| 56:23 | 61:10,21,25 | 57:5 | incident 29:16 | internal 28:1 |
| Francis 9:18 | 62:11 64:7 | help 41:21 45:6 | 48:20 64:22 | intersection |
| Friday 34:17 | 76:15 85:12 | high 9:15,17 | 77:1 | 50:6 56:14,21 |
| 50:21 51:8 | 88:11 | high-capacity | incidents 31:3 | 57:4 62:19 |
| front 68:17 77:17 | good 5:7,8 35:2 | 45:18,21 46:5 | include 33:6,25 | 64:15,20,23 |
| 77:19 | grabbing 73:2 | 48:6,10 | 34:3 83:5 | 65:2 66:4 |
| fulfill 29:3,9,11 | graduate 9:15 | highway 68:24 | 85:4,8 | 68:4 |
| full 37:1 42:20 | 9:20 10:4 | 69:4,11,12 | included 84:14 | introduced 5:12 |
| 42:21 | ground 5:18 | 88:9,11 | including 70:15 | investigation |
| further 94:12 | 59:23 60:19 | history 26:25 | 70:17 | 23:13,17 25:1 |
| | 60:21 | holding 48:12 | incorporates | investigatory |
| **G** | group 30:13 | honest 25:12 | 37:24 | 16:23 |
| gain 46:7,7 61:8 | 31:4 56:20 | hour 36:25 | **INDEX** 2:1,7 | involved 69:12 |
| 61:8 | 61:10,11,19 | 38:21 66:13,14 | individual 34:9 | 87:17,19,24 |
| gas 55:14 78:7 | 64:5 77:11 | hours 3:12 7:8 | 70:25 71:3,4 | 88:13 |
| gear 34:4 | groups 65:13,17 | 19:13 20:1,6 | 73:15 | irritant 78:1,2,4 |
| general 16:14 | 65:17 67:8 | 93:6 | individual-siz ... | issue 81:8,9,13 |
| generally 5:17 | 88:7 | Howell 9:18 | 45:12 | 81:15,18 |
| 32:6 | guards 34:8 | hypothetical | individuals | issued 32:16 |
| Genetec 58:18 | guess 29:14 | 76:7,13 77:2 | 45:10 46:9 | 34:17 36:16 |
| getting 20:22 | guilty 23:21 | 79:7 80:8 | 47:24 69:17 | 48:7,10 59:16 |
| give 31:6 74:12 | guys 77:17 | 82:7 | 91:13,16 | 89:25 90:20 |
| 74:19 81:17 | | hypothetically | Indoors 35:16 | issues 28:16 |
| 92:3 | **H** | 77:4 | information | items 43:16,19 |
| given 29:24 | half 24:22 69:2 | | 76:17 77:6 | 43:24 |
| 36:13 41:18 | Hall 3:12 | **I** | 84:13,20 | |
| 63:5 82:22 | handcuffs 64:5 | I/LEADS 46:12 | infraction 11:19 | **J** |
| gives 84:16 | hands 59:6 | identification | initial 48:14 | January 86:5 |
| giving 80:19 | handwritten 8:6 | 53:5 | injunction | Jessie 4:3 5:13 |
| 81:21 82:10 | 8:11 | identify 57:20 | 89:25 90:11,16 | job 12:7 17:3 |
| 84:16 | hanging 5:25 | 61:24 83:8,9 | 90:20,21 | jsteffan@aclu ... |
| glanced 8:2,3 | happen 22:18 | illegal 75:3 | inside 35:22 | 4:5 |

## K

Karnowski
48:24,25
49:14
keep 88:10
kept 65:14
kidding 93:14
kind 8:25 19:8
20:19 21:1
29:23 55:7
58:17 59:9
60:12
kinds 64:13
76:16 77:5
know 6:22 7:5
7:10 8:22,24
8:25 15:2 17:11
22:3,10,23
23:18 24:17
26:4,5,22,23
28:20,21,23
31:4 32:18
33:3 36:17
39:16 40:8
42:11 44:8,16
44:18,22
45:25 46:3
47:5 48:17
49:22 50:20
51:5 53:22
54:11 56:5,9,11
56:13,13,19,25
58:7,7,12,25
59:1 60:9,11
61:16 62:23
64:11,12,16,17
64:19 65:3,4,7
65:24 66:3,8
66:12 67:17
68:22 75:9
75:22 79:8
83:4,11 86:3
87:11,12,13,16
89:23 90:17
91:3
knowledge

