**U.S. District Court for the
Eastern District of Missouri
Eastern Division**

|  |  |
|---|---|
| Maleeha Ahmad, *et al.*,<br>    Plaintiffs,<br><br>    v.<br><br>City of St. Louis,<br>    Defendants. | Case No. 4:17-cv-2455-CDP<br><br><br>The Honorable Catherine D. Perry |

### Memorandum of Law in Support of Nonparty National Lawyers Guild's Motions to Quash Subpoenas against Keith Rose and Scott Kampas

The National Lawyers Guild is a bar association dedicated to progressivism and social change. Founded in 1937, its members include lawyers, legal workers, jailhouse lawyers, and law students. The organization has a centralized, national leadership structure, and it has local chapters across the country. NLG St. Louis is one such local chapter.

NLG established its well-known Legal Observer Program (LO Program) in 1968. The Program deploys legal observers to First Amendment-protected demonstrations to document police engagement with the demonstrators, in anticipation of litigation arising from those interactions. (Sprehe Decl. ¶¶ 4–5 (Ex.

4).) To become a legal observer, someone must first undergo a training and sign a nondisclosure agreement. (*Id.* ¶ 6.) NLG legal-observer trainings are proprietary material unique to this specific Program. And because they are developed by NLG attorneys in anticipation of litigation, they constitute confidential attorney work product.

St. Louis City, defendant in this litigation, has subpoenaed NLG members Keith Rose and Scott Kampas, demanding production of any LO Program training materials they possess. (Exs. 1, 2.) The subpoenas also demand that Rose and Kampas testify in a deposition, without specifying the deposition's scope or subject matter. (*Id.*) NLG now moves to quash defendant's subpoenas against Rose and Kampas, as they seek materials and testimony subject to trade-secret and attorney-work-product confidentiality. More fundamentally, this court should quash the subpoenas because they are overbroad, and they seek materials and testimony that lack relevance to this case.

## I. Background

Plaintiffs' second amended complaint alleges that on the evening of September 17, 2017, St. Louis City police attacked and kettled demonstrators in downtown St. Louis, at the intersection of Washington Avenue and Tucker Boulevard. (Second Am. Compl. ¶¶ 18–29 (ECF No. 90).) The attack capped a weekend of demonstrations following the acquittal of former St. Louis police officer Jason Stockley, who prosecutors had charged with first-degree murder for shooting and killing Anthony Lamar Smith. (*Id.* ¶¶ 10–17.) Police allegedly attacked demonstrators no less than seven times between September 15, the date of the

acquittal, and the evening of September 17, when the kettle attack occurred. (*Id.* ¶ 17.)

Rose is an NLG member. (Sprehe Decl. ¶ 9 (Ex. 4).) He has participated in NLG's LO Program in the past. *Id.* Rose is also an organizer and activist, separate and apart from his NLG membership. Rose submitted a declaration in support of plaintiffs' motion for a preliminary injunction in this action. (Rose Decl. (ECF No. 11-13).) Rose also testified at the October 18, 2017 hearing over the preliminary-injunction motion. (Preliminary Injunction Hearing Tr.) The declaration and testimony related to two instances where police attacked him—first on September 15, and second on September 17. (Rose Decl. ¶¶ 1–13; PI Hearing Tr. at 56–106.) At all relevant times to this case, Rose acted on his own as an activist, and not as an NLG member. During the preliminary-injunction hearing, defendant both cross-examined and recross-examined Rose under oath. (PI Hearing Tr. at 80–98; 103–05.)

Pamela Lewczuc is an NLG member. (Sprehe Decl. ¶ 10.) On September 15, 2017, she observed two demonstrations as an NLG Legal Observer. (Lewczuc Decl. ¶¶ 2, 4–5, 7 (ECF No. 11-10).) Police attacked both demonstrations with chemical weapons, exposing her to harmful chemical agents on multiple occasions. (*Id.*) On the evening of September 17, 2017, Lewczuc observed a demonstration in downtown St. Louis as an NLG Legal Observer. (*Id.* ¶ 9.) While there, police attacked, kettled, and arrested her, along with other people who were in the vicinity of the demonstration. (*Id.* ¶¶ 9–16.)

Lewczuc submitted a declaration in support of plaintiffs' motion for a preliminary injunction. (*Id.*) The declaration identified Lewczuc as an NLG Legal Observer, and it related facts about the three police attacks she observed and personally suffered. (*Id.* ¶¶ 2–16.) On September 20, 2018, plaintiffs moved to voluntarily dismiss named plaintiff Brian Baude without prejudice, so he could pursue relief in a separate action. (ECF No. 91.) That same day, plaintiffs moved to add Lewczuc as a named party. (ECF No. 92.) According to the motion, "The proposed plaintiff, Pamela Lewczuk, experienced materially identical harm to Plaintiff Baude; that is, like Plaintiff Baude, she was arrested and booked after being 'kettled' by employees of Defendant at the intersection of Tucker Boulevard and Washington Avenue on the evening of September 17, 2017." *Id.* Baude is not an NLG member and does not participate in its LO Program. This Court granted both of plaintiffs' motions on October 10, 2018. (ECF No. 95.)

Defendant deposed Lewczuc on January 28, 2019. (Lewczuc Dep. Tr. (Ex. 3).) Defendant's counsel questioned Lewczuc about her involvement in the local chapter's LO Program. As relevant here, Lewczuc testified that she underwent a two-hour legal-observer training in January 2015. (*Id.* at 161.) When asked who led the training, Lewczuc identified Scott Kampas and another trainer who "may have been Keith [Rose]." (*Id.*)

On March 18, 2019, defendant issued identical subpoenas to Kampas and Rose, commanding them to testify at a deposition on undisclosed subjects. (Exs. 1, 2.) The subpoenas also command both to produce the following: "Any and all documents, videos, and/or recordings, including powerpoint presentation(s),

handouts, pamphlets, and/or written or typed notes, regarding any legal observer trainings you have conducted or attended and any documents you received from the National Lawyers Guild and/or the ACLU pertaining to legal observer trainings." (*Id.*)

Again, NLG began its LO Program in 1968. (*See* NLG Legal Observer Program, https://bit.ly/2WBTkK9.) The Program is operated through local chapters, with oversight from national leadership. (Sprehe Decl. ¶ 11.) NLG Legal Observers all must receive a training and sign nondisclosure agreement as a precondition to participating in the Program. (*Id.* ¶ 6.) When deployed, legal observers wear a distinct, trademarked, bright green hat for easy identification at demonstrations. (*Id.* ¶ 12.) Other organizations, such as the ACLU and Amnesty International, have their own separate legal observer programs, complete with separate methods for identification. But those programs materially differ in scope and purpose. The NLG Program is unique to the purposes of the organization, and all materials and information relating to it are proprietary to NLG.

