UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MALEEHA AHMAD, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 4:17-cv-2455 CDP |
| | ) | |
| CITY OF ST. LOUIS, MISSOURI, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM IN SUPPORT OF MOTION TO DISSOLVE AND DISMISS

Wise accommodation between liberty and order always has been, and ever will be, indispensable for a democratic society.  Insofar as the Constitution commits the duty of making this accommodation to this Court, it demands vigilant judicial self-restraint.

Frankfurter, J., KOVACS V. COOPER, 336 U.S. 77, 86 (1949).

Preliminary Statement

The streets of the City of St. Louis during September 2017 were not the Edmund Pettus Bridge, much as the ACLU and its plaintiffs want the Court to react as though they were.  Pepper spray or mace is not "the new fire hose." III Prel.Inj.Tr.[doc. 64] 32. Plaintiffs, by telescoping evidence of select portions of a connected series of mass demonstrations in the City in the fall of 2017, have inveigled the Court into improvident intrusion into police practices in the City of St. Louis, in contravention of the wise counsel of Justice Frankfurter quoted above and of established principles of federal equity jurisprudence.  Defendant City submits that changed circumstances and a more complete record now require that the preliminary injunction herein be dissolved, and this action be dismissed, consistent with F.R.Civ.P. 12(h)(3) and 60(b)(4)-(6).

Exhibit 1

Defendant has submitted extensive materials to supplement the record and support its motion to dissolve and dismiss.  Much of that evidence was not readily available at the time of the preliminary injunction.  At this point, however, defendant has been able to assemble video footage from its "real time crime center," as well as from its police documentation teams and individual officers at the scene.  Other video was supplied by plaintiffs themselves or their witnesses, or drawn from recognized media sources.

The video exhibits reflect the nature of the protest activity concerning the Stockley acquittal and the police response in a chronological fashion, beginning on September 15 and ending on October 3, 2017.  The defendant has also submitted depositions of plaintiffs, plaintiffs' expert, and numerous police officers, including not only supervisory officers but also line officers deposed by plaintiffs.  Defendant also believes that the material submitted by plaintiffs in support of their motion to certify a class should be considered by the Court in deciding the motion to dissolve and dismiss.

Of course, defendant recognizes that this motion is not appropriate for merely relitigating the preliminary injunction motion.  Defendant urges the Court to reconsider its preliminary injunction findings, but dissolution is nonetheless warranted by three new circumstances: first, the scope of evidence in discovery refuting plaintiffs' claims; second, the filing of numerous damage suits against defendant City and its officers, arising out of the same conduct at issue in this case; and, third, the fact that, contrary to the Court's assumption in 2017, there have been no incidents of mass protests in the City since then that have entailed unlawful assemblies or police use of chemical agents.  These facts support a finding of changed circumstances undermining the propriety of the preliminary injunction.  Further, the numerous damage suits now pending against defendant City,

including actions brought by former plaintiffs in this case, reinforce the conclusion that equitable jurisdiction is lacking in this case.

The video and audio evidence in this case tells a story that does not support but rather refutes the plaintiffs' narrative.  Defendant has endeavored to place the fullest possible video evidence before the Court.  Motion to Dissolve, Ex. G.  The individual witnesses, whether they be professional protesters as marshaled by plaintiffs or professional law enforcement officers, cannot really tell the full story.  Rather, a comprehensive review of the entire video record demonstrates that the St. Louis police on the whole responded to extremely difficult challenges with disciplined effectiveness.  St. Louisans did not experience the violence and terror of full-scale riots, as did Ferguson or Baltimore in similar situations.  For this the community (including plaintiffs, though they may not realize it) owes a debt of gratitude to the vast majority of St. Louis police officers.

 The Court can and should recognize that this lawsuit has but one aim:  to substitute this Court for the democratically elected representatives of the people of the City of St. Louis, as the superintendent of the City's police in difficult and unpredictable situations created by civil disorder.  This is precisely what the Supreme Court has repeatedly rejected in a series of decisions beginning with *O'Shea v. Littleton* through *Graham v. Connor*.

Facts

Both before and after 2014, the City police have been confronted with many protests and marches. See Motion to Dissolve, Ex. A.  Some, but not all, have been directed at the police; some, but not all, have involved the use of mace or, rarely, tear

gas.[1]  In some cases, but not all, protesters have been arrested, because they intentionally blocked vehicular traffic, see Motion to Dissolve, Ex. F, or because the protest turned violent, with assaults on police or other persons and damage to private property.  *Id.*, Ex. D.  On some occasions, relying at least in part on ordinances of the City in force since 1948, police officers have notified protesters that they were engaged in an unlawful assembly and ordered them to disperse.  On some occasions, protests involving blockage of streets dispersed without incident; on others, protesters were arrested.

The catalog of protests before and after September 2017 which has been filed as Exhibit A in support of the motion to dissolve and dismiss reflects that participants in anti-Peabody Coal protests and "Women's Marches," besides participants in anti-police protests, have been arrested under the City ordinance prohibiting the impeding of the flow of vehicular and pedestrian traffic.  See Motion to Dissolve, Ex. A; Ex. S (West depo.) at 30-31.  The catalog also reflects a large number of incidents, including anti-police protests, which did not involve use of chemical agents or arrests.

In 2017, the standing orders governing police operations in regard to mass protest activity conformed to the terms of a settlement agreement concluded in 2014, when individuals sued the City, St. Louis County and the State of Missouri claiming misconduct in regard to policing protests and riots in Ferguson, Missouri.  In addition to incorporating or reemphasizing the terms of the 2014 settlement agreement, known as the *Templeton* agreement, into its standing police orders on the subjects of crowd control and use of force, Prel.Inj. Baumgartner decl. [doc. 33-1], Ex. A, the City police incorporated the settlement standards in the training of all officers, including training for special "civil

---

[1]  Mace and pepper spray are substantially the same thing, and are chemical irritants.  Tear gas is more properly characterized as a "chemical munition" and is deployed by launching canisters and not from hand-held spray cans or streamers. See Motion to Dissolve, Ex. T (Baumgartner) Ex. 2C.

disobedience teams" or CDTs.  Motion to Dissolve, Ex. O (Jemerson depo.) at 24-25, 58-59, Ex. T (Baumgartner depo.) at 33-34 and Depo.Ex. 2.  The civil disobedience teams were established in approximately 2002 in an effort to ensure that a cadre of specially trained officers would be available to respond to protests when public order was threatened.  The CDT officers are equipped with riot gear, primarily defensive protective equipment, which is not ordinarily available to other units.  Motion, Ex. O (Jemerson depo.) at 30.  The practice generally is not to deploy fully equipped CDT officers unless and until the situation requires, as when a crowd is assaulting officers at the scene who are not specially equipped. *Id.* at 31.

In the summer of 2017, the community was awaiting a verdict in the case of former officer Stockley, charged with the murder of a drug dealer.  No one approached any City official about securing a permit for any planned protests, but police intelligence, monitoring social media posts, had reason to believe that protests would occur in the event of an acquittal, and that such protests could be violent or at least engage in unlawful behavior, such as blocking highways.  Motion to Dissolve, Ex. O (Jemerson depo.) at 47; see also Motion Ex. B.

In preparation for the possibility of extemporaneous and disorderly protests, the City police themselves secured a permit for a "free speech zone" within less than one block from City Hall and the state courthouses.  Motion to Dissolve, Ex. U (Chance depo.) at 66, Depo.Ex. 12.  Further, the acting police commissioner (commonly referred to as the acting chief) issued a comprehensive operations order, establishing a chain of command for protest situations, reminding all and sundry of the obligation of the police to protect constitutional rights, and planning the deployment of the CDT and other units

5

as needed.  This operations order was consistent with sound police practice and did not

authorize reckless or punitive deployment of chemical munitions or mace.  See Motion to

Dissolve, Ex. B.

The verdict in the Stockley case was announced on the morning of September 15,

2017.  By noon, a crowd of protesters had materialized and physically occupied the

intersection of Tucker and Market Streets at the center of the downtown civic area.  The

protesters clearly interfered with traffic, forcing drivers to try to avoid them as they

proceeded through the intersection.  Motion to Dissolve, Ex. C (video excerpts 9/15/17).

