IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

MALEEHA AHMAD, et al,        )
                             )
          Plaintiffs,        )
                             )
vs.                          )   No. 4:17-CV-2455 CDP
                             )
CITY OF ST. LOUIS,           )
                             )
          Defendant.         )


Deposition of PAMELA LEWCZUK
taken on behalf of the Defendant
January 28, 2019


INDEX
     Questions By:                         Page:

     MS. DUNCAN                              5


Reporter:  Sara Alice Masuga, CSR, CCR
IL CSR No. 084-002993   MO CCR No. 1012


MASUGA REPORTING SERVICE
2033 HIAWATHA AVENUE
ST. LOUIS, MO  63143-1215

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF MISSOURI
2

3      MALEEHA AHMAD, et al,     )
                                 )
4               Plaintiffs,      )
                                 )
5      vs.                       )  No. 4:17-CV-2455 CDP
                                 )
6      CITY OF ST. LOUIS,        )
                                 )
7               Defendant.       )

8

9   APPEARANCES:

10

    On Behalf of the Plaintiff:
11

12          ACLU
            By Anthony E. Rothert, Esq.
13          906 Olive Street
            Suite 1130
14          St. Louis, MO  63101

15

16  On Behalf of the Defendant:

17

            City Counselor's Office
18          By Abby Duncan, Esq.
            Brandon Laird, Esq.
19          1200 Market Street
            City Hall Room 314
20          St. Louis, MO  63103

21

22

23

24

25
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1           IT IS STIPULATED AND AGREED by and between

 2     counsel for Plaintiffs and counsel for Defendant that the

 3     deposition of PAMELA LEWCZUK may be taken pursuant to the

 4     Federal Rules of Civil Procedure, by and on behalf of the

 5     Defendant on January 28, 2019, at the offices of the

 6     ACLU, 906 Olive Street, St. Louis, Missouri, before me,

 7     Sara Alice Masuga, Certified Court Reporter and Certified

 8     Shorthand Reporter; that the issuance of notice is waived

 9     and that this deposition may be taken with the same force

10     and effect as if all Federal Rules had been complied

11     with.

12           IT IS FURTHER STIPULATED AND AGREED that the

13     signature of the deponent is reserved.

14

15

16

17

18

19

20

21

22

23

24

25
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1                        EXHIBIT INDEX
        Exhibit:                                   Page:
 2

 3   Defendant's Exhibit Lewczuk A......................142
     (Defendant's First Set of Interrogatories Directed
 4    to Plaintiff Pamela Lewczuk)

 5

 6   (Exhibits attached.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          PAMELA LEWCZUK produced, sworn, and examined as a
 2    witness on behalf of the Defendant testified as follows
 3    commencing at 9:05 a.m.:
 4
 5                    E X A M I N A T I O N
 6    BY MS. DUNCAN:
 7
 8          Q.   Could you state your -- state and spell your
 9    full name, ma'am?
10          A.   Uh-huh, Pamela Lynn Lewczuk, L-e-w-c-z-u-k.
11          Q.   Ma'am, I just introduced myself to you, but
12    name is Abby Duncan.  I'm one of the attorneys
13    representing the City on this case.
14          A.   Uh-huh.
15          Q.   This is Brandon Laird.  He's another one of
16    the attorneys --
17          A.   Okay.
18          Q.   -- representing the City in this matter.  Have
19    you ever given your deposition before?
20          A.   No.
21          Q.   Okay.  I just want to go over a few of the
22    ground rules --
23          A.   Uh-huh.
24          Q.   -- both for you and for me.
25          A.   Uh-huh.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          Q.   This is Sara.  She's taking down everything
 2     that we say and so it's important that all of your
 3     answers be -- be verbal.  So, any head shakes or head
 4     nods, "uh-huh," "nuh-uhs," none of those really translate
 5     onto the record that she's making, so --
 6          A.   Okay.
 7          Q.   -- if you'll just try to remember to keep all
 8     your answers verbal.  If at some point you slip up, I may
 9     ask you is that a "yes," and that's not to --
10          A.   Okay.
11          Q.   -- chastise you.  It's just to make the record
12     clear.  And also it would help if we don't speak over one
13     another.  And I'll try not to speak over you if you don't
14     try to speak over me.  It just makes for a clear record.
15          A.   Okay.
16          Q.   And finally -- That's fine.  And finally, if
17     at any point I ask you something that you don't
18     understand or it's worded a little funny, if you'll just
19     tell me and I'll be happy to rephrase.  Otherwise I'll
20     assume that if you answer the question I've asked, that
21     you understand the question; is that fair?
22          A.   Yes.
23          Q.   Okay.  I want to just start off with just some
24     background information, ma'am.  What is your date of
25     birth?
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1           A.    ████████████.
 2           Q.    Okay.  And what's your address?
 3           A.    ████████████████████████████████.  I'm
 4      sorry.  That's my work.  ████████.
 5           Q.    And is that in the city?
 6           A.    No.
 7           Q.    In the county?
 8           A.    Yes.
 9           Q.    Okay.  What is your educational background;
10      where did you go to high school?
11           A.    At Radnor High School outside Philadelphia.
12           Q.    Okay.  And where did you go for undergrad?
13           A.    U- -- I graduated from the University of Texas
14      Health Science Center at Houston.
15           Q.    Okay.  And what degree did you get there?
16           A.    A Bachelor of Science in Nutrition.
17           Q.    Any graduate studies?
18           A.    No.
19           Q.    Okay.  Any other certifications or training
20      that you've received?
21           A.    Renal -- Certified renal nutritionist.
22           Q.    Okay.  What is that?  I don't know what it is.
23           A.    Renal medicine, we work with end-stage renal
24      disease patients who are on dialysis.
25           Q.    Okay.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1              A.    Uh-huh.
 2              Q.    Okay.  Could you tell me a little bit about
 3      your employment history?  Are you currently employed?
 4              A.    Yes.
 5              Q.    Where are you currently employed?
 6              A.    It's a co-owned Washington University DaVita
 7      Dialysis Clinic.
 8              Q.    Okay.  And what is your position title there?
 9              A.    A renal dietitian.
10              Q.    Okay.  Is that a full-time position?
11              A.    Yes.
12              Q.    How long have you been with DaVita?
13              A.    Well, since 1993 to currently, I have on and
14      off worked for them.  So, the most recent was I want to
15      say almost ten -- almost ten years ago.
16              Q.    Okay.  Sure, I understand that we're kind of
17      getting far back.  What did you do before that?
18              A.    So, since 1993, I've worked in dialysis as a
19      renal dietitian.  I had a one six-year period
20      approximately ten years ago where I did restaurant
21      inspections.
22              Q.    Okay.  And was that your full-time position?
23              A.    That was not full time.  That was contract
24      work.
25              Q.    Okay.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          A.    Probably about 20 hours a week.
 2          Q.    And when did you perform your restaurant
 3   inspection duties?
 4          A.    Did you say when?
 5          Q.    Yeah, what the time frame.
 6          A.    That -- Well, that period of time that I'm
 7   sorry I can't give you the exact dates.
 8          Q.    Sure.
 9          A.    It's been a while.  So, less than ten years
10   ago --
11          Q.    Okay.
12          A.    -- for about five years.
13          Q.    Okay.
14          A.    Uh-huh.
15          Q.    And DaVita, that's located here in the city --
16          A.    It is.
17          Q.    -- is that right?  Okay.  And your inspection
18   work, was that located in the city?
19          A.    No, the corporate office that I communicated
20   with is in Chicago.
21          Q.    Okay.
22          A.    And we were given assignments, long list of
23   restaurant assignments, and those restaurants would be
24   anywhere between Poplar Bluff --
25          Q.    Okay.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          A.    -- and Chicago.

 2          Q.    Okay.

 3          A.    A lot of traveling.

 4          Q.    Okay.  But did you remain in the county?  Did

 5     you live in the county during --

 6          A.    Yes.

 7          Q.    -- that time?  Okay.

 8          A.    Yes.

 9          Q.    How long have you been at your current

10     address?

11          A.    Sorry.  About 20 years.

12          Q.    Okay.  I want to ask you generally some things

13     about the ACLU.  Have you ever worked with the ACLU

14     before?

15          A.    Do you mean "worked" as?

16          Q.    Volunteered, worked, interned, been affiliated

17     with them in any way.

18          A.    Affiliated, yes.

19          Q.    And how so?

20          A.    So, as a legal observer --

21          Q.    Okay.

22          A.    -- sometimes ACLU legal observers would also

23     be on the ground and we would work together --

24          Q.    Okay.

25          A.    -- observing protests.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1      Q.   Okay.  And, so, it's from what you made it
2  sound like, the ACLU has their own legal observers, their
3  own group of legal observers would you say?
4      A.   I -- To be honest, I'm not that familiar with
5  the ACLU and what their programs are.  I just know that
6  in particular there was one legal observer who -- well,
7  one ACLU employee who was often out observing, as well.
8      Q.   Uh-huh.  Was --
9      A.   And sometimes we would do trainings together.
10      Q.   Do you know the name of that ACLU employee?
11      A.   Mustafa Abdullah.
12      Q.   And you said that you would see her out --
13      A.   Him, but...
14      Q.   -- him, I'm sorry --
15      A.   That's okay.
16      Q.   -- that you would see him out at protests?
17      A.   So, when I arrived to a protest, we're
18  connecting with all the legal observers and that would be
19  including Mustafa.
20      Q.   Okay.  And when you say "connecting" with
21  other legal observers, what do you mean?
22      A.   Just walk up to each other, say hello.
23      Q.   Ask whom you're affiliated with?
24      A.   Well, I would -- I know.  I know Mustafa, so I
25  wouldn't have to ask that, but...

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1      Q.    Okay.

2      A.    Uh-huh.

3      Q.    How many times would you say you've connected

4  with Mr. Mustafa at legal protests?

5      A.    Probably at least ten, maybe 20.

6      Q.    And have all of these protests been here in

7  the City of St. Louis or have they been elsewhere?

8      A.    Elsewhere, as well.

9      Q.    Okay.  What other places have you seen him at?

10      A.    From what I can remember right now, that would

11  be one of the locations was on the Highway 70 protest in,

12  I guess that's St. Charles.  It's just east of the

13  bridge --

14      Q.    Okay.

15      A.    -- on Highway 70.

16      Q.    And when was that?

17      A.    2015.

18      Q.    And what was the cause that you were

19  protesting at that time?

20      A.    Well, I -- I'm not a protestor, I'm a legal

21  observer, and Mustafa, as well, so we happened to be

22  partnered at that protest legal observing.

23      Q.    What was the cause or issue at that protest?

24      A.    It was a highway shutdown that the protestors

25  were --

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1        Q.   Concerning what issue?

2        A.   I mean, it was -- I would say in general, it

3   was a black liberation kind of, Black Lives Matter.

4        Q.   Okay.

5        A.   Uh-huh.

6        Q.   Any other times that you've seen Mr. Mustafa?

7        A.   Another time that comes to mind is The Loop

8   area near, say, Skinker and Forest Park Ave., like that

9   general neighborhood was another time.

10       Q.   When was that?

11       A.   2017.

12       Q.   Okay.

13       A.   And I don't --

14       Q.   Do you remember when?

15       A.   Oh, oh --

16       Q.   What months, I guess?

17       A.   -- you know what?  I'm sorry.  It could have

18  been 2017 -- No, it must have been 2016.  It was the

19  debate between Clinton and Trump at WashU.

20       Q.   Okay.

21       A.   And there certainly were other times and I

22  don't think at this moment I would be able to remembered

23  it.

24       Q.   That's fine.  But you said about ten times

25  that you've seen him?

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          A.   Yeah, maybe even --

 2          Q.   Okay.

 3          A.   -- more, yeah.

 4          Q.   At protests and demonstrations?

 5          A.   As legal observers; that's right.

 6          Q.   Okay.

 7          A.   Uh-huh.

 8          Q.   Any other affiliations you've had with the

 9   ACLU over than with Mr. Mustafa?

10          A.   No.

11          Q.   Has the ACLU ever represented you in any other

12   lawsuits?

13          A.   No.

14          Q.   Have you ever donated money to the ACLU?

15          A.   I -- I think one time maybe.

16          Q.   Do you remember when that was?

17          A.   When I give donations, it's usually ten, 20

18   dollars.  Do -- Are you asking me do I remember when?

19          Q.   Yes, when you donated to them.

20          A.   I believe it was the Trump inauguration or the

21   Trump --

22          Q.   Okay.

23          A.   -- election.

24          Q.   Okay.

25          A.   And maybe the Muslim ban time period when some
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

 1  lawsuits were.

 2       Q.   Okay.  So, that would have been what, around

 3  2016 or 2017?

 4       A.   Yeah, Muslim ban 1.0, the first one.

 5       Q.   Are you aware of an organization called the

 6  Arch City Defenders?

 7       A.   Yes.

 8       Q.   Okay.  And how do you know of them?

 9       A.   Just in the media.

10       Q.   Okay.

11       A.   They're very active, so I read -- I read what

12  they're publishing.

13       Q.   Okay.  Do you know of anyone in their

14  leadership?

15       A.   No.

16       Q.   Okay.  Have you ever worked with the Arch City

17  Defenders before?

18       A.   No.

19       Q.   Ever hired them to represent you?

20       A.   No.

21       Q.   Ever donated money to them?

22       A.   I've been to a trivia night.

23       Q.   Okay.  Do you remember when that was?

24       A.   Approximately one year ago.

25       Q.   Okay.  And that was, I'm assuming, something

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
1   you pay to get into the trivia night --
2            A.    That's right.
3            Q.    -- and it's for -- it benefits them?
4            A.    That's right.
5            Q.    Okay.  You said that was last year sometime?
6            A.    That's right.
7            Q.    Or 2017?
8            A.    Excuse me.  The last one that they had.
9            Q.    Okay.
10           A.    And I've only been to one, yeah.
11           Q.    Okay.  All right.  Do you know a Megan Green,
12   she's an alderwoman?
13           A.    I know who she is, uh-huh.
14           Q.    And how do you know her or know of --
15           A.    I --
16           Q.    -- her?
17           A.    -- know that -- I know that she's an
18   alderperson and I see her at protests.
19           Q.    Uh-huh.
20           A.    Uh-huh.
21           Q.    Okay.  How many protests would you say you've
22   seen her at?
23           A.    It's possible that she was there at other ones
24   and I didn't notice her or see her --
25           Q.    Sure.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          A.    -- but I would say five.
 2          Q.    Okay.  And when you've had interactions with
 3   her at five protests or demonstrat- -- have these been at
 4   protests and demonstrations --
 5          A.    Yes.
 6          Q.    -- where you've encountered her?
 7          A.    Yes.
 8          Q.    Okay.  And what has been your interaction with
 9   her?
10          A.    "Hello.  Oh, you're Megan Green, aren't you?
11   I'm Pam."
12          Q.    Just introductory --
13          A.    Right.
14          Q.    -- type of things?  Have you had any contact
15   with her about this case?
16          A.    No.
17          Q.    Okay.  I want to talk a little bit about some
18   of your protest history.  I know that we've gone over
19   some things with Mr. Mustafa, but let's -- as we sit here
20   today, let's kind of move backwards.  So, what is the
21   most recent protest that you've attended?
22          A.    I haven't been many lately.  I would have
23   to -- to really think about that to...
24          Q.    That's okay.  You can take your time.
25          A.    Right, right.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          Q.   The Women's March just happened --
 2          A.   No.
 3          Q.   -- a couple weeks ago.  Did you attend that?
 4          A.   No.
 5          Q.   Okay.
 6          A.   I guess I'm going to say the Stockley weekend,
 7     and if there was something in between.  So, in the last
 8     year, I haven't done much --
 9          Q.   Okay.
10          A.   -- legal observing, right.
11          Q.   Okay.  You said you haven't done much with
12     what?
13          A.   Legal observing.
14          Q.   Okay, okay.  You said that you haven't done
15     much since then.  What does that mean?
16          A.   Yeah, because since I can't even recall --
17          Q.   Uh-huh.
18          A.   -- then it was either zero or one that I'm not
19     remembering.
20          Q.   Okay.  So, it's possible --
21          A.   Oh, I'm sorry.  I'm remembering.
22          Q.   Sure.
23          A.   So, I legal observed during that occupation
24     outside Roy Blunt's office.
25          Q.   And when was that?
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

 1          A.    That was maybe four months ago.

 2          Q.    Okay.  And where was that?

 3          A.    At the intersection of Hanley and starts with

 4     a "B."  His office there.

 5          Q.    Okay.

 6          A.    I'm not from St. Louis, so --

 7          Q.    Sure.

 8          A.    -- it is harder for me sometimes east, west,

 9     the street --

10          Q.    Right.

11          A.    -- but --

12          Q.    Yeah.

13          A.    -- without writing down.

14          Q.    I'm not from here, either --

15          A.    Uh-huh.

16          Q.    -- and it's hard for me, too, 'cause everyone

17     seems to know --

18          A.    I know.

19          Q.    -- what is north here and I...  Okay.  But

20     somewhere on Hanley Road you said?

21          A.    His office.

22          Q.    Okay.

23          A.    At the corner, uh-huh.

24          Q.    Okay.  And what cause or what issue was being

25     protested or demonstrated there?

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          A.   So, I believe it was Roy Blunt, his support of
 2   Trump in general --
 3          Q.   Okay.
 4          A.   -- on policies and...
 5          Q.   And what did you do there?
 6          A.   I was legal observing.
 7          Q.   Okay.  And we're going to -- we're going to
 8   get into this a little bit later when I ask you specific
 9   questions about that, but what -- what exactly does that
10   mean?
11          A.   So, we're present.  We do somewhat like to
12   send a message, kind of a deterrent message -- that's one
13   of the reasons that we're there -- to police who are
14   present.  It's our First Amendment right to -- to be
15   there and do that and we observe and record commands that
16   are given to protestors.  There -- We are observing
17   interactions between police and -- and protestors.
18          Q.   And you said that there -- that you're there
19   to send a message.  What message are you there to send?
20          A.   That the protestors' First Amendment rights
21   are being observed and we're not really protecting, we're
22   not there as intervenors protecting, but there's someone
23   there observing that those rights are being observed by
24   police.
25          Q.   Okay.  At this protest, was -- did you observe
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1    any mace or pepper spray or teargas being used?
2            A.   No, not while I was there.
3            Q.   Okay.  And on -- at this Hanley location, was
4    that in the city?
5            A.   That is in Clayton.
6            Q.   Okay.  Any other protests other than -- Like I
7    said, we're kind of moving backwards, so you said --
8            A.   I know.
9            Q.   -- about four months ago, you went to this
10   Roy Blunt demonstration or protest.
11           A.   That's right.
12           Q.   What would have been --
13           A.   Another one?
14           Q.   -- another incident before that?
15           A.   So, if you don't mind, if -- if you continue
16   your questions and it's possible that other events will
17   come to mind --
18           Q.   Uh-huh.
19           A.   -- and -- but at this time, it's -- if it
20   comes to mind, I'll be happy to tell you --
21           Q.   Okay.
22           A.   -- if.
23           Q.   So, moving backwards then, we talked about
24   Roy Blunt and then certainly you remember the Stockley
25   protest?

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          A.    That's right.
 2          Q.    Okay.  So, I want to kind of get into the
 3    details of -- of that.  I want to talk about the weekend
 4    of September 15, 2017.  How did you first hear about the
 5    Stockley verdict?
 6          A.    Television.
 7          Q.    Okay.  Do you remember when that was?
 8          A.    It was early morning.  Well, maybe not early
 9    morning.  9:00 a.m.-ish.
10          Q.    Okay.  And what was your reaction to the
11    verdict?
12          A.    Disappointed.
13          Q.    Uh-huh.  What, if anything, did you do in
14    response to the verdict?
15          A.    Went to work.
16          Q.    Okay.  And when you mean "work," do you mean
17    as a legal observer or do you mean --
18          A.    No.
19          Q.    -- as?
20          A.    At --
21          Q.    -- DaVita?
22          A.    That's right.
23          Q.    Okay.
24          A.    DaVita.
25          Q.    And what time was your schedule at DaVita,
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1    what time did you start work?

2            A.    Probably shortly after that announcement where

3    his -- where Smith's attorney was getting the

4    announcement on the news, so I would have to be guessing

5    like 9:00-ish.

6            Q.    Okay.  So, you went to work at 9:00?

7            A.    That's right.

8            Q.    Okay.  And then did you stay there all day?

9            A.    Basically.

10           Q.    Okay.  At any point -- So, this would have

11   been September 15?

12           A.    Uh-huh.

13           Q.    At any point, did you make your way from your

14   work to the Stockley protest --

15           A.    Yes.

16           Q.    -- and demonstrations?

17           A.    Yes.

18           Q.    At what time was that?

19           A.    About 3:30.

20           Q.    Okay.  Did you take off some time of work to

21   do that?

22           A.    I -- I do.  I take PTO --

23           Q.    Okay.

24           A.    -- from time to time.

25           Q.    Okay.  And, so, at 3:30, you made your way to

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

 1    where?

 2         A.    Outside the courthouse where protestors were

 3    assembled at the corner of Tucker and Market.

 4         Q.    Okay.  And in what capacity were you there,

 5    were you a legal observer?  Were you a --

 6         A.    That's --

 7         Q.    -- protestor?

 8         A.    Legal observer.

 9         Q.    And when you arrived, you said around 3:30; is

10    that right?

11         A.    Uh-huh.

12         Q.    What are some things -- Well, first let me ask

13    you this:  How -- How long did you stay there?

14         A.    There was a march that left that area pretty

15    shortly after 3:30.

16         Q.    Uh-huh.

17         A.    4:00 maybe.  So, I traveled with the march.

18         Q.    Okay.  So, you were there for about 30

19    minutes?

20         A.    Yes.

21         Q.    Okay.  And then after that 30 minutes, where

22    did you go?

23         A.    There was -- I accompanied the march as a

24    legal observer north on Tucker over to the convention

25    center.  They wrapped around the front of a casino, then

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1    back to maybe Broadway or something --

2            Q.    Uh-huh.

3            A.    -- and ended up back at -- not back at, but

4    Tucker and Clark.

5            Q.    Okay.  So, when you first arrived at Market

6    and Tucker, what were some things -- You said that was

7    about 3:30?

8            A.    That's right.

9            Q.    What are some of the things that you observed

10   there?

