**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| MALEEHA AHMAD, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) No. 4:17-cv-2455 CDP |
| | ) |
| CITY OF ST. LOUIS, MISSOURI, | ) |
| | ) |
| Defendant. | ) |

**Memorandum in Opposition to Defendant's Motion to
Dissolve Preliminary Injunction and Dismiss**

Defendant City of St. Louis seeks dismissal of this case under Fed. R. Civ. P. 12(h)(3) and dissolution of the preliminary injunction entered on November 15, 2017. ECF No. 126. The request for dismissal should be denied because it relies entirely on matters outside the pleadings that nonetheless do not undermine the Court's subject-matter jurisdiction. And although the City submits a large volume of evidence representing a portion of the information gathered through discovery so far, that evidence does not warrant reconsideration of the preliminary injunction, which was premised on testimony from the City's own officials as well as lay witnesses, none of whose testimony is brought into question by the new evidence. Moreover, the evidence is presented without context, occasionally redacted, and, in the case of video recordings, accompanied by unsworn commentary describing the date, time, location, and circumstances of the snippets, such that an evidentiary hearing is warranted.

**I.      The motion to dismiss should be denied.**

The City invokes Federal Rule of Civil Procedure 12(h)(3) to dismiss this action. Rule 12(h)(3) provides that "[i]f the court determines at any time that it lacks subject-matter

1

jurisdiction, the court must dismiss the action." The Supreme Court has made clear that disagreement over *either* the merits of a case *or* the scope of a constitutional or statutory right will not typically implicate subject-matter jurisdiction. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) ("It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction . . . . [T]he district court has jurisdiction if the right of the petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another") (internal citations and quotation marks omitted). Indeed, even where a federal claim is inadequate, it is proper to dismiss for lack of subject-matter jurisdiction "only when the claim is so insubstantial, implausible, foreclosed by prior decisions of th[e Supreme] Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Id.* (internal quotation marks omitted).

If a party believes the district court lacks subject-matter jurisdiction over a claim, it may assert that lack as a defense and move for dismissal under Rule 12(b)(1). Such a motion can mount either a "facial attack" or "factual attack" on jurisdiction. *Davis v. Anthony, Inc.*, 886 F.3d 674, 679 (8th Cir. 2018). "A factual attack occurs when the defendant challenges the veracity of the facts underpinning subject matter jurisdiction." *Id.* (internal quotation marks omitted). This seems to be the type of attack the City is advancing here.

Although the City generally avers that the circumstances of the case deprive the Court of equity jurisdiction, it does not specify any facts in the Amended Complaint that are challenged by any specific evidence. "The Judiciary Act of 1789 conferred on the federal courts jurisdiction over 'all suits . . . in equity.'" *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318 (1999). For the most part, that equity jurisdiction is in line with what was

2

"exercised by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act." *Id.* (quoting A. Dobie, Handbook of Federal Jurisdiction and Procedure 660 (1928)). The equity jurisdiction of the High Court of Chancery in England in the late 18th century—and by extension the federal courts of today—unquestionably included the power to enjoin an arm of the government from undertaking allegedly unconstitutional action upon appropriate proof. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978); *Vicksburg Waterworks Co. v. City of Vicksburg*, 185 U.S. 65, 82 (1902) ("It is further contended . . . that mere apprehension that illegal action may be taken by the city cannot be the basis of enjoining such action . . . . We cannot accede to this contention. It is one often made in cases where bills in equity are filed to prevent anticipated and threatened action. But it is one of the most valuable features of equity jurisdiction, to anticipate and prevent a threatened injury, where the damages would be insufficient or irreparable.").

