1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF MISSOURI

3              EASTERN DIVISION

4

5    MALEEHA AHMAD, ET AL.,      )
                                 )
6         Plaintiffs,            )
                                 )
7    vs.                         ) Case No. 4:17-CV-2455-CDP
                                 )
8    CITY OF ST. LOUIS,          )
     MISSOURI,                   )
9                                )
          Defendant.             )

10

11

12

13

14

15

16

17          DEPOSITION OF ERIC LARSON

18     TAKEN ON BEHALF OF THE PLAINTIFFS

19             APRIL 8, 2019

20

21

22

23

24

25

```
 1                    I N D E X
 2                    WITNESSES
 3  ALL WITNESSES  PAGE
 4  For Plaintiffs
 5    ERIC LARSON
 6       Examination by Mr. Praiss              7
 7       Examination by Mr. Dierker           247
 8       Re-Examination by Mr. Praiss         251
 9
10                    EXHIBITS
11  NO.              DESCRIPTION            PAGE
12  Exhibit 1  11/16/17 email from
               Lawrence O'Toole                17
13
    Exhibit 2  Fourth Amended Rule
14             30(b)(6) Deposition Notice      20
15  Exhibit 3  Civil Disobedience Response
               Operations Plan section,
16             CITY 00430 through CITY 00438   62
17  Exhibit 4  Metropolitan Police
               Department - City of St.
18             Louis, Office of the Chief
               of Police, Special Orders       83
19
    Exhibit 5  City of St. Louis Law
20             Department Police Section
               Protest Law, 8/16/17            86
21
    Exhibit 6  Settlement Agreement in
22             Templeton v. Dotson case        93
23  Exhibit 7  Declaration of Jerome V.
               Baumgartner                    101
24
    Exhibit 8  Picture taken from
25             Washington and Tucker          117
```

```
 1                    EXHIBITS
 2    NO.              DESCRIPTION        PAGE
 3    Exhibit 9   Picture taken from the
                  Washington and Tucker
 4                location                  128
 5    Exhibit 10  10/11/17 email from Carl
                  Filler with attached Scope
 6                of Work for Critical
                  Incident Review document   154
 7
      Exhibit 11  Operational Planning,
 8                Major Event - After Action
                  Critique                   162
 9
      Exhibit 12  Chapter 574 sections of
10                the Missouri Revised
                  Statutes                   170
11
      Exhibit 13  Metropolitan Police
12                Department, September 1,
                  2017, Instructions for the
13                Issuance of Warning from
                  Police Officer Unlawful
14                Assembly, Dispersal Order  203
15    Exhibit 14  Civil Disobedience
                  Response Operations Plan
16                relative to the expected
                  Stockley verdict dated
17                9/27/17                    206
18    Exhibit 15  Training Course Lesson
                  Plan, Course Title:  Civil
19                Disobedience Team/7250
                  Training dated September
20                2014                       219
21    Exhibit 16  Declaration of Charles
                  Wall, with attached
22                Exhibit A                  223
23
24
25    (Exhibits attached to transcript.)
```

```
 1                UNITED STATES DISTRICT COURT

 2                EASTERN DISTRICT OF MISSOURI

 3                     EASTERN DIVISION

 4

 5   MALEEHA AHMAD, ET AL.,      )
                                 )
 6         Plaintiffs,           )
                                 )
 7   vs.                         ) Case No. 4:17-CV-2455-CDP
                                 )
 8   CITY OF ST. LOUIS,          )
     MISSOURI,                   )
 9                               )
           Defendant.           )
10

11

12              DEPOSITION OF WITNESS, ERIC LARSON,

13   produced, sworn and examined on the 8th day of

14   April, 2019, between the hours of eight o'clock in

15   the forenoon and six o'clock in the afternoon of

16   that day, at the Office of the St. Louis City

17   Counselor, 1200 Market Street, City Hall, St.

18   Louis, Missouri, before Tara Schwake, a Registered

19   Professional Reporter, Certified Realtime Reporter,

20   Certified Shorthand Reporter (IL), Certified Court

21   Reporter (MO), and Notary Public within and for the

22   State of Missouri.

23

24

25
```

ERIC LARSON  4/8/2019

```
 1   APPEARANCES

 2

 3   FOR THE PLAINTIFFS:

 4        ACLU OF MISSOURI FOUNDATION

 5        906 Olive Street, Suite 1130

 6        St. Louis, Missouri  63101

 7        (314) 652-3114

 8        by:  Mr. Omri Praiss

 9             Ms. Jessie Steffan

10        opraiss@aclu-mo.org

11        jsteffan@aclu-mo.org

12

13   FOR THE DEFENDANT:

14        OFFICE OF THE CITY COUNSELOR

15        1200 Market Street, Room 314

16        St. Louis, Missouri  63103

17        (314) 621-3361

18        by:  Mr. Robert Dierker

19             Ms. Abby Duncan

20             Mr. Andrew Wheaton

21        dierkerr@stlouis-mo.gov

22

23

24

25
```

ERIC LARSON  4/8/2019

```
 1    COURT REPORTER:

 2           TARA SCHWAKE, CRR, RPR, CCR, CSR

 3           Alaris Litigation Services

 4           711 North 11th Street

 5           St. Louis, Missouri  63101

 6           (314) 644-2191

 7           1-800-280-DEPO

 8           transcripts@alarislitigation.us

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

ERIC LARSON  4/8/2019

```
 1                 IT IS HEREBY STIPULATED AND AGREED by
 2     and between Counsel for Plaintiffs and Counsel for
 3     Defendant that this deposition may be taken by Tara
 4     Schwake, Notary Public and Certified Realtime
 5     Reporter, thereafter transcribed into typewriting,
 6     with the signature of the witness being expressly
 7     reserved.
 8                       ERIC LARSON,
 9     of lawful age, having been produced, sworn, and
10     examined on the part of Plaintiffs, testified as
11     follows:
12                       *  *  *  *  *
13          (Deposition commenced at 9:58 a.m.)
14                       EXAMINATION
15     QUESTIONS BY MR. PRAISS:
16          Q      Good morning.
17          A      Good morning.
18          Q      My name's Omri Praiss, I'm an
19     attorney with the ACLU and we're here today for a
20     deposition in a case involving -- titled Ahmad
21     versus City of St. Louis.
22                 Are you familiar with that case?
23          A      I am.
24          Q      Could you state your name for the
25     record?
```

```
 1          A      For the record, my name is Eric
 2    Larson.
 3          Q      And if I refer to you as Mr. Larson,
 4    is that okay?
 5          A      That is fine.
 6          Q      Have you ever been deposed before?
 7          A      I have.
 8          Q      How many times?
 9          A      At least once that I'm aware of.
10          Q      How recently was that?
11          A      That has been probably 15 years ago.
12          Q      It's been a while.
13          A      Yes.
14          Q      I'll give you a quick refresher.
15    Basically I'll be asking you a lot of questions
16    today, and we have a court reporter who is
17    transcribing everything.  Please let me finish my
18    questions even when you can probably anticipate
19    what I'm going to ask you so that the record is
20    clear.  I'll do the same and let you finish your
21    answers before I ask a new question.  Is that fair?
22          A      It is.
23          Q      If at any time I ask you a question
24    today that you don't understand, please ask me to
25    rephrase it.  Otherwise, I'm going to assume you
```

ERIC LARSON  4/8/2019

```
 1   understood my question.  Is that acceptable?
 2        A    That's acceptable.
 3        Q    Okay.  Are you under any medication
 4   that impairs your ability to provide truthful and
 5   accurate answers today?
 6        A    I am not.
 7        Q    And you understand you're under oath?
 8        A    I do.
 9        Q    Subject to penalty of perjury?
10        A    I do.
11        Q    Wonderful.  Do you understand that
12   this is a deposition of what's titled a Rule
13   30(b)(6) deposition where you are actually
14   designated as the representative on behalf the City
15   today?
16        A    I am aware of that.
17        Q    And you're going to be testifying
18   with respect to a series of topics; you understand
19   that?
20        A    I do.
21        Q    If you don't mind, I'll take a few
22   minutes to get a little bit of background
23   information about yourself, because that may impact
24   your testimony on some topics.
25             MR. DIERKER:  Excuse me, I'm sorry to
```

ERIC LARSON  4/8/2019

1    interrupt but I would like to put on the record

2    that originally the plan was that this 30(b)(6)

3    would cover both the Ahmad and the Molina cases and

4    owing to some discovery issues in Molina, this is

5    going forward in the context of Ahmad but my

6    understanding is that topics 4, 5, 8, 9, 10, and 11

7    duplicate topics in the 30(b)(6) notice in the

8    Molina case, and it's our expectation that we will

9    not have to duplicate the testimony in Molina that

10   is being adduced in this case.

11          MR. PRAISS:  And I appreciate your

12   comments.  I'm not sure this is the right place and

13   I don't want to get into a debate with you.  I know

14   there was correspondence between and you Tony

15   Rothert about that issue and I think, as you know,

16   there are still outstanding discovery issues in

17   Molina but I can assure you to the extent, at all

18   possible, we have no intent of duplicating this

19   deposition unnecessarily.

20          MR. DIERKER:  I'm confident that you

21   don't but I felt the need to put something on the

22   record.

23          MR. PRAISS:  That's fine, but we

24   don't know what additional discovery we will be

25   getting and how that will impact so I can't commit

ERIC LARSON  4/8/2019

1    to anything final at this point.

2                MR. DIERKER:  I understand.

3        **Q    (BY MR. PRAISS)  Very briefly, give**

4    **me a summary of your employment background in**

5    **chronological order if you could.**

6        A    Since 1994, I have been employed by

7    the St. Louis Metropolitan Police Department.

8        **Q    And summarize for me a little bit**

9    **about what positions you have held.**

10       A    From essentially February 1995, I was

11   commissioned as a police officer.  I was a patrol

12   officer in the second district until approximately

13   September of 2004.

14       **Q    Okay.**

15       A    When I was transferred to the crime

16   laboratory and began training as a firearm and tool

17   mark examiner.  Which I performed until

18   approximately February of 2010, when I was promoted

19   to the rank of sergeant.  In 2011, I became the

20   supervisor of the evidence technician unit.  In

21   January of 2013, I became the acting laboratory

22   director until June of 2013, when I was promoted to

23   the rank of lieutenant and given the title

24   laboratory director.

25                In September of 2015, I was promoted

ERIC LARSON  4/8/2019

```
 1    to the rank of captain and transferred from the
 2    laboratory to District 5, where I remained until
 3    approximately -- I believe it was August of 2017
 4    when I was transferred to the command of
 5    investigative services, where I remained until
 6    early 2018, I think January 2018, when I was moved
 7    to be over planning and research until April of
 8    2018 when I was promoted to the rank of major, and
 9    I have been the commander/deputy commander of
10    specialized enforcement since that time.
11         Q    Congratulation, it's been an amazing
12    career.
13         A    Thank you.
14         Q    I can ask you a ton of questions on
15    it but I'm going to refrain because I want to focus
16    on the 30(b)(6) but just two I need to understand.
17              In early January of 2018 you said you
18    were transferred to planning and research.
19         A    Correct.
20         Q    Just explain to me a little bit of
21    what that entails?
22         A    Essentially I was moved from
23    investigative services where I was the captain of
24    homicide, bomb and arson, sex crimes, the
25    investigative units of the police department, over
```

ERIC LARSON  4/8/2019

1    to planning and research, which is essentially the

2    departments of research -- planning is responsible

3    for writing special orders, researching policy,

4    preparing our crime numbers for the FBI, and that

5    was -- that was my function.

6          **Q     And you were in that position for**

7    **actually a very short time?**

8          A     For a very short time.

9          **Q     Okay.  And then you were transferred**

10   **-- you were promoted to major; correct?**

11         A     Yes.

12         **Q     And if I understood correctly, you**

13   **were in charge of specialized enforcement?**

14         A     I was the commander of specialized

15   enforcement from April of 2018 through December of

16   2018, and then in 2019 I became the deputy

17   commander.  We have had several department

18   reorganizations between April of 2017 through

19   December of 2018.

20         **Q     As deputy commander, it's still over**

21   **specialized enforcement?**

22         A     Correct.

23         **Q     So my question is, what does the term**

24   **specialized enforcement, what does that entail?**

25         A     Essentially specialized enforcement

ERIC LARSON  4/8/2019

1   are primarily uniformed members of the department

2   who are not in district assignment.  So I'm in

3   charge of, as the deputy commander, I report to a

4   colonel, I have a captain that reports to me, but

5   the units are SWAT, K-9, aviation, traffic,

6   commercial motor vehicle inspection, special

7   operations, which relates primarily to anti-crime

8   and auto theft.  Our drug enforcement and

9   interdiction units, public transportation, and park

10  rangers.  I think that's everybody.

11          **Q      Altogether, how many officers report**

12  **to you?**

13          A     I think it's somewhere about 96 to a

14  hundred.

15          **Q      During the period when you were in**

16  **charge of planning and research the first four**

17  **months of 2018, you mentioned that you were working**

18  **on writing special orders and researching policy?**

19          A     To some extent, yes.

20          **Q      During that time, did you do any work**

21  **that related in any way to what had occurred in the**

22  **Stockley protests?**

23          A     No.  Because the Stockley protest is

24  the subject of litigation and so we won't write

25  policy until the litigation is complete or we have

ERIC LARSON  4/8/2019

 1    some direction from the courts.

 2         **Q     Since the Stockley protests, is it**

 3    **your testimony the City has done -- made no effort**

 4    **to evaluate the current special orders and policies**

 5    **in effect?**

 6         A     No, I would not say that.

 7         **Q     So I misunderstood you.  So again,**

 8    **during the time period that you were there, help me**

 9    **understand what efforts were made by the Department**

10    **of Planning and Research to, I'll broadly**

11    **characterize as this, to evaluate modifying**

12    **policies, writing new policies, or looking at**

13    **lessons learned from the Stockley protest.  I'm**

14    **trying to make is as broad as possible.**

15         A     If you're trying to make it as broad

16    as possible, we're discussing several areas that

17    are outside the scope of planning and research.

18    Planning and research is an area that generally

19    works at the direction of the Chief of Police or

20    senior command.  So a request has to come from that

21    office to the planning and research unit to perform

22    functions related to policy reviews, changes in

23    policy, changes in direction on that.  And when

24    we're talking about policy, we're talking about all

25    department policy.

ERIC LARSON  4/8/2019

```
 1              So I mean, there's something
 2    somewhere along the lines of 3,000 pages of
 3    department policy.  So to say we have made no
 4    changes in policy during that time, I don't believe
 5    would be fair.  To say that we didn't talk or
 6    discuss about things related to protests or protest
 7    activity, I can't say we did or I can't say that we
 8    did not.  We may have, but because of the ongoing
 9    litigation, no concrete direction had been
10    determined on which things would need to be
11    modified or not be modified.
12         Q    Let me follow up a little bit.  If I
13    understood correctly with respect to planning and
14    research, you indicate that the Chief of Police
15    would have to make a request of the department to
16    investigate something?
17         A    Or a senior command, so a colonel,
18    assistant chief.
19         Q    To your knowledge, since September of
20    2017, has the Chief of Police made any requests to
21    the planning and research group, department, that
22    related to the Stockley protests?
23         A    I believe the assistant chief
24    indicated some information which were -- which was
25    related to I believe Judge Perry issued an order
```

ERIC LARSON  4/8/2019

1    related to what we would be allowed to do or not do

2    as far as engaging in the dispersement of

3    individuals during protest activity.  The bulk of

4    that information is already incorporated into a

5    special order.  That Special Order is 1-01, Section

6    XIII.

7             But as far as any hard policy

8    changes, I can tell you there have been none that

9    have been put into effect.

10        Q    And I understand you've told me that

11   now twice, that there hasn't been some changes

12   because of litigation.  My question, and I still

13   don't think you answered it, is, to your knowledge,

14   has the Chief of Police or somebody else below him

15   made a specific request of the planning and

16   research department through an email or other

17   communication, saying, I instruct to you

18   investigate and look at policies that in any way

19   relate to what happened in the Stockley protests?

20        A    I would say to the best of my

21   knowledge, no.

22        Q    Thank you.  I appreciate that answer.

23   Mark this.

24             (Plaintiffs' 30(b)(6) Exhibit 1

25   marked for identification by the court reporter.)

ERIC LARSON  4/8/2019

```
 1          Q     (BY MR. PRAISS)  Mr. Larson, you have

 2     Exhibit 1?

 3          A     I do.

 4          Q     You said something a few seconds ago

 5     in your answer that prompted me to think of this

 6     exhibit, so I figured I'd just real quickly ask a

 7     couple questions about it.

 8                Do you see this as an email that was

 9     sent on November 16, 2017, by Lawrence O'Toole?

10          A     I do.

11          Q     And it indicates it has an attachment

12     to it which is the Ahmad Preliminary Injunction, I

13     believe it's referring to the order that was issued

14     by the judge in this case?

15          A     Correct.

16          Q     Okay.  Have you had an opportunity at

17     any time since November of 2017 to review that

18     order?

19          A     Let me think.  I have -- I obviously

20     received this email because it's directed to the

21     SLMPD.  I would have printed and made a copy of

22     this and reviewed it at around the time that it was

23     issued.  I had not reviewed this order prior to our

24     deposition.  We may have discussed it during

25     settlement meetings that I was a part of.
```

ERIC LARSON  4/8/2019

```
 1          Q      Okay.  You had mentioned in your
 2   testimony referring to the assistant chief
 3   providing some communication relating to the
 4   injunction entered by the court, preliminary
 5   injunction.
 6          A      Yes.
 7          Q      Was this the communication you were
 8   referring to?
 9          A      I believe so.
10          Q      Okay.  And that's what I wanted to
11   confirm.  Other than this communication -- strike
12   that.
13                 To whom this was communication sent?
14          A      It was sent to all members of the
15   SLMPD.
16          Q      So all police officers?
17          A      If it went to SLMPD.org, it went to
18   all employees of the Metropolitan Police
19   Department.
20          Q      Other than this email telling all
21   members of the St. Louis Metropolitan Police
22   Department to familiarize themselves with the order
23   issued by the judge, are you aware of any other
24   steps taken by the St. Louis Metropolitan Police
25   Department to train or inform the police officers
```

ERIC LARSON  4/8/2019

Page 20

1    of the terms of the injunction?

2              MR. DIERKER:  I think I have to

3    object to the form of that question because it

4    could be calling for privileged communications.

5        Q    (BY MR. PRAISS)  Let me make it clear

6    to you.  At no point today do I want you to tell me

7    about communications that attorneys had with you or

8    with police officers; okay?  To the extent there

9    are, I'm not interested, I'm not entitled to those.

10             Separate from that, my question is,

11   to your knowledge, other than this one short little

12   email that we have in front us here that was sent

13   on November 16, 2017, are you aware of any other

14   communications or efforts undertaken by the St.

15   Louis Metropolitan Police Department to train

16   police officers with respect to the substance of

17   the preliminary injunction issued by the court in

18   this case?

19        A    I am not.

20             (Plaintiffs' 30(b)(6) Exhibit 2

21   marked for identification by the court reporter.)

22        Q    (BY MR. PRAISS)  Mr. Larson, I hand

23   you what's been marked Exhibit 2, and this is a

24   copy of the Fourth Amended Rule 30(b)(6) Deposition

25   Notice that was issued by us in this case to the

ERIC LARSON  4/8/2019

Page 21

```
 1   City.  You're familiar with this exhibit?
 2        A    I am.
 3        Q    Obviously, this is the fourth one,
 4   which means there was an original one and a first,
 5   second, and third, potentially, I assume all of
 6   those.
 7             Do you recall the first time you saw
 8   any form of this depo notice, deposition notice?
 9        A    I do not recall the first time I saw
10   it.  I don't know what version I may have seen, but
11   in preparation for this deposition, I saw and
12   reviewed a 30(b)(6) request.
13        Q    When was the first time, your best
14   estimate of when you saw it?  Was it yesterday or a
15   month ago?  That's what I'm trying to get at.
16        A    No, probably November, December.
17        Q    Gotcha.  Thank you.  Did you review
18   it?
19        A    I did.
20        Q    I think one thing I was going to put
21   on the record also that I believe there is one
22   topic and that's the topic number 3 that has been
23   covered and we do not plan to cover that today,
24   just so you know.
25             If you go to the second page of this
```

ERIC LARSON  4/8/2019

```
 1    exhibit, do you see there is a heading Relevant
 2    Time Period and Definitions?
 3         A     Okay.
 4         Q     Can we agree that, you know, when I
 5    use the reference "the City of St. Louis," or even
 6    just the abbreviation of "the City," that this
 7    definition that's here for the City of St. Louis
 8    would apply?
 9         A     Yes.
10         Q     Okay.  I don't want to keep saying a
11    long, convoluted definition each time.  And when I
12    say "Stockley verdict protest," do you agree with
13    the definition that's here; is that acceptable?
14         A     Yes.
15         Q     And the term "prior protests" that's
16    defined here, can we agree that definition is going
17    to apply today?
18         A     Yes.
19         Q     And then there's a definition for
20    "chemical agents."
21               Do you see that?
22         A     I do.
23         Q     Can we agree that definition will
24    apply except in those situations where I make it
25    clear to you that it shouldn't apply?
```

ERIC LARSON  4/8/2019

```
 1          A     Yes.
 2          Q     Okay.  There is, at the end of this
 3     notice, if you notice, a Request for Production on
 4     the last page?
 5                Do you see that?
 6          A     Yes.
 7          Q     Did you rely on any documents in
 8     preparing for today's deposition?
 9          A     I reviewed documents related to
10     today's deposition.
11                MR. PRAISS:  Okay.  A question for
12     counsel.  Have all of those documents been produced
13     to the plaintiffs in this litigation?
14                MR. DIERKER:  To the best of our
15     knowledge, all of the documents on which the
16     witness relied have been produced.
17                MR. PRAISS:  Thank you.  That's what
18     I need to know.
19          Q     (BY MR. PRAISS)  And you notice now
20     the deposition notice has -- this Fourth Amended
21     one has 25 different topics?
22          A     Yes.
23          Q     And you understand that you have been
24     designated as the representative of the City of St.
25     Louis to testify about each of these topics except
```

ERIC LARSON  4/8/2019

Page 24

1   for topic 3?

2        A    I do.

3        Q    How many hours in total would you

4   estimate you spent preparing for this deposition?

5        A    That's difficult to say.  Somewhere

6   between 8 and 16 over the course of several weeks,

7   several months, since November, and I would also

8   indicate that because there are apparently two

9   cases that are very similar, I reviewed a lot of

10  material not all specific to Ahmad.  Some were

11  specific to another case.

12       Q    The other case we're referring to,

13  Molina?

14       A    Correct.

15       Q    But in total in the past few weeks,

16  since the first time you've seen this deposition or

17  some prior version, your estimate is between 8 and

18  16 hours?

19       A    At least, if not more.

20       Q    Okay.  Let me start with trying to

21  narrow the universe of people you may have met

22  with.  Excluding any attorneys, did you meet

23  individually with anybody to prepare for today's

24  deposition?

25       A    Not outside individuals who are in

ERIC LARSON  4/8/2019

1    our law department.

2         Q     Let me start with this one.  Did you

3    have meetings where attorneys were present?

4         A     I did.

5         Q     In those meetings, were there any

6    individuals who are not attorneys also present?

7         A     Yes.

8         Q     Who were those individuals?

9         A     I met with Sergeant Charles Wall, who

10   is currently detached to our law department.

11        Q     Yes.  What does it mean when you say

12   "detached"?

13        A     His assignment is temporarily, he is

14   temporarily assigned to the law department from his

15   parent unit, and I'm not sure where that parent

16   unit was.

17        Q     Is my understanding correct that he

18   was assigned to the law department to assist in

19   connection with the ongoing litigation?

20        A     That is my understanding.

21        Q     Other than Charles Wall, can you

22   think of any other individuals you met with in

23   connection with any meetings with attorneys in

24   preparing for today's deposition?

25        A     No.  They provided materials, I

ERIC LARSON  4/8/2019

1  reviewed materials, and we had discussions about

2  those materials.

3      **Q      So the only non-attorney that you met**

4  **in preparing for today's deposition is Charles**

5  **Wall; correct?**

6      A      As far as I can recall.

7      **Q      And how long do you think met with**

8  **Charles Wall?**

9      A      We had two or three different

10  meetings, probably no more than, total, an hour and

11  a half.

12      **Q      Okay.  Of the 8 to 16 hours that you**

13  **said you estimate you spent preparing, what**

14  **percentage of that would you say was meeting with**

15  **attorneys versus you meeting by yourself?**

16      A      Probably half and half, perhaps.

17  Maybe a little different -- I spent a lot of time

18  -- obviously, anything counsel forwarded to me for

19  review, I reviewed.  So I spent a lot of time

20  reading documents, I refreshed myself with a lot of

21  the material so I would be adequately prepared to

22  discuss these topics.

23      **Q      Is it fair to say that other than the**

24  **meetings you have had with attorneys, the meeting**

25  **with Mr. Charles Wall, and your own efforts, you**

ERIC LARSON  4/8/2019

```
 1    have done nothing else to prepare for the

 2    deposition?

 3         A     No, not that I'm aware of.

 4         Q     Let's start, topic number 1, sir.

 5         A     Okay.

 6         Q     Topic number 1 states, "The manner by

 7    which the City of St. Louis video recorded the

 8    Stockley Verdict Protests."

 9                Do you see that?

10         A     I do.

11         Q     As of September 2017, did the City

12    have any rules or requirements relating to video or

13    audio recording of police response to public

14    protests?

15         A     Well, I want to make sure I'm

16    answering this as completely as possible.  In

17    general, there are several different ways that we

18    document protest activity.  When we have a large

19    event, something that we know is going to occur,

20    something like the Stockley protest, we put an

21    operations order into effect.

22                As part of that operations order,

23    there are officers who are assigned as

24    Documentation Team members.  Those members will

25    have either still cameras or video cameras at their
```

**ERIC LARSON  4/8/2019**

1    disposal to record protester and police activity

2    relative to the event being monitored.

3              We also have a Real Time Crime Center

4    that has cameras located throughout the City which

5    may capture incidents on video.

6              We also have an intelligence division

7    that may use video cameras to document certain

8    aspects of their investigation or their monitoring

9    of activities, and I believe in, relative to like

10   the Stockley incident, some members of our Bicycle

11   Response Team may have had cameras.

12        **Q     I appreciate that and I want to cover**

13   **that information in greater detail but I still want**

14   **to go back to my question.  Is there something in**

15   **writing that I'm not aware of that, where the City**

16   **has laid out specific policies, rules, with respect**

17   **to video or audio recording of a police response to**

18   **a public protest?**

19        A     No, not specifically, other than what

20   we've described in the operations order.

21        **Q     Okay.  As a matter of policy, does**

22   **the City believe it's important to attempt to video**

23   **record police response to public protest?**

24        A     From a matter of policy, we believe

25   it's important to document the activities that we

ERIC LARSON  4/8/2019

```
 1   take during these incidents.
 2        Q    Okay.  As a matter of policy, does
 3   the City believe it's important to attempt to video
 4   record the use of chemical agents by police in
 5   response to public protests?
 6        A    Can you give me that again?
 7        Q    Sure.  As a matter of policy, does
 8   the City believe it is important to video record
 9   the use of chemical agents by police in response to
10   public protests?
11        A    To the best of my knowledge, we have
12   no order that requires us to document by a video
13   the actual deployment of chemical agents.
14        Q    Okay.  You gave me a list of
15   different ways that the City can video record
16   public protests.  You mentioned Documentation Team
17   members; right?
18        A    Mm-hmm.
19        Q    Realtime Crime Center, the
20   intelligence division, and the Bicycle Team, who
21   may also have cameras; correct?
22        A    Correct.
23        Q    Are there any others?
24        A    Well, insofar as the department
25   issues cameras to patrol supervisors for the
```

ERIC LARSON  4/8/2019

 1   documentation of regular type of crime incidents,

 2   you know, there's evidence that needs to be

 3   recovered, things of that nature, but not -- but

 4   that's not specifically related to First Amendment

 5   protests.

 6        Q      Okay.  Any other ways?

 7        A      Not that I'm aware of.

 8        Q      Does the helicopter have capability

 9   to video record?

10        A      Yes.  The -- well, I take that back.

11   The helicopter has certain technological abilities,

12   I believe recording is one of them but I can't

13   confirm that.

14        Q      Has the City at any time considered

15   including some video recording capabilities on the

16   Bear?

17        A      The Bear may have its own type of --

18   I'm not intimately familiar with the mechanics of

19   the Bear.  I know it has certain ability.  I know

20   it has a PA, some other things.  I don't know that

21   it has video and, to the best of my knowledge, we

22   haven't ever discussed putting a camera on the

23   Bear.

24        Q      Okay.  My understanding from the

25   Molina depositions is the Bear does not have any

ERIC LARSON  4/8/2019

1   video recording capabilities and I guess my

2   question to you is, from the City's perspective, is

3   there a reason not to include video capability on a

4   Bear that finds itself in positions where it

5   deploys chemical munitions and, as a matter of

6   policy, would be advisable to record those, no

7   different than all the other ways that the City

8   currently uses?

9          A     It might be advantageous for us to do

10   that in the future.  I don't think there's a

11   deliberate reason we don't have it on there other

12   than it probably isn't equipped with that

13   capability and to equip it with that would be a

14   monetary cost, but it's certainly something I think

15   that's worth looking into.

16          Q     Are you aware of anyone suggesting

17   that that be done since the Stockley protest?

18   Let's start with that time period.

19          A     No, not to my knowledge, I don't

20   believe so.

21          Q     Okay.  The first mechanism you

22   mention is the Documentation Team?

23          A     Mm-hmm.

24          Q     Was the Documentation Team deployed

25   in connection with the Stockley protest?

ERIC LARSON  4/8/2019

```
 1        A     It was.

 2        Q     And did it record events from the
 3   Stockley protest?

 4        A     To the best of my knowledge, it did.
 5   And just as a point clarification, there are
 6   several Documentation Teams relative to the detail.
 7   They are -- each CDT unit is I believe supposed to
 8   have a Documentation Team, so we had several out at
 9   -- roughly at the same time, doing similar
10   functions.

11        Q     And those members, explain to me
12   again what is their purpose when they go out?

13        A     Their purpose is to primarily
14   document police and citizen interaction during the
15   course of a First Amendment protest.  They also are
16   responsible for photographing the arresting officer
17   and the arrested subject prior to the arrested
18   subject being transported in the interest of
19   documenting, and then they have a role in the
20   report preparation aspect.

21        Q     You say "report preparation."  What
22   report are you referring to?

23        A     In general, there is, when incidents
24   transpire and then arrest is made, a police report
25   is prepared, and the Documentation Team participate
```

ERIC LARSON  4/8/2019

 1   in that.

 2        Q     I think you testified that each CDT

 3   unit has its own Documentation Team.  What is a CDT

 4   unit, just to make sure I'm clear?

 5        A     For clarification, Civil Disobedience

 6   Team.

 7        Q     That's what I assumed but I wanted to

 8   make sure.

 9              And when you say "unit," what does

10   that mean in connection with a CDT unit?

11        A     Oh, in the -- if you -- when

12   reviewing the operations order, you'll see there

13   will be CD Team 1 or CD Team Alpha, and then

14   Evidence Collection Team 1.  It just -- or

15   Documentation Team 1.  It's just essentially the

16   officers that are assigned to that team, that unit,

17   within the overall team, that has a specific

18   function.

19        Q     Do you know sitting here today how

20   many different Documentation Teams were assigned to

21   the Stockley protests?

22        A     I believe there were at least four

23   because I believe we had four components to the CDT

24   team.

25        Q     Do you know if the Documentation Team

ERIC LARSON  4/8/2019

1  was present in connection with what's been referred

2  to in the public discourse as the kettle?

3      A    I believe they would have been

4  present but I have no firsthand knowledge that they

5  were present.

6      Q    Do you know if the Documentation Team

7  -- strike that.

8           Do you know if a Documentation Team

9  was present in connection with the Luther Hall

10 incident?

11     A    I don't know at what point that the

12 Documentation Team would have come in on that

13 because they come in behind the CDT efforts, they

14 are stationed behind them in rank.  So I assume

15 they would have been behind the officers in that

16 CDT team but where their location was in connection

17 with those specific incidents, I don't know.

18     Q    Because, for example, in the Luther

19 Hall incident clearly there was a situation where

20 police officers were interacting with people

21 exercising their First Amendment; fair to say?

22     A    It's fair to say there was an

23 incident, yeah.

24     Q    And there was an interaction between

25 the police officers, to put it mildly, and certain

ERIC LARSON  4/8/2019

 1    **individuals; correct?**

 2           A       Yes.

 3           **Q       That would have been the purpose of**

 4    **the Documentation Team to record that incident;**

 5    **correct?**

 6           A       Potentially.

 7           **Q       When the Stockley protests were**

 8    **completed, how does -- how did the records, the**

 9    **video records taken by the Documentation Team, get**

10    **compiled somewhere?  Where are they maintained?**

11    **I'm trying to understand the next process.**

12           A       They would -- depending on the media

13    and how they were recorded, there's a couple of

14    different ways that they get to our property

15    custody section.

16                   So primarily they could be downloaded

17    and put onto a flash drive or a disk and then

18    entered into property custody to be held for review

19    or trial or duplication, discovery requests.

20                   Things that would be recorded by the

21    Real Time Crime Center would be very similar.  They

22    would be recorded, they would be held on a server,

23    copies would be made and then forwarded to the

24    either the prisoner -- prisoner -- property custody

25    for holding.

ERIC LARSON  4/8/2019

```
 1               In the cases of still photos,
 2    anything that would have come off camera cards,
 3    those would have probably been submitted to our
 4    laboratory division and then held in our digital
 5    information management system.
 6          Q     Is there a simple way to search, if
 7    you wanted to know, get a listing of all the video
 8    -- I'm going to start with Documentation Team from
 9    the Stockley protests -- that summarizes here's the
10    Documentation Team, here is the dates and times and
11    location of every video they have done, so it's
12    very easy to find?  Like if I don't know what
13    happened at this intersection at 11 o'clock, I just
14    search through it and there it is?
15          A     Not necessarily, I don't believe we
16    have a comprehensive data management system that --
17    because it's not going into a system that way.
18    It's going in piecemeal.  The records would have
19    been recorded and then submitted as evidence.  I
20    don't believe we have any type of that other than
21    what the Real Time Crime Center would have related
22    to their file storage method.
23          Q     I'm going to deal with the Real Time
24    Crime Center in a minute.  I'm still talking about
25    the Documentation Team.  They complete the process,
```

ERIC LARSON  4/8/2019

1   **they, if I understand correctly, transfer their**

2   **video recordings to the property custody section?**

3           A      Yes, sir.

4           **Q      And my question is, who is in charge**

5   **of the property custody section back in September**

6   **or November, October of 2017, let's say?  If you**

7   **know.**

8           A      The property custody section is a

9   unit within the police department.  It reports to,

10  I believe, the commander of auxiliary services.

11  There is a sergeant who is in charge of the

12  day-to-day operation of the property custody unit.

13  At one time there was a lieutenant.  I am not sure

14  if, the time frame in question, we have a

15  lieutenant there or not.

16          **Q      And that's fine.  I understand people**

17  **move around quite a bit.  I've gotten that**

18  **impression.  But regardless, whoever was in charge**

19  **sometime in let's say end of September, October**

20  **2017, received a significant amount of video**

21  **recordings from Documentation Teams that capture**

22  **the Stockley protests.**

23              **My question to you is, are you just**

24  **throwing them in a big basket somewhere --**

25          A      No, no, no.

ERIC LARSON  4/8/2019

1          Q      -- or is there any effort to
2    document, saying this team recorded this time
3    period, that it's --
4          A      What would have occurred is the
5    incident would have been recorded.  The record
6    would be associated with a complaint number.  The
7    material would be conveyed to the property custody
8    unit.  Property custody would put it in its
9    evidence tracking system by the complaint number.
10   So all evidence related to the incident would, in
11   theory, be in the property custody, tracking the
12   evidence that goes to property custody, would be in
13   their tracking software and everything that we have
14   related to that case would be on a list from them
15   but not specifically related to at a point in time
16   this video, a second point in time this video, a
17   third point in time this video.  And it would be
18   entered by the individual who submitted the
19   evidence.  So I submit evidence, it would be
20   submitted by me under my name.
21         Q      Gotcha.  You used the phrase "case
22   and complaint."  What do you mean when you say
23   that?
24         A      The complaint number relates to the,
25   quote, case or incident.  So any time the police

ERIC LARSON  4/8/2019

1   department has an incident and writes an official

2   report, we generate a complaint number.  The

3   complaint number is a unique identifier related to

4   that specific incident.

5          **Q      And entire, all the videos recorded**

6   **by the Documentation Team in connection with the**

7   **Stockley protests, would they all be classified**

8   **under one complaint or case number?**

9          A      Not necessarily because multiple

10  incidents might occur over the course of a time --

11  the time period, which would have different

12  victims, different subjects; therefore, different

13  complaint numbers could be generated.

14              So you might, if we're talking a

15  series in time, since the Stockley protests

16  occurred over multiple days, there could be

17  multiple complaint numbers related to that --

18  related to those incidents that occurred during a

19  specific time frame.

20         **Q      To your knowledge, if today I was**

21  **looking for a specific incident, let's say I want**

22  **videos taken by a Documentation Team in connection**

23  **with a kettle, is a there a capability by the City**

24  **of St. Louis to locate that readily and produce it**

25  **in litigation or to use it for its own purposes?**

ERIC LARSON  4/8/2019

1         A      Yes, I believe so.

2         **Q      Okay.  I think you testified that**

3    **there is four Documentation Teams?**

4         A      Potentially.  There may be more.

5         **Q      Okay.  There are two, I believe,**

6    **identified in the OPs plan; is that correct?**

7         A      Okay, yes.

8         **Q      Okay.  Do you know what the others**

9    **are?**

10        A      The potential, I was speaking of the

11   fact that we have -- I believe there were four CDT

12   teams out and I was under the impression that there

13   would be one evidence team for -- one evidence

14   collection team for each CDT team.

15              That may not be 100 percent accurate,

16   but I would also indicate that there are the

17   ability of other individuals to collect evidence as

18   well.  So obviously, if there's something -- police

19   officers have a duty to collect and preserve

20   evidence.  If there was some evidence that needed

21   to be collected, we would do that.

22        **Q      Were, to your knowledge, four**

23   **different Documentation Teams deployed in**

24   **connection with the Stockley protests?**

25        A      I'd have to review the OPs order.

ERIC LARSON  4/8/2019

1          Q     Okay.  You mentioned several times
2     the Real Time Crime Center is another vehicle
3     through which the City can record protests?
4          A     Correct.
5          Q     Okay.  Where is that located?
6          A     The center itself is located in
7     police headquarters at 1915 Olive.
8          Q     And I apologize for my ignorance.
9     I'm learning quickly here, a steep learning curve.
10    But is that basically capturing what -- throughout
11    the City, there is, I assume, a capability to
12    record what's transpiring in the City at all times?
13         A     There are a network of cameras that
14    are funded by police and private partnerships that
15    are located in various areas of the City that are
16    connected to the Real Time Crime Center and the
17    Real Time Crime Center has the ability to review or
18    record video from those locations, if needed.
19         Q     Who is responsible for maintaining
20    those cameras throughout the City that are
21    providing information to the Real Time Crime
22    Center?
23         A     I believe it is the City's
24    responsibility; although, I think it depends on who
25    owns the camera as far as because I do know that

ERIC LARSON  4/8/2019

Page 42

```
 1    we, as in the police department, have relationships

 2    with private entities that allow us access to their

 3    cameras but I believe they're responsible for the

 4    maintenance of those cameras.  It's not assumed by

 5    the City.

 6         Q     So to the extent the camera is owned

 7    by a private entity, they're clearly responsible

 8    for maintaining their own cameras but all the

 9    cameras that are owned by the City, is it fair to

10    say the City is responsible for maintaining them?

11         A     I believe that would be fair to say.

12         Q     Does the City, to your knowledge,

13    utilize the services of an independent contractor

14    to maintain the cameras to the extent they

15    malfunction?

16         A     When we have a vendor that we work

17    with that is the camera platform, as I understand

18    it, there are potential video platforms, different

19    video platforms available for this type of unit.

20    We use a platform, I believe it's called Genetec,

21    and that is the platform that we utilize to -- when

22    we have issues with our cameras.  So the cameras

23    need to be Genetec compatible, which is a system

24    style, and that we would work with them if there

25    was some issue with the recordings.
```

ERIC LARSON  4/8/2019

1        Q      I apologize, maybe I'm getting
2    confused here.  Is Genetec a software or is it
3    actually a company?
4        A      I believe it is a company that
5    manages software related to a camera, a hardware
6    and software, so.
7        Q      So is it your understanding that to
8    the extent there is, let's say, either a software
9    or hardware malfunction with a particular camera
10    that is owned by the City, the City will contact
11    Genetec and say there is a problem with camera X,
12    you need to go out and repair it?
13        A      Not necessarily.  We would do our own
14    repair if it was within our capability.  If it was
15    something that was beyond our capability, we would
16    probably work with Genetec to resolve an issue.
17        Q      Is there a particular department
18    that's responsible for that?
19        A      The City, I believe, has a department
20    that maintains the cameras and they work in
21    conjunction with the Real Time Crime Center.  At
22    one time the Real Time Crime Center did do some
23    camera maintenance.  I'm not sure what time frame
24    they stopped doing that and the City took over
25    relative to the merger of the City and the police

ERIC LARSON  4/8/2019

Page 44

```
 1    department.  There's been lots of changes that I
 2    may not be aware of.
 3         Q     Does this department that you
 4    mentioned have a name?
 5         A     I'm not sure what the City calls
 6    that.
 7         Q     Was that department --
 8         A     It could be --
 9         Q     Was that department in existence
10    around September and October of 2017?
11         A     I don't know, but I believe so.
12         Q     Because I'm really focusing about
13    that time period.  So, hypothetically, if there was
14    a camera that malfunctioned in, say, September of
15    2017, and somebody in the City learned about this
16    camera malfunction, I'm trying to understand the
17    process of how that would be communicated to whom
18    and such that it could be repaired.
19         A     I would assume, as I understand it,
20    that if we know that there is a camera
21    malfunctioning, we bring it to the attention of the
22    City group and they assist in getting it resolved.
23         Q     Would that typically happen by
24    communicating through email?
25         A     I would assume it would be a phone
```

ERIC LARSON  4/8/2019

1   call or an email notifying them.

2       **Q      Would there typically be a record**

3   **showing what the repair is -- what repairs are**

4   **necessary and that the repairs have been completed?**

5       A      I assume we would be notified that

6   the repairs are completed.  That would be a

7   communication between the City department and the

8   Real Time Crime Center or the people that are

9   maintaining that.

10      **Q      With respect to the Real Time Crime**

11  **Center, in particular focusing the time period**

12  **again of during and after the Stockley protests, it**

13  **immediately has access to all video recording**

14  **through the cameras that the City operates as well**

15  **as public -- private entities; correct?**

16      A      I believe they have the capability of

17  reviewing those.  They're not looking at every

18  camera that's across the City all the time.

19      **Q      How are those records being retained**

20  **by the Real Crime Center?**

21      A      Essentially what happens is data

22  comes in, depending on how, who owns the camera,

23  there is an overwrite period somewhere between 7

24  and 30 days.  Obviously if -- in the case of

25  something like this Stockley protest where we know

ERIC LARSON  4/8/2019

Page 46

1    that there is the potential for litigation or

2    issues or things that we are going to want to look

3    at again, that information is downloaded and stored

4    on the server and the files are named, listed, and

5    it's maintained on that server pending

6    determination of do we need this or do we not need

7    it.

8           Q     To your knowledge, have all of those

9    records from the Real Crime Center been retained

10   since the Stockley protests?

11          A     To the best of my knowledge, those

12   that have been identified as pertinent have been

13   kept and retained.

14          Q     When you say those that have been

15   designated as pertinent, what does that mean?  Were

16   any records excluded and destroyed relating to the

17   Stockley protests?

18          A     Not that I'm aware of, but as I said,

19   because the Real Time Crime Center covers the

20   entire city, those that may be outside of the

21   interest area may not have been kept for any

22   reason.

23          Q     But anything that -- any video

24   recording of the Stockley protests that captured

25   any activity relating to the protests, those, to

ERIC LARSON  4/8/2019

1    the best of your knowledge, have been retained?

2         A    To the best of my knowledge, those

3    have been retained and produced.

4         Q    Is that also true with respect to the

5    recording done by the Documentation Team?

6         A    Yes.

7         Q    And with respect to the method in

8    which the Real Time Crime Center maintains its

9    records, is it fair to say that there's a really

10   easy way to identify, if I'm looking for a

11   particular video recording, to search for it by

12   date and the location of that camera?

13        A    Yes.  They should be able to do that

14   for you.

15        Q    Okay.  Does the City have any

16   specific rules, handwritten rules, or policies with

17   respect to the retention of video recordings

18   involving protests?

19        A    I don't believe we have a specific

20   retention policy related to protests specifically.

21        Q    Does it have -- is there a general

22   document retention policy that would cover those?

23        A    I don't believe so.  I don't believe

24   we have a specific, at least from the police

25   department side, other than what we discuss related

ERIC LARSON  4/8/2019

Page 48

```
 1   to our in car camera videos, I don't believe that
 2   Real Time Crime Center has their own.  They may
 3   have their own policy on that written policy but I
 4   don't think I've seen that as far as part of the
 5   department's overall special orders.
 6        Q    I'm a little perplexed and want to
 7   make sure I'm hearing you correctly.  Is it your
 8   testimony that the City of St. Louis does not have
 9   a document retention policy, in general?
10        A    Oh, I would never say that.
11             MR. DIERKER:  Excuse me, I have to
12   object because I think you're outside the topics of
13   this 30(b)(6).  But you may answer.
14        Q    (BY MR. PRAISS)  I don't believe -- I
15   think topic number 2, if you look at it, sir,
16   please, Mr. Larson?  "The manner by which the City
17   of St. Louis has retained video recordings of the
18   Stockley Verdict Protests."
19             Do you see that?
20        A    I see that.
21        Q    And when I -- when we wrote this, the
22   manner, at least in my mind, within the scope of it
23   is, the starting point is, is there a policy that
24   relates to the retention of video recordings
25   relating to the Stockley protests?
```

ERIC LARSON  4/8/2019

1               **And if I understood you correctly,**

2    **your testimony a few minutes ago is that you're not**

3    **aware of anything specific dealing with the**

4    **retention of videos by either let's say the**

5    **Documentation Team --**

6          A     Right.

7          Q     **-- or the Real Crime Center --**

8          A     Right.

9          Q     **-- that deals with video protests; is**

10   **that correct?**

11         A     Well, I think we're -- we're saying

12   the same things differently.  What I am saying is,

13   obviously, if we have evidence that relates to a

14   complaint number, that evidence is downloaded,

15   recorded, or held in the manners in which I've

16   discussed going to property custody.  As far as an

17   overall, quote, City policy on the retention of

18   video, I can't speak to that specifically.

19               As far as a police department, i.e.,

20   our policies related to video would be documented

21   in either the in car camera order, because that

22   talks about the -- and even that is downloaded to

23   disk and submitted to property custody, as I've

24   indicated.

25         Q     My question -- let's look at it

ERIC LARSON  4/8/2019

Page 50

1    differently.  How long does that type of

2    documentation have to be retained?

3         A     Until it's approved to be disposed

4    of, which I mean, I'm not following the question.

5         Q     Let's say there's an incident,

6    protests, and no litigation is filed.  How long

7    does the City maintain those records from the

8    Documentation Team and the Real Time Crime Center

9    of that protest?

10        A     If there is no complaint number

11   generated, if there are no incidents involving an

12   arrest, that data would probably not be kept more

13   than, I don't know, anywhere between 7 to 30 days

14   because we have no need for it.

15        Q     Let's assume there was one arrest of

16   one individual because that individual, you know,

17   did not comply with a request by an officer.  At

18   that point, is there any policy that requires the

19   City or whereby the City maintains the records

20   relating to that protest in the event that down the

21   road and during the statute of limitation a lawsuit

22   would be filed?

23        A     Individuals arrested, if there was

24   evidence of that arrest that occurred on video, it

25   would be downloaded, put on disk or flash drive,

ERIC LARSON  4/8/2019

1    and held in evidence until the matter is resolved,

2    adjudicated, or it's purged at some point.

3         Q     If you could look at topic 25?  This

4    says, I'll read it for the record, it's the

5    "Circumstances surrounding the loss or destruction

6    of the video recording produced labeled as City

7    01152."

8              Do you see that?

9         A     I do.

10        Q     What specific steps did you prepare

11   to testify with respect to this topic?

12        A     It is my understanding that related

13   to this topic there is one camera that produced two

14   files, which apparently during the course of

15   collection we noted that there was something wrong

16   with the files and we released them as part of the

17   discovery process and we discussed that there were

18   cameras a block north and a block south of the

19   camera in question that didn't record, and my

20   understanding is that we're working with the

21   vendor, Genetec, to try to recover that data.  And

22   that those files were related to two separate dates

23   and times, so it was apparently a camera

24   malfunction.

25        Q     Do you know where that camera is

ERIC LARSON  4/8/2019

1    located?

2          A     I believe it was located at 14th and

3    Locust but feel free to correct me if I have that

4    location wrong.

5          Q     **To date, has the City been able to**

6    **recover that video?**

7          A     To the best of my knowledge, no, it

8    is an ongoing process and we are working on it.

9          Q     **And if I understood correctly, you**

10   **are working with a vendor, i.e., Genetec?**

11         A     That was information I was given.

12         Q     **Is this a camera that Genetec was**

13   **responsible for maintaining back at the time of the**

14   **Stockley protests?**

15         A     I have no knowledge of that.  I don't

16   believe they are responsible for maintaining the

17   camera.  As we discussed previously, we would only

18   come in -- we only would contact them if it was

19   something that we couldn't fix.

20         Q     **Okay.  When was the first time the**

21   **City learned that the camera that recorded the**

22   **video that was produced as City 01152 had**

23   **malfunctioned?**

24         A     I believe it was when we were

25   compiling the information for discovery, when the

ERIC LARSON  4/8/2019

1    individual that was reviewing those videos found

2    it, noted it, and released it.

3         Q    So at no time -- at the time when

4    this Stockley incident occurred around September,

5    October of 2017, nobody at that point learned to

6    recognize that this camera was not working?

7         A    To the best of my knowledge, no, but

8    that's not to say a work order wasn't put in, but I

9    don't believe so.  Nobody has given me the

10   information that, yes, we were aware that camera

11   was not functioning at the time of the incident.

12        Q    And that's what I'm trying to get at

13   because if I'm hearing you correctly, is it your

14   testimony, as the corporate representative of the

15   City today, that literally this camera has been

16   inoperable and malfunctioning since September of

17   2017 until just recently when somebody, in response

18   to a discovery request, learned that this camera

19   failed many, many months ago?

20        A    Yeah.  I don't know.  You'd have to

21   talk with someone specifically in the Real Time

22   Crime Center --

23        Q    I'm talking to you today because

24   you're the corporate representative and that was

25   your duty to make sure you were knowledgeable and

ERIC LARSON  4/8/2019

Page 54

1    informed about it, with all due respect, Mr.

2    Larson, and I need answers today.  I don't want to

3    go running around.  That's why I do a 30(b)(6),

4    because I need those answers from you and I would

5    have hoped you would have done a little more

6    research.  But I'm going to keep asking questions.

7          A     You're welcome to keep asking

8    questions.

9          Q     To your knowledge, was a work order

10   ever issued after September 2017 with respect to

11   the camera that took the video City 01152?

12         A     No.

13         Q     How would we find if there was one?

14         A     I would have to look into the Real

15   Time Crime Center to see if there's any records or

16   the City agency that we use to maintain the

17   cameras.

18         Q     Prior to today's deposition, what --

19   is there a reason why you did not take steps to

20   determine whether -- when and if a work order was

21   issued with respect to this camera that

22   malfunctioned back in September of 2017?

23         A     I made an assumption that the camera

24   is currently working.  The malfunction, I don't

25   know if it was a sporadic malfunction, a long-term

ERIC LARSON  4/8/2019

Page 55

1   malfunction, if it was repaired and corrected, I

2   don't know.  I was -- in preparation, I learned

3   that there was two files which had been turned over

4   that were corrupted and my investigation was to

5   determine what we knew about those corrupted files.

6           Q       And that's what I'm trying to figure

7   out, what the City knew.  So I -- specific question

8   for you is, when was the first time -- strike that.

9                   I asked you this and I'm going to ask

10  it again, but am I correct that in preparing for

11  today's deposition, in particular topic 25, other

12  than learning that this particular camera

13  malfunctioned back in September of 2017 and that

14  somebody learned about that in connection with

15  responding to a discovery request in this case, you

16  have no knowledge about the circumstances of for

17  how long this camera malfunctioned, what steps, if

18  any, were undertaken by the City to repair it, or

19  what steps the City engaged Genetec to repair it at

20  any time from September '17 until the present?  Is

21  that a fair summary of things you don't have

22  testimony about today?

23          A       Correct.

24                  MR. PRAISS:  Then I would say that we

25  have a serious problem and this will require either

ERIC LARSON  4/8/2019

Page 56

```
 1    a motion for sanctions with the court for failure
 2    to prepare a witness or we'll have to come back
 3    here at a different time, but this is unacceptable.
 4    I need to understand what happened to this video
 5    and I think the topic is pretty damn clear, Judge
 6    Dierker.
 7              He made no effort, as far as I'm
 8    concerned.  To tell me what you wrote in the email
 9    to Tony is unacceptable.  I got that email and I
10    said, gee, I'd like to know what happened.  That's
11    his role today.
12              MR. DIERKER:  Well, with all due
13    respect to your disgruntlement, I think that your
14    inquiring into the history of the repair and
15    malfunctioning of the camera in question at other
16    dates is beyond the topic and is completely beyond
17    the scope of discovery and -- but we will be happy
18    to provide, if they can be located, any work orders
19    with regard to that camera and we'll be happy to
20    resume the deposition if necessary.
21              But my position is that the
22    investigation has occurred into the loss or
23    destruction of the video in question and that it is
24    ongoing.
25              MR. PRAISS:  Well, I don't believe
```

ERIC LARSON  4/8/2019

 1   he's given me any testimony about the circumstances

 2   surrounding the loss or destruction other than what

 3   you wrote in an email, the fact that somebody

 4   discovered it a few months ago.  But why it was

 5   destroyed, what was happening with this camera,

 6   when the City learned about it, those are relevant.

 7             For example -- anyways.  So I -- I

 8   we'll agree to disagree.  Why don't we take a short

 9   break.

10             MR. DIERKER:  Okay.

11             MR. PRAISS:  Thank you.

12             (Off the record.)

13        Q    (BY MR. PRAISS)  Mr. Larson, back on

14   the record.  Close the loop on a few other

15   questions, again dealing with topics 1 and 2 in

16   particular.

17             You had mentioned, I believe in your

18   testimony, if I heard you correctly, about the fact

19   that the City does have an in car cameras for --

20        A    We have some, yes.  Not all police

21   cars are equipped with in car camera system, but

22   some police cars are.

23        Q    Are you aware if there's any in car

24   camera video recording of the Stockley protests?

25        A    I am not.

ERIC LARSON  4/8/2019

1        Q      If I wanted to know if those exist,

2   is that something that -- is it your understanding

3   that the City has, in its recordkeeping,

4   distinguishes between video recording from

5   Documentation Team versus the Real Time Crime

6   Center versus in car camera recording, those are

7   all separately retained in different ways?

8        A      Not necessarily separately retained.

9   They're all retained in -- primarily again with

10  even in car, the information is downloaded,

11  recorded, put on disk, and entered into property

12  custody with the complaint number of the associated

13  incident.

14       Q      But is it fair to say that somewhere

15  in the recording, recordkeeping process, there is

16  some identifier that indicates this was a video

17  recording taken by an in car camera?

18       A      Yes.  We would be -- we would know

19  how, where that came from.  Yes.

20       Q      Perfect.  On a similar note, I think

21  -- and I think, and I apologize if I asked you this

22  or you answered it before but I want to make sure I

23  have a clear understanding myself.

24              How are the Documentation Team videos

25  named or tagged so they can be reviewed?

ERIC LARSON  4/8/2019

1      A     They're essentially downloaded and on

2 -- and burned onto a disk with a file name and that

3 -- and then put into an evidence envelope which

4 would say something to the effect of video of X.

5      **Q     Let's talk about that X.  Would it**

6 **say video from Documentation Team X?**

7      A     Yes.  It would say something to the

8 effect of video recorded by Documentation Team.

9      **Q     Okay.  Would they identify the name**

10 **of a person on the Documentation Team?**

11      A     The seizing and submitting officer

12 would prepare the evidence envelope that would have

13 that information.

14      **Q     And obviously you would identify the**

15 **date and time and the location where that video was**

16 **taken by the Documentation Team?**

17      A     It would indicate that, in the police

18 report on the evidence envelope, it would indicate

19 the date, time, location, where it was collected.

20      **Q     Okay.  Are there any rules or**

21 **policies that the Documentation Team members have**

22 **to follow while they're collecting video?**

23      A     Not specifically, as in they have

24 been trained to, as part of the CDT process, to

25 collect that evidence, that documentation, record

ERIC LARSON  4/8/2019

```
 1   it, seize, mark package, and submit it to property
 2   custody.
 3           Q       Are there any rules that may
 4   expressly prohibit them from deleting videos that
 5   they take that may show improper police conduct?
 6           A       There are no, to the best of my
 7   knowledge, no specific rule directed at that but
 8   our general rule would be, in the special orders,
 9   would be that that would not be acceptable.
10           Q       When you say the "general rule," can
11   you point me to what are you referring to?
12           A       Things like conduct unbecoming.
13   Obviously we -- that would be an illegal criminal
14   act, to destroy evidence, and that would be a
15   violation of law, and, therefore, we don't have an
16   order that says you're not to do unlawful things.
17   So I mean, it's part of the -- part and parcel of
18   being a police officer, you would not download and
19   destroy unfavorable evidence.
20           Q       So to the extent somebody in the
21   Documentation Team recorded an incident where the
22   police acted inappropriately in connection with the
23   Stockley protest and then deleted it, that would be
24   an unlawful act?
25           A       Yes, I believe it would be
```

ERIC LARSON  4/8/2019

Page 61

```
 1   destruction of evidence, hindering prosecution, any

 2   list of crimes.

 3         Q     Has it come to the City's attention

 4   at any time that that -- something like that has

 5   actually happened where somebody on the

 6   Documentation Team has deleted video?

 7         A     I have no knowledge that that

 8   occurred.

 9         Q     As part of CDT training, what

10   Documentation Team training is included?

11         A     As part of the overall briefing on

12   how we're going to execute specific functions, the

13   individuals who are assigned to those teams are

14   given cameras and told to go out and record the

15   actions of protesters and the officers during the

16   event.

17         Q     Other than that, any other training?

18         A     Not to my knowledge, there's not a

19   specific like PowerPoint or lesson plan that covers

20   that.  It's incorporated into the ongoing trainings

21   of the CDT teams.

22         Q     Am I correct that Luther Hall was in

23   the Documentation Team?

24         A     I'm not sure.  Luther Hall was

25   assigned to the intelligence unit at the particular
```

ERIC LARSON  4/8/2019

Page 62

```
 1    time.  I am not sure in the detail where he was
 2    listed, if he was listed in the detail.  He may
 3    have been on a Documentation Team in a previous
 4    assignment.
 5         Q     Okay.  Do you have the OPs plan in
 6    front of you, sir?
 7         A     I do.
 8         Q     Can we mark that as an exhibit, if
 9    you don't mind?
10              MR. DIERKER:  Can we go off the
11    record for a minute?
12              MR. PRAISS:  Sure.
13              (Off the record.)
14              (Plaintiffs' 30(b)(6) Exhibit 3
15    marked for identification by the court reporter.)
16         Q     (BY MR. PRAISS)  Mr. Larson, I'm
17    going to hand you two pages and they have been
18    Bates numbered CITY 430 and 431 on the backside as
19    well as 439 and 438, and these are pages taken from
20    the OPs plan?
21         A     Correct.
22         Q     Okay.  And for the record, when I use
23    the term "OPs plan," what does that mean?
24         A     It's the operation order that is an
25    umbrella document that we utilize to direct
```

ERIC LARSON  4/8/2019

Page 63

1    individuals to their job functions during an event,

2    and we put these together for large scale special

3    events.  So Fair St. Louis would have an OPs an

4    operations order.  Mardi Gras has an operations

5    order.  Things like that.

6         **Q     Are the two pages I've handed, you**

7    **are those from the OPs plan related to the Stockley**

8    **post?**

9         A     They are.

10        **Q     And if you look on pages Bates**

11   **numbered 430 and 439, do you see Luther Hall's name**

12   **shown?**

13        A     I do.

14        **Q     And am I correct it identifies him**

15   **being on the Documentation Team?**

16        A     Correct.

17        **Q     Okay.  Does this confirm for you that**

18   **Luther Hall was on the Documentation Team during**

19   **the Stockley protests?**

20        A     Not necessarily.  The way these

21   things are put together, the individuals' names are

22   -- they go into a pool.  He may -- he is listed in

23   the order as being on the operations plan.  At the

24   particular date and time, incident location, for

25   his incident, I can't state that he was with these

ERIC LARSON  4/8/2019

Page 64

```
 1    individuals at the time.

 2         Q      Do you have any reason to, sitting

 3    here, to not believe that he was on a Documentation

 4    Team as noted in the OPs plan?

 5         A      Again, this OPs plan had him on that

 6    team.  There are changes that occur to the OPs

 7    plan, people call in sick, people get moved around.

 8    In particular, I would have to say that he was not

 9    with the Documentation Team at the time of his

10    incident just because I have been told that that

11    was not the case.

12         Q      Separate and apart from the time of

13    his incident, and I understand a lot of things can

14    happen where changes happen from what the OPs plan

15    says, but sitting here today as the corporate

16    representative, are you aware whether or not any of

17    those actually hypothetical things happened or, to

18    the contrary, Mr. Luther Hall was in fact on a

19    Documentation Team, at least in part, during the

20    Stockley protests?

21         A      He was listed as part of the

22    Documentation Team in that particular operations

23    order.

24         Q      And my question, do you have reason

25    specifically, based on facts, to tell me that he
```

1    didn't participate on the Documentation Team, at

2    least in part, during the Stockley protest?

3            MR. DIERKER:  I need to object as

4    outside the scope of the deposition designation as

5    to Luther Hall's specific assignment, but you may

6    answer.

7            MR. PRAISS:  If he knows.

8        A    I don't -- I don't know.

9        Q    (BY MR. PRAISS)  Okay.  When was the

10   OPs plan -- and I know we only have a few pages of

11   it -- but when was it created?

12           A    It would have been created prior to

13   the verdict announcement.  Probably a week or so

14   prior we would be collecting names.  Because not

15   knowing when the verdict would be released, we have

16   the things, shift changes, all kinds of personnel

17   issues, this is a very big document, we're trying

18   to get multiple members of the police department at

19   one place, at one time.  So it would have been --

20   it operates off a template format, meaning our

21   operation planning unit has a template that they

22   use for specific things, for specific roles, and

23   individuals are plugged into that template.

24           It was an ongoing process to create

25   that document and the document was released prior

ERIC LARSON  4/8/2019

Page 66

1   to the events that occurred.

2           So we knew the Grand Jury verdict was

3   going to come in a day or so.  The OPs plan was

4   ready to go by those dates.

5       Q    Was the OPs plan at any time amended

6   after its release?

7       A    Not to my knowledge, but there are

8   email -- if there were personnel changes in general

9   manners, we update -- like replacement personnel

10  lists, there would be a replacement personnel list.

11  I don't know that one was created.  A lot of that

12  stuff comes by phone.  People call in, say Joe is

13  not coming, Eric is coming, and so.

14      Q    But my question is, to your

15  knowledge, nobody input any of those information

16  about individual changes in terms of generating an

17  amended OPs plan?

18      A    No.  No.

19      Q    Thank you.  Do you have the Notice of

20  Deposition in front of you?

21      A    I do.

22      Q    I'd like to jump to topic 12, if I

23  could, and cover topics 12 and 15 with you.

24      A    Okay.

25      Q    You see they all, in one way or

ERIC LARSON  4/8/2019

1    another, deal with chemical agents?

2         A    Yes.

3         Q    Okay.  Is there anything that you did

4    specifically to prepare for these topics?

5         A    Topic 12 and topic 15?

6         Q    No, topic 12, 13, 14, and 15.

7         A    Yes, I reviewed the special orders,

8    Special Order 1-01 specifically, the section, I

9    believe it's Section VIII-6 that covers mace and

10   Section XIII which covers chemical agents and crowd

11   dispersement.

12        Q    The first section was section?

13        A    I believe it's Section VI.  It's

14   individual use of mace.

15        Q    And the other section you reviewed?

16        A    I believe it was XIII.

17        Q    And other than reviewing those

18   sections from the Special Order, did you do

19   anything else to prepare for testifying as a

20   corporate representative on topics 12 through 15?

21        A    I looked at some training documents,

22   primarily related more towards dispersal order than

23   chemical agents, but that's part of the Special

24   Order Section XIII, 1-01 Section XIII.

25        Q    Okay.  Anything else?  I just want to

ERIC LARSON  4/8/2019

1    make sure I have a complete understanding of what

2    you did, what you looked at in preparing for these

3    topics 12 through 15?

4         A    I believe that would be the extent of

5    it.

6         Q    Okay.  In a few minutes I'm going to

7    show you a particular document.  Please let me

8    know, when I hand it to you, if that's the training

9    document you were referring to or it's something

10    else and we'll explore that a little bit.

11               In your career since -- I think you

12    started out in 1994 --

13         A    Mm-hmm.

14         Q    -- '95 time period, have you yourself

15    ever deployed pepper spray or mace?

16         A    I have been involved in incidents

17    where pepper spray and mace were deployed,

18    primarily as a patrol officer, which would be in

19    the 1995 through 2004 time frame.  Whether I was

20    actually the officer that deployed or was an assist

21    officer, I can't recall.

22         Q    Okay.  Do you recall approximately

23    how many times you, whether yourself did it or

24    another police officer close to you, used pepper

25    spray that you recall from 1995-2004?

ERIC LARSON  4/8/2019

```
 1          A     I can't recall.  I'd be speculating.
 2          Q     Okay.  After 2004, though, you had --
 3    have you ever yourself deployed pepper spray mace,
 4    or witnessed other police officers doing it?
 5          A     I'm sorry, I'm pausing because I'm
 6    trying to think through.  Most of my duties were
 7    not street enforcement related between 2004 and
 8    2015, so I would say during that time frame, no, I
 9    can't recall ever deploying or seeing mace
10    deployed.
11                I can't recall seeing mace deployed
12    as a commander during -- during any -- not where I
13    was -- not where I was like front and center
14    present, no.  I don't -- I don't recall.
15          Q     So really the only times where you
16    either yourself used pepper spray mace, or
17    witnessed someone, would have been during the
18    1995/2004 time period?
19          A     Yes.
20          Q     During that time period, were those
21    incidents in connection with an arrest of an
22    individual?
23          A     Yes.
24          Q     Prior to the use of pepper spray or
25    mace in those incidents, is it your recollection
```

ERIC LARSON  4/8/2019

Page 70

1  **that the officer provided any warnings to the**

2  **individual?**

3        A      No, it would have been relative to

4  affecting an arrest.  The individual would have

5  been told that they were under arrest or it would

6  have been a fight situation so the deployment would

7  have been immediate and there would be no warning

8  given.

9        **Q      Were there any situations where it**

10  **wasn't a fight but simply somebody was not**

11  **compliant with a request, such as turn around so I**

12  **can put handcuffs on you, the person doesn't**

13  **comply, and to effectuate the arrest, the officer**

14  **needs to use pepper spray mace?**

15        A      Under our order, we do not warn that

16  we're going to deploy mace for an arrest situation.

17  The individual is notified that they're under

18  arrest, turn around, put your hands behind your

19  back, and then if when the individual fails to do

20  that, then it's an escalation of force through the

21  use of force continuum.

22             So if I go to put my hands on an

23  individual, and they resist, they begin to flail,

24  then I might use mace to subdue them and bring them

25  under compliance.

ERIC LARSON 4/8/2019

```
 1          Q     Think of a situation where the person
 2    is not resisting in any way physically, there is no
 3    threat of violence, there is no imminent threat of
 4    harm to the police officer who is trying to
 5    effectuate the arrest --
 6          A     Then there would be --
 7          Q     Just a -- let me finish my question.
 8          A     Sorry.
 9          Q     I'm going to start over.  I want you
10    to imagine the following scenario, which is not
11    implausible at all, I hope you'll agree with me,
12    that there is an officer trying to effectuate an
13    arrest.  The officer has the handheld pepper spray
14    mace device with him.  He asks the person to do
15    something and the person is -- simply refuses to
16    comply with that request but is not exhibiting any
17    force or violence, there is absolutely no threat of
18    imminent harm to the police officer or anybody
19    else, just a non-compliant individual.
20                Under those circumstances, is the
21    police officer allowed, on the escalation of use of
22    force, to spray the person with pepper spray
23    without giving him a warning, saying words to the
24    effect, sir, you're not complying with my request;
25    unless you comply, I'm going to spray you with
```

ERIC LARSON  4/8/2019

1    pepper spray and it's going to hurt.  Something to

2    that effect?

3         A    No.

4         Q    Is there a reason why, as a policy,

5    the City wouldn't want police officers under the

6    circumstance that I described, where an individual

7    is simply uncooperative, but not violent, that you

8    wouldn't, in the process of trying to effectuate an

9    arrest in a peaceful manner, not give a warning,

10   saying, I'm going to do something that's going to

11   hurt you, please cooperate?

12        A    Because mace is not --

13             MR. DIERKER:  Excuse me, I'd like to

14   object to the form of the question as

15   argumentative, but you may answer.

16        A    Because, technically, mace is not to

17   be used just on non-compliance, passively resisting

18   persons.  So we would not use mace on someone who

19   is passively resisting.  Mace would be used on an

20   actively resisting.  So if I am refusing to be

21   handcuffed, we would put handcuffs on an individual

22   and use -- we wouldn't necessarily spray them

23   unless they are actively resisting.

24        Q    (BY MR. PRAISS)  So if I heard you

25   correctly, if someone is passively resisting, the

ERIC LARSON  4/8/2019

Page 73

```
1    City's policies is that mace should not be used in
2    that circumstance; is that an accurate statement?
3         A    I believe so.
4         Q    Okay.  To the extent, in connection
5    with the Stockley protests, individuals were
6    engaging in civil disobedience but peacefully, and
7    at no time actively resisting but simply passively
8    resisting a request, an order from a police
9    officer, it would have been inappropriate for a
10   police officer in those situations to use pepper
11   spray at those individuals to get them to comply
12   with a request; is that a fair statement?
13        A    Unless other factors were in play.
14   So, for example, obviously we would need to give
15   warnings to individuals that were -- because of the
16   dynamic nature of protests, where there is some
17   engaged in unlawful activities, sometimes in order
18   to disperse crowds, mace would be deployed, but
19   only after a set of circumstances.
20        Q    Okay.  I want to break that down a
21   little bit and understand what you're saying.  I
22   want to talk about a situation where you have a
23   group of people protesting and officers tell a
24   particular individual -- gives him a command to do
25   X Y and Z.
```

ERIC LARSON  4/8/2019

Page 74

```
 1              At that point, if the person is
 2    passively resisting, refusing to turn around so
 3    handcuffs could be put on him or her, is there any
 4    basis for an officer then to use handheld mace and
 5    spray the person in order to get them to comply,
 6    under the police policies?
 7         A    I think we're going to quibble over
 8    what active/passive resistance looks like.  Under
 9    strict passive resistance, I would say no, there
10    would be no reason, but what shifts from active to
11    passive is where we are going to have issues on
12    when spraying is going to occur or not going to
13    occur.
14         Q    Okay.  But again, I want to focus on
15    my situation, that simply is a refusal to comply
16    with an order but not in any way resisting or
17    tugging or doing anything.  Just saying no, holding
18    my hands like this.  Would an officer be allowed,
19    in my -- I'm just crossing my hands and -- would in
20    your mind be -- is that a position where an officer
21    could spray me without any warning?
22         A    By crossing your arms, you are
23    committing active and defensive resistance, so
24    you're actively resisting my attempt to take you
25    into custody, so, therefore, mace could be
```

ERIC LARSON 4/8/2019

Page 75

1  deployed.

2       Q     Okay.  Is there a reason why the City

3  has a policy that in that situation allows a police

4  officer to spray me without warning to get me to

5  cooperate, knowing that by spraying someone, it's

6  going to hurt like hell, excuse my language, and if

7  I gave the warning as a police officer, I may get

8  compliance?  What's the a rationale for not giving

9  a warning in that situation?  That's why I'm

10 perplexed.

11          MR. DIERKER:  I'll object to the form

12 of the question as argumentative and calls for a

13 legal conclusion.  You may answer.

14      Q     (BY MR. PRAISS)  You're not an

15 attorney, are you?  I just want to make sure I

16 didn't miss something.

17      A     Technically, I am an attorney.  I

18 graduated from law school in 2004.

19      Q     Should have covered your education.

20      A     Yes.

21      Q     Where did you go to law school?

22      A     Saint Louis University School of Law.

23      Q     Okay.  So you are an attorney.

24      A     I am an attorney.  I don't actively

25 practice law.

ERIC LARSON  4/8/2019

Page 76

```
 1            Q      For today's deposition I am not
 2      asking for any legal opinions by you.  I think the
 3      judge will handle the law side quite well.
 4            A      Yes.  I hope so.
 5            Q      Yes.  My question to you is, solely
 6      as the representative of the City today about
 7      City's policies and practices.  And we have topics
 8      dealing with chemical agents, you have mentioned
 9      that you viewed the Special Order Section VI
10      dealing with mace, and I'm going back to my
11      specific question.
12                   Could you explain to me the rationale
13      between -- strike that.
14                   Can you explain to me the City's
15      rationale for allowing officers to use handheld
16      pepper spray against an individual who is not
17      acting violently, but simply refusing an order,
18      without first giving a simple warning, advising the
19      individual that there will be pepper spray deployed
20      against them unless they comply?
21                   MR. DIERKER:  I'll renew my
22      objection.  You may answer.
23            A      The reason is, generally, in order to
24      take the person into custody, to use the element of
25      surprise as it were, to take the individual into
```

ERIC LARSON  4/8/2019

Page 77

 1   custody.  If -- and again, we're talking about

 2   active versus passive resistance.  We wouldn't use

 3   mace on individuals that are just generally not

 4   compliant.  It's when they're not compliant and we

 5   cannot take them into custody.

 6              You cannot comply with -- you can --

 7   I'm trying to phrase this appropriately.  You can

 8   be non-compliant and actively resisting, in which

 9   we would deploy mace.  In general, if you are

10   passively resisting, I am not going to go, I'm

11   going to sit down, we would use empty hand

12   techniques to take the individual into custody.  We

13   would not deploy mace.

14              As regards to warnings, as a standard

15   policy, we do not give warnings to individuals that

16   we are going to not -- we don't use warnings on a

17   one-on-one individual basis.  If we're going to use

18   them in a crowd dispersal basis, then a warning

19   would be applied.

20       Q     (BY MR. PRAISS)  That's what I'm

21   trying to understand.  Why is it in one situation

22   you do have warnings and the City recognizes the

23   value of them, but in this situation, prior to

24   escalating the situation, the City has a policy

25   that allows the use of pepper spray without

ERIC LARSON  4/8/2019

Page 78

 1   warnings?  That's what I'm trying to exactly
 2   understand.
 3            MR. DIERKER:  Once again I object to
 4   the form of the question.
 5        Q    (BY MR. PRAISS)  You may answer.
 6        A    I cannot give you a reason why we
 7   provide warnings other than the tactical
 8   application of the mace itself.
 9        Q    When you say "the tactical
10   application of mace," what do you mean by that,
11   sir?
12        A    The actual deployment, the -- to tell
13   someone that we are going to take a course of
14   action then gives them an opportunity to thwart
15   that course of action.  So we wouldn't -- if I gave
16   you the opportunity to -- if I said I am going to
17   spray you with mace if you don't comply, well, then
18   you might cover your face with your arm and then --
19        Q    Or I may just as well comply,
20   couldn't I?  Isn't that a possibility too?
21        A    All possibilities are possibilities
22   until they become probabilities.
23        Q    So if the goal is to avoid escalating
24   the situation, will you agree with me that, at a
25   minimum, you will try to de-escalate by warning a

ERIC LARSON  4/8/2019

1   **person, saying, sir, your hands are crossed, you**

2   **are resisting my attempt to arrest you, I am asking**

3   **you one last time, please comply or I will have to**

4   **spray you with pepper spray?**

5          A     But in most instances, we've

6   already --

7                 MR. DIERKER:  Excuse me, I object to

8   the form of the question, argumentative, compound,

9   complex, calling for a legal conclusion.

10                MR. PRAISS:  Wow, any other

11  objections, Judge Dierker, from your law school

12  days that you want to come up with?

13                MR. DIERKER:  If I think of any, I'll

14  assert them.

15                MR. PRAISS:  Please assert them.  I

16  think you could add three more.

17         **Q     (BY MR. PRAISS)  But subject to all**

18  **that, sir, could you answer my question?**

19         A     Mostly because our goal in any

20  situation is de-escalation and voluntary

21  compliance.  It -- everything works better for the

22  officer on the street if we can gain voluntary

23  compliance from the individual.  Once we have

24  reached a point where we're in a situation where

25  we've already asked you to comply, we've already

ERIC LARSON  4/8/2019

1    then told you to comply, so we've got two refusals

2    of compliance, at the third point it's time for us

3    to take action.  And the individual officer has the

4    discretion of determining what that action will be.

5    And what is to -- what minimizes the potential for,

6    quote, injuries from taking such action.

7              So we could go hands on and grab and

8    manipulate an individual, force them to the ground,

9    potentially causing injury.  We could spray them

10   with mace, which, while painful, does not tend to

11   have long-lasting effects or long-term injuries.

12   That's why it's a non-deadly use of force.

13             I think that is part of the

14   explanation in that, once we have reached the stage

15   of taking action, we are no longer in a -- required

16   to be giving warnings as far as what we've done.

17   We've already done that.  We've already given the

18   warnings.  We've already said you're failing to

19   comply.  You're subject to arrest.  We're going to

20   arrest you if you fail to comply.  That's a matter

21   of using force.

22        Q    But nowhere in that process is the

23   police officer required to give a warning that he

24   or she is going to -- about to use pepper spray

25   mace in order to get compliance from an individual;

1    correct?

2         A     They are not.

3         Q     Okay.  Could you, for the benefit --

4    for my benefit and for the record, describe as best

5    you can the difference between passively resisting

6    and actively resisting?  What triggers that

7    distinction?  And let me also, I'd like to

8    understand what training is provided to officers or

9    are there anything in writing that defines those

10   things?

11        A     It covers it in the orders and during

12   defensive tactics training I believe from the St.

13   Louis Police Academy, where all officers go through

14   that, you know.  Active resisting is generally an

15   active fight or flailing or resistance to being

16   taken into custody.

17        Q     Let's focus on the last part, "the

18   resistance to being taken into custody."  What

19   constitutes resistance?  What's the minimum amount

20   that I have to do to trigger active resistance?

21   Let's get the minimum threshold.

22        A     The minimum threshold, it first would

23   start with refusing to comply because that's an

24   active act.  And then as we go forward, we're going

25   to get into things that are actually resisting my

ERIC LARSON  4/8/2019

1    arrest.  That could be fleeing.  It could be

2    flailing.  It could be -- those two are the main

3    ones.  Fleeing from being put into handcuffs,

4    running from me, taking a fighting stance.  All of

5    those.

6          **Q      Again, I'm focusing on the minimum.**

7    **You seem to be wanting to look at the higher end of**

8    **the spectrum, with all due respect.**

9          A      Right.

10         **Q      Take the situation, and I think I**

11   **heard you correctly, of an individual simply**

12   **refuses to comply.**

13         A      Mm-hmm.

14         **Q      Was it your testimony that simply**

15   **refusing to comply in itself is actively resisting?**

16         A      It can be.  Refusing to comply, if

17   I'm refusing to comply and I'm locking my arms, or

18   I'm refusing to comply by holding this chair, that

19   can be an active resistance.  Passively resisting

20   is I'm just resisting you.  I'm just saying no.

21   And when the officer puts his hand on me to put me

22   in handcuffs, I willingly put my hands behind my

23   back and I am cuffed and I passively walk away.

24         **Q      So in the situation today of an**

25   **individual who refuses to comply with a request and**

ERIC LARSON  4/8/2019

1    locks his or her hands in such a fashion that make

2    it difficult for a police officer to effectuate an

3    arrest, the police officer can, using his or her

4    discretion, spray that individual with pepper spray

5    without giving any warning; is that a fair summary?

6            A     They do not have to give a warning.

7            Q     Gotcha.

8                  MR. PRAISS:  Let me mark this as an

9    exhibit.

10                 (Plaintiffs' 30(b)(6) Exhibit 4

11   marked for identification by the court reporter.)

12           Q     (BY MR. PRAISS)  I have given you

13   what's been marked as Exhibit 4, and it begins with

14   Bates number CITY 764, and does yours end -- I want

15   to make sure we're looking at the same thing

16   because the numbers seem to be off right now --

17   ends with CITY 53?

18           A     Yes.

19           Q     Okay.  And I don't have an

20   explanation why the Bates numbers are not

21   sequential.  Do you recognize this document?

22           A     I do, and just as a point of

23   clarification in my earlier statement where I said

24   I reviewed pepper mace and I said Section VI, it's

25   actually Roman numeral Section IV, IV instead of

ERIC LARSON  4/8/2019

1  VI.

2       Q     Okay.  If you go to Bates number CITY

3  775?  Is that the portion of the Special Order

4  Section IV dealing with the use of pepper spray?

5  Pepper mace?

6       A     It is.

7       Q     Okay.  Is there anything in here that

8  you can point me to specific language that

9  identifies the difference between passive versus

10 active resistance?

11      A     There is not.

12      Q     Are you aware of any specific

13 training, written documents that specifically

14 delineate to officers the difference between

15 passive versus active resistance?

16      A     I cannot point to any specific

17 training other than just my own as far as what we

18 discuss as far as active versus passive, that you

19 don't want to use mace on passively compliant

20 people.

21      Q     Again, I'm interested in your

22 testimony as a corporate representative and I think

23 one of the topics deals with the training dealing

24 with chemical agents?

25      A     Yes.

ERIC LARSON  4/8/2019

```
 1          Q     You understand our definition of
 2     "chemical agents" includes pepper spray -- pepper
 3     mace?
 4          A     I do.
 5          Q     Okay.  So my question, in preparing
 6     for today's deposition, is it your testimony the
 7     City has no training documents that explain
 8     specifically the difference between passive versus
 9     active resistance which would advise police
10     officers under what circumstances they may or may
11     not use pepper spray mace to effectuate an arrest?
12     I have not seen those documents and I'm trying to
13     find out if they're out there.
14          A     No, I cannot.  I cannot.
15          Q     Have you ever seen such document?
16          A     No, I cannot recall.  No, I cannot.
17          Q     Okay.  For the record, I believe
18     there may be a page missing in here, and I think
19     there was an email from Tony to you about it on
20     Friday and maybe at some point, when we get that
21     page, we'll include it in here.  I noticed that --
22               MR. DIERKER:  Well, it's certainly --
23     it's our intention that you have the whole thing.
24               MR. PRAISS:  I think there are one or
25     two pages missing that Tony brought to your
```

1    attention.  That's all I want to make sure.

2              Okay.  Will you mark this as the next

3    exhibit.

4              (Plaintiffs' 30(b)(6) Exhibit 5

5    marked for identification by the court reporter.)

6         Q    (BY MR. PRAISS)  I'm handing you

7    what's been marked for identification purposes as

8    Exhibit 5.  Mr. Larson, this document, Exhibit 5,

9    is titled City of St. Louis Law Department Police

10   Section Protest Law and it's dated August 16, 2017.

11             Do you see that?

12        A    I do.

13        Q    Have you ever seen this document

14   before today's deposition?

15        A    I have.

16        Q    When do you recall seeing it?

17        A    I saw it when it was presented and I

18   believe that was on 8/16 when it was presented to

19   the senior command during pre-Stockley training.

20        Q    Did you -- is this -- this is not a

21   document you reviewed in preparing for today's

22   deposition?

23        A    I did.  I would have read it in the

24   course of preparation.

25        Q    All right.  Because you recall

ERIC LARSON  4/8/2019

Page 87

1    earlier I tried to be as thorough as possible to

2    find out all documents you reviewed.  I don't

3    recall -- you mentioned a training document.  Is

4    this the document you were referring to?

5         A    I did review this training document,

6    or this document prior to our meeting today.

7         Q    Okay.  Did you make an effort to

8    speak with anybody other than your attorneys about

9    this document, Exhibit 5?

10        A    No.

11        Q    Okay.  Are you aware -- strike that.

12             You mentioned that this was presented

13   to you and others in senior command prior to the

14   Stockley protest?

15        A    Yes.

16        Q    And when you say senior command, what

17   does that mean?

18        A    The senior command would be the

19   chief, the assistant chief, the colonels, the

20   majors, I believe the captains, and perhaps

21   specialized unit lieutenants.

22        Q    Do you recall who provided this

23   presentation?

24        A    It was the law department, I believe

25   it was Christine Hutson.

ERIC LARSON  4/8/2019

```
 1        Q      Do you know if at any time subsequent
 2   to the presentation that was made to the senior
 3   command, a similar presentation of this document
 4   was provided to all police officers?
 5        A      I believe -- I don't believe so.  I
 6   don't know.  It may have gone out in department
 7   mail but I can't recall.
 8        Q      Okay.  This is dated just a few weeks
 9   before the Stockley protest; correct?
10        A      Yes.
11        Q      Do you know if this was prepared
12   specifically in anticipation of the verdict in the
13   Stockley matter?
14        A      I believe it was.
15        Q      Is it fair to say, is it your
16   understanding that this document purports to
17   reflect the policies and practices of the City of
18   St. Louis for the matters that are identified in
19   it?
20        A      Can you repeat that?  I'm confused.
21        Q      Sure.  It's not the clearest
22   question, so thank you for asking me to rephrase.
23              Is it fair to say that Exhibit 5 and
24   the information contained within it about protest
25   law accurately reflects the City's understanding
```

ERIC LARSON  4/8/2019

1    with respect to the matters set forth in the

2    document?

3         A    Yes.

4         Q    All right.  Go to page 17, please, of

5    the PowerPoint.

6         A    Yes.

7         Q    It's titled Chemical Agents.

8              Do you see that?

9         A    I do.

10        Q    It says, "In most cases, mandatory

11   warnings must be given prior to using chemical

12   agents as a result of Templeton."

13             Do you see that?

14        A    Yes.

15        Q    The phrase "In most cases" indicates

16   to me that it's not universal; correct?

17        A    Yes.

18        Q    And is what we discussed up until now

19   about the use of pepper spray, pepper mace, the

20   only exception whereby mandatory warnings must not

21   be given prior to using chemical agents?

22        A    I'm sorry, I'm confused again.

23        Q    We discussed the use of pepper spray

24   mace; correct?

25        A    Yes.

ERIC LARSON  4/8/2019

Page 90

```
 1        Q     And we were talking about it in the
 2   context of handheld device by a police officer;
 3   correct?
 4        A     Correct.
 5        Q     Is that the only situation where a
 6   mandatory warning is not required prior to using a
 7   chemical agent?
 8        A     Well, in general, mandatory warnings
 9   are required when they're being used for crowd
10   dispersal.  So when we're using them as a crowd
11   dispersal tool, then they're going to -- then a
12   mandatory warning is necessary.
13        Q     Gotcha.  So this document is only
14   dealing with the context of -- strike that.
15              Let's go to the next page, page 18.
16        A     Yes.
17        Q     Make sure I got the right page here.
18   I'm going to be so upset at myself.  Are we missing
19   pages here?  Do you have page 18 on yours?
20        A     I have page 18.
21        Q     You're the only one here that has
22   page 18.  It's my lack of -- inability to copy
23   things appropriately.  I'm still learning the Xerox
24   machine at the ACLU.
25              MR. DIERKER:  You have my sympathy.
```

ERIC LARSON  4/8/2019

1              MR. PRAISS:  Thank you.  I tried so
2    hard not to bother anybody at the office and this
3    is what I get.  I have odd pages.  Well, I
4    apologize.  We'll make copies of that one but this
5    is to, the extent I deal with odd pages, we'll be
6    in good shape.
7         Q    (BY MR. PRAISS)  On page 18, am I
8    correct it says, "Which chemical agents are covered
9    by this policy?"  And it says, "All of them."
10   Correct?
11        A    That is correct.
12        Q    Okay.  Are there any chemical agents
13   that are not included in the policy dealing with
14   protest law in --
15        A    No.  Sorry.
16        Q    If the chemical composition -- strike
17   that.
18             Am I correct that the chemical
19   composition of pepper spray mace, whether it's in a
20   handheld device or in a fogger, is identical?
21        A    The chemical composition of, I'm
22   sorry, the handheld mace and a fogger are
23   identical?  I believe they are.  I think it's the
24   dispersal method that is different.
25        Q    Are you familiar with the Templeton

ERIC LARSON  4/8/2019

Page 92

1    Settlement Agreement?

2          A     Yes, I mean, I know that it occurred.

3          Q     Do you see there's references in the

4    pages that follow that refer in the heading to the

5    Templeton versus Dotson, et al., Settlement

6    Agreement?

7          A     Yes.

8          Q     Quite a few pages dealing with it?

9          A     Yes.

10         Q     Have you yourself ever looked at the

11   Templeton Settlement Agreement?

12         A     I believe so.  I believe it was

13   disseminated to commanders at the time of the

14   agreement.

15         Q     Okay.  Did you review the Templeton

16   Settlement Agreement in preparation for today's

17   deposition?

18         A     I don't believe I did because

19   Templeton was incorporated in the Special Order

20   1-01, Section XIII.

21         Q     Did I hear you correctly that

22   Templeton Settlement Agreement -- strike that.

23               Am I correct that the terms of the

24   Templeton Settlement Agreement were incorporated

25   into Section XIII of Special Order 1-01?

ERIC LARSON  4/8/2019

```
 1        A     Yes.

 2        Q     Okay.

 3              MR. DIERKER:  Off the record.

 4              (Off the record.)

 5              (Plaintiffs' 30(b)(6) Exhibit 6

 6   marked for identification by the court reporter.)

 7        Q     (BY MR. PRAISS)  Sir, I'm going to

 8   hand you what's been marked as Exhibit 6, which is

 9   a copy of the Templeton Settlement Agreement?

10        A     Mm-hmm.

11        Q     You don't believe you reviewed this

12   in preparing for the deposition?

13        A     I don't believe so because I believe

14   the context of it was all incorporated into Special

15   Order 1-01 Section XIII.

16        Q     Okay.  If you look on the first page,

17   paragraph A at the bottom, and I'll paraphrase

18   generally, do you see that in, first, the

19   defendants and anybody acting on their behalf

20   basically will not enforce any rule, policy, or

21   practice that grants law enforcement officials

22   authority or discretion to do certain things which

23   are set out on page 2?

24              Do you see that?

25        A     Yes.
```

ERIC LARSON  4/8/2019

1      Q     So to the extent the City of St.

2 Louis had any rule, policy, or practice as of the

3 date of this Settlement Agreement that granted law

4 enforcement officials the authority or discretion

5 of the things that are set forth on the following

6 page, the understanding of the City was that this

7 Settlement Agreement prohibited those practices;

8 correct?

9      A     Correct.

10      Q     It sets out at two different

11 circumstances where chemical agents could be used

12 on the next page; correct?

13      A     Yes.

14      Q     And the first one, basically, it

15 precluded police officers as part of the Settlement

16 Agreement from using chemical agents for the

17 purpose of dispersing groups of individuals who

18 were engaged in non-criminal activity in the City

19 unless the full requirements were met; correct?

20      A     Correct.

21      Q     And the second factor was it

22 prohibited police officers from using chemical

23 agents on individuals who were engaged in

24 non-criminal activity for the purpose of

25 frightening them or punishing them for exercising

ERIC LARSON  4/8/2019

 1    their constitutional rights?

 2         A     That is correct.

 3         Q     Okay.  There was four requirements

 4    that applied to the first circumstance; correct?

 5         A     Yes.

 6         Q     The first one is that there has to be

 7    a clear and unambiguous warning?

 8               Do you see that?

 9         A     Correct.

10         Q     Second one, there's an opportunity to

11    heed the warning?

12         A     Correct.

13         Q     The third one is a minimized impact

14    on individuals who are complying with orders; and

15    the last one is ensure safe egress is available to

16    people.

17               Do you see those four requirements?

18         A     I do, for the individuals engaged in

19    non-criminal activity.

20         Q     No, this would be for element one for

21    the purpose of dispersing groups of individuals.

22         A     Who are engaged in non-criminal

23    activity.

24         Q     Gotcha.  With respect to the first

25    requirement of clear and unambiguous warning, is it

ERIC LARSON  4/8/2019

1    the City's understanding that that warning would,

2    among other things, advise the person that chemical

3    agents would be used?

4        A    Yes, we would give a warning that

5    would say failing to comply with X action can

6    result in the deployment of chemical munitions.  We

7    would then direct individuals where to go and how

8    to comply, and then we'd try to minimize the effect

9    of the chemical agents if they were deployed.

10        Q    And I'm just focusing on the first

11   one.  I just want to make sure that my

12   understanding is accurate that the reference to

13   clear and unambiguous warning specifically

14   contemplates a warning that chemical agents would

15   be used absent compliance.

16        A    Yes.

17        Q    Gotcha.  With respect to minimize

18   impact on individuals who are complying with the

19   order in that situation, is it -- do you agree that

20   it is easier for police officers to comply with

21   this requirement if they use a handheld pepper

22   spray device as compared to a fogger?  Let me ask

23   it differently.

24            Would you agree that foggers tend to

25   spray a larger area and, therefore, more likely to

ERIC LARSON  4/8/2019

 1    impact a greater number of individuals than a

 2    handheld device?

 3         A     Yes.

 4         Q     So if the objective is to minimize

 5    the impact on individuals who are complying with an

 6    order with respect to this requirement, you would

 7    agree with me that using a handheld device would be

 8    more appropriate?

 9         A     It may be.

10         Q     Do you see that there is a definition

11    of "chemical agents" included as part of Settlement

12    Agreement?

13         A     I'm sorry -- oh, what -- yeah, under

14    1, where it says, yes, that there are a range of

15    chemical, that all would be collectively referred

16    to as chemical agents.

17         Q     Okay.  So again, the answer to my

18    question is, there is a specific definition for the

19    term "chemical agents" as it's used in the

20    Templeton Settlement Agreement; is that a fair

21    statement?

22         A     Yes.

23         Q     And that definition includes tear

24    gas, inert smoke, pepper gas, or other chemical;

25    correct?

ERIC LARSON  4/8/2019

```
 1          A     Yes.

 2          Q     And I think we established it before

 3     but again, you agree with me that pepper spray, OC

 4     spray and mace all have the same chemical

 5     composition; correct?

 6          A     Yes.

 7          Q     And am I correct that the definition

 8     of "chemical agents" and in the Templeton

 9     Settlement Agreement does not distinguish based on

10     the manner by which the pepper gas would be

11     deployed against protesters?

12          A     It does not.

13          Q     Am I correct there's no language in

14     the Templeton Settlement Agreement that indicates

15     that pepper gas deployed using an individual

16     handheld device is not included in the definition

17     of "chemical agents"; is that correct?

18          A     That is correct.

19          Q     And am I correct there is no language

20     in the Templeton Settlement Agreement that

21     indicates that only pepper gas deployed using a

22     fogger is included in the definition of "chemical

23     agents"; is that correct?

24          A     I'm sorry, I'm confused.

25          Q     I'll ask -- I'm covering all kinds
```

ERIC LARSON  4/8/2019

1    of --

2         A     I'm focusing on what you're saying to

3    make sure that I'm understanding as I don't want to

4    answer incorrectly.

5         Q     I appreciate it.  Am I correct there

6    is no language in the Templeton Settlement

7    Agreement that indicates that only pepper gas

8    deployed using a fogger is included in the

9    definition of "chemical agents"; is that correct?

10        A     I believe that's correct.

11        Q     Bottom line, regardless how pepper

12   spray is deployed, it is covered within the

13   definition of "chemical agents" under the Templeton

14   Settlement Agreement?

15        A     Yes.

16        Q     Gotcha.  I have a long question.

17        A     Okay.

18        Q     And I'm going to read it.  If you

19   need me to repeat it, I'm happy to do so.

20             Under the Templeton Settlement

21   Agreement, do you agree that absent circumstances

22   that present imminent threat of bodily harm, police

23   officers could not use handheld pepper spray for

24   the purpose of dispersing groups of individuals

25   engaged in non-criminal activity without, among

ERIC LARSON  4/8/2019

1    other things, first providing a clear and

2    unambiguous warning that chemical agents would be

3    utilized and providing those individuals with

4    sufficient opportunity to heed the warning and exit

5    the area?

6         A     Yes.

7         Q     Under the Templeton Settlement

8    Agreement, do you agree that absent circumstances

9    present imminent threat of bodily harm, police

10   officers could not use handheld pepper spray on

11   individuals engaged in non-criminal activity for

12   the purpose of frightening them or punishing them

13   for exercising their constitutional rights?

14        A     That is correct.

15        Q     Okay.  Thank you.

16        A     Is this a good time for a break?

17              MR. PRAISS:  Absolutely.  You've got

18   the toughest job here today.  Well, she has the

19   toughest job, I take it back.  Tara has the hardest

20   job.  But when either of you need a break,

21   seriously, just let me know.  As long as I ask --

22   don't ask for a break when there's a question

23   pending.  That's all.

24              THE WITNESS:  No, of course not.

25              (Off the record.)

ERIC LARSON  4/8/2019

```
 1                  (Plaintiffs' 30(b)(6) Exhibit 7
 2     marked for identification by the court reporter.)
 3          Q     (BY MR. PRAISS)  Mr. Larson, I've
 4     hand you had what's within marked as Exhibit Number
 5     7.
 6                  Do you see that?
 7          A     I do.
 8          Q     And it says Declaration of Jerome
 9     Baumgartner that was submitted as Defendant's
10     Exhibit 1 in connection with a preliminary
11     injunction hearing I'll represent to you?
12          A     Yes.
13          Q     So it's part of a court file.  Have
14     you ever seen this exhibit before today?
15          A     I have not seen the Declaration.  I
16     have seen the Special Order behind it.
17          Q     Perfect.  If you go to paragraph 6 of
18     Mr. Baumgartner's Declaration, I'll read it into
19     the record.  "On January 7, 2015, a temporary
20     directive on the use of chemical agents for
21     dispersing groups engaged in peaceful, non-criminal
22     activity was put in immediate effect, pursuant to
23     the matter then before the US District Court and is
24     attached as Exhibit B."
25                  Do you see that?
```

ERIC LARSON  4/8/2019

 1          A      I do.

 2          Q      Okay.  If you could go to Exhibit B,

 3   please, of Mr. Baumgartner's Declaration, and do

 4   you see at the top of it, it says Directive

 5   2015-01-07?

 6                 Do you see that?

 7          A      Yes.

 8          Q      Am I correct that's -- the date there

 9   is referring to July 1, 2015?  Is that your

10   understanding?

11          A      That is correct.

12          Q      Okay.  Am I  correct the directive

13   went into effect on that date?

14          A      Correct.  This is considered a

15   temporary directive by the St. Louis Police

16   Department and it was put into effect.

17          Q      Okay.  Take as much time as you need

18   just to refresh your recollection of the terms of

19   the temporary directive and I'll ask you some

20   questions about it.  Let me know when you're ready.

21          A      Okay.  I believe I'm ready.

22          Q      And if you could compare the terms of

23   the temporary directive to the terms of the

24   Templeton Settlement Agreement, let me know when

25   you have those side by side, I'll ask you some

ERIC LARSON  4/8/2019

1    questions.

2         A    Okay.

3         Q    Am I  correct that to a large extent,

4    that temporary directive tracks the approach taken

5    under the Templeton Settlement Agreement in terms

6    of laying out under what circumstance, if any,

7    police could use chemical agents in the context of

8    dispersing groups of individuals?

9         A    It does.

10        Q    Okay.  Am I correct that the

11   temporary directive includes the same essential

12   requirements before chemical agents could be used

13   to disperse groups of individuals who are engaged

14   in peaceful, non-criminal activity; am I correct?

15        A    You are correct.

16        Q    Okay.  Am I correct that the

17   temporary directive, similar to the Templeton

18   Settlement Agreement, includes a definition for

19   "chemical agents"?

20        A    It does.

21        Q    Am I correct that the definition of

22   "chemical agents" in the Templeton Settlement

23   Agreement and in the temporary directive is

24   identical?

25        A    Yes.

ERIC LARSON  4/8/2019

1        Q     So is it fair to say all the answers

2    to the questions I asked you before, with respect

3    to the Templeton Settlement Agreement, in terms

4    what's included or not included, applies here?

5        A     Yes.

6        Q     And in particular, am I correct that

7    the temporary directive does not distinguish in any

8    way, based on the manner by which pepper gas would

9    be deployed against protesters?

10       A     It does not speak to the manner of

11   deployment.

12       Q     So am I correct that the temporary

13   directive applies to pepper spray regardless

14   whether it's deployed using a handheld device, a

15   fogger, or some other device?

16       A     It does.

17       Q     Okay.  I got two long questions for

18   you again.  I'll go slow to make sure you have a

19   chance to absorb it.

20             Am I correct that under the temporary

21   directive, police officers could not use handheld

22   pepper spray for the purpose of dispersing groups

23   of individuals engaged in peaceful, non-criminal

24   activity without, among other things, first

25   providing a clear and unambiguous warning that

ERIC LARSON  4/8/2019

1    chemical agents will be utilized and providing

2    those individuals with sufficient opportunity to

3    heed the warning and exit the area?

4         A    Yes.

5         Q    Okay.  Am I correct that under the

6    temporary directive, police officers could not use

7    handheld pepper spray on individuals engaged in

8    peaceful, non-criminal activity for the purposes of

9    frightening them or punishing them for exercising

10   their constitutional rights?

11        A    Yes.

12        Q    Thank you.  If you go to Mr.

13   Baumgartner's Declaration and look on paragraph 7,

14   it indicates that the "temporary directive was sent

15   to all commissioned officers via the Policy

16   Acknowledgment System for review and

17   acknowledgment."

18             Do you see that?

19        A    I do.

20        Q    Okay.  The Policy Acknowledgment

21   System is abbreviated as the PAS System?

22        A    PAS System.

23        Q    Thank you.  When something like the

24   temporary directive is sent to all commissioners

25   and officers using a PAS System, is a complete copy

ERIC LARSON  4/8/2019

1    **of the temporary directive sent or is it just a**

2    **short, brief summary?**

3         A    No, the entire -- the entire

4    directive, the text of -- this text would be sent.

5         **Q    Okay.  Are there times when the PAS**

6    **System is used as a vehicle for training purposes**

7    **where, rather than attach the actual document, a**

8    **just one or two line sentence abbreviation is**

9    **provided?**

10        A    It can be used as a notification

11   method, much like you're describing.  It can also

12   be used as a training where it links to certain

13   videos and things would be supplied.

14        **Q    Okay.  With respect to, for example,**

15   **the use of force policy, for example -- when I say**

16   **the use of force policy, what do you understand**

17   **that to mean?**

18        A    The use of force policy would be the

19   policy that is outlined in Special Order 1-01.

20        **Q    The entirety of Special Order 1-01?**

21        A    Yes.

22        **Q    Okay.  Is there -- is the PAS System**

23   **used with respect to ensuring that police officers**

24   **are up to date on their knowledge of Special Order**

25   **1-01?**

ERIC LARSON  4/8/2019

1        A      It is.

2        **Q      When that's done, how is that**

3  **information conveyed to police officers using the**

4  **PAS System?**

5        A      Monthly a notice is sent from the PAS

6  System to all commissioned members of the

7  department, I believe it would go even all members

8  of the department, and within that guideline is

9  this is the monthly use of force reminder.  As part

10  of that, there will be a test as far as several

11  questions regarding specific elements of use of

12  force.

13            And the employee reviews the order,

14  can review the order, it's there in its entirety,

15  and then can -- and then takes the test, which they

16  have to pass before the order is considered signed.

17        **Q      Is the entirety of Special Order 1-01**

18  **included as part of that communication to the**

19  **commission officers?**

20        A      A link.  There's a button on the side

21  that says "Review."  When you hit the "Review," it

22  will generate the order.

23        **Q      Is it a requirement that they review**

24  **the Special Order or is it sufficient that they**

25  **simply answer the questions?**

ERIC LARSON  4/8/2019

1        A     They must answer the questions to

2   sign the order.  They are not required to review

3   the order in order to sign it.

4        **Q     Is there a requirement that they have**

5   **to answer all the questions correctly in order to**

6   **pass?**

7        A     Yes.

8        **Q     All officers getting the same**

9   **questions at the same time?**

10       A     There is a multiple rotating number

11  of questions that officers are sent, so it's not

12  the same exact test every month.

13       **Q     Okay.  If you look at paragraph 8 of**

14  **Mr. Baumgartner's Declaration, if you take a minute**

15  **to read that?  You see that indicates that the**

16  **temporary directive we have been looking at,**

17  **Exhibit B to Mr. Baumgartner's Declaration, became**

18  **Section XIII of Special Order 1-01 which was issued**

19  **on July 10, 2015.**

20            **Do you see that?**

21       A     I do.

22       **Q     And it indicates in that, "Section**

23  **XIII of Special Order 1-01 outlines the policy for**

24  **deployment of chemical agents for crowd dispersal,**

25  **and identifies the restrictions, consistent with**

1    the Settlement Agreement issued by the US District

2    Court" in the Templeton matter; correct?

3         A    Yes.

4         Q    Okay.  Is it fair to say that Section

5    XIII of Special Order 1-01 was implemented pursuant

6    to the Templeton Settlement Agreement?

7         A    Yes.

8         Q    Is it fair to say that in adopting

9    Section XIII of Special Order 1-01, the City wanted

10   this new provision to be consistent with the terms

11   of the Templeton Settlement Agreement?

12        A    Yes.

13        Q    Other than Section XIII of Special

14   Order 1-01, as of September 2017, the City have any

15   other policies relating to when police officers

16   could deploy chemical agents for crowd dispersal?

17        A    No.

18        Q    Other than Section XIII of Special

19   Order 1-01, does the City presently have any other

20   policies relating to when police officers can

21   deploy chemical agents for crowd dispersal?

22        A    No.

23        Q    If you go to Exhibit C of Mr.

24   Baumgartner's Declaration, am I correct that has

25   Section XIII of Special Order 1-01?

1          A     Yes.

2          Q     Please take as much time as you need

3     to review Special Order XIII.  Let me know when

4     you're ready.

5          A     I believe I'm ready.

6          Q     Okay.  Is this is one of the

7     documents you specifically testified before you

8     reviewed in preparing for today's deposition?

9          A     It is.

10         Q     Gotcha.  Did you speak with anyone

11    other than the City's attorneys with respect to

12    Special Order XIII?

13         A     I did not.

14         Q     And I misspoke.  Section XIII of

15    Special Order 1-01.

16         A     No, I'm sorry, I did not.

17         Q     And am I correct that nowhere in

18    Section XIII of Special Order 1-01 is there a

19    definition for the term "chemical agents"?

20         A     There is not.

21         Q     Okay.  Help me understand, if the

22    City's stated objective was to issue Special Order

23    -- strike that.

24               Help me understand if, as you

25    testified, the City's objective was to issue

1    Section XIII of Special Order 1-01 consistent with

2    the terms of the Templeton Settlement Agreement,

3    why did the City choose not to include a definition

4    for "chemical agents"?

5         A     We didn't include a definition but

6    they included the listing of chemical agents under

7    Section A.  Chemical agent equipment.  So we didn't

8    define "chemical agents."  We listed them, those

9    that were available to the SWAT unit.

10        Q     Could you please compare the

11   definition of -- specifically look at the

12   definition of "chemical agents" both in the

13   Templeton Settlement Agreement and the temporary

14   directive, and confirm to me whether all the items

15   identified in those definitions are included in

16   Section XIII of Special Order 1-01.

17        A     I believe they are.

18        Q     Do you see a reference to the term

19   "tear gas," for example?

20        A     I do.

21        Q     That's included in the Settlement

22   Agreement and the temporary directive; correct?

23        A     It is.

24        Q     Is that included anywhere on Section

25   XIII, Special Order 1-01?

ERIC LARSON  4/8/2019

```
 1          A      It is under CS gas.  CS gas is

 2   considered a tear gas, versus OC, which is

 3   considered a mace.

 4          Q      Is it your testimony that the

 5   language used under the term "chemical agent

 6   equipment" in Section A of Special -- of Section

 7   XIII of Special Order 1-01 essentially has exactly

 8   the same meaning as the definition of "chemical

 9   agents" in the Templeton Settlement Agreement and

10   the temporary directive?

11          A      Yes.

12          Q      Okay.  I think we have established

13   unequivocally that it's the City's understanding

14   that under the Templeton Settlement Agreement and

15   the temporary directive, that they both include

16   pepper spray in any form, whether deployed using a

17   handheld device or a fogger; correct?

18          A      Yes.

19          Q      Is it the City's understanding that

20   handheld pepper spray is or is not included under

21   Section XIII of Special Order 1-01?

22          A      I believe it would be included.

23          Q      Is there any training provided to

24   police officers specifically about that issue,

25   whether handheld pepper spray is covered under
```

ERIC LARSON  4/8/2019

1    Section XIII of Special Order 1-01 or is it

2    exclusively covered under the Section VI that we

3    looked at before about handheld pepper spray?

4    Mace?

5         A    As it relates to dispersement and

6    crowd, it would be listed here in XIII.  As it

7    relates to the individual officers' use for

8    affecting arrests of individuals under general

9    circumstances, the deployment methodology is listed

10   in Section VI.

11        Q    Would you agree with me that it's not

12   difficult to envision circumstances where those two

13   circumstances conflate and get very close to one

14   another?

15        A    Yes.  I would agree with that.

16        Q    For example, in the situation of a

17   kettle, a police officer standing at that moment,

18   trying to interact with a protester, in his or her

19   mind could think, I am under -- my actions are

20   governed by Section VI because I'm trying to

21   effectuate an arrest, or equally could think, no,

22   my actions are governed by Section XIII because

23   we're trying to disperse the heck out of this crowd

24   and they've ignored dispersal orders.

25             That's very plausible; right?

ERIC LARSON  4/8/2019

```
 1        A     Yes.
 2              MR. DIERKER:  I'm a little late in my
 3    objection to the form, but...
 4              MR. PRAISS:  It's quite all right.
 5        Q     (BY MR. PRAISS)  And recognizing that
 6    the scenario that I'm laying out there is quite
 7    possible -- plausible, I misspoke, my question is,
 8    again, are you aware of any specific training
 9    provided to police officers who find themself in
10    that situation where they're trying to decide am I
11    going to be under Section VI or Section XIII of
12    Special Order 1-01 in terms of how I use this
13    handheld device?
14        A     I am not aware of any specific
15    training related to that.
16        Q     Okay.  Are you aware of any documents
17    that deal with that issue?
18        A     No, not outside the orders we've
19    discussed.
20        Q     Are you aware of any specific
21    communications using the PAS System where it was
22    communicated to police officers at any time, before
23    or after the Stockley protests, saying there's two
24    different provisions that handheld pepper mace are
25    covered by, Section VI and, yes, it's also covered
```

 1    under Section XIII, and here is which one applies

 2    under what circumstances.

 3              Has that ever been done, to your

 4    knowledge?

 5         A     No.

 6         Q     Okay.

 7              MR. DIERKER:  Excuse me.  But we've

 8    been referring to Section VI.

 9         A     It's actually Section IV.

10              MR. DIERKER:  And it's actually

11    Section IV.

12         Q     (BY MR. PRAISS)  When I said Section

13    VI in the last few minutes a couple times, you

14    understood I was referring to Section IV, which is

15    the provision we looked at and we marked before

16    dealing with handheld mace; correct?

17         A     I understood you to be referring to

18    the section of the order that refers to mace.

19         Q     Thank you very much, and thank you

20    for correcting me.  I said it once and no one

21    corrected me, so I kept saying it.

22              MR. DIERKER:  Well, I needed to

23    double check myself, so.

24         A     And I think that was my fault.  I

25    misquoted the Roman numerals in my initial

ERIC LARSON  4/8/2019

1  statement.

2      Q    (BY MR. PRAISS)  I'm still trying to

3  understand why, from a practical perspective, when

4  the issue -- when the City issued the Templeton --

5  the temporary directive, it made a conscious

6  decision to track the language in the Templeton

7  Settlement Agreement.  You recall that?

8      A    I was not part of the creation of the

9  temporary directive, but yes, the intent was to

10  mirror the Settlement Agreement.

11      Q    And you've testified as a

12  representative that the same intent applied when

13  the City adopted Section XIII of Special Order

14  1-01.  Correct?

15      A    Yes.

16      Q    Recognizing that, is there a reason

17  why the City did not track and include that same

18  definition for "chemical agents" but rather just

19  blended it in in different sections of 1 and 2

20  under the heading A?  If you are aware of any

21  reason?

22      A    I'm not aware of any reason.

23      Q    Okay.  But it is your testimony, as

24  the corporate representative today, that handheld

25  pepper spray, to the extent it's used in connection

ERIC LARSON  4/8/2019

 1   with crowd dispersal, is included within the terms

 2   and requirements of Section XIII of Special Order

 3   1-01?

 4        A     Yes.

 5        Q     Okay.  So to the extent an officer in

 6   connection with let's say the kettle understood

 7   they were trying to disperse the individuals for

 8   failure to heed their warnings of dispersal, that

 9   officer's conduct should be judged under Section --

10   the terms of Section XIII of Special Order 1-01?

11        A     Yes.

12        Q     Okay.

13              MR. DIERKER:  Would now be a good

14   time to break for lunch?

15              MR. PRAISS:  This is probably less

16   than five minutes.  A few questions here and --

17   even though this was previously marked, could you

18   add the stickers?

19              (Plaintiffs' 30(b)(6) Exhibit 8

20   marked for identification by the court reporter.)

21        Q     (BY MR. PRAISS)  Mr. Larson, I'm

22   going to hand you what's been marked as Deposition

23   Exhibit 8.  Do you have that?

24        A     Yes, you've given it to me.

25        Q     Do you see at the very top it

ERIC LARSON  4/8/2019

1    indicates this is a picture that was taken from

2    Washington and Tucker?

3         A    Okay.

4         Q    Do you see the number 2?  Do you know

5    what that signifies, if anything, next to

6    Washington and Tucker top left?

7         A    I assume it's a camera.

8         Q    And if you look carefully on the

9    bottom in blue, you can read that it looks like it

10   was taken around 11:30 p.m. on September 17, 2017.

11              Do you see that?

12        A    Yes, it appears to be a time stamp.

13        Q    Do you recognize this to be a picture

14   of the police surrounding the individuals in what

15   is known as the kettle?

16        A    It is a picture that represents

17   officers around individuals.  We don't in the

18   police department recognize the term "kettle," so

19   any questions that you have on that, I'm a bit --

20        Q    You do know we have two topics that

21   use the term "kettle"?

22        A    Yes, I saw that in here, but...

23        Q    Is there a different term that you

24   prefer for me to use --

25        A    No.

ERIC LARSON  4/8/2019

```
1          Q      -- that captures that moment when the

2    police came in from four different directions and

3    surrounded a bunch of protesters?

4          A      I will say this picture indicates

5    what appears to be a mass arrest scenario.

6          Q      Do you recognize this to be at the

7    corner of Washington and Tucker where the kettle

8    took place?

9          A      Yes.

10         Q      Gotcha.  And the timing of it

11   corresponds to when the kettle took place, around

12   11:30 p.m.; correct?

13         A      Yes.

14         Q      Can you see, literally right in the

15   middle of the picture, there is a nice foggy area

16   there.

17                Do you see that?

18         A      Mm-hmm, I do.

19         Q      Do you recognize that to be spray

20   from a fogger being used against the individuals in

21   that area?

22         A      It could be.  I can't say what it is.

23         Q      Okay.  Would you agree with me that

24   in the situation -- assuming that when the judge

25   looks at the video and you watch it slowly, it
```

ERIC LARSON  4/8/2019

Page 120

```
 1    becomes abundantly clear that there is an OC spray
 2    being used to effectuate against the people there.
 3         A    Mm-hmm.
 4         Q    Help me understand, in light of the
 5    Section XIII of Section 1-01, that includes the
 6    requirement that chemical agents would not be used
 7    unless the third requirement being that the impact
 8    of chemical agents on individuals who are complying
 9    with lawful law enforcement commands is minimized,
10    how is the use of a fogger in this situation
11    consistent with that restriction?
12              MR. DIERKER:  I'll object to the form
13    of the question, it assumes facts not in evidence,
14    calls for an opinion, speculation.  But you may
15    answer.
16         A    At this point, they may be effecting
17    arrests and there may be resistings occurring.  I
18    can't say that, at this point in time, that the
19    four elements of giving the warning, attempting to
20    get those who wished to comply the opportunity to
21    comply, that has or has not occurred, I can't say,
22    but, you know, based on this picture, it is very
23    difficult, when using a fogger, to minimize the
24    risks to those in the immediate area, including
25    other police officers.
```

ERIC LARSON  4/8/2019

 1          Q       (BY MR. PRAISS)  And with that in

 2     mind, why is the use of a fogger used specifically

 3     in these context, knowing that it, by definition,

 4     is contrary to the restriction about minimizing the

 5     harm to other people who are being compliant and

 6     lawful?

 7          A       I can't answer that.

 8          Q       Again, you're the City's

 9     representative, so the buck stops with you for

10     better or worse today, Mr. Larson --

11          A       I understand, sir.

12          Q       -- and you are on the hot seat.

13          A       Yes.

14          Q       You know, this is the Special Order

15     that governs the dispersal, the deployment of

16     chemical agents for crowd dispersal.  Under

17     Chemical Agent Equipment it specifically identifies

18     high-capacity, extended-range OC spray being issued

19     to sergeants; correct?

20          A       Yes.

21          Q       That high-capacity, extended-range OC

22     spray, by definition, covers a large area unlike a

23     handheld pepper spray device; correct?

24          A       It does.

25          Q       Okay.  And am I  correct that

ERIC LARSON  4/8/2019

Page 122

```
 1    high-capacity, extended-range OC spray was in fact
 2    utilized in connection with the Stockley protest;
 3    correct?
 4        A    It was.
 5        Q    My question to you is, as a policy,
 6    why does the City have -- allow the use of
 7    high-capacity, extended-range OC spray in the
 8    context where there is a group of individuals when
 9    it's very likely that within them there may be some
10    who are complying and acting lawfully, which would
11    then mean it contravenes the Special Order?
12              MR. DIERKER:  Object to the form of
13    the question.
14        A    I would say that as -- it's a tool,
15    as any other tool, and the application for it
16    depends on the -- on the circumstances.  So the
17    fact that we are not restricting the tools that are
18    available, it may not have been the best tool to be
19    utilized at the time, but in the event of it, is a
20    tool that is available for use and, therefore, we
21    don't restrict the use of it.
22        Q    (BY MR. PRAISS)  You are aware that
23    high-capacity, extended-range OC spray was in fact
24    utilized in connection with the Stockley protest?
25        A    Yes.
```

ERIC LARSON  4/8/2019

```
 1          Q      To the extent it was used rather than
 2    handheld device, do you agree that that likely
 3    violated the restrictions about trying to minimize
 4    the impact of chemical agents on individuals who
 5    were compliant because instead a handheld device
 6    should have been used?
 7          A      Can you give that to me again?
 8          Q      Sure.  I think we've established that
 9    at different points in time, and in particular in
10    connection with the kettle, high-capacity,
11    extended-range OC spray was utilized; correct?
12          A      Correct.
13          Q      And I think we've established that
14    the use of high-capacity, extended-range OC spray
15    covers a larger area than a handheld pepper spray;
16    correct?
17          A      Correct.
18          Q      And as a result, the use of
19    high-capacity, extended-range OC spray likely will
20    impact individuals who may be lawful and compliant;
21    correct?
22          A      It can.
23          Q      And my question to you is, do you
24    agree that the use of high-capacity, extended-range
25    OC spray in the context of, let's say, the kettle,
```

ERIC LARSON  4/8/2019

1   **where there was a significant number of people,**

2   **some of whom were acting lawfully and just got**

3   **caught up in the situation, rather than handheld**

4   **device, contravened Section XIII of Special Order**

5   **1-01 because a handheld device, unlike the OC**

6   **spray, would have minimized the impact?**

7       A    No, because the -- also in Special

8   Order is the statement that the above provisions do

9   not apply to situations that turn violent when

10  persons at the scene present immediate threats to

11  bodily injuries, property damage, things of that

12  nature, so that would take out the minimization

13  requirement there.  So I think we agree in

14  principle but perhaps in execution is where we're

15  having the issue.

16      **Q    I like the fact that you went to that**

17  **provision as your so-called safety net here, Mr.**

18  **Larson, but I'm going to probe a little bit about**

19  **that.**

20      A    Of course you are.

21      **Q    In connection with the kettle -- and**

22  **I know you may not like the term but it's an easy,**

23  **short-term abbreviation for what happened around**

24  **11:30 at night on September 17th.  Are you aware of**

25  **any individuals who were acting violently at the**

1    scene such that they presented an imminent threat

2    of bodily harm to persons or damage to property

3    when officers tried to arrest them?

4            A    No.

5            Q    Okay.  Because I have not seen any

6    when I looked at the videos and am I correct also

7    that in fact none of the arrests were for acting

8    violently?  Nobody was charged with violent

9    destruction of property in connection with the

10   kettle; correct?

11           A    Not in connection with the kettle.

12           Q    So I'll go back my question where you

13   resorted to what I'm calling your little safety net

14   here.

15           A    Sure.

16           Q    In connection with the kettle, where

17   we've now established there was no evidence --

18   there is no evidence of anybody acting in a violent

19   manner that presented imminent threat or bodily

20   harm to persons or of damage to property, am I

21   correct that the use of the high-capacity,

22   extended-range OC spray, rather than the handheld

23   pepper spray, contravened the terms of Section XIII

24   of Special Order 1-01 because, by definition, it

25   was going to impact a greater number of individuals

ERIC LARSON  4/8/2019

1    who were compliant with law enforcement?

2         A     No, I don't think so.  I'm confused

3    over the totality of the circumstances that took

4    place during the effecting the arrests as far as

5    utilizing this tool or not utilizing the tool.

6         Q     I'm going to go through it one more

7    time and I'll accept your answer, whatever it is at

8    the end, but I'm a little perplexed here.

9         A     Okay.

10        Q     We have a situation where around

11   11:30 there is a kettle, there is a group of

12   people.

13        A     Okay.

14        Q     You agree with me that it's likely

15   that within that group of people some people

16   weren't even protesters, they just got caught up in

17   the situation; correct?

18        A     I believe that is one of the

19   contentions.

20        Q     Yes.  And we established that there's

21   no evidence that anybody was acting violently and

22   presented imminent threat of harm at that moment in

23   time around 11:30 at night; correct?

24        A     Yes, we have established that.

25        Q     Okay.  Police officers had -- were

ERIC LARSON  4/8/2019

```
 1    trying to effectuate arrests; correct?
 2         A    Yes, they were trying to a mass
 3    arrest of all the individuals there.
 4         Q    But none of those individuals are
 5    acting violently and presenting imminent threat of
 6    harm to them?
 7         A    I --
 8         Q    Are you aware of any evidence, sir,
 9    facts, that somebody was acting in a violent manner
10    and presented imminent threat of harm that was
11    documented by the police from the incident that
12    occurred at 11:30 at Tucker and Washington?
13         A    I am not.
14         Q    Thank you.  So again, with that in
15    mind, the police officers that were congregating
16    around the people there, they had a choice; would
17    you agree with me?  Option 1, they can go and
18    effectuate their arrests using a handheld pepper
19    spray device; correct?
20         A    Mm-hmm.
21         Q    Is that a yes?
22         A    Yes.
23         Q    Or they can do it using the
24    high-capacity, extended-range OC spray; correct?
25         A    Correct.
```

ERIC LARSON  4/8/2019

1      Q      And by definition, we have

2   established that the high-capacity, extended-range

3   OC spray, by its nature, is going to cover a larger

4   range and spray a bunch of people?

5      A      Yes.

6      Q      If the requirements of the Section

7   XIII, the third one is specifically saying that you

8   cannot, per the terms of the Settlement Agreement,

9   deploy chemical agents without satisfying all four

10  elements and the third one is to minimize the

11  impact on individuals, shouldn't those officers

12  have been required to use handheld device rather

13  than the OC spray?

14     A      I'm sorry, I'm processing.

15     Q      Take your time.

16     A      It would have been better to minimize

17  the effects, I think, that to -- than using the

18  fogger.  So to minimize the effects to those who

19  are not -- who are compliant.  But yes.

20     Q      I'll accept that.

21     A      Okay.

22     Q      Let's do one more picture and then

23  we'll take a break.

24            (Plaintiffs' 30(b)(6) Exhibit 9

25  marked for identification by the court reporter.)

ERIC LARSON  4/8/2019

1          Q     (BY MR. PRAISS)  Mr. Larson, do you

2     have Exhibit 9 in front of you?

3          A     I do.

4          Q     This is another picture, if you look

5     again at the top, it's indicates from the

6     Washington and Tucker location?

7          A     Yes.

8          Q     And the time stamp on this one is

9     just a few minutes before.  It's at 11:25, again on

10    September 17, 2017.

11               Do you see that?

12         A     Yes.

13         Q     There is a -- if you look at the

14    picture on the right side of it, do you see a

15    police officer with a gas mask on and his right

16    hand extended?

17         A     Yes.

18         Q     And can you tell that that officer is

19    holding in his right hand an extended

20    high-capacity, OC spray device?

21         A     That's what it appears to be.

22         Q     And do you see just right outside of

23    it a mist in that area?

24         A     Yes.

25         Q     Again, in that situation the officer

ERIC LARSON  4/8/2019

1    is directing that OC spray, it appears, based on

2    the position of his hand, at the person who is

3    standing with his hands up, or I don't know who

4    else.  Can you see who else it's pointing at?

5         A    It's pointing in the general

6    directions of an individual with his hands up and

7    there is an individual that appears to be in front

8    of the officer.  That's moving downward.

9         Q    Oh, the -- when you say "moving

10   downward," are you pointing to the lady with her

11   hands down?

12        A    I'm pointing to this individual here.

13        Q    Okay.  Do you agree with me that the

14   use of the OC spray device in that situation, by

15   definition, would impact a great deal of people

16   because they're all congregating in a very small

17   area?

18        A    Yes.

19        Q    Okay.  Do you agree with me again, it

20   would have been preferable, at a minimum, to use

21   your language, to use a handheld pepper spray

22   device rather than the OC spray if your goal is to

23   be compliant with the terms of Section XIII of

24   Special Order 1-01?

25        A    Yes.

ERIC LARSON  4/8/2019

```
 1           Q      Thank you.
 2                  MR. PRAISS:  Why don't we take a
 3      break.
 4                  (Off the record.)
 5           Q      (BY MR. PRAISS)  Okay, Mr. Larson,
 6      back on the record, we had a nice kind of lunch
 7      break.  If at any time later this afternoon you
 8      need to take a break again, just let me know.
 9           A      I will, thank you.
10           Q      I want to close off a few more
11      questions and then we'll move on to a new topic, I
12      assure you, but I still want to focus on topics 12
13      through 15, make sure I've covered everything.
14           A      Okay.
15           Q      If you look at the exhibit that was
16      the Declaration of Mr. Baumgartner, do you have
17      that?  I think it's number 7?
18           A      I do.
19           Q      And if you go to Exhibit C within
20      that which is Section XIII of Special Order 1-01?
21           A      Yes.
22           Q      There is the reference under Section
23      A 2 that "High-capacity, extended-range OC spray is
24      also issued to Sergeants and available at the Area
25      Stations."
```

ERIC LARSON  4/8/2019

1          A     Yes.

2          Q     I just wanted to ask it, other than

3     sergeants, does anybody else have use of -- had use

4     of extended-range OC spray in connection with the

5     Stockley protests?

6          A     It was issued primarily to

7     supervisors.  I can't say that it wasn't issued or

8     delegated to someone else, but for the most part,

9     the high-capacity, extended-range deployment

10    canisters was for the sergeants only.

11         Q     And when it has a reference to the

12    term "Area Stations," what is that referring to?

13         A     That refers to the three area patrol

14    divisions.  We have a north patrol, a central

15    patrol, and a south patrol division.

16         Q     Okay.  If you go to -- on the next

17    page of it, there's Section D, Required Reporting?

18         A     Yes.

19         Q     And it indicates that, "When chemical

20    agents are deployed for crowd dispersal, the

21    Incident Commander will ensure that an I/LEADS,"

22    all capital, "report is created to document their

23    use," and it lays out certain details that have to

24    be included.

25               Do you see that?

ERIC LARSON  4/8/2019

```
 1          A      Yes.

 2          Q      First of all, just for the record,

 3   who was the incident commander for the Stockley

 4   protest?

 5          A      I believe the incident commander was

 6   Gerald Leyshock.

 7          Q      And do you know -- first of all, what

 8   is the purpose of creating an I/LEADS report?

 9          A      To document the -- I/LEADS is our

10   records management system and the purpose of

11   creating it is to document incidents, both arrest

12   and the non-arrest situations, where we want to

13   have a record of it, so it's our -- it's how we

14   document police reports primarily.

15          Q      And in this case particularly, it's

16   the I/LEADS -- strike that.

17                 So the I/LEADS report can be used for

18   various different reporting scenarios; correct?

19          A      Yes.

20          Q      But in this case it specifies that an

21   I/LEADS report has to be created whenever chemical

22   agents are deployed for crowd dispersal; correct?

23          A      It does.

24          Q      Okay.  And that's the policy of the

25   City of St. Louis?
```

ERIC LARSON  4/8/2019

1         A      Yes.

2         Q      Okay.  Are I/LEADS reports, are they

3    created by hand or on a computer?

4         A      They are created in a computer.  It

5    is a records management software tool that

6    basically is a framework device that -- and

7    information is entered manually into it.

8         Q      Is it a searchable database?

9         A      It is.

10        Q      So if I wanted to find all the

11   I/LEADS report relating to the protests that -- on

12   the issue of the Stockley protests or the Molina

13   protests, the protests involving the Molina case,

14   it's not difficult to locate them, I assume?

15        A      No, not if a report was prepared.

16        Q      Okay.  In those situations chemical

17   agent were deployed; correct?

18        A      Then a report would be prepared and

19   we would have it.

20        Q      Okay.  When a report is prepared, is

21   it the standard practice that the one report is

22   used to encompass all incidents where chemical

23   agents are deployed, or is there a requirement that

24   for each incident where agents were deployed

25   against an individual or group of individuals,

ERIC LARSON  4/8/2019

1   **there's a separate report?**

2        A     It can be done both ways.  It's

3   generally reports are created based on arrest

4   criteria, because when we arrest an individual, we

5   need their pedigree information, their charge

6   information, all of that, and that revolves around

7   a specific complaint number.

8             If multiple arrests are occurring in

9   a specific vicinity with the -- a substantially

10  same group of officers, it could all be included in

11  one complaint number.  If this was multiple

12  locations, multiple commanders, then it might be

13  included -- the incidents may come under multiple

14  complaint numbers.

15       **Q     For example, in the situation of the**

16  **kettle on September 17, 2017, if at that evening**

17  **several different officers deployed chemical agents**

18  **at different groups of individual, would it have**

19  **been appropriate to have one single I/LEADS report**

20  **or several?**

21       A     It would most likely be most

22  appropriate to have one large because we're dealing

23  with one large incident in the downtown area.

24  However, that's not to say there weren't other

25  reports made based on, you know, if other officers

ERIC LARSON  4/8/2019

1    in the fourth district may have made an arrest

2    downtown, that would have a separate complaint

3    number.

4         Q     And to your knowledge, was an I/LEADS

5    report prepared either in the single or plural in

6    connection with the Stockley protests?

7         A     I believe there were reports

8    prepared, yes.

9         Q     Okay.  Is it your understanding,

10   trying to be thorough here, that I/LEADS report,

11   either in plural or single, were prepared in

12   connection with the protests at Page and Walton

13   that are referenced in the Molina litigation?

14        A     Yes.

15        Q     And if I understood you correctly

16   before, your testimony was that Section XIII of

17   Special Order 1-01 that we're looking at applies to

18   the same chemical agents that were referenced in

19   the Templeton Settlement Agreement as well as the

20   temporary directive; correct?

21        A     Yes.

22        Q     And such that this Section XIII of

23   Special Order 1-01 applies to the use of handheld

24   pepper spray if it's done in connection with the

25   dispersal of individuals?

ERIC LARSON  4/8/2019

```
 1        A     Yes.

 2        Q     Okay.  And in those situations, to

 3   the extent that a police officer used handheld mace

 4   in connection with the kettle, would an I/LEADS

 5   report have to be generated or reference that

 6   incident?

 7        A     Yeah, in a mass arrest scenario, if

 8   an officer was deploying mace to take individuals

 9   into custody, it should be documented, yes.

10        Q     Okay.  So this gets to, in my mind a

11   little bit, that blurry line between Section IV,

12   Special Order 1-01 versus Section XIII.  When an

13   officer deploys handheld pepper spray under the

14   terms of Section IV, Special Order 1-01, is an

15   I/LEADS report required?

16        A     It is.

17        Q     It is?

18        A     Yes, under Section IV, it's a use of

19   force; therefore, it would require an I/LEADS

20   report.

21        Q     Okay.  Thank you for clarifying that

22   for me.  Just want to now close the loop on some of

23   these topics if you have them in front of you.

24        A     Sure.

25        Q     Topic 12, I'll read it for the
```

ERIC LARSON  4/8/2019

1    record, it says, "The City of St. Louis's policies

2    and/or practices concerning under what

3    circumstances police officers can use handheld

4    chemical agents, regardless of size of container."

5              Do you see that?

6      A    Yes.

7      Q    Is it fair to say that you have

8    provided me -- strike that.

9              Is it fair to say that the testimony

10   you've provided with respect to Section IV of

11   Special Order 1-01, as well as Section XIII of

12   Special Order 1-01, cover all the circumstance when

13   a handheld chemical agent could be used, regardless

14   of size or container?

15     A    Yes.

16     Q    There is no other provisions that the

17   City has that deal with the use of handheld pepper

18   spray in different circumstances?

19     A    No, I believe those are the two.

20     Q    Okay.  Go to topic 13.  That one

21   focuses on training with respect to exactly what I

22   just read about Section 12.

23              Do you see that?

24     A    I do.

25     Q    What specific steps did you take to

ERIC LARSON  4/8/2019

1    prepare to testify as a representative with respect

2    to topic 13?

3         A    I reviewed the Special Order, I

4    reviewed one of the training materials that the

5    academy provided relative to CDT deployment and the

6    CDT operations which referenced chemical agents and

7    the necessity to provide warrants.

8         Q    I, off the top of my head, can't

9    visualize that document, so unless -- we can go off

10   the record.

11              (Off the record.)

12        Q    (BY MR. PRAISS)  Mr. Larson, you just

13   described an exhibit and it sounds like, with

14   respect to the training exhibit, we were going to

15   try and locate that and later on this afternoon

16   I'll ask you a few questions on it.

17              Other than that one which you

18   described as a two-page document dealing with

19   training issues, did you review any other documents

20   that relate to topic 13?

21        A    I don't believe so.

22        Q    Okay.  Other than that document,

23   which we'll look at in more detail later, are you

24   aware of any other training materials that were

25   provided to police officers concerning under what

ERIC LARSON  4/8/2019

1    circumstances they can use handheld chemical agents

2    regardless of size of container?

3         A     No, other than what we discussed

4    previously today, the training document supplied by

5    the law department in August of 2017.  That

6    training document I reviewed.  I mean, it was a

7    classroom document.

8         Q     No, I'm not looking at things you

9    reviewed.  I'm looking at -- when I'm asking about

10   training, it's training to the police officers in

11   general.

12        A     Right.

13        Q     And we -- the document we looked at

14   before, which was Exhibit Number 6, that was, if I

15   recall your testimony you provided, just the senior

16   staff?

17        A     Yes.

18        Q     And it wasn't disseminated, as far as

19   you know, to all police officers?

20        A     As far as I know.

21        Q     Okay.  Now you have just testified

22   there's about a two-page document that you do

23   believe you reviewed and was provided to all

24   officers; correct?

25        A     No.  It's an internal document

ERIC LARSON  4/8/2019

1    discussing the outline of the training program for

2    the materials that then Sergeant Jemerson, now

3    Lieutenant Jemerson, would have conducted during

4    CDT training.

5        **Q     Okay.  Other than that outline, are**

6    **you aware of any actual written materials that Mr.**

7    **Jemerson or somebody else uses in training police**

8    **officers concerning under what circumstance they**

9    **can use handheld chemical agents?**

10       A     No.

11       **Q     Do you know if any such training**

12   **materials exist in writing?**

13       A     To the best of my knowledge, those

14   would all be incorporated in the document that we

15   turned over relative to the other deposition

16   request, so but no, I did not review them.

17       **Q     When you say "the other document,"**

18   **you're referring to the two-page document?**

19       A     I'm referring to that as incorporated

20   into a large lesson plan of series of materials

21   that speak specifically to this issue, I believe.

22            MR. PRAISS:  Go off the record real

23   quick.

24            (Off the record.)

25       **Q     (BY MR. PRAISS)  Other than the**

ERIC LARSON  4/8/2019

```
 1    two-page document that we'll hopefully get in the
 2    next couple hours and the POST document that you
 3    just referenced, are you aware of any other
 4    training materials that have been provided to
 5    police officers concerning under what circumstances
 6    they can use handheld chemical agents?
 7         A     No, I am not.
 8         Q     Thank you.
 9               Could you look real quick at the next
10    topic?  I think we are on 14.
11         A     Okay.
12         Q     And this one is similar to topic 12
13    but focuses about the City's policies and practices
14    concerning under what circumstance police officers
15    can deploy chemical agents at protesters; correct?
16         A     Mm-hmm.
17         Q     Is that a yes?
18         A     Yes.  Sorry.
19         Q     You have given us quite a bit of
20    testimony with respect to Section XIII of Special
21    Order 1-01.
22         A     Yes.
23         Q     Is that the only policy that the City
24    has concerning when police officers can deploy
25    chemical agents at protesters?
```

ERIC LARSON  4/8/2019

```
 1         A     Yes.
 2         Q     That was in place in September 2017
 3   and still in place today; correct?
 4         A     It is.
 5         Q     It's never been amended?
 6         A     No.
 7         Q     Okay.  Is there anything about --
 8   strike that.
 9               Finally topic 15 goes with topic 14
10   but simply asks for the training that's provided to
11   police officers with respect to under what
12   circumstance they can deploy chemical agents at
13   protesters?
14         A     Right.
15         Q     Okay.  Other than the two exhibits
16   that you just referenced in response to my
17   questions for topic 13, are you aware -- strike
18   that.  I apologize.
19               The two documents that you just
20   recently testified with respect to my questions
21   relating to topic 13, is it your understanding that
22   those documents are also responsive to topic 15?
23         A     Yes.
24         Q     Okay.  Other than those two
25   documents, are you aware of any other documents
```

ERIC LARSON  4/8/2019

1    that have ever been provided to police officers

2    concerning under what circumstance they can deploy

3    chemical agents at protesters?

4         A     I am not.

5         Q     Okay.  Again, I don't have the

6    benefit of those two documents in front of me but

7    separate from -- we know that those are the only

8    documents that you're aware of, that have been used

9    in training police officers about the use of

10   chemical agents, whether in a protest action or in

11   a different situation.

12              How often is that training provided

13   to police officers?

14        A     Relating to the documents that I'm

15   referring to, the CDT outline, it is provided

16   during CDT classes at the Police Academy.  So every

17   officer who is a graduate of the Police Academy,

18   moving forward since 2014, and that's date of the

19   training program, has been trained in CDT tactics,

20   deployment, and when chemical munitions can and

21   should be used or should not be used in civil

22   disturbance cases.

23        Q     Okay.  And that, if I understand you

24   correct, that's taken place for officers since 2014

25   as part of their training in the academy?

ERIC LARSON  4/8/2019

1        A        Correct.

2        Q        **Okay.  What about officers prior to**

3  **2014 where we don't have the benefit of this**

4  **outline?**

5        A        Right.  Officers prior to that time,

6  I mean, the -- we created the Civil Disobedience

7  Teams and civil disobedience training was conducted

8  during the creation of those individual teams.

9  Since we've been doing ongoing training of getting

10  more people trained within the City of St. Louis

11  Police Department to be CDT qualified, we've been

12  doing that.  So there were trainings that took

13  place to get members onto the CDT team and then

14  there's ongoing trainings at the academy.  For new

15  members.  And there's refresher training as well

16  that is handled by the SWAT Team on units,

17  mobility, lot formations and deployments and how

18  and when they should be deployed.

19        Q        **Thank you.  Your answer raises a few**

20  **follow-up questions.**

21        A        I'm sure they do.

22        Q        **Yes, but I want to break it in**

23  **pieces.  First of all, two documents that you've**

24  **referenced in responding to the topics dealing with**

25  **training, one of them we know is dated 2014; right?**

ERIC LARSON  4/8/2019

1          A       Correct.

2          Q       **The second document, what's the name**

3    **I should use for it?**

4          A       I believe it would be the POST

5    accreditation documents.

6          Q       **Okay.  What's the date of that one,**

7    **if you know?**

8          A       I don't know.

9          Q       **Is it after 2014 or before?**

10         A       I don't know.

11         Q       **Prior to 2014, sitting here today as**

12   **the corporate representative, do you know what**

13   **documents, if any, were used in training police**

14   **officers about the use -- the deployment of**

15   **chemical agents?**

16         A       Oh, I don't -- I don't know.

17         Q       **Do you know if they had any**

18   **documents?**

19         A       I assume they had documents but I

20   don't know.

21         Q       **Okay.**

22         A       I would assume any training that

23   related to CDT that would have been handled through

24   the academy, the academy would have some

25   documentation of that type of training.

ERIC LARSON  4/8/2019

```
 1        Q      Did you take any steps to learn that?
 2   And I'm not trying to be mean here --
 3        A      No.
 4        Q      -- but I'm doing my job.
 5        A      Right.
 6        Q      I need to know, in preparing to
 7   testify about topics 12 and 15, did you do any --
 8   what efforts did you take to determine what
 9   specific training materials were being used prior
10   to 2014 with respect to the deployment of chemical
11   agents?
12               MR. DIERKER:  If I could interject, I
13   assume you're within the relevant time period
14   starting September 15, 2012.  Is that --
15               MR. PRAISS:  Yes, all my questions,
16   but there was a gap from 2012 and 2014 that I'm
17   trying to determine.
18               MR. DIERKER:  That's fine.  I just
19   want to be clear you weren't going back to the
20   foundation.
21        Q      (BY MR. PRAISS)  So my question is,
22   what steps did you take to determine what materials
23   were used in training police officers about the
24   deployment of chemical agents for the relevant time
25   period beginning in September of 2012 until 2014?
```

ERIC LARSON  4/8/2019

1          A      None.

2          **Q      And sitting here today you have no**

3    **knowledge one way or the other whether any training**

4    **materials did or didn't exist, you're just making**

5    **an assumption?**

6          A      Right.  Correct.

7          **Q      And focusing on the time period, the**

8    **entire time period, do you know who were the**

9    **individuals who were responsible for training**

10   **police officers with respect to the deployment of**

11   **chemical agents?**

12         A      There is ongoing training through the

13   Police Academy on the -- how to use a chemical

14   agent, so how an officer uses their handheld mace.

15   That is an ongoing training process.  The records

16   of that would be within the St. Louis Metropolitan

17   Police Department Academy.

18              The SWAT Team would be responsible

19   for their training related to the use of chemical

20   munitions, launchers, things of that nature.  They

21   go through training programs related to that

22   specific.  The SWAT commander, CDT commander,

23   Lieutenant Jemerson is responsible, or has been

24   responsible for training the CDT teams and on

25   providing the information on when to use and when

ERIC LARSON  4/8/2019

Page 149

```
1    not to use.  Related to civil disturbances.  And
2    among others.  I mean, there were other individuals
3    in that role other than Lieutenant Jemerson at the
4    time.  He wasn't the SWAT commander during
5    Stockley.
6           Q     If you know, the topics 15 topic 13,
7    they're focusing not about how to use chemical
8    agents but when it's appropriate to use it and when
9    it's not appropriate.
10                Do you understand that?
11          A     I do, and that would be part of the
12   on -- the training on deployment.  It's how we do
13   it.  How and when you would use chemical agents.
14          Q     And the sum and substance is that, if
15   I want to understand -- strike that.
16                If I want to look at what training
17   materials exist that, to your knowledge, from 2012
18   until the present, with respect to when police
19   officers can employ chemical agents, I just need to
20   look at those two documents, the 2014 document you
21   described as well as the POST accreditation and, to
22   your knowledge, there are no other documents that
23   have anything in writing that says when it's
24   appropriate to use chemical agents?
25          A     At this time, that's correct.
```

ERIC LARSON  4/8/2019

Page 150

```
 1          Q     Okay.  I'll take a look at those in
 2    great detail after the deposition.
 3                Do you know how long the training
 4    takes with respect to the circumstance when
 5    chemical agents should be used?
 6          A     I do not.  I know that it is part of
 7    I believe a 16-hour course on CDT deployment.  As
 8    to how many hours or minutes, I don't know.
 9          Q     And you mentioned something about a
10    refresher, I think, in one of your answers?
11          A     Yes.
12          Q     Is that refresher done through the
13    PAS System or is that in person?
14          A     It's generally a method in which the
15    SWAT Team creates a training day, the members of
16    the CDT have to respond to the training day, and
17    they work on the mechanical tactics and they cover
18    use of force during that.
19          Q     During that use of force, do you have
20    personal -- can you testify as a corporate
21    representative under oath that there is actually
22    information about when it's appropriate to use
23    chemical agents rather than how to use chemical
24    agents?
25          A     I believe the bulk of the training
```

ERIC LARSON  4/8/2019

Page 151

```
 1    relates to how to use chemical agents and I can't
 2    say on when.  I believe it is covered.
 3          Q     We're not going to spend very much
 4    time on it but I'd like to at least cover with you
 5    briefly topics 16 and 17.
 6          A     Okay.
 7          Q     And again, these deal with, for lack
 8    of a better term, "kettle"?
 9          A     Mm-hmm.
10          Q     And when I use the term "kettle," you
11    understand that's referring to what transpired on
12    September 17, 2017, around 11:30 at night, downtown
13    St. Louis?
14          A     Yes.
15          Q     And you've indicated that the City
16    itself doesn't use that term at all; correct?
17          A     That is correct.
18          Q     And nevertheless, if it's okay with
19    you, I'll use it just as an abbreviation; is that
20    okay?
21          A     Correct.
22          Q     To your knowledge, at any time, did
23    the City have any policies or practices concerning
24    the use of a kettle, referring to police officers
25    coming in from four different directions to entrap
```

ERIC LARSON  4/8/2019

Page 152

```
 1    a group of people that they want to arrest?
 2           A      No.  We do not have a policy
 3    outlining use of that tactic.
 4           Q      To your knowledge, has the City ever
 5    used that tactic prior to September 17, 2017?
 6           A      To the best of my knowledge, no.
 7           Q      Did simply the incident commander or
 8    other individuals on the ground that evening come
 9    up with that approach on their own, out of thin
10    air?
11           A      I believe so.
12           Q      Gotcha.  Since September 17, 2017,
13    has the City considered adopting any guidelines,
14    policies or practices with respect to under what
15    circumstance, if any, it is appropriate to use an
16    approach such as a kettle in dealing with
17    protesters?
18           A      We have not.  We're waiting on
19    determination of several things to revise or revamp
20    certain aspects of our Special Orders to determine
21    we're not looking, as this kettle or mass arrest
22    scenario is -- has come -- become a topic of
23    concern for the agency, we're in the process of
24    determining what our next step is, policy wise, to
25    avoid or ensconce and procedure what and how these
```

ERIC LARSON  4/8/2019

1   methods should or could be utilize.

2        Q    In a nutshell, am I  hearing you

3   correctly that the City basically is not doing

4   anything to modify or change any of its policies or

5   practices that relate to police interaction with

6   protesters until this case is fully resolved?

7        A    No, I wouldn't make it as declaratory

8   as you have made it.  I mean, I think we are

9   reviewing all types of information and we're

10  constantly trying to figure out how we can do

11  things better, how can we gain compliance, what are

12  the best practices in this situation.  I don't

13  think we've determined what the best course of

14  action is yet.

15       Q    But specifically, has the City, to

16  your knowledge, since the court issued its

17  preliminary injunction, done -- made any changes to

18  whatever to any policies or practices that are

19  relevant to what transpired in connection with the

20  Stockley protest?

21       A    No, other than -- no.  No.  I don't

22  think so.

23       Q    And is the reason the City hasn't

24  done that is, is it because the City is waiting for

25  final resolution of the litigation, or is it

ERIC LARSON  4/8/2019

1    because it determined that there was no need to do

2    it?  That's what I'm trying to understand.

3         A    Right, and I think it's somewhere in

4    between.  We are trying to determine, A, what we

5    need to do and how we need to do it and what is it

6    that we should do.

7         Q    It's been quite a while since the

8    court issued its order and so with respect to the

9    statement that you made about that you're still

10   evaluating, trying to determine, what's taking so

11   long?

12        A    It's a process, like anything else,

13   and processes take time.

14        Q    Let me ask you a question here on

15   that.

16             (Plaintiffs' 30(b)(6) Exhibit 10

17   marked for identification by the court reporter.)

18        Q    (BY MR. PRAISS)  I'm going to hand

19   you what's been marked for identification purposes

20   as Exhibit 10.

21        A    Yes.

22        Q    Are you familiar with Exhibit 10?

23        A    I am.  Well, excuse me, I am not.

24   It's a -- I am familiar in the fact that it is an

25   email but I am not familiar with the content of the

ERIC LARSON  4/8/2019

1    email.  I don't believe I've seen this email

2    previously.

3         Q     Just for the record, so at least the

4    record is clear, this is an email dated October 11,

5    2017, from Carl Filler, F-i-l-l-e-r, to the mayor

6    of the City of St. Louis and Nicole Hudson.

7               Do you see that?

8         A     I do.

9         Q     And it's referring to "Critical

10   Incident Review Draft Scope of Works"?

11        A     Yes.

12        Q     If you could just take a minute and

13   just look at substance of the email from Carl

14   Filler to the mayor, as well as the material

15   attached?

16        A     Mm-hmm.

17        Q     Let me know when you have had a

18   chance to just glance at it.

19        A     Okay.  Okay.

20        Q     Have you had a chance to look at

21   Exhibit 10?

22        A     I have.

23        Q     For the record, I did mention before

24   but you see Carl Filler is the senior policy

25   advisor in the mayor's office?

ERIC LARSON  4/8/2019

1        A     Yes.

2        Q     Okay.  Are you at all familiar with

3    the information that's discussed in the attachment

4    to this email?

5        A     No, I am not.  I don't believe I saw

6    this.

7        Q     Back to the line of questions we had

8    just before I showed you this exhibit.  My question

9    to you was if you're aware of any specific changes

10   made by the City of St. Louis with respect to any

11   policies or practices that relate to the Stockley

12   protest since the court issued its preliminary

13   injunction, and you told me that because of the

14   pending litigation and because it's an ongoing

15   evaluation, that has not happened and no changes

16   have been made; is that a fair summary?

17       A     I believe that is a fair summary.

18       Q     Okay.  With respect to the statement

19   by you that it's an ongoing process, I showed you

20   this exhibit because I thought you might be

21   familiar with it showing efforts done by the City.

22       A     Correct.

23       Q     When you say -- when you testify

24   about ongoing efforts, what are you referring to?

25   What ongoing efforts has the City done specifically

ERIC LARSON  4/8/2019

Page 157

1    to evaluate whether it should amend, modify any of

2    the policies or practices that were at issue in

3    connection with the Stockley protests?

4         A       And as I indicated, I guess what I

5    should be clear on, is I understand that I am the

6    City's representative.  I don't -- I did not have

7    access to the mayor's email in preparation for

8    that.  Most of my statements I think could be

9    construed more directly with the St. Louis Police

10   Department per se.  So if there are events going on

11   that -- such as this document on the opinions and

12   scope of work for critical incident review, I may

13   not be aware of them or was not aware.

14              But as I said, it's an ongoing

15   process and there are a lot of people who are

16   interested in making sure that we have a resolution

17   and we get this right.

18        Q       Just for the record, you do

19   understand you're testifying here today not just on

20   behalf of the St. Louis Metropolitan Police

21   Department but on behalf of the City of which the

22   St. Louis Metropolitan Police Department is

23   subsumed within it; correct?

24        A       Yes, I've been instructed to that.

25        Q       Okay.  I just want to make sure that

ERIC LARSON  4/8/2019

1    was clear to you.

2         A    Yes.

3         Q    My question to you, Mr. Larson, is

4    again, you make a generic statement that, and I

5    believe you, that the City has an interest in

6    having an ongoing evaluation with you of the

7    policies and practices and making necessary

8    changes.  I want more specificity.

9              Can you identify for me sitting here

10   today any specific steps that have been undertaken

11   by the City in evaluating whether it's appropriate

12   to amend, modify any policies or practices that are

13   at issue with respect to the Stockley protest since

14   September of 2017?

15        A    No.

16        Q    Okay.  Back to topics 16 and 17.  We

17   covered topic 16.  On topic 17, I'll let you catch

18   up.  Topic 17 deals with the "Training provided to

19   police officers regarding the City's policies and

20   practices concerning the use of a kettle."

21              And is it fair to say that there are

22   no such training were provided at any time because

23   there are no policies or practices concerning the

24   use of a kettle?

25        A    Yes.

ERIC LARSON  4/8/2019

1      **Q     Okay.  Did you review any video of**
2  **the Stockley protest in preparation for today's**
3  **deposition?**
4      A    I did not watch any video.
5      **Q     At any time did you watch any video**
6  **of the Stockley protests?**
7      A    Only if video was being shown during
8  the protest and it would be open source video.  But
9  no, I did not.
10      **Q     But not after the protest for some**
11  **reason --**
12      A    No, certain -- no, not --
13      **Q     -- meet with people and review it?**
14      A    No.  Well, wait a minute.  We had
15  several POST Stockley training sessions with the
16  senior command on how things were done.  They were
17  kind of an after action review.  I cannot recall if
18  there was video as part of that or not.  The
19  sessions were composed at the direction of the
20  chief's office and I believe Lieutenant Jemerson
21  hosted those and distributed that information.
22      **Q     Do you recall approximately how many**
23  **of those sessions there were?**
24      A    I believe there were at least two,
25  possibly three.

ERIC LARSON  4/8/2019

1          Q     And Jemerson handled all of those?

2          A     Yes.

3          Q     Do you recall, this was again -- just

4     a senior staff?

5          A     Senior staff and possibly involved

6     commanders, specialized unit commanders.

7          Q     Okay.  Were there any specific -- was

8     it a PowerPoint or any other materials used in

9     connection with those meetings?

10          A     I don't recall.  I believe there was

11     a PowerPoint.

12          Q     I'm not sure I've ever seen that

13     PowerPoint.

14               MR. DIERKER:  I know I have not.

15          A     Well, and I could be completely

16     wrong.  We've done so many different after action

17     reports related to incidents, I mean, I know we did

18     one related to the workhouse.  I can't recall --

19     I'll be honest with you, I'm very confused this

20     afternoon.

21          Q     (BY MR. PRAISS)  I definitely don't

22     mean to confuse you and again, if you need a break

23     at any time, just let me know, but again, you know,

24     we have in front of us, for example, what's been

25     marked before as Exhibit Number 6 --

1        A      Correct.

2        Q      -- which is a presentation

3   specifically before the Stockley protest that was

4   given to, and I'm using the term generically,

5   senior staff, including yourself --

6        A      Correct.

7        Q      -- about what the City's

8   understanding was in terms of the applicable

9   statutory and legal provisions dealing with protest

10  law.

11       A      Right.

12       Q      And what you're just testified is

13  that subsequent to the Stockley protest, there have

14  been several meetings where Mr. Jemerson presented

15  information about, I would call them lessons

16  lenders?

17       A      Right.  And I'll be honest, I believe

18  that I am mixing incidents.  We had a change of

19  command after Stockley and I can't recall what we

20  did specifically.  I know that we had similar

21  review -- we had a review session after the

22  workhouse.  We had training and sessions prior to

23  Stockley where we covered material like this.  So

24  I'd have to say that I was confused and I answered

25  in error.

ERIC LARSON  4/8/2019

1          Q     And I appreciate your testimony.
2    Sitting here today, can you testify as the
3    corporate representative with certainty that there
4    have been no meetings and presentations at any time
5    addressing or evaluating after action review, After
6    Action Critique, whatever the term is, in terms of
7    what I will generally call lessons learned from the
8    Stockley protest made to senior staff or anybody
9    else?
10                MR. DIERKER:  I assume you're
11   excluding litigation.
12                MR. PRAISS:  Yes.
13         A     Again, I cannot.
14         Q     (BY MR. PRAISS)  You don't know one
15   way or the other?
16         A     No.  I can't recall one way or the
17   other.
18         Q     Okay.  Are you familiar with the term
19   "After Action Critique"?
20         A     I am.
21         Q     Is After Action Critique the same as
22   an after action review?
23         A     It's interchangeable.
24                (Plaintiffs' 30(b)(6) Exhibit 11
25   marked for identification by the court reporter.)

ERIC LARSON  4/8/2019

Page 163

```
 1          Q     (BY MR. PRAISS)  Mr. Larson, I hand
 2   you what's been marked for identification purposes
 3   as Exhibit 11.
 4                Do you see that?
 5          A     I do.
 6          Q     And is that your name on the second
 7   page of this?
 8          A     S.
 9          Q     So you're definitely familiar with
10   this exhibit?
11          A     I am.
12          Q     And this is titled Operational
13   Planning Major Event - After Action Critique;
14   correct?
15          A     Correct.
16          Q     And you prepared this sometime after
17   the Stockley protest; correct?
18          A     Correct.
19          Q     Okay.  And it's -- in your own words,
20   what's an After Action Critique?
21          A     The After Action Critique is a simple
22   review of the incident that occurred.  In this
23   particular format, it asks a series of questions
24   about the role that an individual played and what
25   things that worked well and things that did not
```

ERIC LARSON  4/8/2019

```
 1    work well.
 2          Q     Okay.  Is there any -- strike that.
 3                If you read, and I'll put it in the
 4    record, that in the block at the top it says, "In
 5    an effort to improve the quality and effectiveness
 6    of the performance of the St. Louis Metropolitan
 7    Police Department and the handling of Special/Major
 8    Events as well as maintaining," all capitalized,
 9    "C-A-L-E-A compliance, all detail commanders and
10    supervisors are required to complete an After
11    Action Critique after major events."
12                Did I read that correctly?
13          A     You did.
14          Q     Is this the only form of After Action
15    Critique that's provided to all detail commanders
16    and supervisors?  Or is there a different form for
17    different supervisors based on their role?
18          A     This would be the main form that
19    would be submitted or requested to be returned.
20          Q     When you say "the main form," is
21    there a different form?
22          A     No.  I mean, not that I'm aware of.
23    There's not another form; although, commanders or
24    individuals could write memorandums as far as a
25    after action review.  I could request from a
```

ERIC LARSON  4/8/2019

Page 165

```
 1    subordinate an after action review for a particular
 2    incident, they would put that on a memorandum, not
 3    specifically this form.
 4         Q    Okay.  To your knowledge, were any
 5    such memorandum prepared by any detail commanders
 6    or supervisors in connection with the Stockley
 7    protest?
 8         A    To the best of my knowledge, no.
 9         Q    To the best of your knowledge, is the
10    After Action Critique that you submitted, which is
11    Exhibit 11, the only After Action Critique that was
12    submitted by detail commanders and supervisors
13    after the Stockley protest?
14         A    As far as I know, it is.
15         Q    Okay.  When it says here that "all
16    detail commanders and supervisors are," and I
17    emphasize the word "required to complete an After
18    Action Critique," did the other detail commanders
19    and supervisors fail to meet that requirement in
20    this case?  Kind of an obvious question.
21         A    Apparently, they did.
22         Q    Okay.  Have they been reprimanded in
23    any way, to your knowledge, for not complying with
24    the Major Event - After Action Critique
25    requirements by the City?
```

ERIC LARSON  4/8/2019

```
 1        A     To my knowledge, no.

 2        Q     Okay.  Is it of a concern, from the

 3   City's perspective, that pretty significant

 4   incident occurred in the City of St. Louis, there

 5   is a document that contemplates that all detail

 6   commanders and supervisors should fill out this

 7   form in order to, quote, "improve the quality and

 8   effectiveness of the performance of the police

 9   department," that you're the only one who took the

10   time to fill one out?  Is that a serious concern?

11        A     It's a concern that more were not

12   submitted.

13        Q     The form that you filled addresses

14   things such as the quality of the food; correct?

15        A     Correct.

16        Q     Talks about whether the roll call

17   location was adequate; correct?

18        A     Correct.

19        Q     About whether the roll call

20   information was adequate; correct?

21        A     Correct.

22        Q     Whether the number of personnel

23   assigned was adequate; correct?

24        A     Correct.

25        Q     By the way, on the food, you
```

1    commented was the "Food provided ranged from

2    adequate to exceptional"; that was your feedback?

3         A    Yes.

4         Q    Okay.  And then it talks about "What

5    things worked well?"

6              Do you see that?

7         A    Yes.

8         Q    And then there's a section of "What

9    can be done to make the detail better next year?"

10   Right?

11        A    Yes.

12        Q    And not a single commander or

13   supervisor filled out the information about what

14   can be done to make the detail better next time.

15   After the Stockley incident; correct?

16        A    Correct, this is the only one that

17   I'm aware of.

18        Q    So now I'm going back to my question,

19   does this in any way refresh your recollection of

20   whether, after the Stockley protest, there has been

21   any presentations where documents were provided to

22   police officers with what I'm going to generally

23   term as lessons learned and how to do things better

24   to ensure that the quality and effectiveness of the

25   performance of the St. Louis Metropolitan Police

ERIC LARSON  4/8/2019

 1    **Department is improved in the future?**

 2         A     I can't recall any.

 3         **Q     Am I correct that this particular**

 4    **document, Exhibit 11, was created at Saint Louis**

 5    **University?**

 6         A     I don't believe so.

 7         **Q     This was not created by a social work**

 8    **professor?**

 9         A     Oh, the actual, where the form was

10    created or how the form was created?

11         **Q     The form, yeah.**

12         A     Oh, I don't -- I don't know the

13    history of the form.

14         **Q     Okay.  Yeah, I was referring to the**

15    **form of it.**

16         A     The only thing I can tell you, it is

17    Version 1 and it first became department policy in

18    October of 2007, but I have no knowledge of how the

19    mechanics of it took place.

20         **Q     But you understood, at the time you**

21    **filled it, that this form and the requirements**

22    **there applied to the events that just had**

23    **transpired in the Stockley protest?**

24         A     Yes.

25         **Q     Okay.  Let's focus on topics 4**

ERIC LARSON  4/8/2019

 1   through 6, if you want to look at those.

 2              Have you had a chance to review

 3   topics 4, 5, and 6?

 4        A    I have.

 5        Q    Do you see the common denominator to

 6   all of them deals with unlawful assembly?

 7        A    Yes.

 8        Q    And different areas of inquiry about

 9   unlawful assembly; is that a fair statement?

10        A    Yes.

11        Q    If you could go back and spend some

12   time looking at Exhibit 6 (sic) that we dealt with

13   before?

14              MR. PRAISS:  And I apologize, Judge,

15   that's the one we don't have the even pages.

16              MR. DIERKER:  That's fine.

17        Q    (BY MR. PRAISS)  If you go to page 5

18   of this document, presentation?

19        A    Mm-hmm.

20        Q    Do you see it's titled Section

21   574.040?

22        A    Yes.

23        Q    And your understanding, that's a

24   provision under Missouri law; correct?

25        A    Correct.

 1        Q     Okay.

 2              (Plaintiffs' 30(b)(6) Exhibit 12

 3     marked for identification by the court reporter.)

 4        Q    (BY MR. PRAISS)  Just so you know, in

 5     Exhibit 12, I did a simple Google search and I

 6     printed out copies of Section 574.040 of the

 7     Missouri Revised Statutes as well as 574.050 and I

 8     believe there should also be one more, 574.060.  So

 9     you have, to the extent you want to refer to the

10     actual language, because sometimes in the exhibit

11     that we're looking at, Exhibit 6, I believe it has

12     elements but might not have the full language, so

13     feel free to refer to both exhibits.

14        A     Thank you.

15        Q     Back to page 5 of the exhibit dealing

16     with Section 574.040, you see it identifies the

17     different elements necessary for a person to

18     violate that statutory provision?

19        A     Yes.

20        Q     And it says, "A person commits the

21     offense of unlawful assembly if," and 1, "he or she

22     must knowingly assemble with six or more other

23     persons"; correct?

24        A     Yes.

25        Q     Second requirement, that individual

ERIC LARSON  4/8/2019

Page 171

```
 1    must "agree with such persons to violate any
 2    criminal laws."
 3              Do you see that?
 4        A    Yes.
 5        Q    The third one, the person must reach
 6    that agreement to violate the criminal laws "with
 7    force or violence"; correct?
 8        A    Yes.
 9        Q    If you now flip to page 6 of the
10    PowerPoint presentation?
11        A    Yes.
12        Q    There is a description of, that lays
13    out the City's understanding of the provision
14    574.040 and when someone potential violates it;
15    correct?
16        A    Correct.
17        Q    And it indicates, and please correct
18    me if I am misstating it, that, "Every person who
19    is present and cognizant of the unlawful acts being
20    committed bit other members of the assembly can be
21    found guilty of being unlawfully assembled"; is
22    that correct?
23        A    That is correct.
24        Q    Is it your understanding that that
25    statement reflects the policy of the City?
```

ERIC LARSON  4/8/2019

Page 172

```
 1        A     Yes, that's the interpretation of the
 2   City on this ordinance.
 3        Q     Sitting here today as a corporate
 4   representative, do you believe that's an accurate
 5   statement?
 6        A     I believe it is.
 7        Q     You're familiar with the word
 8   "cognizant"; correct?
 9        A     Its common definition, yes.
10        Q     Okay.  "Cognizant" means to be aware
11   of something; correct?
12        A     Yes.
13        Q     Okay.  Do you agree that a person can
14   be cognizant of unlawful acts being performed by
15   other individuals without agreeing with other
16   individuals to engage in the same unlawful acts?
17        A     Potentially.
18        Q     To be cognizant of something is very
19   different than to agree to do something; correct?
20        A     Correct.
21        Q     Okay.  Am I correct that the
22   statement on page 6 of the presentation, that does
23   not include any requirements that in order to be
24   found guilty of the crime of unlawful assembly, a
25   person must agree with other individuals to
```

ERIC LARSON  4/8/2019

1    actually violate the criminal laws with force or

2    violence?

3         A     Page 6 does not state that.

4         Q     So to the extent page 6 does not

5    include those requirements of an agreement rather

6    than being cognizant and not only an agreement, but

7    an agreement to violate the criminal laws with

8    force or violence, it is incorrect?

9              MR. DIERKER:  I'll object to the form

10   of the question, calling for a legal conclusion.

11        A     Yeah.

12        Q     (BY MR. PRAISS)  I am not asking for

13   a legal opinion.  I am asking from your

14   understanding as a corporate representative with

15   respect to topics 4, 5, and 6 dealing with unlawful

16   assembly, when it can be declared, on page 6 of the

17   PowerPoint presentation that was provided to senior

18   staff --

19        A     Mm-hmm.

20        Q     -- only one or two weeks before the

21   Stockley -- weeks before the Stockley protest, it

22   suggests, am I correct, that an unlawful assembly

23   can be declared even in circumstances where people

24   are simply cognizant of certain unlawful acts

25   happening but not agreeing to do so?

ERIC LARSON  4/8/2019

1        A     It doesn't say --

2              MR. DIERKER:  Same objection.  Go

3    ahead.

4        A     I was going to say it doesn't say

5    that an unlawful assembly can be declared because

6    people in the crowd are cognizant of the acts.  I

7    mean, the point of this slide appears to be the

8    fact that those people who are in the crowd who are

9    aware that the crowd is creating unlawful acts can

10   be found guilty of unlawful assembly.

11       **Q     (BY MR. PRAISS)  So again, that's**

12   **what I'm trying to understand.  Is it the City's**

13   **position that somebody who is simply found, for**

14   **example, inside the kettle, who is cognizant of the**

15   **protest around him but hasn't reached any agreement**

16   **with anybody to do anything unlawful and to break**

17   **the criminal -- the laws, by force of violence,**

18   **that that individual, just by standing and being**

19   **cognizant that those other people around him, can**

20   **be charged with unlawful assembly?**

21       A     It's very fact dependent in the whole

22   incident -- I mean, you've laid out a large

23   scenario of a hypothetical that I'm having a little

24   trouble keeping up with but, essentially, if there

25   are people within that group that are creating

ERIC LARSON  4/8/2019

Page 175

 1   unlawful acts which have risen to the level to

 2   declare an unlawful assembly, the persons within

 3   that group, whether they've committed an -- a

 4   person in that group could be found guilty of

 5   unlawful -- being unlawfully assembled.

 6           Q       And I apologize for my hypothetical

 7   and I appreciate your answer but I'm going to try

 8   and distill it, if I may, Mr. Larson.

 9                   Is it the City's understanding that a

10   person can be charged with unlawful assembly under

11   circumstance where that person does not reach an

12   agreement with other individuals to violate the

13   criminal laws with force or violence?  That's my

14   question.

15           A       Well, they have to reach an agreement

16   with -- because that's an element of the crime.

17           Q       In the slide that we're looking at on

18   page 6, is there any requirement there that

19   specifies -- strike that.

20                   On page 6, sir, the word "agreement"

21   does not appear?

22           A       It does not.

23           Q       And it specifically says that every

24   person who is simply present and cognizant of the

25   fact that unlawful acts are being committed by

 1    others can be found guilty of unlawful assembly;

 2    correct?

 3         A    That is the statement.

 4         Q    And that's the policy of the City of

 5    St. Louis?

 6         A    It was the information that was

 7    provided.

 8         Q    It was provided, not just to anybody

 9    but the top people who were then expected to share

10    that information with the people below them;

11    correct?

12         A    Yes.

13         Q    Okay.  If you look at page 8, am I

14    correct that deals with City Ordinance 15.52.010?

15         A    It does.

16         Q    And it lays out the key elements

17    necessary for a person to violate this ordinance?

18         A    Yes.

19         Q    And first, you have to have at least

20    two persons; correct?

21         A    Yes.

22         Q    They have to assemble together;

23    correct?

24         A    Yes.

25         Q    They have to act in concert?

ERIC LARSON  4/8/2019

```
 1        A     Yes.

 2        Q     And they have to do so to do any

 3   unlawful act with force or violence; correct?

 4        A     Yes.

 5        Q     Am I correct that both Section

 6   574.040 and Ordinance 15.52.010 include, among

 7   other things, the requirement to do an unlawful act

 8   with force or violence?

 9        A     Yes.

10        Q     Okay.  When it uses the phrase to

11   "act in concert" in Ordinance 15.52.010, what is

12   your understanding that means?

13              MR. DIERKER:  I'll object to the form

14   of the question, asking for a conclusion of law.

15        Q     (BY MR. PRAISS)  I'm not -- let me

16   rephrase the question.

17              What is the City's understanding with

18   respect to the enforcement of Section Ordinance

19   15.52.010, what "act in concert" requires?

20              MR. DIERKER:  Same objection.

21        A     The common definition of to "act in

22   concert" is to act together.

23        Q     (BY MR. PRAISS)  I looked it up, the

24   Merriam-Webster dictionary provides the following

25   definition for the word "concert:  Agreement in
```

ERIC LARSON  4/8/2019

1    design or plan; union formed by mutual

2    communication of opinion and views."

3              As the City's representative, do you

4    agree with that definition?

5         A    I would agree.

6         Q    Okay.  The last part of Ordinance

7    15.52.010 has language about, it starts, "and every

8    person present at such meeting or assembly who

9    shall not endeavor to prevent the commission or

10   perpetration of such unlawful act shall be guilty

11   of a misdemeanor."

12             Do you see that?

13        A    I do.

14        Q    When it uses the phrase there "every

15   person at such meeting or assembly," the language

16   "meeting or assembly," is it the City's

17   understanding that that refers to the meeting or

18   assembly that's discussed above in the first

19   section of the provision?

20             MR. DIERKER:  Once again I'll object

21   to the form of the question as calling for legal

22   conclusions.  I don't feel that legal opinions are

23   within the scope of the corporate representative

24   deposition but --

25        Q    (BY MR. PRAISS)  I'll rephrase my

ERIC LARSON  4/8/2019

1    question because I apologize if I -- and I should

2    be doing it, I am not, again, Mr. Larson, asking

3    for a legal opinion.

4              What I'm trying to understand is the

5    City, when it sends out police officers to enforce

6    Ordinance 15.52.010, I'm trying to learn, no

7    different than any other citizen, of under what

8    circumstance, if any, may I be, based on the City's

9    understanding, subject to a violation of this

10   ordinance?

11             So the City must have an

12   understanding how it enforces it and how it trains

13   police officers about it and that's all I'm looking

14   for.  Not a legal conclusion but an understanding

15   of the City with respect to the enforcement of this

16   provision.  Does that make sense?  And I think I'm

17   entitled to that and I'm happy to take that to the

18   judge any day, Judge.

19             MR. DIERKER:  Well, we'll do that

20   when and if needed but I'll adhere to my objection.

21        Q    (BY MR. PRAISS)  But I want it on the

22   record to be clear what I'm looking for.  I am not

23   looking for, even though I now found out you're an

24   attorney, I don't want your legal opinion.  I want

25   the City's understanding about this.  Fair enough?

ERIC LARSON  4/8/2019

1           When it says in the last clause that

2     "every person present at such meeting or assembly,"

3     is it referring to the two people who assemble

4     together to act in concert?  Is that what it's

5     referring to?  Is that the City's understanding?

6           A     Yes.

7           Q     Okay.  So to the extent two people

8     get together, as referenced in the first section of

9     Ordinance 15.52.010, and one of them --

10          A     Well, I would have to -- may I

11    interject?  I'm sorry.

12          Q     No problem.

13          A     The -- when -- go ahead with your

14    question.

15          Q     My question is going to be much

16    easier.  I came up with a different approach.

17    Let's say two people assemble together at a street

18    corner.

19          A     Yes.

20          Q     And they decide, in concert, as

21    required here, to commit an unlawful act with force

22    of violence against the property of the City or

23    somebody.  Okay?

24          A     All right.

25          Q     Let's say I am standing next to them

ERIC LARSON  4/8/2019

Page 181

```
 1    but I don't even know who the heck they are, but
 2    let's say I'm overhearing this thing.  Is it the
 3    City's understanding that I can be charged with
 4    unlawful assembly because I failed to endeavor to
 5    prevent the commission or perpetration of such
 6    unlawful act?
 7                MR. DIERKER:  Same objection.
 8         A    And I would have to say yes, because,
 9    as we were discussing the first scenario, you
10    indicated the two people together, yes, they are
11    the people who are violating the ordinance.  The
12    rest of the ordinance indicates any -- therefore,
13    "every person present at such meeting or assembly
14    who shall not endeavor to prevent the commission or
15    perpetration of such unlawful act shall be guilty
16    of a misdemeanor."
17                So by failing to stop them, if you've
18    overheard them, you're involved, failing to notify
19    officers, yes, in theory, you would be subject to.
20         Q    (BY MR. PRAISS)  Now change my little
21    hypothetical now, say I don't overhear anything,
22    they're just standing there, they've reached an
23    agreement.  I don't hear a thing, I don't have a
24    clue what they're thinking to do.  I'm just
25    standing next to them.
```

ERIC LARSON  4/8/2019

1              Can I be charged with unlawful

2     assembly even though I have no knowledge of what

3     they're planning to do?

4              MR. DIERKER:  Same objection.

5         Q    (BY MR. PRAISS)  Again, I'm looking

6     for the City's understanding of how it enforces

7     this provision.

8         A    Yes.

9         Q    So your testimony is, as the

10    corporate representative of the City of St. Louis,

11    that in the connection with let's say the kettle,

12    if, hypothetically, there was two people there who

13    reached some agreement to commit an unlawful act by

14    violence, even though you've already testified

15    there's no evidence to suggest anybody acted with

16    violence, everybody else that was entrapped inside

17    the kettle, the City's position could be charged

18    with unlawful assembly even though they didn't even

19    know who those two people were in my hypothetical

20    and they never talked to them and had no idea what

21    their intent was, but simply because they were in

22    the wrong place at the wrong time, they could be

23    charged with a misdemeanor of violating the law?

24        A    They could be.  We're talking about

25    some very fact-dependent circumstances, we're

ERIC LARSON  4/8/2019

1    talking about all kinds of events and prosperity,

2    and these things don't happen in a vacuum.  There

3    is all kinds of warnings that would be given,

4    attempts to get crowd people to disperse, so,

5    therefore, being taken into custody at that point

6    could occur to someone who is not necessarily

7    engaged in the unlawful or riotous behavior,

8    violent behavior.

9         Q    I'm really focusing on the kettle,

10   and I think you've acknowledged to me that in

11   undertaking the approach of the kettle coming in

12   from four corners, it was reasonable to anticipate

13   that some people would get trapped who were not in

14   fact protesters and acting in any way in connection

15   with other protesters; you recall that?

16        A    Yes.

17        Q    Knowing that, my question to you is,

18   it is still the City's position that, when you have

19   trapped a very significant, large group of people,

20   by the mere fact that, and not a complicated

21   hypothetical, only two people in the whole group

22   reached some agreement to do something with

23   violence, is my hypothetical, and everybody else is

24   clueless, they're just kinda like, how the heck did

25   I get here, that the police officers at that point,

ERIC LARSON  4/8/2019

1    that evening, could arrest everybody for unlawful

2    assembly because they are at the wrong place at the

3    wrong time; is that the City's position?

4              MR. DIERKER:  Same objection.

5         A    They -- yes.  That's the City's

6    position.

7         Q    (BY MR. PRAISS)  And since those

8    people, under the City's position, are in violation

9    of the law, even though, again, my fact pattern,

10   they have no idea what's happening with the other

11   people, they're just bystanders, because the City

12   considers them to be engaged in unlawful assembly,

13   that means that under policy Section XIII of

14   Special Order 1-01, the police can deploy chemical

15   agents at them without any warnings?

16        A    Potentially.

17        Q    The warnings -- the warning

18   requirement doesn't apply --

19        A    Doesn't apply --

20        Q    -- because they're engaged in

21   unlawful activity, they're no longer peaceful?

22        A    But it would require violence or

23   threat of violence and things of that nature, and

24   again, you're asking very finite questions about

25   very fluid situations.

ERIC LARSON  4/8/2019

```
 1        Q    I'm trying to -- I'm visualizing the
 2   circumstance of what I believe transpired during
 3   the kettle and you have now explained to me the
 4   City's position, which it is what it is, but that a
 5   lot of people that night, all of them could have
 6   been charged with unlawful assembly, and when I go
 7   back to Special Order -- Section XIII, Special
 8   Order 1-01, it specifies that, "Per the Settlement
 9   Agreement, chemical agents will not be used to
10   disperse groups engaged in non-criminal activity
11   without satisfying the following conditions" --
12        A    Correct.
13        Q    -- one of them being a warning.
14        A    Correct.
15        Q    Is it the City's position that all of
16   those people were engaged in criminal activity
17   because they were unlawfully assembled, even those
18   there were no specific articulable facts to
19   establish that all of those people had knowledge
20   that somebody acted or was going to act in concert
21   to violate the laws?
22             MR. DIERKER:  Object to the form of
23   the question, argumentative, calling for a
24   conclusion of law.
25        Q    (BY MR. PRAISS)  You can answer my
```

ERIC LARSON  4/8/2019

1    question.

2         A    Yes, I mean, the unlawful activity

3    has occurred, in the situation where given,

4    announcements are made, opportunities were given to

5    egress.  Failure to comply with that opportunity,

6    they were -- people were arrested.

7         Q    Okay.  A lot of those people were

8    arrested for unlawful assembly; correct?

9         A    I believe so.

10        Q    So that's why I'm focusing on that

11   provision.  And again, that evening, those people

12   that were arrested for unlawful assembly and in the

13   process were subjected to chemical agents, it is

14   the City's position that the officers were entitled

15   to use chemical agents against them because they

16   were engaged in unlawful assembly; therefore, they

17   were acting in a criminal conduct, no warnings had

18   to be given.  Correct?

19        A    No warnings would have to be given,

20   but warnings were given.

21        Q    Warnings that chemical agents would

22   be used.  I'm focusing on that.  Am I correct no

23   warnings were given to people that chemical agents

24   were going to be used against them, necessarily?

25        A    I can't answer that.

1        Q       Are you aware in prior -- during the

2    Stockley protests of a single time when an officer

3    told someone that, I'm about to deploy chemical

4    agents with handheld pepper spray or a fogger and

5    gave them a warning before doing so?

6        A       I know warnings were given.

7        Q       Warnings about the use of chemical

8    agents.

9        A       But I cannot say that an individual

10   officer did or did not give a warning to an

11   individual they may have used chemical agents on.

12       Q       But under Special Order -- Section

13   XIII of Special Order 1-01 they are not required to

14   give warnings because of the City's interpretation

15   of what constitutes an unlawful assembly; correct?

16       A       Yes.

17       Q       Okay.  If you go to page 9 of the

18   presentation.  That deals with the offense of riot

19   and that deals with Section 574.050, which is --

20       A       Yes.

21       Q       You have a copy of the full statutory

22   provision in Exhibit 12, if you want to refer to

23   it.

24       A       Yes.

25       Q       Do you see on page 9 it lays out the

ERIC LARSON  4/8/2019

```
 1    key elements for the offense of rioting?

 2         A    Yes.

 3         Q    And you got -- in that situation a

 4    person commits the offense of rioting if "he or she

 5    knowingly assembles with six or more persons";

 6    correct?

 7         A    Yes.

 8         Q    "Agrees with such persons to violate

 9    any criminal laws"; correct?

10         A    Yes.

11         Q    "With force or violence"; correct?

12         A    Yes.

13         Q    And, "thereafter, while still so

14    assembled, does violate any criminal laws with

15    force or violence."

16              Those are all the elements?

17         A    Yes.

18         Q    Okay.  Again, that statutory

19    provision, 574.050, clearly requires force or

20    violence; correct?

21         A    Yes.

22         Q    And do you know if anybody was

23    actually charged with violation of this statutory

24    provision in connection with the Stockley protests?

25         A    I do not.
```

ERIC LARSON  4/8/2019

 1         Q      Okay.  Go to page 10.  This one deals

 2    with Section 574.060.

 3                Do you see that?

 4         A      Yes.

 5         Q      And again, feel free to look at

 6    Exhibit 12, if you want to look at the entire

 7    statutory provision, Mr. Larson.

 8         A      Okay.

 9         Q      On page 10 it lays out the key

10    elements for committing the crime of refusal to

11    disperse.

12                Do you see that?

13         A      Yes.

14         Q      The first element is that the person

15    has to be "present at the scene of an unlawful

16    assembly or riot"; correct?

17         A      Yes.

18         Q      And then there is three other

19    elements that follow, "person has to knowingly fail

20    or refuse to obey; a lawful command of a police

21    officer"; and "to depart the scene of such unlawful

22    assembly or riot"; correct?

23         A      Correct.

24         Q      Do you agree, sir -- strike that.

25                Am I correct that it's the City's

ERIC LARSON  4/8/2019

1    position that, in order to commit the crime of

2    refusal to disperse, there must be an underlying

3    unlawful assembly or riot to trigger the failure to

4    disperse?

5              MR. DIERKER:  Object to the form of

6    the question, calls for a legal conclusion.

7         A    Yes, that would be part of the --

8    it's an element of the crime, so it's required to

9    be there prior to charging an individual with

10   refusal to disperse.

11        Q    (BY MR. PRAISS)  And am I  correct

12   that, we've established on several occasions, that

13   in order to have an unlawful assembly or riot --

14   strike that.

15             Focusing again on the kettle, I

16   apologize for belaboring this point but again,

17   you're not aware of any situation where somebody,

18   around 11:30 at night, 11:25 that evening, was

19   engaging in violent conduct that presented imminent

20   threat to police officers or property at that

21   point; correct?

22        A    At that particular moment in time, I

23   don't know what was occurring.  At that particular

24   moment in time in this grand scenario, I don't know

25   if someone was engaging in violence or not.

ERIC LARSON  4/8/2019

Page 191

```
 1          Q     Are you aware of any facts that
 2    suggest that there was somebody arrested for acts
 3    of violence at that time?
 4          A     There were not people arrested at
 5    that -- I'm confused because you're asking me
 6    almost to testify to a specific incident.
 7          Q     Let me help you out.  You're familiar
 8    with, and I don't know his title, Mr. Sachs?
 9          A     Yes.
10          Q     Who testified at the preliminary
11    injunction?
12          A     I know Lieutenant Sachs.  He was the
13    commander of SWAT at the time of the kettling.
14          Q     And I'll represent to you I've read
15    his testimony very carefully.  If he testified that
16    after about 8:30 that evening, where there was
17    property damage, there was no evidence any of
18    violent activity in the City in the later part of
19    that evening, do you have any facts to dispute
20    that?
21                MR. DIERKER:  Well, I'm going to
22    object to that question because it seems to me that
23    that's totally outside the scope of the corporate
24    designee deposition.  You're asking for knowledge
25    of the entire event, specifically specific conduct
```

ERIC LARSON  4/8/2019

1   of specific people.  I will allow him to answer.

2           MR. PRAISS:  For what it's worth,

3   you, of all people, should know speaking objections

4   are not exactly appropriate.  And I think that was

5   a novel of an objection.  You might want to

6   consider shortening it a bit.

7           MR. DIERKER:  I'll note your

8   objection to my objection.

9           MR. PRAISS:  Okay.  And the reason

10  for my question is not trying to go outside the

11  scope and to lay a foundation for the question that

12  he was having difficulty answering, so this is a

13  predicate to my question and that's why I need it.

14      Q    (BY MR. PRAISS)  So my question back

15  to you is, I'm representing to you what Lieutenant

16  Sachs testified, that after 8:30, there was no

17  evidence of violent activity in the City and

18  definitely none around 11:30 when the kettle took

19  place.

20          My question to you is, I just need to

21  understand, are you aware of any of facts to

22  challenge that testimony by Lieutenant Sachs?

23      A    I am not aware of any facts that

24  challenge Lieutenant Sachs's testimony.

25      Q    Okay.  And my question to you then

ERIC LARSON  4/8/2019

1    is, in order to declare -- in order for someone to

2    commit the crime of refusal to disperse, we

3    established that a predicate for that is either

4    being present at an unlawful assembly or a riot;

5    correct?

6         A     Correct.

7         Q     And in order to be, have to be at the

8    scene of an unlawful assembly or a riot, there has

9    to be acts of violence occurring; correct?

10        A     Correct, by the statutory definition.

11        Q     And yet --

12        A     With force or violence.

13        Q     And yet assuming Lieutenant Sachs'

14   testimony is accurate and there were no acts of

15   violence, force or violence occurring at 11:30 at

16   night, what is the basis for charging people with a

17   crime of refusal to disperse if there is no basis

18   for establishing an unlawful assembly or a riot, is

19   what I'm trying to understand.

20             MR. DIERKER:  Object to the form of

21   the question, argumentative.

22        A     I can't state -- I mean, based on the

23   hypothetical scenario, assuming that there is no

24   other individual who can say that force or violence

25   was occurring at that particular time, the

ERIC LARSON  4/8/2019

Page 194

1   declaration of the unlawful assembly was up to the

2   incident commander who should have followed the

3   statutory guidelines to declare.

4        Q   (BY MR. PRAISS)  Okay.  If you go to

5   page 11, please?  It says, "The decision to declare

6   a crowd unlawful must be based on reasonable and

7   articulable facts."

8             What is the City's understanding what

9   it means when it says -- uses the phrase

10   "reasonable and articulable facts"?

11        A   A common sense language definition of

12   what is the standard of reasonableness of an

13   ordinary person, articulable would be demonstrate

14   specificity, specific facts.

15        Q   And that's what I was looking for.

16   You agree with me that it requires some level of

17   specificity before you can go out and just declare

18   an unlawful assembly?

19        A   Yes.

20        Q   Okay.  Go to page 15.  This deals

21   with Interference With An Officer - Best Practice.

22             Do you see that?

23        A   I do.

24        Q   And in the second bullet says, "Warn

25   prior to arrest on this charge by giving an

ERIC LARSON  4/8/2019

1    effective order.  Inform the protester how the

2    protester is interfering with official duty and

3    instruct the protester how to comply."

4              Do you see that?

5        A    Mm-hmm.

6        Q    Is that a yes?

7        A    Yes.  Sorry.

8        Q    No problem.  Am I correct that in

9    this situation, the City's policy is that a warning

10   is appropriate when an individual is interfering

11   with an officer undertaking some police function;

12   correct?

13       A    This point relates to the best

14   practices related to interfering with an officer

15   and the explanation on when, what is interference

16   to warn prior to arrest on the charge by giving an

17   effective order.  So, and I need to be involved in

18   some sort of official act.

19       Q    And it specifically says that in that

20   situation, the best practice is to warn prior to

21   arresting someone and by giving them an effective

22   order, and it delineates an example what an

23   effective order would be; correct?

24       A    Correct.

25       Q    And it would be, among other things,

ERIC LARSON  4/8/2019

1    to inform the protester how he's interfering with

2    official duty and instructing him how to comply;

3    correct?

4         A    Yes.

5         Q    Okay.  Could you help me understand

6    why the City considers it a best practice to

7    provide a warning by giving an effective order in

8    the context of an individual interfering with an

9    officer but doesn't believe that any warning is

10   required before spraying someone with pepper mace

11   using a handheld device under Section IV of Special

12   Order 1-01?

13             MR. DIERKER:  Object to the form of

14   the question, argumentative.

15        A    I cannot.

16        Q    (BY MR. PRAISS)  Can you think of any

17   reason why it's a best practice in one case to give

18   a warning which is giving an effective order of

19   what a person needs to do in one -- in this context

20   and why it's different in the context of an

21   interaction with someone who is, again, interfering

22   with a police officer trying to effectuate an

23   arrest, but in that context there is no best

24   practice; in fact, you have free discretion to

25   spray someone to get them to comply?

ERIC LARSON  4/8/2019

1              MR. DIERKER:  Same objection.

2         Q    (BY MR. PRAISS)  That's what I'm

3    trying to understand.

4         A    I don't have an answer for this.

5         Q    Okay.  Topic number 4, Mr. Larson,

6    specifically, I'll read it into the record, says,

7    "The City of St. Louis's policies and/or practices

8    concerning who has authority to declare an unlawful

9    assembly."

10             Do you see that?

11        A    I do.

12        Q    As of September 2017, did the City

13   have any written policies or practices concerning

14   who has authority to declare an unlawful assembly?

15        A    No.  Any officer can declare an

16   unlawful assembly based on probably cause.  We

17   don't train for -- officers are trained relative to

18   the application of specific ordinances and having

19   probable cause to enforce those ordinances.

20   However, in standard practice, especially related

21   to First Amendment issues, the policy is only a

22   command rank, a supervisor, sergeant, lieutenant on

23   up, incident commander, would be responsible for

24   declaring an unlawful assembly.

25        Q    You gave me a long answer and I'm

ERIC LARSON  4/8/2019

 1    getting tired and I had a tough time following you,

 2    Mr. Larson, so I apologize but I'll break it into

 3    pieces.

 4              Am I correct that any individual

 5    police officers at any point can declare, based on

 6    his or her own opinion, that there's an unlawful

 7    assembly?

 8        A     If the elements of the law are met

 9    and the officer has probable cause to believe that

10    the elements are met, yes, they could.

11        Q     Okay.  Am I correct there is nothing

12    written to provide guidance to an officer with

13    respect to when to declare unlawful assembly other

14    than the language of the statute?

15        A     Correct.

16        Q     Okay.  There's pretty significant

17    consequences when an officer declares an unlawful

18    assembly; right?

19        A     Agreed.

20        Q     Among other things, based on the

21    City's understanding, as you described earlier,

22    everybody that's congregating there, regardless of

23    what their mental state is and what their agreement

24    or lack of agreement is, could be charged with a

25    crime; correct?

ERIC LARSON  4/8/2019

 1                    And with that in mind, my question

 2     is, what training is provided to police officers so

 3     that they know to use their discretion correctly?

 4     That they know what it takes, the elements, that

 5     they don't abuse their discretion and create havoc?

 6     I apologize for the long question but that's what

 7     I'm trying to understand.

 8                    MR. DIERKER:  I apologize for having

 9     to object but I think the second half of the

10     question is fine but the preface --

11                    MR. PRAISS:  And I'll --

12                    MR. DIERKER:  -- injected other

13     matters.

14          Q     (BY MR. PRAISS)  I'll strike the

15     question and do a better job.

16                    You agree with me declaring an

17     unlawful assembly is a pretty serious charge;

18     right?

19          A     In matters related to the First

20     Amendment, yes.

21          Q     And you just explained or testified

22     that any officer has the discretion to declare an

23     unlawful assembly; correct?

24          A     Yes, but common practice is only

25     senior officers would do so.

ERIC LARSON  4/8/2019

1        Q      But there's nothing prohibiting a

2   regular officer, not a senior officer, from doing

3   it under the policies and practices of the City of

4   St. Louis; correct?

5        A      Correct.

6        Q      Okay.  My question to you is, what

7   specific training is provided to every police

8   officer about the standards pursuant to which they

9   can declare an unlawful assembly to make sure they

10  get it right?

11       A      The training is based on all of our

12  training, which is probable cause, to ensure that

13  the elements of the crime are present prior to

14  effecting either an arrest or a declaration of

15  unlawful assembly.  There's no specific training

16  focused at specifically unlawful assembly.

17       Q      To what extent does the City actually

18  test the police officers' knowledge about the

19  relevant elements of the provision to declare

20  unlawful assembly to ascertain to what extent they

21  actually have an accurate working knowledge of the

22  elements?

23       A      I don't believe there is a test.

24       Q      Okay.  And again, I'm trying to

25  understand, is there like a regular training with

ERIC LARSON  4/8/2019

Page 201

```
 1   respect to this element that happens on a monthly,

 2   biyearly, yearly basis, to make sure that officers

 3   know the elements of the crimes they are about to

 4   charge people, in those situations where the

 5   discretion to do so?

 6        A     To the best of my knowledge, and I'm

 7   -- I may have gotten lost, no.  Not on that

 8   specific point or element on unlawful assembly.

 9   Obviously it's a topic that we're concerned about

10   and it's something that we want to make sure we're

11   doing correctly.

12        Q     Would one way to do that would simply

13   to give an open-ended test to police officers and

14   ask them on a piece of paper write down the four

15   elements for an unlawful assembly and realize that

16   probably less than 5 percent of them could do it

17   correctly would be my guess, no disrespect.

18             MR. DIERKER:  I'll object to the

19   statement.

20        A     I'm not sure that -- that was a

21   statement more than a question, but no, I mean,

22   there's no -- I've already answered I think there's

23   no specific training related to that.

24        Q     (BY MR. PRAISS)  Okay.  Topic 5, I'll

25   give you a second.  It is a long one.  I'll let you
```

ERIC LARSON  4/8/2019

1    read it yourself, Mr. Larson.

2          A     Okay.

3          Q     In a nutshell, that one focuses on

4    the City's policies, practices when an unlawful

5    assembly maybe declared; correct?

6          A     Yes.

7          Q     And it's pursuant to any legal

8    authority.  I want to make it general; okay?

9          A     Yes.

10         Q     Am I correct that the exhibit that

11   you have in front of you, I believe this is Exhibit

12   6, the PowerPoint presentation --

13         A     Yes.

14         Q     -- dated August of 2017 and the

15   testimony that you've given me in the last 45

16   minutes captures the City's policies and practices

17   on this issue?

18         A     Yes.

19         Q     Is there anything other than what's

20   referenced in Exhibit 6 that the City believes

21   permits declaring an unlawful assembly under any

22   provision of law?

23         A     I don't believe so.

24               MR. PRAISS:  Okay.  Why don't we take

25   a short break.

ERIC LARSON  4/8/2019

1                    (Off the record.)

2                    (Plaintiffs' 30(b)(6) Exhibit 13

3      marked for identification by the court reporter.)

4           Q     (BY MR. PRAISS)  Back on the record,

5      Mr. Larson.  We are going to deal with topics 7

6      through 1, and if you look at Exhibit 2, which is

7      the notice of this deposition, the common factor to

8      topic 7-11, if you look at it, is dispersal orders.

9                    Do you see that?

10          A     Correct.

11          Q     And I'm going to cover those topics

12     but maybe to help start the process, I've handed

13     you what's been marked as Exhibit 13.

14          A     Okay.

15          Q     This was recently produced us to in

16     the litigation.  Have you ever seen Exhibit 13

17     before today?

18          A     I have not seen it in this format.  I

19     am familiar with the dispersal order and the

20     warning of deployment of munitions.

21          Q     Okay.

22          A     I see it's dated September 1, 2017.

23          Q     Do you know who created this

24     document?

25          A     I do not.

ERIC LARSON  4/8/2019

1     **Q     What specific steps did you take to**
2     **prepare to testify with respect to topics 7 through**
3     **11?**
4          A     Specifically, I reviewed the order on
5     dispersal in -- which is the chemical munitions
6     order we have talked about, Special Order 1-01,
7     Section XIII, talks about dispersal orders.
8          **Q     Okay.  But in terms of, you know,**
9     **topics 7 through 11 deal with other issues such as**
10    **who have authority to issue it --**
11         A     Yes.
12         **Q     -- when should it be declared and**
13    **training with respect to dispersal orders, very**
14    **different, Section XIII of Special Order 1-01**
15    **doesn't cover those things?**
16         A     No, and it's basically -- it's built
17    off of those series of questions were related to
18    what I consider the probable cause requirement of
19    what meets probable cause to declare the unlawful
20    assembly, when the dispersal order should be given
21    relative to the deployment of chemical munitions or
22    the opportunity to comply, things of that nature.
23         **Q     Okay.  This Exhibit 13 is dated**
24    **September 1, 2017; correct?**
25         A     Yes.

ERIC LARSON  4/8/2019

1          Q      **Do you know if there was any similar**
2   **documents dealing with the language for issuing a**
3   **dispersal order prior to that date that the City**
4   **used?**

5          A      I don't -- let me -- I could look at
6   the Special Order and I believe that was dated --
7   what the date is on that.  There is some language
8   in there that is very similar to this so I know
9   that this was a topic of discussion as we were
10  preparing the operations order, I believe it's
11  encapsulated in here on dispersal somewhere.

12         Q      **What are you looking at?**

13         A      Right now I'm looking at the
14  operations plan.

15         Q      **Gotcha.  The OPs plan that you**
16  **referenced before, yep.**

17         A      Yes.

18         Q      **And please take your time but let me**
19  **know if you find anything specifically in the OPs**
20  **plan that deal with dispersal orders that was in**
21  **effect prior to September 1, 2017.**

22              MR. DIERKER:  Off the record.

23              (Off the record.)

24         Q      **(BY MR. PRAISS)  Mr. Larson, I know**
25  **there's a question pending but I'm going to strike**

ERIC LARSON  4/8/2019

Page 206

 1    it and ask you a new one based on this exhibit.

 2    Give me a second to have the court reporter mark it

 3    as an exhibit.

 4              (Plaintiffs' 30(b)(6) Exhibit 14

 5    marked for identification by the court reporter.)

 6         Q    (BY MR. PRAISS)  Are you familiar

 7    with Exhibit 14?

 8         A    I am.

 9         Q    Could you identify it for the record?

10         A    It was the operational Civil

11    Disobedience Response Operations Plan relative to

12    the expected Stockley verdict.

13         Q    And it's dated --

14         A    September 27, 2017.

15         Q    So this was prepared after?  Or

16    before the Stockley protest, is what I'm confused.

17         A    It would have been issued -- the

18    preparation went prior but probably would have been

19    issued on the date that it was given.

20         Q    Okay.  During -- in the last few

21    minutes you had a chance to look through this

22    exhibit; correct?

23         A    Correct.

24         Q    I think at the time the question that

25    I asked you was dealing with any provisions about

ERIC LARSON  4/8/2019

Page 207

1    dispersal or prior to September 1, 2017, which is

2    the date of the dispersal order language in Exhibit

3    13.

4         A    Yes.

5         Q    And so with that in mind, did you

6    find anything in the operations plan relating to

7    the Stockley protest dealing with dispersal orders?

8         A    I did not.  I did not locate it.

9         Q    Thank you.  So sitting here today as

10   the corporate representative, are you aware whether

11   there was anything in writing prior to September 1,

12   2017, that dealt with instructions for the issuance

13   of an unlawful assembly and dispersal orders?

14        A    I am not.

15        Q    Okay.

16        A    And can you tell me where this came

17   from, Exhibit 13?

18        Q    I will let your attorney explain that

19   because he sent it to us.  If he wants to put that

20   on the record, that would be helpful.

21             MR. DIERKER:  We produced that to the

22   plaintiffs within the last week.

23             THE WITNESS:  I understand.  Okay.

24        Q    (BY MR. PRAISS)  And again, you have

25   never seen this particular Exhibit 13 before

ERIC LARSON 4/8/2019

1    today's deposition; correct?

2        A    I wouldn't necessarily say that.  It

3    relates to dispersal language.  I am not -- I am a

4    little confused because it has just a blank heading

5    so it's not an email.  I can't say whether I would

6    have gotten it through email or not.

7            I am familiar with the dispersal

8    order language.  It is the standard language that

9    we use on -- or that is supposed to be used by the

10   incident commanders when issuing a dispersal.

11       Q    Gotcha.  Let's focus on the language

12   for a dispersal order.  It begins with, "This is an

13   unlawful assembly"; correct?

14       A    Yes.

15       Q    So the first thing that has to happen

16   is someone has to determine, based on articulable

17   facts, that all the elements necessary for an

18   unlawful assembly have taken place; correct?

19       A    Yes.

20       Q    And it continues whereby the person

21   giving the dispersal order orders the individuals

22   "to disperse from this area by moving," and it has

23   it in quotes, "to the sidewalk and walking (give a

24   clear course of egress)."

25            Do you see that?

ERIC LARSON  4/8/2019

```
1          A      Yes.

2          Q      So am I correct that the dipersal

3    order language -- first of all, is this language

4    mandatory?

5          A      This verbatim languatory?

6          Q      Yes.

7          A      No.  It is not, the verbatim language

8    is not mandatory per se.

9          Q      At any time since September of 2012

10   to the present, the operative time period for this

11   deposition, has the City had a requirement that

12   specific dispersal order language was mandatory to

13   be used?

14         A      Yes, we are required to give a

15   dispersal order prior to the deployment of chemical

16   munitions and it should follow this form.  It may

17   be paraphrased, it may not be exact word for word,

18   but the intent is to provide this language and this

19   language was most likely prepared to give hands to

20   people, who would have to make these statements, a

21   document to refer to.

22         Q      I think in your answer you used

23   language like it could be paraphrased, it can be --

24   and that it doesn't have to be the exact word for

25   word, so that's what I'm trying to focus on.  The
```

ERIC LARSON  4/8/2019

1    **person giving the dispersal order, is there a**

2    **specific requirement that he or she actually has**

3    **this language in front of her and the only thing**

4    **that they are modifying is potentially the -- what**

5    **is the clear course of egress that applies there**

6    **but the rest of it is going to be read verbatim?**

7    **That is my question.**

8            **Or as you can describe it, the person**

9    **is basically familiar with this general language**

10   **and kind of paraphrases, to use your words, and**

11   **gives a dispersal order?**

12        A     We have to issue a dispersal order

13   and the language that we use would be substantially

14   similar to this.

15        **Q     Substantially similar but does not**

16   **require it to be identical?**

17        A     Does not require it to be identical.

18        **Q     Okay.  Am I correct that the language**

19   **of the dispersal order shown in Exhibit 13 does not**

20   **include any language that instructs individuals to**

21   **cease congregating together?**

22        A     No, there is nothing in here that --

23   in that language that says that.

24        **Q     Am I  correct the dispersal order**

25   **does not include any language that instructs**

ERIC LARSON 4/8/2019

Page 211

```
 1    individuals how far they have to leave the area?
 2           A     No.  The -- no.
 3           Q     Is there a reason, from the City's
 4    perspective, that is now a policy, why it would not
 5    want to include some parenthetical applicable to
 6    the relevant situation but that tells people, in
 7    order for you to comply with this dispersal order,
 8    you need to leave the current area where there's an
 9    unlawful assembly and go three blocks, go past the
10    park, go to the intersection?
11           A     I think it's the City's position that
12    a dispersal order is common sense.  I mean, to
13    disperse, you have to break apart, you have to go
14    away, you have to move.  You can't merely take your
15    group and move 50 feet down the street or into
16    another area.  You need to cease congregating.  You
17    need to go different directions.
18           Q     Since you used the language "cease
19    congregating," it highlight my question before --
20           A     I believe you used the language,
21    "cease congregating."
22           Q     Yes, but you used it now.  My
23    question is, again, that language doesn't appear in
24    the dispersal order; correct?
25           A     No.
```

ERIC LARSON  4/8/2019

1      Q      It doesn't tell people that you need
2  to disperse and not recongregate anywhere; correct?
3      A      No, it doesn't say that.
4      Q      Okay.  Am I correct the dispersal
5  order language in Exhibit 13 doesn't include any
6  language and instructs individuals for how long
7  they have to leave the area; correct?
8      A      No.  It's the -- once the unlawful
9  assembly is declared, there is no return to the
10  incident location.  So there is no reason to say
11  you have to come back in 15 minutes or put a time
12  limit on it.  It's over.  You have to disperse.
13  You have to leave.
14      Q      Right.  But, for example, there's
15  language at the end of it that says, "You have five
16  minutes to comply with this order."
17            Do you see that?
18      A      Yes.
19      Q      There's no language that says you
20  cannot recongregate downtown for the next three
21  hours or this evening because that's what that
22  person declaring the dispersal order is
23  contemplating would satisfy his or her
24  expectations.  That language isn't in there;
25  correct?

ERIC LARSON  4/8/2019

```
 1         A      That language is not present.
 2         Q      So how does a group of people that's
 3   congregating, and now they're being told they're
 4   engaged in unlawful assembly based on the City's
 5   interpretation as you explained it to us earlier,
 6   how are they supposed to know that -- let's say
 7   that happens at 8:30 in the evening and then three
 8   hours later that same group of people, by
 9   coincidence, comes back together and starts
10   congregating again.  Because people communicate by
11   social media quite a bit these days.  It doesn't
12   take much.  Where somebody says, hey, I see a group
13   of people hanging, protesters, in this area.
14              The original dispersal at 8:30 didn't
15   tell them you can't ever come back to the City
16   tonight.  How are they supposed to know that, that
17   they're not going to be violating a dispersal
18   order?
19              MR. DIERKER:  I'll object to the form
20   of the question, it assumes facts not in evidence,
21   it's argumentative.
22         Q      (BY MR. PRAISS)  You may answer my
23   question.
24         A      I don't know what the -- a person is
25   supposed to know or not supposed to know.
```

ERIC LARSON  4/8/2019

```
 1         Q     Well, how is the person possibly
 2   supposed to know that he or she is not supposed to
 3   come back to the City three hours later if the
 4   dispersal order didn't tell them that?
 5              MR. DIERKER:  Same objection.
 6         Q     (BY MR. PRAISS)  Do you see the
 7   problem?
 8              MR. DIERKER:  Same objection.
 9         Q     (BY MR. PRAISS)  Is there a reason,
10   sir, why the City, when it was drafting this
11   dispersal order language, didn't include language
12   specifying what the expectations are in terms of
13   the time period during which people could not
14   recongregate in a certain area?
15              MR. DIERKER:  Same objection.
16         A     I don't know the reason.
17         Q     (BY MR. PRAISS)  And since the
18   Stockley protesters were not aware of any attempts
19   to modify this language such that if we have other
20   situations, potentially, the problems we've been
21   discussing could be eliminated; is that a fair
22   statement?
23         A     I'm not aware of any attempts to
24   modify this language presently.
25         Q     Okay.  We talked before about who had
```

ERIC LARSON  4/8/2019

Page 215

1    authority to declare an unlawful assembly and I

2    think your testimony was pretty much any officer,

3    based on his or her assessment and the presence of

4    articulable facts, could declare an unlawful

5    assembly and now I want to focus on who has

6    authority to issue a dispersal order.

7              And as of September 2017, did the

8    City have any policies or practices related to who

9    had authority to issue a dispersal order?

10        A    The standard policy and practice,

11   much like the declaration of an unlawful assembly,

12   would be that any officer would issue the dispersal

13   order.  In common practice, especially in large

14   scale events like this, it would be up to the

15   incident commander to make those declarations and

16   to ensure that those dispersal orders are given.

17        Q    To your knowledge, have there ever

18   been situations where the incident commander was

19   not the person who gave the dispersal order but

20   some other officers did so using their discretion

21   in connection with any protests in the City since

22   September of 2012?

23        A    Not -- I'm sorry, that's a big

24   question.  Could you break that down for me?

25        Q    I'm just trying to figure out, to

ERIC LARSON  4/8/2019

1    your knowledge, as the City's representative,

2    dealing with the dispersal orders and prior

3    protests, the topic we've been dealing with, have

4    there been situations where an officer other than

5    the incident commander issued a dispersal order?

6         A    That was not directed by the incident

7    commander to issue?  So the incident commander did

8    not direct officer X to provide that.  I am not

9    aware of any time when an officer, on their own

10   volition, during any protest event, would have

11   issued a dispersal order on their own without

12   approval from a commander responsible for that

13   incident.

14        Q    Is there a reason, if I'm hearing you

15   correctly that the City has what you've

16   characterized as a standard practice, that even

17   though any officer has the right to declare an

18   unlawful assembly or issue a dispersal order, the

19   standard practice is it's only people at a higher

20   level do so.

21             Why isn't that delineated in writing

22   as a requirement to eliminate the risk that

23   officers who are not maybe as familiar with the

24   procedures do so incorrectly?

25             MR. DIERKER:  Objection,

```
 1    argumentative.

 2         A    I don't have an answer.

 3         Q    (BY MR. PRAISS)  Okay.  Have the

 4    City's policies or practices related to who has

 5    authority to issue a dispersal order changed in any

 6    way since the Stockley protests?

 7         A    No.

 8         Q    Topic 8, if you look at it, deals

 9    with the circumstances when a dispersal order may

10    be issued; correct?

11         A    Yes.

12         Q    And we looked at the statutory

13    provision, I believe that was Missouri Revised

14    Statute 574.060, which is in Exhibit 12, if you

15    have that?

16         A    Are we discussing 574.060?

17         Q    Yes.

18         A    Okay.

19         Q    Am I correct, looking again at topic

20    8, that the circumstance under which a dispersal

21    order may be declared require that there has to be

22    people present at the scene of either unlawful

23    assembly or at the scene of a riot; correct?

24         A    An unlawful assembly, the statutory

25    language.
```

ERIC LARSON  4/8/2019

1        Q     In fact, the language of dispersal

2   order, back to Exhibit 13, begins with "This is an

3   unlawful assembly"; correct?

4        A     Yes.

5        Q     So before some police officer

6   declares a dispersal order, there has to be all of

7   the facts necessary to establish an unlawful

8   assembly present; correct?

9        A     Yes, sir, the elements of the crime.

10  The unlawful assembly would need to be present

11  before a declaration or a dispersal order should be

12  given.

13       Q     So topics 9 and 11 specifically deal

14  with training provided to police officers relating

15  to the City's policies and practices under

16  circumstances dispersal order should be declared

17  and made and enforced.

18             Do you see that?

19       A     Yes.

20       Q     What specific steps did you take to

21  prepare to testify with respect to topics 9 and 11?

22       A     I reviewed the training document

23  prepared on protests on unlawful assembly which I

24  believe talks about dispersal orders.  Again, I

25  reviewed the Special Order on chemical munitions,

ERIC LARSON  4/8/2019

 1    1-01, Section XIII.

 2        Q     Did you -- when you talk about the

 3    training document, you were looking at Exhibit, I

 4    believe that's 6 in front of you, Mr. Larson?

 5        A     Yes.

 6        Q     Did you look at any actual training

 7    materials that are used to educate police officers

 8    about dispersal orders?

 9        A     I did not.  I did not review any

10    PowerPoints other than the material that we talked

11    about.

12        Q     Okay.  Again, in the operations plan

13    that was issued shortly after the Stockley

14    protests, you weren't able to find -- there's no

15    training materials there referenced about the

16    issuance of a dispersal order; correct?

17        A     No.

18              MR. PRAISS:  Okay.  Let me mark up

19    another exhibit here.

20              (Plaintiffs' 30(b)(6) Exhibit 15

21    marked for identification by the court reporter.)

22        Q     (BY MR. PRAISS)  Do you have Exhibit

23    15 in front of you?

24        A     Yes.

25        Q     I think earlier today you referenced

ERIC LARSON  4/8/2019

Page 220

```
 1     a two-page document of -- that provided an outline

 2     of training materials used by Sergeant Jemerson.

 3     Do you recall?

 4          A     Yes.

 5          Q     Is Exhibit 15 that document?

 6          A     It is.

 7          Q     Okay.  And this is kind of the

 8     outline for the course that Sergeant Jemerson

 9     provides in connection with the Civil Disobedience

10     Team?

11          A     Yes.

12          Q     And this one's dated September 2014.

13                Do you see that?

14          A     Yes.

15          Q     And there's a long list of topics

16     included on this two-page document; correct?

17          A     Yes.

18          Q     Okay.  And the instructional goal it

19     talks about "preparing team members for the task of

20     staging a coordinated, safe, constitutionally sound

21     response to this -- civil disobedience events";

22     correct?

23          A     Yes.

24          Q     So one objective is to make sure that

25     the Civil Disobedience Teams knows how to act in a
```

```
 1   constitutional, sound manner; correct?

 2        A     Yes.

 3        Q     With respect to the use -- I'm sorry.

 4   With respect to dispersal warnings and the

 5   requirements regarding the use of chemical

 6   munitions, that's identified in the fourth topic;

 7   correct?

 8        A     Yes.

 9        Q     Have you yourself, in your individual

10   -- strike that.

11              As a corporate representative or in

12   your individual capacity, have you actually ever

13   seen the material -- specific underlying materials

14   that Randy Jemerson uses to teach the elements laid

15   out in the fourth bullet point here?

16        A     I did not.

17        Q     In preparing for today's deposition

18   you didn't take the time to do that?

19        A     No.

20        Q     Do you know if he actually has any

21   handwritten materials, any typed materials that he

22   actually provides the members of the Civil

23   Disobedience Teams to make sure they act in a

24   constitutionally sound manner in issuing dispersal

25   warnings and releasing chemical munitions at
```

ERIC LARSON  4/8/2019

 1    protesters?

 2         A     I do not.

 3         Q     Would it be a concern for you to find

 4    out that there are no such documents prepared and

 5    provided to the members of the Civil Disobedience

 6    Team?

 7         A     It would be a concern; however, I

 8    know that in order to have an outline such as this

 9    prepared, that there would have to have materials

10    that would support this outline in some way, shape,

11    or form, and, therefore, I believe that there are

12    -- that that is being -- that is occurring, that

13    those training materials are available.

14                   MR. PRAISS:  Go off the record a

15    second.

16                   (Off the record.)

17         Q     (BY MR. PRAISS)  Moving on.  We had a

18    long discussion between counsel, and you were

19    present here to hear it.  My question to you is,

20    other than Exhibit 6, which is a presentation that

21    was given to senior staff on August 16, '17, and

22    the two-page outline used by Mr. Randy Jemerson

23    that just highlights by topics all the things that

24    he covers in the Civil Disobedience Team training,

25    you, as a corporate representative, are not aware

ERIC LARSON  4/8/2019

Page 223

1    of any other training materials used to train

2    police officers about the use of chemical agents,

3    about dispersal orders or unlawful assembly or any

4    of the other topics we've discussed so far today;

5    is that a fair summary?

6           A     That is a fair summary, I am not

7    aware of anything other than what we've discussed.

8           Q     Thank you.  We are going to the last

9    topic and that is topics 18 through 24.  So there

10   is a large group there.

11          A     Yes.

12          Q     I will try and cover them here in the

13   next maybe 45 minutes or so and we'll be done.

14                (Plaintiffs' 30(b)(6) Exhibit 16

15   marked for identification by the court reporter.)

16          Q     (BY MR. PRAISS)  Mr. Larson, you've

17   been handed what's been marked for identification

18   purposes as Exhibit 16.

19                Do you see that?

20          A     Yes.

21          Q     This is a Declaration by Charles Wall

22   regarding Exhibit A, which is attached to his

23   Declaration.

24                Do you see that?

25          A     Yes.

ERIC LARSON  4/8/2019

Page 224

1          Q      And you identified early on today
2    that Mr. Charles Wall was actually, if memory
3    serves me correctly, the only individual other than
4    attorneys that you met with to prepare for today's
5    deposition; is that correct?
6          A      Yes.
7          Q      Okay.  And in paragraph 2 Mr. Wall
8    identifies that he is employed by the St. Louis
9    City division of police and is current assigned to
10   the police legal unit, and assist in discovery and
11   related matters.
12                Do you see that?
13         A      Yes.
14         Q      That's what you referenced here
15   today; correct?
16         A      Yes.
17         Q      Gotcha.  I want to focus on really
18   the substance of Exhibit A in particular.  Is to
19   your knowledge, first of all, Mr. Wall the author
20   of Exhibit A?
21         A      I believe he created the spreadsheet
22   with possibly help from the IT department to
23   identify these potential -- these incidents.
24         Q      Okay.  Are you familiar with what
25   records -- what records the City maintains that

ERIC LARSON  4/8/2019

1    **were the source of all this information?**

2         A     I believe there were the records

3    management system, I/LEADS we've discussed was one

4    source.  I believe there was a source from the

5    intelligence division/Real Time Crime Center that

6    contributed to this, and I also believe that there

7    were possibly information received from a CDT or

8    SWAT supervisor that had a list of incidents that

9    contributed to these.

10        **Q     You identified I believe three**

11   **different sources?**

12        A     Yes.

13        **Q     For each one, if you could go slower**

14   **for me and identify what that source was and what**

15   **type of information, if any, you believe that**

16   **source would have provided for any of the columns**

17   **identified in Exhibit A?**

18        A     Well, the -- the sources are -- I'm

19   going to do this rather generally at first.  The

20   information, as far as detail summary, the units

21   involved, the disposition of arrests, things like

22   that, that all came from the records management

23   system.

24             The actual protests themselves, or,

25   we got two lists from the two groups, we compared

ERIC LARSON  4/8/2019

1  them to the records management system or searched

2  parameters within the record management system, and

3  then created this list of potential -- of cases

4  that met the criteria of protest events based on

5  size.

6          Q     Okay.  I may follow up on that in a

7  few minutes, but let's keep going and I'll decide

8  how much more detail I need.

9                Am I correct the summary in Exhibit A

10  provides -- covers protests in the City from March

11  15, 2012, until the last one identified is July 24,

12  2018?

13         A     Yes.

14         Q     I want to go through the headings on

15  Exhibit A, and obviously the first one is Date.  Am

16  I correct that just reflects the date of when that

17  particular protest took place?

18         A     Yes.

19         Q     Start Time, pretty self-explanatory,

20  it's the start time of the protest?

21         A     Yes.

22         Q     Location is where the protest took

23  place?

24         A     Yes.

25         Q     Okay.  And Action Name.  Who

ERIC LARSON  4/8/2019

1    determined the name that's included in Exhibit A?

2         A    I would assume Charlie Wall, that

3    Sergeant Wall did, or the -- from the original

4    list, the Action Name is the group that was

5    associated with the incident.  So there's several

6    obviously different groups, that was the -- that's

7    how it would be determined the Action Name.

8         Q    Okay.  The next column is the number

9    of protesters.  What information did Mr. Wall rely

10   on to come up with the numbers identified?

11        A    The estimated numbers from the

12   reports and wherever we could glean that

13   information from.  So most likely a records

14   management system.

15        Q    The Details Summary column has more

16   language than other columns.

17             Do you see that?

18        A    Yes.

19        Q    And again, this was inputted by Mr.

20   Wall; correct?

21        A    Yes.

22        Q    Did anybody provide an input with

23   that, or what information did he use to describe

24   the details that he laid in?

25        A    He would have used the information

ERIC LARSON  4/8/2019

Page 228

1   that was provided from the two lists, checking that

2   against the records management system, reviewing

3   the reports, and then creating a detail summary.

4        Q     Okay.  Police Manpower, where would

5   he have gotten that information?

6        A     From the records management system,

7   who was involved.

8        Q     Okay.  When you say "records

9   management system," you used that phrase twice now.

10   What specifically are you -- what system are you

11   referring to?

12        A     The I/LEADS reports.

13        Q     I just wanted to make sure we were on

14   the same page.  Thank you.  Disposition includes

15   various information and level of detail.  Where

16   would that information have come from?

17        A     From the dispositions involving

18   arrests would have come from the I/LEADS report.

19        Q     Okay.  The Report number, what does

20   that refer to?

21        A     That refers to the incident case

22   number that we were discussing earlier, the I/LEADS

23   report number that relates that specific incident,

24   the number is tied to that.

25        Q     And so in some situations there is

ERIC LARSON  4/8/2019

1    only one, others there's a whole series of them.

2    And again, how is that determined whether there's

3    one or a series with respect to one protest?

4         A    The size of the event, the number of

5    the arrests, the individual charges, how it, just

6    it's determined on a case-by-case basis.

7         Q    Okay.  How are those reports

8    maintained by the City?

9         A    They're maintained within the I/LEADS

10   system.

11        Q    So if I wanted a report identified

12   here, how difficult would it be to locate it?

13        A    It would not be difficult at all.

14        Q    How difficult is it, if at all, to

15   determine all of the applicable reports that

16   correspond to a particular protest?

17        A    I'm a little confused by the

18   question.

19        Q    Yeah.  So when Mr. Wall was preparing

20   -- putting this document and, let's say, take the

21   first line item, Occupy Midwest, and the one dated

22   March 15, '12.

23        A    Mm-hmm.

24        Q    How hard is it for him to run a

25   search and locate all the applicable reports that

ERIC LARSON  4/8/2019

Page 230

1    relate to that one?  I guess different way of

2    asking it is, when he came across the report number

3    identified here, how does he know there aren't any

4    other reports out there?

5         A     The search parameter, primarily from

6    the IT department, information technology, would

7    have put in specific parameters, keyword phrases

8    keyword searches, protest, arrests, date and time.

9    So once we could narrow down the date and time of

10   particular incidents, we could run a search through

11   the records management system, I/LEADS, we could

12   search it by various parameters to determine that

13   we have everything that's available.

14        Q     Good.  The next column is P and a

15   number sign.  What does that stand for?

16        A     P and the number sign, I believe that

17   would be the, quote, P number.  So a P number is a

18   number that is in our computer-aided dispatch

19   network.

20              So an officer is sent to a location.

21   A P number is generated.  P number associates that

22   officer to the call for service.  If there is a

23   report written, obviously there is a complaint

24   number drawn, complaint number is associated to a P

25   number, and then the report is prepared.  If the

ERIC LARSON  4/8/2019

1    report is not prepared, a code might be given,

2    responded to monitor protest, no police action

3    needed, put me back in service.  The P number is

4    closed.

5           But the P number is just there, I

6    don't know if he was, what purpose he had it on

7    that list for, if it was something he was going to

8    go back and do or if -- if there was, if we decided

9    not to follow up on that information.

10        **Q     Very few of these entries have a P**

11   **number referenced in this column.**

12        **Do you see that?**

13        A     Yes.

14        **Q     Help me understand what is the**

15   **significance of a P number that's identified on**

16   **those few line items where it's present, and**

17   **equally, what is the significance of the fact that**

18   **there is no P number on the majority of them?**

19        A     The majority of the P numbers, it

20   appears from this list, don't have arrests

21   associated with them.  So we knew there was a

22   protest, we monitored the protest, and no protest

23   number or call for service.

24           Now, I am also looking at, it looks

25   like chronologically, the inclusion of the P number

ERIC LARSON  4/8/2019

Page 232

```
 1    becomes more prevalent in more recent time lines
 2    and it may have been to associate potential
 3    information with those, with these incidents
 4    internally.
 5         Q    Let's look at the entry for the
 6    Stockley verdict protest on September 15, 2017.
 7    There is a long list of P numbers associated there.
 8    Do you see that?  On the bottom of the page and
 9    it's page 4 of 9 of this filed with the court?
10         A    Yes.
11         Q    I'm just using that one as an example
12    where --
13         A    Page 4 of 9.  Yes.  9/15, yes, at the
14    bottom of the page.
15         Q    And you see under the column
16    associated with the P number, there is quite a few
17    entries there; right?
18         A    Yes.
19         Q    If I was to get a copy of the first
20    one, P1709150933, what would I be looking at?
21         A    You would be looking at a call log in
22    the computer-aided dispatch that relates to a
23    dispatch request.
24         Q    And what's the significance of having
25    a P number in connection with a protest, if any?
```

ERIC LARSON 4/8/2019

```
 1          A     There is no -- I mean, we use P
 2    numbers for every police call for service.
 3          Q     Okay.  Is there -- can you think of a
 4    reason why Mr. Wall included this column and what
 5    significance, if any, does it have?  Is what I'm
 6    trying to understand.
 7          A     I think the significance is that a P
 8    number was located related to the incident.
 9          Q     But the fact that the P number was
10    referenced here has no significance in terms of
11    what the police conduct was or what the protesters
12    did or what level of force was used or any other
13    issues?
14          A     No, I don't believe so.
15          Q     Simply a call to dispatch is all it
16    is?
17          A     Yes.
18          Q     Okay.  I think that more than enough
19    covers the P number issue.
20                (Off the record.)
21          Q     (BY MR. PRAISS)  The last two columns
22    there titled Resistance and Force.  Do you see
23    those, Mr. Larson?
24          A     Yes.
25          Q     What is your understanding of where
```

ERIC LARSON  4/8/2019

Page 234

1    Mr. Wall would have gotten the information that he

2    included in those two columns?

3         A      That would have come from the I/LEADS

4    reports that were created.

5         Q      Under the column involving Force, do

6    you see some places identify the use of mace?

7         A      Yes.

8         Q      And other places identify the use of

9    chemical munitions; correct?

10        A      Yes.

11        Q      Is there, for purposes of this chart,

12   are those two terms mutually exclusive?

13        A      I would say for the purposes of this

14   chart, they are not mutually exclusive.  The

15   chemical munitions relate -- would relate more to

16   the launching the gas guns, the pepper balls, those

17   type of things.  When he has mace, that would be

18   much more akin to the handheld canister.

19        Q      When he uses "mace," does it also

20   encompass a situation where a fogger is used?

21        A      It could.

22        Q      Do you know one way or the other?

23   Rather than could, does it, is my question?

24   Because the word "mace" appears a lot in many

25   instances and I'm trying to understand when he uses

ERIC LARSON  4/8/2019

1    the word "mace," in his mind is he saying that's

2    the use of the fogger, or the handheld, or both?

3          A     I would say that it is exactly that,

4    it is mace.  And it doesn't delineate which,

5    whether it was the small canister or the high

6    output canister, in the preparation of that.  But

7    it was separate from the chemical munitions being

8    launched by SWAT.

9          Q     So when SWAT launches chemical

10   munitions, using the different techniques that they

11   have, that's under chemical munitions, and for

12   purposes of this chart, when he uses the word

13   "mace," it applies to mace regardless the manner in

14   which it's deployed, whether it's a handheld device

15   or a fogger; correct?

16         A     Yes.

17         Q     Gotcha.  Thank you for that

18   clarification.  Every time there is a reference

19   here to "mace" or "chemical munitions," am I

20   correct that under the Special Order and I/LEADS

21   report, was supposed to have been prepared?

22         A     An I/LEADS report should have been

23   prepared.

24         Q     On this chart which record would

25   identify I/LEADS report that corresponded that

ERIC LARSON  4/8/2019

1    would reflect the use of mace or chemical munitions

2    in connection with that protest?

3         A    The report number.

4         Q    So the report number is the key

5    document if I'm interested to learn about the use

6    of chemical munitions or mace for each protest?

7         A    Yes.

8         Q    Gotcha.  Do you remember we looked a

9    little before at that After Action Critique that

10   you submitted?

11        A    Yes.

12        Q    You recall you were the only one who

13   did so after the Stockley verdict?  My question to

14   you is, is there any reference on this chart that

15   identifies whether or not an After Action Critique

16   was issued and submitted by all of the detail

17   commanders and supervisors with respect to the

18   special/major events identified in these protests?

19        A    There is not a column for them.

20        Q    Okay.  Am I correct that when it

21   talks in the After Action Critique about the

22   handling special/major events, that each of these

23   protests would qualify as a special/major event?

24        A    Not necessarily.  Some of these are

25   pop up protests that we weren't prepared for that

1    we had to respond quickly to.  So an operations

2    plan would not have been created if there was an

3    operations plan for any of -- any of these, and I'm

4    not presently aware which ones may have had one and

5    which ones wouldn't.  The larger ones would have

6    had one if we were prepared for civil disturbance.

7          **Q     So to have an operational planning**

8    **document prepared, if I'm understanding correctly,**

9    **the City has to have some kind of a notice that an**

10   **event's going to happen and in that situation,**

11   **subsequent to that event is when the detail**

12   **commanders and supervisors are supposed to submit**

13   **their After Action Critique; correct?**

14         A     Yes.

15         **Q     Okay.  From your understanding of the**

16   **systems used by the City, how difficult is it to**

17   **search for and determine to what extent an**

18   **operational plan was created for a particular**

19   **protest that's identified here?**

20         A     It would not be difficult.  The

21   operational planning unit would keep a record of

22   the events that they have created details for and

23   they would be on file.

24         **Q     And how difficult would it be to**

25   **determine whether or not all the detail commanders**

ERIC LARSON  4/8/2019

```
 1    and supervisors submitted an After Action Critique

 2    after that event, assuming that there was an

 3    operational plan issued for --

 4         A    It shouldn't be difficult because

 5    they would have been sent to operational planning

 6    for filing just as you received mine.

 7              (Off the record.)

 8         Q    (BY MR. PRAISS)  I'll give you my

 9    highlighter.

10         A    Okay.  Thank you.

11         Q    I would appreciate -- I've gone and

12    done my best but I doubt that I did a very good job

13    so I need to you help me.  Highlight those rows and

14    as you go through it, identify on the record maybe

15    some information, the date, for example, where

16    officers issue a dispersal order and/or use

17    chemical munitions or mace in connection with a

18    protest that's outlined here.  See what I'm asking

19    to you do?

20         A    Yeah.  You're asking for -- okay.

21         Q    Let's slow down.  Let's make sure

22    we're doing the same thing.

23         A    Mm-hmm.

24         Q    So the first one you identified,

25    which I already unbelievably missed, is the second
```

ERIC LARSON  4/8/2019

```
 1    row, correct, where mace was used?

 2         A    Yes.

 3         Q    Okay.  Please take a few seconds,

 4    we'll go off the record and identify and mark, for

 5    your benefit and mine, those incidents where you

 6    see dispersal orders issued over the PA, unlawful

 7    assembly declared, in the columns under Disposition

 8    and in the column under Force where it indicates

 9    that mace and chemical munitions were used.  I'm

10    going to focus on those.

11         A    Okay.

12              (Off the record.)

13         A    Thank you, I believe I'm finished.

14         Q    (BY MR. PRAISS)  Thank you, Mr.

15    Larson, for doing that.  It will make the

16    questioning go much, much quicker, trust me.

17         A    I understand.

18         Q    You notice that on topics 18 through

19    24 it uses the phrase "prior protests," which is a

20    defined term; right?  In the definitions section of

21    the notice?

22         A    Correct.

23         Q    Okay.  And it makes a distinction

24    between those situations when individuals are

25    protesting police conduct or are not; do you
```

1    understand that?

2        A    Yes.

3        Q    So I have one other favor to ask of

4    you.  I'll give you my pen because it's red ink and

5    take your time and go through all the rows and to

6    the extent the particular protest, as the City's

7    representative, you understand involve protesters

8    challenging police conduct, find a way to write

9    maybe the abbreviation I came up with just now of

10   PPC, standing for protesting police conduct.  So

11   what I want is to have the City's understanding of

12   which of these protests involved protesters

13   protesting police conduct.

14            (Off the record.)

15       A    Okay, I'm done.

16       Q    (BY MR. PRAISS)  Thank you, Mr.

17   Larson.  Now this should be just an exercise of

18   looking at your markings.  If you look at the

19   Exhibit A, that you've now highlighted and

20   identified with the abbreviation PPC for protesting

21   police conduct in applicable rows, for March 15,

22   2012, until September 17, 2017, when the Stockley

23   protest took place, during that time period, please

24   let me know how many protests took place in the

25   City of St. Louis where the police either declared

ERIC LARSON  4/8/2019

1    **an unlawful assembly or issued a dispersal order in**
2    **responding to a protest.**
3         A    I'm sorry, both conditions need to be
4    met?
5         **Q    Either condition.  No, no, either**
6    **one.**
7         A    Can you give that to me again?
8    Because I want to make sure I marked this
9    correctly.
10        **Q    Okay.  I'm looking for any protest**
11   **from March 15, '12, the beginning, until the**
12   **Stockley protest, where the police declared an**
13   **unlawful assembly or issued a dispersal order.**
14        A    Okay.
15        **Q    So it will be in the column --**
16   **obviously, we're looking under -- the times when**
17   **you highlight the column under Disposition, and**
18   **just count those for me.**
19        A    Okay.  If my math is correct, it
20   appears to be 16 times dispersal orders were given.
21        **Q    Okay.  Again, my question was, either**
22   **dispersal or an unlawful assembly.  I'm combining**
23   **the two.  I'm not drawing a distinction.**
24        A    That either a dispersal order or an
25   unlawful assembly was committed.

ERIC LARSON  4/8/2019

1          Q    Okay.  So just so the record is

2    clear, and I apologize, but from your review of

3    your highlighting on Exhibit A, it's your testimony

4    there appear to be 16 different instances from

5    March 15, 2012, until September 17, 2017, when the

6    City declared an unlawful assembly or issued

7    dispersal order in responding to a protest; is that

8    correct?

9          A    Yes, the number appears to be 16.

10         Q    I'm puzzled because I only came up

11   with 13, but I believe you.  You probably found

12   instances I forgot to highlight, so I'm looking

13   again at my work real quick.  Looking for the words

14   "dispersal order" or "unlawful assembly" under the

15   column of Disposition and trying to get those added

16   up.

17         A    This time I came up with 15.

18         Q    Okay.  Let's go with your number.

19              MR. DIERKER:  You were talking about

20   prior to September 15?

21              MR. PRAISS:  Up through including the

22   Stockley protest.

23         A    And I counted through the entire

24   list.

25         Q    (BY MR. PRAISS)  And of those 15 rows

ERIC LARSON  4/8/2019

1    where you have identified that the City declared an

2    unlawful assembly or issued dispersal order, of

3    those 15, how many have the abbreviation PPC for

4    protests of police conduct included?  Do you

5    understand my question?

6          A    I do.  I'm --

7          Q    Of the 15 you've just identified, how

8    many have involved the public protesting the police

9    conduct?

10         A    It looks like 12.

11         Q    Fair to say that the vast majority of

12   the instances where the City, the police declare an

13   unlawful assembly or issue a dispersal order, they

14   involve situations where the public was protesting

15   the police conduct?

16         A    I think that there's numerous

17   explanations for that, but yes, based on the list

18   that we've prepared and the questions that you've

19   asked me, those things are -- yes.

20         Q    If you could do me a favor and refer

21   back to your -- the Exhibit A, focusing again on

22   the time period from March 15, 2012, up to and

23   including the Stockley protests, identify the

24   number of instances where the police used either

25   chemical munitions or mace in responding to a

ERIC LARSON  4/8/2019

Page 244

1    protest, and let me know how many instances you

2    come up with.

3         A    I want to make sure I understand you

4    correctly, sir.

5         Q    All I'm asking now is if you look at

6    the use of Force column, use of Force and look for

7    any situations where either "chemical munitions" or

8    "mace" appears, and let me know how many rows you

9    come up there.

10        A    Thirteen.

11        Q    Just to make sure we're referring to

12   the same thing, it's your testimony that there is

13   13 rows in Exhibit A where under the use of Force

14   column the words "mace" or "chemical munitions"

15   appear?

16        A    Yes.

17        Q    Okay.  Of those 13, how many

18   specifically identify chemical munitions, which you

19   have explained is distinct in this case because of

20   use, it's referring to deployment through the SWAT

21   Team or -- but not of mace through a handheld

22   device.

23        A    I believe 5.

24        Q    Going back to the original number you

25   gave me of 13 instances where either mace or

ERIC LARSON  4/8/2019

Page 245

 1    chemical munitions are referenced, of those, how
 2    many rows also include the abbreviation PPC that
 3    you've marked indicating that not only were
 4    chemical munitions or mace used but involved a
 5    protest where the public was protesting police
 6    conduct?
 7             A     Five.
 8             Q     Was there ever a Code 1200 in effect
 9    during the Stockley protests?
10             MR. DIERKER:  Object to form, lack of
11    foundation.
12             Q     (BY MR. PRAISS)  Do you understand my
13    question, sir?
14             A     I do.  I do believe you're asking if
15    a formal Code 1200 was declared, and I know that we
16    had mutual aide units involved, St. Louis City, the
17    Highway Patrol, those would come under the auspices
18    of a 1200.  Whether we actually, quote, declared a
19    1200, I can't say we did using that terminology but
20    we did coordinate with St. Louis County, the
21    Highway Patrol unit -- agencies, which would fall
22    under an umbrella of a potential 1200.
23             Q     In order to bring in those resources,
24    is it a prerequisite that you have to declare a
25    Code 1200?

ERIC LARSON  4/8/2019

1        A      Not as a prerequisite.  1200, because

2    this was more of a planned response to a proposed

3    issue or potential issue, we would do that.  The

4    1200 is really an emergency operations all hazard

5    plan for what we would do in the case of a

6    spontaneous type event.  So I can't tell you that

7    we declared a 1200 in principle or verbiage but the

8    spirit of having mutual aid was performed.

9        Q      **Gotcha.  Did the City consider the**

10   **Stockley protest to constitute a 7250 at any point?**

11              MR. DIERKER:  Objection, form, lack

12   of foundation.

13       A      A 17250, as far as I believe -- is

14   that the unlawful assembly?  Or --

15       Q      **(BY MR. PRAISS)  The Jemerson**

16   **training document I think refers to that?**

17       A      Oh, you're talking about a 7250.

18       Q      **Yes.**

19       A      A barricaded subject.  I'm sorry.

20   No, it would not have fallen under the barricaded

21   subject type of incident command.

22       Q      **Gotcha.  Okay.**

23       A      Sorry for misunderstanding.

24       Q      **No, I'm happy we clarified it.  Give**

25   **me one second to ask my colleague here a question**

ERIC LARSON  4/8/2019

Page 247

```
 1    but I think we may be close to an end, if not
 2    already there.
 3                    (Off the record.)
 4                    MR. PRAISS:  Mr. Larson, I very much
 5    appreciate your patience today and throughout this
 6    whole process.  I have no further questions for you
 7    and thank you very much.
 8                    MR. DIERKER:  Well, regrettably, I do
 9    have a couple.
10                    MR. PRAISS:  Which is always a risk
11    that I may ask a bunch of new questions.
12                    (Off the record.)
13                         EXAMINATION
14    QUESTIONS BY MR. DIERKER:
15        Q     So, Major, I would like to clarify
16    for the record, we've talked about foggers in
17    connection with mace, and is a fogger also known by
18    another term?
19        A     It could be known by a streamer a
20    high output mace.
21        Q     Okay.  And that device, what is the
22    difference between that device and the hand -- the,
23    what I'll describe as the individual handheld
24    device?
25        A     It's a larger container and it shoots
```

ERIC LARSON  4/8/2019

1   a stream farther, dissipates.

2        Q     And as far as its usage, is its usage

3   -- when would an officer use a streamer as opposed

4   to the smaller handheld device?

5        A     The -- they would use the -- a

6   sergeant or above would be issued the larger

7   device.  It would be used as -- the same as the

8   handheld device but when you need a greater range.

9        Q     So it would depend on the

10  circumstances in which the officer feels that it

11  needs to be deployed against an individual or more

12  than one individual?

13       A     Potentially, yeah, it's used

14  primarily with crowd dispersal and crowd control.

15       Q     Okay.  I'd like to call your

16  attention to Deposition Exhibit 14 and I'd like to

17  call your attention to what's Bates stamped CITY

18  00421.  Can you read the headings?

19       A     The heading is Civil Disobedience

20  Response Protocols.

21       Q     And what circumstances does that

22  address, in summary?

23       A     In summary, it's a outline or

24  guideline for the protocols that will be used

25  during a civil disobedience event.

ERIC LARSON  4/8/2019

1      **Q      And any specific protocol or**
2  **circumstance that it's designed for?**
3      A      I mean, I'm not sure I understand
4  your question, sir.
5      **Q      I'll rephrase it.  To what extent, if**
6  **any, does it pertain to dispersal orders or**
7  **announcements?**
8      A      Oh, it talks about the importance of
9  respecting the individuals' First Amendment rights
10  and that law violations and dispersement issues are
11  given appropriately, that warnings need to be
12  given, we need to allow for the appropriate time
13  for persons to vacate the area, and then afterward,
14  the appropriate time, an incident commander or
15  operation commander can indicate that arrests will
16  need to be made for violations of law.
17      **Q      And with regard to the shorthand**
18  **terminology of "kettle," I would like to refer you**
19  **to page CITY 00427 in Exhibit 14, if you could read**
20  **the headings on that?**
21      A      The Civil Disobedience Team -- Civil
22  Disobedience Team Arrest Procedure.
23      **Q      Is there another heading below that?**
24      A      Next is Civil Disobedience Hand-Off
25  Team.

ERIC LARSON  4/8/2019

Page 250

```
 1          Q     And in your understanding, does that
 2     address the situation where arrests from one to far
 3     more than one would have to be dealt with?
 4          A     Yes.
 5          Q     I would like to put on the record
 6     that when we had a recess, did we undertake to try
 7     to get some answers to the camera maintenance
 8     issues that were raised earlier?
 9          A     Yes.
10          Q     And is it your understanding -- what,
11     if anything, is your understanding as to who
12     maintains the camera at 14th and Locust?
13          A     The maintenance of the camera would
14     be the street department, City of St. Louis.  That
15     was the agency I alluded to in my prior testimony
16     as working with us who maintains the camera.  I
17     wasn't sure -- I wasn't 100 percent sure it was the
18     street department and I didn't want to state that
19     without having that confirmed knowledge.
20          Q     And with regard to the video that's
21     actually recorded, is that a matter of software or
22     hardware?
23          A     My understanding is it is a matter of
24     software, not hardware.
25          Q     And the software is maintained by
```

ERIC LARSON  4/8/2019

1   **whom?**

2       A     The software is licensed from the

3   Genetec company who is currently assisting us

4   trying to resolve the issue with the corrupted

5   data.

6             MR. DIERKER:  If I could huddle with

7   Andrew for just a second?

8             (Off the record.)

9             MR. DIERKER:  Nothing further.

10                  RE-EXAMINATION

11  QUESTIONS BY MR. PRAISS:

12      **Q     I have a series of new questions for**

13  **you, my friend.  I'm sorry.**

14      A     I knew you did.

15      **Q     And going in reverse order, the last**

16  **series of questions dealt with video, that is, I**

17  **believe, topic 25 of your deposition, the one that**

18  **you were unable to -- the City's unable to retrieve**

19  **at this point; you understand that?**

20      A     Correct.  I believe we provided a

21  file in all of the files that we have provided and

22  it was determined that we have -- that that file

23  was not functioning properly.

24      **Q     It's the only file from the only**

25  **camera that we cannot access; you understand that?**

ERIC LARSON  4/8/2019

1        A     My understanding was that there were

2     two files from that particular camera on two

3     different dates that couldn't be accessed.

4        Q     But it's that one camera I meant to

5     say?

6        A     Yes.

7        Q     It's only one camera among all the

8     cameras that were used to record the Stockley

9     protest for which -- which is critical in our eyes

10    but, coincidentally, we don't have the ability to

11    view what it recorded.  You do understand that's

12    what we're talking about?

13       A     I do.

14       Q     And it sounds like at some point

15    during the break you made some inquiries about that

16    subject; correct?

17       A     Yes.

18       Q     Who did you call?

19       A     We talked with Lieutenant Brent Feig

20    of the intelligence division, Real Time Crime

21    Center.

22       Q     Okay.  And did you ask him if there

23    was any written communications between anybody on

24    the City side and Genetec with respect to the

25    circumstances relating to the malfunction of this

ERIC LARSON  4/8/2019

1    particular camera and the fact that these video

2    recordings are not retrievable?

3         A     I did not ask him that.

4         Q     Okay.  Is there a reason why you

5    didn't?

6         A     No.  I mean, I know that we're

7    working on trying to get a resolution to this one

8    way or the other, but no, I did not.

9         Q     So sitting here today you still have

10   no knowledge, no different than it was many hours

11   before we were here today, in terms of at what

12   point in time somebody first realized that that

13   camera was malfunctioning back around September 15,

14   2017?

15        A     No.

16        Q     Okay.  Is it fair to say that,

17   sitting here today as the representative of the

18   City on topic 25, you are making an assumption that

19   the camera never recorded rather than that the

20   recording was somehow lost subsequent to?

21        A     No, based on my inquiry into the

22   topic, there is data present in the file.

23   Therefore, the belief is that something was

24   recorded and that somehow the software has not

25   either adequately recorded it or -- for play back,

ERIC LARSON  4/8/2019

1    that's what the whole process is, the investigation

2    is ongoing trying to determine what is there and is

3    it recoverable, but there is data present is what I

4    am told.

5          Q      And at this point, do you know one

6    way or the other if at any time since September of

7    2017, that camera has consistently, up until the

8    last few weeks, malfunctioned consistently and

9    never been able to record for the same software

10   problem that you reference or, to the contrary,

11   somewhere along the line somebody realized there

12   was a problem and they fixed the camera?

13         A      I don't have that answer.

14         Q      Okay.  Counsel asked you a series of

15   questions about Exhibit 14, the OPs plan?

16         A      Yes.

17         Q      Do you have that?

18         A      Yes.

19         Q      Again, I'll work backwards.  I think

20   the last sequence of questions dealt with what's on

21   Bates number CITY 427 and 428.  I'll let you catch

22   up with me.

23         A      Okay.  427, 428.

24         Q      Am I correct the headings on page 427

25   in that situation deals with a Civil Disobedience

ERIC LARSON  4/8/2019

```
 1    Team Arrest Procedure and Civil Disobedience
 2    Hand-Off Team 1?
 3         A    Yes.
 4         Q    Am I correct neither of those
 5    subjects have anything to do with the use of
 6    chemical agents, dispersal orders, or unlawful
 7    assemblies?
 8         A    No.  That's correct.
 9         Q    Okay.  And if you go, please, to the
10    other page that you were directed to, I believe
11    it's CITY Bates number 421 and 422, and am I
12    correct the heading for that section is Civil
13    Disobedience Response Protocols?
14         A    Yes, that is correct, sir.
15         Q    Okay.  Am I correct that the sum and
16    substance of that section under Civil Disobedience
17    Response Protocols is five paragraphs, about half a
18    page?
19         A    That is an appropriate description,
20    sir.
21         Q    Am I correct that the phrase -- the
22    terms "unlawful assembly" and "failure to disperse"
23    appear only one time in a parenthetical on the
24    bottom of CITY 421?
25         A    Yes.
```

ERIC LARSON  4/8/2019

Page 256

```
 1        Q      Am I correct there is nothing in this
 2   section in terms of protocols explaining or
 3   providing guidance under what circumstance, if any,
 4   unlawful assembly or failure to disperse should be
 5   made by police officers?
 6        A      I'm sorry, you lost me, but I --
 7        Q      I'll ask it again.
 8        A      Please.  Thank you.
 9        Q      Am I correct that, other than the
10   fact that the terms "unlawful assembly" and
11   "failing to disperse" appear in a parenthetical,
12   there is nothing in the section that we're looking
13   at, the Civil Disobedience Response Protocol, that
14   advises police officers under what circumstance
15   they can declare an unlawful assembly or issue a
16   failure to disperse declaration?
17        A      Yes.
18        Q      There is no such, nothing else;
19   correct?
20        A      There is nothing there that
21   references that.
22        Q      Am I correct there is nothing in this
23   section under Civil Disobedience Response Protocols
24   that in any way mentions the -- under what
25   circumstance, if any, it's appropriate to use
```

ERIC LARSON  4/8/2019

Page 257

```
 1   chemical agents, whether it's handheld pepper spray

 2   or other chemical agents?

 3        A    No, I don't believe so.

 4        Q    Okay.  And then finally, there was a

 5   reference at the very beginning of the questioning

 6   from counsel about the term "foggers"; do you

 7   recall?

 8        A    Yes.

 9        Q    And you said that there is a name for

10   it also as streamers?

11        A    Some officers refer to it as

12   streamers.  I think there is a lot of confusion on

13   the -- on the topic itself because people tend to

14   use different nomenclature for similar items.

15        Q    Okay.  And that's what I'm trying to

16   focus on.  There is only one actual object, whether

17   it's called a fogger or a streamer, there's not

18   different types, it's one device --

19        A    Right.

20        Q    -- that deploys pepper mace at a very

21   high rate and over a larger area; correct?

22        A    Yes.

23        Q    Okay.  Because the questioning made

24   me at least confusingly understand that you were

25   suggesting there is different types, and that's
```

ERIC LARSON  4/8/2019

 1    incorrect?

 2         A     No, it's one particular.  There's the

 3    handheld canister and the high output, which is

 4    called by multiple different names.

 5         **Q     Regardless of what name it's called,**

 6    **is it fair to say that the high output fogger, by**

 7    **its nature, disperses a greater amount and over a**

 8    **larger area of pepper spray than the handheld**

 9    **device?**

10         A     I think it launches pepper spray at a

11    greater distance.

12         **Q     But also not only at a greater**

13    **distance but over a wider range?**

14         A     It could spread, I would assume.

15         **Q     It's not necessarily -- you're not**

16    **telling me it's designed to only fire a very narrow**

17    **stream that goes a longer distance; it also has the**

18    **capability and it does in fact spray over a wider**

19    **range than a handheld device?**

20         A     I don't have an answer as far as like

21    I feel like you're asking a very technical question

22    about the stream.  It goes out.  It goes out at a

23    distance.  As it's going out, it could disperse and

24    -- but as far as that goes, that's the best answer

25    I can give you.

ERIC LARSON  4/8/2019

1      **Q      Okay.  And do you recall very early**

2   **on today we looked at, for example, what we marked**

3   **at Exhibits 8 and 9 of your deposition.  In**

4   **particular Exhibit 8, do you recall you testified**

5   **that there is a significant area that -- it's in**

6   **the light blue color -- that is indicative of a**

7   **very large spray range, based on the use of a**

8   **fogger is what it appears to be?**

9      A      Potentially based on the fact that

10   that's assuming that this is in fact that that

11   cloud is an OC mace chemical.

12      **Q      Can you think of anything else that**

13   **was used by the police in connection with the**

14   **kettle that would generate that kind of a spray**

15   **mist over a group of people?**

16      A      No, I cannot, other than inert smoke

17   perhaps, but I don't believe that that would be

18   applicable.

19      **Q      You would not use inert smoke -- gas**

20   **with a group of people surrounding you?**

21      A      No, generally not.

22            MR. PRAISS:  I have no further

23   questions.

24            MR. DIERKER:  I think for the record,

25   we already made it clear that there were some loose

ERIC LARSON  4/8/2019

 1   ends that we need to tie up and produce some

 2   additional documents, and because there was some

 3   duplication in topics between this case and the

 4   Molina case, we are anticipating a further 30(b)(6)

 5   deposition involving the Molina case primarily, but

 6   I just want to put on the record that we are

 7   agreeing that the additional materials that are

 8   provided in connection with this case can be the

 9   topic of further deposition at the time of the

10   Molina 30(b)(6).

11          MR. PRAISS:  Since you're putting

12   this on the record, I'll ask one point question.  I

13   mean, I am here and clearly I would love to wrap up

14   this issue about the training.  And my

15   understanding, Andrew, from what you said, is that

16   you followed up and determined that there is in

17   fact additional training materials, a PowerPoint.

18          And my question is, I'm happy to wait

19   a few minutes.  If you have access to it right now,

20   I would ask let's print it out and let me ask the

21   witness some questions rather than waiting a month.

22   It makes no sense.  I'm here, Jessie's here, and I

23   think that document is -- it's a single document.

24   It's very different than everything else that was

25   encompassed in your statement.

ERIC LARSON  4/8/2019

 1              So if you have it right now, let's

 2    print it out, no different than all the ones you've

 3    printed out so far today.  I can wait a few

 4    minutes.

 5              MR. WHEATON:  That was my hope and I

 6    requested that it be sent as soon as possible.

 7    Unfortunately, I don't have these additional

 8    materials yet.  I don't anticipate having them

 9    within the next few minutes.  I do anticipate

10    having them within the next few days.

11              MR. PRAISS:  I'm sorry to hear that.

12    With that in mind, I have no further questions.

13              THE REPORTER:  Signature?

14              MR. DIERKER:  We'll read and sign.

15              (Wherein, the taking of the instant

16    deposition ceased at 5:24 p.m.)

17              (Deposition to be read and signed by

18    the witness.)

19

20

21

22

23

24

25

ERIC LARSON  4/8/2019

```
 1                  CERTIFICATE OF REPORTER

 2

 3            I, TARA SCHWAKE, a Registered

 4   Professional Reporter and Notary Public within and

 5   for the State of Missouri, do hereby certify that

 6   the witness whose testimony appears in the

 7   foregoing deposition was duly sworn by me; that the

 8   testimony of said witness was taken by me to the

 9   best of my ability and thereafter reduced to

10   typewriting under my direction; that I am neither

11   counsel for, related to, nor employed by any of the

12   parties to the action in which this deposition was

13   taken, and further that I am not a relative or

14   employee of any attorney or counsel employed by the

15   parties thereto, nor financially or otherwise

16   interested in the outcome of the action.

17

18

19            _____

20                  Notary Public in and for

21                  The State of Missouri

22

23

24

25
```

ERIC LARSON  4/8/2019

```
 1                    ALARIS LITIGATION SERVICES

 2

 3   April 12, 2019

 4
     Mr. Robert Dierker
 5   OFFICE OF THE CITY COUNSELOR
     1200 Market Street, Room 314
 6   St. Louis, Missouri  63103

 7   IN RE: MALEEHA AHMAD, et al. v. CITY OF ST. LOUIS,
            MISSOURI
 8
     Dear Mr. Dierker:
 9
     Please find enclosed your copies of the deposition of
10   ERIC LARSON taken on April 8, 2019 in the
     above-referenced case. Also enclosed is the original
11   signature page and errata sheets.

12   Please have the witness read your copy of the
     transcript, indicate any changes and/or corrections
13   desired on the errata sheets, and sign the signature

14   page before a notary public.

15

16   Please return the errata sheets and notarized

17   signature page within 30 days to our office at 711 N

18   11th Street, St. Louis, MO 63101 for filing.

19

20   Sincerely,

21

22

23   TARA SCHWAKE

24

25   Enclosures
```

ERIC LARSON  4/8/2019

```
 1                    ERRATA SHEET
      Witness Name: ERIC LARSON
 2    Case Name: MALEEHA AHMAD, et al. v. CITY OF ST. LOUIS,
               MISSOURI
 3    Date Taken: APRIL 8, 2019

 4

 5    Page #_____   Line #_____

 6    Should read: _____

 7    Reason for change: _____

 8

 9    Page #_____   Line #_____

10    Should read: _____

11    Reason for change: _____

12

13    Page #_____   Line #_____

14    Should read: _____

15    Reason for change: _____

16

17    Page #_____   Line #_____

18    Should read: _____

19    Reason for change: _____

20

21    Page #_____   Line #_____

22    Should read: _____

23    Reason for change: _____

24

25    Witness Signature: _____
```

ERIC LARSON  4/8/2019

Page 265

```
1    STATE OF _____)

2

3    COUNTY OF _____)

4

5    I, ERIC LARSON, do hereby certify:

6         That I have read the foregoing deposition;

7         That I have made such changes in form

8    and/or substance to the within deposition as might

9    be necessary to render the same true and correct;

10        That having made such changes thereon, I

11   hereby subscribe my name to the deposition.

12        I declare under penalty of perjury that the

13   foregoing is true and correct.

14        Executed this _____ day of _____,

15   20___, at _____.

16

17

18

19                         _____

20                         ERIC LARSON

21

22                         _____

23                         NOTARY PUBLIC

24   My Commission Expires:

25
```

ERIC LARSON   4/8/2019

| **A** | 96:12 172:4 | 77:2 81:14,15 | adequate | 109:16,21 |
|---|---|---|---|---|
| a.m 7:13 | 193:14 200:21 | 81:20,24 | 166:17,20,23 | 110:19 111:4,6,8 |
| abbreviated | accurately | 82:19 84:10,15 | 167:2 | 111:12 112:9 |
| 105:21 | 88:25 | 84:18 85:9 | adequately | 116:18 120:6,8 |
| abbreviation | acknowledged | active/passive | 26:21 253:25 | 121:16 123:4 |
| 22:6 106:8 | 183:10 | 74:8 | adhere 179:20 | 128:9 132:20 |
| 124:23 151:19 | acknowledgm... | actively 72:20 | adjudicated | 133:22 134:23 |
| 240:9,20 | 105:16,17,20 | 72:23 73:7 | 51:2 | 134:24 135:17 |
| 243:3 245:2 | ACLU 5:4 7:19 | 74:24 75:24 | adopted 116:13 | 136:18 138:4 |
| Abby 5:19 | 90:24 | 77:8 81:6 | adopting 109:8 | 139:6 140:1 |
| abilities 30:11 | act 60:14,24 | 82:15 | 152:13 | 141:9 142:6,15 |
| ability 9:4 30:19 | 81:24 176:25 | activities 28:9 | advantageous | 142:25 143:12 |
| 40:17 41:17 | 177:3,7,11,19,21 | 28:25 73:17 | 31:9 | 144:3,10 |
| 252:10 262:9 | 177:22 178:10 | activity 16:7 17:3 | advisable 31:6 | 146:15 147:11 |
| able 47:13 52:5 | 180:4,21 181:6 | 27:18 28:1 | advise 85:9 | 147:24 148:11 |
| 219:14 254:9 | 181:15 182:13 | 46:25 94:18 | 96:2 | 149:8,13,19,24 |
| above-refere... | 185:20 195:18 | 94:24 95:19 | advises 256:14 | 150:5,23,24 |
| 263:10 | 220:25 | 95:23 99:25 | advising 76:18 | 151:1 184:15 |
| absent 96:15 | 221:23 | 100:11 101:22 | advisor 155:25 | 185:9 186:13 |
| 99:21 100:8 | acted 60:22 | 103:14 104:24 | afternoon 4:15 | 186:15,21,23 |
| absolutely 71:17 | 182:15 185:20 | 105:8 184:21 | 131:7 139:15 | 187:4,8,11 |
| 100:17 | acting 11:21 | 185:10,16 | 160:20 | 223:2 255:6 |
| absorb 104:19 | 76:17 93:19 | 186:2 191:18 | afterward | 257:1,2 |
| abundantly | 122:10 124:2 | 192:17 | 249:13 | ago 8:11 18:4 |
| 120:1 | 124:25 125:7 | acts 171:19 | age 7:9 | 21:15 49:2 |
| abuse 199:5 | 125:18 126:21 | 172:14,16 | agencies | 53:19 57:4 |
| academy 81:13 | 127:5,9 183:14 | 173:24 174:6,9 | 245:21 | agree 22:4,12 |
| 139:5 144:16 | 186:17 | 175:1,25 191:2 | agency 54:16 | 22:16,23 57:8 |
| 144:17,25 | action 3:8 78:14 | 193:9,14 | 152:23 250:15 | 71:11 78:24 |
| 145:14 146:24 | 78:15 80:3,4,6 | actual 29:13 | agent 90:7 111:7 | 96:19,24 97:7 |
| 146:24 148:13 | 80:15 96:5 | 78:12 106:7 | 112:5 121:17 | 98:3 99:21 |
| 148:17 | 144:10 153:14 | 141:6 168:9 | 134:17 138:13 | 100:8 113:11,15 |
| accept 126:7 | 159:17 160:16 | 170:10 219:6 | 148:14 | 119:23 123:2 |
| 128:20 | 162:5,6,19,21 | 225:24 | agents 22:20 | 123:24 124:13 |
| acceptable 9:1 | 162:22 163:13 | 257:16 | 29:4,9,13 67:1 | 126:14 127:17 |
| 9:2 22:13 | 163:20,21 | add 79:16 117:18 | 67:10,23 76:8 | 130:13,19 171:1 |
| 60:9 | 164:11,14,25 | added 242:15 | 84:24 85:2 | 172:13,19,25 |
| access 42:2 | 165:1,10,11,18 | additional 10:24 | 89:7,12,21 | 178:4,5 |
| 45:13 157:7 | 165:24 | 260:2,7,17 | 91:8,12 94:11 | 189:24 194:16 |
| 251:25 260:19 | 226:25 227:4 | 261:7 | 94:16,23 96:3 | 199:16 |
| accessed | 227:7 231:2 | address 248:22 | 96:9,14 97:11 | Agreed 7:1 |
| 252:3 | 236:9,15,21 | 250:2 | 97:16,19 98:8 | 198:19 |
| accreditation | 237:13 238:1 | addresses | 98:17,23 99:9 | agreeing 172:15 |
| 146:5 149:21 | 262:12,16 | 166:13 | 99:13 100:2 | 173:25 260:7 |
| accurate 9:5 | actions 61:15 | addressing | 101:20 103:7 | agreement 2:21 |
| 40:15 73:2 | 113:19,22 | 162:5 | 103:12,19,22 | 92:1,6,11,14,16 |
| | active 74:10,23 | adduced 10:10 | 105:1 108:24 | 92:22,24 |

ERIC LARSON  4/8/2019

93:9 94:3,7,16
97:12,20 98:9
98:14,20 99:7
99:14,21 100:8
102:24 103:5
103:18,23
104:3 109:1,6
109:11 111:2,13
111:22 112:9,14
116:7,10 128:8
136:19 171:6
173:5,6,7
174:15 175:12
175:15,20
177:25 181:23
182:13 183:22
185:9 198:23
198:24
**Agrees** 188:8
**ahead** 174:3
180:13
**Ahmad** 1:5 4:5
7:20 10:3,5
18:12 24:10
263:7 264:2
**aid** 246:8
**aide** 245:16
**air** 152:10
**akin** 234:18
**al** 1:5 4:5 92:5
263:7 264:2
**Alaris** 6:3 263:1
**allow** 42:2
122:6 192:1
249:12
**allowed** 17:1
71:21 74:18
**allowing** 76:15
**allows** 75:3
77:25
**alluded** 250:15
**Alpha** 33:13
**Altogether** 14:11
**amazing** 12:11
**amend** 157:1
158:12
**amended** 2:13

20:24 23:20
66:5,17 143:5
**Amendment**
30:4 32:15
34:21 197:21
199:20 249:9
**amount** 37:20
81:19 258:7
**and/or** 138:2
197:7 238:16
263:12 265:8
**Andrew** 5:20
251:7 260:15
**announcement**
65:13
**announceme...**
186:4 249:7
**answer** 17:22
18:5 48:13
65:6 72:15
75:13 76:22
78:5 79:18
97:17 99:4
107:25 108:1,5
120:15 121:7
126:7 145:19
175:7 185:25
186:25 192:1
197:4,25
209:22
213:22 217:2
254:13
258:20,24
**answered** 17:13
58:22 161:24
201:22
**answering**
27:16 192:12
**answers** 8:21
9:5 54:2,4
104:1 150:10
250:7
**anti-crime** 14:7
**anticipate** 8:18
183:12 261:8,9
**anticipating**
260:4

**anticipation**
88:12
**anybody** 24:23
71:18 87:8
91:2 93:19
125:18 126:21
132:3 162:8
174:16 176:8
182:15 188:22
227:22
252:23
**anyways** 57:7
**apart** 64:12
211:13
**apologize** 41:8
43:1 58:21
91:4 143:18
169:14 175:6
179:1 190:16
198:2 199:6,8
242:2
**apparently** 24:8
51:14,23
165:21
**appear** 175:21
211:23 242:4
244:15
255:23 256:11
**APPEARANC...**
5:1
**appears** 118:12
119:5 129:21
130:1,7 174:7
231:20
234:24
241:20 242:9
244:8 259:8
262:6
**applicable** 161:8
211:5 229:15
229:25
240:21 259:18
**application**
78:8,10 122:15
197:18
**applied** 77:19
95:4 116:12

168:22
**applies** 104:4,13
115:1 136:17,23
210:5 235:13
**apply** 22:8,17
22:24,25
124:9 184:18
184:19
**appreciate** 10:11
17:22 28:12
99:5 162:1
175:7 238:11
247:5
**approach** 103:4
152:9,16
180:16 183:11
**appropriate**
97:8 135:19
135:22 149:8
149:9,24
150:22 152:15
158:11 192:4
195:10 249:12
249:14 255:19
256:25
**appropriately**
77:7 90:23
249:11
**approval** 216:12
**approved** 50:3
**approximately**
11:12,18 12:3
68:22 159:22
**April** 1:19 4:14
12:7 13:15,18
263:3,10
264:3
**area** 15:18 46:21
96:25 100:5
105:3 119:15
119:21 120:24
121:22 123:15
129:23 130:17
131:24 132:12
132:13 135:23
208:22 211:1,8
211:16 212:7

213:13 214:14
249:13 257:21
258:8 259:5
**areas** 15:16
41:15 169:8
**argumentative**
72:15 75:24
79:8 185:23
193:21 196:14
213:21 217:1
**arm** 78:18
**arms** 74:22
82:17
**arrest** 32:24
50:12,15,24
69:21 70:4,5
70:13,16,18
71:5,13 72:9
79:2 80:19,20
82:1 83:3
85:11 113:21
119:5 125:3
127:3 133:11
135:3,4 136:1
137:7 152:1,21
184:1 194:25
195:16 196:23
200:14
249:22 255:1
**arrested** 32:17
32:17 50:23
186:6,8,12
191:2,4
**arresting** 32:16
195:21
**arrests** 113:8
120:17 125:7
126:4 127:1,18
135:8 225:21
228:18 229:5
230:8 231:20
249:15 250:2
**arson** 12:24
**articulable**
185:18 194:7
194:10,13
208:16 215:4

ERIC LARSON  4/8/2019

ascertain
  200:20
asked 55:9
  58:21 79:25
  104:2 206:25
  243:19 254:14
asking 8:15
  54:6,7 76:2
  79:2 88:22
  140:9 173:12
  173:13 177:14
  179:2 184:24
  191:5,24
  230:2 238:18
  238:20 244:5
  245:14 258:21
asks 71:14
  143:10 163:23
aspect 32:20
aspects 28:8
  152:20
assemble
  170:22 176:22
  180:3,17
assembled
  171:21 175:5
  185:17 188:14
assembles
  188:5
assemblies
  255:7
assembly 3:14
  169:6,9 170:21
  171:20 172:24
  173:16,22
  174:5,10,20
  175:2,10 176:1
  178:8,15,16,18
  180:2 181:4,13
  182:2,18 184:2
  184:12 185:6
  186:8,12,16
  187:15 189:16
  189:22 190:3
  190:13 193:4,8
  193:18 194:1,18
  197:9,14,16,24

198:7,13,18
199:17,23
200:9,15,16
200:20 201:8
201:15 202:5
202:21
204:20
207:13 208:13
208:18 211:9
212:9 213:4
215:1,5,11
216:18 217:23
217:24 218:3
218:8,10,23
223:3 239:7
241:1,13,22,25
242:6,14
243:2,13
246:14
255:22 256:4
256:10,15
assert 79:14,15
assessment
  215:3
assigned 25:14
  25:18 27:23
  33:16,20 61:13
  61:25 166:23
  224:9
assignment
  14:2 25:13
  62:4 65:5
assist 25:18
  44:22 68:20
  224:10
assistant 16:18
  16:23 19:2
  87:19
assisting 251:3
associate
  232:2
associated 38:6
  58:12 227:5
  230:24 231:21
  232:7,16
associates
  230:21

assume 8:25
  21:5 34:14
  41:11 44:19,25
  45:5 50:15
  118:7 134:14
  146:19,22
  147:13 162:10
  227:2 258:14
assumed 33:7
  42:4
assumes 120:13
  213:20
assuming
  119:24 193:13
  193:23 238:2
  259:10
assumption
  54:23 148:5
  253:18
assure 10:17
  131:12
attach 106:7
attached 3:5,21
  3:25 101:24
  155:15 223:22
attachment
  18:11 156:3
attempt 28:22
  29:3 74:24
  79:2
attempting
  120:19
attempts 183:4
  214:18,23
attention 44:21
  61:3 86:1
  248:16,17
attorney 7:19
  75:15,17,23,24
  179:24 207:18
  262:14
attorneys 20:7
  24:22 25:3,6
  25:23 26:15
  26:24 87:8
  110:11 224:4
audio 27:13

28:17
August 12:3
  86:10 140:5
  202:14 222:21
auspices
  245:17
author 224:19
authority 93:22
  94:4 197:8,14
  202:8 204:10
  215:1,6,9
  217:5
auto 14:8
auxiliary 37:10
available 42:19
  95:15 111:9
  122:18,20
  131:24 222:13
  230:13
aviation 14:5
avoid 78:23
  152:25
aware 8:9 9:16
  19:23 20:13
  27:3 28:15
  30:7 31:16
  44:2 46:18
  49:3 53:10
  57:23 64:16
  84:12 87:11
  114:8,14,16,20
  116:20,22
  122:22 124:24
  127:8 139:24
  141:6 142:3
  143:17,25
  144:8 156:9
  157:13,13
  164:22 167:17
  172:10 174:9
  187:1 190:17
  191:1 192:21
  192:23 207:10
  214:18,23
  216:9 222:25
  223:7 237:4

**B**
B 101:24 102:2
  108:17
back 28:14
  30:10 37:5
  52:13 54:22
  55:13 56:2
  57:13 70:19
  76:10 82:23
  100:19 125:12
  131:6 147:19
  156:7 158:16
  167:18 169:11
  170:15 185:7
  192:14 203:4
  212:11 213:9
  213:15 214:3
  218:2 231:3,8
  243:21
  244:24
  253:13,25
background
  9:22 11:4
backside 62:18
backwards
  254:19
balls 234:16
barricaded
  246:19,20
based 64:25
  98:9 104:8
  120:22 130:1
  135:3,25
  164:17 179:8
  193:22 194:6
  197:16 198:5
  198:20 200:11
  206:1 208:16
  213:4 215:3
  226:4 243:17
  253:21 259:7
  259:9
basically 8:15
  41:10 93:20
  94:14 134:6
  153:3 204:16

ERIC LARSON  4/8/2019

210:9
basis 74:4 77:17
77:18 193:16
193:17 201:2
229:6
basket 37:24
Bates 62:18
63:10 83:14
83:20 84:2
248:17 254:21
255:11
Baumgartner
2:23 101:9
131:16
Baumgartner's
101:18 102:3
105:13 108:14
108:17 109:24
Bear 30:16,17,19
30:23,25 31:4
began 11:16
beginning
147:25 241:11
257:5
begins 83:13
208:12 218:2
behalf 1:18 9:14
93:19 157:20
157:21
behavior 183:7
183:8
belaboring
190:16
belief 253:23
believe 12:3
16:4,23,25
18:13 19:9
21:21 28:9,22
28:24 29:3,8
30:12 31:20
32:7 33:22,23
34:3 36:15,20
37:10 40:1,5,11
41:23 42:3,11
42:20 43:4,19
44:11 45:16
47:19,23,23

48:1,14 52:2
52:16,24 53:9
56:25 57:17
60:25 64:3
67:9,13,16
68:4 73:3
81:12 85:17
86:18 87:20
87:24 88:5,5
88:14 91:23
92:12,12,18
93:11,13,13
99:10 102:21
107:7 110:5
111:17 112:22
126:18 133:5
136:7 138:19
139:21 140:23
141:21 146:4
150:7,25 151:2
152:11 155:1
156:5,17 158:5
159:20,24
160:10 161:17
168:6 170:8,11
172:4,6 185:2
186:9 196:9
198:9 200:23
202:11,23
205:6,10
211:20 217:13
218:24 219:4
222:11 224:21
225:2,4,6,10
225:15 230:16
233:14 239:13
242:11 244:23
245:14 246:13
251:17,20
255:10 257:3
259:17
believes
202:20
benefit 81:3,4
144:6 145:3
239:5
best 17:20 21:13

23:14 29:11
30:21 32:4
46:11 47:1,2
52:7 53:7
60:6 81:4
122:18 141:13
152:6 153:12
153:13 165:8,9
194:21 195:13
195:20 196:6
196:17,23
201:6 238:12
258:24 262:9
better 79:21
121:10 128:16
151:8 153:11
167:9,14,23
199:15
beyond 43:15
56:16,16
Bicycle 28:10
29:20
big 37:24 65:17
215:23
bit 9:22 11:8
12:20 16:12
37:17 68:10
73:21 118:19
124:18 137:11
142:19 171:20
192:6 213:11
biyearly 201:2
blank 208:4
blended 116:19
block 51:18,18
164:4
blocks 211:9
blue 118:9
259:6
blurry 137:11
bodily 99:22
100:9 124:11
125:2,19
bomb 12:24
bother 91:2
bottom 93:17
99:11 118:9

232:8,14
255:24
break 57:9
73:20 100:16
100:20,22
117:14 128:23
131:3,7,8
145:22 160:22
174:16 198:2
202:25 211:13
215:24 252:15
Brent 252:19
brief 106:2
briefing 61:11
briefly 11:3 151:5
bring 44:21
70:24 245:23
broad 15:14,15
broadly 15:10
brought 85:25
buck 121:9
built 204:16
bulk 17:3
150:25
bullet 194:24
221:15
bunch 119:3
128:4 247:11
burned 59:2
button 107:20
bystanders
184:11

_____

**C**

C 109:23 131:19
C-A-L-E-A 164:9
call 45:1 64:7
66:12 161:15
162:7 166:16
166:19 230:22
231:23 232:21
233:2,15
248:15,17
252:18
called 42:20
257:17 258:4
258:5

calling 20:4
79:9 125:13
173:10 178:21
185:23
calls 44:5 75:12
120:14 190:6
camera 30:22
36:2 41:25
42:6,17 43:5,9
43:11,23 44:14
44:16,20
45:18,22
47:12 48:1
49:21 51:13,19
51:23,25
52:12,17,21
53:6,10,15,18
54:11,21,23
55:12,17 56:15
56:19 57:5,21
57:24 58:6,17
118:7 250:7,12
250:13,16
251:25 252:2
252:4,7 253:1
253:13,19
254:7,12
cameras 27:25
27:25 28:4,7
28:11 29:21,25
41:13,20 42:3
42:4,8,9,14,22
42:22 43:20
45:14 51:18
54:17 57:19
61:14 252:8
canister 234:18
235:5,6
258:3
canisters 132:10
capabilities
30:15 31:1
capability 30:8
31:3,13 39:23
41:11 43:14,15
45:16 258:18
capacity 221:12

ERIC LARSON  4/8/2019

capital 132:22
capitalized 164:8
captain 12:1,23 14:4
captains 87:20
capture 28:5 37:21
captured 46:24
captures 119:1 202:16
capturing 41:10
car 48:1 49:21 57:19,21,23 58:6,10,17
cards 36:2
career 12:12 68:11
carefully 118:8 191:15
Carl 3:5 155:5 155:13,24
cars 57:21,22
case 1:7 2:22 4:7 7:20,22 10:8,10 18:14 20:18,25 24:11 24:12 38:14,21 38:25 39:8 45:24 55:15 64:11 133:15 133:20 134:13 153:6 165:20 196:17 228:21 244:19 246:5 260:3,4,5,8 263:10 264:2
case-by-case 229:6
cases 10:3 24:9 36:1 89:10,15 144:22 226:3
catch 158:17 254:21
caught 124:3 126:16
cause 197:16,19

198:9 200:12 204:18,19
causing 80:9
CCR 6:2
CD 33:13,13
CDT 32:7 33:2 33:3,10,23 34:13,16 40:11 40:14 59:24 61:9,21 139:5 139:6 141:4 144:15,16,19 145:11,13 146:23 148:22 148:24 150:7 150:16 225:7
cease 210:21 211:16,18,21
ceased 261:16
center 28:3 29:19 35:21 36:21,24 41:2 41:6,16,17,22 43:21,22 45:8 45:11,20 46:9 46:19 47:8 48:2 49:7 50:8 53:22 54:15 58:6 69:13 225:5 252:21
central 132:14
certain 28:7 30:11,19 34:25 93:22 106:12 132:23 152:20 159:12 173:24 214:14
certainly 31:14 85:22
certainty 162:3
CERTIFICATE 262:1
Certified 4:19 4:20,20 7:4
certify 262:5 265:5

chair 82:18
challenge 192:22,24
challenging 240:8
chance 104:19 155:18,20 169:2 206:21
change 153:4 161:18 181:20 264:7,11,15,19 264:23
changed 217:5
changes 15:22 15:23 16:4 17:8,11 44:1 64:6,14 65:16 66:8,16 153:17 156:9,15 158:8 263:12 265:7 265:10
Chapter 3:9
characterize 15:11
characterized 216:16
charge 13:13 14:3,16 37:4,11 37:18 135:5 194:25 195:16 199:17 201:4
charged 125:8 174:20 175:10 181:3 182:1,17 182:23 185:6 188:23 198:24
charges 229:5
charging 190:9 193:16
Charles 3:21 25:9,21 26:4 26:8,25 223:21 224:2
Charlie 227:2
chart 234:11,14 235:12,24 236:14

check 115:23
checking 228:1
chemical 22:20 29:4,9,13 31:5 67:1,10,23 76:8 84:24 85:2 89:7,11 89:21 90:7 91:8,12,16,18 91:21 94:11,16 94:22 96:2,6 96:9,14 97:11 97:15,16,19,24 98:4,8,17,22 99:9,13 100:2 101:20 103:7 103:12,19,22 105:1 108:24 109:16,21 110:19 111:4,6,7 111:8,12 112:5,6 116:18 120:6,8 121:16,17 123:4 128:9 132:19 133:21 134:16 134:22 135:17 136:18 138:4 138:13 139:6 140:1 141:9 142:6,15,25 143:12 144:3 144:10,20 146:15 147:10 147:24 148:11 148:13,19 149:7,13,19,24 150:5,23,23 151:1 184:14 185:9 186:13 186:15,21,23 187:3,7,11 204:5,21 209:15 218:25 221:5,25 223:2 234:9 234:15 235:7 235:9,11,19

236:1,6
238:17 239:9
243:25 244:7
244:14,18
245:1,4 255:6
257:1,2 259:11
chief 2:18 15:19 16:14,18,20,23 17:14 19:2 87:19,19
chief's 159:20
choice 127:16
choose 111:3
Christine 87:25
chronological 11:5
chronologically 231:25
circumstance 72:6 73:2 95:4 103:6 138:12 141:8 142:14 143:12 144:2 150:4 152:15 175:11 179:8 185:2 217:20 249:2 256:3,14,25
circumstances 51:5 55:16 57:1 71:20 73:19 85:10 94:11 99:21 100:8 113:9,12 113:13 115:2 122:16 126:3 138:3,18 140:1 142:5 173:23 182:25 217:9 218:16 248:10 248:21 252:25
citizen 32:14 179:7
city 1:8 2:16,16 2:17,19 4:8,16 4:17 5:14 7:21

9:14 15:3 21:1
22:5,6,7
23:24 27:7,11
28:4,15,22
29:3,8,15
30:14 31:7
39:23 41:3,11
41:12,15,20
42:5,9,10,12
43:10,10,19,24
43:25 44:5,15
44:22 45:7,14
45:18 46:20
47:15 48:8,16
49:17 50:7,19
50:19 51:6
52:5,21,22
53:15 54:11,16
55:7,18,19
57:6,19 58:3
62:18 72:5
75:2 76:6
77:22,24
83:14,17 84:2
85:7 86:9
88:17 94:1,6
94:18 109:9,14
109:19 111:3
116:4,13,17
122:6 133:25
138:1,17
142:23 145:10
151:15,23
152:4,13 153:3
153:15,23,24
155:6 156:10
156:21,25
157:21 158:5,11
165:25 166:4
171:25 172:2
176:4,14 179:5
179:11,15
180:22 182:10
184:11 191:18
192:17 196:6
197:7,12
200:3,17

202:20 205:3
209:11 213:15
214:3,10 215:8
215:21 216:15
224:9,25
226:10 229:8
237:9,16
240:25 242:6
243:1,12
245:16 246:9
248:17 249:19
250:14
252:24
253:18 254:21
255:11,24
263:5,7 264:2
City's 31:2 41:23
61:3 73:1 76:7
76:14 88:25
96:1 110:11,22
110:25 112:13
112:19 121:8
142:13 157:6
158:19 161:7
166:3 171:13
174:12 175:9
177:17 178:3,16
179:8,25
180:5 181:3
182:6,17
183:18 184:3,5
184:8 185:4,15
186:14 187:14
189:25 194:8
195:9 198:21
202:4,16 211:3
211:11 213:4
216:1 217:4
218:15 240:6
240:11 251:18
civil 2:15 3:15,18
33:5 73:6
144:21 145:6,7
149:1 206:10
220:9,21,25
221:22 222:5
222:24 237:6

248:19,25
249:21,21,24
254:25 255:1
255:12,16
256:13,23
clarification
32:5 33:5
83:23 235:18
clarified 246:24
clarify 247:15
clarifying 137:21
classes 144:16
classified 39:7
classroom
140:7
clause 180:1
clear 8:20 20:5
22:25 33:4
56:5 58:23
95:7,25 96:13
100:1 104:25
120:1 147:19
155:4 157:5
158:1 179:22
208:24 210:5
242:2 259:25
clearest 88:21
clearly 34:19
42:7 188:19
260:13
close 57:14
68:24 113:13
131:10 137:22
247:1
closed 231:4
cloud 259:11
clue 181:24
clueless 183:24
code 231:1
245:8,15,25
cognizant 171:19
172:8,10,14,18
173:6,24 174:6
174:14,19
175:24
coincidence
213:9

coincidentally
252:10
colleague
246:25
collect 40:17,19
59:25
collected 40:21
59:19
collecting
59:22 65:14
collection 33:14
40:14 51:15
collectively
97:15
colonel 14:4
16:17
colonels 87:19
color 259:6
column 227:8
227:15 230:14
231:11 232:15
233:4 234:5
236:19 239:8
241:15,17
242:15 244:6
244:14
columns 225:16
227:16 233:21
234:2 239:7
combining
241:22
come 15:20
34:12,13 36:2
52:18 56:2
61:3 66:3
79:12 135:13
152:8,22
212:11 213:15
214:3 227:10
228:16,18
234:3 244:2,9
245:17
comes 45:22
66:12 213:9
coming 66:13,13
151:25 183:11
command 12:4

15:20 16:17
73:24 86:19
87:13,16,18
88:3 159:16
161:19 189:20
197:22 246:21
commander
12:9 13:14,17
13:20 14:3
37:10 69:12
132:21 133:3,5
148:22,22
149:4 152:7
167:12 191:13
194:2 197:23
215:15,18
216:5,7,7,12
249:14,15
commander/d...
12:9
commanders
92:13 135:12
160:6,6 164:9
164:15,23
165:5,12,16,18
166:6 208:10
236:17 237:12
237:25
commands
120:9
commenced
7:13
commented
167:1
comments 10:12
commercial
14:6
commission
107:19 178:9
181:5,14
265:24
commissioned
11:11 105:15
107:6
commissioners
105:24
commit 10:25

ERIC LARSON  4/8/2019

180:21 182:13
190:1 193:2
commits 170:20
188:4
committed
171:20 175:3
175:25 241:25
committing
74:23 189:10
common 169:5
172:9 177:21
194:11 199:24
203:7 211:12
215:13
communicate
213:10
communicated
44:17 114:22
communicating
44:24
communication
17:17 19:3,7,11
19:13 45:7
107:18 178:2
communicatio...
20:4,7,14
114:21 252:23
company 43:3
43:4 251:3
compare
102:22 111:10
compared
96:22 225:25
compatible
42:23
compiled 35:10
compiling
52:25
complaint 38:6
38:9,22,24
39:2,3,8,13,17
49:14 50:10
58:12 135:7,11
135:14 136:2
230:23,24
complete 14:25
36:25 68:1

105:25 164:10
165:17
completed 35:8
45:4,6
completely
27:16 56:16
160:15
complex 79:9
compliance
70:25 75:8
79:21,23 80:2
80:25 96:15
153:11 164:9
compliant 70:11
77:4,4 84:19
121:5 123:5,20
126:1 128:19
130:23
complicated
183:20
comply 50:17
70:13 71:16,25
73:11 74:5,15
76:20 77:6
78:17,19 79:3
79:25 80:1,19
80:20 81:23
82:12,15,16,17
82:18,25 96:5
96:8,20
120:20,21
186:5 195:3
196:2,25
204:22 211:7
212:16
complying
71:24 95:14
96:18 97:5
120:8 122:10
165:23
components
33:23
composed
159:19
composition
91:16,19,21
98:5

compound 79:8
comprehensive
36:16
computer 134:3
134:4
computer-aid...
230:18
232:22
concern 152:23
166:2,10,11
222:3,7
concerned
56:8 201:9
concerning
138:2 139:25
141:8 142:5,14
142:24 144:2
151:23 158:20
158:23 197:8
197:13
concert 176:25
177:11,19,22
177:25 180:4
180:20
185:20
conclusion
75:13 79:9
173:10 177:14
179:14 185:24
190:6
conclusions
178:22
concrete 16:9
condition 241:5
conditions
185:11 241:3
conduct 60:5
60:12 117:9
186:17 190:19
191:25 233:11
239:25 240:8
240:10,13,21
243:4,9,15
245:6
conducted
141:3 145:7
confident 10:20

confirm 19:11
30:13 63:17
111:14
confirmed
250:19
conflate 113:13
confuse 160:22
confused 43:2
88:20 89:22
98:24 126:2
160:19 161:24
191:5 206:16
208:4 229:17
confusingly
257:24
confusion
257:12
Congratulation
12:11
congregating
127:15 130:16
198:22 210:21
211:16,19,21
213:3,10
conjunction
43:21
connected
41:16
connection
25:19,23
31:25 33:10
34:1,9,16 39:6
39:22 40:24
55:14 60:22
69:21 73:4
101:10 116:25
117:6 122:2,24
123:10 124:21
125:9,11,16
132:4 136:6,12
136:24 137:4
153:19 157:3
160:9 165:6
182:11 183:14
188:24 215:21
220:9 232:25
236:2 238:17

247:17 259:13
260:8
conscious 116:5
consequences
198:17
consider 192:6
204:18 246:9
considered
30:14 102:14
107:16 112:2,3
152:13
considers
184:12 196:6
consistent
108:25 109:10
111:1 120:11
consistently
254:7,8
constantly
153:10
constitute
246:10
constitutes
81:19 187:15
constitutional
95:1 100:13
105:10 221:1
constitutionally
220:20
221:24
construed 157:9
contact 43:10
52:18
contained
88:24
container 138:4
138:14 140:2
247:25
contemplates
96:14 166:5
contemplating
212:23
content 154:25
contentions
126:19
context 10:5
90:2,14 93:14

| | | | | |
|---|---|---|---|---|
| 103:7 121:3 | 191:23 207:10 | 166:20,21,23 | 255:21 256:1 | 142:2 247:9 |
| 122:8 123:25 | 221:11 222:25 | 166:24 167:15 | 256:9,19,22 | course 3:18,18 |
| 196:8,19,20 | correct 12:19 | 167:16 168:3 | 257:21 265:9 | 24:6 32:15 |
| 196:23 | 13:10,22 18:15 | 169:24,25 | 265:13 | 39:10 51:14 |
| continues | 24:14 25:17 | 170:23 171:7 | corrected 55:1 | 78:13,15 |
| 208:20 | 26:5 29:21,22 | 171:15,16,17,22 | 115:21 | 86:24 100:24 |
| continuum | 35:1,5 40:6 | 171:23 172:8,11 | correcting | 124:20 150:7 |
| 70:21 | 41:4 45:15 | 172:19,20,21 | 115:20 | 153:13 208:24 |
| contractor | 49:10 52:3 | 173:22 176:2 | corrections | 210:5 220:8 |
| 42:13 | 55:10,23 | 176:11,14,20 | 263:12 | court 1:1 4:1,20 |
| contrary 64:18 | 61:22 62:21 | 176:23 177:3,5 | correctly 13:12 | 6:1 8:16 17:25 |
| 121:4 254:10 | 63:14,16 81:1 | 185:12,14 | 16:13 37:1 48:7 | 19:4 20:17,21 |
| contravened | 88:9 89:16,24 | 186:8,18,22 | 49:1 52:9 | 56:1 62:15 |
| 124:4 125:23 | 90:3,4 91:8,10 | 187:15 188:6,9 | 53:13 57:18 | 83:11 86:5 |
| contravenes | 91:11,18 92:23 | 188:11,20 | 72:25 82:11 | 93:6 101:2,13 |
| 122:11 | 94:8,9,12,19 | 189:16,22,23 | 92:21 108:5 | 101:23 109:2 |
| contributed | 94:20 95:2,4 | 189:25 190:11 | 136:15 153:3 | 117:20 128:25 |
| 225:6,9 | 95:9,12 97:25 | 190:21 193:5,6 | 164:12 199:3 | 153:16 154:8 |
| control 248:14 | 98:5,7,13,17,18 | 193:9,10 195:8 | 201:11,17 | 154:17 156:12 |
| conveyed 38:7 | 98:19,23 99:5 | 195:12,23,24 | 216:15 224:3 | 162:25 170:3 |
| 107:3 | 99:9,10 100:14 | 196:3 198:4,11 | 237:8 241:9 | 203:3 206:2 |
| convoluted | 102:8,11,12,14 | 198:15,25 | 244:4 | 206:5 219:21 |
| 22:11 | 103:3,10,14,15 | 199:23 200:4 | correspond | 223:15 232:9 |
| cooperate 72:11 | 103:16,21 | 200:5 202:5 | 229:16 | courts 15:1 |
| 75:5 | 104:6,12,20 | 202:10 | corresponded | cover 10:3 |
| coordinate | 105:5 109:2 | 203:10 | 235:25 | 21:23 28:12 |
| 245:20 | 109:24 110:17 | 204:24 | corresponde... | 47:22 66:23 |
| coordinated | 111:22 112:17 | 206:22,23 | 10:14 | 78:18 128:3 |
| 220:20 | 115:16 116:14 | 208:1,13,18 | corresponds | 138:12 150:17 |
| copies 35:23 | 119:12 121:19 | 209:2 210:18 | 119:11 | 151:4 203:11 |
| 91:4 170:6 | 121:23,25 | 210:24 211:24 | corrupted 55:4 | 204:15 223:12 |
| 263:9 | 122:3 123:11,12 | 212:2,4,7,25 | 55:5 251:4 | covered 21:23 |
| copy 18:21 | 123:16,17,21 | 217:10,19,23 | cost 31:14 | 75:19 91:8 |
| 20:24 90:22 | 125:6,10,21 | 218:3,8 219:16 | counsel 7:2,2 | 99:12 112:25 |
| 93:9 105:25 | 126:17,23 | 220:16,22 | 23:12 26:18 | 113:2 114:25 |
| 187:21 232:19 | 127:1,19,24,25 | 221:1,7 224:5 | 222:18 254:14 | 114:25 131:13 |
| 263:12 | 133:18,22 | 224:15 226:9 | 257:6 262:11 | 151:2 158:17 |
| corner 119:7 | 134:17 136:20 | 226:16 | 262:14 | 161:23 |
| 180:18 | 140:24 142:15 | 227:20 234:9 | Counselor 4:17 | covering 98:25 |
| corners 183:12 | 143:3 144:24 | 235:15,20 | 5:14 263:5 | covers 46:19 |
| corporate 53:14 | 145:1 146:1 | 236:20 | count 241:18 | 61:19 67:9,10 |
| 53:24 64:15 | 148:6 149:25 | 237:13 239:1 | counted | 81:11 121:22 |
| 67:20 84:22 | 151:16,17,21 | 239:22 241:19 | 242:23 | 123:15 222:24 |
| 116:24 146:12 | 156:22 157:23 | 242:8 251:20 | County 245:20 | 226:10 233:19 |
| 150:20 162:3 | 161:1,6 163:14 | 252:16 | 265:3 | create 65:24 |
| 172:3 173:14 | 163:15,17,18 | 254:24 255:4 | couple 18:7 | 199:5 |
| 178:23 182:10 | 166:14,15,17,18 | 255:8,12,14,15 | 35:13 115:13 | created 65:11,12 |

ERIC LARSON  4/8/2019

| | | | | |
|---|---|---|---|---|
| 66:11 132:22 | 165:10,11,18,24 | 253:22 254:3 | 139:18 145:24 | 256:15 265:12 |
| 133:21 134:3,4 | 236:9,15,21 | **database** 134:8 | 152:16 161:9 | **declared** 173:16 |
| 135:3 145:6 | 237:13 238:1 | **date** 47:12 52:5 | 170:15 173:15 | 173:23 174:5 |
| 168:4,7,10,10 | **crossed** 79:1 | 59:15,19 | 205:2 206:25 | 202:5 204:12 |
| 203:23 | **crossing** 74:19 | 63:24 94:3 | 207:7 216:2,3 | 212:9 217:21 |
| 224:21 226:3 | 74:22 | 102:8,13 | **deals** 49:9 | 218:16 239:7 |
| 234:4 237:2 | **crowd** 67:10 | 106:24 144:18 | 84:23 158:18 | 240:25 241:12 |
| 237:18,22 | 77:18 90:9,10 | 146:6 205:3,7 | 169:6 176:14 | 242:6 243:1 |
| **creates** 150:15 | 108:24 109:16 | 206:19 207:2 | 187:18,19 189:1 | 245:15,18 |
| **creating** 133:8 | 109:21 113:6 | 226:15,16 | 194:20 217:8 | 246:7 |
| 133:11 174:9 | 113:23 117:1 | 230:8,9 | 254:25 | **declares** 198:17 |
| 174:25 228:3 | 121:16 132:20 | 238:15 264:3 | **dealt** 169:12 | 218:6 |
| **creation** 116:8 | 133:22 174:6 | **dated** 3:16,19 | 207:12 250:3 | **declaring** |
| 145:8 | 174:8,9 183:4 | 86:10 88:8 | 251:16 254:20 | 197:24 199:16 |
| **crime** 11:15 13:4 | 194:6 248:14 | 145:25 155:4 | **Dear** 263:8 | 202:21 212:22 |
| 28:3 29:19 | 248:14 | 202:14 | **debate** 10:13 | **Defendant** 1:9 |
| 30:1 35:21 | **crowds** 73:18 | 203:22 | **December** 13:15 | 4:9 5:13 7:3 |
| 36:21,24 41:2 | **CRR** 6:2 | 204:23 205:6 | 13:19 21:16 | **Defendant's** |
| 41:16,17,21 | **CS** 112:1,1 | 206:13 220:12 | **decide** 114:10 | 101:9 |
| 43:21,22 45:8 | **CSR** 6:2 | 229:21 | 180:20 226:7 | **defendants** |
| 45:10,20 46:9 | **cuffed** 82:23 | **dates** 36:10 | **decided** 231:8 | 93:19 |
| 46:19 47:8 | **current** 15:4 | 51:22 56:16 | **decision** 116:6 | **defensive** |
| 48:2 49:7 | 211:8 224:9 | 66:4 252:3 | 194:5 | 74:23 81:12 |
| 50:8 53:22 | **currently** 25:10 | **day** 4:13,16 66:3 | **declaration** | **define** 111:8 |
| 54:15 58:5 | 31:8 54:24 | 150:15,16 | 2:23 3:21 | **defined** 22:16 |
| 172:24 175:16 | 251:3 | 179:18 265:14 | 101:8,15,18 | 239:20 |
| 189:10 190:1,8 | **curve** 41:9 | **day-to-day** | 102:3 105:13 | **defines** 81:9 |
| 193:2,17 | **custody** 35:15 | 37:12 | 108:14,17 | **definitely** |
| 198:25 200:13 | 35:18,24 37:2 | **days** 39:16 | 109:24 131:16 | 160:21 163:9 |
| 218:9 225:5 | 37:5,8,12 38:7 | 45:24 50:13 | 194:1 200:14 | 192:18 |
| 252:20 | 38:8,11,12 | 79:12 213:11 | 215:11 218:11 | **definition** 22:7 |
| **crimes** 12:24 | 49:16,23 | 261:10 263:17 | 223:21,23 | 22:11,13,16,19 |
| 61:2 201:3 | 58:12 60:2 | **de-escalate** | 256:16 | 22:23 85:1 |
| **criminal** 60:13 | 74:25 76:24 | 78:25 | **declarations** | 97:10,18,22 |
| 171:2,6 173:1,7 | 77:1,5,12 81:16 | **de-escalation** | 215:15 | 98:7,16,22 |
| 174:17 175:13 | 81:18 137:9 | 79:20 | **declaratory** | 99:9,13 103:18 |
| 185:16 186:17 | 183:5 | **deal** 36:23 67:1 | 153:7 | 103:21 110:19 |
| 188:9,14 | | 91:5 114:17 | **declare** 175:2 | 111:3,5,11,12 |
| **criteria** 135:4 | **D** | 130:15 138:17 | 193:1 194:3,5 | 112:8 116:18 |
| 226:4 | **D** 2:1 132:17 | 151:7 203:5 | 194:17 197:8 | 121:3,22 |
| **critical** 3:6 | **damage** 124:11 | 204:9 205:20 | 197:14,15 | 125:24 128:1 |
| 155:9 157:12 | 125:2,20 | 218:13 | 198:5,13 | 130:15 172:9 |
| 252:9 | 191:17 | **dealing** 49:3 | 199:22 200:9 | 177:21,25 |
| **Critique** 3:8 | **damn** 56:5 | 57:15 76:8,10 | 200:19 204:19 | 178:4 193:10 |
| 162:6,19,21 | **data** 36:16 | 84:4,23 90:14 | 215:1,4 216:17 | 194:11 |
| 163:13,20,21 | 45:21 50:12 | 91:13 92:8 | 243:12 | **definitions** 22:2 |
| 164:11,15 | 51:21 251:5 | 115:16 135:22 | 245:24 | 111:15 239:20 |

ERIC LARSON  4/8/2019

delegated
  132:8
deleted 60:23
  61:6
deleting 60:4
deliberate 31:11
delineate 84:14
  235:4
delineated
  216:21
delineates
  195:22
demonstrate
  194:13
denominator
  169:5
depart 189:21
department
  2:17,20 3:12
  11:7 12:25
  13:17 14:1 15:9
  15:25 16:3,15
  16:21 17:16
  19:19,22,25
  20:15 25:1,10
  25:14,18
  29:24 37:9
  39:1 42:1
  43:17,19 44:1,3
  44:7,9 45:7
  47:25 49:19
  65:18 86:9
  87:24 88:6
  102:16 107:7,8
  118:18 140:5
  145:11 148:17
  157:10,21,22
  164:7 166:9
  168:1,17
  224:22 230:6
  250:14,18
department's
  48:5
departments
  13:2
depend 248:9
dependent

174:21
depending
  35:12 45:22
depends 41:24
  122:16
deploy 70:16
  77:9,13 109:16
  109:21 128:9
  142:15,24
  143:12 144:2
  184:14 187:3
deployed 31:24
  40:23 68:15
  68:17,20 69:3
  69:10,11 73:18
  75:1 76:19
  96:9 98:11,15
  98:21 99:8,12
  104:9,14 112:16
  132:20 133:22
  134:17,23,24
  135:17 145:18
  235:14 248:11
deploying 69:9
  137:8
deployment
  29:13 70:6
  78:12 96:6
  104:11 108:24
  113:9 121:15
  132:9 139:5
  144:20 146:14
  147:10,24
  148:10 149:12
  150:7 203:20
  204:21 209:15
  244:20
deployments
  145:17
deploys 31:5
  137:13 257:20
depo 21:8
deposed 8:6
deposition 1:17
  2:14 4:12 7:3
  7:13,20 9:12
  9:13 10:19

18:24 20:24
  21:8,11 23:8,10
  23:20 24:4,16
  24:24 25:24
  26:4 27:2
  54:18 55:11
  56:20 65:4
  66:20 76:1
  85:6 86:14,22
  92:17 93:12
  110:8 117:22
  141:15 150:2
  159:3 178:24
  191:24 203:7
  208:1 209:11
  221:17 224:5
  248:16 251:17
  259:3 260:5
  260:9 261:16
  261:17 262:7
  262:12 263:9
  265:6,8,11
depositions
  30:25
deputy 13:16,20
  14:3
describe 81:4
  210:8 227:23
  247:23
described
  28:20 72:6
  139:13,18
  149:21 198:21
describing
  106:11
description 2:11
  3:2 171:12
  255:19
design 178:1
designated 9:14
  23:24 46:15
designation
  65:4
designed 249:2
  258:16
designee
  191:24

desired 263:13
destroy 60:14
  60:19
destroyed
  46:16 57:5
destruction
  51:5 56:23
  57:2 61:1
  125:9
detached 25:10
  25:12
detail 28:13
  32:6 62:1,2
  139:23 150:2
  164:9,15 165:5
  165:12,16,18
  166:5 167:9,14
  225:20 226:8
  228:3,15
  236:16 237:11
  237:25
details 132:23
  227:15,24
  237:22
determination
  46:6 152:19
determine
  54:20 55:5
  147:8,17,22
  152:20 154:4
  154:10 208:16
  229:15 230:12
  237:17,25
  254:2
determined
  16:10 153:13
  154:1 227:1,7
  229:2,6
  251:22 260:16
determining
  80:4 152:24
device 71:14
  90:2 91:20
  96:22 97:2,7
  98:16 104:14
  104:15 112:17
  114:13 121:23

123:2,5 124:4
  124:5 127:19
  128:12 129:20
  130:14,22
  134:6 196:11
  235:14
  244:22
  247:21,22,24
  248:4,7,8
  257:18 258:9
  258:19
dictionary
  177:24
Dierker 2:7 5:18
  9:25 10:20
  11:2 20:2
  23:14 48:11
  56:6,12 57:10
  62:10 65:3
  72:13 75:11
  76:21 78:3
  79:7,11,13
  85:22 90:25
  93:3 114:2
  115:7,10,22
  117:13 120:12
  122:12 147:12
  147:18 160:14
  162:10 169:16
  173:9 174:2
  177:13,20
  178:20 179:19
  181:7 182:4
  184:4 185:22
  190:5 191:21
  192:7 193:20
  196:13 197:1
  199:8,12
  201:18 205:22
  207:21 213:19
  214:5,8,15
  216:25 242:19
  245:10 246:11
  247:8,14
  251:6,9
  259:24 261:14
  263:4,8

| | | | | |
|---|---|---|---|---|
| dierkerr@stlo... | 255:10 | 15:16 141:1 | 215:9,12,16,19 | 248:1 |
| 5:21 | directing 130:1 | 181:9 214:21 | 216:2,5,11,18 | distance 258:11 |
| difference 81:5 | direction 15:1,19 | 217:16 228:22 | 217:5,9,20 | 258:13,17,23 |
| 84:9,14 85:8 | 15:23 16:9 | discussion | 218:1,6,11,16 | distill 175:8 |
| 247:22 | 159:19 262:10 | 205:9 222:18 | 218:24 219:8 | distinct 244:19 |
| different 23:21 | directions 119:2 | discussions | 219:16 221:4 | distinction 81:7 |
| 26:9,17 27:17 | 130:6 151:25 | 26:1 | 221:24 223:3 | 239:23 |
| 29:15 31:7 | 211:17 | disgruntlement | 238:16 239:6 | 241:23 |
| 33:20 35:14 | directive 101:20 | 56:13 | 241:1,13,20,22 | distinguish |
| 39:11,12,12 | 102:4,12,15,19 | disk 35:17 | 241:24 242:7 | 98:9 104:7 |
| 40:23 42:18 | 102:23 103:4 | 49:23 50:25 | 242:14 243:2 | distinguishes |
| 56:3 58:7 | 103:11,17,23 | 58:11 59:2 | 243:13 248:14 | 58:4 |
| 91:24 94:10 | 104:7,13,21 | disobedience | 249:6 255:6 | distributed |
| 114:24 116:19 | 105:6,14,24 | 2:15 3:15,19 | disperse 73:18 | 159:21 |
| 118:23 119:2 | 106:1,4 108:16 | 33:5 73:6 | 103:13 113:23 | district 1:1,2 4:1 |
| 123:9 133:18 | 111:14,22 | 145:6,7 206:11 | 117:7 183:4 | 4:2 11:12 12:2 |
| 135:17,18 | 112:10,15 116:5 | 220:9,21,25 | 185:10 189:11 | 14:2 101:23 |
| 138:18 144:11 | 116:9 136:20 | 221:23 222:5 | 190:2,4,10 | 109:1 136:1 |
| 151:25 160:16 | directly 157:9 | 222:24 | 193:2,17 | disturbance |
| 164:16,17,21 | director 11:22 | 248:19,25 | 208:22 211:13 | 144:22 237:6 |
| 169:8 170:17 | 11:24 | 249:21,22,24 | 212:2,12 | disturbances |
| 172:19 179:7 | disagree 57:8 | 254:25 255:1 | 255:22 256:4 | 149:1 |
| 180:16 196:20 | discourse 34:2 | 255:13,16 | 256:11,16 | division 1:3 4:3 |
| 204:14 211:17 | discovered | 256:13,23 | 258:23 | 28:6 29:20 |
| 225:11 227:6 | 57:4 | dispatch 230:18 | dispersement | 36:4 132:15 |
| 230:1 235:10 | discovery 10:4 | 232:22,23 | 17:2 67:11 | 224:9 252:20 |
| 242:4 252:3 | 10:16,24 35:19 | 233:15 | 113:5 249:10 | division/Real |
| 253:10 257:14 | 51:17 52:25 | dispersal 3:14 | disperses | 225:5 |
| 257:18,25 | 53:18 55:15 | 67:22 77:18 | 258:7 | divisions 132:14 |
| 258:4 260:24 | 56:17 224:10 | 90:10,11 91:24 | dispersing | document 3:6 |
| 261:2 | discretion 80:4 | 108:24 109:16 | 94:17 95:21 | 27:18 28:7,25 |
| differently | 83:4 93:22 | 109:21 113:24 | 99:24 101:21 | 29:12 32:14 |
| 49:12 50:1 | 94:4 196:24 | 117:1,8 121:15 | 103:8 104:22 | 38:2 47:22 |
| 96:23 | 199:3,5,22 | 121:16 132:20 | disposal 28:1 | 48:9 62:25 |
| difficult 24:5 | 201:5 215:20 | 133:22 136:25 | disposed 50:3 | 65:17,25,25 |
| 83:2 113:12 | discuss 16:6 | 203:8,19 | disposition | 68:7,9 83:21 |
| 120:23 134:14 | 26:22 47:25 | 204:5,7,13,20 | 225:21 228:14 | 85:15 86:8,13 |
| 229:12,13,14 | 84:18 | 205:3,11,20 | 239:7 241:17 | 86:21 87:3,4,5 |
| 237:16,20,24 | discussed | 207:1,2,7,13 | 242:15 | 87:6,9 88:3,16 |
| 238:4 | 18:24 30:22 | 208:3,7,10,12 | dispositions | 89:2 90:13 |
| difficulty 192:12 | 49:16 51:17 | 208:21 209:12 | 228:17 | 106:7 132:22 |
| digital 36:4 | 52:17 89:18 | 209:15 210:1 | dispute 191:19 | 133:9,11,14 |
| dipersal 209:2 | 89:23 114:19 | 210:11,12,19,24 | disrespect | 139:9,18,22 |
| direct 62:25 | 140:3 156:3 | 211:7,12,24 | 201:17 | 140:4,6,7,13 |
| 96:7 216:8 | 178:18 223:4,7 | 212:4,22 | disseminated | 140:22,25 |
| directed 18:20 | 225:3 | 213:14,17 | 92:13 140:18 | 141:14,17,18 |
| 60:7 216:6 | discussing | 214:4,11 215:6 | dissipates | 142:1,2 146:2 |

| | | | | |
|---|---|---|---|---|
| 149:20 157:11 | 43:24 69:4 | 87:1 198:21 | 35:24 43:8 | employees |
| 166:5 168:4 | 74:17 145:9,12 | 213:5 219:25 | 49:4,21 55:25 | 19:18 |
| 169:18 203:24 | 147:4 153:3 | 228:22 250:8 | 69:16 100:20 | employment |
| 209:21 218:22 | 179:2 187:5 | early 12:6,17 | 136:5,11 193:3 | 11:4 |
| 219:3 220:1,5 | 200:2 201:11 | 224:1 259:1 | 200:14 217:22 | empty 77:11 |
| 220:16 | 238:22 | easier 96:20 | 240:25 241:5 | encapsulated |
| 229:20 236:5 | 239:15 | 180:16 | 241:5,21,24 | 205:11 |
| 237:8 246:16 | Dotson 2:22 | EASTERN 1:2,3 | 243:24 244:7 | enclosed 263:9 |
| 260:23,23 | 92:5 | 4:2,3 | 244:25 | 263:10 |
| documentation | double 115:23 | easy 36:12 | 253:25 | Enclosures |
| 27:24 29:16 | doubt 238:12 | 47:10 124:22 | element 76:24 | 263:25 |
| 30:1 31:22,24 | download 60:18 | educate 219:7 | 95:20 175:16 | encompass |
| 32:6,8,25 | downloaded | education 75:19 | 189:14 190:8 | 134:22 |
| 33:3,15,20,25 | 35:16 46:3 | effect 15:5 17:9 | 201:1,8 | 234:20 |
| 34:6,8,12 35:4 | 49:14,22 | 27:21 59:4,8 | elements 107:11 | encompassed |
| 35:9 36:8,10 | 50:25 58:10 | 71:24 72:2 | 120:19 128:10 | 260:25 |
| 36:25 37:21 | 59:1 | 96:8 101:22 | 170:12,17 | endeavor 178:9 |
| 39:6,22 40:3 | downtown | 102:13,16 | 176:16 188:1,16 | 181:4,14 |
| 40:23 47:5 | 135:23 136:2 | 205:21 245:8 | 189:10,19 | ends 83:17 |
| 49:5 50:2,8 | 151:12 212:20 | effecting 120:16 | 198:8,10 199:4 | 260:1 |
| 58:5,24 59:6 | downward | 126:4 200:14 | 200:13,19,22 | enforce 93:20 |
| 59:8,10,16,21 | 130:8,10 | effective 195:1 | 201:3,15 | 179:5 197:19 |
| 59:25 60:21 | Draft 155:10 | 195:17,21,23 | 208:17 218:9 | enforced 218:17 |
| 61:6,10,23 | drafting 214:10 | 196:7,18 | 221:14 | enforcement |
| 62:3 63:15,18 | drawing 241:23 | effectiveness | eliminate | 12:10 13:13,15 |
| 64:3,9,19,22 | drawn 230:24 | 164:5 166:5 | 216:22 | 13:21,24,25 |
| 65:1 146:25 | drive 35:17 | 167:24 | eliminated | 14:8 69:7 |
| documented | 50:25 | effects 80:11 | 214:21 | 93:21 94:4 |
| 49:20 127:11 | drug 14:8 | 128:17,18 | email 2:12 3:5 | 120:9 126:1 |
| 137:9 | due 54:1 56:12 | effectuate | 17:16 18:8,20 | 177:18 179:15 |
| documenting | 82:8 | 70:13 71:5,12 | 19:20 20:12 | enforces 179:12 |
| 32:19 | duly 262:7 | 72:8 83:2 | 44:24 45:1 | 182:6 |
| documents | Duncan 5:19 | 85:11 113:21 | 56:8,9 57:3 | engage 172:16 |
| 23:7,9,12,15 | duplicate 10:7,9 | 120:2 127:1,18 | 66:8 85:19 | engaged 55:19 |
| 26:20 67:21 | duplicating | 196:22 | 154:25 155:1,1 | 73:17 94:18,23 |
| 84:13 85:7,12 | 10:18 | effort 15:3 38:1 | 155:4,13 156:4 | 95:18,22 |
| 87:2 110:7 | duplication | 56:7 87:7 | 157:7 208:5,6 | 99:25 100:11 |
| 114:16 139:19 | 35:19 260:3 | 164:5 | emergency | 101:21 103:13 |
| 143:19,22,25 | duties 69:6 | efforts 15:9 | 246:4 | 104:23 105:7 |
| 143:25 144:6 | duty 40:19 | 20:14 26:25 | emphasize | 183:7 184:12 |
| 144:8,14 | 53:25 195:2 | 34:13 147:8 | 165:17 | 184:20 185:10 |
| 145:23 146:5 | 196:2 | 156:21,24,25 | employ 149:19 | 185:16 186:16 |
| 146:13,18,19 | dynamic 73:16 | egress 95:15 | employed 11:6 | 213:4 |
| 149:20,22 | | 186:5 208:24 | 224:8 262:11 | engaging 17:2 |
| 167:21 205:2 | **E** | 210:5 | 262:14 | 73:6 190:19 |
| 222:4 260:2 | E 2:1 | eight 4:14 | employee | 190:25 |
| doing 32:9 | earlier 83:23 | either 27:25 | 107:13 262:14 | ensconce |

152:25
ensure 95:15
132:21 167:24
200:12 215:16
ensuring
106:23
entail 13:24
entails 12:21
entered 19:4
35:18 38:18
58:11 134:7
entire 39:5
46:20 106:3,3
148:8 189:6
191:25 242:23
entirety 106:20
107:14,17
entities 42:2
45:15
entitled 20:9
179:17 186:14
entity 42:7
entrap 151:25
entrapped
182:16
entries 231:10
232:17
entry 232:5
envelope 59:3
59:12,18
envision 113:12
equally 113:21
231:17
equip 31:13
equipment 111:7
112:6 121:17
equipped 31:12
57:21
Eric 1:17 2:5 4:12
7:8 8:1 66:13
263:10 264:1
265:5,20
errata 263:11,13
263:16 264:1
error 161:25
escalating
77:24 78:23

escalation
70:20 71:21
especially
197:20 215:13
essential 103:11
essentially 11:10
12:22 13:1,25
33:15 45:21
59:1 112:7
174:24
establish 185:19
218:7
established
98:2 112:12
123:8,13
125:17 126:20
126:24 128:2
190:12 193:3
establishing
193:18
estimate 21:14
24:4,17 26:13
estimated
227:11
et 1:5 4:5 92:5
263:7 264:2
evaluate 15:4,11
157:1
evaluating
154:10 158:11
162:5
evaluation
156:15 158:6
evening 135:16
152:8 184:1
186:11 190:18
191:16,19
212:21 213:7
event 3:8 27:19
28:2 50:20
61:16 63:1
122:19 163:13
165:24 191:25
216:10 229:4
236:23 237:11
238:2 246:6
248:25

event's 237:10
events 32:2
63:3 66:1
157:10 164:8,11
168:22 183:1
215:14 220:21
226:4 236:18
236:22
237:22
everybody
14:10 182:16
183:23 184:1
198:22
evidence 11:20
30:2 33:14
36:19 38:9,10
38:12,19,19
40:13,13,17,20
40:20 49:13
49:14 50:24
51:1 59:3,12,18
59:25 60:14
60:19 61:1
120:13 125:17
125:18 126:21
127:8 182:15
191:17 192:17
213:20
exact 108:12
209:17,24
exactly 78:1
112:7 138:21
192:4 235:3
Examination
2:6,7 7:14
247:13
examined 4:13
7:10
examiner 11:17
example 34:18
57:7 73:14
106:14,15
111:19 113:16
135:15 160:24
174:14 195:22
212:14 232:11
238:15 259:2

exception
89:20
exceptional
167:2
excluded 46:16
excluding
24:22 162:11
exclusive
234:12,14
exclusively
113:2
excuse 9:25
48:11 72:13
75:6 79:7
115:7 154:23
execute 61:12
Executed
265:14
execution
124:14
exercise 240:17
exercising
34:21 94:25
100:13 105:9
exhibit 2:12,13
2:15,17,19,21
2:23,24 3:3,5
3:7,9,11,15,18
3:21,22 17:24
18:2,6 20:20
20:23 21:1
22:1 62:8,14
83:9,10,13
86:3,4,8,8
87:9 88:23
93:5,8 101:1,4
101:10,14,24
102:2 108:17
109:23 117:19
117:23 128:24
129:2 131:15
131:19 139:13
139:14 140:14
154:16,20,22
155:21 156:8
156:20
160:25 162:24

163:3,10 165:11
168:4 169:12
170:2,5,10,11
170:15 187:22
189:6 202:10
202:11,20
203:2,6,13,16
204:23 206:1
206:3,4,7,22
207:2,17,25
210:19 212:5
217:14 218:2
219:3,19,20
219:22 220:5
222:20
223:14,18,22
224:18,20
225:17 226:9
226:15 227:1
240:19 242:3
243:21 244:13
248:16 249:19
254:15 259:4
exhibiting 71:16
exhibits 2:10 3:1
3:25 143:15
170:13 259:3
exist 58:1 141:12
148:4 149:17
existence 44:9
exit 100:4 105:3
expectation
10:8
expectations
212:24 214:12
expected 3:16
176:9 206:12
Expires 265:24
explain 12:20
32:11 76:12,14
85:7 207:18
explained 185:3
199:21 213:5
244:19
explaining
256:2
explanation

80:14 83:20
195:15
**explanations**
243:17
**explore** 68:10
**expressly** 7:6
60:4
**extended**
129:16,19
**extended-ran...**
121:18,21 122:1
122:7,23
123:11,14,19,24
125:22 127:24
128:2 131:23
132:4,9
**extent** 10:17
14:19 20:8
42:6,14 43:8
60:20 68:4
73:4 91:5 94:1
103:3 116:25
117:5 123:1
137:3 170:9
173:4 180:7
200:17,20
237:17 240:6
249:5
**eyes** 252:9

___

**F**
F-i-l-l-e-r 155:5
**face** 78:18
**fact** 40:11 57:3
57:18 64:18
122:1,17,23
124:16 125:7
154:24 174:8
174:21 175:25
183:14,20
184:9 196:24
218:1 231:17
233:9 253:1
256:10 258:18
259:9,10
260:17
**fact-dependent**

182:25
**factor** 94:21
203:7
**factors** 73:13
**facts** 64:25
120:13 127:9
185:18 191:1,19
192:21,23
194:7,10,14
208:17 213:20
215:4 218:7
**fail** 80:20
165:19 189:19
**failed** 53:19
181:4
**failing** 80:18
96:5 181:17,18
256:11
**fails** 70:19
**failure** 56:1
117:8 186:5
190:3 255:22
256:4,16
**fair** 8:21 16:5
26:23 34:21
34:22 42:9,11
47:9 55:21
58:14 63:3
73:12 83:5
88:15,23
97:20 104:1
109:4,8 138:7
138:9 156:16
156:17 158:21
169:9 179:25
214:21 223:5
223:6 243:11
253:16 258:6
**fall** 245:21
**fallen** 246:20
**familiar** 7:22
21:1 30:18
91:25 154:22
154:24,25
156:2,21
162:18 163:9
172:7 191:7

203:19 206:6
208:7 210:9
216:23
224:24
**familiarize**
19:22
**far** 17:2,7 26:6
41:25 48:4
49:16,19 56:7
80:16 84:17,18
107:10 126:4
140:18,20
164:24 165:14
211:1 223:4
225:20
246:13 248:2
250:2 258:20
258:24 261:3
**farther** 248:1
**fashion** 83:1
**fault** 115:24
**favor** 240:3
243:20
**FBI** 13:4
**February** 11:10
11:18
**feedback** 167:2
**feel** 52:3 170:13
178:22 189:5
258:21
**feels** 248:10
**feet** 211:15
**Feig** 252:19
**felt** 10:21
**fight** 70:6,10
81:15
**fighting** 82:4
**figure** 55:6
153:10 215:25
**figured** 18:6
**file** 36:22 59:2
101:13 237:23
251:21,22,24
253:22
**filed** 50:6,22
232:9
**files** 46:4 51:14

51:16,22 55:3
55:5 251:21
252:2
**filing** 238:6
263:18
**fill** 166:6,10
**filled** 166:13
167:13 168:21
**Filler** 3:5 155:5
155:14,24
**final** 11:1 153:25
**finally** 143:9
257:4
**financially**
262:15
**find** 36:12 54:13
85:13 87:2
114:9 134:10
205:19 207:6
219:14 222:3
240:8 263:9
**finds** 31:4
**fine** 8:5 10:23
37:16 147:18
169:16 199:10
**finish** 8:17,20
71:7
**finished** 239:13
**finite** 184:24
**fire** 258:16
**firearm** 11:16
**first** 14:16 21:4,7
21:9,13 24:16
30:4 31:21
32:15 34:21
52:20 55:8
67:12 76:18
81:22 93:16,18
94:14 95:4,6
95:24 96:10
100:1 104:24
133:2,7 145:23
168:17 176:19
178:18 180:8
181:9 189:14
197:21 199:19
208:15 209:3

224:19 225:19
226:15 229:21
232:19
238:24 249:9
253:12
**firsthand** 34:4
**five** 117:16
212:15 245:7
255:17
**fix** 52:19
**fixed** 254:12
**flail** 70:23
**flailing** 81:15
82:2
**flash** 35:17
50:25
**fleeing** 82:1,3
**flip** 171:9
**fluid** 184:25
**focus** 12:15
74:14 81:17
131:12 168:25
208:11 209:25
215:5 224:17
239:10 257:16
**focused** 200:16
**focuses** 138:21
142:13 202:3
**focusing** 44:12
45:11 82:6
96:10 99:2
148:7 149:7
183:9 186:10
186:22 190:15
243:21
**fogger** 91:20,22
96:22 98:22
99:8 104:15
112:17 119:20
120:10,23
121:2 128:18
187:4 234:20
235:2,15
247:17 257:17
258:6 259:8
**foggers** 96:24
247:16 257:6

follow 16:12
59:22 92:4
189:19 209:16
226:6 231:9
follow-up
145:20
followed 194:2
260:16
following 50:4
71:10 94:5
177:24 185:11
198:1
follows 7:11
food 166:14,25
167:1
force 70:20,21
71:17,22 80:8
80:12,21
106:15,16,18
107:9,12
137:19 150:18
150:19 171:7
173:1,8 174:17
175:13 177:3,8
180:21 188:11
188:15,19
193:12,15,24
233:12,22
234:5 239:8
244:6,6,13
foregoing
262:7 265:6
265:13
forenoon 4:15
forgot 242:12
form 20:3 21:8
72:14 75:11
78:4 79:8
112:16 114:3
120:12 122:12
164:14,16,18
164:20,21,23
165:3 166:7,13
168:9,10,11,13
168:15,21
173:9 177:13
178:21 185:22

190:5 193:20
196:13 209:16
213:19 222:11
245:10 246:11
265:7
formal 245:15
format 65:20
163:23 203:18
formations
145:17
formed 178:1
forth 89:1 94:5
forward 10:5
81:24 144:18
forwarded
26:18 35:23
found 53:1
171:21 172:24
174:10,13
175:4 176:1
179:23 242:11
foundation 5:4
147:20 192:11
245:11 246:12
four 14:16 33:22
33:23 40:3,11
40:22 95:3,17
119:2 120:19
128:9 151:25
183:12 201:14
fourth 2:13
20:24 21:3
23:20 136:1
221:6,15
frame 37:14
39:19 43:23
68:19 69:8
framework
134:6
free 52:3 170:13
189:5 196:24
Friday 85:20
friend 251:13
frightening
94:25 100:12
105:9
front 20:12 62:6

66:20 69:13
129:2 130:7
137:23 144:6
160:24 202:11
210:3 219:4
219:23
full 94:19 170:12
187:21
fully 153:6
function 13:5
33:18 195:11
functioning
53:11 251:23
functions 15:22
32:10 61:12
63:1
funded 41:14
further 247:6
251:9 259:22
260:4,9
261:12 262:13
future 31:10
168:1

---

## G

gain 79:22
153:11
gap 147:16
gas 97:24,24
98:10,15,21
99:7 104:8
111:19 112:1,1,2
129:15 234:16
259:19
gee 56:10
general 27:17
32:23 47:21
48:9 60:8,10
66:8 77:9
90:8 113:8
130:5 140:11
202:8 210:9
generally 15:18
76:23 77:3
81:14 93:18
135:3 150:14
162:7 167:22

225:19 259:21
generate 39:2
107:22 259:14
generated
39:13 50:11
137:5 230:21
generating
66:16
generic 158:4
generically
161:4
Genetec 42:20
42:23 43:2,11
43:16 51:21
52:10,12 55:19
251:3 252:24
Gerald 133:6
getting 10:25
43:1 44:22
108:8 145:9
198:1
give 8:14 11:3
29:6 72:9
73:14 77:15
78:6 80:23
83:6 96:4
123:7 187:10
187:14 196:17
201:13,25
206:2 208:23
209:14,19
238:8 240:4
241:7 246:24
258:25
given 11:23
52:11 53:9
57:1 61:14
70:8 80:17
83:12 89:11,21
117:24 142:19
161:4 183:3
186:3,4,18,19
186:20,23
187:6 202:15
204:20
206:19 215:16
218:12 222:21

231:1 241:20
249:11,12
gives 73:24
78:14 210:11
giving 71:23
75:8 76:18
80:16 83:5
120:19 194:25
195:16,21
196:7,18
208:21 210:1
glance 155:18
glean 227:12
go 21:25 28:14
32:12 43:12
54:3 61:14
62:10 63:22
66:4 70:22
75:21 77:10
80:7 81:13,24
84:2 89:4
90:15 96:7
101:17 102:2
104:18 105:12
107:7 109:23
125:12 126:6
127:17 131:19
132:16 138:20
139:9 141:22
148:21 169:11
169:17 174:2
180:13 185:6
187:17 189:1
192:10 194:4
194:17,20
211:9,9,10,13
211:17 222:14
225:13 226:14
231:8 238:14
239:4,16
240:5 242:18
255:9
goal 78:23
79:19 130:22
220:18
goes 38:12
143:9 258:17

ERIC LARSON  4/8/2019

| | | | | |
|---|---|---|---|---|
| 258:22,22,24 | 208:11 224:17 | **guideline** 107:8 | 128:12 130:21 | **harm** 71:4,18 |
| **going** 8:19,25 | 235:17 236:8 | 248:24 | 136:23 137:3 | 99:22 100:9 |
| 9:17 10:5 12:15 | 246:9,22 | **guidelines** | 137:13 138:3 | 121:5 125:2,20 |
| 21:20 22:16 | **gotten** 37:17 | 152:13 194:3 | 138:13,17 140:1 | 126:22 127:6 |
| 27:19 36:8,17 | 201:7 208:6 | **guilty** 171:21 | 141:9 142:6 | 127:10 |
| 36:18,23 46:2 | 228:5 234:1 | 172:24 174:10 | 148:14 187:4 | **havoc** 199:5 |
| 49:16 54:6 | **governed** | 175:4 176:1 | 196:11 234:18 | **hazard** 246:4 |
| 55:9 61:12 | 113:20,22 | 178:10 181:15 | 235:2,14 | **head** 139:8 |
| 62:17 66:3 | **governs** 121:15 | **guns** 234:16 | 244:21 | **heading** 22:1 |
| 68:6 70:16 | **grab** 80:7 | | 247:23 248:4 | 92:4 116:20 |
| 71:9,25 72:1 | **graduate** 144:17 | ——— H ——— | 248:8 257:1 | 208:4 248:19 |
| 72:10,10 74:7 | **graduated** | **half** 26:11,16,16 | 258:3,8,19 | 249:23 |
| 74:11,12,12 | 75:18 | 199:9 255:17 | **handing** 86:6 | 255:12 |
| 75:6 76:10 | **grand** 66:2 | **Hall** 4:17 34:9,19 | **handle** 76:3 | **headings** |
| 77:10,11,16,17 | 190:24 | 61:22,24 | **handled** 145:16 | 226:14 248:18 |
| 78:13,16 80:19 | **granted** 94:3 | 63:18 64:18 | 146:23 160:1 | 249:20 |
| 80:24 81:24 | **grants** 93:21 | **Hall's** 63:11 65:5 | **handling** 164:7 | 254:24 |
| 90:11,18 93:7 | **Gras** 63:4 | **hand** 20:22 | 236:22 | **headquarters** |
| 99:18 114:11 | **great** 130:15 | 62:17 68:8 | **hands** 70:18,22 | 41:7 |
| 117:22 124:18 | 150:2 | 77:11 82:21 | 74:18,19 79:1 | **hear** 92:21 |
| 125:25 126:6 | **greater** 28:13 | 93:8 101:4 | 80:7 82:22 | 181:23 222:19 |
| 128:3 139:14 | 97:1 125:25 | 117:22 129:16 | 83:1 130:3,6,11 | 261:11 |
| 147:19 151:3 | 248:8 258:7 | 129:19 130:2 | 209:19 | **heard** 57:18 |
| 154:18 157:10 | 258:11,12 | 134:3 154:18 | **handwritten** | 72:24 82:11 |
| 167:18,22 | **ground** 80:8 | 163:1 247:22 | 47:16 221:21 | **hearing** 48:7 |
| 174:4 175:7 | 152:8 | **Hand-Off** | **hanging** 213:13 | 53:13 101:11 |
| 180:15 185:20 | **group** 16:21 | 249:24 255:2 | **happen** 44:23 | 153:2 216:14 |
| 186:24 191:21 | 44:22 73:23 | **handcuffed** | 64:14,14 183:2 | **heck** 113:23 |
| 203:5,11 | 122:8 126:11 | 72:21 | 208:15 237:10 | 181:1 183:24 |
| 205:25 210:6 | 126:15 134:25 | **handcuffs** 70:12 | **happened** 17:19 | **heed** 95:11 |
| 213:17 223:8 | 135:10 152:1 | 72:21 74:3 | 36:13 56:4,10 | 100:4 105:3 |
| 225:19 226:7 | 174:25 175:3,4 | 82:3,22 | 61:5 64:17 | 117:8 |
| 231:7 237:10 | 183:19,21 | **handed** 63:6 | 124:23 156:15 | **held** 11:9 35:18 |
| 239:10 | 211:15 213:2,8 | 203:12 223:17 | **happening** 57:5 | 35:22 36:4 |
| 244:24 251:15 | 213:12 223:10 | **handheld** 71:13 | 173:25 184:10 | 49:15 51:1 |
| 258:23 | 227:4 259:15 | 74:4 76:15 | **happens** 45:21 | **helicopter** 30:8 |
| **good** 7:16,17 | 259:20 | 90:2 91:20,22 | 201:1 213:7 | 30:11 |
| 91:6 100:16 | **groups** 94:17 | 96:21 97:2,7 | **happy** 56:17,19 | **hell** 75:6 |
| 117:13 230:14 | 95:21 99:24 | 98:16 99:23 | 99:19 179:17 | **help** 15:8 110:21 |
| 238:12 | 101:21 103:8,13 | 100:10 104:14 | 246:24 | 110:24 120:4 |
| **Google** 170:5 | 104:22 135:18 | 104:21 105:7 | 260:18 | 191:7 196:5 |
| **Gotcha** 21:17 | 185:10 225:25 | 112:17,20,25 | **hard** 17:7 91:2 | 203:12 |
| 38:21 83:7 | 227:6 | 113:3 114:13,24 | 229:24 | 224:22 231:14 |
| 90:13 95:24 | **guess** 31:1 157:4 | 115:16 116:24 | **hardest** 100:19 | 238:13 |
| 96:17 99:16 | 201:17 230:1 | 121:23 123:2,5 | **hardware** 43:5 | **helpful** 207:20 |
| 110:10 119:10 | **guidance** | 123:15 124:3,5 | 43:9 250:22 | **hey** 213:12 |
| 152:12 205:15 | 198:12 256:3 | 125:22 127:18 | 250:24 | **high** 235:5 |

247:20
257:21 258:3
258:6
high-capacity
121:18,21 122:1
122:7,23
123:10,14,19
123:24 125:21
127:24 128:2
129:20 131:23
132:9
higher 82:7
216:19
highlight 211:19
238:13 241:17
242:12
highlighted
240:19
highlighter
238:9
highlighting
242:3
highlights
222:23
Highway 245:17
245:21
hindering 61:1
history 56:14
168:13
hit 107:21
holding 35:25
74:17 82:18
129:19
homicide 12:24
honest 160:19
161:17
hope 71:11 76:4
261:5
hoped 54:5
hopefully 142:1
hosted 159:21
hot 121:12
hour 26:10
hours 4:14 24:3
24:18 26:12
142:2 150:8
212:21 213:8

214:3 253:10
huddle 251:6
Hudson 155:6
hundred 14:14
hurt 72:1,11 75:6
Hutson 87:25
hypothetical
64:17 174:23
175:6 181:21
182:19 183:21
183:23 193:23
hypothetically
44:13 182:12

——————— I ———————

i.e 49:19 52:10
I/LEADS 132:21
133:8,9,16,17
133:21 134:2,11
135:19 136:4
136:10 137:4
137:15,19
225:3 228:12
228:18,22
229:9 230:11
234:3 235:20
235:22,25
idea 182:20
184:10
identical 91:20
91:23 103:24
210:16,17
identification
17:25 20:21
62:15 83:11
86:5,7 93:6
101:2 117:20
128:25 154:17
154:19 162:25
163:2 170:3
203:3 206:5
219:21 223:15
223:17
identified 40:6
46:12 88:18
111:15 221:6
224:1 225:10

225:17 226:11
227:10 229:11
230:3 231:15
236:18 237:19
238:24
240:20 243:1
243:7
identifier 39:3
58:16
identifies 63:14
84:9 108:25
121:17 170:16
224:8 236:15
identify 47:10
59:9,14 158:9
206:9 224:23
225:14 234:6
234:8 235:25
238:14 239:4
243:23
244:18
ignorance 41:8
ignored 113:24
IL 4:20
illegal 60:13
imagine 71:10
immediate 70:7
101:22 120:24
124:10
immediately
45:13
imminent 71:3
71:18 99:22
100:9 125:1,19
126:22 127:5
127:10 190:19
impact 9:23
10:25 95:13
96:18 97:1,5
120:7 123:4
123:20 124:6
125:25 128:11
130:15
impairs 9:4
implausible
71:11
implemented

109:5
importance
249:8
important
28:22,25
29:3,8
impression
37:18 40:12
improper 60:5
improve 164:5
166:7
improved 168:1
inability 90:22
inappropriate
73:9
inappropriately
60:22
incident 3:6
28:10 34:10,19
34:23 35:4
38:5,10,25
39:1,4,21 50:5
53:4,11 58:13
60:21 63:24
63:25 64:10
64:13 127:11
132:21 133:3,5
134:24 135:23
137:6 152:7
155:10 157:12
163:22 165:2
166:4 167:15
174:22 191:6
194:2 197:23
208:10 212:10
215:15,18
216:5,6,7,13
227:5 228:21
228:23 233:8
246:21 249:14
incidents 28:5
29:1 30:1
32:23 34:17
39:10,18 50:11
68:16 69:21
69:25 133:11
134:22 135:13

160:17 161:18
224:23 225:8
230:10 232:3
239:5
include 31:3
85:21 111:3,5
112:15 116:17
172:23 173:5
177:6 210:20
210:25 211:5
212:5 214:11
245:2
included 61:10
91:13 97:11
98:16,22 99:8
104:4,4 107:18
111:6,15,21,24
112:20,22 117:1
132:24 135:10
135:13 220:16
227:1 233:4
234:2 243:4
includes 85:2
97:23 103:11
103:18 120:5
228:14
including 30:15
120:24 161:5
242:21
243:23
inclusion
231:25
incorporated
17:4 61:20
92:19,24
93:14 141:14,19
incorrect 173:8
258:1
incorrectly 99:4
216:24
independent
42:13
indicate 16:14
24:8 40:16
59:17,18
249:15 263:12
indicated 16:24

| | | | | |
|---|---|---|---|---|
| 49:24 151:15 | 95:14,18,21 | **informed** 54:1 | 116:9,12 | 245:16 |
| 157:4 181:10 | 96:7,18 97:1,5 | **initial** 115:25 | 182:21 209:18 | **involving** 7:20 |
| **indicates** 18:11 | 99:24 100:3,11 | **injected** 199:12 | **intention** 85:23 | 47:18 50:11 |
| 58:16 89:15 | 103:8,13 | **injunction** 18:12 | **interact** 113:18 | 134:13 228:17 |
| 98:14,21 99:7 | 104:23 105:2 | 19:4,5 20:1,17 | **interacting** | 234:5 260:5 |
| 105:14 108:15 | 105:7 113:8 | 101:11 153:17 | 34:20 | **issuance** 3:13 |
| 108:22 118:1 | 117:7 118:14,17 | 156:13 191:11 | **interaction** | 207:12 219:16 |
| 119:4 129:5 | 119:20 120:8 | **injuries** 80:6,11 | 32:14 34:24 | **issue** 10:15 |
| 132:19 171:17 | 122:8 123:4 | 124:11 | 153:5 196:21 | 42:25 43:16 |
| 181:12 239:8 | 123:20 124:25 | **injury** 80:9 | **interchangea...** | 110:22,25 |
| **indicating** | 125:25 127:3 | **ink** 240:4 | 162:23 | 112:24 114:17 |
| 245:3 | 127:4 128:11 | **inoperable** | **interdiction** 14:9 | 116:4 124:15 |
| **indicative** | 134:25 136:25 | 53:16 | **interest** 32:18 | 134:12 141:21 |
| 259:6 | 137:8 148:9 | **input** 66:15 | 46:21 158:5 | 157:2 158:13 |
| **individual** 38:18 | 149:2 152:8 | 227:22 | **interested** 20:9 | 202:17 204:10 |
| 50:16,16 53:1 | 164:24 172:15 | **inputted** 227:19 | 84:21 157:16 | 210:12 215:6,9 |
| 66:16 67:14 | 172:16,25 | **inquiries** 252:15 | 236:5 262:16 | 215:12 216:7 |
| 69:22 70:2,4 | 175:12 208:21 | **inquiring** 56:14 | **interference** | 216:18 217:5 |
| 70:17,19,23 | 210:20 211:1 | **inquiry** 169:8 | 194:21 195:15 | 233:19 238:16 |
| 71:19 72:6,21 | 212:6 239:24 | 253:21 | **interfering** | 243:13 246:3 |
| 73:24 76:16,19 | **individuals'** | **inside** 174:14 | 195:2,10,14 | 246:3 251:4 |
| 76:25 77:12,17 | 63:21 249:9 | 182:16 | 196:1,8,21 | 256:15 260:14 |
| 79:23 80:3,8 | **inert** 97:24 | **insofar** 29:24 | **interject** 147:12 | **issued** 16:25 |
| 80:25 82:11 | 259:16,19 | **inspection** 14:6 | 180:11 | 18:13,23 19:23 |
| 82:25 83:4 | **inform** 19:25 | **instances** 79:5 | **internal** 140:25 | 20:17,25 |
| 98:15 113:7 | 195:1 196:1 | 234:25 242:4 | **internally** 232:4 | 54:10,21 |
| 130:6,7,12 | **information** | 242:12 243:12 | **interpretation** | 108:18 109:1 |
| 134:25 135:4 | 9:23 16:24 | 243:24 244:1 | 172:1 187:14 | 116:4 121:18 |
| 135:18 145:8 | 17:4 28:13 | 244:25 | 213:5 | 131:24 132:6,7 |
| 163:24 170:25 | 36:5 41:21 | **instant** 261:15 | **interrupt** 10:1 | 153:16 154:8 |
| 174:18 187:9,11 | 46:3 52:11,25 | **instruct** 17:17 | **intersection** | 156:12 206:17 |
| 190:9 193:24 | 53:10 58:10 | 195:3 | 36:13 211:10 | 206:19 216:5 |
| 195:10 196:8 | 59:13 66:15 | **instructed** | **intimately** 30:18 | 216:11 217:10 |
| 198:4 221:9,12 | 88:24 107:3 | 157:24 | **investigate** | 219:13 236:16 |
| 224:3 229:5 | 134:7 135:5,6 | **instructing** | 16:16 17:18 | 238:3 239:6 |
| 247:23 248:11 | 148:25 150:22 | 196:2 | **investigation** | 241:1,13 242:6 |
| 248:12 | 153:9 156:3 | **instructional** | 28:8 55:4 | 243:2 248:6 |
| **individually** | 159:21 161:15 | 220:18 | 56:22 254:1 | **issues** 10:4,16 |
| 24:23 | 166:20 167:13 | **instructions** | **investigative** | 29:25 42:22 |
| **individuals** 17:3 | 176:6,10 225:1 | 3:12 207:12 | 12:5,23,25 | 46:2 65:17 |
| 24:25 25:6,8 | 225:7,15,20 | **instructs** 210:20 | **involve** 240:7 | 74:11 139:19 |
| 25:22 35:1 | 227:9,13,23 | 210:25 212:6 | 243:14 | 197:21 204:9 |
| 40:17 50:23 | 227:25 228:5 | **intelligence** | **involved** 68:16 | 233:13 249:10 |
| 61:13 63:1 64:1 | 228:15,16 | 28:6 29:20 | 160:5 181:18 | 250:8 |
| 65:23 73:5,11 | 230:6 231:9 | 61:25 225:5 | 195:17 225:21 | **issuing** 205:2 |
| 73:15 77:3,15 | 232:3 234:1 | 252:20 | 228:7 240:12 | 208:10 221:24 |
| 94:17,23 | 238:15 | **intent** 10:18 | 243:8 245:4 | **item** 229:21 |

ERIC LARSON  4/8/2019

items 111:14
  231:16 257:14
IV 83:25,25
  84:4 115:9,11
  115:14 137:11,14
  137:18 138:10
  196:11

_____

**J**

January 11:21
  12:6,17 101:19
Jemerson 141:2
  141:3,7 148:23
  149:3 159:20
  160:1 161:14
  220:2,8
  221:14 222:22
  246:15
Jerome 2:23
  101:8
Jessie 5:9
Jessie's 260:22
job 63:1 100:18
  100:19,20
  147:4 199:15
  238:12
Joe 66:12
jsteffan@aclu-...
  5:11
judge 16:25
  18:14 19:23
  56:5 76:3
  79:11 119:24
  169:14 179:18
  179:18
judged 117:9
July 102:9
  108:19 226:11
jump 66:22
June 11:22
Jury 66:2

_____

**K**

K-9 14:5
keep 22:10
  54:6,7 226:7
  237:21

keeping 174:24
kept 46:13,21
  50:12 115:21
kettle 34:2
  39:23 113:17
  117:6 118:15,18
  118:21 119:7,11
  123:10,25
  124:21 125:10
  125:11,16
  126:11 135:16
  137:4 151:8,10
  151:24 152:16
  152:21 158:20
  158:24 174:14
  182:11,17 183:9
  183:11 185:3
  190:15 192:18
  249:18 259:14
kettling 191:13
key 176:16 188:1
  189:9 236:4
keyword 230:7
  230:8
kind 131:6
  159:17 165:20
  210:10 220:7
  237:9 259:14
kinda 183:24
kinds 65:16
  98:25 183:1,3
knew 55:5,7
  66:2 231:21
  251:14
know 10:13,15
  10:24 21:10,24
  22:4 23:18
  27:19 30:2,19
  30:19,20
  33:19,25 34:6
  34:8,11,17 36:7
  36:12 37:7
  40:8 41:25
  44:11,20
  45:25 50:13
  50:16 51:25
  53:20 54:25

55:2 56:10
58:1,18 65:8
65:10 66:11
68:8 81:14
88:1,6,11 92:2
100:21 102:20
102:24 110:3
118:4,20
120:22 121:14
124:22 130:3
131:8 133:7
135:25 140:19
140:20 141:11
144:7 145:25
146:7,8,10,12
146:16,17,20
147:6 148:8
149:6 150:3,6
150:8 155:17
160:14,17,23
160:23 161:20
162:14 165:14
168:12 170:4
181:1 182:19
187:6 188:22
190:23,24
191:8,12 192:3
199:3,4 201:3
203:23 204:8
205:1,8,19,24
213:6,16,24
213:25,25
214:2,16
221:20 222:8
230:3 231:6
234:22
240:24 244:1
244:8 245:15
253:6 254:5
knowing 65:15
75:5 121:3
183:17
knowingly
170:22 188:5
189:19
knowledge
16:19 17:13,21

20:11 23:15
29:11 30:21
31:19 32:4
34:4 39:20
40:22 42:12
46:8,11 47:1,2
52:7,15 53:7
54:9 55:16
60:7 61:7,18
66:7,15
106:24 115:4
136:4 141:13
148:3 149:17
149:22 151:22
152:4,6 153:16
165:4,8,9,23
166:1 168:18
182:2 185:19
191:24 200:18
200:21 201:6
215:17 216:1
224:19 250:19
253:10
knowledgeable
53:25
known 118:15
247:17,19
knows 65:7
220:25

_____

**L**

labeled 51:6
laboratory 11:16
11:21,24 12:2
36:4
lack 90:22 151:7
198:24 245:10
246:11
lady 130:10
laid 28:16
174:22 221:14
227:24
language 75:6
84:8 98:13,19
99:6 112:5
116:6 130:21
170:10,12

178:7,15 194:11
198:14 205:2
205:7 207:2
208:3,8,8,11
209:3,3,7,12
209:18,19,23
210:3,9,13,18
210:20,23,25
211:18,20,23
212:5,6,15,19
212:24 213:1
214:11,11,19,24
217:25 218:1
227:16
languatory
209:5
large 27:18
63:2 103:3
121:22 135:22
135:23 141:20
174:22 183:19
215:13 223:10
259:7
larger 96:25
123:15 128:3
237:5 247:25
248:6 257:21
258:8
Larson 1:17 2:5
4:12 7:8 8:2,3
18:1 20:22
48:16 54:2
57:13 62:16
86:8 101:3
117:21 121:10
124:18 129:1
131:5 139:12
158:3 163:1
175:8 179:2
189:7 197:5
198:2 202:1
203:5 205:24
219:4 223:16
233:23
239:15 240:17
247:4 263:10
264:1 265:5

265:20
late 114:2
launched 235:8
launchers 148:20
launches 235:9 258:10
launching 234:16
law 2:19,20 25:1 25:10,14,18 60:15 75:18,21 75:22,25 76:3 79:11 86:9,10 87:24 88:25 91:14 93:21 94:3 120:9 126:1 140:5 161:10 169:24 177:14 182:23 184:9 185:24 198:8 202:22 249:10,16
lawful 7:9 120:9 121:6 123:20 189:20
lawfully 122:10 124:2
Lawrence 2:12 18:9
laws 171:2,6 173:1,7 174:17 175:13 185:21 188:9,14
lawsuit 50:21
lay 192:11
laying 103:6 114:6
lays 132:23 171:12 176:16 187:25 189:9
learn 147:1 179:6 236:5
learned 15:13 44:15 52:21 53:5,18 55:2 55:14 57:6

162:7 167:23
learning 41:9,9 55:12 90:23
leave 211:1,8 212:7,13
left 118:6
legal 75:13 76:2 79:9 161:9 173:10,13 178:21,22 179:3,14,24 190:6 202:7 224:10
lenders 161:16
lesson 3:18 61:19 141:20
lessons 15:13 161:15 162:7 167:23
let's 27:4 31:18 37:6,19 39:21 43:8 49:4,25 50:5,15 59:5 81:17,21 90:15 117:6 123:25 128:22 168:25 180:17,25 181:2 182:11 208:11 213:6 226:7 229:20 232:5 238:21 238:21 242:18 260:20 261:1
level 175:1 194:16 216:20 228:15 233:12
Leyshock 133:6
licensed 251:2
lieutenant 11:23 37:13,15 141:3 148:23 149:3 159:20 191:12 192:15,22,24 193:13 197:22 252:19
lieutenants 87:21

light 120:4 259:6
limit 212:12
limitation 50:21
line 99:11 106:8 137:11 156:7 229:21 231:16 254:11 264:5 264:9,13,17,21
lines 16:2 232:1
link 107:20
links 106:12
list 29:14 38:14 61:2 66:10 220:15 225:8 226:3 227:4 231:7,20 232:7 242:24 243:17
listed 46:4 62:2 62:2 63:22 64:21 111:8 113:6,9
listing 36:7 111:6
lists 66:10 225:25 228:1
literally 53:15 119:14
litigation 6:3 14:24,25 16:9 17:12 23:13 25:19 39:25 46:1 50:6 136:13 153:25 156:14 162:11 203:16 263:1
little 9:22 11:8 12:20 16:12 20:11 26:17 48:6 54:5 68:10 73:21 114:2 124:18 125:13 126:8 137:11 174:23 181:20 208:4 229:17 236:9
locate 39:24

134:14 139:15
207:8 229:12 229:25
located 28:4 41:5,6,15 52:1 52:2 56:18 233:8
location 3:4 34:16 36:11 47:12 52:4 59:15,19 63:24 129:6 166:17 212:10 226:22 230:20
locations 41:18 135:12
locking 82:17
locks 83:1
Locust 52:3 250:12
log 232:21
long 22:11 26:7 50:1,6 55:17 99:16 100:21 104:17 150:3 154:11 197:25 199:6 201:25 212:6 220:15 222:18 232:7
long-lasting 80:11
long-term 54:25 80:11
longer 80:15 184:21 258:17
look 17:18 46:2 48:15 49:25 51:3 54:14 63:10 82:7 93:16 105:13 108:13 111:11 118:8 129:4,13 131:15 139:23 142:9 149:16 149:20 150:1 155:13,20

169:1 176:13
189:5,6 203:6 203:8 205:5 206:21 217:8 219:6 232:5 240:18 244:5 244:6
looked 67:21 68:2 92:10 113:3 115:15 125:6 140:13 177:23 217:12 236:8 259:2
looking 15:12 31:15 39:21 45:17 47:10 83:15 108:16 136:17 140:8,9 152:21 169:12 170:11 175:17 179:13,22,23 182:5 194:15 205:12,13 217:19 219:3 231:24 232:20,21 240:18 241:10 241:16 242:12 242:13 256:12
looks 74:8 118:9 119:25 231:24 243:10
loop 57:14 137:22
loose 259:25
loss 51:5 56:22 57:2
lost 201:7 253:20 256:6
lot 8:15 24:9 26:17,19,20 64:13 66:11 145:17 157:15 185:5 186:7 234:24 257:12
lots 44:1

ERIC LARSON  4/8/2019

| | | | | |
|---|---|---|---|---|
| **Louis** 1:8 2:18,19 | 85:11 89:19,24 | **MALEEHA** 1:5 | 83:8 86:2 | 109:2 250:21 |
| 4:8,16,18 5:6 | 91:19,22 98:4 | 4:5 263:7 | 206:2 219:18 | 250:23 |
| 5:16 6:5 7:21 | 112:3 113:4 | 264:2 | 239:4 | **matters** 88:18 |
| 11:7 19:21,24 | 114:24 115:16 | **malfunction** | **marked** 17:25 | 89:1 199:13,19 |
| 20:15 22:5,7 | 115:18 137:3,8 | 42:15 43:9 | 20:21,23 | 224:11 |
| 23:25 27:7 | 148:14 196:10 | 44:16 51:24 | 62:15 83:11,13 | **mayor** 155:5,14 |
| 39:24 48:8,17 | 234:6,17,19,24 | 54:24,25 55:1 | 86:5,7 93:6,8 | **mayor's** 155:25 |
| 63:3 75:22 | 235:1,4,13,13 | 252:25 | 101:2,4 115:15 | 157:7 |
| 81:13 86:9 | 235:19 236:1 | **malfunctioned** | 117:17,20,22 | **mean** 16:1 25:11 |
| 88:18 94:2 | 236:6 238:17 | 44:14 52:23 | 128:25 154:17 | 33:10 38:22 |
| 102:15 133:25 | 239:1,9 | 54:22 55:13 | 154:19 160:25 | 46:15 50:4 |
| 145:10 148:16 | 243:25 244:8 | 55:17 254:8 | 162:25 163:2 | 60:17 62:23 |
| 151:13 155:6 | 244:14,21,25 | **malfunctioning** | 170:3 203:3 | 78:10 87:17 |
| 156:10 157:9 | 245:4 247:17 | 44:21 53:16 | 203:13 206:5 | 92:2 106:17 |
| 157:20,22 | 247:20 | 56:15 253:13 | 219:21 223:15 | 122:11 140:6 |
| 164:6 166:4 | 257:20 259:11 | **management** | 223:17 241:8 | 145:6 147:2 |
| 167:25 168:4 | **machine** 90:24 | 36:5,16 133:10 | 245:3 259:2 | 149:2 153:8 |
| 176:5 182:10 | **mail** 88:7 | 134:5 225:3 | **Market** 4:17 | 160:17,22 |
| 200:4 224:8 | **main** 82:2 | 225:22 226:1 | 5:15 263:5 | 164:22 174:7 |
| 240:25 | 164:18,20 | 226:2 227:14 | **markings** | 174:22 186:2 |
| 245:16,20 | **maintain** 42:14 | 228:2,6,9 | 240:18 | 193:22 201:21 |
| 250:14 263:6 | 50:7 54:16 | 230:11 | **mask** 129:15 | 211:12 233:1 |
| 263:7,18 | **maintained** | **manages** 43:5 | **mass** 119:5 | 249:3 253:6 |
| 264:2 | 35:10 46:5 | **mandatory** | 127:2 137:7 | 260:13 |
| **Louis's** 138:1 | 229:8,9 | 89:10,20 90:6 | 152:21 | **meaning** 65:20 |
| 197:7 | 250:25 | 90:8,12 209:4 | **material** 24:10 | 112:8 |
| **love** 260:13 | **maintaining** | 209:8,12 | 26:21 38:7 | **means** 21:4 |
| **lunch** 117:14 | 41:19 42:8,10 | **manipulate** | 155:14 161:23 | 172:10 177:12 |
| 131:6 | 45:9 52:13,16 | 80:8 | 219:10 221:13 | 184:13 194:9 |
| **Luther** 34:9,18 | 164:8 | **manner** 27:6 | **materials** 25:25 | **meant** 252:4 |
| 61:22,24 63:11 | **maintains** | 48:16,22 72:9 | 26:1,2 139:4 | **mechanical** |
| 63:18 64:18 | 43:20 47:8 | 98:10 104:8,10 | 139:24 141:2,6 | 150:17 |
| 65:5 | 50:19 224:25 | 125:19 127:9 | 141:12,20 | **mechanics** |
| | 250:12,16 | 221:1,24 | 142:4 147:9 | 30:18 168:19 |
| ——————— | **maintenance** | 235:13 | 147:22 148:4 | **mechanism** |
| **M** | 42:4 43:23 | **manners** 49:15 | 149:17 160:8 | 31:21 |
| **mace** 67:9,14 | 250:7,13 | 66:9 | 219:7,15 | **media** 35:12 |
| 68:15,17 69:3 | **major** 3:8 12:8 | **Manpower** | 220:2 221:13 | 213:11 |
| 69:9,11,16,25 | 13:10 163:13 | 228:4 | 221:21,21 | **medication** 9:3 |
| 70:14,16,24 | 164:11 165:24 | **manually** 134:7 | 222:9,13 | **meet** 24:22 |
| 71:14 72:12,16 | 247:15 | **March** 226:10 | 223:1 260:7 | 159:13 165:19 |
| 72:18,19 73:1 | **majority** 231:18 | 229:22 | 260:17 261:8 | **meeting** 26:14 |
| 73:18 74:4,25 | 231:19 243:11 | 240:21 241:11 | **math** 241:19 | 26:15,24 87:6 |
| 76:10 77:3,9 | **majors** 87:20 | 242:5 243:22 | **matter** 28:21,24 | 178:8,15,16,17 |
| 77:13 78:8,10 | **making** 148:4 | **Mardi** 63:4 | 29:2,7 31:5 | 180:2 181:13 |
| 78:17 80:10 | 157:16 158:7 | **mark** 11:17 17:23 | 51:1 80:20 | **meetings** 18:25 |
| 80:25 83:24 | 253:18 | 60:1 62:8 | 88:13 101:23 | 25:3,5,23 |
| 84:5,19 85:3 | | | | |

26:10,24
160:9 161:14
162:4
meets 204:19
members 14:1
19:14,21 27:24
27:24 28:10
29:17 32:11
59:21 65:18
107:6,7 145:13
145:15 150:15
171:20 220:19
221:22 222:5
memorandum
165:2,5
memorandums
164:24
memory 224:2
mental 198:23
mention 31:22
155:23
mentioned
14:17 19:1
29:16 41:1
44:4 57:17
76:8 87:3,12
150:9
mentions
256:24
mere 183:20
merely 211:14
merger 43:25
Merriam-Web...
177:24
met 24:21 25:9
25:22 26:3,7
94:19 198:8,10
224:4 226:4
241:4
method 36:22
47:7 91:24
106:11 150:14
methodology
113:9
methods 153:1
Metropolitan
2:17 3:11 11:7

19:18,21,24
20:15 148:16
157:20,22
164:6 167:25
middle 119:15
Midwest 229:21
mildly 34:25
mind 9:21
48:22 62:9
74:20 113:19
121:2 127:15
137:10 199:1
207:5 235:1
261:12
mine 238:6
239:5
minimization
124:12
minimize 96:8
96:17 97:4
120:23 123:3
128:10,16,18
minimized
95:13 120:9
124:6
minimizes 80:5
minimizing
121:4
minimum 78:25
81:19,21,22
82:6 130:20
minute 36:24
62:11 108:14
155:12 159:14
minutes 9:22
49:2 68:6
115:13 117:16
129:9 150:8
202:16
206:21 212:11
212:16 223:13
226:7 260:19
261:4,9
mirror 116:10
misdemeanor
178:11 181:16
182:23

misquoted
115:25
missed 238:25
missing 85:18
85:25 90:18
Missouri 1:2,8
3:10 4:2,8,18
4:22 5:4,6,16
6:5 169:24
170:7 217:13
262:5,21
263:6,7 264:2
misspoke 110:14
114:7
misstating
171:18
mist 129:23
259:15
misunderstan...
246:23
misunderstood
15:7
mixing 161:18
Mm-hmm 29:18
31:23 68:13
82:13 93:10
119:18 120:3
127:20 142:16
151:9 155:16
169:19 173:19
195:5 229:23
238:23
MO 4:21 263:18
mobility 145:17
modified 16:11,11
modify 153:4
157:1 158:12
214:19,24
modifying 15:11
210:4
Molina 10:3,4,8
10:9,17 24:13
30:25 134:12
134:13 136:13
260:4,5,10
moment 113:17
119:1 126:22

190:22,24
monetary 31:14
monitor 231:2
monitored 28:2
231:22
monitoring
28:8
month 21:15
108:12 260:21
monthly 107:5,9
201:1
months 14:17
24:7 53:19
57:4
morning 7:16,17
motion 56:1
motor 14:6
move 37:17
131:11 211:14,15
moved 12:6,22
64:7
moving 130:8,9
144:18 208:22
222:17
multiple 39:9,16
39:17 65:18
108:10 135:8
135:11,12,13
258:4
munitions 31:5
96:6 144:20
148:20
203:20 204:5
204:21 209:16
218:25 221:6
221:25 234:9
234:15 235:7
235:10,11,19
236:1,6
238:17 239:9
243:25 244:7
244:14,18
245:1,4
mutual 178:1
245:16 246:8
mutually 234:12
234:14

| **N** |
| --- |

**N** 2:1 263:17
**name** 7:24 8:1
38:20 44:4
59:2,9 63:11
146:2 163:6
226:25 227:1
227:4,7 257:9
258:5 264:1,2
265:11
**name's** 7:18
**named** 46:4
58:25
**names** 63:21
65:14 258:4
**narrow** 24:21
230:9 258:16
**nature** 30:3
73:16 124:12
128:3 148:20
184:23
204:22 258:7
**necessarily**
36:15 39:9
43:13 58:8
63:20 72:22
183:6 186:24
208:2 236:24
258:15
**necessary** 45:4
56:20 90:12
158:7 170:17
176:17 208:17
218:7 265:9
**necessity** 139:7
**need** 10:21
12:16 16:10
23:18 42:23
43:12 46:6,6
50:14 54:2,4
56:4 65:3
73:14 99:19
100:20 102:17
110:2 131:8
135:5 147:6
149:19 154:1,5

154:5 160:22
192:13,20
195:17 211:8,16
211:17 212:1
218:10 226:8
238:13 241:3
248:8 249:11
249:12,16
260:1
**needed** 40:20
41:18 115:22
179:20 231:3
**needs** 30:2
70:14 196:19
248:11
**neither** 255:4
262:10
**net** 124:17
125:13
**network** 41:13
230:19
**never** 48:10
143:5 182:20
207:25
253:19 254:9
**nevertheless**
151:18
**new** 8:21 15:12
109:10 131:11
145:14 206:1
247:11 251:12
**nice** 119:15 131:6
**Nicole** 155:6
**night** 124:24
126:23 151:12
185:5 190:18
193:16
**nomenclature**
257:14
**non-arrest**
133:12
**non-attorney**
26:3
**non-complian...**
72:17
**non-compliant**
71:19 77:8

**non-criminal**
94:18,24
95:19,22
99:25 100:11
101:21 103:14
104:23 105:8
185:10
**non-deadly**
80:12
**north** 6:4 51:18
132:14
**notarized**
263:16
**notary** 4:21 7:4
262:4,20
263:14
265:23
**note** 58:20
192:7
**noted** 51:15
53:2 64:4
**notice** 2:14 10:7
20:25 21:8,8
23:3,3,19,20
66:19 107:5
203:7 237:9
239:18,21
**noticed** 85:21
**notification**
106:10
**notified** 45:5
70:17
**notify** 181:18
**notifying** 45:1
**novel** 192:5
**November** 18:9
18:17 20:13
21:16 24:7
37:6
**number** 21:22
27:4,6 38:6,9
38:24 39:2,3
39:8 48:15
49:14 50:10
58:12 83:14
84:2 97:1
101:4 108:10

118:4 124:1
125:25 131:17
135:7,11 136:3
140:14 160:25
166:22 197:5
227:8 228:19
228:22,23,24
229:4 230:2
230:15,16,17
230:17,18,21
230:21,24,24
230:25 231:3
231:5,11,15,18
231:23,25
232:16,25
233:8,9,19
236:3,4 242:9
242:18
243:24
244:24
254:21 255:11
**numbered**
62:18 63:11
**numbers** 13:4
39:13,17 83:16
83:20 135:14
227:10,11
231:19 232:7
233:2
**numeral** 83:25
**numerals**
115:25
**numerous**
243:16
**nutshell** 153:2
202:3

---

## O

**o'clock** 4:14,15
36:13
**O'Toole** 2:12
18:9
**oath** 9:7 150:21
**obey** 189:20
**object** 20:3
48:12 65:3
72:14 75:11

78:3 79:7
120:12 122:12
173:9 177:13
178:20 185:22
190:5 191:22
193:20 196:13
199:9 201:18
213:19 245:10
257:16
**objection** 76:22
114:3 174:2
177:20 179:20
181:7 182:4
184:4 192:5,8
192:8 197:1
214:5,8,15
216:25 246:11
**objections** 79:11
192:3
**objective** 97:4
110:22,25
220:24
**obvious** 165:20
**obviously** 18:19
21:3 26:18
40:18 45:24
49:13 59:14
60:13 73:14
201:9 226:15
227:6 230:23
241:16
**OC** 98:3 112:2
120:1 121:18,21
122:1,7,23
123:11,14,19,25
124:5 125:22
127:24 128:3
128:13 129:20
130:1,14,22
131:23 132:4
259:11
**occasions**
190:12
**Occupy** 229:21
**occur** 27:19
39:10 64:6
74:12,13 183:6

**occurred** 14:21
38:4 39:16,18
50:24 53:4
56:22 61:8
66:1 92:2
120:21 127:12
163:22 166:4
186:3
**occurring**
120:17 135:8
190:23 193:9
193:15,25
222:12
**October** 37:6,19
44:10 53:5
155:4 168:18
**odd** 91:3,5
**offense** 170:21
187:18 188:1,4
**office** 2:18 4:16
5:14 15:21 91:2
155:25 159:20
263:5,17
**officer** 3:13 11:11
11:12 32:16
50:17 59:11
60:18 68:18
68:20,21,24
70:1,13 71:4,12
71:13,18,21
73:9,10 74:4
74:18,20 75:4
75:7 79:22
80:3,23 82:21
83:2,3 90:2
113:17 117:5
129:15,18,25
130:8 137:3,8
137:13 144:17
148:14 187:2
187:10 189:21
194:21 195:11
195:14 196:9
196:22 197:15
198:9,12,17
199:22 200:2
200:2,8 215:2

215:12 216:4,8
216:9,17 218:5
230:20,22
248:3,10
**officer's** 117:9
**officers** 14:11
19:16,25 20:8
20:16 27:23
33:16 34:15
34:20,25
40:19 61:15
69:4 72:5
73:23 76:15
81:8,13 84:14
85:10 88:4
94:15,22
96:20 99:23
100:10 104:21
105:6,15,25
106:23 107:3
107:19 108:8,11
109:15,20
112:24 114:9
114:22 118:17
120:25 125:3
126:25 127:15
128:11 135:10
135:17,25
138:3 139:25
140:10,19,24
141:8 142:5,14
142:24 143:11
144:1,9,13,24
145:2,5 146:14
147:23 148:10
149:19 151:24
158:19 167:22
179:5,13 181:19
183:25 186:14
190:20 197:17
198:5 199:2
199:25 201:2
201:13 215:20
216:23 218:14
219:7 223:2
238:16 256:5
256:14 257:11

**officers'** 113:7
200:18
**official** 39:1
195:2,18 196:2
**officials** 93:21
94:4
**oh** 33:11 48:10
97:13 130:9
146:16 168:9
168:12 246:17
249:8
**okay** 8:4 9:3
11:14 13:9 18:16
19:1,10 20:8
22:3,10 23:2
23:11 24:20
26:12 27:5
28:21 29:2,14
30:6,24 31:21
40:2,5,7,8 41:1
41:5 47:15
52:20 57:10
59:9,20 62:5
62:22 63:17
65:9 66:24
67:3,25 68:6
68:22 69:2
73:4,20 74:14
75:2,23 81:3
83:19 84:2,7
85:5,17 86:2
87:7,11 88:8
91:12 92:15
93:2,16 95:3
97:17 99:17
100:15 102:2
102:12,17,21
103:2,10,16
104:17 105:5
105:20 106:5
106:14,22
108:13 109:4
110:6,21 112:12
114:16 115:6
116:23 117:5,12
118:3 119:23
121:25 125:5

126:9,13,25
128:21 130:13
130:19 131:5,14
132:16 133:24
134:2,16,20
136:9 137:2,10
137:21 138:20
139:22 140:21
141:5 142:11
143:7,15,24
144:5,23
145:2 146:6,21
150:1 151:6,18
151:20 155:19
155:19 156:2
156:18 157:25
158:16 159:1
160:7 162:18
163:19 164:2
165:4,15,22
166:2 167:4
168:14,25
170:1 172:10,13
172:21 176:13
177:10 178:6
180:7,23
186:7 187:17
188:18 189:1,8
192:9,25
194:4,20
196:5 197:5
198:11,16
200:6,24
201:24 202:2
202:8,24
203:14,21
204:8,23
206:20
207:15,23
210:18 212:4
214:25 217:3
217:18 219:12
219:18 220:7
220:18 224:7
224:24 226:6
226:25 227:8
228:4,8,19

229:7 233:3
233:18
236:20
237:15 238:10
238:20 239:3
239:11,23
240:15 241:10
241:14,19,21
242:1,18
244:17
246:22
247:21 248:15
252:22 253:4
253:16 254:14
254:23 255:9
255:15 257:4
257:15,23
259:1
**Olive** 5:5 41:7
**Omri** 5:8 7:18
**once** 8:9 78:3
79:23 80:14
115:20 178:20
212:8 230:9
**one's** 220:12
**one-on-one**
77:17
**ones** 82:3
237:4,5,5
261:2
**ongoing** 16:8
25:19 52:8
56:24 61:20
65:24 145:9
145:14 148:12
148:15 156:14
156:19,24,25
157:14 158:6
254:2
**open** 159:8
**open-ended**
201:13
**operates** 45:14
65:20
**operation** 37:12
62:24 65:21
249:15

**operational** 3:7
163:12 206:10
237:7,18,21
238:3,5
**operations** 2:15
3:15 14:7 27:21
27:22 28:20
33:12 63:4,4
63:23 64:22
139:6 205:10
205:14 206:11
207:6 219:12
237:1,3 246:4
**operative**
209:10
**opinion** 120:14
173:13 178:2
179:3,24
198:6
**opinions** 76:2
157:11 178:22
**opportunities**
186:4
**opportunity**
18:16 78:14,16
95:10 100:4
105:2 120:20
186:5 204:22
**opposed** 248:3
**opraiss@aclu-...**
5:10
**OPs** 40:6,25
62:5,20,23
63:3,7 64:4,5
64:6,14 65:10
66:3,5,17
205:15,19
254:15
**Option** 127:17
**order** 3:14 11:5
16:25 17:5,5
18:13,18,23
19:22 27:21
27:22 28:20
29:12 33:12
40:25 49:21
53:8 54:9,20

ERIC LARSON  4/8/2019

| | | | | |
|---|---|---|---|---|
| 60:16 62:24 | 213:18 214:4,11 | **outlined** 106:19 | 90:20,22 91:7 | 211:5 255:23 |
| 63:4,5,23 | 215:6,9,13,19 | 238:18 | 93:16,23 94:6 | 256:11 |
| 64:23 67:8,18 | 216:5,11,18 | **outlines** 108:23 | 94:12 132:17 | **park** 14:9 211:10 |
| 67:22,24 | 217:5,9,21 | **outlining** 152:3 | 136:12 163:7 | **part** 7:10 18:25 |
| 70:15 73:8,17 | 218:2,6,11,16 | **output** 235:6 | 169:17 170:15 | 27:22 48:4 |
| 74:5,16 76:9 | 218:25 219:16 | 247:20 258:3 | 171:9 172:22 | 51:16 59:24 |
| 76:17,23 | 222:8 235:20 | 258:6 | 173:3,4,16 | 60:17,17 61:9 |
| 80:25 84:3 | 238:16 241:1 | **outside** 15:17 | 175:18,20 | 61:11 64:19,21 |
| 92:19,25 | 241:13,24 | 24:25 46:20 | 176:13 187:17 | 65:2 67:23 |
| 93:15 96:19 | 242:7,14 | 48:12 65:4 | 187:25 189:1,9 | 80:13 81:17 |
| 97:6 101:16 | 243:2,13 | 114:18 129:22 | 194:5,20 | 94:15 97:11 |
| 106:19,20,24 | 245:23 251:15 | 191:23 192:10 | 228:14 232:8 | 101:13 107:9,18 |
| 107:13,14,16,17 | **orders** 2:18 13:3 | **outstanding** | 232:9,13,14 | 116:8 132:8 |
| 107:22,24 | 14:18 15:4 | 10:16 | 249:19 | 144:25 149:11 |
| 108:2,3,3,5,18 | 48:5 56:18 | **overall** 33:17 | 254:24 | 150:6 159:18 |
| 108:23 109:5 | 60:8 67:7 | 48:5 49:17 | 255:10,18 | 178:6 190:7 |
| 109:9,14,19,25 | 81:11 95:14 | 61:11 | 263:11,14,17 | 191:18 |
| 110:3,12,15,18 | 113:24 114:18 | **overhear** 181:21 | 264:5,9,13,17 | **participate** |
| 110:22 111:1,16 | 152:20 203:8 | **overheard** | 264:21 | 32:25 65:1 |
| 111:25 112:7,21 | 204:7,13 | 181:18 | **pages** 16:2 | **particular** 43:9 |
| 113:1 114:12 | 205:20 207:7 | **overhearing** | 62:17,19 63:6 | 43:17 45:11 |
| 115:18 116:13 | 207:13 208:21 | 181:2 | 63:10 65:10 | 47:11 55:11,12 |
| 117:2,10 121:14 | 215:16 216:2 | **overwrite** 45:23 | 85:25 90:19 | 57:16 61:25 |
| 122:11 124:4,8 | 218:24 219:8 | **owing** 10:4 | 91:3,5 92:4,8 | 63:24 64:8 |
| 125:24 130:24 | 223:3 239:6 | **owned** 42:6,9 | 169:15 | 64:22 68:7 |
| 131:20 136:17 | 241:20 249:6 | 43:10 | **painful** 80:10 | 73:24 104:6 |
| 136:23 137:12 | 255:6 | **owns** 41:25 | **paper** 201:14 | 123:9 163:23 |
| 137:14 138:11 | **ordinance** 172:2 | 45:22 | **paragraph** | 165:1 168:3 |
| 138:12 139:3 | 176:14,17 177:6 | | 93:17 101:17 | 190:22,23 |
| 142:21 154:8 | 177:11,18 178:6 | **P** | 105:13 108:13 | 193:25 |
| 166:7 172:23 | 179:6,10 180:9 | **P** 230:14,16,17 | 224:7 | 207:25 |
| 184:14 185:7,8 | 181:11,12 | 230:17,21,21 | **paragraphs** | 224:18 226:17 |
| 187:12,13 190:1 | **ordinances** | 230:24 231:3 | 255:17 | 229:16 230:10 |
| 190:13 193:1,1 | 197:18,19 | 231:5,10,15,18 | **parameter** | 237:18 240:6 |
| 193:7 195:1,17 | **ordinary** 194:13 | 231:19,25 | 230:5 | 252:2 253:1 |
| 195:22,23 | **original** 21:4 | 232:7,16,25 | **parameters** | 258:2 259:4 |
| 196:7,12,18 | 213:14 227:3 | 233:1,7,9,19 | 226:2 230:7 | **particularly** |
| 203:19 204:4 | 244:24 | **p.m** 118:10 | 230:12 | 133:15 |
| 204:6,6,14,20 | 263:10 | 119:12 261:16 | **paraphrase** | **parties** 262:12 |
| 205:3,6,10 | **originally** 10:2 | **P1709150933** | 93:17 | 262:15 |
| 207:2 208:8 | **outcome** | 232:20 | **paraphrased** | **partnerships** |
| 208:12,21 | 262:16 | **PA** 30:20 239:6 | 209:17,23 | 41:14 |
| 209:3,12,15 | **outline** 141:1,5 | **package** 60:1 | **paraphrases** | **PAS** 105:21,22 |
| 210:1,11,12,19 | 144:15 145:4 | **page** 2:3,11 3:2 | 210:10 | 105:25 106:5 |
| 210:24 211:7,7 | 220:1,8 222:8 | 21:25 23:4 | **parcel** 60:17 | 106:22 107:4 |
| 211:12,24 | 222:10,22 | 85:18,21 89:4 | **parent** 25:15,15 | 107:5 114:21 |
| 212:5,16,22 | 248:23 | 90:15,15,17,19 | **parenthetical** | 150:13 |

pass 107:16
  108:6
passive 74:9,11
  77:2 84:9,15
  84:18 85:8
passively 72:17
  72:19,25 73:7
  74:2 77:10
  81:5 82:19,23
  84:19
patience 247:5
patrol 11:11
  29:25 68:18
  132:13,14,15,15
  245:17,21
pattern 184:9
pausing 69:5
peaceful 72:9
  101:21 103:14
  104:23 105:8
  184:21
peacefully 73:6
pedigree 135:5
pen 240:4
penalty 9:9
  265:12
pending 46:5
  100:23 156:14
  205:25
people 24:21
  34:20 37:16
  45:8 64:7,7
  66:12 73:23
  84:20 95:16
  120:2 121:5
  124:1 126:12
  126:15,15
  127:16 128:4
  130:15 145:10
  152:1 157:15
  159:13 173:23
  174:6,8,19,25
  176:9,10 180:3
  180:7,17 181:10
  181:11 182:12
  182:19 183:4
  183:13,19,21

184:8,11 185:5
  185:16,19
186:6,7,11,23
  191:4 192:1,3
  193:16 201:4
  209:20 211:6
  212:1 213:2,8
  213:10,13
  214:13 216:19
  217:22 257:13
  259:15,20
pepper 68:15,17
  68:24 69:3,16
  69:24 70:14
  71:13,22 72:1
  73:10 76:16,19
  77:25 79:4
  80:24 83:4,24
  84:4,5 85:2,2
  85:11 89:19,19
  89:23 91:19
  96:21 97:24
  98:3,10,15,21
  99:7,11,23
  100:10 104:8
  104:13,22
  105:7 112:16
  112:20,25
  113:3 114:24
  116:25 121:23
  123:15 125:23
  127:18 130:21
  136:24 137:13
  138:17 187:4
  196:10 234:16
  257:1,20
  258:8,10
percent 40:15
  201:16 250:17
percentage
  26:14
Perfect 58:20
  101:17
perform 15:21
performance
  164:6 166:8
  167:25

performed 11:17
  172:14 246:8
period 14:15
  15:8 22:2
  31:18 38:3
  39:11 44:13
  45:11,23 68:14
  69:18,20
  147:13,25
  148:7,8
  209:10 214:13
  240:23
  243:22
perjury 9:9
  265:12
permits 202:21
perpetration
  178:10 181:5,15
perplexed 48:6
  75:10 126:8
Perry 16:25
person 59:10
  70:12 71:1,14
  71:15,22 74:1,5
  76:24 79:1
  96:2 130:2
  150:13 170:17
  170:20 171:5
  171:18 172:13
  172:25 175:4
  175:10,11,24
  176:17 178:8
  178:15 180:2
  181:13 188:4
  189:14,19
  194:13 196:19
  208:20 210:1
  210:8 212:22
  213:24 214:1
  215:19
personal
  150:20
personnel
  65:16 66:8,9
  66:10 166:22
persons 72:18
  124:10 125:2

125:20 170:23
  171:1 175:2
  176:20 188:5
  188:8 249:13
perspective
  31:2 116:3
  166:3 211:4
pertain 249:6
pertinent 46:12
  46:15
phone 44:25
  66:12
photographing
  32:16
photos 36:1
phrase 38:21
  77:7 89:15
  177:10 178:14
  194:9 228:9
  239:19 255:21
phrases 230:7
physically 71:2
picture 2:24 3:3
  118:1,13,16
  119:4,15
  120:22 128:22
  129:4,14
piece 201:14
piecemeal
  36:18
pieces 145:23
  198:3
place 10:12
  65:19 119:8,11
  126:4 143:2,3
  144:24 145:13
  168:19 182:22
  184:2 192:19
  208:18 226:17
  226:23
  240:23,24
places 234:6,8
plaintiffs 1:6,18
  2:4 4:6 5:3
  7:2,10 23:13
  207:22
Plaintiffs' 17:24

20:20 62:14
  83:10 86:4
  93:5 101:1
  117:19 128:24
  154:16 162:24
  170:2 203:2
  206:4 219:20
  223:14
plan 2:15 3:15
  3:18 10:2
  21:23 40:6
  61:19 62:5,20
  62:23 63:7,23
  64:4,5,7,14
  65:10 66:3,5
  66:17 141:20
  178:1 205:14
  205:15,20
  206:11 207:6
  219:12 237:2
  237:3,18
  238:3 246:5
  254:15
planned 246:2
planning 3:7
  12:7,18 13:1,2
  14:16 15:10,17
  15:18,21 16:13
  16:21 17:15
  65:21 163:13
  182:3 237:7,21
  238:5
platform 42:17
  42:20,21
platforms 42:18
  42:19
plausible 113:25
  114:7
play 73:13
  253:25
played 163:24
please 8:17,24
  48:16 68:7
  72:11 79:3,15
  89:4 102:3
  110:2 111:10
  171:17 194:5

ERIC LARSON  4/8/2019

205:18 239:3
240:23 255:9
256:8 263:9
263:12,16
**plugged** 65:23
**plural** 136:5,11
**point** 11:1 20:6
32:5 34:11
38:15,16,17
48:23 50:18
51:2 53:5
60:11 74:1
79:24 80:2
83:22 84:8,16
85:20 120:16
120:18 174:7
183:5,25
190:16,21
195:13 198:5
201:8 221:15
246:10 251:19
252:14 253:12
254:5 260:12
**pointing** 130:4
130:5,10,12
**points** 123:9
**police** 2:17,18
2:20 3:11,13
11:7,11 12:25
15:19 16:14,20
17:14 19:16,18
19:21,24,25
20:8,15,16
27:13 28:1,17
28:23 29:4,9
32:14,24
34:20,25 37:9
38:25 40:18
41:7,14 42:1
43:25 47:24
49:19 57:20
57:22 59:17
60:5,18,22
65:18 68:24
69:4 71:4,18
71:21 72:5
73:8,10 74:6

75:3,7 80:23
81:13 83:2,3
85:9 86:9
88:4 90:2
94:15,22
96:20 99:22
100:9 102:15
103:7 104:21
105:6 106:23
107:3 109:15
109:20 112:24
113:17 114:9,22
118:14,18 119:2
120:25 126:25
127:11,15
129:15 133:14
137:3 138:3
139:25 140:10
140:19 141:7
142:5,14,24
143:11 144:1,9
144:13,16,17
145:11 146:13
147:23 148:10
148:13,17
149:18 151:24
153:5 157:9
157:20,22
158:19 164:7
166:8 167:22
167:25 179:5
179:13 183:25
184:14 189:20
190:20 195:11
196:22 198:5
199:2 200:7
200:18 201:13
218:5,14 219:7
223:2 224:9
224:10 228:4
231:2 233:2,11
239:25 240:8
240:10,13,21
240:25 241:12
243:4,8,12,15
243:24 245:5
256:5,14

259:13
**policies** 15:4,12
15:12 17:18
28:16 47:16
49:20 59:21
73:1 74:6 76:7
88:17 109:15
109:20 138:1
142:13 151:23
152:14 153:4
153:18 156:11
157:2 158:7,12
158:19,23
197:7,13
200:3 202:4
202:16 215:8
217:4 218:15
**policy** 13:3 14:18
14:25 15:22
15:23,24,25
16:3,4 17:7
28:21,24 29:2
29:7 31:6
47:20,22 48:3
48:3,9,23
49:17 50:18
72:4 75:3
77:15,24 91:9
91:13 93:20
94:2 105:15
105:20 106:15
106:16,18,19
108:23 122:5
133:24 142:23
152:2,24
155:24 168:17
171:25 176:4
184:13 195:9
197:21 211:4
215:10
**pool** 63:22
**pop** 236:25
**portion** 84:3
**position** 13:6
56:21 74:20
130:2 174:13
182:17 183:18

184:3,6,8
185:4,15
186:14 190:1
211:11
**positions** 11:9
31:4
**possibilities**
78:21,21
**possibility**
78:20
**possible** 10:18
15:14,16 27:16
87:1 114:7
261:6
**possibly** 159:25
160:5 214:1
224:22 225:7
**post** 63:8 142:2
146:4 149:21
159:15
**potential** 40:10
42:18 46:1
80:5 171:14
224:23 226:3
232:2 245:22
246:3
**potentially** 21:5
35:6 40:4
80:9 172:17
184:16 210:4
214:20 248:13
259:9
**PowerPoint**
61:19 89:5
160:8,11,13
171:10 173:17
202:12 260:17
**PowerPoints**
219:10
**PPC** 240:10,20
243:3 245:2
**practical** 116:3
**practice** 75:25
93:21 94:2
134:21 194:21
195:20 196:6
196:17,24

197:20 199:24
215:10,13
216:16,19
**practices** 76:7
88:17 94:7
138:2 142:13
151:23 152:14
153:5,12,18
156:11 157:2
158:7,12,20
158:23 195:14
197:7,13
200:3 202:4
202:16 215:8
217:4 218:15
**Praiss** 2:6,8 5:8
7:15,18 10:11
10:23 11:3 18:1
20:5,22 23:11
23:17,19 48:14
55:24 56:25
57:11,13 62:12
62:16 65:7,9
72:24 75:14
77:20 78:5
79:10,15,17
83:8,12 85:24
86:6 91:1,7
93:7 100:17
101:3 114:4,5
115:12 116:2
117:15,21 121:1
122:22 129:1
131:2,5 139:12
141:22,25
147:15,21
154:18 160:21
162:12,14 163:1
169:14,17
170:4 173:12
174:11 177:15
177:23 178:25
179:21 181:20
182:5 184:7
185:25 190:11
192:2,9,14
194:4 196:16

ERIC LARSON  4/8/2019

197:2 199:11,14
201:24
202:24 203:4
205:24 206:6
207:24
213:22 214:6
214:9,17 217:3
219:18,22
222:14,17
223:16 233:21
238:8 239:14
240:16 242:21
242:25
245:12 246:15
247:4,10
251:11 259:22
260:11 261:11
pre-Stockley
86:19
precluded
94:15
predicate
192:13 193:3
preface 199:10
prefer 118:24
preferable
130:20
preliminary
18:12 19:4
20:17 101:10
153:17 156:12
191:10
preparation
21:11 32:20,21
55:2 86:24
92:16 157:7
159:2 206:18
235:6
prepare 24:23
27:1 51:10
56:2 59:12
67:4,19 139:1
204:2 218:21
224:4
prepared 26:21
32:25 88:11
134:15,18,20

136:5,8,11
163:16 165:5
206:15
209:19 218:23
222:4,9
230:25 231:1
235:21,23
236:25 237:6
237:8 243:18
preparing 13:4
23:8 24:4
25:24 26:4,13
55:10 68:2
85:5 86:21
93:12 110:8
147:6 205:10
220:19 221:17
229:19
prerequisite
245:24 246:1
presence 215:3
present 25:3,6
34:1,4,5,9
55:20 69:14
99:22 100:9
124:10 149:18
171:19 175:24
178:8 180:2
181:13 189:15
193:4 200:13
209:10 213:1
217:22 218:8
218:10 222:19
231:16 253:22
254:3
presentation
87:23 88:2,3
161:2 169:18
171:10 172:22
173:17 187:18
202:12
222:20
presentations
162:4 167:21
presented
86:17,18 87:12
125:1,19

126:22 127:10
161:14 190:19
presenting
127:5
presently
109:19 214:24
237:4
preserve 40:19
pretty 56:5
166:3 198:16
199:17 215:2
226:19
prevalent 232:1
prevent 178:9
181:5,14
previous 62:3
previously
52:17 117:17
140:4 155:2
primarily 14:1,7
32:13 35:16
58:9 67:22
68:18 132:6
133:14 230:5
248:14 260:5
principle 124:14
246:7
print 260:20
261:2
printed 18:21
170:6 261:3
prior 18:23
22:15 24:17
32:17 54:18
65:12,14,25
69:24 77:23
87:6,13 89:11
89:21 90:6
145:2,5 146:11
147:9 152:5
161:22 187:1
190:9 194:25
195:16,20
200:13 205:3
205:21 206:18
207:1,11
209:15 216:2

239:19
242:20
250:15
prisoner 35:24
35:24
private 41:14
42:2,7 45:15
privileged 20:4
probabilities
78:22
probable 197:19
198:9 200:12
204:18,19
probably 8:11,18
21:16 26:10,16
31:12 36:3
43:16 50:12
65:13 117:15
197:16 201:16
206:18 242:11
probe 124:18
problem 43:11
55:25 180:12
195:8 214:7
254:10,12
problems
214:20
procedure
152:25
249:22 255:1
procedures
216:24
process 35:11
36:25 44:17
51:17 52:8
58:15 59:24
65:24 72:8
80:22 148:15
152:23 154:12
156:19 157:15
186:13 203:12
247:6 254:1
processes
154:13
processing
128:14
produce 39:24

260:1
produced 4:13
7:9 23:12,16
47:3 51:6,13
52:22 203:15
207:21
Production
23:3
Professional
4:19 262:4
professor 168:8
program 141:1
144:19
programs
148:21
prohibit 60:4
prohibited 94:7
94:22
prohibiting
200:1
promoted 11:18
11:22,25 12:8
13:10
prompted 18:5
properly 251:23
property 35:14
35:18,24 37:2
37:5,8,12 38:7
38:8,11,12
49:16,23 58:11
60:1 124:11
125:2,9,20
180:22
190:20 191:17
proposed
246:2
prosecution
61:1
prosperity 183:1
protest 2:20
14:23 15:13
16:6 17:3
22:12 27:18
27:20 28:18
28:23 31:17
31:25 32:3,15
45:25 50:9

50:20 60:23
65:2 86:10
87:14 88:9,24
91:14 122:2,24
133:4 144:10
153:20 156:12
158:13 159:2,8
159:10 161:3,9
161:13 162:8
163:17 165:7
165:13 167:20
168:23 173:21
174:15 206:16
207:7 216:10
226:4,17,20
226:22 229:3
229:16 230:8
231:2,22,22
231:22 232:6
232:25 236:2
236:6 237:19
238:18 240:6
240:23 241:2
241:10,12
242:7,22
244:1 245:5
246:10 252:9
**protester** 28:1
113:18 195:1,2
195:3 196:1
**protesters** 61:15
98:11 104:9
119:3 126:16
142:15,25
143:13 144:3
152:17 153:6
183:14,15
213:13 214:18
222:1 227:9
233:11 240:7
240:12
**protesting**
73:23 239:25
240:10,13,20
243:8,14
245:5
**protests** 14:22

15:2 16:6,22
17:19 22:15
27:8,14 29:5
29:10,16 30:5
33:21 35:7
36:9 37:22
39:7,15 40:24
41:3 45:12
46:10,17,24
46:25 47:18
47:20 48:18
48:25 49:9
50:6 52:14
57:24 63:19
64:20 73:5,16
114:23 132:5
134:11,12,13,13
136:6,12 157:3
159:6 187:2
188:24 215:21
216:3 217:6
218:23 219:14
225:24
226:10 236:18
236:23,25
239:19 240:12
240:24 243:4
243:23 245:9
**protocol** 249:1
256:13
**protocols**
248:20,24
255:13,17
256:2,23
**provide** 9:4
56:18 78:7
139:7 196:7
198:12 209:18
216:8 227:22
**provided** 25:25
70:1 81:8
87:22 88:4
106:9 112:23
114:9 138:8,10
139:5,25
140:15,23
142:4 143:10

144:1,12,15
158:18,22
164:15 167:1,21
173:17 176:7,8
199:2 200:7
218:14 220:1
222:5 225:16
228:1 251:20
251:21 260:8
**provides** 177:24
220:9 221:22
226:10
**providing** 19:3
41:21 100:1,3
104:25 105:1
148:25 256:3
**provision**
109:10 115:15
124:17 169:24
170:18 171:13
178:19 179:16
182:7 186:11
187:22 188:19
188:24 189:7
200:19
202:22 217:13
**provisions**
114:24 124:8
138:16 161:9
206:25
**public** 4:21 7:4
14:9 27:13
28:18,23 29:5
29:10,16 34:2
45:15 243:8
243:14 245:5
262:4,20
263:14
265:23
**punishing**
94:25 100:12
105:9
**purged** 51:2
**purports** 88:16
**purpose** 32:12
32:13 35:3
94:17,24

95:21 99:24
100:12 104:22
133:8,10 231:6
**purposes** 39:25
86:7 105:8
106:6 154:19
163:2 223:18
234:11,13
235:12
**pursuant** 101:22
109:5 200:8
202:7
**put** 10:1,21 17:9
21:20 27:20
34:25 35:17
38:8 50:25
53:8 58:11
59:3 63:2,21
70:12,18,22
72:21 74:3
82:3,21,22
101:22 102:16
164:3 165:2
207:19 212:11
230:7 231:3
250:5 260:6
**puts** 82:21
**putting** 30:22
229:20
260:11
**puzzled** 242:10

——————
**Q**
——————

**qualified** 145:11
**qualify** 236:23
**quality** 164:5
166:7,14
167:24
**question** 8:21
8:23 9:1 13:23
17:12 20:3,10
23:11 28:14
31:2 37:4,14
37:23 49:25
50:4 51:19
55:7 56:15,23
64:24 66:14

71:7 72:14
75:12 76:5,11
78:4 79:8,18
85:5 88:22
97:18 99:16
100:22 114:7
120:13 122:5
122:13 123:23
125:12 147:21
154:14 156:8
158:3 165:20
167:18 173:10
175:14 177:14
177:16 178:21
179:1 180:14,15
183:17 185:23
186:1 190:6
191:22 192:10
192:11,13,14,20
192:25 193:21
196:14 199:1,6
199:10,15
200:6 201:21
205:25
206:24 210:7
211:19,23
213:20,23
215:24 222:19
229:18
234:23
236:13 241:21
243:5 245:13
246:25 249:4
258:21 260:12
260:18
**questioning**
239:16 257:5
257:23
**questions** 7:15
8:15,18 12:14
18:7 54:6,8
57:15 102:20
103:1 104:2,17
107:11,25 108:1
108:5,9,11
117:16 118:19
131:11 139:16

ERIC LARSON  4/8/2019

143:17,20
145:20 147:15
156:7 163:23
184:24 204:17
243:18 247:6
247:11,14
251:11,12,16
254:15,20
259:23
260:21 261:12
quibble 74:7
quick 8:14
141:23 142:9
242:13
quicker 239:16
quickly 18:6
41:9 237:1
quite 37:17 76:3
92:8 114:4,6
142:19 154:7
213:11 232:16
quote 38:25
49:17 80:6
166:7 230:17
245:18
quotes 208:23

R

raised 250:8
raises 145:19
Randy 221:14
222:22
range 97:14
128:4 248:8
258:13,19
259:7
ranged 167:1
rangers 14:10
rank 11:19,23
12:1,8 34:14
197:22
rate 257:21
rationale 75:8
76:12,15
Re-Examination
2:8 251:10
reach 171:5

175:11,15
reached 79:24
80:14 174:15
181:22 182:13
183:22
read 51:4 86:23
99:18 101:18
108:15 118:9
137:25 138:22
164:3,12 191:14
197:6 202:1
210:6 248:18
249:19 261:14
261:17 263:12
264:6,10,14,18
264:22 265:6
readily 39:24
reading 26:20
ready 66:4
102:20,21
110:4,5
real 18:6 28:3
35:21 36:21
36:23 41:2,16
41:17,21 43:21
43:22 45:8,10
45:20 46:9,19
47:8 48:2
49:7 50:8
53:21 54:14
58:5 141:22
142:9 242:13
252:20
realize 201:15
realized 253:12
254:11
really 44:12
47:9 69:15
183:9 224:17
246:4
Realtime 4:19
7:4 29:19
reason 31:3,11
46:22 54:19
64:2,24 72:4
74:10 75:2
76:23 78:6

116:16,21,22
153:23 159:11
192:9 196:17
211:3 212:10
214:9,16
216:14 233:4
253:4 264:7
264:11,15,19
264:23
reasonable
183:12 194:6
194:10
reasonablene...
194:12
recall 21:7,9
26:6 68:21,22
68:25 69:1,9
69:11,14 85:16
86:16,25 87:3
87:22 88:7
116:7 140:15
159:17,22
160:3,10,18
161:19 162:16
168:2 183:15
220:3 236:12
257:7 259:1,4
received 18:20
37:20 225:7
238:6
recess 250:6
recognize 53:6
83:21 118:13,18
119:6,19
recognizes
77:22
recognizing
114:5 116:16
recollection
69:25 102:18
167:19
recongregate
212:2,20
214:14
record 7:25 8:1
8:19 10:1,22
21:21 28:1,23

29:4,8,15
30:9 31:6
32:2 35:4
38:5 41:3,12
41:18 45:2
51:4,19 57:12
57:14 59:25
61:14 62:11,13
62:22 81:4
85:17 93:3,4
100:25 101:19
131:4,6 133:2
133:13 138:1
139:10,11
141:22,24
155:3,4,23
157:18 164:4
179:22 197:6
203:1,4
205:22,23
206:9 207:20
222:14,16
226:2 233:20
235:24
237:21 238:7
238:14 239:4
239:12 240:14
242:1 247:3
247:12,16
250:5 251:8
252:8 254:9
259:24 260:6
260:12
recorded 27:7
35:13,20,22
36:19 38:2,5
39:5 49:15
52:21 58:11
59:8 60:21
250:21 252:11
253:19,24,25
recording 27:13
28:17 30:12,15
31:1 45:13
46:24 47:5,11
51:6 57:24
58:4,6,15,17

253:20
recordings 37:2
37:21 42:25
47:17 48:17,24
253:2
recordkeeping
58:3,15
records 35:8,9
36:18 45:19
46:9,16 47:9
50:7,19 54:15
133:10 134:5
148:15 224:25
224:25 225:2
225:22 226:1
227:13 228:2
228:6,8
230:11
recover 51:21
52:6
recoverable
254:3
recovered 30:3
red 240:4
reduced 262:9
refer 8:3 92:4
170:9,13
187:22 209:21
228:20
243:20
249:18 257:11
reference 22:5
96:12 111:8
131:22 132:11
137:5 235:18
236:14 254:10
257:5
referenced
136:13,18
139:6 142:3
143:16 145:24
180:8 202:20
205:16 219:15
219:25 224:14
231:11 233:10
245:1
references

92:3 256:21
referred 34:1
97:15
referring 18:13
19:2,8 24:12
32:22 60:11
68:9 87:4
102:9 115:8,14
115:17 132:12
141:18,19
144:15 151:11
151:24 155:9
156:24 168:14
180:3,5 228:11
244:11,20
refers 115:18
132:13 178:17
228:21 246:16
reflect 88:17
236:1
reflects 88:25
171:25 226:16
refrain 12:15
refresh 102:18
167:19
refreshed
26:20
refresher 8:14
145:15 150:10
150:12
refusal 74:15
189:10 190:2
190:10 193:2
193:17
refusals 80:1
refuse 189:20
refuses 71:15
82:12,25
refusing 72:20
74:2 76:17
81:23 82:15,16
82:17,18
regard 56:19
249:17
250:20
regarding 107:11
158:19 221:5

223:22
regardless
37:18 99:11
104:13 138:4
138:13 140:2
198:22 235:13
258:5
regards 77:14
Registered 4:18
262:3
regrettably
247:8
regular 30:1
200:2,25
relate 17:19
139:20 153:5
156:11 230:1
234:15,15
related 14:21
15:22 16:6,22
16:25 17:1
23:9 30:4
36:21 38:10,14
38:15 39:3,17
39:18 43:5
47:20,25
49:20 51:12
51:22 63:7
67:22 69:7
114:15 146:23
148:19,21 149:1
160:17,18
195:14 197:20
199:19 201:23
204:17 215:8
217:4 224:11
233:8 262:11
relates 14:7
38:24 48:24
49:13 113:5,7
151:1 195:13
208:3 228:23
232:22
relating 19:3
27:12 46:16
46:25 48:25
50:20 109:15

109:20 134:11
143:21 144:14
207:6 218:14
252:25
relationships
42:1
relative 3:16
28:2,9 32:6
43:25 70:3
139:5 141:15
197:17 204:21
206:11 262:13
release 66:6
released 51:16
53:2 65:15,25
releasing
221:25
relevant 22:1
57:6 147:13,24
153:19 200:19
211:6
relied 23:16
rely 23:7 227:9
remained 12:2
12:5
remember
236:8
reminder 107:9
render 265:9
renew 76:21
reorganizations
13:18
repair 43:12,14
45:3 55:18,19
56:14
repaired 44:18
55:1
repairs 45:3,4,6
repeat 88:20
99:19
rephrase 8:25
88:22 177:16
178:25 249:5
replacement
66:9,10
report 14:3,11
32:20,21,22

32:24 39:2
59:18 132:22
133:8,17,21
134:11,15,18,20
134:21 135:1,19
136:5,10 137:5
137:15,20
228:18,19,23
229:11 230:2
230:23,25
231:1 235:21
235:22,25
236:3,4
reporter 4:19,19
4:20,21 6:1
7:5 8:16 17:25
20:21 62:15
83:11 86:5
93:6 101:2
117:20 128:25
154:17 162:25
170:3 203:3
206:2,5
219:21 223:15
261:13 262:1,4
reporting 132:17
133:18
reports 14:4
37:9 133:14
134:2 135:3
135:25 136:7
160:17 227:12
228:3,12
229:7,15,25
230:4 234:4
represent 101:11
191:14
representative
9:14 23:24
53:14,24
64:16 67:20
76:6 84:22
116:12,24
121:9 139:1
146:12 150:21
157:6 162:3
172:4 173:14

178:3,23
182:10 207:10
216:1 221:11
222:25 240:7
253:17
representing
192:15
represents
118:16
reprimanded
165:22
request 15:20
16:15 17:15
21:12 23:3
50:17 53:18
55:15 70:11
71:16,24 73:8
73:12 82:25
141:16 164:25
232:23
requested
164:19 261:6
requests 16:20
35:19
require 55:25
137:19 184:22
210:16,17
217:21
required 80:15
80:23 90:6,9
108:2 128:12
132:17 137:15
164:10 165:17
180:21 187:13
190:8 196:10
209:14
requirement
95:25 96:21
97:6 107:23
108:4 120:6,7
124:13 134:23
165:19 170:25
175:18 177:7
184:18 204:18
209:11 210:2
216:22
requirements

95:3,17 103:12
117:2 128:6
165:25 168:21
172:23 173:5
221:5
requires 29:12
50:18 177:19
188:19 194:16
research 12:7,18
13:1,2 14:16
15:10,17,18,21
16:14,21 17:16
54:6
researching
13:3 14:18
reserved 7:7
resist 70:23
resistance 74:8
74:9,23 77:2
81:15,18,19,20
82:19 84:10,15
85:9 233:22
resisting 71:2
72:17,19,20
72:23,25 73:7
73:8 74:2,16
74:24 77:8,10
79:2 81:5,6,14
81:25 82:15,19
82:20
resistings
120:17
resolution
153:25 157:16
253:7
resolve 43:16
251:4
resolved 44:22
51:1 153:6
resorted 125:13
resources
245:23
respect 9:18
16:13 20:16
28:16 45:10
47:4,7,11 51:11
54:1,10,21

56:13 82:8
89:1 95:24
96:17 97:6
104:2 106:14
106:23 110:11
138:10,21 139:1
139:14 142:20
143:11,20
147:10 148:10
149:18 150:4
152:14 154:8
156:10,18
158:13 173:15
177:18 179:15
198:13 201:1
204:2,13
218:21 221:3,4
229:3 236:17
252:24
respecting
249:9
respond 150:16
237:1
responded
231:2
responding
55:15 145:24
241:2 242:7
243:25
response 2:15
3:15 27:13
28:11,17,23
29:5,9 53:17
143:16 206:11
220:21 246:2
248:20
255:13,17
256:13,23
responsibility
41:24
responsible
13:2 32:16
41:19 42:3,7
42:10 43:18
52:13,16 148:9
148:18,23,24
197:23 216:12

responsive
143:22
rest 181:12 210:6
restrict 122:21
restricting
122:17
restriction
120:11 121:4
restrictions
108:25 123:3
result 89:12
96:6 123:18
resume 56:20
retained 45:19
46:9,13 47:1,3
48:17 50:2
58:7,8,9
retention 47:17
47:20,22 48:9
48:24 49:4,17
retrievable
253:2
retrieve 251:18
return 212:9
263:16
returned 164:19
revamp 152:19
reverse 251:15
review 3:6 18:17
21:17 26:19
35:18 40:25
41:17 87:5
92:15 105:16
107:14,21,21
107:23 108:2
110:3 139:19
141:16 155:10
157:12 159:1,13
159:17 161:21
161:21 162:5
162:22 163:22
164:25 165:1
169:2 219:9
242:2
reviewed 18:22
18:23 21:12
23:9 24:9

26:1,19 58:25
67:7,15 83:24
86:21 87:2
93:11 110:8
139:3,4 140:6
140:9,23
204:4 218:22
218:25
reviewing 33:12
45:17 53:1
67:17 153:9
228:2
reviews 15:22
107:13
revise 152:19
Revised 3:10
170:7 217:13
revolves 135:6
right 10:12 29:17
49:6,8 82:9
83:16 86:25
89:4 90:17
113:25 114:4
119:14 129:14
129:15,19,22
140:12 143:14
145:5,25
147:5 148:6
154:3 157:17
161:11,17 167:10
180:24 198:18
199:18 200:10
205:13 212:14
216:17 232:17
239:20
257:19 260:19
261:1
rights 95:1
100:13 105:10
249:9
riot 187:18
189:16,22
190:3,13 193:4
193:8,18
217:23
rioting 188:1,4
riotous 183:7

risen 175:1
risk 216:22
247:10
risks 120:24
road 50:21
Robert 5:18
263:4
role 32:19 56:11
149:3 163:24
164:17
roles 65:22
roll 166:16,19
Roman 83:25
115:25
Room 5:15
263:5
rotating 108:10
Rothert 10:15
roughly 32:9
row 239:1
rows 238:13
240:5,21
242:25 244:8
244:13 245:2
RPR 6:2
rule 2:13 9:12
20:24 60:7,8
60:10 93:20
94:2
rules 27:12
28:16 47:16,16
59:20 60:3
run 229:24
230:10
running 54:3
82:4

## S

S 163:8
Sachs 191:8,12
192:16,22
Sachs' 193:13
Sachs's 192:24
safe 95:15
220:20
safety 124:17
125:13

Saint 75:22
  168:4
sanctions 56:1
satisfy 212.23
satisfying 128:9
  185:11
saw 21:7,9,11,14
  86:17 118:22
  156:5
saying 17:17
  22:10 38:2
  49:11,12 71:23
  72:10 73:21
  74:17 79:1
  82:20 99:2
  114:23 115:21
  128:7 235:1
says 51:4 60:16
  64:15 89:10
  91:8,9 97:14
  101:8 102:4
  107:21 138:1
  149:23 164:4
  165:15 170:20
  175:23 180:1
  194:5,9,24
  195:19 197:6
  210:23 212:15
  212:19 213:12
scale 63:2
  215:14
scenario 71:10
  114:6 119:5
  137:7 152:22
  174:23 181:9
  190:24 193:23
scenarios
  133:18
scene 124:10
  125:1 189:15
  189:21 193:8
  217:22,23
school 75:18,21
  75:22 79:11
Schwake 4:18
  6:2 7:4 262:3
  263:23

scope 3:5 15:17
  48:22 56:17
  65:4 155:10
  157:12 178:23
  191:23 192:11
se 157:10 209:8
search 36:6,14
  47:11 170:5
  229:25 230:5
  230:10,12
  237:17
searchable
  134:8
searched 226:1
searches 230:8
seat 121:12
second 11:12
  21:5,25 38:16
  94:21 95:10
  146:2 163:6
  170:25 194:24
  199:9 201:25
  206:2 222:15
  238:25
  246:25 251:7
seconds 18:4
  239:3
section 2:15,20
  17:5 35:15
  37:2,5,8 67:8
  67:9,10,12,12
  67:13,15,24,24
  76:9 83:24,25
  84:4 86:10
  92:20,25
  93:15 108:18
  108:22 109:4
  109:9,13,18,25
  110:14,18 111:1
  111:7,16,24
  112:6,6,21 113:1
  113:2,10,20,22
  114:11,11,25
  115:1,8,9,11,12
  115:14,18
  116:13 117:2,9
  117:10 120:5,5

124:4 125:23
  128:6 130:23
  131:20,22
  132:17 136:16
  136:22 137:11
  137:12,14,18
  138:10,11,22
  142:20 167:8
  169:20 170:6
  170:16 177:5
  177:18 178:19
  180:8 184:13
  185:7 187:12
  187:19 189:2
  196:11 204:7
  204:14 219:1
  239:20
  255:12,16
  256:2,12,23
sections 3:9
  67:18 116:19
see 18:8 22:1,21
  23:5 27:9
  33:12 48:19
  48:20 51:8
  54:15 63:11
  66:25 86:11
  89:8,13 92:3
  93:18,24 95:8
  95:17 97:10
  101:6,25 102:4
  102:6 105:18
  108:15,20
  111:18 117:25
  118:4,11 119:14
  119:17 129:11
  129:14,22
  130:4 132:25
  138:5,23
  155:7,24
  163:4 167:6
  169:5,20
  170:16 171:3
  178:12 187:25
  189:3,12
  194:22 195:4
  197:10 203:9

203:22
  208:25 212:17
  213:12 214:6
  218:18 220:13
  223:19,24
  224:12 227:17
  231:12 232:8
  232:15
  233:22 234:6
  238:18 239:6
seeing 69:9,11
  86:16
seen 21:10
  24:16 48:4
  85:12,15 86:13
  101:14,15,16
  125:5 155:1
  160:12 203:16
  203:18
  207:25 221:13
seize 60:1
seizing 59:11
self-explanat...
  226:19
sends 179:5
senior 15:20
  16:17 86:19
  87:13,16,18
  88:2 140:15
  155:24 159:16
  160:4,5 161:5
  162:8 173:17
  199:25 200:2
  222:21
sense 179:16
  194:11 211:12
  260:22
sent 18:9 19:13
  19:14 20:12
  105:14,24
  106:1,4 107:5
  108:11 207:19
  230:20 238:5
  261:6
sentence 106:8
separate 20:10
  51:22 64:12

135:1 136:2
  144:7 235:7
separately 58:7
  58:8
September 3:12
  3:19 11:13,25
  16:19 27:11
  37:5,19 44:10
  44:14 53:4,16
  54:10,22
  55:13,20
  109:14 118:10
  124:24 129:10
  135:16 143:2
  147:14,25
  151:12 152:5
  152:12 158:14
  197:12 203:22
  204:24
  205:21 206:14
  207:1,11 209:9
  215:7,22
  220:12 232:6
  240:22 242:5
  242:20
  253:13 254:6
sequence
  254:20
sequential
  83:21
sergeant 11:19
  25:9 37:11
  141:2 197:22
  220:2,8
  227:3 248:6
sergeants
  121:19 131:24
  132:3,10
series 9:18
  39:15 141:20
  163:23 204:17
  229:1,3 251:12
  251:16 254:14
serious 55:25
  166:10 199:17
seriously 100:21
server 35:22

| | | | | |
|---|---|---|---|---|
| 46:4,5 | 249:17 | 73:7 74:15 | 237:10 250:2 | 141:7 174:13 |
| serves 224:3 | shortly 219:13 | 76:17 82:11,14 | 254:25 | 180:23 185:20 |
| service 230:22 | show 60:5 68:7 | 107:25 143:10 | situations | 190:17 191:2 |
| 231:3,23 | showed 156:8 | 152:7 173:24 | 22:24 70:9 | 213:12 253:12 |
| 233:2 | 156:19 | 174:13 175:24 | 73:10 124:9 | 254:11 |
| services 6:3 | showing 45:3 | 182:21 201:12 | 133:12 134:16 | soon 261:6 |
| 12:5,23 37:10 | 156:21 | 233:15 | 137:2 184:25 | sorry 9:25 69:5 |
| 42:13 263:1 | shown 63:12 | Sincerely | 201:4 214:20 | 71:8 89:22 |
| session 161:21 | 159:7 210:19 | 263:20 | 215:18 216:4 | 91:15,22 97:13 |
| sessions 159:15 | sic 169:12 | single 135:19 | 228:25 | 98:24 110:16 |
| 159:19,23 | sick 64:7 | 136:5,11 167:12 | 239:24 | 128:14 142:18 |
| 161:22 | side 47:25 76:3 | 187:2 260:23 | 243:14 244:7 | 180:11 195:7 |
| set 73:19 89:1 | 102:25,25 | sir 27:4 37:3 | six 4:15 170:22 | 215:23 221:3 |
| 93:23 94:5 | 107:20 129:14 | 48:15 62:6 | 188:5 | 241:3 246:19 |
| sets 94:10 | 252:24 | 71:24 78:11 | size 138:4,14 | 246:23 251:13 |
| settlement 2:21 | sidewalk | 79:1,18 93:7 | 140:2 226:5 | 256:6 261:11 |
| 18:25 92:1,5,11 | 208:23 | 121:11 127:8 | 229:4 | sort 195:18 |
| 92:16,22,24 | sign 108:2,3 | 175:20 189:24 | slide 174:7 | sound 220:20 |
| 93:9 94:3,7,15 | 230:15,16 | 214:10 218:9 | 175:17 | 221:1,24 |
| 97:11,20 98:9 | 261:14 263:13 | 244:4 245:13 | SLMPD 18:21 | sounds 139:13 |
| 98:14,20 99:6 | signature 7:6 | 249:4 255:14 | 19:15 | 252:14 |
| 99:14,20 | 261:13 263:11 | 255:20 | SLMPD.org | source 159:8 |
| 100:7 102:24 | 263:13,17 | sit 77:11 | 19:17 | 225:1,4,4,14 |
| 103:5,18,22 | 264:25 | sitting 33:19 | slow 104:18 | 225:16 |
| 104:3 109:1,6 | signed 107:16 | 64:2,15 146:11 | 238:21 | sources 225:11 |
| 109:11 111:2,13 | 261:17 | 148:2 158:9 | slower 225:13 | 225:18 |
| 111:21 112:9,14 | significance | 162:2 172:3 | slowly 119:25 | south 51:18 |
| 116:7,10 128:8 | 231:15,17 | 207:9 253:9 | small 130:16 | 132:15 |
| 136:19 185:8 | 232:24 233:5 | 253:17 | 235:5 | speak 49:18 |
| sex 12:24 | 233:7,10 | situation 34:19 | smaller 248:4 | 87:8 104:10 |
| shape 91:6 | significant | 70:6,16 71:1 | smoke 97:24 | 110:10 141:21 |
| 222:10 | 37:20 124:1 | 73:22 74:15 | 259:16,19 | speaking 40:10 |
| share 176:9 | 166:3 183:19 | 75:3,9 77:21 | so-called 124:17 | 192:3 |
| SHEET 264:1 | 198:16 259:5 | 77:23,24 | social 168:7 | special 2:18 |
| sheets 263:11,13 | signifies 118:5 | 78:24 79:20 | 213:11 | 13:3 14:6,18 |
| 263:16 | similar 24:9 | 79:24 82:10 | software 38:13 | 15:4 17:5,5 |
| shift 65:16 | 32:9 35:21 | 82:24 90:5 | 43:2,5,6,8 | 48:5 60:8 |
| shifts 74:10 | 58:20 88:3 | 96:19 113:16 | 134:5 250:21 | 63:2 67:7,8,18 |
| shoots 247:25 | 103:17 142:12 | 114:10 119:24 | 250:24,25 | 67:23 76:9 |
| short 13:7,8 | 161:20 205:1,8 | 120:10 124:3 | 251:2 253:24 | 84:3 92:19,25 |
| 20:11 57:8 | 210:14,15 | 126:10,17 | 254:9 | 93:14 101:16 |
| 106:2 202:25 | 257:14 | 129:25 130:14 | solely 76:5 | 106:19,20,24 |
| short-term | simple 36:6 | 135:15 144:11 | somebody 17:14 | 107:17,24 |
| 124:23 | 76:18 163:21 | 153:12 186:3 | 44:15 53:17 | 108:18,23 |
| shortening | 170:5 | 188:3 190:17 | 55:14 57:3 | 109:5,9,13,18 |
| 192:6 | simply 70:10 | 195:9,20 211:6 | 60:20 61:5 | 109:25 110:3 |
| shorthand 4:20 | 71:15 72:7 | 234:20 | 70:10 127:9 | 110:12,15,18 |

| | | | | |
|---|---|---|---|---|
| 110:22 111:1,16 | 210:2 218:20 | 75:4 76:16,19 | 156:10 157:9 | 250:18 262:5 |
| 111:25 112:6,7 | 221:13 228:23 | 77:25 78:17 | 157:20,22 | 262:21 265:1 |
| 112:21 113:1 | 230:7 249:1 | 79:4,4 80:9 | 164:6 166:4 | stated 110:22 |
| 114:12 116:13 | specifically | 80:24 83:4,4 | 167:25 176:5 | statement 73:2 |
| 117:2,10 121:14 | 28:19 30:4 | 84:4 85:2,11 | 182:10 197:7 | 73:12 83:23 |
| 122:11 124:4,7 | 38:15 47:20 | 89:19,23 91:19 | 200:4 224:8 | 97:21 116:1 |
| 125:24 130:24 | 49:18 53:21 | 96:22,25 | 240:25 | 124:8 154:9 |
| 131:20 136:17 | 59:23 64:25 | 98:3,4 99:12 | 245:16,20 | 156:18 158:4 |
| 136:23 137:12 | 67:4,8 84:13 | 99:23 100:10 | 250:14 263:6 | 169:9 171:25 |
| 137:14 138:11 | 85:8 88:12 | 104:13,22 | 263:7,18 | 172:5,22 |
| 138:12 139:3 | 96:13 110:7 | 105:7 112:16 | 264:2 | 176:3 201:19 |
| 142:20 152:20 | 111:11 112:24 | 112:20,25 | staff 140:16 | 201:21 214:22 |
| 184:14 185:7,7 | 121:2,17 128:7 | 113:3 116:25 | 160:4,5 161:5 | 260:25 |
| 187:12,13 | 141:21 153:15 | 119:19 120:1 | 162:8 173:18 | statements |
| 196:11 204:6 | 156:25 161:3 | 121:18,22,23 | 222:21 | 157:8 209:20 |
| 204:14 205:6 | 161:20 165:3 | 122:1,7,23 | stage 80:14 | states 1:1 4:1 |
| 218:25 | 175:23 191:25 | 123:11,14,15,19 | staging 220:20 | 27:6 |
| 235:20 | 195:19 197:6 | 123:25 124:6 | stamp 118:12 | stationed 34:14 |
| special/major | 200:16 204:4 | 125:22,23 | 129:8 | Stations 131:25 |
| 164:7 236:18 | 205:19 218:13 | 127:19,24 | stamped 248:17 | 132:12 |
| 236:22,23 | 228:10 244:18 | 128:3,4,13 | stance 82:4 | statute 50:21 |
| specialized | specificity 158:8 | 129:20 130:1 | stand 230:15 | 198:14 217:14 |
| 12:10 13:13,14 | 194:14,17 | 130:14,21,22 | standard 77:14 | Statutes 3:10 |
| 13:21,24,25 | specifies | 131:23 132:4 | 134:21 194:12 | 170:7 |
| 87:21 160:6 | 133:20 175:19 | 136:24 137:13 | 197:20 208:8 | statutory 161:9 |
| specific 17:15 | 185:8 | 138:18 187:4 | 215:10 216:16 | 170:18 187:21 |
| 24:10,11 28:16 | specifying | 196:25 257:1 | 216:19 | 188:18,23 |
| 33:17 34:17 | 214:12 | 258:8,10,18 | standards | 189:7 193:10 |
| 39:4,19,21 | spectrum 82:8 | 259:7,14 | 200:8 | 194:3 217:12 |
| 47:16,19,24 | speculating | spraying 74:12 | standing 113:17 | 217:24 |
| 49:3 51:10 | 69:1 | 75:5 196:10 | 130:3 174:18 | steep 41:9 |
| 55:7 60:7 | speculation | spread 258:14 | 180:25 181:22 | Steffan 5:9 |
| 61:12,19 65:5 | 120:14 | spreadsheet | 181:25 240:10 | step 152:24 |
| 65:22,22 | spend 151:3 | 224:21 | start 24:20 | steps 19:24 |
| 76:11 84:8,12 | 169:11 | St 1:8 2:17,19 | 25:2 27:4 | 51:10 54:19 |
| 84:16 97:18 | spent 24:4 | 4:8,16,17 5:6 | 31:18 36:8 | 55:17,19 |
| 107:11 114:8,14 | 26:13,17,19 | 5:16 6:5 7:21 | 71:9 81:23 | 138:25 147:1 |
| 114:20 135:7,9 | spirit 246:8 | 11:7 19:21,24 | 203:12 226:19 | 147:22 158:10 |
| 138:25 147:9 | spontaneous | 20:14 22:5,7 | 226:20 | 204:1 218:20 |
| 148:22 156:9 | 246:6 | 23:24 27:7 | started 68:12 | stickers 117:18 |
| 158:10 160:7 | sporadic 54:25 | 39:24 48:8,17 | starting 48:23 | STIPULATED |
| 185:18 191:6 | spray 68:15,17 | 63:3 81:12 | 147:14 | 7:1 |
| 191:25 192:1 | 68:25 69:3,16 | 86:9 88:18 | starts 178:7 | Stockley 3:16 |
| 194:14 197:18 | 69:24 70:14 | 94:1 102:15 | 213:9 | 14:22,23 15:2 |
| 200:7,15 | 71:13,22,22 | 133:25 138:1 | state 4:22 7:24 | 15:13 16:22 |
| 201:8,23 | 71:25 72:1,22 | 145:10 148:16 | 63:25 173:3 | 17:19 22:12 |
| 204:1 209:12 | 73:11 74:5,21 | 151:13 155:6 | 193:22 198:23 | 27:8,20 28:10 |

31:17,25 32:3
33:21 35:7
36:9 37:22
39:7,15 40:24
45:12,25
46:10,17,24
48:18,25
52:14 53:4
57:24 60:23
63:7,19 64:20
65:2 73:5
87:14 88:9,13
114:23 122:2
122:24 132:5
133:3 134:12
136:6 149:5
153:20 156:11
157:3 158:13
159:2,6,15
161:3,13,19,23
162:8 163:17
165:6,13
167:15,20
168:23 173:21
173:21 187:2
188:24 206:12
206:16 207:7
214:18 217:6
219:13 232:6
236:13
240:22 241:12
242:22
243:23 245:9
246:10 252:8
stop 181:17
stopped 43:24
stops 121:9
storage 36:22
stored 46:3
stream 248:1
  258:17,22
streamer
  247:19 248:3
  257:17
streamers
  257:10,12
street 4:17 5:5

5:15 6:4 69:7
79:22 180:17
211:15 250:14
250:18 263:5
263:18
strict 74:9
strike 19:11 34:7
55:8 76:13
87:11 90:14
91:16 92:22
110:23 133:16
138:8 143:8,17
149:15 164:2
175:19 189:24
190:14 199:14
205:25
221:10
stuff 66:12
style 42:24
subdue 70:24
subject 9:9
14:24 32:17,18
79:17 80:19
179:9 181:19
246:19,21
252:16
subjected
186:13
subjects 39:12
255:5
submit 38:19
60:1 237:12
submitted 36:3
36:19 38:18
38:20 49:23
101:9 164:19
165:10,12
166:12 236:10
236:16 238:1
submitting 59:11
subordinate
165:1
subscribe
265:11
subsequent
88:1 161:13
237:11 253:20

substance
20:16 149:14
155:13 224:18
255:16 265:8
substantially
135:9 210:13
210:15
subsumed
157:23
sufficient 100:4
105:2 107:24
suggest 182:15
191:2
suggesting
31:16 257:25
suggests
173:22
Suite 5:5
sum 149:14
255:15
summarize 11:8
summarizes
36:9
summary 11:4
55:21 83:5
106:2 156:16
156:17 223:5
223:6 225:20
226:9 227:15
228:3 248:22
248:23
supervisor
11:20 167:13
197:22 225:8
supervisors
29:25 132:7
164:10,16,17
165:6,12,16,19
166:6 236:17
237:12 238:1
supplied 106:13
140:4
support 222:10
supposed 32:7
208:9 213:6
213:16,25,25
214:2,2

235:21 237:12
sure 10:12 25:15
27:15 29:7
33:4,8 37:13
43:23 44:5
48:7 53:25
58:22 61:24
62:1,12 68:1
75:15 83:15
86:1 88:21
90:17 96:11
99:3 104:18
123:8 125:15
131:13 137:24
145:21 157:16
157:25 160:12
200:9 201:2
201:10,20
220:24
221:23 228:13
238:21 241:8
244:3,11
249:3 250:17
250:17
surprise 76:25
surrounded
119:3
surrounding
51:5 57:2
118:14 259:20
SWAT 14:5 111:9
145:16 148:18
148:22 149:4
150:15 191:13
225:8 235:8
235:9 244:20
sworn 4:13 7:9
262:7
sympathy
90:25
system 36:5,16
36:17 38:9
42:23 57:21
105:16,21,21
105:22,25
106:6,22
107:4,6 114:21

133:10 150:13
225:3,23
226:1,2
227:14 228:2
228:6,9,10
229:10 230:11
systems 237:16

T

tactic 152:3,5
tactical 78:7,9
tactics 81:12
144:19 150:17
tagged 58:25
take 9:21 29:1
30:10 54:19
57:8 60:5
74:24 76:24
76:25 77:5,12
78:13 80:3
82:10 100:19
102:17 108:14
110:2 124:12
128:15,23
131:2,8 137:8
138:25 147:1,8
147:22 150:1
154:13 155:12
179:17 202:24
204:1 205:18
211:14 213:12
218:20 221:18
229:20 239:3
240:5
taken 1:18 2:24
3:3 7:3 19:24
35:9 39:22
58:17 59:16
62:19 81:16,18
103:4 118:1,10
144:24 183:5
208:18 262:8
262:13 263:10
264:3
takes 107:15
150:4 199:4
talk 16:5 53:21

ERIC LARSON  4/8/2019

| | | | | |
|---|---|---|---|---|
| 59:5 73:22 | Team/7250 | 116:6 136:19 | 140:21 143:20 | theory 38:11 |
| 219:2 | 3:19 | temporarily | 161:12 182:14 | 181:19 |
| talked 182:20 | teams 32:6 | 25:13,14 | 191:10,15 | thereon 265:10 |
| 204:6 214:25 | 33:20 37:21 | temporary | 192:16 199:21 | thereto 262:15 |
| 219:10 247:16 | 40:3,12,23 | 101:19 102:15 | 259:4 | thin 152:9 |
| 252:19 | 61:13,21 145:7 | 102:19,23 | testify 23:25 | thing 21:20 |
| talking 15:24,24 | 145:8 148:24 | 103:4,11,17,23 | 51:11 139:1 | 83:15 85:23 |
| 36:24 39:14 | 220:25 | 104:7,12,20 | 147:7 150:20 | 168:16 181:2 |
| 53:23 77:1 | 221:23 | 105:6,14,24 | 156:23 162:2 | 181:23 208:15 |
| 90:1 182:24 | tear 97:23 111:19 | 106:1 108:16 | 191:6 204:2 | 210:3 238:22 |
| 183:1 242:19 | 112:2 | 111:13,22 | 218:21 | 244:12 |
| 246:17 252:12 | technical | 112:10,15 116:5 | testifying 9:17 | things 16:6,10 |
| talks 49:22 | 258:21 | 116:9 136:20 | 67:19 157:19 | 30:3,20 |
| 166:16 167:4 | technically | tend 80:10 | testimony 9:24 | 35:20 46:2 |
| 204:7 218:24 | 72:16 75:17 | 96:24 257:13 | 10:9 15:3 19:2 | 49:12 55:21 |
| 220:19 236:21 | technician 11:20 | term 13:23 | 48:8 49:2 | 60:12,16 63:5 |
| 249:8 | techniques | 22:15 62:23 | 53:14 55:22 | 63:21 64:13,17 |
| Tara 4:18 6:2 | 77:12 235:10 | 97:19 110:19 | 57:1,18 82:14 | 65:16,22 81:10 |
| 7:3 100:19 | technological | 111:18 112:5 | 84:22 85:6 | 81:25 90:23 |
| 262:3 263:23 | 30:11 | 118:18,21,23 | 112:4 116:23 | 93:22 94:5 |
| task 220:19 | technology | 124:22 132:12 | 136:16 138:9 | 96:2 100:1 |
| teach 221:14 | 230:6 | 151:8,10,16 | 140:15 142:20 | 104:24 106:13 |
| team 27:24 | tell 17:8 20:6 | 161:4 162:6,18 | 162:1 182:9 | 124:11 140:8 |
| 28:11 29:16,20 | 56:8 64:25 | 167:23 | 191:15 192:22 | 148:20 152:19 |
| 31:22,24 32:8 | 73:23 78:12 | 239:20 | 192:24 193:14 | 153:11 159:16 |
| 32:25 33:3,6 | 129:18 168:16 | 247:18 257:6 | 202:15 215:2 | 163:25,25 |
| 33:13,13,14,15 | 207:16 212:1 | terminology | 242:3 244:12 | 166:14 167:5 |
| 33:16,17,24,25 | 213:15 214:4 | 245:19 249:18 | 250:15 262:6 | 167:23 177:7 |
| 34:6,8,12,16 | 246:6 | terms 20:1 | 262:8 | 183:2 184:23 |
| 35:4,9 36:8,10 | telling 19:20 | 66:16 92:23 | text 106:4,4 | 195:25 198:20 |
| 36:25 38:2 | 258:16 | 102:18,22,23 | thank 12:13 | 204:15,22 |
| 39:6,22 40:13 | tells 211:6 | 103:5 104:3 | 17:22 21:17 | 222:23 |
| 40:14,14 47:5 | template 65:20 | 109:10 111:2 | 23:17 57:11 | 225:21 234:17 |
| 49:5 50:8 | 65:21,23 | 114:12 117:1,10 | 66:19 88:22 | 243:19 |
| 58:5,24 59:6 | Templeton | 125:23 128:8 | 91:1 100:15 | think 10:15 12:6 |
| 59:8,10,16,21 | 2:22 89:12 | 130:23 137:14 | 105:12,23 | 14:10,13 17:13 |
| 60:21 61:6,10 | 91:25 92:5,11 | 161:8 162:6 | 115:19,19 | 18:5,19 20:2 |
| 61:23 62:3 | 92:15,19,22 | 204:8 214:12 | 127:14 131:1,9 | 21:20 25:22 |
| 63:15,18 64:4 | 92:24 93:9 | 233:10 234:12 | 137:21 142:8 | 26:7 31:10,14 |
| 64:6,9,19,22 | 97:20 98:8,14 | 253:11 255:22 | 145:19 170:14 | 33:2 40:2 |
| 65:1 145:13,16 | 98:20 99:6,13 | 256:2,10 | 207:9 223:8 | 41:24 48:4,12 |
| 148:18 150:15 | 99:20 100:7 | test 107:10,15 | 228:14 235:17 | 48:15 49:11 |
| 220:10,19 | 102:24 103:5 | 108:12 200:18 | 238:10 239:13 | 56:5,13 58:20 |
| 222:6,24 | 103:17,22 | 200:23 201:13 | 239:14 240:16 | 58:21 68:11 |
| 244:21 249:21 | 104:3 109:2,6 | testified 7:10 | 247:7 256:8 | 69:6 71:1 74:7 |
| 249:22,25 | 109:11 111:2,13 | 33:2 40:2 | theft 14:8 | 76:2 79:13,16 |
| 255:1,2 | 112:9,14 116:4 | 110:7,25 116:11 | themself 114:9 | 80:13 82:10 |

84:22 85:18
85:24 91:23
98:2 112:12
113:19,21
115:24 123:8
123:13 124:13
126:2 128:17
131:17 142:10
150:10 153:8
153:13,22
154:3 157:8
179:16 183:10
192:4 196:16
199:9 201:22
206:24
209:22 211:11
215:2 219:25
233:3,7,18
243:16 246:16
247:1 254:19
257:12 258:10
259:12,24
260:23
thinking 181:24
third 21:5 38:17
80:2 95:13
120:7 128:7,10
171:5
Thirteen 244:10
thorough 87:1
136:10
thought 156:20
threat 71:3,3,17
99:22 100:9
125:1,19
126:22 127:5
127:10 184:23
190:20
threats 124:10
three 26:9
79:16 132:13
159:25 189:18
211:9 212:20
213:7 214:3
225:10
threshold 81:21
81:22

throwing 37:24
thwart 78:14
tie 260:1
tied 228:24
time 8:23 12:10
13:7,8 14:20
15:8 16:4 18:17
18:22 21:7,9
21:13 22:2,11
24:16 26:17,19
28:3 30:14
31:18 32:9
35:21 36:21
36:23 37:13,14
38:2,15,16,17
38:25 39:10,11
39:15,19 41:2
41:16,17,21
43:21,22,22
43:23 44:13
45:8,10,11,18
46:19 47:8
48:2 50:8
52:13,20 53:3
53:3,11,21
54:15 55:8,20
56:3 58:5
59:15,19 61:4
62:1 63:24
64:1,9,12
65:19 66:5
68:14,19 69:8
69:18,20 73:7
79:3 80:2 88:1
92:13 100:16
102:17 108:9
110:2 114:22
117:14 118:12
120:18 122:19
123:9 126:7
126:23 128:15
129:8 131:7
145:5 147:13
147:24 148:7,8
149:4,25 151:4
151:22 154:13
158:22 159:5

160:23 162:4
166:10 167:14
168:20 169:12
182:22 184:3
187:2 190:22
190:24 191:3
191:13 193:25
198:1 205:18
206:24 209:9
209:10 212:11
214:13 216:9
221:18 225:5
226:19,20
230:8,9 232:1
235:18 240:5
240:23
242:17
243:22
249:12,14
252:20
253:12 254:6
255:23 260:9
times 8:8 36:10
41:1,12 51:23
68:23 69:15
106:5 115:13
241:16,20
timing 119:10
tired 198:1
title 3:18 11:23
191:8
titled 7:20 9:12
86:9 89:7
163:12 169:20
233:22
today 7:19 8:16
8:24 9:5,15
20:6 21:23
22:17 33:19
39:20 53:15
53:23 54:2
55:22 56:11
64:15 76:6
82:24 87:6
100:18 101:14
116:24 121:10
140:4 143:3

146:11 148:2
157:19 158:10
162:2 172:3
203:17 207:9
219:25 223:4
224:1,15
247:5 253:9
253:11,17
259:2 261:3
today's 23:8,10
24:23 25:24
26:4 54:18
55:11 76:1
85:6 86:14,21
92:16 110:8
159:2 208:1
221:17 224:4
told 17:10 61:14
64:10 70:5
80:1 156:13
187:3 213:3
254:4
ton 12:14
tonight 213:16
Tony 10:14 56:9
85:19,25
tool 11:16 90:11
122:14,15,18
122:20 126:5
126:5 134:5
tools 122:17
top 102:4 117:25
118:6 129:5
139:8 164:4
176:9
topic 21:22,22
24:1 27:4,6
48:15 51:3,11
51:13 55:11
56:5,16 66:22
67:5,5,6 131:11
137:25 138:20
139:2,20
142:10,12
143:9,9,17,21
143:22 149:6
152:22 158:17

158:17,18
197:5 201:9
201:24 203:8
205:9 216:3
217:8,19 221:6
223:9 251:17
253:18,22
257:13 260:9
topics 9:18,24
10:6,7 23:21
23:25 26:22
48:12 57:15
66:23 67:4,20
68:3 76:7
84:23 118:20
131:12 137:23
145:24 147:7
149:6 151:5
158:16 168:25
169:3 173:15
203:5,11
204:2,9
218:13,21
220:15
222:23 223:4
223:9 239:18
260:3
total 24:3,15
26:10
totality 126:3
totally 191:23
tough 198:1
toughest 100:18
100:19
track 116:6,17
tracking 38:9,11
38:13
tracks 103:4
traffic 14:5
train 19:25
20:15 197:17
223:1
trained 59:24
144:19 145:10
197:17
training 3:18,19
11:16 61:9,10,17

67:21 68:8
81:8,12 84:13
84:17,23 85:7
86:19 87:3,5
106:6,12
112:23 114:8,15
138:21 139:4
139:14,19,24
140:4,6,10,10
141:1,4,7,11
142:4 143:10
144:9,12,19,25
145:7,9,15,25
146:13,22,25
147:9,23 148:3
148:9,12,15,19
148:21,24
149:12,16
150:3,15,16,25
158:18,22
159:15 161:22
199:2 200:7,11
200:12,15,25
201:23 204:13
218:14,22
219:3,6,15
220:2 222:13
222:24 223:1
246:16 260:14
260:17
trainings 61:20
145:12,14
trains 179:12
transcribed 7:5
transcribing
8:17
transcript 3:25
263:12
transcripts@al...
6:8
transfer 37:1
transferred 11:15
12:1,4,18 13:9
transpire 32:24
transpired 151:11
153:19 168:23
185:2

transpiring
41:12
transportation
14:9
transported
32:18
trapped 183:13
183:19
trial 35:19
tried 87:1 91:1
125:3
trigger 81:20
190:3
triggers 81:6
trouble 174:24
true 47:4 265:9
265:13
trust 239:16
truthful 9:4
try 51:21 78:25
96:8 139:15
175:7 223:12
250:6
trying 15:14,15
21:15 24:20
35:11 44:16
53:12 55:6
65:17 69:6
71:4,12 72:8
77:7,21 78:1
85:12 113:18
113:20,23
114:10 116:2
117:7 123:3
127:1,2 136:10
147:2,17
153:10 154:2,4
154:10 174:12
179:4,6 185:1
192:10 193:19
196:22 197:3
199:7 200:24
209:25
215:25 233:6
234:25
242:15 251:4
253:7 254:2

257:15
Tucker 2:25 3:3
118:2,6 119:7
127:12 129:6
tugging 74:17
turn 70:11,18
74:2 124:9
turned 55:3
141:15
twice 17:11
228:9
two 12:16 24:8
26:9 40:5
51:13,22 55:3
62:17 63:6
80:1 82:2
85:25 94:10
104:17 106:8
113:12 114:23
118:20 138:19
143:15,19,24
144:6 145:23
149:20 159:24
173:20 176:20
180:3,7,17
181:10 182:12
182:19 183:21
225:25,25
228:1 233:21
234:2,12
241:23 252:2
252:2
two-page
139:18 140:22
141:18 142:1
220:1,16
222:22
type 30:1,17
36:20 42:19
50:1 146:25
225:15 234:17
246:6,21
typed 221:21
types 153:9
257:18,25
typewriting 7:5
262:10

typically 44:23
45:2

**U**

umbrella 62:25
245:22
unable 251:18
251:18
unacceptable
56:3,9
unambiguous
95:7,25 96:13
100:2 104:25
unbecoming
60:12
unbelievably
238:25
uncooperative
72:7
underlying
190:2 221:13
understand
8:24 9:7,11,18
11:2 12:16 15:9
17:10 23:23
35:11 37:1,16
42:17 44:16,19
56:4 64:13
73:21 77:21
78:2 81:8 85:1
106:16 110:21
110:24 116:3
120:4 121:11
144:23 149:10
149:15 151:11
154:2 157:5,19
174:12 179:4
192:21 193:19
196:5 197:3
199:7 200:25
207:23 231:14
233:6 234:25
239:17 240:1
240:7 243:5
244:3 245:12
249:3 251:19
251:25 252:11

257:24
understanding
10:6 25:17,20
30:24 43:7
51:12,20 58:2
58:23 68:1
88:16,25 94:6
96:1,12 99:3
102:10 112:13
112:19 136:9
143:21 161:8
169:23 171:13
171:24 173:14
175:9 177:12,17
178:17 179:9
179:12,14,25
180:5 181:3
182:6 194:8
198:21 233:25
237:8,15
240:11 250:1
250:10,11,23
252:1 260:15
understood 9:1
13:12 16:13
49:1 52:9
115:14,17 117:6
136:15 168:20
undertake
250:6
undertaken
20:14 55:18
158:10
undertaking
183:11 195:11
unequivocally
112:13
unfavorable
60:19
Unfortunately
261:7
uniformed 14:1
union 178:1
unique 39:3
unit 11:20 15:21
25:15,16 32:7
33:3,4,9,10,16

37:9,12 38:8
42:19 61:25
65:21 87:21
111:9 160:6
224:10 237:21
245:21
UNITED 1:1 4:1
units 12:25 14:5
14:9 145:16
225:20
245:16
universal 89:16
universe 24:21
University
75:22 168:5
unlawful 3:13
60:16,24
73:17 169:6,9
170:21 171:19
172:14,16,24
173:15,22,24
174:5,9,10,16
174:20 175:1,2
175:5,10,25
176:1 177:3,7
178:10 180:21
181:4,6,15
182:1,13,18
183:7 184:1,12
184:21 185:6
186:2,8,12,16
187:15 189:15
189:21 190:3
190:13 193:4,8
193:18 194:1,6
194:18 197:8
197:14,16,24
198:6,13,17
199:17,23
200:9,15,16
200:20 201:8
201:15 202:4
202:21 204:19
207:13 208:13
208:18 211:9
212:8 213:4
215:1,4,11

216:18 217:22
217:24 218:3,7
218:10,23
223:3 239:6
241:1,13,22,25
242:6,14
243:2,13
246:14 255:6
255:22 256:4
256:10,15
unlawfully
171:21 175:5
185:17
unnecessarily
10:19
update 66:9
upset 90:18
usage 248:2,2
use 22:5 28:7
29:4,9 39:25
42:20 54:16
62:22 65:22
67:14 69:24
70:14,21,24
71:21 72:18,22
73:10 74:4
76:15,24 77:2
77:11,16,17,25
80:12,24 84:4
84:19 85:11
89:19,23
96:21 99:23
100:10 101:20
103:7 104:21
105:6 106:15
106:16,18
107:9,11 113:7
114:12 118:21
118:24 120:10
121:2 122:6,20
122:21 123:14
123:18,24
125:21 128:12
130:14,20,21
132:3,3,23
136:23 137:18
138:3,17 140:1

141:9 142:6
144:9 146:3,14
148:13,19,25
149:1,7,8,13,24
150:18,19,22
150:23 151:1
151:10,16,19,24
152:3,15
158:20,24
186:15 187:7
199:3 208:9
210:10,13
221:3,5 223:2
227:23 233:1
234:6,8 235:2
236:1,5
238:16 244:6
244:6,13,20
248:3,5
255:5 256:25
257:14 259:7
259:19
uses 31:8 141:7
148:14 177:10
178:14 194:9
221:14 234:19
234:25
235:12 239:19
utilize 42:13,21
62:25 153:1
utilized 100:3
105:1 122:2,19
122:24 123:11
utilizing 126:5,5

———————
V
———————
v 2:22,23 263:7
264:2
vacate 249:13
vacuum 183:2
value 77:23
various 41:15
133:18 228:15
230:12
vast 243:11
vehicle 14:6
41:2 106:6

vendor 42:16
51:21 52:10
verbatim 209:5
209:7 210:6
verbiage 246:7
verdict 3:16
22:12 27:8
48:18 65:13,15
66:2 88:12
206:12 232:6
236:13
version 21:10
24:17 168:17
versus 7:21
26:15 58:5,6
77:2 84:9,15
84:18 85:8
92:5 112:2
137:12
VI 67:13 76:9
83:24 84:1
113:2,10,20
114:11,25 115:8
115:13
vicinity 135:9
victims 39:12
video 27:7,12
27:25 28:5,7
28:17,22 29:3
29:8,12,15
30:9,15,21 31:1
31:3 35:9 36:7
36:11 37:2,20
38:16,16,17
41:18 42:18,19
45:13 46:23
47:11,17 48:17
48:24 49:9,18
49:20 50:24
51:6 52:6,22
54:11 56:4,23
57:24 58:4,16
59:4,6,8,15
59:22 61:6
119:25 159:1,4
159:5,7,8,18
250:20

251:16 253:1
videos 39:5,22
48:1 49:4 53:1
58:24 60:4
106:13 125:6
view 252:11
viewed 76:9
views 178:2
VIII-6 67:9
violate 170:18
171:1,6 173:1,7
175:12 176:17
185:21 188:8
188:14
violated 123:3
violates 171:14
violating 181:11
182:23 213:17
violation 60:15
179:9 184:8
188:23
violations
249:10,16
violence 71:3,17
171:7 173:2,8
174:17 175:13
177:3,8
180:22 182:14
182:16 183:23
184:22,23
188:11,15,20
190:25 191:3
193:9,12,15,15
193:24
violent 72:7
124:9 125:8,18
127:9 183:8
190:19 191:18
192:17
violently 76:17
124:25 125:8
126:21 127:5
visualize 139:9
visualizing 185:1
volition 216:10
voluntary 79:20
79:22

ERIC LARSON  4/8/2019

| | | | | |
|---|---|---|---|---|
| vs 1:7 4:7 | 134:10 228:13 | 36:6,17 47:10 | 125:17 145:9,11 | 42:16,24 |
| **W** | 229:11 | 63:20 66:25 | 153:13 160:16 | 43:16,20 53:8 |
| wait 159:14 | wanting 82:7 | 71:2 74:16 | 190:12 214:20 | 54:9,20 56:18 |
| 260:18 261:3 | wants 207:19 | 104:8 148:3 | 216:3 223:4,7 | 150:17 157:12 |
| waiting 152:18 | warn 70:15 | 162:15,16 | 225:3 243:18 | 164:1 168:7 |
| 153:24 260:21 | 194:24 195:16 | 165:23 166:25 | 247:16 | 242:13 254:19 |
| walk 82:23 | 195:20 | 167:19 183:14 | week 65:13 | worked 163:25 |
| walking 208:23 | warning 3:13 | 201:12 217:6 | 207:22 | 167:5 |
| Wall 3:21 25:9 | 70:7 71:23 | 222:10 230:1 | weeks 24:6,15 | workhouse |
| 25:21 26:5,8 | 72:9 74:21 | 234:22 240:8 | 88:8 173:20 | 160:18 161:22 |
| 26:25 223:21 | 75:4,7,9 76:18 | 253:8 254:6 | 173:21 254:8 | working 14:17 |
| 224:2,7,19 | 77:18 78:25 | 256:24 | welcome 54:7 | 51:20 52:8,10 |
| 227:2,3,9,20 | 80:23 83:5,6 | ways 27:17 | went 19:17,17 | 53:6 54:24 |
| 229:19 233:4 | 90:6,12 95:7 | 29:15 30:6 | 102:13 124:16 | 200:21 |
| 234:1 | 95:11,25 96:1 | 31:7 35:14 | 206:18 | 250:16 253:7 |
| **Walton** 136:12 | 96:4,13,14 | 58:7 135:2 | weren't 126:16 | works 15:19 |
| want 10:13 12:15 | 100:2,4 | we'll 56:2,19 | 135:24 147:19 | 79:21 155:10 |
| 20:6 22:10 | 104:25 105:3 | 57:8 68:10 | 219:14 236:25 | worse 121:10 |
| 27:15 28:12,13 | 120:19 184:17 | 85:21 91:4,5 | Wheaton 5:20 | worth 31:15 |
| 39:21 46:2 | 185:13 187:5 | 128:23 131:11 | 261:5 | 192:2 |
| 48:6 54:2 | 187:10 195:9 | 139:23 142:1 | wider 258:13,18 | wouldn't 72:5,8 |
| 58:22 67:25 | 196:7,9,18 | 179:19 223:13 | willingly 82:22 | 72:22 77:2 |
| 71:9 72:5 | 203:20 | 239:4 261:14 | wise 152:24 | 78:15 153:7 |
| 73:20,22 | warnings 70:1 | we're 7:19 15:16 | wished 120:20 | 208:2 237:5 |
| 74:14 75:15 | 73:15 77:14,15 | 15:24,24 | witness 4:12 7:6 | Wow 151:9 |
| 79:12 83:14 | 77:16,22 78:1 | 24:12 39:14 | 23:16 56:2 | wrap 260:13 |
| 84:19 86:1 | 78:7 80:16,18 | 49:11,11 51:20 | 100:24 | write 14:24 |
| 96:11 99:3 | 89:11,20 90:8 | 61:12 65:17 | 207:23 | 164:24 201:14 |
| 131:10,12 | 117:8 183:3 | 70:16 74:7 | 260:21 261:18 | 240:8 |
| 133:12 137:22 | 184:15,17 | 77:1,17 79:24 | 262:6,8 | writes 39:1 |
| 145:22 147:19 | 186:17,19,20 | 80:19 81:24 | 263:12 264:1 | writing 13:3 |
| 149:15,16 | 186:21,23 | 83:15 90:10 | 264:25 | 14:18 15:12 |
| 152:1 157:25 | 187:6,7,14 | 113:23 124:14 | witnessed 69:4 | 28:15 81:9 |
| 158:8 169:1 | 221:4,25 | 135:22 136:17 | 69:17 | 141:12 149:23 |
| 170:9 179:21 | 249:11 | 151:3 152:18,21 | WITNESSES | 207:11 216:21 |
| 179:24,24 | warrants 139:7 | 152:23 153:9 | 2:2,3 | written 48:3 |
| 187:22 189:6 | Washington | 170:11 175:17 | Wonderful 9:11 | 84:13 141:6 |
| 192:5 201:10 | 2:25 3:3 118:2 | 182:24,25 | word 165:17 | 197:13 198:12 |
| 202:8 211:5 | 118:6 119:7 | 201:9,10 | 172:7 175:20 | 230:23 |
| 215:5 224:17 | 127:12 129:6 | 238:22 241:16 | 177:25 209:17 | 252:23 |
| 226:14 240:11 | wasn't 53:8 | 244:11 252:12 | 209:17,24,25 | wrong 51:15 |
| 241:8 244:3 | 70:10 132:7 | 253:6 256:12 | 234:24 235:1 | 52:4 160:16 |
| 250:18 260:6 | 140:18 149:4 | we've 28:20 | 235:12 | 182:22,22 |
| wanted 19:10 | 250:17,17 | 79:5,25,25 | words 71:23 | 184:2,3 |
| 33:7 36:7 58:1 | watch 119:25 | 80:1,16,17,17 | 163:19 210:10 | wrote 48:21 |
| 109:9 132:2 | 159:4,5 | 80:18 114:18 | 242:13 244:14 | 56:8 57:3 |
| | way 14:21 17:18 | 115:7 123:8,13 | work 3:6 14:20 | |

ERIC LARSON  4/8/2019

**X**

X 2:1 43:11 59:4
  59:5,6 73:25
  96:5 216:8
**Xerox** 90:23
**XIII** 17:6 67:10
  67:16,24,24
  92:20,25
  93:15 108:18
  108:23 109:5
  109:9,13,18,25
  110:3,12,14,18
  111:1,16,25
  112:7,21 113:1,6
  113:22 114:11
  115:1 116:13
  117:2,10 120:5
  124:4 125:23
  128:7 130:23
  131:20 136:16
  136:22 137:12
  138:11 142:20
  184:13 185:7
  187:13 204:7
  204:14 219:1

**Y**

Y 73:25
**yeah** 34:23
  53:20 97:13
  137:7 168:11,14
  173:11 229:19
  238:20
  248:13
**year** 167:9
**yearly** 201:2
**years** 8:11
**yep** 205:16
**yesterday** 21:14

**Z**

Z 73:25

**0**

**00421** 248:18
**00427** 249:19
**00430** 2:16

**00438** 2:16
**01152** 51:7
  52:22 54:11

**1**

1 2:12 3:12 17:24
  18:2 27:4,6
  33:13,14,15
  57:15 97:14
  101:10 102:9
  116:19 127:17
  168:17 170:21
  203:6,22
  204:24
  205:21 207:1
  207:11 255:2
**1-01** 17:5 67:8
  67:24 92:20
  92:25 93:15
  106:19,20,25
  107:17 108:18
  108:23 109:5
  109:9,14,19,25
  110:15,18 111:1
  111:16,25 112:7
  112:21 113:1
  114:12 116:14
  117:3,10 120:5
  124:5 125:24
  130:24 131:20
  136:17,23
  137:12,14
  138:11,12
  142:21 184:14
  185:8 187:13
  196:12 204:6
  204:14 219:1
**1-800-280-DE...**
  6:7
**10** 3:5 10:6
  108:19 154:16
  154:20,22
  155:21 189:1,9
**10/11/17** 3:5
**100** 40:15
  250:17
**101** 2:23

**11** 3:7 10:6 36:13
  155:4 162:24
  163:3 165:11
  168:4 194:5
  204:3,9
  218:13,21
**11/16/17** 2:12
**11:25** 129:9
  190:18
**11:30** 118:10
  119:12 124:24
  126:11,23
  127:12 151:12
  190:18 192:18
  193:15
**1130** 5:5
**117** 2:25
**11th** 6:4 263:18
**12** 3:9 66:22,23
  67:5,6,20
  68:3 131:12
  137:25 138:22
  142:12 147:7
  170:2,5
  187:22 189:6
  217:14 229:22
  241:11 243:10
  263:3
**1200** 4:17 5:15
  245:8,15,18,19
  245:22,25
  246:1,4,7
  263:5
**128** 3:4
**13** 3:11 67:6
  138:20 139:2
  139:20 143:17
  143:21 149:6
  203:2,13,16
  204:23 207:3
  207:17,25
  210:19 212:5
  218:2 242:11
  244:13,17,25
**14** 3:15 67:6
  142:10 143:9
  206:4,7

248:16 249:19
  254:15
**14th** 52:2
  250:12
**15** 3:18 8:11
  66:23 67:5,6
  67:20 68:3
  131:13 143:9
  143:22 147:7
  147:14 149:6
  194:20 212:11
  219:20,23
  220:5 226:11
  229:22 232:6
  240:21 241:11
  242:5,17,20
  242:25 243:3
  243:7,22
  253:13
**15.52.010**
  176:14 177:6,11
  177:19 178:7
  179:6 180:9
**154** 3:6
**16** 3:21 18:9
  20:13 24:6,18
  26:12 86:10
  151:5 158:16,17
  222:21 223:14
  223:18 241:20
  242:4,9
**16-hour** 150:7
**162** 3:8
**17** 2:12 55:20
  89:4 118:10
  129:10 135:16
  151:5,12 152:5
  152:12 158:16
  158:17,18
  222:21
  240:22 242:5
**170** 3:10
**17250** 246:13
**17th** 124:24
**18** 90:15,19,20
  90:22 91:7
  223:9 239:18

**1915** 41:7
**1994** 11:6 68:12
**1995** 11:10 68:19
**1995-2004**
  68:25
**1995/2004**
  69:18

**2**

2 2:13 20:20,23
  48:15 57:15
  93:23 116:19
  118:4 131:23
  203:6 224:7
**20** 2:14 265:15
**2004** 11:13
  68:19 69:2,7
  75:18
**2007** 168:18
**2010** 11:18
**2011** 11:19
**2012** 147:14,16
  147:25 149:17
  209:9 215:22
  226:11 240:22
  242:5 243:22
**2013** 11:21,22
**2014** 3:20
  144:18,24
  145:3,25
  146:9,11 147:10
  147:16,25
  149:20 220:12
**2015** 11:25 69:8
  101:19 102:9
  108:19
**2015-01-07**
  102:5
**2017** 3:12 12:3
  13:18 16:20
  18:9,17 20:13
  27:11 37:6,20
  44:10,15 53:5
  53:17 54:10
  54:22 55:13
  86:10 109:14
  118:10 129:10

ERIC LARSON  4/8/2019

| | | | |
|---|---|---|---|
| 135:16 140:5 | 170:2 203:2 | **6** | **9** |
| 143:2 151:12 | 206:4 219:20 | **6** 2:21 93:5,8 | **9** 3:3 10:6 |
| 152:5,12 155:5 | 223:14 260:4 | 101:17 140:14 | 128:24 129:2 |
| 158:14 197:12 | 260:10 | 160:25 169:1,3 | 187:17,25 |
| 202:14 | **314** 5:7,15,17 | 169:12 170:11 | 218:13,21 |
| 203:22 | 6:6 263:5 | 171:9 172:22 | 232:9,13 |
| 204:24 | | 173:3,4,15,16 | 259:3 |
| 205:21 206:14 | **4** | 175:18,20 | **9/15** 232:13 |
| 207:1,12 215:7 | **4** 2:17 10:6 | 202:12,20 | **9/27/17** 3:17 |
| 232:6 240:22 | 83:10,13 | 219:4 222:20 | **9:58** 7:13 |
| 242:5 253:14 | 168:25 169:3 | **62** 2:16 | **906** 5:5 |
| 254:7 | 173:15 197:5 | **621-3361** 5:17 | **93** 2:22 |
| **2018** 12:6,6,8,17 | 232:9,13 | **63101** 5:6 6:5 | **95** 68:14 |
| 13:15,16,19 | **4:17-CV-2455...** | 263:18 | **96** 14:13 |
| 14:17 226:12 | 1:7 4:7 | **63103** 5:16 | |
| **2019** 1:19 4:14 | **421** 255:11,24 | 263:6 | |
| 13:16 263:3,10 | **422** 255:11 | **644-2191** 6:6 | |
| 264:3 | **427** 254:21,23 | **652-3114** 5:7 | |
| **203** 3:14 | 254:24 | | |
| **206** 3:17 | **428** 254:21,23 | **7** | |
| **219** 3:20 | **430** 62:18 63:11 | **7** 2:6,23 45:23 | |
| **223** 3:22 | **431** 62:18 | 50:13 101:1,5 | |
| **24** 223:9 226:11 | **438** 62:19 | 101:19 105:13 | |
| 239:19 | **439** 62:19 63:11 | 131:17 203:5 | |
| **247** 2:7 | **45** 202:15 | 204:2,9 | |
| **25** 23:21 51:3 | 223:13 | **7-11** 203:8 | |
| 55:11 251:17 | | **711** 6:4 263:17 | |
| 253:18 | **5** | **7250** 246:10,17 | |
| **251** 2:8 | **5** 2:19 10:6 12:2 | **764** 83:14 | |
| **27** 206:14 | 86:4,8,8 87:9 | **775** 84:3 | |
| | 88:23 169:3 | | |
| **3** | 169:17 170:15 | **8** | |
| **3** 2:15 21:22 | 173:15 201:16 | **8** 1:19 2:24 10:6 | |
| 24:1 62:14 | 201:24 | 24:6,17 26:12 | |
| **3,000** 16:2 | 244:23 | 108:13 117:19 | |
| **30** 45:24 50:13 | **5:24** 261:16 | 117:23 176:13 | |
| 263:17 | **50** 211:15 | 217:8,20 | |
| **30(b)(6)** 2:14 | **53** 83:17 | 259:3,4 | |
| 9:13 10:2,7 | **574** 3:9 | 263:10 264:3 | |
| 12:16 17:24 | **574.040** 169:21 | **8/16** 86:18 | |
| 20:20,24 | 170:6,16 171:14 | **8/16/17** 2:20 | |
| 21:12 48:13 | 177:6 | **8:30** 191:16 | |
| 54:3 62:14 | **574.050** 170:7 | 192:16 213:7 | |
| 83:10 86:4 | 187:19 188:19 | 213:14 | |
| 93:5 101:1 | **574.060** 170:8 | **83** 2:18 | |
| 117:19 128:24 | 189:2 217:14 | **86** 2:20 | |
| 154:16 162:24 | 217:16 | **8th** 4:13 | |