No. 19-8011

In the
UNITED STATES COURT OF APPEALS
for the EIGHTH CIRCUIT

**MALEEHA AHMAD, et al.,**
**Plaintiffs/Respondents,**

v.

**CITY OF ST. LOUIS, MISSOURI,**
**Defendant/Petitioner.**

On Petition to Appeal from the United States District Court
Eastern District of Missouri, Eastern Division
The Honorable Catherine D. Perry, District Judge

**PETITION FOR PERMISSION TO APPEAL CLASS CERTIFICATION
ORDER PURSUANT TO F.R.CIV.P. 23(f), IN E.D.MO. NO. 4:17-CV-2455**

JULIAN L. BUSH
CITY COUNSELOR
Robert H. Dierker 23671MO
dierkerr@stlouis-mo.gov
Brandon Laird 65564MO
Associate City Counselors
Abby Duncan 67766MO
Megan Bruyns 69987MO
Amy Raimondo 71291MO
Assistant City Counselors
1200 Market St.
City Hall, Rm 314
St. Louis, MO 63103
314-622-3361/FAX 622-4956

FILED
MAY 2 1 2019
MICHAEL GANS
CLERK OF COURT

RECEIVED
MAY 2 1 2019
U.S. COURT OF APPEALS
EIGHTH CIRCUIT

## TABLE OF CONTENTS

TABLE OF CONTENTS............................................................ ii

TABLE OF AUTHORITIES ................................................. iii

PRELIMINARY STATEMENT ............. …………………………………1

STATEMENT OF THE CASE.....................................................4

QUESTIONS PRESENTED....................................................14

REASONS FOR GRANTING THE APPEAL........................16

RELIEF SOUGHT ........................................................29

CERTIFICATE OF SERVICE ................................................31

CERTIFICATE OF COMPLIANCE.....................................31

APPENDIX ............................................................... A-001

ii

# TABLE OF AUTHORITIES

## CASES

*Abdullah v. St. Louis County,*
    52 F.Supp.3d 936 (E.D.Mo. 2014) ...............................................................22

*Agnew v. District of Columbia,*
    2019 US App LEXIS 10060 (D.C. Cir. 2019)...............................................19

*Ahmad v. City of St. Louis*,
    2017 U.S. Dist. LEXIS 188478 (E.D.Mo. 2017) ...........................................4

*Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir. 1998) ...........................25

*Bd. of County Commissioners v. Brown,* 520 U.S. 397 (1997) ........................17, 21

*Bernini v. City of St. Paul*, 665 F.3d 997 (8th Cir. 2012) ...................................17, 18

*Brown v. Bd. of Education,* 394 U.S. 294 (1955) ....................................................26

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) .......................... 17, 20, 21, 22, 23

*City of Monterey v. Del Monte Dunes,* 526 U.S. 687 (1999) ...................................24

*Colten v. Kentucky,* 407 U.S. 104 (1972) ................................................................28

*Dairy Queen, Inc. v. Wood*, 369 U.S. 469 (1962)....................................................24

*Duke v. City of Little Rock,* 902 F.3d 858 (8th Cir. 2018).......................................19

*Elizabeth M. v. Montenez*, 458 F.3d 779 (8th Cir. 2006).......................17, 20, 22, 23

*General Telephone Co. v. Falcon,* 457 U.S. 147 (1982) .........................................29

*Lawyer v. City of Council Bluffs,* 361 F.3d 1099 (8th Cir. 2004)...........................18

*Lozman v. City of Riviera Beach,* 138 S.Ct. 1945 (2018)........................................19

iii

*Lytle v. Household Mfg., Inc.*, 494 U.S. 545 (1990)...................................................24

*Malone v. Hinman,* 847 F.3d 949 (8th Cir. 2017) ...................................................23

*Missourians for Fiscal Accountability v. Klahr,* 830 F.3d 789 ...............................27

*Multi-Ethnic Immigrant Workers Org. Net. v. City of Los Angeles,*
    246 F.R.D. 621 (C.D. Cal. 2007)..............................................................21, 22

*O'Shea v. Littleton*, 414 U.S. 488 (1974) ....................................................17, 18, 20

*Parklane Hosiery Co. v. Shore,* 439 U.S. 322 (1979) ..............................................25

*Peterson v. Kopp,* 754 F.3d 594, 599 (8th Cir. 2014)..............................................19

*Phelps-Roper v. City of Manchester,* 697 F.3d 678 (8th Cir. 2012).......................19

*Postawko v. Mo. Dept. of Corr.,* 910 F.3d 1030 (8th Cir. 2018).......................22, 29

*Prow v. Medtronic, Inc.,* 770 F.2d 117 (8th Cir. 1985) ...........................................26

*Rahman v. Cherthoff,* 530 F.3d 622..................................................................16, 29

*Riffey v. Rauner,* 910 F.3d 314 (7th Cir. 2018) ......................................................26

*Rizzo v. Goode*, 423 U.S. 362 (1976).....................................................17, 20, 22, 26

*Robinson v. Sheriff of Cook County,*
    167 F.3d 1155, 1157 (7th Cir. 1999) ...........................................................27

*Stahl v. City of St. Louis,* 687 F.3d 1038 (8th Cir. 2012) ........................................19

*Steel Co. v. Citizens for a Better Environment,*
    523 U.S. 83 (1998)........................................................................................22

*Vallario v. Vandehey,* 554 F.3d 1259, 1269-70 (10th Cir. 2009)............................23

*Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338 (2011).................................17, 21, 25

iv

*White v. Jackson*, 865 F.3d 1064 (8th Cir. 2017) ...............................................17, 18

**STATUTES**

42 U.S.C. § 1983 ...................................................... 1, 3, 14, 16, 17, 20, 22

Mo.Rev.Stat. 574.060 ...........................................................................18

Mo.Rev.Stat. §574.010 .........................................................................27

**RULES**

F.R.Civ.P. 23 ........................................................ 1, 2, 3, 15, 17, 20, 22, 23, 26, 29

**ORDINANCES**

City Code § 15.52.010 .......................................................................13, 18

City Code § 17.16.275 .......................................................................13, 18

v

## Preliminary Statement

There can be few more difficult challenges for police than enforcing the law in the face of mass protests directed at the police themselves.  In the underlying action, the district court is proceeding at the behest of ACLU plaintiffs with a view to imposing mandatory policing standards by class action injunction on the division of police of the City of St. Louis, when officers enforce facially valid laws and ordinances in civil disorder and mass protest situations.  The district court granted a preliminary injunction in November 2017 but did not certify a class until May 7, 2019.  Defendant City now seeks review of the class certification order under F.R.Civ.P. 23(f).