28:7,17 29:23
30:16 31:2
36:15 58:22
59:3 64:12
90:24
knows 74:6

## L

laptop 53:9
large 28:12,12
28:13,15 33:7
38:4 39:6
69:10
larger 37:11,13
law 13:9 14:8
75:11
lawful 5:3 81:21
leave 83:17,17
83:23 84:19
leaving 84:9
left 50:2 54:9
56:7 84:5
let's 44:23
57:19 69:2
72:14,17 76:6
letters 21:16,16
level 16:14
Liberties 4:3
license 11:7,10
11:14
lieutenant 5:7
12:4,6,9 13:25
15:3,8,9,10,11
15:18,23 16:1,2
16:5,12,15,25
20:13,17 27:2
27:5 59:21
61:22 62:7,8
91:3 92:6,21
lieutenants
26:2
light 52:1 54:22
limitations 71:15
72:7 74:11
line 17:23 48:16
48:25 57:2,5
57:8,8,9,16

66:16,17 67:4
67:10,23,25
linebacker
48:13
lines 48:15
88:10
listen 9:8
Litigation 4:14
live 9:11
location 35:12
36:21 39:7
40:9 41:1 51:15
51:17 66:11
67:7
locations 7:12
log 8:3
logbook 8:3,5,6
8:8,10
long 5:24 12:5
12:16 13:4,17
13:22 14:5,7
15:18 16:5
24:18 33:9
35:24 36:4,23
38:22 39:15
50:11 54:25
55:2 64:25
83:11,12 84:21
long-sleeved
62:3
longer 23:10
66:13
looking 77:6
loud 74:5 82:23
Louis 1:6 3:6,12
3:13 4:5,9,10
4:15 5:14 7:14
9:12,23,24,25
10:12 12:3,19
12:24 13:2,11
13:14 21:12,18
23:1 26:3 32:4
59:3 60:1
70:9 78:20
84:24 85:18
86:6
Lucas 66:11

67:21,22

## M

ma'am 17:2
35:7 90:1
mails 9:8
maintenance
34:4
majority 14:25
43:18,23
making 73:4
75:21
MALEEHA 1:3
3:3
management
28:12,15 33:8
maneuver 30:5
march 86:5
marched 61:2,4
64:5
marching 61:10
61:18 88:8
marked 53:4
55:19
Market 3:12 4:9
39:23
mask 55:14
mass 63:6 65:9
66:10 69:12
Matt 48:24
matter 30:20
78:10
mean 16:15 18:2
19:17 20:1
28:11 35:10,19
50:5 59:1
65:17 73:8
77:25 83:15
92:15
medical 10:20
medications
6:4
meeting 90:3,4
90:5
meets 25:13
members 43:23
59:16 63:10,14

64:1 66:17
67:18 69:20
74:13
mentioned 7:25
27:8 82:14,25
Meramec 10:9
Meritorious
21:15
messages 9:8
met 75:6
method 61:11
metropolitan
12:3,19 13:2,14
26:3 32:4
59:4 60:2
70:9
middle 58:6
military 10:15,18
mine 7:15
minimum 20:3
91:4
minute 61:23
minutes 57:20
mischaracteri...
46:19
misconduct
25:7
Missouri 1:1,6
3:1,6,13,14 4:4
4:5,10,15 94:4
mistake 37:18
moment 55:24
57:22
morning 5:7,8
19:7 36:2
52:23 65:6
mounted 58:11
move 35:11
36:5 39:1,2,4
53:9 61:11
80:20,20,23
81:8,9,20,22
82:9,10 83:18
moved 40:2,9
moving 39:9
74:20
multi-week

19:14
multiple 65:13
65:16 80:14

## N

N 3:13 4:13 94:3
name 5:10
75:10
named 23:6
names 34:12
near 64:14
68:23
necessary
19:23 20:7
need 18:18
76:14,17,25
77:23
needed 21:25
33:2
needs 18:17,17
neither 94:9
never 67:1,2
night 18:16
65:25
nine 13:23 14:6
15:22,23
Ninth 35:15,15
35:25 88:18
nodded 36:22
non-hypothet...
72:15
non-protesters
65:20
north 4:14 35:15
35:25 56:9
63:2,4,18 65:1
66:4 68:9
north-south
67:24 68:1,2
northwest
56:15 63:21
November 1:15
3:11
number 6:23
24:1 37:12,13
69:10 91:4
92:6

numerous 67:17
88:24,25

## O

o'clock 34:23
object 51:11
59:6 85:12
objection 17:9
19:24 22:8
24:19 42:8
43:9,13 44:21
46:18 47:4
51:11 56:22
60:4,24 61:14
65:11,22 71:1
71:18 72:10
74:15,23 75:19
76:11,22 79:5
79:11 80:2,7
80:18 81:5
83:25 84:6,11
85:1,19 86:1
88:2 89:5,11
89:21 90:14
90:22 91:6,24
objects 59:6
obstruct 78:24
obstructing
79:4,17,22
80:1,6,11
obstruction
78:21
OC 78:9
occasions
72:22
occur 74:13
occurred 89:20
October 31:13
32:3 68:23
offenders 77:14
Office 4:9
officer 11:2 13:8
13:16,18,21,22
13:24 14:3,8
14:14,15,20
15:21,22 17:24
17:24 24:12