## II. Argument

### A. *The documents and testimony sought lack relevance to this case.*

Rule 401 of the Federal Rules of Evidence defines relevant evidence as evidence that "(a) . . . has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Rule 402 provides that relevant evidence is generally admissible, but irrelevant evidence is not. And Rule 403 provides for exclusion of relevant evidence when "its probative value is substantially outweighed by a danger of one or more of

the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. *See generally Langenbau v. Med-trans Corp.*, 167 F. Supp. 3d 983, 991–93 (N.D. Iowa 2016).

This case involves numerous incidents of alleged police attacks on demonstrators over the weekend of September 15, 2017. Specifically, it involves the way police treated Lewczuc and others on the evening of September 17. The second amended complaint does not reference the National Lawyers Guild or its St. Louis chapter. Neither does plaintiffs' motion to add Lewczuc as a named party. True, Lewczuc testified that she was participating in the LO Program as a legal observer on September 17. But that fact alone does not implicate how the local chapter trains its observers. No party has suggested that Lewczuc has "special rights" as a legal observer. Nor has anyone suggested that police targeted Lewczuc on September 17 because of her legal-observer status. So Lewczuc's involvement with the LO Program has a foundational relevance—she was in the area because she was observing police activity—but the chain of relevance ends there. Her January 2015 training, an event that occurred nearly three years before the events at issue in this case, does not relate to any fact of consequence in this action. Nor does it relate to any of the alleged facts on which this case was brought. Indeed, defendant has already provided a tacit admission to this reality, on the record: its recently filed motion to dismiss and accompanying memorandum of law do not once mention NLG, the LO Program, or legal observers. (ECF Nos. 126, 127-1.)

Even if the evidence is considered relevant, the prejudice to NLG outweighs production. The LO Program is specifically geared toward limiting police abuse and holding governments accountable to the U.S. Constitution. *See* NLG Legal Observer Program, https://bit.ly/2WBTkK9. The Program's training materials reflect litigation strategies and legal issues that NLG lawyers are seeking to pursue in court. (Sprehe Decl. ¶¶ 5, 7.) Disclosing these materials to the very entity NLG is seeking to hold accountable would cause significant harm to the organization's interests and the continued viability of the LO Program.

So the information defendant seeks lacks any relevance to what Lewczuc (or anyone else) allegedly experienced at the hands of police on September 17, 2017. Training or no training, she was present at Washington Avenue and Tucker Boulevard when police attacked a group of people, a group that included her. Her legal-observer status is no more relevant than the multitude of other reasons proposed class members were present at the intersection that evening. And the sought legal-observer training materials are even more attenuated—defendant is now asking not just how Lewczuc ended up at the intersection, but also how she was trained as a legal observer, even though her legal-observer status does not differentiate her from anyone else kettled and arrested that night.

NLG thus respectfully asks this Court to quash both subpoenas, as they seek irrelevant and inadmissible evidence. This Court should also grant the motions to quash based on the prejudicial effect the commanded disclosure would have on NLG and its LO Program.

*B. The requested legal-observer training materials constitute confidential proprietary information of NLG.*

Under Federal Rules of Civil Procedure 23(b)(7) and 45(d)(3)(B)(i), this Court may quash a subpoena that seeks disclosure of a "trade secret or other confidential research, development, or commercial information[.]" The U.S. Court of Appeals for the Eighth Circuit has established a burden-shifting framework for claims involving confidential proprietary information. "First, the party opposing discovery must show that the information is a 'trade secret or other confidential research, development, or commercial information,' under Rule 26(c)(7) and that its disclosure would be harmful to the party's interest in the property. The burden then shifts to the party seeking discovery to show that the information is relevant to the subject matter of the lawsuit and is necessary to prepare the case for trial. If the party seeking discovery shows both relevance and need, the court must weigh the injury that disclosure might cause to the property against the moving party's need for the information. If the party seeking discovery fails to show both the relevance of the requested information and the need for the material in developing its case, there is no reason for the discovery request to be granted, and the trade secrets are not to be revealed." *In re Remington Arms Co., Inc.*, 952 F.2d 1029, 1032 (8th Cir. 1991).

The LO Program's training materials are developed by NLG-member attorneys to aid legal observers in gathering necessary information to support anticipated litigation between demonstrators and police. (Sprehe Decl. ¶¶ 5, 7, 13.) The materials therefore constitute NLG property. (*Id.* ¶ 15.) Because NLG has its own

particular interests in mind when creating training materials, they cannot be merely substituted out for training materials provided by other organizations. The LO Program operates independently when training and deploying legal observers—even when it cosponsors a training with another interested organization. (*Id.* ¶¶ 5, 7, 13.) The trainings are not publicly available, and it is the Program's policy that one must sign a nondisclosure agreement before being trained. (*Id.* ¶ 6.)

The LO Program is a public-facing effort, and its successes are directly linked to donations and the recruitment of dues-paying members. (*Id.* ¶ 16.) To allow disclosure of our trainings would permit other organizations to copy our program and compete with us for fundraising purposes. More importantly, sharing the training materials with defendant—the entity the local chapter's program is anticipating to sue—would give defendant an unfair advantage in future litigation around unconstitutional state activity.

Thus the training materials sought by defendant are confidential proprietary information, and their disclosure—especially to defendant—would cause the LO Program considerable harm. As already noted, these documents are not even relevant to the case at bar. For these reasons, this Court should quash the subpoenas issued against Rose and Kampas.

*C. The requested materials are subject to attorney work product confidentiality.*

Federal Rule of Civil Procedure 26(b)(3)(A) codifies the attorney work product doctrine. "Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety,

indemnitor, insurer, or agent)." Fed. R. Civ. P. 26(b)(3)(A). Work product may consist of "raw factual information," or it may include the attorney's "mental impressions, conclusions, opinions or legal theories." *Baker v. General Motors Corp.*, 209 F.3d 1051, 1054 (8th Cir. 2000). A document is prepared in anticipation of litigation when, "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 604 (8th Cir. 1977). And as the U.S. Supreme Court has clarified, "the doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system. One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself." *United States v. Nobles*, 422 U.S. 225, 238–39 (1975). Finally, unlike for proprietary confidential information, a court *must* grant a motion to quash when a subpoena seeks disclosure of confidential attorney work product. Fed. R. Civ. P. 45(d)(3)(A)(iii).