The police responded to the scene but took no action other than to close off the streets a

block away and divert traffic around the protest.  The CDT unit was positioned over a

block away, out of sight on buses near Fire Department headquarters and the former

police headquarters.  II Prel.Inj. Tr. [doc. 63] at 148-49  (Sachs testimony); Motion Ex. C.

During the afternoon, the crowd of protesters swelled to several hundred and a

large contingent began to march through the downtown area, going west, then north, and

then east on Olive Street.  Motion to Dissolve, Ex. C.  Meanwhile, another group went

south on Tucker and tried unsuccessfully to seize a ramp leading to Interstate 64/40.  I

Prel.Inj. Tr. [doc. 62] 270-71.   Foiled in that effort by the City police bicycle unit

(equipped with no riot gear), the crowd settled in to occupy the intersection of Tucker and

Clark Streets, reinforced by many of the group that had marched to Olive and Tucker.

Motion Ex. C; see also I Prel.Inj.Tr. [doc. 62] 270-72, II Prel.Inj.Tr. [doc. 63] at 143.

From the beginning of the protest at noon until late afternoon, the police made no

arrests, deployed no chemical munitions or mace, and otherwise accommodated the

protest by escorting the marchers and diverting traffic.  However, the CDT that had been

positioned near Tucker and Clark at the beginning of the protest activity ultimately became the target of the protesters.  See Motion to Dissolve, Ex. C.  At that time, the police commanders had decided that they would withdraw the CDT in order to "de-escalate."  II Prel.Inj.Tr. [doc. 63] at 148-49.  The CDT members were in regular public transit buses and were not deployed until the protesters surrounded the buses.  See Motion Ex.  C.

In the course of extricating the CDT buses, several officers used mace against protesters.  Motion to Dissolve, Ex. P (Boyher depo.) at 44-45.  At least one protester was maced while he was wrestling a bicycle officer for control of a bicycle, Motion Ex. C, Ex. R (Karnowski depo.) at 71; another (plaintiff Ahmad) was maced when she stood with locked arms with other protesters blocking a CDT bus and refused orders to move.  Motion Ex. C, Ex.L (Ahmad depo.) at 36-39  One or two other protesters were maced when they approached police lines in what some officers could have perceived to have been an aggressive manner, despite commands to "move back."  Motion Ex. C; I Prel.Inj.Tr. 246-47.  Although protesters threw water bottles and broken concrete (obtained when protesters broke a concrete sewer cover) at the police lines and buses, there was no large-scale deployment of mace, and tear gas was never deployed.[2]

After the CDT buses were removed, the protesters turned to a nearby marked police vehicle and began to vandalize it.  Officers in plain clothes attempted to arrest one perpetrator, but he escaped, and those officers in turn had to be rescued from the crowd

---

[2] It is interesting to note that plaintiff Ahmad and her cohorts came prepared to neutralize the effects of pepper spray with milk of magnesia. See Motion to Dissolve Ex. L (Ahmad depo.) 38-39, Ex. M (Mobley depo.) 59-60.  Other protesters sported masks and goggles on September 15 and at nearly every "protest" during the fall of 2017. Motion to Dissolve, Ex. C-F; II Prel.Inj.Tr. [doc. 63] 130.

by bicycle officers.  See Motion, Ex. C; Ex. R (Karnowski depo.) at 117-18; II

Prel.Inj.Tr. [doc. 63] at 118-19.

In the late afternoon of September 15, the police declared that the assembly at

Tucker and Clark was unlawful.  When an "unlawful assembly" was declared, there was

no question but that a large contingent of protesters was in fact blocking the intersection

and obstructing access to the main downtown firehouse, and that objects had been thrown

at police.  Motion to Dissolve Ex. C; see also I Prel.Inj.Tr. [doc. 62] 247.   The protesters

eventually dispersed without further incident; however, the day was not over.

Plaintiffs have been coy about the nighttime assault on the Mayor's residence in a

quiet neighborhood near Lake and Waterman Avenues in the City's Central West End.

Plaintiffs' witnesses were particularly incredible in their denials of observing any riotous

behavior.  E.g., I Prel.Inj.Tr. [doc. 62] 261-62.  Nevertheless, the overwhelming evidence

shows that a large crowd attempted to storm Interstate Highway 64/40 near

Kingshighway after dark on September 15, but were thwarted.  II Prel.Inj.Tr. [doc. 63]

171.  Turning to the north, the crowd of 500 to nearly 1000 protesters converged on the

Mayor's residence, throwing bricks, paint, water bottles and other objects.  Motion to

Dissolve Ex. D.  Officers guarding the Mayor's home were overwhelmed and the police

had to hastily summon CDT and other units.  State Highway Patrol and St. Louis County

units were also called to the scene.  During the disturbance, Sgt. Rossomanno and other

officers audibly and clearly announced that the protest was an unlawful assembly and

commanded dispersal.  They were ignored.  At that point, tear gas and pepper balls were

deployed, and officers formed lines to split the mob and shepherd one part to the west

and another part to the east.  See Motion, Ex. D; I Prel.Inj.Tr. [doc. 62] at 292ff., II Prel.Inj.Tr. [doc. 63] at 159ff.

 Eventually the protest dissolved into smaller groups near Euclid and McPherson, where several plaintiffs' witnesses--either unaware or dismissive of the circumstances which brought police lines to Euclid--complained about the police tactics.  I Prel.Inj.Tr. [doc. 62] 122, 134; see also Prel.Inj.Pl.Ex. 6.  One bystander apparently threw a gas or smoke canister back at police, but escaped arrest by fleeing into a nearby restaurant, which shut out the pursuing police.  II Prel.Inj.Tr. [doc. 63] at 178-79.  Shortly thereafter, the police withdrew as the protest groups had dissipated.

 On September 17, a large protest again materialized, this time in front of police headquarters on Olive Street. Motion to Dissolve, Ex. E.  The protesters began marching around the mid-town area, near the campuses of St. Louis University and Harris-Stowe State University, ultimately wending their way back to police headquarters.  The protest was peaceful and was escorted by police throughout.  No mace or any other chemical munitions were deployed by the police during this protest, notwithstanding that the protesters plainly occupied thoroughfares and the sidewalks, making it impossible for other foot or vehicular traffic to pass.  Motion Ex. E; II Prel.Inj.Tr. [doc. 63] at 184-85.  One unmarked police car ventured into the crowd of protesters but quickly withdrew, pursued by protesters.  No mace or other chemical agents were deployed during this episode.  Motion Ex. E.

 As evening approached on September 17, the protest in front of police headquarters wound down, but a large group of 75-100 persons began to proceed east to the downtown area.  Motion to Dissolve Ex. E; II Prel.Inj.Tr. [doc. 63] 123, 187-88.  In

the process, this group threw or damaged chairs that were set up for a ceremony on Olive at the public library building.  Heading further east, the protesters began to smash windows, overturn planters, and engage in other miscellaneous vandalism.  Motion, Ex. O (Jemerson depo.) at 41-43, Ex. R (Karnowski depo.) 104ff.  After a lull, a crowd of protesters re-emerged and proceeded from Olive to Locust Street and west to Tucker.  *Id.* At Tucker and Locust, police officers repeatedly announced that the assembly was unlawful, due to the prior vandalism and actual street blockage, and ordered the group to disperse.  At that time, there were multiple avenues open to protesters to leave the area. Motion to Dissolve, Ex. E, Ex. L (Ahmad depo.) 48-50, Ex. O (Jemerson depo.) at 45-46, Ex. R (Karnowski depo.) 113; I Prel.Inj.Tr. [doc. 62] 60, 187, 194, 252; II Prel.Inj.Tr. [doc. 63] 112-13.

As the hour grew late, police commanders decided that the crowd was not dispersing and that there was a risk that a larger group could reassemble with the additional attendant risk of property damage or violence.  At that point, police surrounded the area of Tucker and Washington, where the crowd was milling about.  The officers closed in with the intention of arresting all the persons in the vicinity of the intersection at the time.[3]  Although the dispersal commands had been given some time earlier, the crowd was still congregated together and persons wearing masks and goggles were in evidence, even though no chemical agents had been deployed.  Motion to Dissolve, Ex. E; Prel.Inj.Pl.Ex. O (video).