11           A.    A very large group of protestors.

12           Q.    How many would you say?

13           A.    300, 400.

14           Q.    And what were these protestors doing?

15           A.    They were milling around in the street.

16           Q.    Uh-huh.

17           A.    Police -- Police had blocked off the area --

18           Q.    Uh-huh.

19           A.    -- to traffic, so there was no traffic coming

20   through.

21           Q.    Do you know why they did that?

22           A.    I'm assuming because of people being in the

23   street.

24           Q.    Okay.  When you say you saw people milling

25   around, were there people holding signs?

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          A.    Yes.
 2          Q.    Were there people yelling?
 3          A.    Not that I can recall.  I...
 4          Q.    Were people chanting anything?
 5          A.    Probably.
 6          Q.    Do you remember what they were chanting?
 7          A.    I don't.  I want to be honest.  I don't
 8    remember exact --
 9          Q.    That's fine.
10          A.    -- wording.  It's not something that I'm sure
11    to take note of or anything, yeah.
12          Q.    Okay.  When you say that people were milling
13    around, what -- what are some of the things that you
14    heard from people?
15          A.    Just normal conversation, you know, about, I
16    guess, discussing the verdict and I would say, you know,
17    people were upset.
18          Q.    Uh-huh.  Did you hear people say, "Fuck the
19    police"?
20          A.    I just have no memory of exactly words said --
21          Q.    Okay.
22          A.    -- so I can't testify to that.
23          Q.    Okay.  Anything else that you saw other than a
24    large group of people milling around?
25          A.    No.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1          Q.    Do you remember any protestors blocking a bus?

2          A.    I -- No.

3          Q.    Do you remember any buses at the location at

4     all?

5          A.    No.

6          Q.    Do you remember anyone being pepper-sprayed or

7     maced at that location?

8          A.    No.

9          Q.    After you moved from Tucker to Market, you

10    said you kind of followed the protestors down by a casino

11    around Broadway.  What did you observe the protestors

12    doing at those locations?

13         A.    They were marching in the street.

14         Q.    Okay.

15         A.    Uh-huh.

16         Q.    Do you remember anything about what was being

17    said?

18         A.    I wouldn't be able to honestly recall exact --

19         Q.    Sure.

20         A.    -- wording.

21         Q.    Sure.

22         A.    Uh-huh.

23         Q.    At Tucker and Market or the location where you

24    described them kind of arching around through the

25    casinos, do you remember any of the protestors throwing

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1    rocks at the police?

2            A.    I've never seen that.

3            Q.    You've never seen that --

4            A.    That's right.

5            Q.    -- at all?

6            A.    I've never seen rocks thrown.  I personally

7    have never seen that.

8            Q.    At any protest you've been to; is that your

9    testimony?

10           A.    That's correct.

11           Q.    Okay.

12           A.    Uh-huh.

13           Q.    On September 15 of 2017, did you see any water

14   bottles being thrown at the police?

15           A.    No.

16           Q.    Do you know of any officers that were injured

17   during that time?

18           A.    On the -- At the intersection of Maryland

19   Plaza and Euclid the night of the 15th --

20           Q.    Uh-huh.

21           A.    -- there was an officer overcome by teargas

22   and taken away by ambulance.

23           Q.    And did you personally observe that?

24           A.    Yes.

25           Q.    Okay.

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1              A.    I was overcome by the teargas, as well.
 2              Q.    Okay.  So, at the point where the protestors
 3      are kind of around Broadway, about what time is that?
 4              A.    So, if we left approximately at 4:00, I would
 5      say a bit before 5:00.
 6              Q.    Okay.  And then where did you go?
 7              A.    The intersection of Clark and Tucker.
 8              Q.    And was that about five o'clock?
 9              A.    That's right.
10              Q.    Okay.  And what did you observe there?
11              A.    When I arrived there, it was a very tense
12      scene, like some interactions had -- had gone down at
13      that intersection before I arrived.  There was a police
14      line across Tucker south of Clark.  There were protestors
15      upset, running around.  Some of them looked like they had
16      been teargassed -- I'm sorry -- pepper-sprayed --
17              Q.    Uh-huh.
18              A.    -- because of the milk of mag. treatment --
19              Q.    Uh-huh.
20              A.    -- running down their eyes and clothing.  I
21      heard a dispersal order pretty quickly after I arrived
22      that scene.
23              Q.    Okay.
24              A.    I notified that it wasn't an amplified
25      dispersal order.  It was -- I -- I was not very far away
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

 1  from the officer and could barely hear it.  So, those are
 2  the kind of things that we take note of and I --
 3          Q.   Uh-huh.
 4          A.   -- so that's why I remember that.
 5          Q.   Uh-huh.  Do you remember what officer it was
 6  that gave the dispersal order?
 7          A.   I did write that down.  Ross.
 8          Q.   Okay.  And when you say you wrote that down,
 9  do you have, like, a legal pad or some kind of notations
10  that you --
11          A.   That's right.
12          Q.   -- make as you're observing?
13          A.   That's right.
14          Q.   Okay.
15          A.   Uh-huh.
16          Q.   And you had that on September 15 --
17          A.   Uh-huh.
18          Q.   -- 2017?
19          A.   That's right.
20          Q.   Okay.  And what about the following days, did
21  you have that notebook with you, as well?
22          A.   So, there are certainly times when I am
23  relying on my phone video --
24          Q.   Uh-huh.
25          A.   -- versus notes --

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          Q.   Uh-huh.
 2          A.   -- so I would have to think about your
 3   question carefully to know whether a particular day I was
 4   using video --
 5          Q.   Uh-huh.
 6          A.   -- versus notes.
 7          Q.   Uh-huh.  But it's likely that you have notes
 8   about that weekend?
 9          A.   Yes.
10          Q.   Okay.
11          A.   Maybe not every interaction, but yeah.
12          Q.   Sure.  And did you show those notes to your
13   attorney?
14          A.   I recall sharing videos --
15          Q.   Uh-huh.
16          A.   -- all my videos.
17          Q.   Okay.  And do you still have that notebook or
18   those notes that you had about that weekend?
19          A.   Yes.
20          Q.   Okay.
21          A.   'Cause that's evidence that we would share
22   with attorneys --
23          Q.   Okay.
24          A.   -- if asked to.
25          Q.   Okay.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1       A.    But I know I shared videos.

2       Q.    Right.

3       A.    Yeah.

4       Q.    And we -- And we've received some --

5       A.    Okay.

6       Q.    -- of those videos and I've -- I've been able

7    to -- to look through those.  It's my understanding that

8    you have some additional videos that you did not produce

9    or recently found that you are going to produce to your

10   attorneys; is that right?

11      A.    I mean, I -- I have -- any videos that I have

12   I've always had in possession.  And then when an attorney

13   asks me for -- they might ask me for a particular day --

14      Q.    Uh-huh.

15      A.    -- for a defendant or a plaintiff or myself in

16   this case --

17      Q.    Uh-huh.

18      A.    -- so I might be asked for a particular day.

19   That's usually -- or a particular event --

20      Q.    Uh-huh.

21      A.    -- of one day, so that's usually how it works,

22   so I honestly can't answer exactly what I was asked to

23   produce.

24            MR. ROTHERT:  If we could go off the record.

25       Can we go off the record for a second?

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

 1          MS. DUNCAN:  Yeah, yeah.

 2              (Questions by Ms. Duncan)

 3      Q.   So, ma'am, I understand that you've given your

 4  attorney all the videos that you have from September 15,

 5  2017; is that correct?

 6      A.   Yes.

 7      Q.   But you have additional videos from

 8  September 16, 17, and perhaps more?

 9      A.   That's correct.

10      Q.   Okay.  And you intend to give those videos to

11  your attorney or you already have; is that right?

12      A.   As I said, I -- I operate very specifically,

13  so if an attorney is asking me for, you know, it's my --

14  that's the purpose that -- the reason that I'm out there

15  is to -- to be a deterrent, you know, observe the

16  situations, and then the third thing is if an attorney

17  ever asks me for any video from a particular incident or

18  a particular day, I would never hold that back.

19      Q.   Sure.

20      A.   Yeah.

21      Q.   And is that any attorney's request or only --

22      A.   Any attorney of a --is a defendant or a

23  plaintiff that needs that.  And not just any attorney.

24  Right, it would be a specific attorney that's

25  representing someone.

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          Q.   Okay.
 2          A.   'Cause there's the chain of custody I'm
 3   familiar with, so...
 4          Q.   Okay.
 5          A.   Yeah.
 6          Q.   I want to take us back to September 15, and
 7   you said that you arrived at Clark and Tucker at about
 8   5:00 p.m. and that there was a tense scene --
 9          A.   Uh-huh.
10          Q.   -- 'cause there was some interactions that had
11   gone down.  What do you mean by interactions that had
12   gone down?
13          A.   So, I wasn't there, so I don't know, but when
14   I arrived, there was a heavy, like I can almost say I was
15   exposed, you know, it was a very heavy pepper spray type
16   chemicals in the air.
17          Q.   Uh-huh.
18          A.   So, and there were people upset, crying, maybe
19   screaming.
20          Q.   Okay.
21          A.   Not a lot of protestors, not 500.  I want to
22   say it was more like a hundred.
23          Q.   Okay, okay.  And you said that you saw a line
24   of police officers?
25          A.   Starting to kind of form.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
1          Q.    Okay.
2          A.    Right, not a solid, you know --
3          Q.    Uh-huh.
4          A.    -- yet.
5          Q.    Uh-huh.  At that point, did you see buses at
6     that intersection?
7          A.    I did -- I don't recall seeing a bus, no.
8          Q.    Okay.  You said that you heard a dispersal
9     order from Mr. Ross, Officer Ross?
10         A.    That's right.
11         Q.    Okay.  And at the time that he gave that
12    dispersal order, did you, in fact, disperse?
13         A.    No.
14         Q.    When you said that --
15         A.    I may have been on the -- I may have been
16    standing in the street and then moved to a sidewalk.
17    That's typically what --
18         Q.    Okay.
19         A.    -- I'll do if I'm dispersed to.
20         Q.    If you're asked to disperse, that's what you
21    will do, you'll move --
22         A.    I'll --
23         Q.    -- from the street to the sidewalk?
24         A.    Well, I -- I'm almost always on the sidewalk
25    anyway observing, but if I happen -- I believe when that
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1  dispersal order was given by -- by an Officer Ross, I --
2  I pretty much recall that I was a couple of -- a foot or
3  so from the curb and I stepped on the sidewalk.
4         Q.   Okay.
5         A.   That's right.
6         Q.   Okay.  But you said you didn't disperse?
7         A.   So, by --
8         Q.   You moved from the street to the sidewalk?
9         A.   Right, so by dispersing meaning -- to me I
10  followed -- I'm not sure if the dispersal order was to --
11  it wasn't explained, well, like, to leave the area or, so
12  I stepped onto the sidewalk, in my mind thinking that,
13  well, I'm on the street, so let me go where he's ordering
14  me to go to --
15         Q.   Uh-huh.
16         A.   -- a public sidewalk.
17         Q.   Did he said to -- Did he -- Did Mr. -- I'm
18  sorry.  Did Officer Ross say to move to the sidewalk?
19         A.   No, I'm sure that was not what he said.
20         Q.   He said to disperse?
21         A.   That's right.
22         Q.   Okay.  How many feet from the curb was the
23  sidewalk, roughly, if you remember?
24         A.   How many feet from the --
25         Q.   Yeah, I --

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          A.    -- curb --

 2          Q.    -- guess, how --

 3          A.    -- was the sidewalk?

 4          Q.    -- how long -- You said you were near the

 5    curb?

 6          A.    Right.

 7          Q.    I guess how many -- when he gave --

 8          A.    Maybe --

 9          Q.    -- that dispersal order, how far away did you

10    walk?

11          A.    About a foot or so.

12          Q.    Okay.

13          A.    It was I was close.

14          Q.    Anything else you remember seeing at Clark --

15    Well, let me ask you this:  Did you see anyone be maced,

16    pepper-sprayed, or teargassed at that location?  I

17    know that you said --

18          A.    Yes.

19          Q.    -- when you got there, you --

20          A.    I hadn't seen, but I smelled it.

21          Q.    Right.

22          A.    Uh-huh.

23          Q.    But after that, did you see or observe anyone

24    get maced, pepper-sprayed, or teargassed?

25          A.    I did.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1          Q.    Okay.  Do you remember who that would have

2    been?

3          A.    Myself.

4          Q.    Were you directly sprayed?

5          A.    Well, not like (indicating) from this

6    distance, but in my general area, yes.

7          Q.    Okay.  So, you were exposed to --

8          A.    Yes.

9          Q.    -- that would be accurate to say?

10         A.    Yes.

11         Q.    Okay.

12         A.    And then others, as well, but...

13         Q.    Do you remember anyone else that was there

14   that was --

15         A.    Yes.

16         Q.    -- pepper-sprayed --

17         A.    Yes.

18         Q.    -- or maced?

19         A.    There's three locations that I'm thinking of.

20   One was at the -- a few feet north of the intersection,

21   north and on the west side of Tucker, at that

22   intersection there was spraying occurring as a police

23   line was moving.  There was another line of police,

24   another time that they were spraying and it was

25   Officer Rossomanno, across -- there was a police line

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1   starting to form across Clark just west of Tucker.  And

2   then the most egregious spraying that was really quite

3   upsetting to me was occurred on the sidewalk on the Clark

4   north side sidewalk just outside the City Hall parking

5   lot, which there's a wall, brick wall there.

6       Q.   Uh-huh.

7       A.   There were protestors, a couple of protestors,

8   not that many, complying with an order to move along

9   towards Tucker on that Clark sidewalk and it was a riot

10  line of police moving people and what I observed from a

11  close distance was an officer, not Rossomanno, an officer

12  jumped out from behind that tight police line and sprayed

13  another legal observer right in the face from this

14  distance (indicating) and then jumped back behind.

15      Q.   And "from this distance," you're demonstrating

16  a couple --

17      A.   Literally --

18      Q.   -- of feet away?

19      A.   That's right.

20      Q.   Okay.

21      A.   Right in the eyes.

22      Q.   Who was the legal observer that you saw that

23  was maced?

24      A.   Ken Blumenthal.

25      Q.   Okay.

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          A.   He's an attorney.
 2          Q.   In these -- How close were you to Ken when he
 3   was maced?
 4          A.   The distance between Brendan and I (pointing).
 5          Q.   Would you say that's three or four feet?
 6          A.   Maybe five.
 7          Q.   Okay.
 8          A.   Uh-huh.  There were other protestors sprayed
 9   at that moment, as well --
10          Q.   Uh-huh.
11          A.   -- but to be honest, I was focused on Ken.
12          Q.   Okay.
13          A.   Uh-huh.  And if I can just say that about an
14   hour later, when that scene was dying down, I saw him
15   in -- right in front of City Hall unable to -- to barely
16   open his eyes and in extreme pain and I was trying to --
17   he said he wouldn't be able to drive home and I was
18   thinking -- we were trying to work out would he call his
19   wife or what -- what we were going to do next, but...
20          Q.   Uh-huh.  I want to take us back a little bit
21   before Ken Blumenthal.  You said --
22          A.   Uh-huh.
23          Q.   -- you saw some spraying happening.  Do you
24   know what -- what the situation was that caused pepper
25   spray or mace to be deployed?
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
1          A.   So, the first time that I saw it at that
2    intersection I believe was on that same sidewalk that
3    they were moving Ken and et cetera--
4          Q.   Uh-huh.
5          A.   -- off of, but -- but it was further to the
6    west on that sidewalk --
7          Q.   Okay.
8          A.   -- further from that corner.  So, there was --
9    there were a couple of protestors, maybe 20 or 30, that
10   were not blocking the street.  They were on the sidewalk
11   and they were a little bit in the street, as well.
12   Probably not even a whole lane.  And they were -- But I
13   can't recall hearing a dispersal order at that time, but
14   I heard, "Move back," that kind of language, "Move back."
15         Q.   And did the protestors move back?
16         A.   I don't recall.
17         Q.   Okay.  And is it at that point that mace or
18   pepper spray was deployed?
19         A.   Yes.
20         Q.   Okay.
21         A.   That was one of the times.
22         Q.   Okay.  Any time after that other than the
23   "move back" situation and the situation with
24   Ken Blumenthal that you remember?
25         A.   Right.  So, there was that police line that
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1    was starting to form that wasn't solid yet, but just west

2    of Tucker on Clark, across Clark.  So, I was standing on

3    the south end of that police line, very close to the curb

4    there, and the spraying was happening right there.

5              Q.   Do you know what caused the spray to be

6    deployed in that situation?

7              A.   Again, it was chaotic.  To me it seemed like

8    the police response was chaotic, as well --

9              Q.   Uh-huh.

10             A.   -- 'cause there was kind of police scattered

11   around.  It looked like they were trying to form a line,

12   but it wasn't clear to me where they were trying to move

13   the protestors to.  Eventually I -- I could figure that

14   out.  It was they were trying to move people towards

15   Tucker --

16             Q.   Uh-huh.

17             A.   -- but at that moment where there was spraying

18   happening and a choke hold, by the way, there was that

19   same language, "Move back" --

20             Q.   Uh-huh.

21             A.   -- and there was spraying happening at the

22   same time.

23             Q.   Do you know whether protestors moved back when

24   they were commanded to?

25             A.   I did observe -- I can't observe everything,

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1   you know, at that whole intersection, right?

2          Q.   Uh-huh.

3          A.   So, what I observed in that location was a

4   couple of protestors complying by moving quickly from the

5   west to the -- towards Tucker and being sprayed and choke

6   hold dragged to the ground.

7          Q.   Okay.  When you say "choke hold," what do you

8   mean?

9          A.   So, there was a particular guy who was

10  basically running backwards.  I'm assuming complying

11  because he was moving in that direction.  And from

12  behind, who he would not have been able to see, he was

13  grabbed by an officer like this (demonstrating) roughly

14  and thrown to the ground.

15         Q.   Do you know what would have -- what would have

16  happened before that to -- to cause the officer to react

17  in that way?

18         A.   He was moving quickly backwards.

19         Q.   Uh-huh.

20         A.   But I can't predict.  I -- Yeah.

21         Q.   So, you don't know, but all you -- all you saw

22  was a person moving back quickly and then an officer

23  restraining --

24         A.   That's right.

25         Q.   -- the -- Okay.  And was this person a

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
1   protestor?

2        A.   Yes.

3        Q.   Okay.   Anything else that you observed there

4   at Clark and Tucker?

5        A.   There was another spraying.   It was either

6   very shortly before or very shortly after the

7   Ken Blumenthal spraying and it was in the street on

8   Tucker just a few feet east of Clark.

9        Q.   And was this towards an individual protestor?

10       A.   So, they -- the police line was trying to

11  continue to move protestors, like, looks like completely

12  off of Clark and onto Tucker and then maybe like even

13  north of Tuck- -- on Tucker.

14       Q.   Uh-huh.

15       A.   And there was a woman, an older woman, an

16  elderly woman in a white skirt, red top, tall woman who

17  was standing in that -- right in that intersection as

18  that line was moving, that --

19       Q.   Uh-huh.

20       A.   -- cop line was moving, and I noticed that she

21  was pushed to the ground by police.

22       Q.   Uh-huh.

23       A.   And a young man protestor moved to that area

24  I'm assuming to assist her, I don't know, but he seemed

25  upset and he approached her and that's when some spraying
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1   occurred in our direction.  I'm considering myself
 2   sprayed because I was maybe 15 feet away and it was --
 3          Q.   Okay.
 4          A.   -- made me cough and...
 5          Q.   Okay.  So, you saw a tall woman standing in
 6   the intersection and the police are trying to --
 7   they're -- they're moving people back; is that correct?
 8          A.   They're -- They're trying to move everybody,
 9   right, onto Tucker and kind of like north of --
10          Q.   North on Tucker?
11          A.   -- that inter- -- That's right.
12          Q.   And she's standing in the middle of the
13   street?
14          A.   She was.  I wondered if she really understood
15   or heard.
16          Q.   Uh-huh.
17          A.   That -- That occurred to me that she might not
18   have --
19          Q.   Did you --
20          A.   -- understood.
21          Q.   Did you hear the police say, "Move back"?
22          A.   I would have to consult my notes.  I -- I'm
23   assuming that I heard, "Move back."
24          Q.   Uh-huh.
25          A.   Uh-huh.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1      Q.   And then was she moving back or was she
2  continuing to stand?
3      A.   She was just standing there.  She seemed a
4  little bit dazed --
5      Q.   Uh-huh.
6      A.   -- to me.  She was elderly and I wondered if
7  she was fully with it.
8      Q.   Uh-huh.  Any other spraying, macing,
9  teargassing, pepper spray that you saw deployed?
10      A.   No, those were the three.
11      Q.   Okay.
12      A.   And I did hear a dispersal order, as I said,
13  from Officer Ross --
14      Q.   Uh-huh.
15      A.   -- but I don't recall hearing any chemical
16  munition warning at that location.
17      Q.   And at what point did you hear the dispersal
18  order from Officer Ross?
19      A.   As when I approached around 5:00, 5:15.
20      Q.   Okay.  Any other dispersal orders that you
21  heard other than from this -- from Officer Ross?
22      A.   Not that I can recall.
23      Q.   After you were at Clark and Tucker, where did
24  you go?
25      A.   At approximately eight o'clock was when I

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1    arrived at Central West End, Maryland Plaza and Euclid.

2         Q.   So, when did you -- did you leave Clark and

3    Tucker at around that time?

4         A.   I left there around 6:00, I think.

5         Q.   Between the hours of 6:00 to 8:00 p.m. on

6    September 15, what did you do?

7         A.   Excuse me.  I -- I don't recall other than

8    I -- I -- I know that I parked over at Whole Foods and

9    probably went in there to get something to eat and just

10   sit and rest in my car.  That's an approximate.

11        Q.   Sure.  And at 8:00 p.m., you said you were at

12   Maryland and Euclid?

13        A.   That's right.

14        Q.   And what was happening at Maryland and Euclid?

15        A.   Just people sitting, congregating.  Very large

16   group of protestors.  I want to say probably not a

17   thousand, but 800, something like that, 500.  So, just in

18   the intersection.  I -- I guess there was some chanting.

19   I can't remember the chants --

20        Q.   Okay.

21        A.   -- if there were, but...

22        Q.   Is this the crowd that descended onto the

23   mayor's house?