Plaintiffs seek prospective relief to prevent Defendant City from enforcing certain customs and policies in the future that they have alleged to be unconstitutional. The City suggests that the Court lacks equity jurisdiction because damages lawsuits have been filed over the City's past enforcement of some of these policies or customs.[1] However, a suit seeking retroactive redress for past constitutional violations does not afford the relief Plaintiffs seek: the halting of unconstitutional activity in the future. The City points to no case supporting the notion that the availability of damages as a remedy for a past constitutional violation eliminates

---

[1] In an effort to buttress its claim that jurisdiction is lacking, the City rehashes its argument that Plaintiffs lack standing. Plaintiffs have standing. *See* ECF No. 57 at 28. In their class-certification reply brief, Plaintiffs explained why they and members of the putative class have standing. *See* ECF No. 119 at 2-6. Plaintiffs incorporate that elucidation here.

3

jurisdiction to determine whether prospective relief should be allowed. Indeed, it is not unusual for damages and prospective relief to be awarded in the same case.

Defendant City also suggests that prospective relief is not warranted because there have been no incidents of "mass protests" in the City that have "entailed unlawful assemblies or police use of chemical agents." It is unclear how this would affect jurisdiction, but it is meritless nonetheless. Neither this case nor the preliminary injunction are limited to mass protests, and the City does not advise whether there have been more modestly attended protests that have "entailed unlawful assemblies or police use of chemical agents." More to the point, however, to the extent no one has alleged a misuse of the unlawful-assembly ordinance or chemical agents at a mass protest since fall 2017, that fact can be attributed to the tailored preliminary injunction, not the lack of need for equitable relief. In essence, the City argues the Court now lacks subject-matter jurisdiction to issue a permanent injunction because the City has complied with the preliminary injunction—at least, at mass protests. Not only is this conception of subject-matter jurisdiction not supported by law,[2] it is also a bit like saying we can tear down the levee because we have gone almost two years without a flood.

## II. The motion to dissolve the preliminary injunction should be entertained after an evidentiary hearing and then denied.

In deciding whether to issue a preliminary injunction, courts in the Eighth Circuit consider the four factors articulated by the *Dataphase* court: (1) the probability that Plaintiffs will prevail on the merits, (2) whether Plaintiffs face a threat of irreparable harm absent the injunction, (3) the balance between the harm Plaintiffs face and the injury that the injunction's

---

[2] *See Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009) ("[N]o purpose is served by indirectly arguing the merits in the context of federal jurisdiction. Judicial economy is best promoted when the existence of a federal right is directly reached and, where no claim is found to exist, the case is dismissed on the merits.") (quoting *Williamson v. Tucker*, 645 F.2d 404, 415 (5th Cir. 1981)).

4

issuance would inflict upon Defendants, and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc); *accord Amos v. Higgins*, 996 F. Supp. 2d 810, 812 (W.D. Mo. 2014). When a plaintiff demonstrates likely success on a First Amendment free-speech claim, the remaining factors are generally deemed to be satisfied. *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (en banc). This Court previously concluded that all four *Dataphase* elements weighed in favor of a preliminary injunction. ECF No. 57.

    a. *The City's long delay and the approaching trial date counsel in favor of deferring ruling on the preliminary injunction until after an evidentiary hearing*

The City waited until March 29, 2019 to ask the Court to dissolve the preliminary injunction entered on November 15, 2017, ECF No. 58. The motion came 499 days after the injunction took effect and a mere 150 days before this case is scheduled for trial on the merits. The combination of delay with a quickly approaching trial counsels in favor of deferring any ruling on the motion until the Court has an opportunity to consider the evidence advanced by both sides at trial. This is especially true because the sizeable volume of evidence attached to the City's motion is of little value as presented and represents only a fraction of the evidence accumulated during the discovery period.

    b. *Nothing in the City's motion undermines the Court's central conclusions following the 2017 evidentiary hearing*

The reasons for the preliminary injunction remain sound. Not only does the evidence submitted by the City fail to contradict the evidence presented at the preliminary injunction hearing, it in many respects supports it. At the last evidentiary hearing, after hearing from

5

twenty-one live witnesses and reviewing affidavits, documents, and video recording, the Court determined that the following conclusions warranted a preliminary injunction:

- "[P]laintiffs have presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant's custom or policy is to permit officers to issue vague dispersal orders to protesters exercising their first amendment rights in an arbitrary and retaliatory way and then to enforce those dispersal orders without sufficient notice and opportunity to comply before being subjected to uses of force or arrest, in violation of plaintiffs' First and Fourth Amendment rights."