Plaintiffs' claims in the underlying action implicate the considerations of equitable jurisdiction, comity and federalism that have led the Supreme Court repeatedly to reject similar efforts to utilize the federal judiciary to "police the police," because plaintiffs lack standing to seek such relief on account of hypothetical future injury.  In proceeding to certify a class, the district court wholly ignored the precepts demanding "rigorous analysis" of the prerequisites for a class action, as well as the Supreme Court's commands for "rigorous analysis" in connection with actions under 42 U.S.C. §1983 premised on municipal liability for an unconstitutional "custom."  In the process, the district court also ignored the principles of equitable jurisdiction enunciated by the Supreme Court in numerous

1

cases seeking to inject district courts into the administration of state and local law enforcement operations.  The district court has also disregarded this Court's plain teachings in comparable actions arising out of civil disorder in Ferguson, Missouri, and in St. Paul, Minnesota.  Plaintiffs and the district court have attempted to shoehorn this case into generic First Amendment standing principles, but the shoe does not fit.

The district court has compounded its errors by casually dismissing the clear threat to the City's right to trial by jury in damage suits arising out of the same conduct that is alleged by the putative class, and by designating class representatives who are not even members of the class as re-defined by the district court.  The result is that, unless this Court intervenes and accepts this appeal, the district court will proceed with a class action for injunctive relief on behalf of a class that lacks standing to seek the relief demanded, an action that finds no support in the decisions of this Court and very little support outside the Eastern District of Missouri and the Southern District of California.

Rule 23(f) review of the class certification order is particularly advisable in light of the difficult and complex issue of the relationship between the "rigorous analysis" demanded of district courts in assessing the compliance with the prerequisites of Rule 23 and the "rigorous analysis" demanded of courts in deciding the question of the existence of a municipal "custom" for purposes of

2

liability under 42 U.S.C. §1983.  While broad-based merits inquiry is not the province of the class certification analysis, the inevitable interrelationship between the merits of a claim and the propriety of class certification is enhanced when a §1983 plaintiff's standing to seek equitable relief depends on his ability to demonstrate the existence of an unconstitutional municipal "custom."

Although this petition is filed at a time when trial on the merits is scheduled, it is nevertheless crucial that this Court intervene to review the class certification order.  It is plain that plaintiffs will not be content with the limited preliminary injunction, and the district court's redefinition of the class to include a universe of persons entirely unconnected with the plaintiffs' stated claims makes it equally plain that the district court is likely to greatly expand its intrusion into police practices if this action proceeds to judgment. Thus, the district court's clear error in its casual rejection of defendant's standing arguments, the issue of how the §1983 municipal liability standard should affect Rule 23 analysis, the unsettled issue regarding the effect of a 23(b)(2) class action on parallel damage suits, and the district court's abuse of discretion in its selection of class representatives all militate strongly in favor of review the class certification order in this case.

3

## STATEMENT OF THE CASE[1]

In September of 2017, a state judge acquitted a former St. Louis police officer (Stockley by name) of murder for killing a convicted drug dealer after a pursuit.  ECF 11-1.  The verdict was announced on the morning of September 15 and evoked a series of protests, commencing with an almost immediate assembly of persons in downtown St. Louis, blocking a major intersection near the courthouse.  The protest grew larger and began to march through various streets in the downtown area.  Eventually, the protesters returned to the area of the courthouse, where an attempt was made to block nearby Interstate 64/40 (generally known as "Highway 40") but was repulsed by deployment of a line of bicycle police.  Memorandum & Order of Preliminary Injunction, ECF 57, p. 3; ECF 11-5 (video attachments).

Mass protests--usually involving 100 or more persons, many sporting masks and goggles--continued through the weekend of September 15-17.  After the downtown protest during the daytime on September 15, another crowd numbering in the hundreds massed in the western part of the City, near a major hospital complex.  Again, an effort was made to block Highway 40 but failed.  The crowd

---

[1]  This statement is derived from the district court's preliminary findings in its Memorandum and Order, ECF doc. 57, published at Ahmad v. City of St. Louis, 2017 U.S. Dist. LEXIS 188478 (E.D.Mo. 2017), and the evidence before the district court on the motion to certify, which included the transcript of the preliminary injunction hearing and exhibits introduced at that hearing, as well as additional material submitted with the motion to certify--although a much more complete presentation of evidence, especially of video evidence retrieved after the preliminary injunction hearing, was part of the record in connection with the City's motion to dismiss and dissolve--which was summarily denied after entry of the class certification order.  See Order of May 15, 2019, ECF 159.

4

then swarmed into a quiet residential area known as the Central West End and converged on the Mayor's home.  There is no dispute that the protest then degenerated into a near-riot, with an outright attack on the Mayor's home and on police guarding it.  ECF doc. 57, p. 6; II Prel.Inj.Tr. (ECF doc. 63), pp. 121, 158ff.

The next night, a large protest march began in the nearby suburb of University City.  After some vandalism and assaults on suburban officers, the group wended its way into the City where it dispersed without any particular incident.  There is no evidence of any improper conduct by City police at this time. ECF doc. 63, pp. 6-7.