24:25 25:24
27:1 29:24
41:11 42:25
43:11 44:19
46:16 47:2,3
48:7 59:3
60:2 70:9
71:14 72:1
81:24 82:1,1,13
91:21
officer's 24:5
25:16
officers 18:3,6,9
25:19 26:15
27:6 28:18
29:1,9 34:10,11
37:2,6,11 38:1
38:5,7,8
42:22 44:9,14
46:24 47:15
47:20,23 48:3
48:8,9,10 57:2
57:3,16,24
58:2 59:5,22
61:17 62:16
64:9,13 73:1,2
73:4 85:5
officers' 34:12
73:2
Oh 26:11 58:14
okay 53:16
55:23 56:17
63:23 71:17
73:21 76:8
81:7
old 9:13
oleoresin 78:9
Olive 4:4 88:18
open 66:23
87:10,20,25
88:22
opened 87:3,5
88:5
opening 88:12
operate 21:8
operational
33:24

operations
15:10 16:11,15
16:17,20,21
31:25
opposed 90:19
order 25:9 36:9
41:18 71:9
73:24 77:6
79:3 80:23
83:11 90:16
orders 75:2
80:19 81:22
82:10
ordinance 11:19
78:21,23 79:2
79:4,10
oriented 56:1
outcome 23:16
94:15
outdoors 35:16
35:18
outside 27:24
27:24 35:23
52:1 57:7,9,15
overnight 19:16

## P

p.m 53:9 55:22
56:25 62:12
Page 2:3,4,9
part 6:17,17,18
8:1 25:24
33:17 38:7,10
41:4 57:2,5
60:7,16,19,23
69:14
participated
32:24 33:16
particular 29:16
34:11 35:12
parties 94:11,14
patrol 12:4 13:21
13:22,24 14:3
14:14,20 15:2
15:9,11,13,18,21
16:1,5 17:20
18:7,19 27:1

38:7 65:12
86:4
patrolled 70:7
70:13,21
patrolling 17:6,6
17:18 19:1,4
90:19
pedestrian
67:22
pedestrians
67:3,6,9,12,15
pending 81:3
people 27:24
29:19 35:22
38:13 43:15
48:12 54:1
56:20 64:4,19
69:10,14,18,21
72:25 76:8
77:12,18 80:14
80:16,23 81:8
81:20 82:10
83:12 84:24
85:16,25 86:8
86:19,23 91:4
92:25
pepper 45:8,13
45:17 70:25
71:5,10,15,17
71:24 72:5,8,9
72:19,25 73:5
73:8,13,14,18
73:21 74:8
76:9 78:3,10
perceived
28:16 30:14
perception
30:12 43:17
43:22
period 19:14
24:2 66:12
periods 20:9
permanent
26:19 28:23
37:22 38:7
permanently
49:4

68:16
**person** 29:6
71:16,24 72:4
76:8 79:2,9,16
79:22,25
80:5,13 84:15
84:21 87:1
**personal** 92:14
**personally**
69:18 77:9,10
86:21,24
87:24 88:13
89:2 91:21
**personnel** 25:8
35:12 38:12,12
38:13,15,16,19
48:14
**pertain** 6:24
8:18 25:6
**pertained** 8:19
**Peters** 9:19
**physical** 23:12
**physically** 87:7
**place** 25:9 46:8
66:15
**Plaintiff's** 2:9
53:3
**plaintiffs** 1:4,14
3:4 4:2 5:4,14
**Plaintiffs's** 53:4
**plan** 18:7 19:9
**play** 53:14 54:14
57:19
**playing** 55:21
59:19
**please** 5:9 37:4
61:24
**plus** 38:8
**point** 12:8 14:24
15:15,19 26:4
36:15 37:2
39:10,12 40:2
40:3,5,10,12
40:18 41:14
43:12 44:11
45:4 46:2
50:17 51:6

57:25 63:15
63:25 65:10
66:4,21,25
67:19 68:13
74:10
**pointing** 57:3
59:4 63:18
**police** 6:20,21
7:25 9:20,23
10:1,10,12 12:3
12:19 13:2,3,7
13:8,14 17:24
26:3 30:6
32:4 35:17
38:15 42:6,22
42:25 43:11
55:19 58:15,16
59:4 60:2
65:14 70:9
71:14 77:16
85:5 87:14
89:3,9,14,17
**policemen** 54:1
**policing** 21:8
37:23 82:8
**policy** 22:1
**polo** 54:25
55:2
**portion** 53:2
**position** 27:3
48:13 63:5,12
63:25 65:1
**positions** 14:18
**predicted** 33:17
**preliminary**
89:25 90:11,15
90:20,21
**preparation** 7:9
7:19,22 9:7
**prepare** 6:12
7:17 32:22
33:20
**prepared** 35:11
**presence** 65:15
**present** 79:9
80:11
**press** 53:14