When the LO Program deploys legal observers, those observers are collecting materials and information in anticipation of litigation. (Sprehe Decl. ¶¶ 4–5, 7, 13.) This is because they are deployed to First Amendment demonstrations that often risk disruption from law enforcement. (*Id.*) So any information compiled by a legal observer while participating in the Program constitutes confidential attorney work product. Given the particular circumstances in this case, NLG expressly waives its

right to confidentiality for documents and other tangibles that Lewczuc created from September 15 to September 17, 2017.

Attorney work product confidentiality extends to legal-observer training materials. Such materials are developed by attorneys to direct legal observers to obtain relevant information for anticipated litigation. (*Id.* ¶¶ 5, 7.) That litigation includes defense of criminal prosecutions arising from First Amendment activity, as well as civil litigation designed to vindicate demonstrators' constitutional rights. (*Id.*) These materials are developed and altered in response to patterns and practices by police in First Amendment contexts. (*Id.* ¶ 7.) In other words, they contain legal theories and mental impressions of NLG attorneys, and they train legal observers to document police activity that might come under those theories. Without these confidential communications, NLG attorneys would not have an effective way to instruct legal observers on what they should pay attention to, and when. For these reasons, the training materials defendant seeks are subject to attorney work product confidentiality.

And because the doctrine applies, this Court should grant NLG's motions to quash the subpoenas against Rose and Kampas. As hinted before, the prejudice NLG would suffer if the confidential information is disclosed cannot be overstated. The legal theories and mental impressions contained in NLG's training materials are targeted towards anticipated litigation with state actors—in this instance, targeted toward the requesting defendant, City of St. Louis. Thus the potential harm from disclosure in this case is at its zenith, making the grant of NLG's motions to quash all the more necessary.

*D. Even if the requested documents are relevant and lack protection, the request is overbroad and unduly burdensome.*

Defendant's subpoenas against Rose and Kampas are overbroad. In essence, defendants have sought *all* documents they possess that *relate to* legal-observer trainings they have conducted or attended, and any documents received from NLG pertaining to legal-observer trainings. This request is not limited in time or scope. By its wording, it seeks not just a "powerpoint," but also any information provided by NLG that could inform edits to training materials. So any email from another NLG member who had a question or concern about the LO Program would come under this subpoena. (Sprehe Decl. ¶ 17.) Given that the training itself is not relevant to this case, this extraordinarily broad request would cause Rose and Kampas an undue burden to meet. If defendant would like a production of the January 2015 training materials—the only conceivable hook on which it could hang this argument—defendant should ask for it without the surplusage. And even then, the narrowed request would still seek irrelevant, confidential information. This goes to the ultimate issue behind these subpoenas—defendant appears to be using discovery to conduct an investigation into the local chapter's legal-observing practices.

## III. Conclusion

The subpoenas issued to Rose and Kampas do not seek relevant documents and testimony. Instead, they are a fishing expedition looking to uncover confidential proprietary information and attorney work product. The training materials sought have nothing to do with the events of September 17, 2017. NLG is not implicated in

any of the pleadings or defendant's motion to dismiss, so its property has no bearing on this case's outcome. While Lewczuc may be a named party, her legal-observer status does not differentiate her from others who were allegedly attacked on September 17, 2017. And even putting all these problems aside, the fact remains that the request is overly broad and unduly burdensome.

For these reasons, NLG respectfully requests that this Court grant its motions to quash defendant's subpoenas against Rose and Kampas.

Dated April 1, 2019.

Respectfully submitted,
*/s/ Margaret Ellinger-Locke*
Margaret Ellinger-Locke, 63802MO
Counsel for National Lawyers Guild
2019 Sheridan Street
Hyattsville, MD 20782
Ellinger.Locke@gmail.com
Phone: (314) 805-7335

## Certificate of Service

I certify that on April 1, 2019, the foregoing was served electronically on all parties via CM/ECF.

*/s/ Margaret Ellinger-Locke*, 63802MO
Counsel for the National Lawyers Guild

# Exhibit 1

# UNITED STATES DISTRICT COURT
for the

Eastern District of Missouri  [ ▼ ]

| | | |
|---|---|---|
| Maleeha Ahmad, et al. | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   4:17-CV-2455 |
| City of St. Louis | ) | |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                                             Keith Rose

---

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: 1200 Market Street<br>City Hall- Rm 314<br>St. Louis, MO 63103 | Date and Time:<br>04/03/2019 10:00 am |
|---|---|

The deposition will be recorded by this method:   Stenographer

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: Any and all documents, videos, and/or recordings, including powerpoint presentation(s), handouts, pamphlets, and/or written or typed notes, regarding any legal observer trainings you have conducted or attended and any documents you received from the National Lawyers Guild and/or the ACLU pertaining to legal observer trainings.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    03/18/2019

CLERK OF COURT

OR

_____                    _____
*Signature of Clerk or Deputy Clerk*                         *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   City of St. Louis
_____, who issues or requests this subpoena, are:
Abby Duncan, 1200 Market Street, City Hall- Rm 314, St. Louis, MO 63103, DuncanA@stlouis-mo.gov, (314) 622-4694

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 4:17-CV-2455

# PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

   ❏ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

   ❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

                             _____
                                        *Server's signature*

                             _____
                                     *Printed name and title*

                             _____
                                      *Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
  **(A) *Appearance Not Required.*** A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B) *Objections.*** A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***

  **(A) *When Required.*** On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B) *When Permitted.*** To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C) *Specifying Conditions as an Alternative.*** In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  **(A) *Documents.*** A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B) *Form for Producing Electronically Stored Information Not Specified.*** If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C) *Electronically Stored Information Produced in Only One Form.*** The person responding need not produce the same electronically stored information in more than one form.
  **(D) *Inaccessible Electronically Stored Information.*** The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
  **(A) *Information Withheld.*** A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B) *Information Produced.*** If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

EXHIBIT 2

# UNITED STATES DISTRICT COURT

for the

Eastern District of Missouri ▾

| | |
|---|---|
| Maleeha Ahmad, et al. | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 4:17-CV-2455 |
| City of St. Louis | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                                    Scott Kampas

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: 1200 Market Street<br>City Hall- Rm 314<br>St. Louis, MO 63103 | Date and Time:<br>04/02/2019 10:00 am |
|---|---|