---

[3] At some point before arrests began at the intersection of Tucker and Washington, certain officers, in their own words, went "rogue" and apparently assaulted an undercover officer in the crowd.  A federal indictment has resulted from that incident.  Class Cert. Motion doc. 111-2, p. 5.  There is no evidence whatsoever that police commanders or other officers had any knowledge of these officers' intentions.  The federal charges stand in stark contrast to the professional behavior of the great majority of other officers during the protests.

Plaintiffs, and the Court in its preliminary findings, focus on the Tucker and Washington mass arrest as evidence of a City "custom" causing constitutional violations. The mass arrest was not a model operation. See Motion to Dissolve, Ex. O (Jemerson depo.) 51. However, the evidence is that the operation was undertaken only after the police had allowed ample time for the crowd--which included persons known to have been part of the crowd when property was damaged earlier--to disband.  II Prel.Inj.Tr. [doc. 62] 27-28; Motion to Dissolve Ex. R (Karnowski depo.) 107-08.  The members of the crowd showed no signs of dispersing, moving in and out of the thoroughfare.  Motion, Ex. E; Prel.Inj.Pl.Ex. L. In any event, no mace or physical force was used until officers were taking members of the crowd into custody.  Only a small number of the 120 or so arrestees were subjected to mace.  No tear gas or heavier munitions were employed at any time.  *Id.*

The Tucker and Washington mass arrest operation stands in contrast to the mass arrest in October, when protesters blocked Interstate 64/40.  More than 100 protesters were arrested when they exited the highway at Jefferson Avenue.  At the time, the protesters, acting as a unit, had completely blocked the Jefferson thoroughfare.  No pepper spray whatever was used, although there is no question that the protest was anti-police and animated by the Stockley verdict.  See Motion to Dissolve, Ex. F; I Prel.Inj.Tr. [doc. 62] 116.

Evidence of the manner of enforcing the unlawful assembly laws and the use of mace or tear gas at protests prior to 2017 was sparse at the preliminary injunction hearing, probably because it would not support plaintiffs' narrative.  Plaintiffs point to a disturbance at Page and Walton Avenues in the City following a police raid, and allude to

11

other incidents in 2014 and 2015.  However, other than the specious testimony of some

plaintiffs--who almost always witness police misconduct but never seem to hear or see

violence in their own ranks--there is no evidence that City police wantonly deployed

mace or other chemical munitions against lawful, peaceful protesters.  On the contrary,

video evidence submitted by defendant City--consisting of materials of record in *Molina*

*v. City of St. Louis,* 4:17-cv-2498, brought by one of plaintiffs' preliminary injunction

witnesses--shows the violent behavior of a disorderly crowd and the manner in which

police utilized tear gas at Page and Walton Avenues in 2015. This evidence clearly

refutes assertions of the reckless use of chemical agents against "peaceful" protesters

prior to 2017.  Motion to Dissolve, Ex. V, Ex. W (Becherer depo.) at 111-12.

One police officer deposed by plaintiffs presented a very real illustration of how

the police properly enforce the assembly and impeding ordinances, and utilize pepper

spray in a reasonable manner to enforce commands to disperse.  Motion to Dissolve Ex. S

(West depo.).  Officer West described an incident of a large crowd of disorderly bar

patrons who congregated on a major thoroughfare in the early morning hours, engaging

in brawling and peace disturbance generally.  Officer West warned the crowd via his

squad car public address that they should disperse.  Some did.  After other warnings and

more departures, he proceeded to walk through the crowd spraying mace over their

heads.  The crowd broke up.  Public order was preserved, thanks to sensible exercise of

officer discretion and reasonable use of hand-held chemical agents.  *Id.* at 33-35.

Officer West's testimony demonstrates conclusively that there is no custom or

policy of using mace differently than standing orders would contemplate, when the

targets are anti-police protesters.  The only custom and policy of the City police is to enforce the law in accordance with its terms, using non-lethal force only when necessary.

This Court entered its order in the fall of 2017, when the evidence suggested that protests could be ongoing.  However, the plaintiffs can point to no incidents since 2017 that occasioned the sort of protest activity seen in September and October 2017.  None of the named plaintiffs or plaintiffs' other professional protest witnesses has experienced any tortious conduct at the hands of City police since 2017.  Motion to Dissolve, Ex. L (Ahmad depo.) 63-64, Ex. M (Mobley depo.) 13-14, 53, Ex. N (Lewczuk depo.) 158-59.  As plaintiffs' counsel well know, the City ordinance concerning impeding traffic has been enforced on at least one occasion since 2017 against a protester not connected with an anti-police demonstration, see *Langford v. City of St. Louis,* 4:18-CV-02037.

There have been other developments since 2017, however:  defendant City and its police officers have been the target to more than 20 damage suits in the Eastern District arising out of the Stockley protests.  Without exception, the complaints in those actions advert to this Court's findings and its preliminary injunction in attempting to plead a claim of municipal liability against the City.  The pendency of this action and the existence of the preliminary injunction have worked a significant harm to the City in defending against the damage suits, and this action presents a clear threat to the City's (and its officers') right to trial by jury.

In sum, the evidence shows that if the City has a policy in regard to anti-police protests, it is to accommodate them until the behavior of the protesters turns violent or the protesters occupy thoroughfares with no intention of dispersing voluntarily.  In cases of violence or extended impeding of traffic thoroughfares, the police act on probable cause

to arrest or order dispersal.  Above all, the probability that plaintiffs, or anyone else, who is lawfully and peacefully protesting anything, will experience improper enforcement of laws regulating behavior of assemblies and impeding traffic, or the deployment of chemical agents by police, is virtually nil.

Argument

**1.      Because plaintiffs have failed to demonstrate standing to seek prospective injunctive relief, and because the record supports a finding of changed circumstances, the plaintiffs' claims for injunctive relief can and should be dismissed in accordance with Rules 12(h)(3) and 60(b)(4)&(5), and plaintiffs should be remitted to actions at law.**

Defendant recognizes the burden imposed by F.R.Civ.P. 60(b), as well as Rule 65(a), when a party seeks dissolution of a preliminary injunction after the time for appeal has elapsed.  However, the circumstances of this case compel the conclusion that the Court lacks equitable jurisdiction to grant relief to plaintiffs, and that, in any event, it is not equitable for the preliminary injunction to remain in force.

This case is but one step removed from the "institutional reform" litigation described by the Supreme Court as warranting special consideration under Rule 60(b). See *Horne v. Flores,* 557 U.S. 433, 448 (2009).  As will be demonstrated below, this Court's preliminary injunction does not give proper consideration to the principles governing equitable relief as set out in *City of Los Angeles v. Lyons, Rizzo v. Goode,* and *O'Shea v. Littleton.*  The Court also acted on an assumption that the mass protests of the fall of 2017 would be recurring.  Since the entry of the preliminary injunction, there has been absolutely no protest activity that exhibited the disorderly behavior that

14

characterized the protests in which plaintiffs were involved.  There has been at least one mass march that resulted in exactly one arrest.  On the other hand, there has been a freshet of related damage suits filed against defendant City, some of which have been initiated by former plaintiffs in this action as well as several plaintiffs' witnesses.[4]

The most significant changed circumstance since the entry of the preliminary injunction is the proliferation of damage suits against defendant arising out of the same protest activity in which plaintiffs participated.  As the defendant argued in opposing class certification (see Memorandum in Opposition to Class Certification, doc. 115), the plaintiffs' efforts to impose liability on the City in this action threaten to impede the right of the City and its employees to trial by jury in the damage suits.  Plaintiffs have scoffed at the City's position, but they acknowledge that a judgment in this equitable action could have significant preclusive effect on the damage suits. Reply Memo. [doc. 119] p. 17.