24        A.   It was a very large crowd and I'm pretty

25   certain that all of those people did not go to the

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1   mayor's house.  There wasn't 800 people at the mayor's
 2   house that I recall.
 3            Q.   Okay.
 4            A.   So, I can't say that all of them, no.
 5            Q.   Right.  But do you remember that a part of
 6   that group --
 7            A.   Yes.
 8            Q.   -- at least went to the mayor's house?
 9            A.   That's right.
10            Q.   Okay.  And did you follow them to the mayor's
11   house?
12            A.   I did.
13            Q.   Okay.  At the mayor's house, how many people
14   would you say were there?
15            A.   Several hundred.
16            Q.   Okay.  And what did you observe?
17            A.   We were not there very long.  I honestly
18   needed to sit down for one minute and tie my shoes, so I
19   personally, me and another legal observer, were sitting
20   on a large storm sewer curb that was located almost at
21   the intersection of Westminster and Lake --
22            Q.   Okay.
23            A.   -- to the side of her house, not the front of
24   her house, but that side, so we were sitting on that curb
25   tying shoes, resting for a minute facing away from her
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1    house and she and I heard a very loud crash right behind
2    us.  It was very startling.  So --
3            Q.   What do you mean by "crash," you mean
4    broken --
5            A.   Just --
6            Q.   -- glass?  You mean vehicles --
7            A.   Yeah.
8            Q.   -- colliding?
9            A.   Like at the -- at the moment, I didn't know
10   what it was, you know, but it was a startling loud noise
11   that, yeah, I think sounded like a window breaking.
12           Q.   Okay.
13           A.   Right.
14           Q.   Do you know whether -- at that location
15   whether some protestors were throwing rocks at the
16   mayor's house?
17           A.   I don't -- I didn't observe that.  I didn't
18   observe what happened behind me, that loud crash.  I was
19   assuming it was some -- a hard object.  I don't know if
20   it was a rock or what it was.
21           Q.   Uh-huh.
22           A.   I also don't know if it was a protestor,
23   but -- but someone in the crowd did that.
24           Q.   Uh-huh, okay.  What else did you observe by
25   way of protestor activity at the mayor's house?

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          A.   I -- We were there a very short time, so just
 2    congregating, probably some chanting.
 3          Q.   Uh-huh.  Did you see any paint being thrown?
 4          A.   I didn't.  I heard about that from someone.  I
 5    don't -- I may have seen it.  I'm not remembering the
 6    paint.
 7          Q.   Okay.  Did you see any rocks being thrown by
 8    protestors?
 9          A.   I did not.
10          Q.   Okay.  Did you see any water bottles being
11    thrown by protestors?
12          A.   I honestly don't recall seeing that.  I'm not
13    saying it didn't happen.  I didn't ob-
14          Q.   That's fine.
15          A.   I didn't observe it, yeah.
16          Q.   That's fine.  I'm just --
17          A.   Okay.
18          Q.   -- asking about your recollection.
19          A.   Uh-huh.
20          Q.   When did you end up leaving the mayor's house?
21          A.   About 10:00.
22          Q.   Okay.  So, how long were you at the mayor's --
23          A.   About 15 minutes.
24          Q.   Okay.  So, from the time of 8:45 to 9:45 p.m.,
25    you were at Maryland and Euclid or you were traveling
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1   with the group?
 2           A.    Traveling.
 3           Q.    Okay.  And what is the route that you-all
 4   took?
 5           A.    I believe it was north on Euclid and then west
 6   on a gated community type street, which I want to say was
 7   Waterman.
 8           Q.    Okay.
 9           A.    So, that one block, crossed over Kings., and
10   continued on Waterman.
11           Q.    Okay.  How were the police stationed during
12   this march?
13           A.    So, also if I can say because I don't know if
14   we're going back to the mayor's house at some point
15   because -- can I tell you what I observed that was very
16   disturbing at the mayor's house or would that be later?
17           Q.    I --
18           A.    It was a --
19           Q.    Sure.
20           A.    It was a chemical deployment that...
21           Q.    Right.  Okay.
22           A.    should I tell you about that?
23           Q.    Sure.
24           A.    So, that was about 9:45 or 10:00 --
25           Q.    Uh-huh.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1        A.    -- when -- well, immediately after the loud
2    noise, the window breaking --
3        Q.    Uh-huh.
4        A.    -- so there were sirens.  Police were coming.
5        Q.    Uh-huh.
6        A.    So, the crowd was -- I would say the crowd
7    seemed very startled by that noise, as well, and left,
8    they -- was leaving the area.
9        Q.    Uh-huh.
10       A.    We remained, a group of LOs, because there
11   were still ten or 20 protestors there in the intersection
12   of her house.  So, when the -- when that first deployment
13   of police arrived, it was about five of them.
14       Q.    Uh-huh.
15       A.    They jumped out of their car, said, "Move
16   back," and immediately pepper-sprayed at close range two
17   black males and one black female, young --
18       Q.    Uh-huh.
19       A.    -- people.
20       Q.    Uh-huh.  Before --
21       A.    So, that was disturbing.  There was no order
22   that that -- that the munitions were going to be
23   deployed.
24       Q.    Uh-huh.
25       A.    There was a "move back" order.

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1          Q.    Okay.  And did the protestors move back?
2          A.    They were running at the time.  They were
3    moving fast --
4          Q.    Uh-huh.
5          A.    -- along the sidewalk when the police arrived,
6    I believe from Westminster, you know, from the east
7    side --
8          Q.    Uh-huh.
9          A.    -- I think they arrived, they drove up, jumped
10   out of their cars.  So, those three young people were
11   running away --
12         Q.    Uh-huh.
13         A.    -- on the sidewalk and were sprayed.
14         Q.    Uh-huh.
15         A.    Running away --
16         Q.    But you --
17         A.    -- with their face towards the police --
18         Q.    Uh-huh.
19         A.    -- you know, on the backwards.
20         Q.    Uh-huh.  But you didn't see who -- your
21   testimony is you didn't see who was throwing things at
22   the mayor's house, right?
23         A.    I didn't.  I didn't.
24         Q.    And you don't know --
25         A.    My --

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1      Q.    -- who broke the window?

2      A.    I do not.

3      Q.    Okay.

4      A.    No.  And that --

5      Q.    Any --

6      A.    -- those -- the -- those three protestors or,

7  you know, young people -- I'm assuming they're prote- --

8  that were sprayed at point-blank range --

9      Q.    Uh-huh.

10     A.    -- crossed over to our side of the street and

11 other protestors came and flushed their eyes --

12     Q.    Uh-huh.

13     A.    -- with the milk of mag. and they were in

14 pretty extreme pain --

15     Q.    Uh-huh.

16     A.    -- so it was upsetting to see that.

17     Q.    Uh-huh.  You said that there were -- Well, I

18 guess let me -- At the time that you -- What commands did

19 you hear were given at the mayor's house by police?

20     A.    The police were not at the mayor's house --

21     Q.    Uh-huh.

22     A.    -- when we arrived.  The first time I -- that

23 I'm aware of that the police were at the mayor's house

24 was after the window breaking.

25     Q.    Okay.  Before, just to back up a little, from,

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1   I guess, eight o'clock to 9:45, you said that you were
 2   following the crowd of protestors.
 3          A.   That's right.
 4          Q.   What is the route that you took?
 5          A.   Well, as I said earlier, north on Euclid --
 6          Q.   Okay.
 7          A.   -- west on Waterman, I believe --
 8          Q.   Okay.
 9          A.   -- and north on Lake.
10          Q.   What is some protest activity that you
11   observed during that time?
12          A.   So, if you can believe it, you know, it was a
13   huge crowd, I would say most of them were on the
14   sidewalk, but there were some in the street.
15          Q.   Uh-huh.  Okay.
16          A.   So, just in the street marching, that's --
17          Q.   And what --
18          A.   -- that's the protest activity.  And probably
19   some signs.
20          Q.   Uh-huh.
21          A.   Some chanting.
22          Q.   Uh-huh.  Uh-huh.  Okay.  Anything else you
23   remember observing from eight o'clock to 9:45 on
24   September 15?
25          A.   No.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1        Q.   Okay.  You said you left the mayor's house at

2   10:30?

3        A.   No.

4        Q.   Around ten o'clock?

5        A.   Nine -- Let's see.  I think we arrived around

6   9:45 and moved away from the house starting around 10:00.

7        Q.   Okay.  And you said there were several hundred

8   people there, right?

9        A.   I would say, well, at least a hundred, but...

10       Q.   Okay.  Why were you moving away from that

11  area?

12       A.   Being myself?

13       Q.   Uh-huh.

14       A.   Well, the protestors were leaving the area --

15       Q.   Okay.

16       A.   -- except for a few, and which is why I

17  stayed.

18       Q.   Uh-huh.  And then at around -- What do you do

19  after that?  Then after the mayor's house, what did you

20  do?

21       A.   So, the protestors moved to the intersection

22  of Lake and Waterman --

23       Q.   Uh-huh.

24       A.   -- and that's when I saw a very large police

25  presence, probably a hundred, and they were giving --

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1   Let's see.  I believe that they -- they were forming a
 2   line kind of kitty-corner from, so it was a little
 3   confusing, the orders at that time, because they were
 4   coming in from the east and they were starting to kind of
 5   line up between the southwest corner of that intersection
 6   over across to the west north instead of, like, across --
 7            Q.   Uh-huh.
 8            A.   -- Waterman, it was more like a zigzaggy
 9   thing.  Do you want me to continue?  And -- And
10   so that --
11            Q.   Sure.
12            A.   Yeah, it was a very large police presence --
13            Q.   Uh-huh.
14            A.   -- and the orders being given were to head
15   west on Waterman.  And I had several protestors approach
16   me and to say, "Do you know where we're supposed to go
17   because we just headed west and we were ordered by some
18   other police officers to head" -- I'm sorry -- "We were
19   headed east as we were told to, and when we tried to do
20   that, we were told by other officers to head west on
21   Waterman" --
22            Q.   Uh-huh.
23            A.   -- so there was a discrepancy in orders.
24            Q.   Uh-huh.  And after that, what did you do;
25   where did you go?
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          A.    Well, I stood at that intersection observing
 2   police at that intersection for a fairly long period of
 3   time.  Well, fifteen minutes anyway.
 4          Q.    Uh-huh, okay.  And then what did you do?
 5          A.    Then the police started to form -- more and
 6   more police came, County, probably up to maybe even more
 7   than a hundred, and they started to form a more solid
 8   line across Waterman to the point of sidewalk to
 9   sidewalk --
10          Q.    Uh-huh.
11          A.    -- blocking egress --
12          Q.    Uh-huh.
13          A.    -- as far as east to west.
14          Q.    Uh-huh.  And then what did -- what happened?
15          A.    So, I -- So -- I'm sorry.  So, I moved west.
16          Q.    Okay.  West on Waterman?
17          A.    That's right.
18          Q.    Okay.  And this was about at what time?
19          A.    10:15.
20          Q.    Okay, and then what happened; where did you go
21   then?
22          A.    So, there was an order, I believe it was an
23   amplified order, which was nice, maybe even a van
24   amplified order to disperse west on Waterman.
25          Q.    Okay.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          A.   So, I --
 2          Q.   At this point, how many protestors are -- are
 3    there in this crowd?
 4          A.   I know that there was quite a few, like maybe
 5    50 or so, that made it east before there was a change in
 6    orders to go west and then I didn't observe anything
 7    headed that way.  But how many protestors on the west
 8    side?  Under a hundred.  Maybe 50.
 9          Q.   Okay.  And when you were given the order to
10    disperse west on Waterman, did the protestors, in fact,
11    disperse?
12          A.   Yes, moving west towards Union --
13          Q.   Okay.
14          A.   -- uh-huh.
15          Q.   And did they move there as a group or did they
16    go their -- their separate ways?
17          A.   Well, so, I would say more or less as a group
18    kind of moving slowly --
19          Q.   Uh-huh.
20          A.   -- west.
21          Q.   Okay.
22          A.   Not a quick scatter, uh-huh.
23          Q.   Okay.  So, they stayed as a group and went
24    west on Waterman is your recollection?
25          A.   There may have been 30 or so that were kind of
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1    I would call a group and then maybe another ten or 20

2    that were loosely still further west.

3           Q.    Okay.  So, the crowd goes west toward Union

4    and this is about at 10:15?

5           A.    Uh-huh.

6           Q.    Okay.  So, then what did you observe after

7    that?  Where did you go?

8           A.    So, then there was teargas deployed.

9           Q.    Okay.

10          A.    Uh-huh.  And I believe --

11          Q.    Towards who?

12          A.    -- it was -- Well, I believe that there was a

13   canister -- excuse me -- shot to the east first and

14   then --

15          Q.    Did you see that?

16          A.    I saw a -- You know, I'm -- I saw a cloud that

17   I believe was teargas to the east seconds before a

18   canister was shot our way to the west.

19          Q.    Okay.  You say that it was shot.

20          A.    Right.

21          Q.    Do you know from --

22          A.    I don't know --

23          Q.    -- what it was shot?

24          A.    I don't --

25          Q.    -- from whom?

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1        A.    -- know anything more than I just -- I
2  observed smoke in that -- I mean, I observed gas --
3        Q.    Okay.
4        A.    -- in that in the general -- in the air just
5  east of.
6        Q.    Okay.  And do you know where the canister was
7  coming from?
8        A.    So, the -- the canister that I actually
9  observed the canister --
10       Q.    Uh-huh.
11       A.    -- on the ground behind me came from the
12  direction of the police line --
13       Q.    Uh-huh.
14       A.    -- at that intersection --
15       Q.    Okay.
16       A.    -- I believe.
17       Q.    And it dispersed what?  What was in the air at
18  that point?
19       A.    Teargas.
20       Q.    Okay.
21       A.    Uh-huh.
22       Q.    And you said there's about 50 people at this
23  point?
24       A.    I believe so.
25       Q.    Okay.  And this was after the dispersal order

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

 1   was given?

 2         A.    Yes.

 3         Q.    Okay.  And at that point, teargas was

 4   deployed --

 5         A.    That's right.

 6         Q.    -- is that your understanding?

 7         A.    And I don't recall a -- I just want to make

 8   sure that I note that.  I don't recall hearing a chemical

 9   munitions deployment dispersal order being given.

10         Q.    But it was your testimony that you heard the

11   dispersal order to go west on Waterman --

12         A.    Yes.

13         Q.    -- right?

14         A.    Yes.

15         Q.    Okay.  And then after that, what happened?

16         A.    So, I was with a couple of other legal

17   observers and we were overcome by the gas.  It was very

18   painful, choking, and your throat.  I had difficulty

19   breathing for a bit, eyes burning, and we raced down an

20   alley, I think an alley, and just kind of ducked down,

21   concerned that there might be more.  Not -- Not clear to

22   us how to leave the area because the teargas landed to

23   the west of us where --

24         Q.    Uh-huh.

25         A.    -- we were told to disperse.  We were told to

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1    disperse west.  The canister lands to the west of us.

2    So, we travel down an alleyway that unfortunately became

3    a dead end.  So, and -- and just sat behind there and

4    gave each other medical assistance --

5         Q.   Uh-huh.

6         A.   -- with the milk of mag. and so forth and we

7    were just kind of in that medical huddle for a good ten

8    minutes until we started to feel better and then exited

9    west to Union.

10        Q.   Okay.  What did you do west of Union?

11        A.   We walked as a group north -- I'm sorry --

12   south on Union and then west on Lindell.

13        Q.   Okay.  And were there a group of you at this

14   point?

15        A.   Group of LOs.

16        Q.   Okay.

17        A.   Uh-huh.

18        Q.   And what were you doing?  Were you looking for

19   protestors to observe at that point?

20        A.   Yes.

21        Q.   Were you --

22        A.   We -- We were concerned about whether the

23   protestors had a legal observer.  The protestors that had

24   dispersed east --

25        Q.   Uh-huh.

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          A.    -- we didn't know if there was a legal
 2    observer with them or not, so, and we knew that a group
 3    had traveled east --
 4          Q.    Uh-huh.
 5          A.    -- so that's where we were headed.
 6          Q.    Okay.  And did you, in fact, catch up with the
 7    other group?
 8          A.    Yes.
 9          Q.    And where was this, was this on Lindell?
10          A.    So -- So -- No, we were by ourselves until we
11    arrived Kingshighway, traveled north on Kings., and maybe
12    less -- certainly less than a block.  I don't -- Maybe
13    500 feet or something or a thousand feet south of the
14    CRC, the Central Reform Cov- -- yeah, to the CRC.
15          Q.    Okay.
16          A.    There was a line of riot police across
17    Kingshighway sidewalk to sidewalk --
18          Q.    Uh-huh.
19          A.    -- so they were preventing us from being able
20    to observe protestors --
21          Q.    Uh-huh.
22          A.    -- that were on the other side of that line.
23          Q.    Uh-huh.  Did they tell you to move back?
24          A.    Yeah, that was the command, I believe, "Move
25    back."
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1        Q.    And did you do that?

2        A.    Yes.

3        Q.    Okay.  And where did you move back to?

4        A.    So, that line of police was pushing everyone.

5   Unfortunately, I did overhear protestors saying -- asking

6   officers if they could get to their cars that were just

7   on the other side of that line and they were told no,

8   move -- move back --

9        Q.    Uh-huh.

10       A.    -- so everyone was pushed south on Kings.  And

11  then people moved east on Maryland Plaza.  The riot line

12  of police followed them and continued to push them.

13       Q.    At this point, did you -- how many numbers of

14  people are we talking, still the 30 to 50?  Forty to 50?

15       A.    Right, or -- yeah.

16       Q.    Okay.  Did you hear a dispersal order there on

17  South Kingshighway after you were told to move back?

18       A.    I -- I heard just, "Move back," is what I

19  recall --

20       Q.    Okay.

21       A.    -- at this time.

22       Q.    Okay.  So, you're there on South Kingshighway,

23  they're telling you to move back.  Where do you guys go?

24       A.    Maryland Plaza to the intersection of Euclid.

25       Q.    Okay.  And at that point, what happens, if

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1    anything?  Is this still the 30 --
2        A.    The li- -
3        Q.    -- the 40 to --
4        A.    There was still --
5        Q.    -- 50 people?
6        A.    -- like a -- Yes.  So, still a line, the
7    police line.  They removed people who were sitting at
8    restaurant outdoor patio equipment and they were still
9    sidewalk to sidewalk.  Basically no way to move west of
10   that line.
11       Q.    Uh-huh.
12       A.    And they stopped, the police line stopped, at
13   that intersection just west of Euclid.
14       Q.    Okay.
15       A.    Ten feet west of it.
16       Q.    Okay.  And then what happened, if anything?
17       A.    They just stood there.  The protest activity I
18   guess you could say was -- was just people there.
19       Q.    Uh-huh.
20       A.    Chanting maybe.  And police just there.
21       Q.    Okay.
22       A.    So, you're asking what happened --
23       Q.    So, there was kind of --
24       A.    -- but...
25       Q.    -- a standoff then?

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          A.   Yeah.
 2          Q.   They were holding their ground, protestors
 3   weren't leaving; is that fair?
 4          A.   We stay until the last protestor is, so
 5   they -- it may -- there may have been protestors that
 6   left at that point I have to say, but there must have
 7   been at least a dozen or so left or else we would have
 8   left, too.
 9          Q.   Uh-huh.  And then at that point, what happens?
10   There's about a dozen protestors --
11          A.   Right.
12          Q.   -- the police line is held?
13          A.   Right.
14          Q.   What happens, if anything?
15          A.   I'm remembering an escalation with a window
16   that I did not observe, but I believe I heard a
17   shattering of a window pretty close around that time and
18   definitely that intersection and I want to say it might
19   have been a bar or something from the -- a restaurant
20   that is -- there was a window shattering on Maryland
21   Plaza, that's where the window was, and the restaurant
22   was that intersection.  Maybe --
23          Q.   Do you know how the window was shattered?
24          A.   No, I don't.  I remember hearing, I believe.
25   I believe I remember hearing it.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1      Q.   Hearing the window shatter or hearing how the

2  window shattered?

3      A.   I think I heard it.  And --

4      Q.   Okay.

5      A.   I mean, I heard that, yeah.

6      Q.   Do you remember how --

7      A.   No.

8      Q.   -- whether a protestor broke the window or

9  not?

10      A.   No, I -- I don't know that.

11      Q.   Okay.  After the shattering of a window, what

12  did you observe?

13      A.   There was an intensification of the police, so

14  the -- that police line I believe moved pretty rapidly to

15  push people north on Euclid.

16      Q.   Okay.  And did the crowd comply?

17      A.   Yes.

18      Q.   Okay.  And then after they're at North Euclid,

19  where did they go?  At what time is this, approximately?

20      A.   After midnight.

21      Q.   Okay.

22      A.   Between midnight and 1:00 a.m., I believe.

23      Q.   Okay.

24      A.   So, protestors moved north on Euclid and I'm

25  pretty sure it was a -- it was a sidewalk-to-sidewalk

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1    blockade --

2           Q.   Uh-huh.

3           A.    -- you know, and they were asked to keep

4    moving, keep moving, keep moving.

5           Q.   Did they, in fact, keep moving?

6           A.   Yes.  Yeah.

7           Q.   Okay.  Okay.  Where did they go after that?

8    We're down to about a dozen or so protes-

9           A.   Right.

10          Q.    -- tors, right?

11          A.   Right.  I -- What I remember is that police

12   line -- that tensions reduced --

13          Q.   Uh-huh.

14          A.    -- and the police line kind of retreated and

15   pro- -- and a couple of protestors moving back south on

16   Euclid.

17          Q.   Uh-huh.

18          A.   And that's where me and two other legal

19   observers positioned ourselves right outside that Whiskey

20   restaurant, so at the intersection there.

21          Q.   Uh-huh.

22          A.   And then there wasn't really much happening.

23   It was just police and protestors kind of just hanging

24   around.