- "Plaintiffs have presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant's custom or policy is to permit any officer to declare an unlawful assembly in the absence of the force or violence requirement of St. Louis City Ordinance 17.16.275 and Mo. Rev. Stat. § 574.060, in violation of plaintiffs' First and Fourth Amendment rights."

- "Plaintiffs have also presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant has a custom or policy of using chemical agents without warning on citizens engaged in expressive activity that is critical of police or who are recording police in retaliation for the exercise of their first amendment rights, in violation of the First, Fourth, and Fourteenth Amendments."

- "Plaintiffs also introduced sufficient, credible evidence of people being maced while simply recording police activity and/or voicing criticism of officers and for no readily apparent, legitimate law enforcement purpose, contrary to the official written policy regarding recording set out in Special Order 1-06."

ECF No. 57.

The evidence submitted with Defendant City's motion is largely consistent with the testimony from the City's own witnesses at that hearing: although it violates City ordinance to protest on a street or sidewalk, groups are allowed to do so until police officers exercise their discretion to decide that a protest may no longer continue. This unfettered discretion—and the consequences such as vague dispersal orders and the use of chemical agents that flow from it—are precisely the problem about which Plaintiffs complain in this suit. *See City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) (holding that a law may be unconstitutionally vague because it "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct

it prohibits," because it "authorize[s] and even encourage[s] arbitrary and discriminatory enforcement," or both).

Through discovery, Plaintiffs have uncovered more evidence that further supports the conclusion that they are likely to succeed on the merits of their claim. To that end, if the Court decides to reconsider the preliminary injunction, Plaintiffs request an evidentiary hearing—either at the already scheduled trial on the merits or at an earlier date—on the motion to dissolve the preliminary injunction.[3]

c. *Deposition testimony further supports Plaintiffs' constitutional claims and request for prospective injunctive relief*

Discovery and investigation continue, and Plaintiffs are not prepared to put forward all of their evidence in a written response.[4] However, deposition testimony from the City's Rule 30(b)(6) designee and the former acting commissioner of police, even taken alone, demonstrate that Plaintiffs remain likely to succeed on the merits of their constitutional claims.

For example, Plaintiffs remain likely to succeed on their challenge to the City's policies and practices regarding the issuance of dispersal orders for alleged unlawful assemblies. The "standard policy and practice" is that "any officer [c]ould issue the dispersal order." Dep. of Major Eric Larson, Rule 30(b)(6) designee, Apr. 8, 2019, at 215. The language in the dispersal order is "not mandatory per se." *Id.* at 209; *accord* Prel. Inj. Tr. Vol. II 15:4-9, Testimony of Timothy Sachs (stating that officer has discretion to decide what specificity to include in dispersal order). The dispersal order does not include any language that instructs individuals to cease congregating together. Larson Dep. 210. It does not instruct individuals how far they have

---

[3] At this late date, Plaintiffs believe that the best time for an evidentiary hearing is the already scheduled trial and that the Court should defer ruling on the request to dissolve the preliminary injunction until the close of evidence. However, Plaintiffs will make themselves available for an earlier hearing if the Court directs.

[4] The parties have conducted thirty depositions, with additional depositions scheduled.

7

to go in order to leave the area. Larson Dep. 210-11; *accord* Sachs at Tr. Vol. II 80:6-17 (responding "I couldn't give you what is enough" when asked how many blocks a person must go and "I don't know" when asked how a person on the street is supposed to know how far is enough). It does not tell anyone for how long they have to leave the area. Larson Dep. 212; *accord* Sachs at Tr. Vol. II 80:18-21. What the dispersal order does include, however, is the beginning phrase: "This is an unlawful assembly." The facts necessary to establish an unlawful assembly, then, are prerequisites to a dispersal order. Larson Dep. 189-90, 193, 218. This is problematic because in addition to vague dispersal orders, the customs and practices surrounding unlawful assemblies are also likely unconstitutional.