On September 17, another large crowd gathered outside police headquarters in the City of St. Louis.  The crowd then proceeded to march through the City's midtown area, returning to police headquarters and conducting a "die-in," where protesters laid down in the street.  ECF 57, p. 7; ECF 63, pp. 123, 185.  Eventually, the bulk of the crowd dispersed without police action.  However, a large segment broke away and headed to the St. Louis downtown area as night was falling.  As they went, this group of around 100 persons damaged property in the downtown area.  Eventually, a large proportion of this crowd confronted and assaulted officers at Tucker and Locust Streets.  ECF 57, pp. 8-9; ECF 63, pp. 188-90. Although officers declared an unlawful assembly, there was a considerable delay

5

until a sufficient number of officers assembled, whereupon this group was surrounded and arrested *en masse.*

Two additional protest events were in evidence before the district court. One occurred at Busch Stadium in downtown St. Louis on September 29. The other occurred on October 3, when a crowd of protesters finally managed to seize control of Highway 40's westbound lanes during the evening and were arrested when they moved off the highway. ECF 57, pp. 17-18.

Although the evidence concerning the police response to the so-called Stockley protests was hotly disputed in some respects, there was and is no dispute that police declared unlawful assemblies and issued orders to disperse at several times during the course of the protests. ECF 57, pp. 8, 11. It is also undisputed that individual police officers deployed "chemical agents," i.e., mace or pepper spray, at various times when encountering protesters, primarily on September 15 and 17; no chemical agents of any kind were used at the other mass arrest on October 3. ECF 57, p. 12; see also ECF 11-12 (video attachment). Tear gas and higher impact pepper balls fired from launchers were also used, but the use of these agents was limited to the night of September 15 in connection with the attack on the Mayor's home and its aftermath. ECF 63, pp. 176-77. During the weekend, numerous police officers were injured, some seriously, by missiles hurled by members of the protest crowds. ECF 57, p. 6; ECF 63, p. 156.

6

In cases of "First Amendment" protests, the record on the class certification motion reflected that the City does not issue permits for marches in the street, but its practice is to accommodate such protest marches by blocking traffic and escorting the marchers.  ECF 57, p. 2.[2]  In this case, neither plaintiffs nor anyone else acting on behalf of any organization or group ever inquired about or sought a permit, but the police had been expecting protests when the Stockley verdict came down and planned accordingly.  Thus, when protests commenced on September 15, police deployed to protect and escort the marchers, while special "civil disobedience teams" and other officers were in reserve.  This practice was also followed on the night of September 15 until the affray erupted at the Mayor's home, and it was likewise followed on September 16 near University City and on September 17 through the day and early evening, up until the mass arrest late that night.

It is undisputed that plaintiff Ahmad was maced by a City police officer on September 15.  When she was maced, she was standing with other protesters in front of a bus carrying City police officers.   The police were attempting to extricate the bus, and the district court found that Ahmad was intentionally blocking the bus and impeding its removal.  ECF 57, p. 3.  Ahmad was maced in

---

[2]  This finding of the district court is erroneous, insofar as it implies that the protesters asked for or were denied a permit.  As was clarified in discovery, permits for any sort of demonstration can be obtained with sufficient notice, but there was no evidence whatever before the district court that any protester ever applied for a permit.  The Court's finding that the City's policy is to accommodate protests without a permit is correct.

7

order to force her away from the bus.  It is likewise undisputed that, during the
September 15 protests, police were bombarded by missiles, including fragments of
concrete, and a police vehicle was vandalized.  ECF 57, p. 3; ECF 63, pp. 120-21.

It was at the mass arrest on the night of September 17 that the district court
found the bulk of objectionable conduct by police.  ECF doc. 57, pp. 14-16, 37.
Although police witnesses testified that an unlawful assembly was declared and
repeated multiple times, plaintiffs' witnesses insisted that they did not hear the
announcements, or that they did not get clear directives on where they could go, or
that, in some cases, their efforts to depart were frustrated by police lines, and,
further, that some people were actually allowed to enter the area from which the
crowd was supposed to disperse.  It was also during the evening of September 17
that plaintiff Mobley was detained briefly by police.

By plaintiff Mobley's own account, he was recording an encounter between
police and two other persons on the street when he was accosted by a police
officer, detained, and his cell phone seized.  At the time, there was no protest as
such going on in the vicinity, and the encounter observed by Mobley appears to
have been adventitious.  ECF doc. 62, pp. 62, 167-68.  After being rudely treated
(but not physically assaulted or maced), he was released and his cell phone
returned to him.  However, he found that the recording of the police encounter had
been deleted.

8

It was also during the evening of September 17 that several self-proclaimed "rogue" police officers assaulted an undercover police officer whom they took for a protester, according to the allegations of a federal criminal indictment.  The indictment quotes text messages of one of the indicted officers, suggesting that many officers in St. Louis intended to or did mistreat protesters.  ECF doc. 111-2. Of course, there was and is no evidence whatsoever that any City policymaker had any notice of these officers' intentions.  The district court accepted at face value the double hearsay of the federal indictment regarding these rogue officers' statements of the willingness of police officers generally to mistreat protesters or unlawfully seize their cell phones.  Memorandum and Order, ECF doc. 157, p. 2.

Plaintiff Lewczuk--added as a plaintiff after a different plaintiff was dropped from this case and commenced a damage suit--is a member of a cadre of self-appointed "observers" who take it upon themselves to attend selected mass protests for the express purpose of monitoring police activity.  ECF doc. 11-10 (Lewczuk declaration).  Such "observers" apparently are trained by the National Lawyers Guild, but the district court refused to allow discovery of any training materials. ECF doc. 143.  In any event, Lewczuk attested that she was on hand at various protests during the weekend of September 15-17.  She was arrested on the night of September 17.   She testified that she was "exposed" to mace and tear gas on the 15th and 17th, and apparently an officer directed mace at her once on the 15th.