**presume** 5:20
**previously**
29:20
**primary** 17:21
42:14 65:12
69:23
**probable** 8:4,14
8:15,23 9:3
**probationary**
13:16,17 14:15
14:20 15:21
**problem** 56:12
**process** 10:18
**produced** 3:11
5:3 53:7 58:16
**promoted** 12:9
20:22 21:10
**promotion**
20:17
**prosecuted**
11:22
**protected** 85:17
**protective** 25:9
34:4,6 55:4,7
57:16 62:3
**protest** 30:21
68:20 70:17
84:25 85:5,8
85:17,25 86:9
86:12,17 89:18
**protesters** 39:6
39:9,10 40:1
40:14,22,23
41:16 42:18
44:3,6,10
50:16,19 51:2
51:9,19 52:3
65:18,20,21
69:3 88:7
**protesting**
30:13
**protests** 32:5
32:20,23
33:17,20 70:8
70:13,21
87:20 88:1,14
88:23 89:4,10

89:15 91:20
**provide** 91:15
**public** 28:16
70:7 81:8,9,12
81:14,17
**purpose** 41:20
60:2 61:7
**put** 48:16
**putting** 88:10

**Q**

**qualifications**
25:13
**question** 5:20
5:21,22,25 6:1
11:6 19:18
20:15 22:11
25:21 30:15
43:20 49:1
51:14 70:12
71:22 72:13
73:11 76:1
80:4 81:1,3
85:15 87:22
**questions** 92:2
92:7

**R**

**ramps** 88:8,9
**rank** 12:5,9 13:6
13:14,20 14:2
16:2 20:12
**read** 6:16,18 8:1
8:14 9:3
64:22 75:4,25
81:1,3 93:4,4,8
**real** 58:14,23
**recall** 20:20
21:16,22,24
22:2,6,13,17
23:4,18,22
24:3 25:11
31:10 33:10
34:16 43:4
47:20 50:4,14
52:4,7,20,23
54:16 55:10

55:20 68:8,11
68:21 69:6
75:14 88:4,21
92:8
**receive** 20:13
20:24
**received** 21:2,11
21:20 27:9
89:13
**recognize**
57:24 58:2
62:16
**recommend**
92:25
**record** 5:10,20
53:6 54:22
57:11,14 90:25
91:2
**recruitment**
10:17
**reduced** 94:8
**refer** 53:2
**referring** 31:14
34:7
**reflected** 25:7
**refused** 87:3
**regards** 92:7,10
**related** 87:20
88:6,22 94:10
**relation** 56:19
62:22
**relative** 94:12
**relaying** 36:9
**released** 52:16
**remain** 29:13,16
35:24 64:25
84:21
**remained**
38:20
**remains** 83:12
**remember** 6:6
6:9 24:22
55:9 88:12
**removed** 87:7
**repeat** 37:4
**report** 6:17,20
6:21 8:1 46:12