The deposition will be recorded by this method:    Stenographer

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: Any and all documents, videos, and/or recordings, including powerpoint presentation(s), handouts, pamphlets, and/or written or typed notes, regarding any legal observer trainings you have conducted or attended and any documents you received from the National Lawyers Guild and/or the ACLU pertaining to legal observer trainings.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    03/18/2019

| CLERK OF COURT | | |
|---|---|---|
| | OR | *Abby Duncan* |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*    City of St. Louis
, who issues or requests this subpoena, are:
Abby Duncan, 1200 Market Street, City Hall- Rm 314, St. Louis, MO 63103, DuncanA@stlouis-mo.gov, (314) 622-4694

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 4:17-CV-2455

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

❐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
 **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
 **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
  **(i)** is a party or a party's officer; or
  **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
 **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
 **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
 **(A) *Appearance Not Required.*** A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
 **(B) *Objections.*** A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
  **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
  **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***
 **(A) *When Required.*** On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
  **(i)** fails to allow a reasonable time to comply;
  **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
  **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
  **(iv)** subjects a person to undue burden.
 **(B) *When Permitted.*** To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

  **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
  **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
 **(C) *Specifying Conditions as an Alternative.*** In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
  **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
  **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
 **(A) *Documents.*** A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
 **(B) *Form for Producing Electronically Stored Information Not Specified.*** If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
 **(C) *Electronically Stored Information Produced in Only One Form.*** The person responding need not produce the same electronically stored information in more than one form.
 **(D) *Inaccessible Electronically Stored Information.*** The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
 **(A) *Information Withheld.*** A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
  **(i)** expressly make the claim; and
  **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
 **(B) *Information Produced.*** If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

MALEEHA AHMAD, et al,          )
                               )
          Plaintiffs,          )
                               )
vs.                            )   No. 4:17-CV-2455 CDP
                               )
CITY OF ST. LOUIS,             )
                               )
          Defendant.           )


Deposition of PAMELA LEWCZUK
taken on behalf of the Defendant
January 28, 2019


INDEX

Questions By:                            Page:

MS. DUNCAN                                 5


Reporter:  Sara Alice Masuga, CSR, CCR
IL CSR No. 084-002993   MO CCR No. 1012


MASUGA REPORTING SERVICE
2033 HIAWATHA AVENUE
ST. LOUIS, MO  63143-1215

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF MISSOURI

2

3    MALEEHA AHMAD, et al,    )
                        )

4           Plaintiffs,   )
                        )

5    vs.                )  No. 4:17-CV-2455 CDP
                        )

6    CITY OF ST. LOUIS,    )
                        )

7           Defendant.    )

8

9   APPEARANCES:

10

On Behalf of the Plaintiff:

11

12       ACLU
       By Anthony E. Rothert, Esq.

13       906 Olive Street
       Suite 1130

14       St. Louis, MO  63101

15

16  On Behalf of the Defendant:

17

       City Counselor's Office

18       By Abby Duncan, Esq.
       Brandon Laird, Esq.

19       1200 Market Street
       City Hall Room 314

20       St. Louis, MO  63103

21

22

23

24

25

1          IT IS STIPULATED AND AGREED by and between

2     counsel for Plaintiffs and counsel for Defendant that the

3     deposition of PAMELA LEWCZUK may be taken pursuant to the

4     Federal Rules of Civil Procedure, by and on behalf of the

5     Defendant on January 28, 2019, at the offices of the

6     ACLU, 906 Olive Street, St. Louis, Missouri, before me,

7     Sara Alice Masuga, Certified Court Reporter and Certified

8     Shorthand Reporter; that the issuance of notice is waived

9     and that this deposition may be taken with the same force

10    and effect as if all Federal Rules had been complied

11    with.

12         IT IS FURTHER STIPULATED AND AGREED that the

13    signature of the deponent is reserved.

14

15

16

17

18

19

20

21

22

23

24

25

1                          EXHIBIT INDEX
           Exhibit:                                    Page:
2

3    Defendant's Exhibit Lewczuk A........................142
     (Defendant's First Set of Interrogatories Directed
4     to Plaintiff Pamela Lewczuk)