The pendency of the damage suits, the intervening production of voluminous discovery, and the absence of any recurring protests together demonstrate why the Court should dissolve the preliminary injunction, and go further and dismiss plaintiffs' action

---

[4]Damage suits filed since the inception of this action include: Rasheed Aldridge v. City of St. Louis, et al. 4:18-CV-01677; Fareed Alston v. City of St. Louis, et al. 4:18-CV-01569; Amir Brandy v. City of St. Louis, et al. 4:18-CV-01674; Brian Baude v. City of St. Louis, et al. 4:18-CV-01564; Crystal Brown v. City of St. Louis, et al. 4:18-CV-01676; Emily Davis v. City of St. Louis, et al. 4:18-CV-01574; Heather DeMian v. City of St. Louis, et al. 4:18-CV-01680; Alison Dreith v. City of St. Louis, et al. 4:18-CV-01565; Michael Faulk v. City of St. Louis, et al. 4:18-CV-00308; Darryl Gray v. City of St. Louis, et al. 4:18-CV-01678; Megan Ellyia Green v. City of St. Louis, et al. 4:18-CV-01629; Mark Gullet v. City of St. Louis, et al. 4:18-CV-01571; Calvin Kennedy v. City of St. Louis, et al. 4:18-CV-01679; Lindsey Laird and Andre Roberts v. City of St. Louis, et al. 4:18-CV-01567; Derek Laney v. City of St. Louis, et al. 4:18-CV-01575; Alex Nelson and Iris Nelson v. City of St. Louis, et al.4:18-CV-01561; Dillan Newbold v. City of St. Louis, et al. 4:18-CV-01572; Mario Ortega v. City of St. Louis, et al. 4:18-CV-01576; Christopher Robertson v. City of St. Louis, et al. 4:18-CV-01570; Keith Rose v. City of St. Louis, et al. 4:18-CV-01568; Demetrius Thomas v. City of St. Louis, et al. 4:18-CV-01566; Jonathan Ziegler v. City of St. Louis, et al. 4:18-CV-00308.

altogether for lack of standing (in the sense of inability to show a case or controversy) and equity.  Rule 60(b)(4).

The Supreme Court has observed that the standing inquiry "shades into" the factors determining whether injunctive relief is appropriate.  *O'Shea v. Littleton,* 414 U.S. at 499.  Standing to seek injunctive relief entails an inquiry not only into the existence of a threatened injury, but also into the reality of the claimed threat.  To warrant the extraordinary relief of an injunction, plaintiffs must show that they face a real and immediate threat of again being subjected to the allegedly illegal conduct.  "A federal court may not entertain a claim by any or all citizens who no more than allege that certain practices of law enforcement officers are unconstitutional."  *City of Los Angeles v. Lyons,* 461 U.S. at 111.

The record in this case, as in *Lyons,* shows that plaintiffs' claims of irreparable harm are chimerical.  Despite their efforts to show a pattern or practice of giving inadequate warnings to disperse or of misuse of chemical agents against anti-police protesters, there is no sound basis on which to conclude that plaintiffs' claims of threatened future injury are anything but speculative.  *If* there is a mass protest against the police in St. Louis in the future, and *if* plaintiffs participate, and *if* the protest turns violent or lawless, and *if* the police issue vague or contradictory dispersal commands, and *if* the protesters cannot or will not comply, and *if* the police use chemical agents, then plaintiffs will be injured.  This concatenation of *ifs* does not support injunctive relief.

The power of a federal court to supervise the functioning of a police department is limited by equitable principles and federalism, so that federal courts are not at liberty to slight the preconditions for equitable relief, which in any event is to be used "sparingly."

These considerations reinforce the requirement of proof of irreparable harm which is both great and immediate. *Lyons* at 111. This is particularly true when plaintiffs seek relief against those in charge of an executive branch of state or local government. See *Rizzo v. Goode,* 423 U.S. 362 (1976).

Although plaintiffs doubtless will argue that they have marshaled enough evidence of a "pervasive pattern" to justify this Court's continuance of the preliminary injunction, that is not so. As *Rizzo* illustrates, there is no "unacceptably high" number of past constitutional violations by police officers that necessarily warrants injunctive relief under §1983. There must be proof of the adoption and enforcement of deliberate policies by municipal officials directed against a specific group. While this Court's disapproval of the mass arrests at Tucker and Washington on September 17 is entirely rational, it does not suffice to support the Court's intervention prospectively in the operation of the St. Louis division of police. Even if the City's ordinances are invalid (and they are not), the Court would be limited in the relief it could grant, for Mo.Rev.Stat. §§574.040 and 574.060 remain unchallenged, and the Court's rubric for declaring unlawful assemblies would trench upon police enforcement of those statutes.

Defendant City submits that plaintiffs' failure to show an entitlement to any injunctive relief is tantamount to failure to show the jurisdiction of the Court, and warrants not only dissolution of the preliminary injunction, but dismissal of the action as beyond the equitable powers of the Court. F.R.Civ.P. 12(b)(1)&(h), 60(b)(4).

**2.      The preliminary injunction should be dissolved as no longer equitable in light of the absence of any realistic threat of irreparable harm flowing from an unconstitutional policy or custom of defendant City,**

The plaintiffs' case is perfectly encapsulated by the following testimony at the preliminary injunction hearing:

> THE COURT: And why is it civil disobedience?
> THE WITNESS: Because as long as I've been a Christian minister and social worker --
> THE COURT: I'm not asking why you did it. I'm asking why you think that meets the definition of civil disobedience.
> THE WITNESS: Because it is a powerful symbol to have people standing in front of a vehicle used for public transit but instead as a holding place for police to wage war on citizens.
> THE COURT: Go ahead with your cross-examination.
> Q (By Mr. McDonnell) Okay. So can we agree, Ms. Yang, you were blocking the bus in the street?
> A I was standing in solidarity with my community.
> MR. MCDONNELL: Judge, can you direct the witness to answer, please?
> THE COURT: She's answered. She says, no, she wasn't blocking the bus. That hurts her credibility, of course, because she obviously was, but that's her answer, and she's sticking to it.  [III Prel.Inj.Tr., Doc. 64, at 16.]

Plaintiffs, in substance, contend that they have an absolute right to seize control of City streets and sidewalks at will, so long as they are engaged in "expressive activity," and the police cannot act to arrest them but must first invite them to disperse.  Just as the witness quoted above considered that her blockade of a bus in a public street was above the law, the plaintiffs would have this Court re-write the law to suit their notions of proper policing of protest activity.  As the Court observed, the witness was not credible, but this witness's incredible testimony demonstrates why the plaintiffs lack standing to seek the relief they demand.[5]

In a series of cases beginning with *O'Shea v. Littleton,* 414 U.S. 488 (1974), the Supreme Court has emphatically rejected efforts to inject the federal courts into management of the conduct of affairs of state and local government in the matter of law

---

[5] The quoted testimony also illustrates why the video evidence is so important, see *Scott v. Harris,* 550 U.S. 372 (2007).

enforcement.  In *O'Shea*, the Court quite clearly held that injunctive relief under 42

U.S.C. §1983 requires a likelihood of substantial and immediate irreparable injury and

inadequacy of remedies at law.  "Past exposure to illegal conduct does not in itself show a

present case or controversy regarding injunctive relief . . . if unaccompanied by any

continuing, present adverse effects."

     Although *O'Shea* involved a claim seeking relief in the context of hypothetical

future criminal prosecutions, its principles were embellished and applied in *Rizzo v.

Goode,* 423 U.S. 361 (1976), which addressed a claim for mandatory injunctive relief

directed at supervision of the Philadelphia police.  Instructing that injunctive relief under

§1983 is to be used "sparingly," the Court again rejected the contention that some

"unacceptably high number" of past constitutional violations warranted judicial intrusion

into management of police departments.  The Court quite clearly reiterated that the

plaintiffs' claims would take the courts into the area of speculation and conjecture about

situations that could arise in the future.  Further, the Court instructed that federal judicial

power to supervise a police department is limited by principles of equity and federalism.