25          Q.   Uh-huh.

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          A.   Wasn't anything.  But I heard a loud noise
 2    maybe a half a block south of us on Euclid and I started
 3    to smell a lot of teargas --
 4          Q.   Uh-huh.
 5          A.   -- and that's when I saw in particular that
 6    officer that was overcome by the teargas --
 7          Q.   Uh-huh.
 8          A.   -- being brought to that intersection and
 9    hustled into that restaurant and then the ambulance came.
10          Q.   Okay.  Do you remember anything after that?
11          A.   No, I left very shortly after that.
12          Q.   And at what time did you leave?
13          A.   About 1:00 a.m.
14          Q.   Okay.  During the point where you hear the
15    window shattering and the intensification of police, do
16    you hear police giving dispersal orders?
17          A.   I -- I heard, "Move back," I believe.
18          Q.   Okay.
19          A.   At this time, what I can tell you that I
20    remember is I heard, "Move back."
21          Q.   Okay.  You don't remember whether they gave
22    dispersal orders or not; is that fair?
23          A.   I know that there was no clear amplified or
24    even megaphone type of an order to disperse from this
25    area.  I -- I heard -- I believe I saw batons and
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1   commands to move back.

2          Q.   Okay.

3          A.   That's --

4          Q.   That's all you remember?

5          A.   That's right, at this time.

6          Q.   Okay.  So, you leave around 1:00 a.m., which

7   would have been, I guess, the morning of September 16,

8   2017, right?

9          A.   That's right.

10         Q.   Do you participate in any protest activities

11  or observing protest activities on Saturday,

12  September 16?

13         A.   Yes.

14         Q.   Okay.  And what --

15              MR. ROTHERT:  Before -- Before we start the --

16              MS. DUNCAN:  Yeah.

17              MR. ROTHERT:  -- new day, can we take a --

18              MS. DUNCAN:  Absolutely.

19              MR. ROTHERT:  -- brief break?

20              (At this point, there was a break taken from

21              10:21 a.m. to 10:29 a.m.)

22                   (Questions by Ms. Duncan)

23         Q.   Ma'am, I just want to ask you a few questions

24  before we get into September 16 --

25         A.   Okay.

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          Q.    -- of 2017.  Do you know who, if anyone, was
 2    in the mayor's house?
 3          A.    No.  Inside the mayor's house?
 4          Q.    Yeah, do you know was --
 5          A.    Oh, how would I know?
 6          Q.    -- was at home?
 7          A.    Oh, I would have no idea.
 8          Q.    Okay.  Do you know if any family members were
 9    in there?
10          A.    I would have no idea.
11          Q.    Okay.  And as far as you said that you were
12    out there with other legal observers on September 15?
13          A.    15th, so which location?  Oh, Lyda's house?
14          Q.    Well, yeah, I guess -- I guess at any of them.
15    Were there a specific group of you at each of these
16    locations or different legal observers were at different
17    locations?
18          A.    That's more like it --
19          Q.    Okay.
20          A.    -- yeah.  There's a lot of us and...
21          Q.    Okay.  How many -- Let's start at Tucker and
22    Clark.  Which legal observers were with you there?
23          A.    Now, let me get that.  So, okay, Tucker,
24    Clark.  How many legal observers?
25          Q.    The names of the legal observers.  You
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1   mentioned Ken Blumenthal --

 2        A.   Right.

 3        Q.   -- as one?

 4        A.   Uh-huh.

 5        Q.   And then you?

 6        A.   Uh-huh.

 7        Q.   And then who else?

 8        A.   Mark Timmerman.

 9        Q.   Okay.

10        A.   Let me think about that.  That's all that come

11   to mind.

12        Q.   At that location?

13        A.   That's right.

14        Q.   Okay.  What about when you moved to the

15   Central West End on Maryland and Euclid?

16        A.   So, you mean at the start of that march?

17        Q.   Sure.

18        A.   Nicole Warrington and myself.  I'm trying to

19   think of Scott.  Probably Scott Kampas.

20        Q.   Okay.

21        A.   Right.

22        Q.   And then when you moved from Maryland and

23   Euclid to the mayor's house?

24        A.   Oh, and I should say in addition to

25   Scott Kampas, there was Margaret Phillips.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          Q.    Okay.
 2          A.    When we were moving, it was those same ones --
 3          Q.    Okay.
 4          A.    -- and as well at the -- at Lyda's location it
 5   would have been --
 6          Q.    Okay.
 7          A.    -- the four of us, that's right.
 8          Q.    Okay.  And then after moving from the mayor's
 9   house onto Kingshighway area and then finally where
10   you-all ended up and left, who all was there, was it also
11   those four?
12          A.    Say that again?
13          Q.    Sure.  After Lyda's house, you-all move to I
14   think it was Euclid and west on Kingshighway?
15          A.    West on Kingshighway?
16          Q.    Or maybe it was east.
17          A.    I want you to be very specific.
18          Q.    Well, I guess who -- who was there with you
19   that evening following Lyda's house, what other legal
20   observers were there?
21          A.    So -- Well, they check in and out, so it's
22   going to take a minute to...
23          Q.    Sure.
24          A.    Okay.  So, leaving Lyda's house, it was the
25   four of us.  I feel like maybe Phillip Weeks might have
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1  popped up in there at some point, but I can't say when,

2  you know, like exactly which time or location, but I do

3  recall him walking with us east on Lindell --

4       Q.   Okay.

5       A.   -- towards Kings. and, honestly, I don't

6  remember interacting with him after that, so...

7       Q.   Okay.

8       A.   But anyway, so, the Central West End location,

9  several people dropped off and I would -- I really only

10 recall Scott Kampas.  I remember Steven Hoffman coming in

11 late, like maybe that location, like around midnight or

12 11:00 or 12:00 or something.  So, I really just recall

13 me, Steven, and Scott at that late hour.

14      Q.   Okay.  And this is Scott Kampas?

15      A.   That's right.

16      Q.   Okay.

17      A.   Possibly Phillip in and out.

18      Q.   Okay.  And you said that the legal observers

19 come in shifts.  Are they assigned a particular shift?

20      A.   No.  Well, no.  Huh-uh.

21      Q.   So, they come and go as they please?

22      A.   Well, no, there's usually a coordinator.  We

23 were all coordinators that were there, but.  So,

24 typically, we're -- Well, I don't think I have to get

25 into all the details of our program here, so --

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          Q.   I'll ask you about that later.
 2          A.   Yeah.  Oh.
 3          Q.   Yeah.
 4          A.   So, but, yeah, there -- go ahead.
 5          Q.   So, there weren't any particular shifts on
 6    that particular day, September 15, 2017?
 7          A.   Not like hard shifts, right.
 8          Q.   Okay.  Were there general time frames that you
 9    wanted people to be at places?
10          A.   It's -- It's not like that.
11          Q.   Okay.  We'll get into a little bit of the
12    program and how you-all are trained and things like that
13    a little bit later.
14               So, as far as September the 16th, 2017, what
15    did you do that day, how did your day start off?
16          A.   Are you talking about in the morning?
17          Q.   Yes.  Did you participate in any legal
18    observing activ- --
19          A.   Oh, no.
20          Q.   -- ities on the morning --
21          A.   No.
22          Q.   -- of September 16?
23          A.   No.
24          Q.   Okay.  At what point did you observe any
25    legal -- or protest activities on September 16?
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          A.    Yes.
 2          Q.    And what -- when did that happen?
 3          A.    It was about dusk and I arrived at the
 4    intersection of Delmar and Skinker.
 5          Q.    Okay.  And how did you know to go to that
 6    location?
 7          A.    I -- I can't recall at this moment how I knew
 8    to go to that location.
 9          Q.    Okay.  And when you arrived at that location,
10    at what time?  You said dusk.  Would that have been --
11    What time would that have been?
12          A.    So, I'm going to say 6:00.
13          Q.    Okay.  And what did you observe when you got
14    there?
15          A.    There was a large group of protestors,
16    hundreds, maybe 300 and they were taking the -- called
17    taking the intersection, right.
18          Q.    What does that mean?
19          A.    And there was a die-in when I arrived.  There
20    was a die-in occurring.
21          Q.    What do you mean by "taking the intersection"?
22          A.    They were in the intersection.  Their bodies
23    were in the intersection.
24          Q.    Is there traffic that was attempting to
25    maneuver around them?
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          A.    I don't recall the traffic situation --

 2          Q.    Could cars --

 3          A.    -- to be honest.

 4          Q.    -- get through?

 5          A.    No.

 6          Q.    And you mentioned a die-in?

 7          A.    Uh-huh.

 8          Q.    What is that?

 9          A.    That's where protestors are lying in the

10   intersection.

11          Q.    Okay.  And how long were the protestors taking

12   the intersection in -- in this die-in position?

13          A.    I'm going to guess five minutes.

14          Q.    Okay.  So, from 6:00 a.m. (sic) to 6:05

15   a.m. (sic)?

16          A.    Right.

17          Q.    Okay.  And were police at that location?

18          A.    They were.  There was police about a block

19   north on Skinker.

20          Q.    Okay.

21          A.    And I was -- I was at the -- at a particular

22   intersection --

23          Q.    Uh-huh.

24          A.    -- and which was east and north of that

25   intersection, so that's why I was only able to observe
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1    police activity to my north --

2          Q.    Okay.

3          A.    -- is what I'm saying, yeah.

4          Q.    Okay.  What did you observe the police doing,

5    if anything?

6          A.    I believe it was just a couple of sedans or

7    SUVs just parked there observing.

8          Q.    Uh-huh.  So, from 6:00 a.m. (sic) to 6:05, the

9    protestors were in the street having this die-in, and

10   then after that, what happened?

11         A.    And -- And there was no dispersal order, by

12   the way.

13         Q.    Uh-huh.

14         A.    Okay.

15         Q.    Uh-huh.

16         A.    No dispersal order at that location.  Then the

17   march moved south on Skinker.

18         Q.    There wasn't any pepper spray, mace, or

19   teargas deployed at Delmar and Skinker, was --

20         A.    Not --

21         Q.    -- there?

22         A.    -- that -- That's correct; not that I recall.

23         Q.    Okay.  And you said the march moved south on

24   Skinker?

25         A.    That's right.

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1           Q.   Okay.  And what happened there?

2           A.   And I want to -- I want to say that I believe

3      that there was a police escort ahead and behind the march

4      and no dispersal order.  Then they reached the

5      intersection -- we reached the intersection of Forest

6      Park Ave. and Skinker.  I believe they just were taking a

7      corner there.  There was not another die-in.  There might

8      have been like a few second or minute hesitation.  Maybe

9      they were deciding which direction they were going to go,

10     but, so, then the direction of the march moved east on

11     Forest Park Ave.

12          Q.   And this is all in the street?

13          A.   That's right.

14          Q.   Okay.  What did you observe protestors doing

15     at that time when they were moving east on Forest Park

16     and then south -- south on Skinker and then later east on

17     Forest Park?

18          A.   Just marching and chanting.

19          Q.   Okay.

20          A.   Uh-huh.

21          Q.   Did you see any rocks being thrown?

22          A.   No.

23          Q.   Any water bottles being thrown at police?

24          A.   I did not observe that.

25          Q.   Any windows breaking?

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1           A.   I did not observe that.
 2           Q.   Any property damage at that time?
 3           A.   No.
 4           Q.   When they were east on Forest Park, then where
 5      did they go?
 6           A.   North on a side street.  It's the first light
 7      I would say, you know, heading that direction.
 8           Q.   And then what happened?
 9           A.   And there were cars that were -- it was a
10      little tense I would say for the protestors at that point
11      because there were cars pushing, trying to head in that
12      direction where the protestors were at.
13           Q.   Were those police cars or --
14           A.   No.
15           Q.   -- those were --
16           A.   I --
17           Q.   -- regular passenger vehicles?
18           A.   Right.  Right.  I don't be- -- I don't really
19      recall a police presence there, so, anyways, so then the
20      movement was north on that side street there and for
21      maybe one block and then they headed back towards that
22      original intersection, so west on a side street and then
23      again north back to the original intersection.
24           Q.   At Delmar and Skinker?
25           A.   That's right.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1        Q.    Okay.  What, if anything, occurred there?

2        A.    I believe that's when most people went home.

3    The crowd really shrank at that point.

4        Q.    At what time was that?

5        A.    Maybe an hour later, 7:00-ish.

6        Q.    Okay.  What did you do at around 7:00 a.m.

7    (sic) on September 16?

8        A.    7:00 a.m.?

9        Q.    Yeah, af- - after you said they went --

10       A.    7:00 p.m.

11       Q.    7:00 a.m.  You said that this was in the

12   morning?  No, you said dusk.

13            MR. ROTHERT:  Can we go off the record?

14            MS. DUNCAN:  Yeah, I'm sorry.

15            (At this point, an off-the-record discussion

16             was had.)

17                 (Questions by Ms. Duncan)

18       Q.    So, you were at 6:40 -- or 6:00 a.m. (sic) --

19       A.    6:00 a.m.?

20       Q.    6:00 -- You're at 6:00 p.m. to 6:05 at Delmar

21   and Skinker?

22       A.    Yes.

23       Q.    Okay.

24       A.    Yeah.

25       Q.    Okay.  That's my mistake.

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1          A.   Okay.

2          Q.   And then we're going south on Skinker, east on

3    Forest Park, north on a side street, there's cars and

4    vehicles trying to get by the protestors in the street;

5    correct?

6          A.   Yeah, it looked a little problematic for

7    protestors with there was angry people in their cars --

8          Q.   Uh-huh.

9          A.   -- yeah.

10         Q.   'Cause they were trying to get through on the

11   street?

12         A.   I think one may have even jumped out and --

13   but anyway.

14         Q.   Right.  And then we're at 7:00 p.m. on Delmar

15   and Skinker?

16         A.   That's right.

17         Q.   And then what -- what did you do after that?

18         A.   Like I said, a large number of those

19   protestors left and then I believe what happened was

20   there was another -- there was a group of maybe 50

21   protestors --

22         Q.   Uh-huh.

23         A.   -- that continued to march west on Delmar.

24         Q.   Okay.  And where did they go?  Other than west

25   on Delmar, where else did they go?

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1          A.    They were just heading west maybe as far as

2     the Police Department, the U. City Police Department.

3          Q.    Okay.

4          A.    Somewhere right around in there.  And then

5     that's when a line of police showed up from the west and

6     lined up across Delmar facing east.

7          Q.    Were there dispersals (sic) order given to the

8     protestors?

9          A.    I have to think about that.  I don't recall at

10    this time an order.

11         Q.    So, there's 50 protestors, and what -- what

12    did you observe the protestors doing?

13         A.    They were being confronted by police, so kind

14    of like approaching that police line and probably some

15    chanting --

16         Q.    Uh-huh.

17         A.    -- and...

18         Q.    At that point, did you see any water bottles

19    being thrown, rocks being thrown at police?

20         A.    I don't re- -- I don't recall seeing that.

21         Q.    Okay.  Did you hear any verbal threats against

22    police or their family members?

23         A.    I didn't.  I did not.  I was on the extreme

24    south side of that line, so would have only been able to

25    hear what was happening on that side.

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1      Q.   Okay.  After they went west to the Police

2  Department at U. City, what did those other 15

3  protestors -- 50 protestors do; where did they end up?

4      A.   Can you repeat that?

5      Q.   Sure.  You said that there were 50 protestors

6  that went west on Delmar and then west to the Police

7  Department of U. City.  Where -- Where else did they go

8  after that?

9      A.   There was a standoff --

10     Q.   Okay.

11     A.   -- for quite a long time --

12     Q.   Okay.

13     A.   -- maybe a half an hour, across Delmar there.

14     Q.   Okay.  Standoff --

15     A.   And not -- not -- it was east of the Police

16  Department at that point.

17     Q.   And by "standoff," you mean the police were

18  holding their line, the protestors weren't leaving,

19  everyone was just kind of --

20     A.   That's right.

21     Q.   -- standing there?

22     A.   That's right.

23     Q.   Okay.  That lasted for 30 minutes and went up

24  to what, 7:30 p.m. that day?

25     A.   Maybe, and maybe later.

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1      Q.   And then where did you go, what did you do?
2      A.   So, for a long period of time, the -- I'm
3   sorry.  I mean, if you're asking me when I went home
4   after -- after legal observing in The Loop that night, I
5   went and ate something at Blueberry Hill.
6      Q.   Uh-huh.
7      A.   And I believe I just went home after that.
8      Q.   Okay.  You don't remember observing any
9   protest activity after 7:30 p.m. on September 16?
10      A.   The -- That evening, I was in The Loop for an
11   hour or two observing and, unfortunately, my memory is
12   that it was nighttime.  It could have been seven, eight,
13   nine o'clock.  So, if I was there for a couple of hours,
14   I probably left at 10:00 or 11:00.
15      Q.   Okay.  Any teargassing, mace being used,
16   anything that you saw on September 16 in the evening?
17      A.   I don't recall seeing any chemical deployment
18   there.
19      Q.   And by "chemical deployment," do you mean
20   teargas, mace, or pepper spray?
21      A.   That's right.
22      Q.   Any protesting activity that you observed on
23   September 17, which would have been the Sunday?
24      A.   So, do you want to start with -- is there a
25   specific location or time that you're talking about?

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1      Q.    Let's start in the morning.

2      A.    Okay.  So, the morning of the 17th.  Okay.

3  So, I arrived around three o'clock to a march that met up

4  at 20th and Olive, basically Police Headquarters.

5      Q.    And you said that was about at 3:00 p.m.?

6      A.    That's right.

7      Q.    How many people did you observe at that march

8  at Police Headquarters?

9      A.    It was a large number.  Hundreds.

10     Q.    Okay.  And where did that march travel to?

11     A.    SLU campus.

12     Q.    And did it end at SLU campus?

13     A.    No, it continued to Grand and then they went

14  north on Grand to that intersection where SLU is and then

15  they went back east on -- I don't know.  It wasn't 20th I

16  don't think, but some street parallel to 20th --

17     Q.    Okay.

18     A.    -- back towards Headquarters.

19     Q.    Okay.  And what police -- or what protesting

20  activity did you observe during that march?

21     A.    Marching, chanting.

22     Q.    Was there a police presence at that march?

23     A.    It was light.  So, we were at Police

24  Headquarters, so, yes, there was -- there were police to

25  the west of -- of the starting point on Olive maybe a

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1   half a block out.

2        Q.   Okay.  What, if anything, did you observe

3   these police doing?

4        A.   Observing.

5        Q.   Okay.  There's no teargas, mace --

6        A.   No.

7        Q.   -- pepper spray deployed at that point?

8        A.   No.

9        Q.   Okay.  You said that the march started at 3:00

10  p.m.  What time did it end?

11       A.   About 5:00 or 6:00 at that same location.

12       Q.   After -- And it ended at Police

13  Headquarters --

14       A.   That's right.

15       Q.   -- is that -- Okay.  After being at Police

16  Headquarters after the march ended, where did you go?

17       A.   So, there -- the march ended.  There was even

18  an announcement that the march was ending.  And most

19  people, you know, at least a hundred people left.  A few,

20  you know, maybe 50 to a hundred remained, so, obviously,

21  I re- -- you know, I remained as a legal observer and

22  there was some loud noises to -- on 20th, a half a block

23  north on 20th north of Olive, so some protestors, a

24  handful of protestors and myself headed to that location

25  and it was one or two SU -- police SUVs with lights,

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1    there was a sedan, an undercover sedan, and there was a

2    confrontation with those police and a couple of young

3    black men.  No idea if they were protestors or who they

4    were.  It was right there at the --

5         Q.   Okay.

6         A.   -- police office, so, and there -- those --

7         Q.   Do you know what the confrontation --

8         A.   I --

9         Q.   -- was about?

10         A.   -- don't.  I don't.

11         Q.   Okay.

12         A.   It was just I believe those young men said

13    they won't let us travel north or something like that.

14    They won't -- I'm trying to get through here and you're

15    not letting me, something like that.  And, so, when we

16    started -- when a crowd started to arrive --

17         Q.   Uh-huh.

18         A.   -- it looked to me like the police -- the two

19    undercovers or the two people in the undercover got

20    spooked, they jumped into their sedan, and it was one of

21    the most disturbing things I've ever seen at a protest.

22    They went full-blown backwards into the crowd at a fast

23    speed --

24         Q.   Uh-huh.

25         A.   -- into the crowd and this was very shortly

Case: 4:17-cv-02455-CDP Doc. #: 144-3 Filed: 04/04/19 Page: 90 of 184 PageID #: 3317

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1   after Heather Heyer in Charlottesville --

2        Q.   Uh-huh.

3        A.   -- so it was quite disturbing.  It's even hard

4   talking about.  But they -- they went very fast speed

5   through that crowd and two -- a block or two all the way

6   to Pine --

7        Q.   Uh-huh.

8        A.   -- where the sedan stopped.

9        Q.   Uh-huh.

10       A.   And that really triggered the protestors and

11  they rushed to that sedan and then a riot line of police

12  came and --

13       Q.   You said --

14       A.   -- lined up on either side of the sedan and

15  then there was a confrontation.

16       Q.   I want to back up a little bit.  When you said

17  that there were loud noises on 20th and Olive, what loud

18  noises did you hear?

19       A.   There was -- It was a shouting.  It was a...

20       Q.   Okay.

21       A.   Yeah.

22       Q.   Could you tell from whom, like who was

23  shouting?