Plaintiffs are likely to succeed on their challenge to the City's policies and practices regarding purported unlawful assemblies. It is the City's custom that any police officer is authorized to declare an unlawful assembly. Larson Dep. 198. Beyond the text of the city and state unlawful assembly laws, police officers are not provided with any guidance concerning when to declare an unlawful assembly. *Id.* The City interprets its unlawful-assembly policy, codified as St. Louis Code of Ords. § 15.52.010, to be that a person commits the offense of unlawful assembly when any two persons assemble together and act in concert to do any unlawful act with force or violence. Larson Dep. 176–78. But one can also be guilty of unlawfully assembling without taking action; the final clause of § 15.52.010 provides that "every person present at such meeting or assembly, who shall not endeavor to prevent the commission or perpetration of such unlawful act, shall be guilty of a misdemeanor." The City's designee testified that, under City policy, a person who standing near others who have agreed to break a window—but who not only did not enter that agreement but also has <u>no knowledge</u> of it—can still be charged with unlawful assembly. Larson Dep. 180-82. In practice, the City also

8

customarily declares unlawful assemblies for the offenses of interfering with pedestrian or vehicular traffic, even though such offenses cannot reasonably be thought to employ force or violence, and orders dispersal. *See* Sachs at Tr. Vol. II 51:21-22; 59:9-12.The consequences of these customs, together with the vagaries surrounding the dispersal orders, take on added importance when considered with the City's customs causing the gratuitous use of chemical agents against persons deemed out of compliance with the vague ordinance or dispersal order.

Plaintiffs are also likely to succeed on their challenge to the City's policies and customs related to the gratuitous deployment of chemical agents at protestors. Based on its document production to date, it is clear the City has done very little training on what circumstances allow its police officers to lawfully deploy chemical agents against protestors. In fact, Lieutenant Colonel Lawrence O'Toole, the acting commissioner of police in September 2017, was asked the following question:

8 Q. And my question is[:] are you aware of
9 anything in writing that's provided to the officers
10 that really explains when it's appropriate to use
11 chemical agents consistent with the requirements of
12 these two special orders [on chemical agents]?
13 A. My answer is -- is no. My -- what I've
14 seen in writing is -- is regarding the pepper spray
15 itself.

O'Toole Dep., April 17, 2019, at 55:8-15.

Some basic facts about chemical munitions are not disputed. All police officers are provided with a handheld pepper spray device. Larson Dep. at 91. Sergeants (the rank immediately above police officer) also have access to high-capacity, extended range OC spray devices, commonly known as a fogger. *Id*. There is no difference in the chemical composition of the pepper spray and/or mace used in the handheld pepper spray device versus the fogger; the only difference is the method of deployment. *Id*.

But confusion persists. Lieutenant Timothy Sachs testified that Section XIII of Special Order 1-01 does not govern the use of handheld pepper spray. Prelim. Inj. Tr. Vol. II at 54-55. Consistent with this understanding, the City's attorney advised the Court that the warning requirements emanating from the *Templeton* settlement are not required before using mace. Tr. Vol. I at 329. On the other hand, Defendant's Rule 30(b)(6) designee testified that it is the City's position that handheld pepper spray is included in Section XIII of Special Order 1-01 to the extent it is used for crowd dispersal. Larson Dep. 112, 116-17. If these key witnesses have imcompatible understandings concerning this basic question, it is no wonder that confusion among police officers persists.