There is no dispute that the police intended to and did arrest all persons caught within the encircling lines of officers at Tucker and Washington at approximately 11 p.m. on September 17.  Further, there is no dispute that a number of persons, including some plaintiffs' witnesses and plaintiff Lewczuk, were arrested, and some were maced in the process of the mass arrest.  See, e.g., ECF doc. 11-12 (Ziegler attached video).   However, the video record makes plain that any use of mace was in connection with the actual arrests of protesters, and there was no general deployment of chemical agents against any protest group as a whole.

There was evidence of two later protest situations, one involving the use of mace by an officer at a protest at Busch Stadium in downtown St. Louis on September 29, and another involving a mass arrest of protesters who blocked Highway 40 on October 3 and were arrested after they marched onto nearby Jefferson Avenue.  Although the district court seems to have ignored the evidence on this point, see ECF doc. 57 at p. 17, there is no dispute that the police had reason to believe that the crowd on Jefferson Avenue was the same group that had blocked the highway, although one plaintiffs' witness claimed that he had not blocked the highway but was arrested as he stood with the crowd on the sidewalk near the highway exit to Jefferson.  ECF doc. 62, pp. 116-17.  In any event, no mace or other chemical agents were used on October 3.

There was and is no evidence before the district court on the motion to certify that there have been any incidents of unlawful assemblies or deployment of chemical agents in connection with mass protests in the City of St. Louis since 2017.   There was very sparse evidence regarding police enforcement of unlawful assembly and impeding traffic flow laws in the past.  Some plaintiffs' witnesses testified to seeing chemical agents deployed against "peaceful" protesters in 2014 and 2015.  ECF doc. 62, pp. 69, 70-71, 113-15.

There is no contention that the formal, official policies of the City of St. Louis with regard to police use of force, the deployment of chemical agents in connection with crowd dispersal, or the recording of police conduct by citizens conform to the law.   Further, the district court did not find any constitutional flaw in the statute and ordinances that principally were relied on by the police in their (successful) efforts to prevent the protests from turning into full-scale riots.  (The text of the pertinent statutes and ordinances is included in the appendix to this petition.)

The City had been the target of one prior protest-related action involving the use of chemical agents, known as the *Templeton* case.  ECF doc. 57, pp. 20-22. The City entered into a consent settlement in that case.  The district court concluded that the City's entry into the consent settlement could be used as evidence against the City in this action, although the terms of the settlement had

11

been incorporated in standing police operations orders. The district court faulted the interpretation of the decree and the standing orders by police commanders, finding that the decree's provisions regarding the use of mace to disperse crowds were applicable to hand-held mace as well as all other chemical agents. ECF doc. 57, p. 42.

Based almost exclusively on plaintiffs' evidence of police misuse of "chemical agents" during the mass arrest on September 17, evidence of "vague and confusing" dispersal orders were given by police on several occasions, and also on a finding that mass protests were likely to continue in the City, the district court found sufficient evidence of an unconstitutional "custom" to warrant a preliminary injunction defining the manner in which the police could properly issue dispersal orders and use chemical agents to disperse mass protests, in the absence of violent conduct. ECF doc. 58.

Subsequent to the entry of the preliminary injunction, the parties concentrated efforts on settlement, and neither the parties nor the district court pressed the issue of class certification. In the meantime, several of the original class plaintiffs were dropped from the action and instituted actions for damages against the City (and various individual officers) based on almost identical claims of an unconstitutional city "custom." ECF doc. 95; see complaint filed in *Baude v. City of St. Louis,* 4:18-CV-1564 (E.D.Mo.). On May 7, 2019, acting on a renewed

motion to certify the class, the district court entered an order granting the motion

based on the preliminary injunction record and selected additional evidence

proffered by plaintiffs.  ECF doc. 157 (included as an Appendix to this petition).

Shortly thereafter, the court summarily denied the City's pending motion to

dissolve the preliminary injunction and to dismiss the action, which proffered

extensive additional evidence of the circumstances of the 2017 protests.  ECF doc.

159.

       The plaintiffs' second amended complaint (ECF doc. 90) alleges deprivation

of First, Fourth and Fourteenth Amendment rights premised on an alleged City

"custom" and "failure to train," and seeks the following relief:

B.     Issue a permanent injunction requiring the City of St. Louis to:

    a.     Declare protests "unlawful assemblies" and to order protesters "to disperse" in a constitutional manner and otherwise limit police activities at protests as required by the Constitution;

    b.     Refrain from deploying chemical agents without warning, provision of routes of egress, and a reasonable time to disperse, unless the person against whom the agents are deployed is currently engaging in force or violence;

    c.     Provide sufficient supervision to permit investigation of alleged misconduct related to patrol of First Amendment events, including disciplining officers who fail to wear visible badges; and

    d.     Provide adequate training to prevent the unconstitutional enforcement of Ords. 15.52.010 and 17.16.275 including:

13

        i.     Bias-free policing;

        ii.    Police First Amendment events;

        iii.   Principles of community policing; and

        iv.   Supervisor training;

C.    Make permanent the preliminary injunction issued on November 15, 2017 . . .

The class definition proposed by plaintiffs was "those individuals who will participate in expressive activity that is intended or perceived as a protest of police at a traditional or designated public forum within the City of St. Louis."  ECF doc. 110.  The district court, asserting that the case "does not include protesters engaged in violent, unlawful activity," and concluding that re-definition was necessary to "make the class more readily ascertainable," elected to re-define the class as follows:

> persons who will in the future participate in or observe non-violent public demonstrations and/or who record such public demonstrations and/or police activities at the public demonstrations for the exercise of constitutional rights of free speech and assembly in the City of St. Louis.  [ECF doc. 157, p. 6.]