SCOTT BOYHER  11/21/2018

| | | | | |
|---|---|---|---|---|
| 78:17 | review 7:24 9:6 | 81:8,9,12,14,18 | sergeant 14:4,5 | sleeves 55:2 |
| reported 49:7 | 23:25 47:9 | Saint 4:10 | 14:22 15:1,22 | slightly 66:3 |
| reporter 3:13 | 92:22 93:1 | sake 78:5 | 48:24,25 | SLMPD 70:14 |
| 4:12 5:12,19 | reviewed 41:4 | saw 46:15 47:10 | 49:14 | smaller 37:11 |
| 81:4 92:20,24 | 48:2 | 47:13,15,20 | sergeants 49:9 | software 58:17 |
| 94:1,4,19 | ride 21:5 | 67:7 | served 10:14 | 58:20 |
| reports 41:17 | right 12:14,22 | saying 19:10 | 14:15 | somebody |
| reprimand 21:21 | 13:1 15:5,24 | 29:15 61:5 | Service 21:15 | 19:20 36:11 |
| 21:23 | 16:3,12 17:19 | 70:18 72:3 | Services 4:14 | 81:10 |
| reprimanded | 18:10 19:4,23 | 81:25 | set 19:19,20,21 | someplace |
| 25:18,23 | 20:7 22:15 | says 5:4 56:5 | 20:9 | 42:17 |
| request 36:12 | 27:15 29:4,10 | scene 41:13 | shared 34:10 | sorry 6:18 12:11 |
| required 78:17 | 29:17 30:23 | 44:10 57:15 | shield 61:1,4 | 22:11 37:4 |
| respond 28:9 | 32:7,10 34:15 | schedule 19:19 | shields 77:16 | 49:18 81:2 |
| responder | 35:22,24 | 19:20,21 | shifts 19:6 | sort 16:14 18:4 |
| 10:23,24 | 50:10 54:21 | school 9:15,17 | Shin 34:8 | 18:12,22 68:16 |
| responding | 56:7 58:11 | Scott 1:13 3:11 | shirt 54:23,24 | 68:16 |
| 77:16 | 59:6 84:25 | 5:2,11 | 54:25 55:2 | south 39:23 |
| response 12:13 | 85:5,8,16,22 | screen 62:2 | 62:4,9 | 56:10 68:10 |
| 14:19 15:5 17:1 | 92:15,22,25 | scrimmage | shook 58:1 | speak 5:18 7:19 |
| 17:18 21:2,6 | 93:8 | 48:16 | short 52:12 | 7:21 11:4 67:9 |
| 27:7,19,23 | right-hand 62:2 | second 54:15 | 57:12 | speaker 74:5 |
| 28:4 30:2,3 | riotous 83:16 | 57:11 62:1 | shot 73:8 | 82:23 |
| 32:5,20,25 | river 17:16 | 82:15 91:1 | show 53:2,25 | speaking 12:7 |
| 33:1 37:16,17 | road 79:17,19 | 92:3 93:9 | showing 53:22 | 22:20 51:6,16 |
| 37:21,24 38:4 | roaming 65:14 | seconds 53:15 | 61:9 | 77:2,3 78:2 |
| 38:10 41:14,21 | rock 76:8 | see 41:24 44:3 | side 62:2 68:3 | speaks 90:16 |
| 63:7,10,15 | rocks 76:3 | 44:9,14,19 | sidewalk 66:20 | special 15:9 |
| 64:2 66:17 | 77:12,13,15,18 | 46:24 53:10 | 66:23,25 | 16:11,15,16,20 |
| 67:19 89:3,9 | role 12:13,16 | 56:4,20 58:9 | 67:13,16 79:23 | 16:21 31:25 |
| 89:14,17 | 13:6 14:23 | 59:23 61:18 | 80:1,6,13,15,21 | 73:24 75:2 |
| responsibilities | 28:7 31:1 41:13 | 61:23 62:1 | 80:24 81:10 | specialized 11:9 |
| 17:4,5,23 | 70:1 | 64:2,4,4,10 | 81:20,21,23 | specific 22:6 |
| responsibility | roles 15:7 29:10 | 69:19,25 91:21 | 82:9,12 | 23:5,7,22 |
| 65:12 | roll 18:15,21,24 | seen 42:1 53:11 | sidewalks 85:9 | 72:11 74:2,2 |
| responsible | room 35:20 | 53:19 62:13,16 | 85:25 | 75:1 76:23 |
| 17:12,14,18 | roughly 12:17 | send 93:13 | sign 93:1 | 85:14 88:5 |
| 37:23 75:20 | 17:15,17 24:23 | sense 43:7,11 | Signature | specifically |
| rest 38:14 | 26:7 33:14 | 49:1 | 92:20 | 23:6 76:25 |
| restate 5:23 | 36:14 38:5,14 | sent 89:2,8 | singles 67:8 | specifics 76:15 |
| 25:21 | 45:8 | September | sit 92:15 | 77:1 |
| resting 42:12 | rules 5:18 | 31:13 32:3 | situation 74:8 | speculation |
| restrictions | ruling 32:14 | 34:17 37:10 | 76:7 82:5 | 60:5 61:15 |
| 11:13 | running 58:17 | 50:22 51:8 | 84:3,7 91:22 | 71:19 72:11 |
| result 90:21 | | 52:5,14 54:3 | six 45:8,9 91:12 | 74:16,24 76:12 |
| retained 2:12 | **S** | 68:20 88:19 | size 35:19 | 76:23 79:6 |
| retrained 22:1 | safety 28:16 | 91:10 | sleeve 54:25 | 80:3 81:6 84:1 |

SCOTT BOYHER  11/21/2018

85:13 86:2
89:22 90:15
91:7
spell 5:9
spend 14:25
spray 45:8,13,17
70:25 71:6,10
71:15,17,24
72:5,8,9,19
73:1,6,8,13,14
73:18,21 74:8
76:9 78:3,9,10
78:10
sprayed 73:10
Spruce 17:15,15
39:3,13,23
40:2,7,20
squads 63:16
squished 35:21
St 1:6 3:6,12,13
4:5,9,15 5:14
7:14 9:12,19
9:23,24,25
10:12 12:3,19
12:24 13:2,11
13:14 21:12,18
23:1 26:3 32:4
59:3 60:1
70:9 78:20
84:24 85:18
86:6
staff 8:6 90:6,9
stage 42:13
staged 35:9,14
35:25 36:4,4
36:20,23
38:22 39:17
39:19 40:4,7
40:13,19
staging 35:10
38:25
stamp 53:9
55:22 62:12
stand 77:17
standing 79:25
80:5
start 34:22 35:2