5

6    (Exhibits attached.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              PAMELA LEWCZUK produced, sworn, and examined as a
2     witness on behalf of the Defendant testified as follows
3     commencing at 9:05 a.m.:
4
5                     E X A M I N A T I O N
6     BY MS. DUNCAN:
7
8         Q.   Could you state your -- state and spell your
9     full name, ma'am?
10        A.   Uh-huh, Pamela Lynn Lewczuk, L-e-w-c-z-u-k.
11        Q.   Ma'am, I just introduced myself to you, but
12    name is Abby Duncan.  I'm one of the attorneys
13    representing the City on this case.
14        A.   Uh-huh.
15        Q.   This is Brandon Laird.  He's another one of
16    the attorneys --
17        A.   Okay.
18        Q.   -- representing the City in this matter.  Have
19    you ever given your deposition before?
20        A.   No.
21        Q.   Okay.  I just want to go over a few of the
22    ground rules --
23        A.   Uh-huh.
24        Q.   -- both for you and for me.
25        A.   Uh-huh.
```

1        Q.   Is he pretty much it from Expect US?

2        A.   I would -- Yeah, that I have heard from,

3   uh-huh.

4        Q.   What other community groups have contacted you

5   to be a legal observer at protests?

6        A.   So, not -- not me specifically, so -- and I

7   don't have names for you, but there's many different

8   community groups.  There's LGBTQ community, there's the

9   Science March people, the Women's March people.

10       Q.   Okay.

11       A.   Immigration folks.  It's pretty limitless.

12       Q.   And how would they find out about you?

13       A.   I don't -- I can't answer how they find out

14   about us.  I don't know.

15       Q.   Do you post anything online advertising your

16   legal observing services?

17       A.   There is an NLG site.

18       Q.   What does NLG stand for?

19       A.   National Lawyers Guild.

20       Q.   Okay.  And is it your understanding that all

21   legal observers are listed there?

22       A.   Oh, no, we're not listed.

23       Q.   Okay.  What is on the NLG site that would help

24   community organizers know about legal observers?

25       A.   I would have to read it again to, you know...

1  Just the existence of.

2        Q.   Sure.  During your time protesting (sic), do

3  you become --

4        A.   You mean legal observing?

5        Q.   -- legal observing --

6        A.   Uh-huh.

7        Q.   -- do you become familiar with individual

8  protestors?

9        A.   Sure.

10        Q.   What individual protestors did you observe

11  protesting the weekend of September 15, 2017?

12        A.   Yeah, I think I've already -- that should be

13  in my Interrogatories, too.

14        Q.   I have -- I have those here.

15        A.   Yeah.

16        Q.   I'm handing you --

17             MS. DUNCAN:  We can mark these as Exhibit A.

18             (At this point, an off-the-record discussion

19              was had.)

20             (At this point, Defendants' Exhibit Lewczuk A

21              was marked for identification.)

22                (Questions by Ms. Duncan)

23        Q.   Handing you what's been marked as Defendant's

24  Deposition Exhibit A.  Do you recognize that document?

25        A.   Yes.

1      Q.  And do you recognize that as the

2  Interrogatories you filled out --

3      A.  Yes.

4      Q.  -- in preparation for this case?

5      A.  Yes.

6      Q.  Okay.  You said that you may have listed

7  certain protestors that you recognized --

8      A.  Excuse me.

9      Q.  -- the weekend of September 15 --

10     A.  That's right.

11     Q.  -- somewhere in there?  Okay.  Feel free to

12  look through that and then --

13     A.  Find list?

14     Q.  -- if you could direct me to where you think

15  that answer is.

16         (At this point, an off-the-record discussion

17          was had.)

18     A.  So, those are not necessarily protestors.  I

19  think some of them are legal observers.  I think the --

20     Q.  And you're --

21     A.  -- question --

22     Q.  -- referring --

23     A.  -- is --

24     Q.  You're referring to question 6?

25     A.  Uh-huh.

1      Q.   Is that right?

2      A.   Uh-huh.

3      Q.   Okay.

4           THE WITNESS:  Should I read since this is an

5      answer?

6      A.   Okay.  So, the question was who I saw a --

7  chemical agents deployed at?

8      Q.   Other than those individuals listed, do you

9  remember seeing any other protestors that you know of

10  specifically there the weekend --

11      A.   I --

12      Q.   -- of September 15?

13      A.   I don't.  I mean, I --

14      Q.   Okay.

15      A.   -- there are a lot of faces that seem

16  familiar, but yeah.

17      Q.   Okay.  Thank you.

18      A.   Uh-huh.

19      Q.   And how do you know the names of these

20  individuals?

21      A.   Well, some of them are legal observers that I

22  work with.

23      Q.   And who are those --

24      A.   Volunteer with.

25      Q.   -- if you want to list those legal observers?

1        A.   Ken, Steven, Scott, Margaret, Alicia, Mark,

2   and Nicole.

3        Q.   Okay.

4        A.   And the rest of them are not legal

5   observers --

6        Q.   Okay.

7        A.   -- but that I observed --

8        Q.   Okay.

9        A.   -- chemicals deploy at.

10       Q.   Okay.  And the people that you didn't mention

11  then are specific protestors that you are familiar with;

12  is that fair?

13       A.   Yes.

14       Q.   Okay.  And the protestors who are listed under

15  question Number 6, how do you know these people?

16       A.   From pro- -- protests --

17       Q.   Okay.

18       A.   -- yeah.

19       Q.   What has your interaction with them been?

20       A.   Just communicating with them.  I've gotten to

21  know them a bit over the years and --

22       Q.   Uh-huh.

23       A.   -- uh-huh.

24       Q.   Do you interact with them outside of protests?

25       A.   Yes, a bit.

1        Q.    And who would that be?

2        A.    Keith.

3        Q.    Keith Rose?

4        A.    Yes.

5        Q.    Okay.

6        A.    Jon Ziegler, Emily Davis.

7        Q.    Are you aware that these three individuals

8    have brought lawsuits against the City of St. Louis?

9        A.    Let me look at the list again.

10        Q.    Sure.

11        A.    I -- I feel like I do know something about

12    Emily and a lawsuit, yes.

13        Q.    Okay.

14        A.    Keith, yes.  Ziegler, I -- I don't know.

15        Q.    Have you ever visited Mr. Ziegler's, I guess

16    it's his social media site, RebZ?

17        A.    I have seen, I have watched his livestreams a

18    couple of times --

19        Q.    Uh-huh.

20        A.    -- over the years, but I didn't know that he

21    has a -- Did you say he has a website?

22        Q.    I believe so --

23        A.    I don't know --

24        Q.    -- or a social media site.

25        A.    -- about that.  I've just kind of seen there's

1  a livestream.

2       Q.   Okay.  Have you seen Keith Rose, Jon Ziegler,

3  or Emily Davis since the weekend of September 15, 2017?

4       A.   Probably.  Emily does Homeless Outreach and

5  I've done some of that, also.

6       Q.   Okay.

7       A.   Sorry I have to keep looking at this.

8       Q.   That's fine.

9       A.   So, you're asking if I've seen any of those

10 people since after the 17th-ish?

11      Q.   Right.

12      A.   Uh-huh.  Yes.  So, like I said, Emily with

13 Outreach.  Keith, I mean, he's a legal observer

14 coordinator, as well, so I see him.  And Nicole, I -- I