     Next, in *City of Los Angeles v. Lyons,* 461 U.S. 95 (1983), the Court rejected a

claim for injunctive relief that closely parallels the plaintiffs' claims here.  As with

plaintiffs' complaints about mace or chemical agents in this case, the plaintiff in *Lyons*

complained about police use of "chokeholds" in subduing compliant arrestees.  As do

plaintiffs here, Lyons claimed that the city authorized and encouraged the practice that he

attacked, and that the use of chokeholds violated his First, Fourth and Fourteenth

Amendment rights (and Eighth Amendment rights for good measure).  The district court

granted a preliminary injunction forbidding use of the chokehold absent threat of death or serious injury to an officer, and directing more training.  The Supreme Court reversed.

In *Lyons,* the Supreme Court held that the plaintiff simply lacked standing to seek an injunction.  Noting that standing to seek injunctive relief is different than standing to seek damages, the Court held that, to have standing, Lyons would have had to allege that he would have another encounter with the police *and* also make the "incredible" allegation that either (1) *all* Los Angeles police officers always choke any citizen with whom they have an encounter or (2) that the city ordered police officers to do so.  461 U.S. at 106.

Leaving aside the question of the validity of the ordinances attacked by plaintiffs, discussed below, it is evident that the preliminary injunction in this case suffers from the same infirmities as the injunctions in *Rizzo* and *Lyons.*  To be sure, unlike the plaintiff in *Lyons,* the plaintiffs here have indeed made the incredible allegation that the City has authorized or directed (by "custom") its police officers to enforce statutes and ordinances and deploy chemical agents in an unconstitutional manner.  Nevertheless, the principles of *Rizzo* and *Lyons* apply.

While the Court's preliminary injunction [doc. 57] is not unreasonable as an abstract matter, it is at once too broad and too narrow.  Purporting to restrain or direct the exercise of police discretion, it suffers from the same defect as the order in *Lyons*, in that it generally forbids use of any chemical agent against persons engaging in "expressive, non-violent activity" in the City in the absence of probable cause to arrest and without observing the Court's conditions precedent (¶3), but it also authorizes use of chemical agents to disperse such persons even without probable cause to arrest, if certain

20

conditions are met (¶5).  It then modifies its commands by excluding situations involving imminent threats of violence, bodily harm, damage to property or defensive use of chemical agents by officers, Order, p. 48, proviso.  In substance, City police are left pretty much where they were under the police division's standing orders, but with the threat of contempt to make their lot even more difficult.

The terms of the preliminary injunction demonstrate why plaintiffs have failed to show the requisite standing to secure injunctive relief.  Neither this Court nor anyone else can reliably predict an eruption of anti-police protests that will be both unlawful and necessitate the use of chemical agents; nor can plaintiffs credibly argue that they will in fact participate in assemblies in the future that will be declared unlawful, or that, if they do participate in unlawful assemblies, St. Louis police officers will inevitably deploy chemical agents without warning or legal authority.

Of course, plaintiffs and the Court have bottomed the right to injunctive relief on the assertion that the City has a "custom" of arbitrarily declaring unlawful assemblies and macing, arresting or dispersing lawful anti-police protesters or persons recording police conduct in those situations.  The Court's findings of the existence of a "custom" on which its order is based did not conform to the rigorous standard of municipal liability repeatedly enunciated by the Supreme Court and cannot be maintained in light of the video record.

The record shows that St. Louis police officers deployed chemical agents sparingly during September 2017.  Hand held mace canisters or streamers were used selectively, when officers were confronted with assemblies of protesters whose members assaulted police officers, damaged property, occupied the public right of way without

21

color of right, approached police lines in a threatening manner, and effectively imprisoned police officers in their own buses.  The record does *not* show that use of mace was promiscuous or punitive.  Likewise, the record shows that tear gas and pepper balls were deployed during and after the attack on the Mayor's home, but the record does *not* show that tear gas or heavier-duty riot control chemicals were deployed against any groups of protesters who were obeying the law or were passively (but unlawfully) occupying the streets.

The Court's preliminary injunction findings themselves make clear that the express policies of the City of St. Louis police in regard to protests do not contemplate the use of unreasonable force or arrests without probable cause.  St. Louis police officers utilize hand-held mace canisters only when necessary to overcome resistance to arrest, to repel an apparent assault on officers, or to assist in dispersing a crowd which is threatening or behaving unlawfully, when it is not feasible to make individual arrests. E.g., Motion to Dissolve, Ex. S (West depo.) 34. Similarly, standing police orders forbid interference with persons recording police activity, unless there is reason to believe that the recorder is a threat or is interfering with police actions.  See Motion to Dissolve, Ex. T (Baumgartner depo.) Ex. 2D.

When confronted with large-scale protests,[6] the practice of City police is to accommodate such protests--including anti-police protests--by escorting marchers and by blocking traffic, even where the protesters are illegally obstructing the streets.  Only when such unpermitted protests become disruptive or engage in illegal behavior, such as prolonged blocking traffic, assaults or property damage, do the police resort to declarations of an unlawful assembly and commands to disperse, or to arrests.  In doing so, the police rely both on the statutes, Mo.Rev.Stat. §§574.040, 574.060, and the ordinance (§15.52.010) defining unlawful assemblies, and on City Code (ordinance) §17.16.275, which prohibits impeding the flow of vehicular or pedestrian traffic.  An unlawful assembly will usually be declared by a command rank officer, although any officer can invoke the ordinances, with probable cause to believe that they are being violated, and seek to disperse a disorderly assembly.

Plaintiffs and the Court have focused attention almost exclusively on the mass arrest that occurred at Tucker and Washington Boulevards late on the night of September 17, 2017.  Even considering that event in isolation, it is clear that the police action was not the product of an illegal custom or policy.  No City policymaker was present or authorized the mass arrest.  Compare *Bernini v. City of St. Paul,* 665 F.3d at 1007 with with *Vodak v. City of Chicago,* 639 F.3d 738 (7th Cir. 2011).  The incident commander

---

[6] Admittedly, the record is confusing with regard to the issue of permits for protests.  The City can and does issue permits for protest marches, and, in late summer 2017, City police actually obtained a permit for a "free speech safe zone" in downtown St. Louis, in anticipation of protests regarding a verdict in the Stockley murder case.  However, no permit is required if the City is informed that the protesters will simply march along sidewalks and will not require street closings.  Motion to Dissolve, Ex. U (Chance depo.) 25-26, 66-67, Ex. 12.  When all is said and done, however, the issue of permits is irrelevant.  Neither plaintiffs or anyone acting as a protest organizer ever even inquired about permits in September 2017.

directed the arrests at a time when there was ample probable cause to do so.  The evidence is clear that a large crowd of protesters had left an earlier, peaceful and orderly protest in front of police headquarters, and had marched into the downtown area, damaging property as they went.  Many of the same participants in this unruly march remained in the downtown area and eventually migrated to the area of Tucker and Washington.  More than a few of these people sported masks and goggles, suggestive of an intent to confront police. Motion to Dissolve Ex. E.

Eventually, fearing a repeat of the earlier violent outbursts of property damage and objects thrown at police, the incident commander directed that the intersection be closed off and that all persons appearing to be part of the assembly should be arrested.  At that time, it was plain that many persons were in fact blocking Tucker and Washington Boulevards.  Motion to Dissolve, Ex. E.  There was no simple way to separate persons who were protesters or had been with the crowd earlier from ordinary passersby who happened upon the scene.  Indeed, video footage of earlier protests shows people with strollers and dogs on leashes actually joining the marchers.  See Motion to Dissolve, Ex. C.

The night of September 17 should not, however, be considered in isolation.  The video evidence from the weekend of September 15-17 shows no widespread or routine use of mace on unresisting protesters, even when they were plainly violating the law, as they were doing at Tucker and Clark on September 15.  Nearly all such usage of mace was clearly in connection with an arrest, or in connection with efforts to defend police lines or compel protesters to move away from police buses.  Motion to Dissolve, Ex. C.

Plaintiffs' own crowd control police expert reviewed *nothing* concerning any anti-police protests antedating September 2017.  Nor did he review any evidence concerning the October 3 mass arrest that also occurred in connection with the Stockley verdict protests.  His opinion, like the plaintiffs' whole case, is based on the night of September 17.  Motion to Dissolve, Ex. K (Golden depo.) 18-19.