24       A.   I think the young man -- the young men that

25  were having the interaction with the police were

MASUGA REPORTING SERVICE
314/680-2424

Page 90

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
1   shouting, "Hey, why don't" -- "why aren't you letting me
2   through?" or something like that.
3          Q.   Okay.  And then after the police car had
4   backed up, you --
5          A.   Backed up?  Oh --
6          Q.   You said --
7          A.   -- drove at 20 miles an hour or so, yeah.
8          Q.   After the police car had backed up --
9          A.   Yeah.
10         Q.   -- you said that the protestors kind of
11  stormed the -- the car; is that fair?
12         A.   The protestors were upset --
13         Q.   Uh-huh.
14         A.   -- by that action.  I believe people were -- I
15  was right there and observing it.  I stepped out of the
16  way of the car.
17         Q.   Uh-huh.
18         A.   Many people were jumping out of the way.
19         Q.   Uh-huh.
20         A.   And, so, protestors did run towards that
21  sedan, yes.
22         Q.   Uh-huh.  Did they encircle --
23         A.   No.
24         Q.   -- the sedan?
25         A.   No.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
1          Q.   Okay.  What did you hear when you heard the
2   protestors confronting the people in the sedan?
3          A.   I can't recall specific words --
4          Q.   Uh-huh.
5          A.   -- but they were upset.  "What are you doing?"
6   that kind of thing.
7          Q.   Uh-huh.  After that happened, what -- what
8   happened next; where did you go?
9          A.   So, they -- they were so upset by that
10  event --
11         Q.   Uh-huh.
12         A.   -- that they marched to the front of Police
13  Headquarters --
14         Q.   Okay.
15         A.   -- like maybe a hundred or so, and, so, I
16  followed them.
17         Q.   Okay.
18         A.   And there was some upset chanting and so forth
19  in front of the Police Department.
20         Q.   And what do you mean by that --
21         A.   Due to that --
22         Q.   -- "upset chanting"?
23         A.   Due to the re- -- I'm assuming due to
24  the response -- a response to what had just happened --
25         Q.   Uh-huh.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          A.   -- but I can't remember the exact words of
 2    what they were saying.
 3          Q.   Okay.  So, you followed the crowd from --
 4          A.   Pine and 20th to --
 5          Q.   To Headquarters?
 6          A.   Front door, right.
 7          Q.   Okay.  How -- At -- At what point, I guess, at
 8    what time did you arrive at Headquarters?
 9          A.   So, if the march -- if this all happened
10    around 7:00, then you're talking about after that
11    incident --
12          Q.   Right.
13          A.   -- the sedan incident?
14          Q.   Right.
15          A.   Was probably less than an hour from the time
16    the event ha- -- that sedan event happened.
17          Q.   Okay.  So, would that put us at about 7:00
18    p.m.?
19          A.   7:00 or 8:00.
20          Q.   Okay.
21          A.   7:00 or 8:00.  It wasn't quite dark yet.
22          Q.   Okay.
23          A.   It was getting there.
24          Q.   Okay.  And then at Police Headquarters, you
25    said you observed some upset chanting?
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          A.    Uh-huh.

 2          Q.    Anything else that you observed there?

 3          A.    No.

 4          Q.    Okay.  What was police protes- -- or presence

 5    like at Headquarters, if any?

 6          A.    I mean, there was the riot line at Pine.

 7          Q.    Uh-huh.

 8          A.    I don't recall there being police outside the

 9    building right there where the protestors were.  I can't

10    recall that.

11          Q.    Okay.  And then after you're at Police

12    Headquarters, where do you go?

13          A.    Then the march started.  They left -- They

14    seemed upset.  They left Police Headquarters and marched

15    east on Olive.

16          Q.    Okay.

17          A.    And I took a break.  I went to that parking

18    lot across from Police Headquarters and just sat and for

19    at least a half an hour and had a snack and a drink.

20          Q.    Okay.

21          A.    So, I don't know.  I wasn't with the march

22    when they went east on Olive --

23          Q.    Okay.

24          A.    -- for a good, like, 45 minutes or so.  Half

25    hour, 45 minutes.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1        Q.   Okay.  Then after you took a break at Police
2   Headquarters for about 45 minutes, which would put us at
3   about what time would you say?
4        A.   8:00 or 9:00.
5        Q.   Okay.
6        A.   Uh-huh.
7        Q.   After that, where did you go?
8        A.   My car was close to Police Headquarters, so I
9   wanted to continue observing because I knew that
10  protestors were out, so I got into my car at that
11  location and drove my car to around 9th --
12       Q.   Okay.
13       A.   -- a little -- a little south of Washington --
14       Q.   Okay.
15       A.   -- and just where I could find a parking spot.
16       Q.   Okay.
17       A.   And I knew they were in that general area.
18       Q.   The protestors you mean?
19       A.   I could hear them and see -- see them and,
20  yeah --
21       Q.   Okay.
22       A.   -- police everywhere.  It was kind of a
23  chaotic scene, uh-huh.
24       Q.   And there was how many protestors would you
25  say at this point?

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1         A.   So, I parked my car, got out of my car and
2    heard what sounded to me like rubber bullets or teargas
3    canisters.  There was a lot of noisy munitions type and
4    screaming.
5         Q.   Uh-huh.
6         A.   And I got out of my car and looked behind me
7    and there was police running after some -- some people.
8         Q.   Uh-huh.
9         A.   I don't know if they were protestors or not,
10   but they were running, so I jumped out of the way.
11        Q.   Uh-huh.
12        A.   And I -- that was in one spot.  Then I
13   happened to see a couple of legal observers,
14   Nicole Warrington and Scott Kampas, for instance, pretty
15   close around that corner and, so, I joined up with them.
16        Q.   Okay.  You said Nicole Warner (sic) and
17   Scott Kampas?
18        A.   That's right.
19        Q.   Okay.  And this is at the south of Washington,
20   9th and south of Washington location still?
21        A.   This is south of Washington, right.
22        Q.   Okay.
23        A.   And -- And west of Broadway or -- yeah.
24        Q.   Okay.  Do you know what happened before you
25   got there to -- to see --

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          A.   I don't.

 2          Q.   -- the reaction that you saw?

 3          A.   I don't.  I assume it was something big.

 4          Q.   Okay.  Did Scott or Nicole tell you what

 5     happened or what they had seen?

 6          A.   Not that I recall.

 7          Q.   Okay.  So, after you meet up with them, where

 8     did you go?

 9          A.   So, we were traveling west.  We traveled west,

10     and probably for the next half hour I can only say that

11     we were on those -- in that general area on a lot of

12     different back streets and seeing standoffs between

13     different groups of police and different protestors.

14          Q.   Okay.  When you were down there at this time,

15     did you see any of the -- anyone committing property

16     damage?

17          A.   I did not see that.

18          Q.   Did you see anyone throwing water bottles at

19     police?

20          A.   I did not.

21          Q.   Did you see anyone break any big planters?

22          A.   No.

23          Q.   Did you see anyone break windows?

24          A.   I didn't see that, but I know that planters

25     were broken because after the fact I happened to be
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1   walking down that street, and I don't remember the name
 2   of that street, but -- and I saw the planters broken --
 3          Q.    Okay.
 4          A.    -- but that was --
 5          Q.    So, you knew that there was property damage
 6   done, but you didn't know --
 7          A.    I saw it.  That's right --
 8          Q.    Yeah.
 9          A.    -- I saw it, uh-huh.
10          Q.    You saw property damage, but you didn't see
11   who did the property --
12          A.    No.
13          Q.    -- damage or --
14          A.    No.
15          Q.    After that, where did you go?
16          A.    Yeah.  So, yeah, so, we were on those back
17   streets just observing here and there different
18   standoffs.
19          Q.    Uh-huh.
20          A.    There was multiple things going on at the same
21   time.
22          Q.    Uh-huh.
23          A.    And there was a line of police, I think it was
24   Locust, across Locust --
25          Q.    Uh-huh.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          A.    -- in kind of a standoff with two or three
 2     people --
 3          Q.    And at these --
 4          A.    -- right there?
 5          Q.    -- standoffs, what -- what are you observing
 6     when you say that or what do you mean when you say that?
 7          A.    People are there, they're chanting and so
 8     forth, you know, they're -- they're protesting --
 9          Q.    Uh-huh.
10          A.    -- and police are preventing them from going
11     in a certain direction.
12          Q.    Uh-huh.  Do the protestors act like they want
13     to go in a certain direction or are they both just kind
14     of --
15          A.    Yeah, not necessarily --
16          Q.    -- standing there yelling at each other?
17          A.    Yeah, not necessarily.  I can't say that I
18     observed that someone -- in those little instances that
19     someone was trying to go in a direction.
20          Q.    Uh-huh.
21          A.    When we are -- were on one of those streets,
22     it wasn't Washington, but it was a major street south --
23     south of it, there was a well-known livestreamer,
24     Derk Brown --
25          Q.    Uh-huh.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          A.    -- who was in cuffs in the middle of the
 2    street, and we LOs and -- were following several
 3    protestors that went to that location and we were pushed
 4    by police to the west --
 5          Q.    And by --
 6          A.    -- away from, so we weren't -- we -- I wanted
 7    to observe --
 8          Q.    Uh-huh.
 9          A.    -- the arrest of Derk Brown and I was --
10          Q.    Uh-huh.
11          A.    -- we were prevented from doing that.
12          Q.    Okay.  And when you say "pushed," do you mean
13    that you were physically --
14          A.    No.
15          Q.    -- you were taken by the shoulders and pushed?
16          A.    No.
17          Q.    Do you mean that you were told to -- to --
18          A.    That's right.  We were --
19          Q.    -- stand back?
20          A.    That's right.  We were -- We were on the
21    sidewalk and a police line formed and gave "move back"
22    directives and we complied by moving west on that street.
23          Q.    All right.  And do you remember which street
24    that was?
25          A.    I don't.  It was --
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          Q.   Okay.
 2          A.   -- kind of a major street and, so, I'm...
 3          Q.   You don't remember as you sit --
 4          A.   I don't.
 5          Q.   -- here?
 6          A.   I don't.
 7          Q.   Okay.  After that incident, what happened?
 8          A.   But -- But I do remember feeling perturbed
 9    that I wasn't able to fulfill my right to be present and
10    observe.
11          Q.   Uh-huh.  You said that Derk Brown, he was
12    arrested, and then after that, what -- what happened?
13          A.   So --
14          Q.   Where did you-all go?
15          A.   Yeah, so, we moved -- we moved west in
16    compliance with that order --
17          Q.   Uh-huh.
18          A.   -- and went as far as Tucker.
19          Q.   Uh-huh.
20          A.   And I believe we just kind of went back and
21    forth on Tucker following different protest groups.
22          Q.   Uh-huh, okay.  When you're following or legal
23    observing, do you participate in chants with the
24    protestors?
25          A.   No.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1         Q.    Okay.
 2         A.    We're there as neutral observers.
 3         Q.    And, so, at this point, you said that you're
 4    at Tucker and would it be Washington?
 5         A.    Just south of that I would say.
 6         Q.    Okay.
 7         A.    More like Locust.  Kind of -- Well, kind of
 8    like --
 9         Q.    Okay.
10         A.    -- back and forth between Washington and
11    Locust I would say --
12         Q.    Okay.
13         A.    -- on both sides of Tucker.
14         Q.    Okay.  And at what -- at what time is it at
15    that point?
16         A.    Between 8:00 and 9:00 that we're kind of back
17    and forth in that location --
18         Q.    Okay.
19         A.    -- uh-huh.
20         Q.    And how long did you go back and forth in that
21    location?
22         A.    Maybe an hour.
23         Q.    Okay.  So, that would put us at nine or ten
24    o'clock?
25         A.    That's right.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          Q.   Okay.  Did you see any teargas or mace, pepper
 2   spray deployed?
 3          A.   Up until that point, only what I really didn't
 4   observe, but smelled in the air when I parked my car.
 5          Q.   Okay.  So, at around nine or ten o'clock,
 6   after you had gone back and forth just south of
 7   Washington and Tucker, what did you do?
 8          A.   So, you're asking to me it's the same
 9   question.  So, I was in that location for about an
10   hour --
11          Q.   Okay.  Then what happened?
12          A.   -- between 9:00 and 10:00.
13          Q.   Then -- Then after that, what happened; where
14   did you go?
15          A.   So, I'm trying to remember specifically.
16   Like, it seems like a line of police showed up briefly
17   for -- across Tucker and there was a police van giving a
18   dispersal order --
19          Q.   Uh-huh.
20          A.   -- maybe about ten o'clock.
21          Q.   Okay.
22          A.   And --
23          Q.   And did you disperse at that point?
24          A.   I did move to -- I think that they were saying
25   move west --
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          Q.   Okay.
 2          A.   -- and I did move west --
 3          Q.   Okay.
 4          A.   -- yeah.
 5          Q.   So, you were given a specific location to move
 6   to at that point?
 7          A.   West.
 8          Q.   You were told -- You were told --
 9          A.   Move --
10          Q.   -- to move west?
11          A.   That's right.
12          Q.   Okay.
13          A.   That's what I recall -- recall.
14          Q.   Okay.  And, so, in fact, you did move west?
15          A.   That's right.
16          Q.   And then what happened?
17          A.   So, then I was west and then also more or less
18   in the area then of Washington and Tucker --
19          Q.   Okay.
20          A.   -- on the sidewalk of the Washington south
21   side sidewalk, yeah.
22          Q.   Okay.  And was Washington and Tucker, was
23   that -- was that road closed at that time or was it still
24   open?
25          A.   So, I would say between 10:00 and 11:00, there
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1    formed a police line -- Well, I should say there was -- I
2    believe there was already a police line formed across
3    Tucker --
4         Q.    Okay.
5         A.    -- just north of Washington and it was kind of
6    sidewalk to sidewalk, but there was some fluidity to it.
7         Q.    Uh-huh.
8         A.    So, I want to say that that was the first line
9    at that intersection that I saw around eleven o'clock.
10   Ten or -- Ten or eleven o'clock.
11        Q.    Okay.
12        A.    So, what was new at 11:00, though, was another
13   line starting to form and come forward.  Like they were
14   maybe a block away, but I noticed that they were sidewalk
15   to sidewalk.  And an officer approached me and said, You
16   need to leave" -- "You should leave the area because
17   there's some people on the top of that building that are
18   going to throw fire down onto you."
19        Q.    Who said that to you?
20        A.    An officer.
21        Q.    Okay.  So, you were told to leave the area?
22        A.    Well, I was told, "You" -- I was told -- It
23   wasn't a command to leave the area, so I'm sorry if I
24   gave you that impression.  It was more like you may want
25   to leave --

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1            Q.    Uh-huh.
 2            A.    -- because there's some people up there that
 3     are going to throw fire down at you.
 4            Q.    Uh-huh.
 5            A.    It was a very unusual statement --
 6            Q.    Uh-huh.
 7            A.    -- so...
 8            Q.    Do you remember who it was that told you
 9     that --
10            A.    No.
11            Q.    -- the officer's --
12            A.    Just --
13            Q.    -- name?
14            A.    -- it was a white officer.  That's about the
15     most detail I remember.
16            Q.    Uh-huh.  And this is after the disporsal --
17     dispersal order is given at 10:00?
18            A.    That ten o'clock one --
19            Q.    Yeah.
20            A.    -- was, yeah, the last one I heard, so --
21            Q.    Okay.
22            A.    -- yeah, it was this was closer to 11:00.
23            Q.    Okay.  So, that --
24            A.    And that was said to me and --
25            Q.    So, that would have been after that, right?
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          A.    That's right.
 2          Q.    Okay.  After you see the line forming across
 3   Tucker and then you said the line was forming across
 4   another location.
 5          A.    Right.
 6          Q.    I just didn't get that.
 7          A.    Right.  So, I believe that the second line
 8   that I noticed --
 9          Q.    Uh-huh.
10          A.    -- being formed was about a block south of us
11   across Tucker.
12          Q.    Okay.  What happened after that?  This would
13   have been at about --
14          A.    So, they --
15          Q.    -- after 11:00 p.m.?
16          A.    That -- That line --
17          Q.    Uh-huh.
18          A.    -- started to march towards the intersection.
19          Q.    And when they marched towards the
20   intersection, did they say, "Get back"?  Did they -- Were
21   they chanting anything, giving any orders?
22          A.    No, it was kind of eery.  It was just batons
23   whacking the ground --
24          Q.    Okay.
25          A.    -- is what I remember.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1      Q.   Okay.  And then after you saw them -- I guess
2  they were coming towards you then, that line?
3      A.   That's right.
4      Q.   Okay.  And then what else did you see after
5  that?
6      A.   So, around that same time, I noticed that a
7  line of police was forming a block or so west of us
8  across Washington.
9      Q.   Okay.
10     A.   Also their batons whacking.  It was so loud at
11 that point, too, even a block away, that there were no --
12 there were no orders given but that I could hear and I
13 don't know how I would have heard it.
14     Q.   You don't remember them saying, "Get back"?
15     A.   No, I don't remember --
16     Q.   Okay.
17     A.   -- at that point, yeah, uh-huh.
18     Q.   Okay.  So, then you saw a third line form --
19     A.   Right.
20     Q.   -- sometime after 11:00 p.m.?
21     A.   That's right.
22     Q.   Okay.  And then what happened?  How were the
23 protestors -- Are there still about 50 to a hundred
24 protestors at this point?
25     A.   That's right.

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          Q.   Okay.  And what was the interaction or
 2     response to these lines being formed by --
 3          A.   They --
 4          Q.   -- the protestors?
 5          A.   They looked concerned --
 6          Q.   Uh-huh.
 7          A.   -- and moving around kind of quickly in
 8     different directions towards those lines.
 9          Q.   Uh-huh.
10          A.   And I remember a couple of protestors coming
11     up to me and saying, "They want us to leave, but we can't
12     leave" --
13          Q.   Uh-huh.
14          A.   -- "the sidewalks are blocked."
15          Q.   Uh-huh.
16          A.   So, I recall that.
17          Q.   Okay.  Do you remember anything else that the
18     protestors were doing?
19          A.   Just looking concerned and --
20          Q.   Uh-huh.
21          A.   -- and moving around and --
22          Q.   Uh-huh.
23          A.   Right.  I saw, who I assumed to be a resident,
24     a woman, kind of youngish, well, younger than me woman,
25     trying to -- seeing that line move, the one that we're
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1    talking about most recently on the west side, trying to

2    open the door of her apartment and get inside to the

3    lobby --

4            Q.    Uh-huh.

5            A.    -- and I guess this was pretty -- a point when

6    that riot line was pretty close and a police officer

7    grabbed her and pulled her out of her doorway.  And the

8    reason I know a little bit of detail about that person is

9    I was in jail with that person and --

10           Q.    Okay.

11           A.    -- I --

12           Q.    Do you remember -- Do you remember her name?

13           A.    No, I never knew her name.

14           Q.    Okay, okay.  So, at around eleven o'clock, you

15   see a third line form and then what happened?

16           A.    Then I noticed, I believe it was the last line

17   formed, was bicycle police --

18           Q.    Uh-huh.

19           A.    -- on the east side.

20           Q.    Are you there with any other legal

21   protestors (sic) at that time?

22           A.    You mean legal observers?

23           Q.    Legal observers, I'm sorry.

24           A.    Yeah.  Yeah.

25           Q.    Okay.  Who was there?

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1          A.    Scott Kampas, Nicole Warrington, and me.

2          Q.    Okay.   Scott, Nicole, and you?

3          A.    Yeah.

4          Q.    Okay.   And was that pretty much the entire day

5     on the 17th, were there the three of you that day?

6          A.    It was a long day, so if you -- if we're

7     talking about the SLU event --

8          Q.    Uh-huh.

9          A.    -- I would have to think carefully about

10    everybody that was there.   It was a pretty large march --

11         Q.    Uh-huh.

12         A.    -- so there was probably more than -- than us

13    there --

14         Q.    Okay.

15         A.    -- yeah, but --

16         Q.    Okay.

17         A.    -- can't recall at this time exactly who was

18    with me all day.

19         Q.    Okay.

20         A.    Yeah.

21         Q.    So, during the line formation incident,

22    though, it was Scott, Nicole, and you?

23         A.    That's right.

24         Q.    Okay.   And then after that last line was

25    formed, did you hear -- what did you hear from police, if

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
1    anything?  Did you hear any orders or commands given?

2         A.   I heard some, "Move back."

3         Q.   Okay.

4         A.   I believe it was people who were trying to

5    approach the line and maybe look for a way out --

6         Q.   Uh-huh.

7         A.   -- and they were being told to move back,

8    meaning move back into the intersection.

9         Q.   Uh-huh.  Do you remember --

10        A.   And I heard a command -- Not a command.  I'm

11   sorry.  I heard two police officers on -- in a particular

12   location say, "Who's streets?" which was a little

13   strange.  I saw -- I saw and heard, I was in close radius

14   to two police officers who shouted, "Who's streets?"  And

15   that was two officers that were on the Tucker line, the

16   North Tucker line on the west side.

17        Q.   Do you know the names of these officers?

18        A.   No.  There -- There were not a lot of name

19   badges present -- present that night.

20        Q.   Okay.  And then what happened?  After the last

21   line was formed about eleven o'clock, are we still at

22   about eleven o'clock?

23        A.   Yes.

24        Q.   Okay.

25        A.   Maybe a little after.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          Q.    Okay.
 2          A.    So that the four -- Well, the police -- the
 3    bicycle police line didn't move --
 4          Q.    Uh-huh.
 5          A.    -- and neither was the Tucker on the north
 6    side line moving.  They were stationary.  And the other
 7    two lines were marching closer and closer with batons
 8    striking.
 9          Q.    Okay.
10          A.    And all three lines batons were striking.
11          Q.    Okay.
12          A.    It was very loud.
13          Q.    Okay.  What happened after that?
14          A.    So, at some point, we were in ma- -- in a
15    close box, you know --
16          Q.    Uh-huh.
17          A.    -- that the intersection basically we call the
18    box, and we were ordered to the ground.
19          Q.    Uh-huh.  Did you get on the ground?
20          A.    Yes --
21          Q.    Okay.
22          A.    -- immediately.
23          Q.    And then what happened after you were ordered
24    to the ground?
25          A.    So, I was ordered to turn off my phone.  My
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
1   phone was -- was laying on my stomach.
2         Q.   Uh-huh.
3         A.   And that was --
4         Q.   When you were on the ground?
5         A.   That's right.  I was on the ground on my back.
6   And that seemed to be it was like threat of violence is
7   what.  You know, "Turn off that phone."  Was a very --
8         Q.   Uh-huh.
9         A.   -- angry command.
10        Q.   Uh-huh.
11        A.   So --
12        Q.   Did they say turn --
13        A.   And --
14        Q.   -- off your phone --
15        A.   And as a --
16        Q.   -- or we'll --
17        A.   And as a legal observer, I would probably, if
18  I wasn't told to turn off my phone, I would have
19  preferred to have it on.  I'm there to observe, right?
20        Q.   Uh-huh.
21        A.   So, there was an angry command to turn off
22  that phone.
23        Q.   Uh-huh.  And did --
24        A.   So --
25        Q.   -- you comply with that?
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1       A.   Yes.

2       Q.   Okay.

3       A.   As soon as I was told to, I did.

4       Q.   And then after you turned off your phone, what

5  happened?

6       A.   Pretty shortly after, I felt pepper spray

7  dripping over my skin and I could see an officer with a

8  spray can.  The officer that I saw with a can was -- had

9  been behind me.  I could see people behind me on the

10  ground.  And he was coming around and people were

11  screaming and as he was spraying.  And I know he was

12  spraying 'cause some of it was hitting me --

13      Q.   Uh-huh.

14      A.   -- and it dripped onto me and then he was

15  moving to the right and I could hear more screaming --

16      Q.   Uh-huh.

17      A.   -- as people were on the ground.

18      Q.   Okay.  But could you see -- could you see the

19  situations under which they were being spray- -- I guess,

20  so, you're on your back --

21      A.   Right.

22      Q.   -- looking up?

23      A.   Well, I was -- I could look to my left and my

24  right and I was doing that (demonstrating).