Even setting aside the confusion, Defendant City's policies provide the discretion that causes the gratuitous use of pepper spray. For example, Section IV of Special Order 1-01 deals specifically with the use of handheld mace. Although the City asserts that it has a policy that handheld pepper mace should not be used on someone who is "*passively* resisting," it may appropriate to use it against someone who is "*actively* resisting." Larson Dep. 72-73. The policy fails to describe the difference between passive versus active resistance, Larson Dep. 84, and there are no training documents that explain the difference between passive versus active resistance. Larson Dep. 85. But according to the City's designee, there is no real difference: "The minimum threshold, it first would start with refusing to comply because that an active act." Larson Dep. 81-82. And, under those circumstances, a police officer is authorized by police to effectuate an arrest by pepper spraying an individual without warning. Larson Dep. 82-83; *see also* Larson Dep. 196.

The challenged policies act together to cause the unconstitutional use of chemical agents. According to the City's designee: (1) a person can be committing the crime of unlawful

10

assembly even when she has no knowledge of any agreement to violate the criminal laws with force or violence, and (2) under Section XIII of Special Order 1-01, City police can deploy chemical agents at this person without any warning because she is allegedly engaged in a criminal activity (unlawful assembly). Larson Dep. 184.

The risks presented by the City's policies are not hypothetical. Together, for instance, they caused the September 17, 2017 kettle and its particularly egregious maelstrom of constitutional violations. First, there was no basis to declare an unlawful assembly: the City's designee knew of no individuals acting violently at the scene such that they presented an imminent threat of bodily harm to persons or damage to property when officers tried to arrest them. Larson Dep. 124-25, 127.[5] Second, without an unlawful assembly, there was no basis for police to order dispersal—setting aside that any dispersal orders were vague as to whom they applied and what they required as well as delivered in a manner not to reach most of those arrested. Even assuming dispersal had been justified, the City acknowledges its police should not use chemical agents to disperse groups engaged in non-criminal activity unless they ensure that the "impact of chemical agents on individuals who are complying with lawful law enforcement commands is minimized." Larson Dep. 128. Yet third, supervisory police officers used foggers during the kettle, even though the fogger, "by definition, covers a large area, unlike a handheld pepper spray device." Larson Dep. 121-22. The City's designee recognized that in light of the fact that the use of the fogger necessarily impacted a great deal of people, it would have been preferable, at a minimum, to use handheld pepper spray if the "goal" was to not impact those who are complying. Larson Dep. 130.

---

[5] Indeed, consistent with the designee's testimony, no one was arrested for violent destruction of property in connection with the kettle. Larson Dep. 125.

11

Plaintiffs are also likely to prevail on the challenge to Defendant City's policies and practices regarding interference with the ability to record police conduct. Nothing in the City's submission challenges the unrefuted preliminary injunction testimony of William Patrick Mobley; instead, a City document produced during discovery confirms that City police did, in fact, run his information at the time and location he testified to. Since then, it has also been revealed that, the same evening, another City officer destroyed the cellular phone of a perceived protestor who turned out to be an undercover detective. ECF No. 113-1 at 9. Additional evidence will show that the custom of interfering with persons recording the police carrying out their official duties is prevalent in St. Louis.

The effects of this chain reaction are invidious. The challenged policies and customs have acted in concert for years in St. Louis to harm perceived protestors and to suppress viewpoints that would otherwise have been expressed. Indeed, everyone willing to protest the police knows they may face arbitrary arrest or be indiscriminately sprayed with chemicals should they exercise their First Amendment rights.

### III. Conclusion

Plaintiffs request that the motion to dismiss for lack of jurisdiction be denied. Plaintiffs request a hearing on the motion to dissolve the preliminary injunction and suggest that the hearing should be at the trial on the merits. Ultimately, the motion to dissolve should be denied.

Respectfully submitted,

/s/ Anthony E. Rothert
Anthony E. Rothert, #44827MO
Jessie Steffan, #64861MO
ACLU of Missouri Foundation
906 Olive Street, Suite 1130
St. Louis, Missouri 63101

(314) 652-3114
arothert@aclu-mo.org
jsteffan@aclu-mo.org

Gillian R. Wilcox, #61278MO
406 West 34th Street, Suite 420
Kansas City, Missouri 64111
ACLU of Missouri Foundation
(816) 470-9938
gwilcox@aclu-mo.org
*Attorneys for Plaintiffs*