## QUESTIONS PRESENTED

I.    Whether the district court's class certification order erred in failing to conduct the necessary "rigorous analysis" of the appropriateness of a class action under 42 U.S.C. §1983 based on an unconstitutional "custom," in light of a record demonstrating that the class representatives and the class itself, as defined by plaintiffs or the district court, presented wholly hypothetical and speculative claims of future irreparable harm,

14

did not lack adequate remedies at law, and presented no basis for federal equitable jurisdiction to impose federal judicial guidelines on police management of civil disorder situations.

II.     Whether the district court's class certification order and consequent proceeding with equitable claims under F.R.Civ.P. 23(b)(2) against a municipal defendant was an abuse of discretion in light of the clear and present danger of impairment of the defendant's right to trial by jury in numerous parallel actions for damages pending against the defendant and its officers, arising out of the identical constitutional claims and being prosecuted by members of the class as defined either by plaintiffs or the district court.

III.    Whether the district court's class certification order was an abuse of discretion in designating three persons as class representatives whose claims were highly fact-specific and atypical, including one individual who indisputably engaged in patent violation of law by direct interference with police in combination with other persons.

15

REASONS FOR GRANTING THE APPEAL

I.      THE APPEAL SHOULD BE GRANTED BECAUSE THE DISTRICT
COURT  ERRED IN FAILING TO CONDUCT THE NECESSARY
"RIGOROUS ANALYSIS" OF THE APPROPRIATENESS OF A CLASS
ACTION UNDER 42 U.S.C. §1983 BASED ON AN UNCONSTITUTIONAL
"CUSTOM," IN LIGHT OF A RECORD DEMONSTRATING THAT THE
CLASS REPRESENTATIVES AND THE CLASS ITSELF, AS DEFINED BY
PLAINTIFFS OR THE DISTRICT COURT, PRESENTED WHOLLY
HYPOTHETICAL AND SPECULATIVE CLAIMS OF FUTURE
IRREPARABLE HARM, DID NOT LACK ADEQUATE REMEDIES AT LAW,
AND PRESENTED NO BASIS FOR FEDERAL EQUITABLE JURISDICTION
TO IMPOSE FEDERAL JUDICIAL GUIDELINES ON POLICE
MANAGEMENT OF CIVIL DISORDER SITUATIONS.

In *Rahman v. Cherthoff,* 530 F.3d 622, 626 (7th Cir. 2008), Judge

Easterbrook observed, in reversing a class certification order, that a case relied on

by the plaintiffs was

> a relic of a time when the federal judiciary thought that structural injunctions
> taking control of executive functions were sensible. That time is past. The
> decrees issued in that case have been vacated, in decisions that also
> demonstrate the impropriety of certifying open-ended classes to facilitate
> structural injunctions designed to regulate law-enforcement practices.

Judge Easterbrook was perhaps too sanguine in his appreciation of the

passing of the era of structural injunctions, as the district court's orders in this case

suggest.  Nevertheless, Judge Easterbrook's rejection of the class certifications in

*Rahman* emphasizes the plain error committed by the district court in this case and

demonstrates why the City's petition to appeal under Rule 23(f) should be sustained.

The Supreme Court has made it plain that "rigorous analysis" is demanded in two areas of the law at issue here:  the prerequisites of Rule 23, and municipal liability for a "custom" under 42 U.S.C. §1983.  Compare *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338 (2011) with *Bd. of County Commissioners v. Brown,* 520 U.S. 397 (1997).  However, the district court's analysis falls far short in both areas, leading the district court to casually dismiss the City's objections to plaintiffs' standing.

The district court's conclusion that plaintiffs have standing in this case flies in the face of *O'Shea v. Littleton*, 414 U.S. 488 (1974), *Rizzo v. Goode*, 423 U.S. 362 (1976), and *City of Los Angeles v. Lyons,* 461 U.S. 95 (1983).  It likewise wholly disregards the teachings of this Court in *White v. Jackson,* 865 F.3d 1064 (8th Cir. 2017),  *Bernini v. City of St. Paul*, 665 F.3d 997 (8th Cir. 2012),  and *Elizabeth M. v. Montenez,* 458 F.3d 779 (8th Cir. 2006).  *O'Shea*, *Rizzo,* and *Lyons* all rest on the proposition that standing to seek injunctive relief against future law enforcement conduct depends on a showing of immediate, irreparable harm and a lack of an adequate remedy at law.  They recognize that injunctive relief, particularly where it would inject a federal court into the management of state and local law enforcement, is extraordinary and to be granted rarely.  In this respect,

17

the Supreme Court instructs that the standing inquiry "shades into" the inquiry as to whether the plaintiffs have shown the basic requirements for equitable relief. *O'Shea*, 414 U.S. 501-03.

Similarly, this Court's opinions in *Jackson* and *Bernini* teach that law enforcement tactics when confronting a potential riot situation must be tailored to the precise circumstances and assessed from the standpoint of officers in the field, not judges in courtrooms after the fact.

Plaintiffs and the district court sought to evade the standing issue in this case by invoking general principles of First Amendment standing and the alleged City "custom" of misusing mace and issuing "vague" dispersal orders to masses of protesters occupying City streets.  Yet the district court's redefinition of the plaintiff class, the class allegations pleaded by plaintiffs, and the terms of the preliminary injunction actually entered all reflect the central reality of plaintiffs' claims:  they are speculative.

The district court did not question the validity of the laws and ordinances primarily at issue, i.e., the Missouri unlawful assembly statute, Mo.Rev.Stat. 574.060, the City's unlawful assembly ordinance, City Code §15.52.010, and the City's impeding traffic ordinance, City Code §17.16.275.[3]  The statute and the

---

[3]  The City notes that an arrest is not to be judged by the officer's subjective reliance on a particular law; if there is probable cause or arguable probable cause to arrest or detain under any law applicable to the circumstances, an officer's actions are legitimate. E.g., *Lawyer v. City of*

18

ordinances are unquestionably valid.  Compare *Agnew v. District of Columbia,* 2019 US App LEXIS 10060 (D.C. Cir. 2019), with *Stahl v. City of St. Louis,* 687 F.3d 1038 (8th Cir. 2012).  Instead, plaintiffs and the district court focus on the manner in which City police have enforced them.  In doing so, however, they fail to recognize that plaintiffs' standing disappears.