44:23 53:8
61:21
started 52:20
62:10 73:11
starting 59:20
State 3:13 94:4
statement 8:4
8:15,15 9:4
statements 31:6
STATES 1:1 3:1
station 35:17
stay 29:21 83:12
93:5
staying 88:10
Steffan 2:3,12
4:3 5:6,13
17:13 20:1
22:13 24:9,20
25:11,15 31:20
42:11 43:10,17
44:3,23 46:20
47:6 51:17
52:11,13 53:1,6
53:11 55:11
56:24 57:10
57:13 60:6
61:3,17 65:16
66:1 71:7,21
72:14 74:21,25
75:22 76:6,16
77:3 79:8,16
80:5,10,22
81:14 84:4,8
84:13 85:4,16
85:21 86:4,22
86:23 87:9,13
88:4 89:7,13
89:24 90:18
90:25 91:3,9
92:2,19 93:8
93:11
sticks 59:8,9,23
Stockley 32:13
32:20 34:17
69:7 70:15,17
70:22 87:21
88:1,6,14,23

89:4,10,14,18
91:20
stop 46:8 53:17
54:14 55:23
57:22 61:25
62:11 73:6
stopped 59:25
streamer 45:18
45:19,21 46:5
46:10,13 48:6
72:20 73:8
78:12 91:12
streamers 48:3
48:5,11
street 3:13 4:4,9
4:14 17:16,16
60:3 65:24
66:21 67:20
86:8,15 87:3,4
87:5,10 88:6
88:13,22
streets 39:7
85:11,18,24
87:20,25
strictly 92:13
stuff 41:17
subject 17:10
19:25 22:9
23:25 25:8
25:24 65:23
91:25
subordinate
49:2
subset 37:2
successfully
50:1,24
Suite 4:4,9
Sunday 52:14
52:21 88:19
88:20
supervise 18:3
18:6
supervising
17:6
Supervisor 18:1
Supervisors
48:12

sure 20:20
25:22 33:23
43:20 52:11
55:6 64:8
74:4,5 78:13
80:25 87:23
89:7
SWAT 16:18
31:16,22
sworn 3:11 5:3
94:6

──────

**T**
take 5:19,24
52:9 76:6
93:2
taken 1:14 6:4
7:6,11 39:6
52:12 57:12
94:7,12
talking 8:7 32:7
35:5 50:21
teach 33:7
team 6:25 12:13
14:19 15:5 17:1
17:18 21:3,6
27:7,19,23
28:4,5,8,19
29:2,7,21,22
29:25 30:23
30:25 31:2,7
31:17,22
32:25 33:2
37:16,21,24
38:4,11 41:15
41:21 59:15,17
60:8 63:7,11
63:15 64:2
66:17 67:19
81:19 82:8
teams 41:12
66:9 70:3
tear 78:7
tell 46:22 47:23
58:5 68:25
80:16 83:9,16
84:18 90:11

93:3
telling 18:9
ten 12:10 23:9
26:6,6,7,8,14
76:7
tenure 21:11,18
23:1 70:8,14
term 30:7
terms 92:11,15
testified 26:25
37:5 46:15,21
71:23 82:16
91:11
testify 6:9
testimony 46:19
60:9 94:5,7
text 9:7 83:1
Thanks 92:17
thereto 94:14
thing 34:24
38:24 40:6
things 6:6
23:20 33:25
71:9 74:2 75:1
75:8,13,18
82:18
think 26:24
30:8 32:17,17
37:5 56:15,18
57:14 63:18
63:22 69:22
79:9 83:1
thinking 8:13
thirty 14:9,11
thorough 24:25
thoroughfare
79:14
three 13:5 23:9
23:10 74:3
three-day 20:21
throwing 41:17
41:24 42:1
43:16,19,24
76:3 77:12,13
77:15,18
throws 76:8
time 5:24 12:8

Case: 4:17-cv-02455-CDP   Doc. #: 126-16   Filed: 03/29/19   Page: 105 of 106 PageID #: 2219