15 have seen her.  Also an Outreach person, so there or --

16 and, well, she's -- I'm sorry.  She's also a legal

17 observer, so I see --

18      Q.   Who is, Nicole?

19      A.   Yes.

20      Q.   Yes.

21      A.   So, I've seen her.  Ziegler, no, I have not

22 seen him since this event --

23      Q.   Okay.

24      A.   -- yeah.

25      Q.   And I'm sorry, I thought you said that

1  Keith Rose was a protestor, not a legal observer?

2       A.   So, on this weekend --

3       Q.   Uh-huh.

4       A.   -- to my knowledge, he -- to my knowledge on

5  the 17th, Keith was not legal observing.

6       Q.   Okay.  And other than seeing Emily at this

7  Homeless Outreach, have you seen her at any protests, any

8  other protests since September 15, 2017?

9       A.   'Cause remember I have really not been to many

10 myself.  What was the one that we remembered I was at?

11      Q.   The Roy Blunt incident?

12           MR. ROTHERT:  The Roy Blunt.

13      A.   Okay.  Oh, yeah, I did.  I think I saw her

14 there one night.  I saw Keith there one night.  Not

15 Ziegler.

16      Q.   Okay.  And Keith, was he there in his capacity

17 as a legal observer at the Roy Blunt incident or was he

18 there as a protestor?

19      A.   No.  I mean, I just saw him pop up and talk to

20 him a little bit and I -- I can't say whether he was

21 protesting.

22      Q.   Okay.

23      A.   Yeah.

24           MS. DUNCAN:  Can we take a quick break?

25           (At this point, there was a break taken from

1       A.   -- of Washington and Tucker?

2       Q.   I believe you said they were moving east on

3   Washington towards Tucker.

4       A.   Oh, that on the 17th?

5       Q.   No.

6       A.   What are you talking about now?

7       Q.   This would have been the protest that happened

8   a weekend after --

9       A.   Oh --

10      Q.   -- that weekend.

11      A.   -- sorry.  Yeah.  Yes, I was a legal

12  observing.

13      Q.   You were a legal observer --

14      A.   That's right.

15      Q.   -- there, as well?

16      A.   That's right.

17      Q.   Have you ever been -- At what -- When did you

18  become a legal observer?

19      A.   I was trained in January of '15.

20      Q.   Okay.  And before that, had you been a

21  protestor?

22      A.   I went out a handful of times after

23  Mike Brown.

24      Q.   Okay.  And since becoming a legal observer in

25  January of 2015, have you attended any protests as a

1    A.    -- when, where, how, who.

2    Q.    Okay.  And you mentioned some training, that

3  you were trained in January of '15?

4    A.    Uh-huh.

5    Q.    Who conducted that training?

6    A.    So, it was coordinators of the local chapter.

7    Q.    Okay.  And is that what -- what is the local

8  chapter called?

9    A.    The National Lawyers Guild St. Louis Chapter.

10    Q.    Do you remember the specific trainers by name?

11    A.    I -- I know it was Scott and I believe there

12  was a second one.

13    Q.    Scott Kampas?

14    A.    Yes.

15    Q.    Do you remember the other one you said?

16    A.    It may have been Keith.

17    Q.    Keith Rose?

18    A.    Yes.

19    Q.    How long was the training?

20    A.    Two hours.

21    Q.    Where was the training held?

22    A.    That was in the Christ Church Cathedral next

23  to the library.

24    Q.    And what were you taught at the training?

25    A.    There's about 20 slides.  Just very general

1    information.  Like the very general laws of freedom to

2    assemble and observation.  You know, the purpose of us

3    being there is observing police and looking for badge

4    numbers, car numbers, and so forth.  What not to do.

5         Q.    Uh-huh.

6         A.    You know, intervening in a protest or

7    giving -- we're instructed not to give legal advice

8    because we're not legal people.

9         Q.    Okay.  Do you know whether Scott or Keith Rose

10   are lawyers?

11        A.    They're not.

12        Q.    Okay.

13        A.    Uh-huh.

14        Q.    Do you know who trained them to be trainers?

15        A.    No.

16        Q.    And after completion, do you get a

17   certificate?

18        A.    No.

19        Q.    Do you get --

20        A.    No.

21        Q.    Okay.

22        A.    No.

23        Q.    It's just that you've done it?

24        A.    Just a familiar -- a familiarity with freedom

25   to assemble and what to look for in the interactions.

1      Q.   Okay.  And what is it that they train you to

2  look for?

3      A.   Take note of when orders are given and what

4  those orders are as specifically as possible word for

5  word.

6      Q.   Uh-huh.

7      A.   And the locations of police and protestors at

8  that moment when an order is given.  And what was the

9  rest of the question?  I forgot.

10     Q.   Sure.

11     A.   Yeah.

12     Q.   Just what -- what you're trained to look for.

13     A.   Right.  So, just the orders and the -- and the

14  scene, what's happening at the scene and if there were

15  arrests, uh-huh.

16     Q.   After you complete this training, are you put

17  on some kind of mailing list or how -- how would people

18  know to contact you if they wanted you to be a legal

19  observer at their protest?

20     A.   Just from -- I think legal observers have been

21  on the scene since Mike Brown and maybe even before

22  that --

23     Q.   Uh-huh.

24     A.   -- so they're known and I'm assuming a phone

25  number is exchanged.

1      Q.   Okay.  When you are at protests, do you hand

2  out business cards?

3      A.   No.

4      Q.   Okay.  As part of your training, are you

5  taught to call police fucking cowards?

6      A.   Oh, gosh, no.

7      Q.   Okay.  As part of your training as a legal

8  observer, were you taught to tell protestors that police

9  are coming to kill them?

10      A.   No.

11      Q.   As part of your training as a legal observer,

12  are you told to stand a safe distance from the action for

13  your self-protection?

14      A.   So, if there's an interaction, I often get as

15  close as three to four feet away from that interaction.

16  That's about as close as, unless I'm giving -- given an

17  order from a police officer to move back, then I -- then

18  I move back a couple of feet and --

19      Q.   Uh-huh.

20      A.   -- I get my orders from them and an idea of

21  how much distance to give.

22      Q.   And is that something that you were trained to

23  do or is that just kind of your comfort level?

24      A.   We're trained to get close enough to the

25  interaction to be able to observe it --

1        Q.    Okay.

2        A.    -- in case there's any brutality.

3        Q.    Okay.  Are you taught or were you trained as a

4   legal observer to carry a face mask?

5        A.    Yes.

6        Q.    And were you carrying a face mask the weekend

7   of September 15?

8        A.    Yes.  And by "face mask," it can be just the

9   paper, you know.

10        Q.    As a legal observer, are you taught that laws

11   do not pertain to you?

12        A.    That's not correct, no.

13        Q.    Okay.  As part of your training, are you

14   taught that police commands do not pertain to you?

15        A.    No.

16        Q.    You understand that if you're getting three to

17   four feet from the action, shall we say, is that fair --

18        A.    (Nodding.)

19        Q.    -- that there might be some collateral damage

20   that ensues; is that right?

21        A.    Can you -- I don't know what you mean by --