Yet the video evidence of a mass arrest that took place at Interstate 64/40 and Jefferson Avenue in October 2017 is of the utmost significance.  In that instance, protesters, including several of plaintiffs' witnesses at the preliminary injunction hearing, succeeded in blocking traffic on the highway.  They then marched onto Jefferson Avenue, completely blocking it, whereupon they were arrested. No mace or other chemicals were deployed.  Nothing was thrown at the officers by the protesters.  There was no resistance by protesters to being arrested.  In short, the incident demonstrates that the City police respond to "peaceful" but illegal conduct by protesters in an entirely constitutional way, acting on probable cause and without the need to "declare" any unlawful assembly.  It is only when protesters both violate the law and appear to pose a threat to officers, or resist arrest, that mace or other non-lethal force is sometimes used.

Aside from ignoring the precepts governing standing to seek injunctive relief, plaintiffs have also ignored other applicable principles when a claim is premised on retaliation for constitutionally protected activity.  First, there is the principle that the subjective motives of police officers in enforcing the law are irrelevant.  If, objectively considered, the totality of the circumstances would support an arrest for any offense, or the use of force, the arrest or use of force is valid, even if the officer believed a different offense had been committed or the officer's subjective motivation was animus toward the

arrestee.  See *Graham v. Connor,* 490 U.S. 386 (1989); *Lawyer v. City of Council Bluffs,* 361 F.3d 1099, 1106 (8th Cir. 2004). The reasonableness of the use of force must be judged from the standpoint of the officer on the scene, rather than by judicial hindsight. *Id.*; cf. Motion to Dissolve, Ex. K (Golden depo.) at 10.

Second, if the claim is one of infringement of First Amendment rights, the plaintiff must plead and prove (1) he engaged in protected activity, (2) a government officer took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, (3) the adverse action was motivated at least in part by the protected activity, and (4) the arrest lacked probable cause or arguable probable cause.  E.g. *Peterson v. Kopp,* 754 F.3d 594 (8th Cir. 2014).  Even in the First Amendment context, an officer is entitled to make a reasonable interpretation of the law he is expected to enforce.  *Frye v. KCMO Police Dept.,* 375 F.3d 785 (8th Cir. 2004).

Third, it can hardly be a City "custom" to violate the right to record police activity, when such a right has not been clearly established. See *Colten v. Kentucky,* 407 U.S. 104 (1972)(suggesting that bystanders have no constitutional right to observe issuance of traffic ticket or engage in conversation with officer); *Szabla v. City of Brooklyn,* 486 F.3d 385, 394 (8th Cir. 2007)(*en banc*); *Turner v. Driver,* 848 F.3d 678, 696 (5th Cir. 2017)(Clement, J., dissenting).  If there is indeed a constitutional right to record police activity, that activity, like speech itself, is subject to reasonable time, place and manner regulation.  Certainly a person who attempts to shove a cell phone or other recording device in an officer's face while the officer is attempting to arrest another person could reasonably be seen as interfering with the officer.  *Colten v. Kentucky,* supra.

In the matter of evidence of a City's custom, it is well established under §1983 that where a plaintiff claims that a municipality has not directly inflicted an injury but has caused an employee to do so, "rigorous standards" of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employees.  Thus, a plaintiff claiming an actionable "custom" must not only identify conduct properly attributable to the municipality but must also demonstrate that through its deliberate conduct, the municipality was the "moving force" behind the injury alleged. *Bd. of County Commissioners v. Brown,* 520 U.S. 397, 400, 405 (1997).  This rigorous standard is all the more important when a plaintiff seeks injunctive relief against hypothetical future injury from law enforcement practices.

In the case at bar, the plaintiffs have signally failed to show the existence of an actionable custom.  There is no evidence whatever that the Mayor, the Director of Public Safety (the police commissioner's superior) or the Board of Aldermen of the City had notice of or acquiesced in a pattern of unconstitutional behavior by police toward protesters.  On the contrary, to the extent that the *Templeton* suit can be considered such notice, the City's settlement demonstrates that policymakers did *not* acquiesce in or tacitly authorize any misuse of chemical agents by City police, or arbitrary law enforcement conduct, but agreed to an order that had the opposite effect.  Thus, the express policies of the City directly refute the plaintiffs' claims of unconstitutional policy or custom.  See *Malone v. Hinman,* 847 F.3d 949 (8th Cir. 2017)(need for proof of deliberate indifference to or tacit authorization of alleged misconduct by the government's policymaking officials, after notice of the misconduct); *Rogers v. City of Little Rock,* 152 F.3d 790 (8th Cir. 1998)(evidence of actual investigation of complaints

refuted claim of illegal policy of ignoring complaints); *Chestnut v. Wallace,* 2018

U.S.Dist.LEXIS 190476 (E.D.Mo. 2018)(express police department policies conclusively

negated claim of "custom" having force of law).

The evidence in this case fails to demonstrate that the City's officers customarily

retaliate against protesters based on the content of the protest or on account of recording

police activity.  Plaintiffs have presented no evidence that any protest group evincing

behavior comparable to that evinced by plaintiffs' groups (blockading police on buses,

throwing rocks, bottles, vandalizing private property, blockading highways and

thoroughfares, otherwise assaulting police) has been or will be treated differently than

plaintiffs' groups.

Aside from its conflict with the teachings of *O'Shea, Rizzo and Lyons,* this Court's

analysis in granting the preliminary injunction is at odds with *White v. Jackson*, 865 F.3d

1064 (8th Cir. 2017) and *Bernini v. City of St. Paul,* 665 F.3d 997 (8th Cir. 2012).  Both

of those cases involved police efforts to control protests.  *White,* of course, grew out of

the Ferguson riots that spawned the *Templeton* case; *Bernini* grew out of a mass protest at

the Republican National Convention in 2008.  In both cases, the police were confronted

with large groups of protesters who engaged in assaults on police officers, vandalism, and

blockades of rights of way.  In both cases, the police relied on laws pertaining to unlawful

assembly in attempting to disperse or control the crowds.  In both cases, the police

resorted to mace or tear gas to defend police lines, shepherd protesters away from rights

of way, and otherwise to quell unlawful conduct.

In *Bernini* in particular, the Court of Appeals recognized that a reasonable police

officer at the scene of a large and potentially riotous group need not have individualized

probable cause to arrest the members of the group, so long as it was objectively reasonable to conclude that the group was acting as a unit and had committed a crime. The Court of Appeals noted that the behavior of a group that included people wearing masks or goggles, shouting and taunting the police, could be considered in assessing the reasonableness of police action to arrest the group.  The Court also held that where the police could not readily distinguish between members of the group and innocent bystanders at the time, a reasonable investigative detention was warranted to ascertain an individual's status.  665 F.3d at 1004-05.

This Court has overlooked the role of probable cause in enforcing the unlawful assembly statutes and ordinances, and the impeding traffic ordinance.  While the unlawful assembly laws pertain to unlawful conduct with force or violence, the impeding traffic ordinance has no such limitation.  As demonstrated below, that does not render the ordinance unconstitutional, nor are the police disabled from enforcing it against "peaceful" protesters.

In short, the Court has been misled by plaintiffs' tunnel vision.  Because individual officers may have misused pepper spray on September 15 or September 17, 2017, the Court apparently concluded that the City must have acquiesced in or authorized such misuse, notwithstanding the extensive evidence of protest activity at which the police took no action other than to escort the marchers or monitor the situation, the uncontradicted evidence that tear gas was used only in actual riot conditions, and the unrefuted evidence that many protesters were arrested on September 17 and on October 3 without any use of force whatever.  Of the more than 200 persons arrested on September 17 and October 3, the evidence shows merely a handful who claim to have been maced

on September 17, and in a number of those cases, the issue of resisting arrest is hotly

disputed.  This is in sharp contrast to the evidence of assaultive behavior by plaintiffs'

protest groups, resulting in injury to many officers, including disabling injuries.  Motion

to Dissolve, Ex. H, J.

Nothing in §1983 jurisprudence suggests that a plaintiff seeking an injunction can

be held to a lesser standard of proving a municipal custom than a plaintiff seeking

damages.  It has been consistently held that an actionable custom must be a practice or

policy having the force of law, i.e., virtually legitimizing the conduct complained of.  Cf.