25      Q.   Okay.

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1              A.   And I could see people complying with the
 2      order to lay on the ground.
 3              Q.   Okay.
 4              A.   Yeah.
 5              Q.   And do you know the names of the people that
 6      were pepper-sprayed?
 7              A.   I -- I mean, I know Scott Kampas was one of
 8      them.
 9              Q.   Okay.
10              A.   And I could see him sprayed.  He was very
11      close to me.
12              Q.   Okay.
13              A.   Uh-huh.  And I could tell you other people
14      that I saw in jail that I know were sprayed.
15              Q.   Okay.  What --
16              A.   Tony, Tony Rice, who I know, he -- I happened
17      to be sitting next to him before we were put in a van and
18      he was very bad.  I felt like he should have been put in
19      an ambulance, he was...
20              Q.   Okay.  As far as --
21              A.   But --
22              Q.   -- when you're there --
23              A.   Right, with -- on -- with my back on the
24      ground?
25              Q.   Yes.  That Scott Kampas is the only one that
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1   you observed get --

2           A.   No.

3           Q.   Okay.

4           A.   No, I saw that officer continue around to my

5   right and spray people that were -- and I could see them

6   lying there --

7           Q.   Uh-huh.

8           A.   -- and being sprayed and I heard them

9   screaming.

10          Q.   Uh-huh.

11          A.   So, probably two or three more people that I

12  could see with my own eyes --

13          Q.   Okay.

14          A.   -- and I heard more screaming than that,

15  but...

16          Q.   Okay.  And then what happened after you're on

17  your back, turned off your phone, you see some people

18  getting --

19          A.   Right.  So, then --

20          Q.   -- sprayed?

21          A.   So, then ordered to roll over onto my stomach,

22  which I did.

23          Q.   Okay.

24          A.   And then I was cuffed.

25          Q.   Okay.

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1           A.    Uh-huh.  And then a police officer approached
2    me and I have to say it was the -- in my whole lifetime,
3    it was the roughest way my body has ever been handled --
4           Q.    Uh-huh.
5           A.    -- so this police officer grabbed me by the
6    back.  Didn't say stand up.  Just grabbed me by the back
7    and stood me up and was kind of giving me commands to
8    move through the crowd, but by the time I heard the
9    command, he was already lifting me.  I was at least one
10   foot off the -- off the ground and being shoved through a
11   crowd and then ordered to sit on the sidewalk.
12          Q.    Okay.  And did you sit on the sidewalk --
13          A.    Yes.
14          Q.    -- at that point?
15          A.    Yes.
16          Q.    And after you're on the sidewalk, are you in
17   cuffs at that point?
18          A.    Yes.
19          Q.    Okay.  And then what happens?
20          A.    So, as I said, there were a couple of
21   protestors to my right.  I think I was on the extreme
22   left side of that line of people, but -- and one of them
23   was Tony Rice and he was in intense pain and I know that
24   from the sound of the breathing and just, "Ahhhh"
25   (phonetically), you know.

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1      Q.   Uh-huh.

2      A.   Not crying, but yeah.

3      Q.   Uh-huh.

4      A.   And --

5      Q.   He was next to you on the sidewalk?

6      A.   He was about two people down.

7      Q.   Okay.

8      A.   Right.

9      Q.   Okay.

10     A.   And, so, I had a little bit of exposure,

11 but --

12     Q.   Uh-huh.

13     A.   -- other people along that line were heavily

14 exposed and were coughing --

15     Q.   Uh-huh.

16     A.   -- and -- and in distress.

17     Q.   Okay.

18     A.   Uh-huh.

19     Q.   How long were you on the sidewalk before -- I

20 assume you were taken in a van --

21     A.   Right.

22     Q.   -- to jail?

23     A.   Or a bus.

24     Q.   Okay.

25     A.   Yeah.  Twenty minutes or half hour.

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          Q.    Okay.
 2          A.    Uh-huh.
 3          Q.    And then you were transported to the Criminal
 4    Justice Center?
 5          A.    That's right.
 6          Q.    Okay.  And then when you're at the Criminal
 7    Justice Center, they -- what did they do with you there?
 8          A.    Processing and --
 9          Q.    Okay.
10          A.    -- at least one or two different cells,
11    uh-huh.
12          Q.    Okay.  How long were you at the Criminal
13    Justice Center?
14          A.    I think I was released I want to say it was
15    under 24 hours.
16          Q.    Okay.
17          A.    Just under that, uh-huh.
18          Q.    Were your other legal observer, Nicole and
19    Scott, were they also arrested?
20          A.    That's right.
21          Q.    Okay.
22          A.    Uh-huh.
23          Q.    And did you see them at the Criminal Justice
24    Center?
25          A.    I don't remember seeing Scott.  Nicole, yes.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          Q.   Okay.  Okay.
 2          A.   Uh-huh.  I remember seeing Scott afterward
 3   when I was released and then -- I was released before him
 4   and he was released after and he was bruised up and
 5   smelled heavily of the --
 6          Q.   You're talking about --
 7          A.   -- chemical spray.
 8          Q.   -- Scott Kampas?
 9          A.   Yes.
10          Q.   Okay.
11          A.   Yeah.
12          Q.   Okay.  Your testimony is that you were not
13   directly maced the weekend of September 15, right; that
14   you were exposed to it?
15          A.   So, at Tucker and Clark, I -- spray was in my
16   direction.  It just wasn't directly in my eyes --
17          Q.   Right.
18          A.   -- but I would say I was sprayed.
19          Q.   Okay.
20          A.   Uh-huh.
21          Q.   Okay.  That was at Tucker and Clark on the
22   15th?
23          A.   That's right.
24          Q.   Okay.  And then, again, you mentioned on the
25   17th?
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          A.    When I was on the ground, I was --
 2          Q.    Right.
 3          A.    Yeah.
 4          Q.    Okay.  Are those the only two times that you
 5    were exposed to teargas, mace, or pepper spray during the
 6    weekend of September 15?
 7          A.    Oh, no, remember we were talking about the
 8    evening in the Cen- -- near Lyda's house --
 9          Q.    Okay.
10          A.    -- teargas, yeah.
11          Q.    Okay.  So, at Tucker and Clark, at Tucker and
12    Washington --
13          A.    And the Central West End, Maryland and Euclid,
14    remember?
15          Q.    Right.  And is that the mayor's house
16    incident?
17          A.    No.
18          Q.    Okay.
19          A.    That was when the officer was -- who was
20    overcome by the same gas that I was exposed to, but he
21    may have been closer to it, I guess, but I was exposed to
22    that gas --
23          Q.    Okay.
24          A.    -- that was deployed south of me on Euclid.
25          Q.    And by "exposed to," what do you mean by that?
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          A.   It was -- It was strong.  It hurt my eyes and
 2    made me cough.
 3          Q.   Okay.  Any kind of medical treatment that you
 4    sought because of that?
 5          A.   I did -- I mean, my nose was hurting, you
 6    know, for -- it's -- it's a very unpleasant experience,
 7    you know --
 8          Q.   Uh-huh.
 9          A.   -- all of those, I might be down playing a
10    little bit, but especially that exposure on Maryland --
11    I'm sorry -- on Waterman.
12          Q.   Uh-huh.
13          A.   That was very, very painful.
14          Q.   Okay.
15          A.   And, so, I did go to my doctor within a day or
16    two complaining of some pain in my, like, sinuses.
17          Q.   Uh-huh.
18          A.   I didn't know if there was any treatment.
19          Q.   And who is your doctor that you saw for that?
20          A.   So, they change so often.  Chung?  She's --
21    She was my primary care at that time.
22          Q.   Okay.  Chung, C-h-u-n-g?
23          A.   I think so.
24          Q.   Okay.  Do you remember her first name?
25          A.   She's re- -- She didn't retire.  She stopped.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1    I only had her for about a year because she went on a

 2    maternity leave and then she -- is no longer practicing

 3    right now, so.

 4             Q.    Okay.

 5             A.    So, what was your question?

 6             Q.    When did you visit her?

 7             A.    It was in -- within a day or two of that.

 8             Q.    Okay.

 9             A.    Guessing.

10             Q.    Do you remember her first name, Dr. Chung's

11    first name?

12             A.    I would have to look it up.

13             Q.    Okay.

14             A.    Yeah.

15             Q.    And is she with Barnes or --

16             A.    No.

17             Q.    -- who is she affiliated with?

18             A.    Kind of -- Mercy, I guess you would say.

19             Q.    Okay.  Other than visiting Dr. Chung, is there

20    any other medical treatment that you sought because of

21    your exposure?

22             A.    No.

23             Q.    What did Dr. Chung tell you about your

24    complaints of pain in your sinuses?

25             A.    There wasn't really any treatment that I
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1   recall her saying I could -- I could do.

2        Q.   Uh-huh.

3        A.   Right.

4        Q.   Did she give you any --

5        A.   She didn't really say too much about it.

6        Q.   Okay.

7        A.   "I'm sorry that happened to you," I think is

8   what she said.

9        Q.   Okay.  But there was no diagnosis or did she

10  give you any me- --

11       A.   I don't think there was any medicine, yeah.

12       Q.   Okay.  No medicine or diagnosis?

13       A.   No.

14       Q.   I know I've asked you this before, but I just

15  want to make sure that it's clear for the record.  So --

16       A.   Uh-huh.

17       Q.   -- for the weekend of September 15, did you

18  observe any violence towards police officers?

19       A.   So, that -- that seemed violent to me that

20  that police officer, he was really -- even we were

21  concerned about the one that was exposed to the

22  teargas --

23       Q.   Uh-huh.

24       A.   -- and left in an ambulance --

25       Q.   Uh-huh.

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          A.    -- so that was a violent occurrence.

 2          Q.    Uh-huh.

 3          A.    So, I know that -- Yeah, no.  No.

 4          Q.    Did you see any water bottles being thrown at

 5    the police?

 6          A.    I did not.

 7          Q.    Okay.  Did you see any rocks being thrown?

 8          A.    No.

 9          Q.    Any broken concrete being thrown at police?

10          A.    No.

11          Q.    What about on September 29 of 2017?

12          A.    Oh, boy.

13          Q.    That would have been the -- the Busch Stadium

14    incident, Busch Stadium protest.  Were you there --

15          A.    I don't --

16          Q.    -- for that?

17          A.    -- even know if I was there.  I would have --

18          Q.    Okay.

19          A.    -- to think.  Can you describe anything about

20    it and then I would know if I was there or not?

21          Q.    No, it's just --

22          A.    Oh.

23          Q.    -- there were Bu- -- there were protests right

24    outside of Busch Stadium in regards to the Stockley

25    verdict.  Do you remember if you were there or not for
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1    that?

2          A.    I've been to Busch Stadium to observe protests

3    many times, but I -- I don't know if I was at that one.

4          Q.    Okay.

5          A.    Yeah.

6          Q.    Did you hear people making violent threats

7    towards police officers the weekend of September 15?

8          A.    No.

9          Q.    Did you hear any threatening of sexual assault

10   to the family members of police officers on that weekend?

11         A.    No, I did not.

12         Q.    Did you witness -- You talked about that there

13   were some windows broken?

14         A.    Uh-huh.

15         Q.    Okay.  Did you directly witness any of that or

16   I remember you just saying something about hearing the

17   noises of it?

18         A.    Right.

19         Q.    Okay.  Did you witness any protestors or

20   demonstrators breaking any planters?

21         A.    I did not observe that.  I walked by at a

22   later point and saw, uh-huh.

23         Q.    Did you witness any other property damage by

24   protestors or demonstrators?

25         A.    No.

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1      Q.   Okay.  In your opinion, would these be things
2  in line with what you would consider to be protesting?
3      A.   So, "protesting" meaning chanting, taking
4  space on sidewalks and streets?
5      Q.   My question --
6      A.   Is that --
7      Q.   -- is -- My question is whether you would
8  consider throwing water bottles, breaking planters,
9  breaking windows --
10      A.   I would not consider --
11      Q.   -- concrete --
12      A.   -- that protesting, right.
13      Q.   And why not?
14      A.   Well, those are criminal acts.  I don't see --
15  I've never seen, you know, protestor engaging in a
16  criminal act like that.
17      Q.   Would you agree that the freedom to protest
18  and assembly has its limits?
19      A.   So, the laws are to allow non-criminal protest
20  activity, chanting, signs.
21      Q.   Are there any limitations on those rights --
22      A.   So, I guess I don't --
23      Q.   -- as far as you understand?
24      A.   Any limitations you mean that -- that
25  protest -- a protest assembly can start to behave in a

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1  criminal way, is that what you're asking me, if that's

2  allowed to act in a criminal way?

3        Q.   Yeah, I guess I'm asking --

4        A.   So --

5        Q.   -- if --

6        A.   -- of course --

7        Q.   -- you see --

8        A.   -- not to act --

9        Q.   -- any limitations that could be imposed to

10  protesting or freedom of expression or assembly.

11        A.   So, when -- you know, if pro- -- if a protest

12  assembly starts to behave in a criminal way, then

13  they're -- that's the limitation is what I understand.

14        Q.   Okay.

15        A.   Uh-huh.

16        Q.   Do you believe that the First Amendment allows

17  someone to commit acts of violence against the police?

18        A.   No.

19        Q.   Do you think that a person's right to protest

20  or the right to assembly absolves them from obeying laws?

21        A.   No.

22        Q.   Okay.  Do you believe that you, as a legal

23  observer, are absolved from obeying laws?

24        A.   No.

25        Q.   Do you think that protesting or assembling

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1   absolves you from impeding the flow of traffic?
 2        A.   No.  I know that there's a law to not block
 3   traffic.
 4        Q.   Okay.  Do you believe that protesting or
 5   assembling absolves you from dispersing when told?
 6        A.   Yes.
 7        Q.   And how so?
 8        A.   So, you're -- Oh, I'm sorry.  Did you say
 9   absolved from --
10        Q.   Yeah.
11        A.   -- dispersing?  Oh, I'm sorry.  I --
12        Q.   Do you think a person doesn't have to?
13        A.   Oh, no, no.  I thought you said do -- do --
14   should protestors disperse, and the answer is yes, they
15   should --
16        Q.   Okay.
17        A.   -- uh-huh.
18        Q.   And do you believe that these things apply to
19   you as a legal observer, as well?
20        A.   Yes.
21        Q.   Okay.  Do you believe that you were a part of
22   an assembly on September 15, 2017, and September 17 of
23   2017?
24        A.   So, the question is do I believe I was part of
25   an assembly?
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          Q.   Yes.
 2          A.   "Part of" is the question in my mind.  You
 3   mean a part of a demon- -- was I behaving in the part of
 4   a demonstration; is that your question?
 5          Q.   Well, I guess, were you -- were you in a
 6   location with multiple people who were protesting?
 7          A.   I observed protests, yes --
 8          Q.   Okay.
 9          A.   -- and was in those locations.
10          Q.   And you were amongst the protestors; correct?
11          A.   Well, if -- if you're amongst them, you're not
12   able to observe police, so that's why we usually position
13   our bodies away from protests (sic) --
14          Q.   Okay.
15          A.   -- and closer, much closer to police.  I'd
16   rather be, if the police are here (pointing) and the
17   protestors are here (pointing), I'm here (pointing).
18          Q.   Uh-huh.
19          A.   Not there (pointing).
20          Q.   How close would you typically say that you are
21   to the protestors?
22          A.   To the protestors?
23          Q.   Uh-huh.
24          A.   It depends on how close they are to the
25   police.  So, if -- So, I'm literally as close to the
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
1   police as I can get so that I can see badge numbers and
2   so forth and watch, listen to orders --
3         Q.   Uh-huh.
4         A.   -- but, you know.  So, if protestors are five
5   feet from the police, then that's probably around the
6   same distance that I am.  I'm with them at that point.
7         Q.   Okay.  When you are amongst the protestors or
8   observing the protestors --
9         A.   Well, I don't observe protestors, but...
10        Q.   Or you don't observe protestors?
11        A.   I observe interactions.  I -- I observe police
12  interactions with protestors --
13        Q.   Right.
14        A.   -- so...
15        Q.   And part of that is observing protestors, as
16  well, would you say?
17        A.   Not selectively, no.  If protestors are --
18  Like I said, we're focused on police, so a lot of times
19  there is some close interaction and then I'm seeing the
20  protestors, but there's not a selective point or role for
21  me to be observing protestors (demonstrating).
22        Q.   Okay.  Well, when you are observing police and
23  protestors and interactions with the two --
24        A.   Uh-huh.
25        Q.   -- if an unlawful assembly is declared --
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          A.   Uh-huh.
 2          Q.   -- do you think that that pertains to you?
 3          A.   Yes.
 4          Q.   Okay.  And, so, if an unlawful assembly is
 5     declared and it pertains to you --
 6          A.   Uh-huh.
 7          Q.   -- what do you understand to be your
 8     obligation then?
 9          A.   I would -- I would move.  That's -- That's
10     what I do is I -- I move away.
11          Q.   Okay.  Was an unlawful assembly declared on
12     the weekend of September 15, September -- yeah -- of
13     2017?
14          A.   I did hear dispersal orders to move west, for
15     example --
16          Q.   And that was at what point --
17          A.   -- was one of them, and -- and also in the
18     Central West End to move west.
19          Q.   Okay.
20          A.   Uh-huh.
21          Q.   Okay.  And whose right is it to declare an
22     unlawful assembly to your knowledge?
23          A.   I believe it's the police chief's, you know,
24     the people in -- the police who are in charge --
25          Q.   Okay.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          A.    -- which are the ones.
 2          Q.    To your knowledge, what does the word
 3    "disperse" mean?
 4          A.    So, let's say if there were a group of
 5    protestors blocking an entrance to a building or
 6    something and the police might come in and say -- give a
 7    dispersal order --
 8          Q.    Uh-huh.
 9          A.    -- then they would move from -- I'm assuming
10    they would move and the right thing to do would be to
11    remove from the entryway.
12          Q.    And would you expect them to move as a group
13    or to move in different directions individually?
14          A.    I mean, my -- I don't know if I have an
15    expectation of what protestors should do.  I mean, they
16    should listen to the police orders.
17          Q.    Okay.  What does "leave the area" mean to you?
18          A.    So, in my example, they would leave.  They
19    would leave the entryway to that building.
20          Q.    During the weekend of September 15, 2017, did
21    you walk in the street?
22          A.    I -- We try very hard to stay on the sidewalk
23    as much as we can.  That's why I usually take pictures
24    when there's a sign that says sidewalk closed or
25    something --
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          Q.   Uh-huh.
 2          A.   -- and then I'm in the street if I have to be.
 3          Q.   But were you in the street at some point the
 4     weekend of September 15, 2017?
 5          A.   Yes.  Yeah.  Observing.  When I'm obser- --
 6     When there's a police line --
 7          Q.   Uh-huh.
 8          A.   -- across a street, then I go to that police
 9     line --
10          Q.   Uh-huh.
11          A.   -- which is in the street.
12          Q.   Okay.  And when you were in the street, were
13     you blocking vehicular traffic by walking in the street?
14          A.   So, at the times that I'm thinking that I was
15     in the street were that line across Clark 'cause --
16     'cause a line formed, so I moved from the sidewalk to the
17     street to observe closeup that line.
18          Q.   Uh-huh.
19          A.   There was no way traffic would be coming
20     because there's a police line there.
21          Q.   Uh-huh.
22          A.   And the same time that for a few moments that
23     I moved from the sidewalk -- well, I was pushed off the
24     sidewalk anyway where Ken was sprayed --
25          Q.   Uh-huh.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
1        A.   -- so we were pushed into the street by a
2   police line, so there was no vehicular traffic because of
3   that police line.
4        Q.   Uh-huh.  When you were at Delmar and Skinker
5   and there was the die-in --
6        A.   Uh-huh.
7        Q.   -- were you in the street at that point?
8        A.   No.
9        Q.   At no point --
10       A.   'Cause there was --
11       Q.   -- were you in the street?
12       A.   -- no -- No, no, no.  Well, I was on the
13  sidewalk at that intersection and, again, I'm not, like,
14  focused on them, I'm focused on those police that are to
15  the north.  So, on the sidewalk.
16       Q.   Okay.
17       A.   Yeah.  And I was on the -- when they traveled
18  on Skinker south --
19       Q.   Uh-huh.
20       A.   -- I was on the sidewalk the whole time while
21  every -- all the protestors are in the street.
22       Q.   Okay.
23       A.   The only time I was not on a sidewalk was on
24  Forest Park because there was just a -- there was no
25  sidewalk on the side of the street that I ended up on.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1   So, it was a grassy area.  And then -- then there's no
 2   grassy.  Then there's just road, so --
 3           Q.   Uh-huh.
 4           A.   -- I was on the street for that small section.
 5           Q.   And what about at --
 6           A.   Because there was no sidewalk to be on, yeah.
 7           Q.   What about at Washington and Tucker, were you
 8   in the street at that point?
 9           A.   Washington and Tucker?  Okay, the kettle area?
10   I was on -- Anytime that I was in that intersection, I
11   was on the east side Tucker sidewalk or I crossed over
12   Tucker and I was on the west side Tucker parking lot or I
13   crossed over Washington and I was on the sidewalks of
14   Washington and then a little north of that sidewalk on --
15           Q.   Uh-huh.
16           A.   -- Tucker.
17           Q.   Okay.
18           A.   Until the lines moved in --
19           Q.   Uh-huh.
20           A.   -- and then I was on the street when the lines
21   moved in.  I was pushed to the intersection.
22           Q.   And, again, by "pushed," you mean that you
23   were told --
24           A.   Yes.
25           Q.   -- to move in that direction?
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          A.   Well, "Move back.  Move back," (gesturing),
 2    so...
 3          Q.   Okay.  Do you know how the protests of the
 4    weekend of September 15 were organized, if at all?
 5          A.   No, I wouldn't be involved or have any
 6    knowledge of organization of protests.
 7          Q.   How did you know to go to Tucker and Clark on
 8    September 15, 2017?
 9          A.   So, sometimes protest organizers will reach
10    out --
11          Q.   Uh-huh.
12          A.   -- to one of -- to people that they know who
13    are legal observers and say, you know, we're -- we're a
14    community group and we want -- we would like legal
15    observer presence at our protest and blah, blah, blah.
16          Q.   And did that happen the weekend of
17    September 15?
18          A.   I'm trying to think.  Let me think about that.
19    So, that situation was such a large, you know, that was
20    the -- that was the verdict day, right?
21          Q.   Uh-huh.
22          A.   So, it -- I must have just seen on Facebook
23    and then -- to know and communicate, you know, we talked
24    to each other on the phone, other legal observers, so I
25    knew to go to that position.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1        Q.   Okay.  And what about on September 16 at
2   Delmar and Skinker?
3        A.   'Cause I think you're -- if you're asking a
4   very specific thing like which organ- -- you know, which
5   organizer ca- -- called which person, I -- I can only
6   just say in general I know that our group has been
7   requested by a community group to show up at a certain
8   location.
9        Q.   Did that happen --
10       A.   So...
11       Q.   -- on September 16?
12       A.   Yes --
13       Q.   And --
14       A.   -- it would have happened, but I don't --
15       Q.   Did --
16       A.   -- recall.
17       Q.   Did that community -- What community group
18   would have reached out to you?
19       A.   Wow, I don't -- I don't know.
20       Q.   Uh-huh.  And do you remember if you were the
21   one that spoke to them or if another one of your legal
22   observers spoke --
23       A.   I don't --
24       Q.   -- to these --
25       A.   -- remember.