Plaintiffs and the district court have transmuted standing to attack a vague law into standing to seek an injunction to control police discretion in enforcing a valid law.  The vagueness doctrine is aimed at laws that allow the police unfettered discretion to determine what constitutes a crime.  It simply does not apply to the myriad situations in which a police officer must exercise discretion in dealing with a violation of a law that tells him exactly what conduct is prohibited.  See *Duke v. City of Little Rock,* 902 F.3d 858 (8th Cir. 2018).

Every appellate case cited by plaintiffs and the district court in support of the claim of standing has involved a facial attack on a law's validity.  All of them seek to enjoin enforcement of the law or regulation in question.   E.g., *Phelps-Roper v. City of Manchester,* 697 F.3d 678 (8th Cir. 2012)(*en banc*).  None of them seeks a mandatory injunction establishing standing orders to be followed by officers in the

---

*Council Bluffs,* 361 F.3d 1099, 1106 (8th Cir. 2004).  The City also notes that the subjective motivation of an officer to punish constitutionally protected conduct by an arrest repeatedly has been held irrelevant if there is probable cause.  See *Peterson v. Kopp,* 754 F.3d 594, 599 (8th Cir. 2014); but cf. *Lozman v. City of Riviera Beach,* 138 S.Ct. 1945 (2018)(emphasizing evidence of direct involvement of policy-makers of city in directing an arrest as essential to municipal liability).

field when enforcing particular laws.  None of them approves a "script" for declaring unlawful assemblies or a rubric for when and how to apply mace. Finally, none of them purports to enjoin "punishing" anyone for exercising generic constitutional rights.  The reason is obvious:  no one can know in advance how police will or must react to a potential riot, or whether they will "punish" anybody.

Plaintiffs allege violations of First, Fourth and Fourteenth Amendment rights, but so did the plaintiffs in *O'Shea*, *Rizzo* and *Lyons*; so did the plaintiffs in *Elizabeth M. v. Montenez*.  To evade those cases, plaintiffs and the district court rely on a City "custom" of issuing "vague" dispersal orders and deploying "chemical agents" so as to "punish" protesters or disperse crowds in an unconstitutional manner.  Here, the rigorous analysis demanded by Rule 23 coincides with the rigorous analysis demanded for municipal liability under §1983.

The district court's findings show that the City's explicit policies regarding unlawful assemblies and policing civil disorder comport with constitutional standards.  However, the district court proceeds to rely on anecdotal evidence of use of mace and tear gas years in the past and a pedantic approach to dispersal orders[4] to justify the finding of an unconstitutional policy threatening future harm to plaintiffs.

---

[4]  The district court's handiwork in writing proper dispersal orders is itself an exercise in vagueness:  police must "specify with reasonable particularity" the place from which dispersal should occur, must give "audible and unambiguous" orders, must provide a "sufficient and

20

It is here that the confluence of *Wal-Mart*, *Lyons* and *Brown* demands more to show standing.  The district court made no finding that any City policymaker knew of or authorized any punishment of protesters, knew of or authorized any "vague" dispersal orders, or knew of or authorized the wholesale deployment of mace to disperse peaceful protesters (which never happened anyway).  What the district court did was to infer a City custom from actions of individual police officers at differing times and under differing circumstances.  Neither the plaintiffs nor the district court faulted City police conduct with regard to the assault on the Mayor's home; yet the police issued the same dispersal orders as they did in other instances.  Further, the video evidence offered by plaintiffs themselves shows no indiscriminate use of mace by all police officers all the time.  Rather, the video shows sporadic use, and at least in two instances (plaintiff Ahmad being one), use of mace was directed at persons then and there violating the law and refusing commands to desist.  This is not the stuff of which a "custom having the force of law" is made.

The only case clearly in support of the district court is *Multi-Ethnic Immigrant Workers Org. Net. v. City of Los Angeles,* 246 F.R.D. 621 (C.D. Cal. 2007).  Like the district court here, the court in *Multi-Ethnic* used past settlement agreements against the city defendant, and relied on other disparate acts of police

---

announced time," etc.--all with a "provided" that all bets are off in cases of "imminent threat" of violence.   ECF doc. 58, ¶5.  If the City's ordinance were so worded, what would the ACLU say?

21

officers, to find a "realistic threat" of repetition of allegedly unconstitutional behavior to establish standing, so as to distinguish *Lyons*.  However, the incident confronting the *Multi-Ethnic* court was dispersal of a demonstration taking place in a public park with a permit, and, further, the court relied heavily on the 9th Circuit's discredited class action analysis in *Dukes* in reaching its conclusions about class certification.  Neither *Multi-Ethnic* nor the district court's own prior erroneous unappealed precedent, *Abdullah v. St. Louis County,* 52 F.Supp.3d 936 (E.D.Mo. 2014), can or should be accepted by this Court.

Plaintiffs and the district court relied on this Court's decision in *Postawko v. Mo. Dept. of Corrections,* 910 F.3d 1030 (8th Cir. 2018); but the applicable precedent is actually *Elizabeth M*.  In the latter case, claims premised on the First, Fourth, Fifth, Ninth and Fourteenth Amendments were pleaded, but the relief sought was to have the court mandate and monitor a detailed program covering nearly every facet of the operation of state residential care facilities.  Citing *Rizzo v. Goode,* this Court vacated the class certification.  This Court recognized the limited nature of the merits inquiry under Rule 23, but nevertheless held that the rigorous analysis under the Rule compelled consideration of what the parties must prove, citing *Lyons* and *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83 (1998).  The importance of this rigorous analysis is heightened in the §1983 context because, unlike in the context of a Title VII "pattern and practice" claim, a

22

municipal employer is not liable for the conduct of employees under *respondeat superior*:  the municipal defendant must be shown to have caused a constitutional violation by deliberate conduct of its policymakers.  E.g., *Malone v. Hinman,* 847 F.3d 949 (8th Cir. 2017).