**SCOTT BOYHER  11/21/2018**

14:16,20 15:1
16:9 20:22
22:25 24:2
31:9 32:6,9
34:22 36:1,4
36:12 37:9,17
40:19,21
45:23 49:6,9
51:9,17 52:4
52:20 53:1,8
55:22 56:23
56:24 58:23
61:1 62:12,20
63:11 65:4
66:2 71:16
72:3 73:6
75:24 87:22
89:6
times 22:21
29:4 45:2,8
73:25 88:21
88:25
today 89:19
90:19 92:15
today's 6:13
7:17 9:7 41:5
47:9
told 21:25
top 56:7
total 16:6 38:12
38:12,16
Town 13:3,4,6
13:10
traffic 67:22
78:21,24 79:4
79:13,13,15,17
79:21,23 80:1
80:6,11 82:3
82:12
train 27:22,22
27:25
trained 33:2
38:2,10 45:20
45:24 92:9
trainers 27:21
27:22,23 28:1
28:2

training 10:20
10:23,23,24
11:1,10 20:13,14
20:16,19,21,24
21:1,2,3,4,6
27:7,8,11,14,17
27:18,19,20
29:23 30:1,2
30:4 32:24
33:6,9,15,16
60:12,15,16,20
60:23
transcript 25:6
92:22 93:4
transport 41:11
treat 25:12,14
true 72:8
trust 92:23
93:2
truthful 6:5
truthfully 6:10
try 11:4,5 41:19
53:8
trying 20:5
24:21,21
26:24 43:15
46:5 56:2
68:6,9 74:1,18
76:4 81:19
82:1,8 88:9
Tucker 36:6,19
37:10 38:20
38:25 39:21
40:22,24 41:7
41:15 42:4
43:4,23 44:12
45:5 48:18
49:12,15 51:22
54:2 56:14
57:4 65:2
66:11
two 23:9,10,20
37:19 39:20
41:9 47:22
52:15 63:16
two-and-a-half
12:17

type 54:16,19
types 75:17
typewriting
94:9
typical 18:12,14
typically 92:25
typographical
92:23

___

**U**

Uh-huh 55:3
58:19 59:24
ultimately 49:17
unable 68:25
understand
5:22 6:2 18:8
19:18 20:15
26:18 29:1,14
32:5 37:18
38:3,6,18 39:8
39:20 51:13,15
58:10 71:22
72:13 81:25
understanding
12:12 15:20
30:22 56:16
66:16 70:24
77:21 78:16
79:1 80:23
81:7 90:10
92:14
understood
5:21
unfounded
23:19
unhappy 30:13
uniform 15:13
54:16,19 62:9
uniforms 34:5,9
34:12
Union 4:3
unison 30:5
76:3,19,21
77:13,20
80:14,17
unit 16:17,20,21
16:22 17:22

17:25 19:10
20:24 21:8
25:19,25
26:16,20,21
27:2,3,4,7,12
28:24 29:7
31:21,21,24
32:10 33:20
35:6 37:1,7,15
37:21,22,22
37:25,25 38:8
38:13 41:14,20
49:5 69:11,20
69:22,24 70:1
**UNITED** 1:1 3:1
units 37:19
64:13
unlawful 74:18
74:22 75:6
82:17 91:5
unreasonable
91:23
unrelated 70:21
unrest 7:3 8:19
28:9,10,13
30:7,9,12,17
31:11 92:8
unruly 75:6
unsure 6:17
38:22 43:2
49:13 50:12
71:20 80:4
85:15
upper 34:15
use 25:16,19,25
33:7 45:12,15
45:17,21 48:3
59:13,14
70:25 71:10,15
71:17,24,24
72:5,8,9 73:13
73:14,18,21
74:7 76:9
79:14
uses 24:1 59:15
usually 20:3
77:18

___

**V**

vague 56:23
90:23
vantage 63:25
vehicles 34:4
vehicular 67:22
verbal 21:23
verdict 32:15
32:20 34:16
36:16 52:15
69:7 70:22
87:21 88:1,6
88:15,23 89:4
89:10,15,18
91:20
vest 55:16,18,19
vests 34:8
video 7:25 41:4
42:1 47:9,18
47:21 48:2
53:2,7,12,19
54:7,13,15
55:21,23 56:1
57:19,22,25
58:10,17,23
59:19,25 61:18
61:21,25 62:10
62:11,14,17,22
64:10
videos 7:11
violating 30:20
79:2,3,10
violation 11:20
75:11 82:11
83:9
violence 75:11
75:18
violent 73:23
73:25 74:9,14
75:17
violently 77:8
voice 9:8
vs 1:5 3:5 5:14