22        Q.    Sure.  So, I'll try and give you an example.

23   So, if you are trying to observe a rambunctious resisting

24   of arrest and you are close to that situation, you

25   understand that it's possible that somehow, someway maybe

1  you could get hurt or -- or hit or that something could

2  happen if you're standing that close to that kind of

3  situation; is that right?

4       A.   So, I am not trained to know even whether that

5  would be a resisting arrest kind of a thing or maybe the

6  person's complying and is being dragged or -- so that's

7  the first thing I just want to say.

8       Q.   Uh-huh.

9       A.   So, I like to be there to observe it so that

10  if that -- that evidence needs to be given --

11      Q.   Uh-huh.

12      A.   -- then it's interpreted later by an attorney

13  whether that or a police officer charge, so I guess I

14  wouldn't -- I wouldn't absolve police from the fact that

15  they can't assault me.  If I happen to be close, I

16  don't --

17      Q.   Uh-huh.

18      A.   -- feel like that just because I'm close,

19  three to four feet away, does not --

20      Q.   Uh-huh.

21      A.   -- give them the right to assault me.

22      Q.   Right, and I'm not suggesting --

23      A.   Yeah.

24      Q.   -- that.  I guess my question, ma'am, is just,

25  do you recognize that there are certain risks with being

1    so close to the action?  Being three or four feet away,

2    do you understand that there are some risks that could be

3    associated with that?

4        A.   Yes.

5        Q.   Okay.  And a part of those risks, for example,

6    if someone is getting maced or pepper-sprayed and you are

7    that close, that then you could be impacted by that?

8        A.   Yes.

9        Q.   And would you see that as part of your job as

10   a legal observer is to engage in those kind of risks?

11       A.   Not necessarily, because some legal observers

12   choose not to take that risk and, so, it's not a

13   requirement, no.

14       Q.   But, I guess, do you take that risk?  Do

15   you --

16       A.   Not all the time.  Not all the time.

17       Q.   On the weekend of September 15, 2017, did you

18   take those risks at times?

19       A.   Yes.

20       Q.   Okay.  You voluntarily signed up to be a legal

21   observer; is that right?

22       A.   That's right.

23       Q.   And you voluntarily engage -- or you

24   voluntarily engage in the risk of standing close to

25   protestors in their interaction with police; is that

1  right?

2       A.   Yes.

3       Q.   I noticed on -- there's a Declaration that you

4  submitted for the preliminary injunction.

5       A.   Uh-huh.

6       Q.   It's Exhibit J and I won't enter it right now,

7  but it says here that you're a coordinator of -- it says

8  legal observer coordinator.

9       A.   Uh-huh.

10       Q.   Is that still true today?

11       A.   Uh-huh, uh-huh.

12       Q.   Okay.  And what does that entail; what makes

13  you a coordinator?

14       A.   It's just someone on the ground at a

15  protestor (sic) that the other legal observers can get

16  direction from in terms of location where -- where to

17  position ourselves.

18       Q.   Okay.

19       A.   That's pretty much it, uh-huh.

20       Q.   So, is there like a -- I mean, I would just

21  imagine is there like a huddle before the protest to kind

22  of direct people where they're going to be standing?

23       A.   Yeah, we...

24       Q.   Okay.

25       A.   Ideally, but not always, yeah.

1      Q.   Right.  And does -- did that happen on

2  September 15 of 2017?

3      A.   Which location?

4      Q.   At the one before you go to the Central West

5  End there by the courthouse on Tucker and Clark.

6      A.   So, there's an example of not really.  It was

7  very large and I don't recall any kind of a huddle,

8  huh-uh.

9      Q.   Okay.

10      A.   One of us might -- might be kind of close to

11  the front of a march --

12      Q.   Uh-huh.

13      A.   -- and, so, they're just staying in that

14  position and then others are in the back, so they stay in

15  a position.

16      Q.   Okay.

17      A.   It's not always coordinated, yeah.

18      Q.   Okay.  Sometimes it can be, sometimes it's --

19      A.   Right.

20      Q.   -- not depending on, I guess, maybe how

21  impromptu --

22      A.   Right.

23      Q.   -- how much notice you have of the protest?

24      A.   Or just when we're arriving, uh-huh.

25      Q.   Okay.  And do you contact your other legal

1  observers by phone, do you text each other, or do you

2  just -- how do you identify each other?

3       A.   Yeah, we're -- we're on our phone.

4       Q.   Okay.

5       A.   Uh-huh.

6       Q.   With all your legal observers, are there,

7  like, monthly meetings or any kind of scheduled

8  meetings --

9       A.   No.

10      Q.   -- or organized meetings of that kind?

11      A.   No.

12      Q.   Okay.  Just looking at the photos, I see that

13  you have florescent green hats on.

14      A.   Uh-huh.

15      Q.   Where did you get those hats from?

16      A.   So, when legal observers arrive to a

17  protestor -- I mean to a protest --

18      Q.   Sure.

19      A.   -- the coordinator will -- will give them a

20  hat temporarily --

21      Q.   Okay.

22      A.   -- to wear.

23      Q.   So, as the coordinator, then you keep all

24  those hats or do you disburse?

25      A.   I have a couple, uh-huh.

1        Q.   Okay.  But I guess where are those from, do

2   you make those yourselves?

3        A.   No, no, they're purchased from -- it's a

4   national organization.  I don't -- I don't --

5        Q.   From the National Lawyers Guild --

6        A.   Yes.

7        Q.   -- is that where you get them?

8        A.   But I don't know that address or --

9        Q.   Sure.

10       A.   -- how to order them.

11       Q.   Sure.  And what do they say on the green hats?

12       A.   National Lawyers Guild.

13       Q.   Okay.  Does it say legal observer on it, as

14   well, or is it just National Lawyers Guild?

15       A.   Yes, I believe you're right.

16       Q.   Okay.

17       A.   Yes.

18       Q.   Okay.  You talked about how as a legal

19   observer you're trained to kind of take in the scene of

20   the protest; is that fair?

21       A.   Uh-huh.

22       Q.   And then you're taught to observe police

23   behavior; correct?

24       A.   That's right.

25       Q.   Okay.  But you understand, don't you, that

1        Q.    Thanks.  And I just want to make sure the
2    record is clear.  On -- Your testimony is that the
3    weekend of September 15, 2017, you did not engage in any
4    protest activity?
5        A.    That's correct.
6        Q.    Okay.  So, you did not chant anything with
7    protestors; is that correct?
8        A.    That's correct.
9        Q.    And you didn't hold signs?
10       A.    That's correct.
11       Q.    And you didn't shout anything to police?
12       A.    That's correct.
13       Q.    Are you paid to be a legal observer?
14       A.    No.
15       Q.    Okay.  It's a pure voluntary type of position?
16       A.    Yes.
17       Q.    Before you became a legal observer in January
18   of 2015, I believe you said that you had engaged in
19   protest activity before that as a protestor?
20       A.    Yes.
21       Q.    And I think you mentioned the Michael Brown
22   protests in Ferguson?
23       A.    Yes.
24       Q.    Any -- How many protests would you say you
25   attended as a protestor before January of 2015?

1          A.    Five; something like that.