*Adickes v. S.H. Kress & Co.,* 398 U.S. 144 (1970).  Plaintiffs have shown no actionable

custom of the City to retaliate against any protesters on account of the subject of protest,

including anti-police protesters.

The failure of plaintiffs' claims of policy or custom dictates the dissolution of the

preliminary injunction in this case and dismissal of the action, at least insofar as the use

of chemical agents by police is concerned.

**3.      The statutes and ordinances attacked by plaintiffs are valid on their face and**

**as applied.**

The plaintiffs' second amended complaint targets two City ordinances:

§15.52.010 and §17.16.275, R.C.St.Louis. If plaintiffs have standing, it is only to seek

injunctive relief as to the enforcement of these ordinances.  The ordinances provide as

follows:

15.52.010 - Defined.

Any two persons who shall, in this City, assemble together, or, being assembled, shall act
in concert to do any unlawful act with force or violence, against the property of this City,
or the person or property of another, or against the peace or to the terror of others, and
shall make any movement or preparation therefor, and every person present at such

30

meeting or assembly, who shall not endeavor to prevent the commission or perpetration of such unlawful act, shall be guilty of a misdemeanor.

17.16.275 - Impeding and interfering with pedestrian and vehicular traffic.

A. No person, or persons congregating with another or others, shall stand or otherwise position himself or herself in any public place in such a manner as to obstruct, impede, interfere, hinder or delay the reasonable movement of vehicular or pedestrian traffic.
B. No person, or persons congregating with another or others, shall stand or otherwise position himself or herself in any entrance, exit, corridor or passage of any public building in such a manner as to obstruct, impede, interfere, hinder or delay the reasonable movement of vehicular or pedestrian traffic.
C. No person, or persons congregating with another or others, shall stand or otherwise position himself or herself at the entrance or exit to a private building, including driveway, entrance to a garage and entrance to a parking pad, in such a manner as to obstruct, impede, interfere, hinder or delay the reasonable movement of vehicular or pedestrian traffic.
D. No person, or persons congregating with another or others, shall for the purpose of selling or offering for sale goods or services without a license; or soliciting a ride, employment, business, or contributions from vehicular traffic: 1. Stand or otherwise position himself or herself in any public place; 2. Stand or otherwise position himself of herself at the entrance or exit to a private building or public building, including the driveway, entrance/exit to a garage and entrance/exit to a parking pad.
E. No person who has committed an act or acts within the description of subsections (A) through (D) above, upon being given an order by a police officer, state trooper, marshal, ranger, firefighter, Missouri authorized security guard, or other authorized law enforcement or emergency response personnel to disperse, clear, or otherwise move, shall fail or refuse to obey such order. Such failure or refusal shall constitute the separate offense of failure to obey a dispersing order by a police officer, state trooper, marshal, ranger, firefighter, Missouri authorized security guard, or other authorized law enforcement or emergency response personnel.
F. Any person violating any of the provisions of this section shall, for each such violation, be guilty of a Class A misdemeanor and upon conviction shall be subject to a fine of no less than one hundred dollars ($100) and not more than five hundred dollars ($500) or by imprisonment for not more than ninety days, or by both fine and imprisonment.

Both ordinances are content-neutral on their face.  Contrary to plaintiffs' claims,

enforcement of the ordinances requires proof of *scienter*.  See *City of St. Louis v. Jones,*

536 S.W.3d 794 (Mo.App.E.D. 2018); see also Mo.Rev.Stat. §562.021.  The ordinances

regulate conduct only.  They are unquestionably reasonable time, place and manner

regulations, reflecting the governmental interest in ensuring public safety and order and promoting the free flow of traffic on streets and sidewalks, and narrowly tailored to that end. E.g., *McCullen v. Coakley,* 134 S.Ct. 2518 (2014); *Ward v. Rock Against Racism,* 491 U.S. 781 (1989); compare *City of Houston v. Hill,* 482 U.S. 451 (1987) with *Colten v. Kentucky,* 407 U.S. 104 (1972).

Notably, §17.16.275, impeding the flow of traffic, was enacted after a prior similar ordinance was held invalid by the Eighth Circuit. *Stahl v. City of St. Louis,* 687 F.3d 1038 (8th Cir. 2012). The prior ordinance had two major defects: it expressly included speech in its proscription, and it criminalized speech in a way that rendered it impossible for the speaker to know in advance what was illegal, because its violation turned on the reactions of third persons. The Court also noted the absence of a *scienter* requirement. However, the Court declared, "So long as the ordinance is clear as to what conduct is deemed likely to cause a traffic problem, these regulations do not offend due process." 687 F.3d at 1041; see also *Duhe v. City of Little Rock,* 902 F.3d 858 (8th Cir. 2018).

In the case at bar, §17.16.275 is clear: any person who intentionally positions himself in a public way or in front of a building entrance so as to obstruct the free flow of vehicular or pedestrian traffic is in violation. As an alternative to arrest, the ordinance further authorizes officers to command the obstructor or obstructors to move out of the way (i.e., disperse) or be subject to arrest for failure to obey the order. There is nothing vague or overbroad about these provisions.

The unlawful assembly ordinance, §15.52.010, is also content neutral and relates solely to conduct as part of a group that is violent. The ordinance closely resembles the

32

Missouri statute on the same subject, Mo.Rev.Stat. §574.040, which is unchallenged by plaintiffs.  (The ordinance also resembles the Minnesota statute discussed in *Bernini*, supra.) It criminalizes only conduct, i.e., acting in concert to do an unlawful act with force or violence.  It cannot be seriously doubted that this ordinance is facially valid. This Court has not held otherwise.

Plaintiffs' "as applied" challenges likewise fail.

In the first place, it is not at all clear that plaintiffs have standing to seek an injunction on this basis.  While they claim that they intend to protest police conduct in the future, there is no evidence whatever that they have been genuinely threatened with any form of future enforcement action.  Cf. *Steffel v. Thompson,* 415 U.S. 452 (1974).  Surely it is impossible to say that the putative class has been so threatened.  More importantly, plaintiffs do not claim nor is there evidence that they intend to engage in the conduct forbidden by the ordinances, i.e., joining with two or more others to commit unlawful acts with force or violence, or intentionally impeding traffic flow on public streets.

The courts assume that people will conduct activities within the law and so avoid prosecution.  *O'Shea v. Littleton,* 414 U.S. at 497.  Given that the ordinances are not facially invalid, either on the basis of vagueness or overbreadth, it is difficult to see how plaintiffs present a live controversy on the basis of an "as applied" theory.

In any case, the ordinances were properly applied to plaintiffs under all the circumstances.[7]  This is not a matter of an ordinance or policy which accords unbridled discretion to the police as to what protests to permit or not.  The ordinances challenged

---

[7] Again, this is not a case involving permits.  The protests in which plaintiffs and their putative class were involved were not "permitted," but no one other than the police themselves ever applied for any sort of permit to accommodate protests of the Stockley verdict.  The City's permit ordinances and practices are therefore wholly irrelevant to this case.

by plaintiffs confer only the discretion that every police officer has at all times:  to arrest on probable cause for conduct falling within the ordinances' proscriptions.  Cf. *Colten v. Kentucky,* supra; *Bernini v. City of St. Paul*, supra.  To be sure, the ordinance on impeding traffic gives additional discretion:  an officer may command that the obstructor move away, but here, too, the officer must have probable cause to believe that the person so directed is impeding traffic.  If a command to move is given and ignored, the ordinance permits arrest for the additional or alternative charge of failure to obey the order.  There is no unbridled discretion.