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          Q.   -- community organizers?
 2          A.   I don't remember.
 3          Q.   What about on September the 17th, how did you
 4   know that protests were taking place there -- then?
 5          A.   The 17th?  So, we were -- someone in our group
 6   must have been contacted -- and I honest to God don't
 7   remember if it was me or not -- to show up at that three
 8   o'clock march, so...
 9          Q.   And you don't remember who contacted you or
10   who --
11          A.   No.
12          Q.   -- told you about that?
13          A.   I want to say that one was Expect US.
14          Q.   Okay.
15          A.   But I don't know the specific person that
16   would have, you know.
17          Q.   Okay.  Do you communicate with people from
18   Expect US at times?
19          A.   They will -- They, like many other community
20   groups, will contact one of us about a protest, yes.
21          Q.   And who from Expect US would be the person
22   contacting you?
23          A.   I mean, Reverend gray was, yeah.
24          Q.   Okay.
25          A.   Uh-huh.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1           Q.   Is he pretty much it from Expect US?
 2           A.   I would -- Yeah, that I have heard from,
 3      uh-huh.
 4           Q.   What other community groups have contacted you
 5      to be a legal observer at protests?
 6           A.   So, not -- not me specifically, so -- and I
 7      don't have names for you, but there's many different
 8      community groups.  There's LGBTQ community, there's the
 9      Science March people, the Women's March people.
10           Q.   Okay.
11           A.   Immigration folks.  It's pretty limitless.
12           Q.   And how would they find out about you?
13           A.   I don't -- I can't answer how they find out
14      about us.  I don't know.
15           Q.   Do you post anything online advertising your
16      legal observing services?
17           A.   There is an NLG site.
18           Q.   What does NLG stand for?
19           A.   National Lawyers Guild.
20           Q.   Okay.  And is it your understanding that all
21      legal observers are listed there?
22           A.   Oh, no, we're not listed.
23           Q.   Okay.  What is on the NLG site that would help
24      community organizers know about legal observers?
25           A.   I would have to read it again to, you know...
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

 1    Just the existence of.

 2         Q.   Sure.   During your time protesting (sic), do

 3    you become --

 4         A.   You mean legal observing?

 5         Q.   -- legal observing --

 6         A.   Uh-huh.

 7         Q.   -- do you become familiar with individual

 8    protestors?

 9         A.   Sure.

10         Q.   What individual protestors did you observe

11    protesting the weekend of September 15, 2017?

12         A.   Yeah, I think I've already -- that should be

13    in my Interrogatories, too.

14         Q.   I have -- I have those here.

15         A.   Yeah.

16         Q.   I'm handing you --

17              MS. DUNCAN:   We can mark these as Exhibit A.

18              (At this point, an off-the-record discussion

19               was had.)

20              (At this point, Defendants' Exhibit Lewczuk A

21               was marked for identification.)

22                 (Questions by Ms. Duncan)

23         Q.   Handing you what's been marked as Defendant's

24    Deposition Exhibit A.  Do you recognize that document?

25         A.   Yes.

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1              Q.    And do you recognize that as the
 2      Interrogatories you filled out --
 3              A.    Yes.
 4              Q.    -- in preparation for this case?
 5              A.    Yes.
 6              Q.    Okay.   You said that you may have listed
 7      certain protestors that you recognized --
 8              A.    Excuse me.
 9              Q.    -- the weekend of September 15 --
10              A.    That's right.
11              Q.    -- somewhere in there?   Okay.   Feel free to
12      look through that and then --
13              A.    Find list?
14              Q.    -- if you could direct me to where you think
15      that answer is.
16                    (At this point, an off-the-record discussion
17                     was had.)
18              A.    So, those are not necessarily protestors.   I
19      think some of them are legal observers.   I think the --
20              Q.    And you're --
21              A.    -- question --
22              Q.    -- referring --
23              A.    -- is --
24              Q.    You're referring to question 6?
25              A.    Uh-huh.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          Q.   Is that right?

 2          A.   Uh-huh.

 3          Q.   Okay.

 4               THE WITNESS:  Should I read since this is an

 5       answer?

 6          A.   Okay.  So, the question was who I saw a --

 7       chemical agents deployed at?

 8          Q.   Other than those individuals listed, do you

 9       remember seeing any other protestors that you know of

10       specifically there the weekend --

11          A.   I --

12          Q.   -- of September 15?

13          A.   I don't.  I mean, I --

14          Q.   Okay.

15          A.   -- there are a lot of faces that seem

16       familiar, but yeah.

17          Q.   Okay.  Thank you.

18          A.   Uh-huh.

19          Q.   And how do you know the names of these

20       individuals?

21          A.   Well, some of them are legal observers that I

22       work with.

23          Q.   And who are those --

24          A.   Volunteer with.

25          Q.   -- if you want to list those legal observers?
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          A.   Ken, Steven, Scott, Margaret, Alicia, Mark,
 2   and Nicole.
 3          Q.   Okay.
 4          A.   And the rest of them are not legal
 5   observers --
 6          Q.   Okay.
 7          A.   -- but that I observed --
 8          Q.   Okay.
 9          A.   -- chemicals deploy at.
10          Q.   Okay.  And the people that you didn't mention
11   then are specific protestors that you are familiar with;
12   is that fair?
13          A.   Yes.
14          Q.   Okay.  And the protestors who are listed under
15   question Number 6, how do you know these people?
16          A.   From pro- -- protests --
17          Q.   Okay.
18          A.   -- yeah.
19          Q.   What has your interaction with them been?
20          A.   Just communicating with them.  I've gotten to
21   know them a bit over the years and --
22          Q.   Uh-huh.
23          A.   -- uh-huh.
24          Q.   Do you interact with them outside of protests?
25          A.   Yes, a bit.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          Q.    And who would that be?

 2          A.    Keith.

 3          Q.    Keith Rose?

 4          A.    Yes.

 5          Q.    Okay.

 6          A.    Jon Ziegler, Emily Davis.

 7          Q.    Are you aware that these three individuals

 8   have brought lawsuits against the City of St. Louis?

 9          A.    Let me look at the list again.

10          Q.    Sure.

11          A.    I -- I feel like I do know something about

12   Emily and a lawsuit, yes.

13          Q.    Okay.

14          A.    Keith, yes.  Ziegler, I -- I don't know.

15          Q.    Have you ever visited Mr. Ziegler's, I guess

16   it's his social media site, RebZ?

17          A.    I have seen, I have watched his livestreams a

18   couple of times --

19          Q.    Uh-huh.

20          A.    -- over the years, but I didn't know that he

21   has a -- Did you say he has a website?

22          Q.    I believe so --

23          A.    I don't know --

24          Q.    -- or a social media site.

25          A.    -- about that.  I've just kind of seen there's
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1   a livestream.
 2        Q.   Okay.  Have you seen Keith Rose, Jon Ziegler,
 3   or Emily Davis since the weekend of September 15, 2017?
 4        A.   Probably.  Emily does Homeless Outreach and
 5   I've done some of that, also.
 6        Q.   Okay.
 7        A.   Sorry I have to keep looking at this.
 8        Q.   That's fine.
 9        A.   So, you're asking if I've seen any of those
10   people since after the 17th-ish?
11        Q.   Right.
12        A.   Uh-huh.  Yes.  So, like I said, Emily with
13   Outreach.  Keith, I mean, he's a legal observer
14   coordinator, as well, so I see him.  And Nicole, I -- I
15   have seen her.  Also an Outreach person, so there or --
16   and, well, she's -- I'm sorry.  She's also a legal
17   observer, so I see --
18        Q.   Who is, Nicole?
19        A.   Yes.
20        Q.   Yes.
21        A.   So, I've seen her.  Ziegler, no, I have not
22   seen him since this event --
23        Q.   Okay.
24        A.   -- yeah.
25        Q.   And I'm sorry, I thought you said that
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1   Keith Rose was a protestor, not a legal observer?

2       A.   So, on this weekend --

3       Q.   Uh-huh.

4       A.   -- to my knowledge, he -- to my knowledge on

5   the 17th, Keith was not legal observing.

6       Q.   Okay.  And other than seeing Emily at this

7   Homeless Outreach, have you seen her at any protests, any

8   other protests since September 15, 2017?

9       A.   'Cause remember I have really not been to many

10  myself.  What was the one that we remembered I was at?

11      Q.   The Roy Blunt incident?

12           MR. ROTHERT:   The Roy Blunt.

13      A.   Okay.  Oh, yeah, I did.  I think I saw her

14  there one night.  I saw Keith there one night.  Not

15  Ziegler.

16      Q.   Okay.  And Keith, was he there in his capacity

17  as a legal observer at the Roy Blunt incident or was he

18  there as a protestor?

19      A.   No.  I mean, I just saw him pop up and talk to

20  him a little bit and I -- I can't say whether he was

21  protesting.

22      Q.   Okay.

23      A.   Yeah.

24           MS. DUNCAN:   Can we take a quick break?

25           (At this point, there was a break taken from

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1                   11:49 a.m. to 11:56 a.m.)

 2                  (Questions by Ms. Duncan)

 3          Q.   So, we talked about some of the protestors

 4   that you recognized on the weekend of September 17 --

 5          A.   Uh-huh.

 6          Q.   -- or the weekend of --

 7          A.   The weekend.

 8          Q.   -- September 15.

 9          A.   Right.

10          Q.   Did you recognize any police officers?

11          A.   Rossomanno.

12          Q.   Okay.

13          A.   I mean, I don't know that many police

14   officers, you know, by name.

15          Q.   Right.  Okay.

16          A.   So, that particular weekend, Jemerson --

17          Q.   Okay.

18          A.   -- yes, and Rossomanno are two that I know

19   that I recall at this time seeing.

20          Q.   And how do you know them?

21          A.   From previous protests; Ferguson and the city.

22          Q.   You said at Ferguson protests?

23          A.   Well, so, I know they're -- they're city, but

24   just different protests around the county, city.

25          Q.   Okay.  And what has your interaction with them
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1    been?

2            A.    So, you mean them specifically?

3            Q.    Uh-huh.

4            A.    So, nothing to -- nothing -- in terms of

5    Jemerson, nothing that I can recall that was super

6    adversarial or anything that I recall.  With Rossomanno,

7    I feel like I've observed where he will call an unlawful

8    assembly and order people to disperse who may not

9    necessarily be doing a criminal activity, like even

10   blocking a street --

11           Q.    Uh-huh.

12           A.    -- or beyond that.

13           Q.    And when have you experienced that with him?

14           A.    So, that -- specific dates, that's going to be

15   too difficult for me to --

16           Q.    Is it at --

17           A.    -- yeah.

18           Q.    -- general protests?  Do you remember which --

19           A.    Yes.

20           Q.    -- protest it were -- it was?

21           A.    Well, I can say at Clark and Tucker --

22           Q.    Okay.

23           A.    -- I saw him spraying people and, as you know,

24   I didn't hear a chemical munitions order --

25           Q.    Uh-huh.

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1        A.    -- warning given there --

2        Q.    Uh-huh.

3        A.    -- so that's one.  Yeah, I -- it's...

4        Q.    Anything prior to the protests of the weekend

5   of September 15?

6        A.    Yes, there was on Washington Street, I believe

7   it was after that weekend, and there was a march headed

8   east on Washington, and as soon as they got to Tucker, he

9   was there and I believe giving a dispersal order.

10        Q.    And were you there as a legal observer?

11        A.    Yes.

12        Q.    And this was when?  You said that was after

13   the weekend of September 15?

14        A.    I believe so.

15        Q.    Okay.

16        A.    Shortly after, maybe within a week.

17        Q.    Okay.  And you were out there as a legal

18   observer then or as a protestor?

19        A.    Legal observer --

20        Q.    Okay.

21        A.    -- uh-huh.  At -- I did not observe him at the

22   synagogue, but -- so I can't say.  I've seen a video of

23   him at the synagogue.

24        Q.    Okay.  Were you -- You said you weren't

25   present at the synagogue --

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          A.    That's right.

 2          Q.    -- incident?

 3          A.    We were blocked from going there, uh-huh.

 4          Q.    Okay.  Any other times that you've seen

 5     Rossomanno declare an unlawful assembly when you felt

 6     that it wasn't warranted?

 7          A.    I -- I can't recall, huh-uh.

 8          Q.    Did you participate or were you a legal

 9     observer of the Highway 40 blockage incident?

10          A.    I was a legal observer.

11          Q.    Okay.  And what did you observe about the

12     Highway 40 blockage incident?

13          A.    So, I was at -- I think we're back at Clark

14     again, aren't we?  I think I parked my car at Clark and

15     not Grand.  Here's my St. Louis thing that I'm not.

16     Jefferson.

17          Q.    Okay.

18          A.    So, I parked my car close to that intersection

19     and I observed approximately 80 or so protestors exiting

20     the highway at that point and onto Jefferson headed

21     north.

22          Q.    Okay.  Did you see protestors attempt to block

23     the highway or did you only see them coming away from

24     that situation?

25          A.    I only saw them coming away.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          Q.    Okay.

 2          A.    Uh-huh.

 3          Q.    Do you know whether teargas, pepper spray, or

 4   mace was utilized in that incident?

 5          A.    I -- Not that I can recall.

 6          Q.    Have you ever applied for a permit to protest?

 7          A.    Me personally?

 8          Q.    Uh-huh.

 9          A.    No.

10          Q.    Do you know that you can do that?

11          A.    In the city --

12                MR. ROTHERT:  No, wait just a second.  Let me

13       object --

14                MS. DUNCAN:  Sure.

15                MR. ROTHERT:  -- for lack of foundation.  Go

16       ahead.

17                MS. DUNCAN:  Sure.

18                THE WITNESS:  Should I --

19                MR. ROTHERT:  Go --

20                THE WITNESS:  -- answer?

21                MR. ROTHERT:  Yes, you can go --

22                THE WITNESS:  Oh.

23                MR. ROTHERT:  -- ahead and answer.  I just had

24       to get an objection --

25                THE WITNESS:  Or the best --
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
1              MR. ROTHERT:  -- on --
2              THE WITNESS:  -- I can?  Or yeah.
3              MR. ROTHERT:  No, answer.  No limitation.  Go
4        ahead and answer.
5              THE WITNESS:  Okay.
6                   (Questions by Ms. Duncan)
7        Q.   It's kind of weird.  It's like it never
8    happened --
9        A.   Okay.
10       Q.   -- when it does.  It's weird.
11       A.   So, from my knowledge, the City does not give
12   permits for marches --
13       Q.   Okay.
14       A.   -- in the city.
15       Q.   Okay.  So, you don't think that that can be
16   done in the city to your knowledge?
17       A.   To my -- To my knowledge.
18       Q.   To your knowledge, okay.  In any of the
19   protests that you've attended -- I know that you've said
20   as a legal -- So, on the weekend of September 15, you
21   were a legal observer.  On this protest that happened
22   on -- east on Washington and Tucker within a week of that
23   weekend, you were a legal observer --
24       A.   East --
25       Q.   -- is that right?
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          A.    -- of Washington and Tucker?
 2          Q.    I believe you said they were moving east on
 3    Washington towards Tucker.
 4          A.    Oh, that on the 17th?
 5          Q.    No.
 6          A.    What are you talking about now?
 7          Q.    This would have been the protest that happened
 8    a weekend after --
 9          A.    Oh --
10          Q.    -- that weekend.
11          A.    -- sorry.  Yeah.  Yes, I was a legal
12    observing.
13          Q.    You were a legal observer --
14          A.    That's right.
15          Q.    -- there, as well?
16          A.    That's right.
17          Q.    Have you ever been -- At what -- When did you
18    become a legal observer?
19          A.    I was trained in January of '15.
20          Q.    Okay.  And before that, had you been a
21    protestor?
22          A.    I went out a handful of times after
23    Mike Brown.
24          Q.    Okay.  And since becoming a legal observer in
25    January of 2015, have you attended any protests as a
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1    protestor?
2          A.   It's possible one -- maybe one or two times in
3    all those years.  It's possible.
4          Q.   And do you remember when that would have been
5    or what causes they would have been?
6          A.   The -- The community groups always need legal
7    observers, so that's when.  So, at this time, I can't
8    recall --
9          Q.   Okay.
10         A.   -- what they were.
11         Q.   On the weekend of September 15, 2017, do you
12   recall hearing that there was a free speech zone
13   designated for protestors?
14         A.   And I'm sorry, which week -- which location?
15   Which?
16         Q.   The -- Just the entire weekend.  I guess
17   predominantly it would have been on Clark and Tucker,
18   the -- the day of the 15th.
19         A.   Oh, by the mayor?  You mean the mayor made an
20   announcement or something that, okay, there's a free
21   speech zone?  I believe I might have heard that --
22         Q.   Okay.
23         A.   -- in that park there --
24         Q.   Okay.
25         A.   -- yeah.

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1      Q.   And at what time did you hear that, something
2  about a free speech zone?
3      A.   Maybe a day before or...
4      Q.   So, then on September 14 you would have heard
5  that?
6      A.   Possibly.
7      Q.   Okay.  And you said that you remember the
8  mayor saying something about that?
9      A.   I think it was like a message from the mayor
10 or something, yes.
11     Q.   Okay.  And do you remember where you recall
12 hearing that?
13     A.   TV or radio or something like that, uh-huh.
14     Q.   Do you remember where the free speech zone was
15 located?
16     A.   I believe the corner of Tucker and Market,
17 that park.
18     Q.   Okay.
19     A.   What's the name of that park?
20     Q.   Okay.  Do you remember any discussion of a
21 free speech zone the week from September 15 to the 17th?
22     A.   Are you saying --
23     Q.   Not from the mayor.  Just do you remember
24 hearing that amongst protestors or police?
25     A.   I don't recall hearing anything.

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          Q.   Okay.  Do you know of any officer-involved
 2    shootings since the Stockley verdict?
 3          A.   I have to -- Do you have a few minutes for me
 4    to think about it?  So, you're talking about any
 5    officer-involved shooting in the last year and a half?
 6          Q.   Right.
 7          A.   And that I'm -- that I'm aware of?
 8          Q.   Yeah.
 9          A.   There was an officer-involved shooting maybe
10    Friday, a Russian roulette amongst police officers --
11          Q.   Uh-huh.
12          A.   -- so that was one police officer shooting
13    another maybe.
14          Q.   Uh-huh.
15          A.   So, I'm aware of that one just going back from
16    there.  I -- I don't know if I'm going to be able to
17    remember at this --
18          Q.   That's okay.
19          A.   -- time.
20          Q.   That's okay.
21          A.   And I could be aware of something that I'm
22    forgetting.
23          Q.   Sure.  Do you remember being involved in any
24    protests as a legal observer because of any other
25    officer-involved shootings other than September 15?
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          A.    It -- It's possible.
 2          Q.    Okay.  Did you participate in any of
 3     the Ball-Bey protests --
 4          A.    No.
 5          Q.    -- as a legal observer?
 6          A.    No.
 7          Q.    Justice for Isaiah protests?
 8          A.    Yes.  So, I arrived as a legal observer
 9     probably within an hour after that shooting.
10          Q.    And when would that have been?  Do you
11     remember the --
12          A.    You mean --
13          Q.    -- the date?
14          A.    -- the -- No, I don't remember the date.
15          Q.    Okay.
16          A.    It was summertime.  I mean, it wasn't win- --
17     winter.
18          Q.    Okay.  And this would have been before or
19     after the Stockley verdict?
20          A.    Before.
21          Q.    At that protest, did you observe any mace,
22     pepper spray, or teargas deployed?
23          A.    In front of Isaiah Hammett's house?
24          Q.    Yeah.
25          A.    No, not that I was aware of.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1        Q.   At the protest that you observed a week after
2   September the 15th, did you observe any teargas, pepper
3   spray, or mace being deployed?
4        A.   Not that I recall, no.
5        Q.   I want to ask you about your legal observer
6   duties, what that is.
7        A.   Uh-huh.
8        Q.   What is a legal observer; how would you define
9   it?
10        A.   So, we are, as I said, contacted by community
11   groups who want to express their First Amendment right to
12   protest, usually in response to an event like a Muslim
13   ban --
14        Q.   Uh-huh.
15        A.   -- or a police shooting or Trump's -- Trump's
16   election --
17        Q.   Uh-huh.
18        A.   -- so forth or something, some piece of
19   legislation that's affected these community groups, so
20   we're contacted by them, they're having a protest.  And
21   we arrive and we observe police and police/protestor
22   interactions, their orders that -- the orders that are
23   given, arrests made.  We'll take detail down of
24   arrests --
25        Q.   Okay.