Another aspect of the decision to certify in this case is the district court's utter disregard of plaintiffs' failure to demonstrate the inadequacy of remedies at law.  The federal courts have rejected any notion that criminal penalties and civil liability are inadequate deterrents to unconstitutional conduct of local governments and their officers.  E.g., *O'Shea,* supra; *Vallario v. Vandehey,* 554 F.3d 1259, 1269-70 (10th Cir. 2009).  Indeed, the district court alluded to the indictments of the rogue officers in this case, but drew the wrong conclusion.  The fact that plaintiffs can point to no other comparable misdeeds by City police in civil disorder situations shows that criminal deterrents do work and that there is no "custom" of such outrageous conduct in the City's police division.

 As this Court observed in *Elizabeth M.*, before certifying a class seeking broad injunctive relief against a government agency, the district court must ensure that it has article III jurisdiction to entertain each claim asserted.  The district court in this case did not do so, and review by this Court is necessary.

II.     THE DISTRICT COURT'S CLASS CERTIFICATION ORDER AND CONSEQUENT PROCEEDING WITH EQUITABLE CLAIMS UNDER F.R.CIV.P. 23(b)(2) AGAINST A MUNICIPAL DEFENDANT WAS AN

23

ABUSE OF DISCRETION IN LIGHT OF THE DANGER OF IMPAIRMENT OF THE DEFENDANT'S RIGHT TO TRIAL BY JURY IN NUMEROUS PARALLEL ACTIONS FOR DAMAGES, PENDING AGAINST THE DEFENDANT AND ITS OFFICERS, ARISING OUT OF THE IDENTICAL CONSTITUTIONAL CLAIMS AND BEING PROSECUTED BY MEMBERS OF THE CLASS AS DEFINED EITHER BY PLAINTIFFS OR THE DISTRICT COURT.

A defendant, including a municipal defendant, in a §1983 action has an undoubted right to trial by jury. See *City of Monterey v. Del Monte Dunes,* 526 U.S. 687 (1999).   It is equally indisputable that the Seventh Amendment restricts a federal court's ability to decide equitable claims in a way that impairs a party's right to trial by jury.  See *Lytle v. Household Mfg., Inc.*, 494 U.S. 545 (1990). While this issue normally emerges when legal and equitable claims are joined in a single action, defendant submits that the principles enunciated in *Dairy Queen, Inc. v. Wood*, 369 U.S. 469 (1962) should have guided the district court in making a class certification determination here, and these principles counsel review by this Court of the certification decision, as the jury trial issue may well be an issue of first impression under Rule 23.

The district court gave short shrift to the City's concerns about proceeding with a class action for "prospective" injunctive relief when the same nucleus of fact has given rise to more than two dozen damage suits against the City and its police officers, claiming the existence of the same unconstitutional "custom" as alleged

24

here.  One of those cases is pending before the same district court, and plaintiffs in the certification proceedings here did not trouble to deny the symmetry of issues between their case and the damage suits.  The district court insisted that the preclusive effect of any judgment in this case should be determined later, in the damage cases; but this is backwards.  If the plaintiffs succeed in this case and induce the district court to find and conclude that the City does indeed have an unconstitutional "custom"--something the court is well on its way to doing--the City's defense of the damage suits on that issue will be crippled.  Cf. *Parklane Hosiery Co. v. Shore,* 439 U.S. 322 (1979).

In the usual case, when a class asserts claims for both injunctive relief and damages, the court can assess whether a class should even be certified under Rule 23(b)(2).  Cf. *Wal-Mart Stores, Inc. v. Dukes,* supra;  *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir. 1998).  It will not do to argue that plaintiffs here seek only prospective relief.  The central issue in this case is the existence of a City "custom" as asserted by plaintiffs and preliminarily found by the district court.  A judgment that there was and is such a custom will bind the City, given that the class as defined by the district court or by plaintiffs undoubtedly embraces any current damages plaintiff, and so preclusion would be a certainty, as there would be mutuality as a result of the class certification.  Indeed, plaintiffs' success on the merits in this case would presage the speedy assertion of a class claim for

25

compensatory damages--unless the City could successfully argue that the class

plaintiffs here have waived damages for the class, an argument not likely to be

successful.

Certification of a class action is not a matter of right; it is entirely

discretionary.  E.g., *Riffey v. Rauner,* 910 F.3d 314 (7th Cir. 2018).  Fairness to the

parties is an element of the class certification equation.  Surely where a class action

for injunctive relief threatens the fundamental right of trial by jury, a district court

should at least consider that factor. Thus, this case presents a serious question as to

whether plaintiffs' claims should be allowed to proceed as a class action, and this

Court should review the certification order under Rule 23(f).

III.   THE DISTRICT COURT'S CLASS CERTIFICATION ORDER WAS AN
ABUSE OF DISCRETION IN DESIGNATING THREE PERSONS AS CLASS
REPRESENTATIVES WHOSE CLAIMS ARE HIGHLY FACT-SPECIFIC AND
ATYPICAL, INCLUDING ONE INDIVIDUAL WHO INDISPUTABLY
ENGAGED IN PATENT VIOLATION OF LAW BY DIRECT INTERFERENCE
WITH POLICE IN COMBINATION WITH OTHER PERSONS.