___

**W**

waive 92:25
93:3,14

SCOTT BOYHER  11/21/2018

| | | | | |
|---|---|---|---|---|
| walked 69:10 | 4:8 17:9 19:24 | 12:21 13:2 | **1200** 3:12 4:9 | **4:17-cv-2455-** ... |
| want 25:4 42:6 | 22:8 24:7,19 | 65:8,8 | 51:22 | 1:5 3:5 |
| 79:8 | 25:4 31:18 | working 50:8 | 14th 39:3,12,20 | 40 20:3,6 |
| wanted 42:12 | 42:8 43:9,13 | 52:16 54:5 | 40:2,7,20 | |
| 42:14 | 44:2,21 46:18 | 63:11 68:19,24 | 15th 34:17 37:10 | **5** |
| wanting 79:7 | 47:4 51:11 | works 28:4 | 50:22 51:8 | 5 2:3 |
| warning 83:1,5 | 52:9 55:9 | write 77:23 | 52:5 91:10 | 52 9:14 |
| 84:14,20 | 56:22 60:4 | 78:17 | 16th 17:16 | 53 2:9 |
| warnings 82:22 | 60:24 61:14 | written 21:20 | 17th 17:16 52:14 | |
| Washington | 65:11,22 71:1 | 24:9,11 | 52:21 54:3 | **6** |
| 54:2 56:5,6 | 71:18 72:10 | wrong 82:6 | 88:19 | 60 26:7,11 38:5 |
| 56:14 57:4 | 74:15,23 75:19 | | 1992 12:20 | 38:8 64:11 |
| 65:1 68:4,10 | 75:25 76:11 | **X** | | 60-ish 38:16 |
| watch 7:2 53:15 | 76:22 79:5,11 | | **2** | 63101 4:5,15 |
| 61:23 | 80:2,7,18 81:1 | **Y** | 20 37:2,11 | 63103 3:13 4:10 |
| watched 6:16 | 81:5 83:25 | yeah 14:12 | 20-ish 38:7 | |
| 7:9 | 84:6,11 85:1,12 | 15:25 24:10 | 2017 31:13 32:3 | **7** |
| way 35:2 53:10 | 85:19 86:1,20 | 26:12 39:14 | 34:18 37:10 | 7 34:23 |
| 56:13 68:7 | 87:6,11 88:2 | 77:10 86:22 | 51:8 52:15 | 70 64:11 |
| 92:9 | 89:5,11,21 | 89:1 | 54:3 68:21 | 711 4:14 |
| we'll 25:12,13,14 | 90:14,22 91:6 | year 13:19 15:21 | 86:5 91:10 | |
| 53:2,14 | 91:24 92:3,5 | 24:22 46:1,1 | 2018 1:15 3:11 | **8** |
| we're 8:7 25:4 | 92:17,21 93:7 | 69:1 | 21 1:15 | 8:45 36:14 |
| 50:21 53:17 | 93:10,13 | years 12:10,11,17 | 215 35:15,25 | 80s 10:2 |
| 54:13 55:21 | wheatona@st... | 13:5,23 14:6,11 | 21st 3:11 | |
| 56:9 57:23 | 4:10 | 15:22,23 16:7 | 22 26:17 37:6 | **9** |
| 59:19 61:22 | When's 23:3 | 23:6,8,9,9,10 | 24 26:17 37:6 | 9:15 3:12 5:1 |
| 62:12 74:4 | 31:9 45:23 | Yesterday 9:5 | 25 26:8,10 37:2 | 906 4:4 |
| 76:4 77:1 | white 54:23,24 | | 37:11 | 92 2:4 |
| wear 11:14 | 54:25 55:1 | **Z** | 27 38:13 | |
| wearing 54:17 | 62:4,9 | | 28th 68:20 | |
| 54:20,21 55:1 | witness 36:22 | **0** | 29th 68:20 | |
| 55:4,8,11,14,16 | 58:1 93:5,14 | 01176 53:7 | | |
| 57:5 62:3 | 94:5,7 | | **3** | |
| week 19:14 | women's 86:5 | **1** | 3-by-5 74:3 | |
| 20:2 33:13,13 | work 12:24 13:1 | 1 2:9 53:3,4 | 82:25 | |
| 33:14 | 13:9 18:17 19:6 | 10 83:18,21 | 314 4:9 | |
| weeks 7:3 32:14 | 19:8,16,22 | 11:25 53:9 | 314)622-3361 | |
| went 39:12 | 20:2,6 30:23 | 11:25:45 53:18 | 4:11 | |
| 57:13 67:15,24 | 30:24 31:16,21 | 11:26 55:22 | 314)644-2191 | |
| 67:25 | 31:24 34:20 | 56:25 | 4:15 | |
| weren't 87:17 | 34:22,25 | 11:27:45 57:23 | 314)652-3114 | |
| west 39:21 | 50:11,13 52:20 | 59:20 | 4:6 | |
| 63:17 | 65:4,6 | 11:27:58 61:22 | 32 38:14 | |
| west-east | workday 18:13 | 11:28:30 62:2 | 3rd 68:23 | |
| 67:25 | 18:14 | 11:30 3:12 62:12 | | |
| Wheaton 2:4 | worked 11:2 | 11:31 93:15 | **4** | |
| | | 1130 4:4 | | |

ALARIS LITIGATION SERVICES