2          Q.    And were those all in relation to the

3   Michael Brown shooting?

4          A.    Yes.

5          Q.    And since you have become a legal observer in

6   January of 2015, how many protests would you say you've

7   attended as a legal observer?

8          A.    As a legal observer?

9          Q.    Uh-huh.

10         A.    Since which date, January, '15?

11         Q.    Since you became one.

12         A.    Uh-huh.  300?  200?  A lot.

13         Q.    Okay.

14         A.    Is that --

15         Q.    That is a lot.

16         A.    Yeah.

17         Q.    And do you keep a record of any of the

18   protests that you've attended?

19         A.    No.

20         Q.    You said that you are able to take in the

21   scene in the big picture as a legal observer; is that

22   correct?

23         A.    I think that I said that it's not our role to

24   take in the whole picture.  Our role is selective to when

25   there's an interaction between police and protestors.

1     Q.   Okay.

2     A.   That's the hyperfocus.

3     Q.   Okay.  Would you agree -- and I believe you've

4 already testified -- that in some groups, there are both

5 protestors and those who commit criminal acts; is that

6 fair?

7     A.   Yes.

8     Q.   Okay.  So, there could be some protestors

9 mixed in with people who commit property damage, for

10 example?

11     A.   Yes.

12     Q.   And you are solely focused on the police who

13 are responding to any kind of behavior, be it from

14 protestors or criminal acts; would you say that's true?

15     A.   Yes.

16     Q.   Okay.  And your focus is on the police and how

17 they respond?

18     A.   Yes.

19     Q.   Okay.  So, is it possible -- Well, I guess if

20 your focus is on the police, it wouldn't be possible for

21 you to know whether police response is to the criminal

22 activity or to the protesting activity; is that fair?

23     A.   I have seen police officers respond to

24 protests that are not engaging in criminal activity that

25 I could see.

1      Q.   Okay.  But I guess that wasn't my question.

2           MS. DUNCAN:  Sara, could you read back my

3      question because I forgot how I worded it?

4           (At this point, the reporter read back the

5           question beginning on Page 179, Line 19.)

6      A.   Isn't possible seems strong.  And if you're

7      talking about every single situation I'm in, it's too

8      hard to answer that question yes or no because there may

9      be some of those many protests where that was more

10     evident.

11          MS. DUNCAN:  Okay.  I have no further

12     questions at this point.

13          MR. ROTHERT:  Okay.  We'll review.

14          (Deposition adjourned at 12:43 p.m.)

15               (SIGNATURE RESERVED)

16

17

18

19

20

21

22

23

24

25

# Exhibit 4

**U.S. District Court for the
Eastern District of Missouri
Eastern Division**

Maleeha Ahmad, *et al.*,
     Plaintiffs,

v.

City of St. Louis,
     Defendants.

Case No. 4:17-cv-2455-CDP

The Honorable Catherine D. Perry

**Declaration of Taylor Sprehe**

     The following declaration is based on declarant's personal knowledge of the related facts, stated under penalty of perjury that the following is true and correct.

     1.     My name is Taylor Sprehe, and I am a licensed attorney who is primarily located in the St. Louis area.

     2.     I am a member of the National Lawyers Guild (NLG) and its St. Louis Chapter.

     3.     I lead the St. Louis NLG Chapter's participation in NLG's Legal Observer Program (LO Program).

4.    The LO Program deploys legal observers to demonstrations and protests to document police engagement with demonstrators and protesters.

5.    When the LO Program deploys legal observers, it does so in anticipation of litigation arising from the interaction between police, on the one hand, and demonstrators and protesters, on the other. Such litigation includes both criminal and civil litigation. When deployed, legal observers are under the direction of an attorney, and I regularly serve in this role—including the weekend of September 15–17, 2017.

6.    To become a legal observer with NLG's St. Louis Chapter, one must sign a nondisclosure agreement and undergo a training. Both are prerequisites to becoming a legal observer who may participate in the LO Program.

7.    The LO Program's training materials are created and developed by attorneys to help legal observers pay attention to certain discrete facts necessary for a successful future litigation. They reflect litigation strategies and legal theories that NLG attorneys are seeking to pursue in cases where law enforcement violates the constitutional rights of demonstrators. The trainings are periodically updated to reflect up-to-date information about current law enforcement practices, and in some rare instances the LO Program will revise its training materials for a specific set of protest activities.

8.    Keith Rose is a member of the National Lawyers Guild and its St. Louis Chapter. He sometimes participates in the LO Program.

9.    Scott Kampas is a member of the National Lawyers Guild and its St. Louis Chapter. He sometimes participates in the LO Program.

10.     Pamela Lewczuc is a member of the National Lawyers Guild and its St. Louis Chapter. She sometimes participates in the LO Program.

11.     The LO Program is operated through local chapters, with oversight from NLG's national leadership.

12.     When deployed, NLG legal observers wear a bright green, trademarked hat for easy identification during demonstrations.

13.     When deployed, NLG legal observers act as investigators seeking information in anticipation of litigation, working at the direction of an attorney.

14.      Although a 2003 version of an NLG Legal Observer Training Manual is available online, this document is woefully out of date, and it does not reflect current practices and trainings for NLG legal observers. The St. Louis Chapter does not use or rely on that training manual when training new legal observers.

15.     LO Program training materials constitute NLG property.

16.     The LO Program is a public-facing effort, and many new dues-paying members join NLG after seeing NLG legal observers at demonstrations. Other members of the public are most familiar with NLG through its LO Program. The LO Program generates new dues-paying members and charitable contributions from nonmembers.

17.     The local chapter is in regular contact with national leadership regarding the LO Program, and local members subscribe to several national email lists that discuss legal-observer issues on a regular basis.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on March 30, 2019.

*/s/ Taylor Sprehe*

Taylor Sprehe
Attorney at Law
St. Louis Chapter
National Lawyers Guild
IL Bar Number 6324696
Tele: (638) 713-0325
Email: TaySprehe@gmail.com

## Verification of Signed Original Document

       Pursuant to Local Rule 11-2.11, Maggie Ellinger-Locke, attorney for nonparty National Lawyers Guild, hereby attests to the existence of a paper copy of this **Declaration of Taylor Sprehe** bearing the original signature of Taylor Sprehe. The document was filed electronically on April 1, 2019 with Taylor Sprehe's electronic signature. Counsel will retain the paper copy bearing the original signature during the pendency of the litigation including all possible appeals.

Respectfully submitted,
*/s/ Margaret Ellinger-Locke*
Margaret Ellinger-Locke, 63802MO
Counsel for National Lawyers Guild
2019 Sheridan Street
Hyattsville, MD 20782
Ellinger.Locke@gmail.com
Phone: (314) 805-7335