It is clear from the record, as discussed at length above, that the plaintiffs' protests involved unlawful activity, including property damage, assaults on officers, and impeding traffic, giving the police probable cause to arrest or to command dispersal on September 15 at Tucker and Clark, on September 15 in the Central West End, and on September 17. As the Court itself found, Memorandum and Order [doc. 57], at 43, plaintiff Ahmad unquestionably violated the impeding ordinance.  The fact that the police conducted mass arrests on two occasions does not alter the analysis.  Such arrests are permissible if the officers could reasonably believe that the group was acting as a unit and its members had committed an offense.  See *Bernini v. City of St. Paul,* 665 F.3d at 1002.  The standard for enforcement of the ordinances is the same standard that governs enforcement of every criminal law:  probable cause.  That issue can be contested in every arrest, but an argument regarding the issue does not warrant intervention by a federal court, through an injunction attempting to specify the circumstances under which officers may act.  *City of Los Angeles v. Lyons,* supra; cf. *Stefanelli v. Minard,* 342 U.S. 117 (1951).

The evidence in this case is sharply conflicting as to the quality and quantity of warnings given by City police in enforcing the statutes and ordinances in September 2017. Yet some of plaintiffs' witnesses admitted that they *did* hear warnings and commands to disperse. I Prel.Inj.Tr. [doc. 62] 187, 194. The point is that the addition of an injunction adds nothing to the equation: both the unlawful assembly and impeding traffic ordinances are properly enforced when there is probable cause to believe they have been or are being violated.[8]

As discussed above, the applicable standards of liability under 42 U.S.C. §1983 do not permit the Court to rewrite ordinances or police regulations to suit plaintiffs. See *Hague v. C.I.O.,* 307 U.S. 496 (1939). Nor does the law support declaring the City ordinances unconstitutional "as applied." Plaintiffs have presented no evidence that the police have enforced the ordinances differently on the basis of the subject of the protests rather than the conduct of the protesters. On the contrary, plaintiffs' counsel is at present prosecuting an action against the City on account of an arrest for impeding traffic at the 2017 "Women's March," and the evidence shows that a form of the impeding ordinance was enforced against protesting coal company employees, "Occupy Midwest" protesters, and anti-abortion protesters in 2012 and 2013. Motion to Dissolve, Ex. A, Ex. S (West depo.).

The Court apparently felt that the ability of any officer to declare an unlawful assembly was a constitutional vice warranting relief, but the Court overlooked the elementary principles that, first, if the officer has probable cause to arrest, the officer's

---

[8]The City notes that Mo.Rev.Stat. §574.060 penalizes refusal to disperse upon command from the scene of an unlawful assembly. The statute is unchallenged by plaintiffs. The term "disperse" is a term of common understanding and denotes departure from the scene without simply relocating to continue the assembly. Cf. *Boos v. Barry,* 485 U.S. 312 (1988)(ordinance forbidding "congregating" not vague or overbroad).

belief as to what law is being violated is irrelevant, and, second, that the ordinance against impeding traffic can be enforced without regard to the passivity of the persons who are intentionally doing the impeding.  Thus, while it is the practice of the City police to provide an opportunity to disperse before arrest for impeding traffic, there is no constitutional right to an opportunity to stop violating the law before one is arrested--so long as the officer has probable cause.  See *White v. Jackson,* 865 F.3d at 1079; see also *Dist. of Columbia v. Wesby,* 138 S.Ct. 577 (2018); *McCabe v. Parker,* 608 F.3d 1068 (8th Cir. 2010).

In the context of unlawful assemblies, the evidence shows that, in fact, the City does not have a policy that allows individual officers to willy-nilly declare unlawful assemblies in mass protest situations.  That call is supposed to be made by the incident commanders.  See Motion to Dissolve, Ex. B. In this case, unlawful assemblies were declared by supervising officers during or in close proximity to violent unlawful conduct by protesters on September 15 and September 17, and there was ample probable cause to do so.  Motion to Dissolve, Ex. C-G.  However, it is not unconstitutional for any officer to do so, as long as there is probable cause to believe that a crowd is acting as a unit to commit unlawful acts with force or violence (and throwing missiles at police and damaging private property qualify, regardless of plaintiffs' ridiculous efforts to trivialize such conduct).  *Bernini v. City of St. Paul,* supra.

Plaintiffs' novel theories of their unqualified right to seize control of streets and sidewalk are flatly contradicted by the Supreme Court:

> We emphatically reject the notion . . . that the First and Fourteenth Amendments afford the same kind of freedom to those who would communicate ideas by conduct such as patrolling, marching, and picketing on streets and highways, as

these amendments  afford to those who communicate ideas by pure speech.  [*Cox v. Louisiana,* 379 U.S. 538, 554-55 (1969)[citations omitted.]

Plaintiffs have no constitutional right to seize the streets.  Despite plaintiffs' incantations of "chill" and "arbitrary enforcement," the record shows that the City police do their best to accommodate all peaceful protests, even when traffic is impeded, and they make no distinctions between protesters based on the message.  The City has not authorized or caused them to do anything else.  The ordinances at issue make no distinction based on speech; they can be enforced only if the protesters commit unlawful acts with force or violence, or if they intentionally impede traffic.  The police have no more discretion in enforcing the assembly and impeding ordinances than they do in enforcing any other law.

The City's ordinances have been and will continue to be enforced prudently and constitutionally.[9]  The Court's injunction modifying the City's ordinances by imposing standards for the declaration of unlawful assemblies and enforcement of dispersal orders--based almost entirely on evidence of the September 17 incident at Tucker and Washington[10]--is contrary to law and should be dissolved.

**3.      Normal principles of equity, comity and federalism compel the rejection of plaintiffs' claims for injunctive relief to micromanage police response, including use of non-lethal force, when faced with illegal conduct by protesters.**

---

[9] Plaintiffs' theories of invalidity of §17.16.275, if adopted, would not only make it impossible to ensure free passage on public streets, but would render the City powerless to police abortion clinic protests.
[10] In its Memorandum, the Court alluded to the incident on October 3, 2017, as evidence of an illegal custom.  However, the record clearly shows that the police had probable cause to arrest every participant in the blockade of Interstate 64/40, Motion to Dissolve, Ex. F, and it is difficult to see how the Court can require advance notice and an opportunity to disperse when the police have probable cause to arrest.

Neither the City nor the police can forbid unpermitted, extemporaneous protests, see *Vodak v. City of Chicago,* 639 F.3d 738 (7th Cir. 2011), and so the police must do what they can to protect constitutional rights and public order in cases such as the Stockley verdict protests. "What is reasonable in the context of a potential large-scale urban riot may be different from what is reasonable in the relative calm of a tavern with a dozen patrons." *Bernini*, 665 F.3d at 1003; cf. *Lawyer v. City of Charleston,* 361 F.3d 1099 (8th Cir. 2004)(pepper spray can be used, if otherwise proper, even where it is foreseeable that bystanders could be affected).

Without wishing to be unduly repetitious of prior argument, defendant City must emphasize that the Court's intervention in the matters of declaring unlawful assemblies and using chemical agents is a significant departure from the precepts of equity jurisprudence. There is little, if any, authority to support the Court's injunction directed at police in the field. On the contrary, the wide variety of circumstances that officers in the field must face compels the conclusion that the courts generally must leave these split-second judgments to the officers, with the alternative remedies of damages and potential criminal prosecution to serve as the deterrent to unlawful police behavior.

It is particularly significant that many of the original plaintiffs or their witnesses in this case are now suing defendant City and individual officers for damages, and that an unrepresentative few officers have been indicted on criminal civil rights violations. The pendency of these other proceedings demonstrates the soundness of the Supreme Court's consistent view that equity will not act in cases such as this, given the adequate alternative remedies. *O'Shea v. Littleton,* 414 U.S. at 502-03.

Conclusion

38

For the foregoing reasons, the preliminary injunction previously entered herein should be dissolved, and the second amended complaint should be dismissed for lack of a justiciable claim for equitable relief.

Respectfully submitted,
JULIAN L. BUSH
CITY COUNSELOR

/s/ Robert H. Dierker
Robert H. Dierker 23671MO
Associate City Counselor
dierkerr@stlouis-mo.gov
Brandon Laird 65564MO
Associate City Counselor
Abby Duncan 67766MO
Assistant City Counselor
Megan Bruyns 69987MO
Assistant City Counselor
Amy Raimondo 71291MO
Assistant City Counselor
1200 Market St.
City Hall, Rm 314
St. Louis, MO 63103
314-622-3361
Fax 314-622-4956