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1            A.    -- when, where, how, who.
 2            Q.    Okay.  And you mentioned some training, that
 3       you were trained in January of '15?
 4            A.    Uh-huh.
 5            Q.    Who conducted that training?
 6            A.    So, it was coordinators of the local chapter.
 7            Q.    Okay.  And is that what -- what is the local
 8       chapter called?
 9            A.    The National Lawyers Guild St. Louis Chapter.
10            Q.    Do you remember the specific trainers by name?
11            A.    I -- I know it was Scott and I believe there
12       was a second one.
13            Q.    Scott Kampas?
14            A.    Yes.
15            Q.    Do you remember the other one you said?
16            A.    It may have been Keith.
17            Q.    Keith Rose?
18            A.    Yes.
19            Q.    How long was the training?
20            A.    Two hours.
21            Q.    Where was the training held?
22            A.    That was in the Christ Church Cathedral next
23       to the library.
24            Q.    And what were you taught at the training?
25            A.    There's about 20 slides.  Just very general
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1    information.  Like the very general laws of freedom to

 2    assemble and observation.  You know, the purpose of us

 3    being there is observing police and looking for badge

 4    numbers, car numbers, and so forth.  What not to do.

 5         Q.   Uh-huh.

 6         A.   You know, intervening in a protest or

 7    giving -- we're instructed not to give legal advice

 8    because we're not legal people.

 9         Q.   Okay.  Do you know whether Scott or Keith Rose

10    are lawyers?

11         A.   They're not.

12         Q.   Okay.

13         A.   Uh-huh.

14         Q.   Do you know who trained them to be trainers?

15         A.   No.

16         Q.   And after completion, do you get a

17    certificate?

18         A.   No.

19         Q.   Do you get --

20         A.   No.

21         Q.   Okay.

22         A.   No.

23         Q.   It's just that you've done it?

24         A.   Just a familiar -- a familiarity with freedom

25    to assemble and what to look for in the interactions.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1          Q.    Okay.  And what is it that they train you to
2    look for?
3          A.    Take note of when orders are given and what
4    those orders are as specifically as possible word for
5    word.
6          Q.    Uh-huh.
7          A.    And the locations of police and protestors at
8    that moment when an order is given.  And what was the
9    rest of the question?  I forgot.
10         Q.    Sure.
11         A.    Yeah.
12         Q.    Just what -- what you're trained to look for.
13         A.    Right.  So, just the orders and the -- and the
14   scene, what's happening at the scene and if there were
15   arrests, uh-huh.
16         Q.    After you complete this training, are you put
17   on some kind of mailing list or how -- how would people
18   know to contact you if they wanted you to be a legal
19   observer at their protest?
20         A.    Just from -- I think legal observers have been
21   on the scene since Mike Brown and maybe even before
22   that --
23         Q.    Uh-huh.
24         A.    -- so they're known and I'm assuming a phone
25   number is exchanged.

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          Q.   Okay.  When you are at protests, do you hand
 2     out business cards?
 3          A.   No.
 4          Q.   Okay.  As part of your training, are you
 5     taught to call police fucking cowards?
 6          A.   Oh, gosh, no.
 7          Q.   Okay.  As part of your training as a legal
 8     observer, were you taught to tell protestors that police
 9     are coming to kill them?
10          A.   No.
11          Q.   As part of your training as a legal observer,
12     are you told to stand a safe distance from the action for
13     your self-protection?
14          A.   So, if there's an interaction, I often get as
15     close as three to four feet away from that interaction.
16     That's about as close as, unless I'm giving -- given an
17     order from a police officer to move back, then I -- then
18     I move back a couple of feet and --
19          Q.   Uh-huh.
20          A.   -- I get my orders from them and an idea of
21     how much distance to give.
22          Q.   And is that something that you were trained to
23     do or is that just kind of your comfort level?
24          A.   We're trained to get close enough to the
25     interaction to be able to observe it --
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          Q.   Okay.
 2          A.   -- in case there's any brutality.
 3          Q.   Okay.  Are you taught or were you trained as a
 4     legal observer to carry a face mask?
 5          A.   Yes.
 6          Q.   And were you carrying a face mask the weekend
 7     of September 15?
 8          A.   Yes.  And by "face mask," it can be just the
 9     paper, you know.
10          Q.   As a legal observer, are you taught that laws
11     do not pertain to you?
12          A.   That's not correct, no.
13          Q.   Okay.  As part of your training, are you
14     taught that police commands do not pertain to you?
15          A.   No.
16          Q.   You understand that if you're getting three to
17     four feet from the action, shall we say, is that fair --
18          A.   (Nodding.)
19          Q.   -- that there might be some collateral damage
20     that ensues; is that right?
21          A.   Can you -- I don't know what you mean by --
22          Q.   Sure.  So, I'll try and give you an example.
23     So, if you are trying to observe a rambunctious resisting
24     of arrest and you are close to that situation, you
25     understand that it's possible that somehow, someway maybe
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1    you could get hurt or -- or hit or that something could

2    happen if you're standing that close to that kind of

3    situation; is that right?

4          A.    So, I am not trained to know even whether that

5    would be a resisting arrest kind of a thing or maybe the

6    person's complying and is being dragged or -- so that's

7    the first thing I just want to say.

8          Q.    Uh-huh.

9          A.    So, I like to be there to observe it so that

10   if that -- that evidence needs to be given --

11         Q.    Uh-huh.

12         A.    -- then it's interpreted later by an attorney

13   whether that or a police officer charge, so I guess I

14   wouldn't -- I wouldn't absolve police from the fact that

15   they can't assault me.  If I happen to be close, I

16   don't --

17         Q.    Uh-huh.

18         A.    -- feel like that just because I'm close,

19   three to four feet away, does not --

20         Q.    Uh-huh.

21         A.    -- give them the right to assault me.

22         Q.    Right, and I'm not suggesting --

23         A.    Yeah.

24         Q.    -- that.  I guess my question, ma'am, is just,

25   do you recognize that there are certain risks with being

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

 1    so close to the action?  Being three or four feet away,

 2    do you understand that there are some risks that could be

 3    associated with that?

 4         A.   Yes.

 5         Q.   Okay.  And a part of those risks, for example,

 6    if someone is getting maced or pepper-sprayed and you are

 7    that close, that then you could be impacted by that?

 8         A.   Yes.

 9         Q.   And would you see that as part of your job as

10    a legal observer is to engage in those kind of risks?

11         A.   Not necessarily, because some legal observers

12    choose not to take that risk and, so, it's not a

13    requirement, no.

14         Q.   But, I guess, do you take that risk?  Do

15    you --

16         A.   Not all the time.  Not all the time.

17         Q.   On the weekend of September 15, 2017, did you

18    take those risks at times?

19         A.   Yes.

20         Q.   Okay.  You voluntarily signed up to be a legal

21    observer; is that right?

22         A.   That's right.

23         Q.   And you voluntarily engage -- or you

24    voluntarily engage in the risk of standing close to

25    protestors in their interaction with police; is that

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1   right?
 2          A.    Yes.
 3          Q.    I noticed on -- there's a Declaration that you
 4   submitted for the preliminary injunction.
 5          A.    Uh-huh.
 6          Q.    It's Exhibit J and I won't enter it right now,
 7   but it says here that you're a coordinator of -- it says
 8   legal observer coordinator.
 9          A.    Uh-huh.
10          Q.    Is that still true today?
11          A.    Uh-huh, uh-huh.
12          Q.    Okay.  And what does that entail; what makes
13   you a coordinator?
14          A.     It's just someone on the ground at a
15   protestor (sic) that the other legal observers can get
16   direction from in terms of location where -- where to
17   position ourselves.
18          Q.    Okay.
19          A.    That's pretty much it, uh-huh.
20          Q.    So, is there like a -- I mean, I would just
21   imagine is there like a huddle before the protest to kind
22   of direct people where they're going to be standing?
23          A.    Yeah, we...
24          Q.    Okay.
25          A.    Ideally, but not always, yeah.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          Q.   Right.  And does -- did that happen on
 2   September 15 of 2017?
 3          A.   Which location?
 4          Q.   At the one before you go to the Central West
 5   End there by the courthouse on Tucker and Clark.
 6          A.   So, there's an example of not really.  It was
 7   very large and I don't recall any kind of a huddle,
 8   huh-uh.
 9          Q.   Okay.
10          A.   One of us might -- might be kind of close to
11   the front of a march --
12          Q.   Uh-huh.
13          A.   -- and, so, they're just staying in that
14   position and then others are in the back, so they stay in
15   a position.
16          Q.   Okay.
17          A.   It's not always coordinated, yeah.
18          Q.   Okay.  Sometimes it can be, sometimes it's --
19          A.   Right.
20          Q.   -- not depending on, I guess, maybe how
21   impromptu --
22          A.   Right.
23          Q.   -- how much notice you have of the protest?
24          A.   Or just when we're arriving, uh-huh.
25          Q.   Okay.  And do you contact your other legal
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1    observers by phone, do you text each other, or do you

 2    just -- how do you identify each other?

 3            A.   Yeah, we're -- we're on our phone.

 4            Q.   Okay.

 5            A.   Uh-huh.

 6            Q.   With all your legal observers, are there,

 7    like, monthly meetings or any kind of scheduled

 8    meetings --

 9            A.   No.

10            Q.   -- or organized meetings of that kind?

11            A.   No.

12            Q.   Okay.  Just looking at the photos, I see that

13    you have florescent green hats on.

14            A.   Uh-huh.

15            Q.   Where did you get those hats from?

16            A.   So, when legal observers arrive to a

17    protestor -- I mean to a protest --

18            Q.   Sure.

19            A.   -- the coordinator will -- will give them a

20    hat temporarily --

21            Q.   Okay.

22            A.   -- to wear.

23            Q.   So, as the coordinator, then you keep all

24    those hats or do you disburse?

25            A.   I have a couple, uh-huh.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1           Q.   Okay.  But I guess where are those from, do
 2     you make those yourselves?
 3           A.   No, no, they're purchased from -- it's a
 4     national organization.  I don't -- I don't --
 5           Q.   From the National Lawyers Guild --
 6           A.   Yes.
 7           Q.   -- is that where you get them?
 8           A.   But I don't know that address or --
 9           Q.   Sure.
10           A.   -- how to order them.
11           Q.   Sure.  And what do they say on the green hats?
12           A.   National Lawyers Guild.
13           Q.   Okay.  Does it say legal observer on it, as
14     well, or is it just National Lawyers Guild?
15           A.   Yes, I believe you're right.
16           Q.   Okay.
17           A.   Yes.
18           Q.   Okay.  You talked about how as a legal
19     observer you're trained to kind of take in the scene of
20     the protest; is that fair?
21           A.   Uh-huh.
22           Q.   And then you're taught to observe police
23     behavior; correct?
24           A.   That's right.
25           Q.   Okay.  But you understand, don't you, that
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1    police behavior does not happen in a vacuum?
 2            A.    Uh-huh.
 3            Q.    That someti- -- Is that a "yes"?
 4            A.    I guess I need clarification on "in a vacuum."
 5            Q.    Sure.  So, police officers are not acting --
 6    they often are reacting to situations or contexts of
 7    situations; would you agree with that?
 8            A.    Do you mean emotionally on a personal level --
 9            Q.    I mean --
10            A.    -- reacting rather than under an order of a
11    supervisor?
12            Q.    No, I mean as far as just in their police
13    duties that there are times that they perform certain
14    actions as a police officer in response to a protestor's
15    actions.
16            A.    Uh-huh, yes.
17            Q.    Is that fair?
18            A.    Yes.
19            Q.    Okay.  And, so, as a legal observer, you would
20    want to observe both the actions of the police and the
21    protestors; is that fair?
22            A.    Yes.
23            Q.    Okay.  Because you would want to get a full
24    picture of why the police are acting in one way and why
25    the protestors are reacting or responding in a certain
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1    way; is that right?
 2            A.    So, I don't get that full picture because I'm
 3    selectively looking at police, so -- and I don't put
 4    myself in that judgment position of, okay, this happened,
 5    so, yeah, that makes sense that that happened and this
 6    and that.
 7            Q.    Uh-huh.
 8            A.    That's beyond my duties --
 9            Q.    Uh-huh.
10            A.    -- or ability to interpret --
11            Q.    Uh-huh.
12            A.    -- so I'm selectively focused on police.
13            Q.    Okay.  So, if a police officer were to mace or
14    pepper spray someone, you would only be looking at that
15    activity and not perhaps the causes of that activity --
16            A.    I --
17            Q.    -- is that right?
18            A.    I -- I might miss that prior activity --
19            Q.    Okay.
20            A.    -- if it happened out of my sight.  If I'm
21    looking here (pointing), maybe something happened over
22    here (pointing) --
23            Q.    Yeah.
24            A.    -- and I'm seeing a reaction.
25            Q.    Yeah.  And in our conversation today, there
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1  have been many times when you haven't been able to recall

2  what protestors have done or what have caused police to

3  react in a certain way; is that fair?

4          A.   Can you repeat that?

5          Q.   Sure.  So, during the course of our

6  conversation today, you have been able to recall that

7  police have maced or pepper-sprayed someone but have not

8  been able to recall maybe some of the reasons they may

9  have done that?

10         A.   Right, I'm -- I'm -- people -- protestors are

11 in particular places, which may be on the street

12 unlawfully, if they're blocking traffic and so forth, so

13 I usually can presume why they're being given a dispersal

14 order, but I often don't see those individual occurrences

15 that you're talking about, like if someone threw a rock

16 or all these -- these individual actions, I don't always

17 see that.

18         Q.   Uh-huh.

19         A.   I see a larger -- The larger picture is

20 usually what I'm capturing.

21         Q.   The larger picture of police --

22         A.   People are assembled, you know, outside a

23 house or in a street, but something could happen that

24 took a few seconds over here or there (pointing) and I --

25 it doesn't necessarily mean that I saw that.

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          Q.   Right.

 2          A.   Right.

 3          Q.   And, so, if you see a police officer reacting

 4   to that with mace or pepper spray, you would see only

 5   what the police officer does, but not the protestor who

 6   may have -- may have done something to warrant that

 7   behavior; is that fair?

 8          A.   That's possible.

 9          Q.   Okay.

10          A.   That's possible, yeah.

11               MS. DUNCAN:  Could I have just a second to --

12               MR. ROTHERT:  Uh-huh.

13               MS. DUNCAN:  -- pop out for a second?

14               (At this point, there was a break taken from

15               12:28 p.m. to 12:37 p.m.)

16                  (Questions by Ms. Duncan)

17          Q.   Ma'am, I'll just ask you if -- I know that you

18   said after the Stockley verdict protests on the weekend

19   of September 15, 2017, that you had participated in one

20   other protest as a legal observer at the Roy Blunt

21   protest --

22          A.   Yes.

23          Q.   -- correct?  Have there been any other

24   protests that you have legally observed since the weekend

25   of September 15, 2017?
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1        A.    There have been other ones.  One more that I'm
 2   recalling now is on October 9, Union Station in the
 3   morning, and it was a response -- it was high school
 4   students in response to the Parkland shooting.
 5        Q.    Okay.  And you were a legal observer --
 6        A.    That's right.
 7        Q.    -- at that protest?  Was there any police
 8   presence at that protest?
 9        A.    Yes.
10        Q.    Okay.  Was there any teargas, pepper spray, or
11   mace deployed --
12        A.    No.
13        Q.    -- at that protest?
14              MR. ROTHERT:  Excuse me for a moment.  You've
15         been doing really great, but right now you're kind
16         of giving your answers before the questions are
17         done --
18              THE WITNESS:  Okay.
19              MR. ROTHERT:  -- so let her finish the
20         question.
21              THE WITNESS:  Okay.
22        Q.    Sorry, I --
23              MR. ROTHERT:  Otherwise it won't look right.
24              THE WITNESS:  Okay.
25              MR. ROTHERT:  Thank you.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1          Q.   Thanks.  And I just want to make sure the

2     record is clear.  On -- Your testimony is that the

3     weekend of September 15, 2017, you did not engage in any

4     protest activity?

5          A.   That's correct.

6          Q.   Okay.  So, you did not chant anything with

7     protestors; is that correct?

8          A.   That's correct.

9          Q.   And you didn't hold signs?

10         A.   That's correct.

11         Q.   And you didn't shout anything to police?

12         A.   That's correct.

13         Q.   Are you paid to be a legal observer?

14         A.   No.

15         Q.   Okay.  It's a pure voluntary type of position?

16         A.   Yes.

17         Q.   Before you became a legal observer in January

18    of 2015, I believe you said that you had engaged in

19    protest activity before that as a protestor?

20         A.   Yes.

21         Q.   And I think you mentioned the Michael Brown

22    protests in Ferguson?

23         A.   Yes.

24         Q.   Any -- How many protests would you say you

25    attended as a protestor before January of 2015?

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1          A.   Five; something like that.
 2          Q.   And were those all in relation to the
 3   Michael Brown shooting?
 4          A.   Yes.
 5          Q.   And since you have become a legal observer in
 6   January of 2015, how many protests would you say you've
 7   attended as a legal observer?
 8          A.   As a legal observer?
 9          Q.   Uh-huh.
10          A.   Since which date, January, '15?
11          Q.   Since you became one.
12          A.   Uh-huh.  300?  200?  A lot.
13          Q.   Okay.
14          A.   Is that --
15          Q.   That is a lot.
16          A.   Yeah.
17          Q.   And do you keep a record of any of the
18   protests that you've attended?
19          A.   No.
20          Q.   You said that you are able to take in the
21   scene in the big picture as a legal observer; is that
22   correct?
23          A.   I think that I said that it's not our role to
24   take in the whole picture.  Our role is selective to when
25   there's an interaction between police and protestors.
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1      Q.   Okay.

2      A.   That's the hyperfocus.

3      Q.   Okay.  Would you agree -- and I believe you've

4  already testified -- that in some groups, there are both

5  protestors and those who commit criminal acts; is that

6  fair?

7      A.   Yes.

8      Q.   Okay.  So, there could be some protestors

9  mixed in with people who commit property damage, for

10  example?

11      A.   Yes.

12      Q.   And you are solely focused on the police who

13  are responding to any kind of behavior, be it from

14  protestors or criminal acts; would you say that's true?

15      A.   Yes.

16      Q.   Okay.  And your focus is on the police and how

17  they respond?

18      A.   Yes.

19      Q.   Okay.  So, is it possible -- Well, I guess if

20  your focus is on the police, it wouldn't be possible for

21  you to know whether police response is to the criminal

22  activity or to the protesting activity; is that fair?

23      A.   I have seen police officers respond to

24  protests that are not engaging in criminal activity that

25  I could see.

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1          Q.    Okay.  But I guess that wasn't my question.

2                MS. DUNCAN:  Sara, could you read back my

3      question because I forgot how I worded it?

4                (At this point, the reporter read back the

5                question beginning on Page 179, Line 19.)

6          A.    Isn't possible seems strong.  And if you're

7      talking about every single situation I'm in, it's too

8      hard to answer that question yes or no because there may

9      be some of those many protests where that was more

10     evident.

11               MS. DUNCAN:  Okay.  I have no further

12     questions at this point.

13               MR. ROTHERT:  Okay.  We'll review.

14               (Deposition adjourned at 12:43 p.m.)

15                    (SIGNATURE RESERVED)

16

17

18

19

20

21

22

23

24

25

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
 1   STATE OF                    )
                                 ) SS
 2   COUNTY OF                   )

 3

 4         I, PAMELA LEWCZUK, do hereby state that the

 5   foregoing statements are true and correct to the best of

 6   my knowledge and belief.

 7

 8

 9

10

11         _____

12                  PAMELA LEWCZUK

13

14

15         Subscribed and sworn to before me this _____ day

16   of _____, 2019.

17

18

19

20         _____

21                  NOTARY PUBLIC

22

23   My Commission Expires:

24

25
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
1                   DEPOSITION CORRECTION SHEET
                    DEPOSITION OF PAMELA LEWCZUK
2

3      In Re:  MALEEHA AHMAD, et al vs. CITY OF ST. LOUIS
       No.  4:17-CV-2455 CDP
4

5      Page:   Line:          Should Read:
       Reason:
6
       Page:   Line:          Should Read:
7      Reason:

8      Page:   Line:          Should Read:
       Reason:
9
       Page:   Line:          Should Read:
10     Reason:

11     Page:   Line:          Should Read:
       Reason:
12
       Page:   Line:          Should Read:
13     Reason:

14     Page:   Line:          Should Read:
       Reason:
15
       Page:   Line:          Should Read:
16     Reason:

17     Page:   Line:          Should Read:
       Reason:
18
       Page:   Line:          Should Read:
19     Reason:

20

21     _____
                    SIGNATURE OF DEPONENT
22

23

24

25
```

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

1                 C E R T I F I C A T E

2

3          I, Sara Alice Masuga, Certified Shorthand

4    Reporter and Certified Court Reporter within and for the

5    States of Illinois and Missouri, DO HEREBY CERTIFY that

6    pursuant to agreement between counsel that on January 28,

7    2019, at the offices of the ACLU, 906 Olive Street,

8    St. Louis, Missouri, there appeared before me the

9    aforementioned witness, and having been duly sworn to

10   tell the whole truth, was examined, and the examination

11   was taken down in shorthand by me and afterwards

12   transcribed upon the computer, and said transcription is

13   herewith returned.

14          IN WITNESS WHEREOF, I have hereunto subscribed my

15   name this 9th day of February, 2019.

16

17

18

19

20

21          _____
            Sara Alice Masuga, CSR, CCR
            IL CSR No. 084-002993
22          MO CCR No. 1012

23

24

25

MALEEHA AHMAD, et al v. CITY OF ST. LOUIS
Deposition of PAMELA LEWCZUK taken on 01/28/2019

```
                    MASUGA REPORTING SERVICE
                      2033 Hiawatha Avenue
                    St. Louis, MO  63143-1215
                        (314)680-2424


February 9, 2019


ACLU
Attn:  Anthony E. Rothert, Esq.
906 Olive Street
Suite 1130
St. Louis, MO  63101
In Re: MALEEHA AHMAD, et al vs. CITY OF ST. LOUIS
No. 4:17-CV-2455 CDP


Dear Mr. Rothert:


Enclosed herewith, please find your copy of the
deposition transcript of PAMELA LEWCZUK taken in the
above-styled matter along with the original signature
page of same.
Please have the deponent read your copy of the
transcript, note any corrections to be made, sign the
original signature page, have the deponent's signature
notarized where indicated, and return the signed
signature page and correction sheets to Ms. Duncan for
proper filing of the original transcript with the Court.


Thank you for your attention to this matter.


Sincerely,


MASUGA REPORTING SERVICE



Sara Alice Masuga, CSR, CCR


cc:  Ms. Duncan
```