In constitutional litigation of this sort, the federal courts apply the generally

accepted precepts of equity jurisprudence.  E.g., *Rizzo v. Goode,* supra; *Brown v.*

*Bd. of Education,* 394 U.S. 294 (1955).  Two elementary principles of equity have

been disregarded by the district court in designating plaintiff Ahmad as a class

representative:  he who comes into equity must come with clean hands, and he who

seeks equity must do equity.  Cf. *Prow v. Medtronic, Inc.,* 770 F.2d 117 (8th Cir.

26

1985).  Plaintiff Ahmad satisfies neither principle.[5]  She violated at least two valid and enforceable laws on September 15, 2017:  she intentionally stood in the middle of a public thoroughfare and blocked movement of a bus, and she interfered with officers who were doing their best to move the bus and disperse the crowd from the street.  See Mo.Rev.Stat. §574.010.1(2)(a)(peace disturbance by obstructing vehicular traffic).  The district court itself found that she was engaged in criminal activity when she was maced.  Memorandum & Order, ECF doc. 57, p. 43.

The district court's determination that Ahmad will fairly and adequately represent the class is thus fatally flawed.  Her claims are not typical; her situation was not and is not common to other members of the district court's expansive class.  She was not the subject of a vague order to disperse; she was not the subject of some cloud of gas or spray unleashed broadly on a group of otherwise peaceful protesters; she was not "observing" or recording a "demonstration."  The district court manifestly abused its discretion in appointing her to represent the district court's class.  See *Robinson v. Sheriff of Cook County,* 167 F.3d 1155, 1157 (7th Cir. 1999)("One whose own claim is a loser from the start knows that he has nothing to gain from the victory of the class, and so he has little incentive to assist or cooperate in the litigation; the case is then a pure class action lawyer's suit.")

---

[5]  This assumes standing; it is doubtful that any "chill" suffered by plaintiff Ahmad is objectively reasonable in any case so as to give her standing to attack the City's policing of civil disorder. Cf. *Missourians for Fiscal Accountability v. Klahr,* 830 F.3d 789, 800 (Arnold, dissenting).

27

Similarly, plaintiff Mobley should not have been designated to represent the class as defined by the district court.  By his own testimony, he was not engaged in recording the policing of a protest.  The encounter that he was observing was isolated and bore no resemblance to an encounter between a force of police and a First Amendment "demonstration."  Prel.Inj. Tr. (ECF doc. 62) p. 162, 167-69.  Assuming that a citizen has a First Amendment right to record police at any time and at any place, absent direct physical interference with an officer, but cf. *Colten v. Kentucky,* 407 U.S. 104, 110 (1972),  it does not follow that Mobley's experience displays the requisite commonality or typicality of the claims of persons within the district court's defined class.  Indeed, his claim goes well beyond the amended complaint's claims and the district court's defined class.  He was not arrested, and his cell phone was restored to him.  His complaint is not that he was prevented from recording a First Amendment demonstration, but that his recording of a street arrest was illegally seized and destroyed.

Finally, while it is a closer question, the designation of plaintiff Lewczuk is also an abuse of discretion.  Plaintiff Lewczuk is a member of a self-appointed group of First Amendment vigilantes, who profess not to "participate" in mass protests at all, but simply to "observe" the protest for police misconduct.  She has no more interest in the litigation than any citizen walking down the street at any time.  She was not herself maced when she was arrested on September 17,

28

although she claims to have been "exposed to" mace and tear gas at other times. So far as the record of the class certification motion is concerned, there is no evidence that she was prevented from recording police activities except to the extent that she was directed to turn off her cell phone when she was actually being arrested on September 17.

It is elementary that a Rule 23(b)(2) class must be "cohesive," because the essence of a such a class action is a claim that the defendant has acted or refused to act on grounds applying generally to the class.  E.g., *Postawko v. Mo. Dept. of Corr.,* supra, 910 F.3d 1039-40.   To survive the "rigorous" analysis demanded of class action plaintiffs, the plaintiffs must show that the certified class corresponds to the injuries received by the representative plaintiffs.  *Rahman v. Chertoff,* supra, 530 F.3d 626.  The district court simply failed to evaluate carefully the named plaintiffs' claims that they are truly representative of the class.  See *General Telephone Co. v. Falcon,* 457 U.S. 147 (1982).  The petition for review should be granted on this issue.

## RELIEF SOUGHT

For the foregoing reasons, petitioner City of St. Louis respectfully requests that this petition for review be granted, and that the order of the district court be reversed and cause be remanded with directions to dismiss for lack of standing.

29

Respectfully submitted,

JULIAN L. BUSH
CITY COUNSELOR
 /s/ Robert H. Dierker
 Robert H. Dierker 23671MO
 Associate City Counselor
 dierkerr@stlouis-mo.gov
 Brandon Laird 65564MO
 Associate City Counselor
 Abby Duncan 67766MO
 Assistant City Counselor
 Megan Bruyns 69987MO
 Assistant City Counselor
 Amy Raimondo 71291MO
 Assistant City Counselor
 1200 Market St.
 City Hall, Rm 314
 St. Louis, MO 63103
 314-622-3361
 Fax 314-622-4956

ATTORNEYS FOR APPELLANT

30

## CERTIFICATE OF SERVICE

I hereby certify that on this 21 day of May, 2019, a copy of the foregoing

petition to appeal under F.R.Civ.P. 23(f) was served on counsel of record for

appellee, Anthony Rothert, via e-mail and a paper copy was mailed via first class

mail, postage prepaid to said counsel at ACLU of Missouri Foundation, 906 Olive

Street, Suite 1130, St. Louis, MO  63101, arothert@aclu-mo.org.


  */s/Robert H. Dierker*
Associate City Counselor


## CERTIFICATION OF COMPLIANCE

<u>CERTIFICATION OF TYPE AND VOLUME LIMITATION</u>

I hereby certify that the text of the foregoing document contains 6,788 words

of proportionally spaced text as determined by the automated word count of the

Microsoft Word 2010 word processing system and has 14 point print size.

  *Robert H. Dierker*
Associate City Counselor

31